UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CRAIG GOULET, | ) | Civil Action No. 04-12577 JLT |
| | ) | |
| Plaintiff, | ) | JUDGE TAURO |
| | ) | |
| vs. | ) | **NOTICE OF FILING DEPOSITION** |
| | ) | **TRANSCRIPT OF PLAINTIFF** |
| NEW PENN MOTOR EXPRESS, INC., | ) | **CRAIG GOULET** |
| et. al., | ) | |
| | ) | |
| Defendants. | ) | |

Please take notice that on January 13, 2006, Defendant New Penn Motor Express, Inc.,

filed the complete deposition transcript of Plaintiff Craig Goulet with this Court.

Respectfully submitted,

/s/ Carl H. Gluek
T. Merritt Bumpass, Jr. (Ohio Bar # 0015189)
mbumpass@frantzward.com
Carl H. Gluek (Ohio Bar #0029531)
cgluek@frantzward.com
FRANTZ WARD LLP
2500 Key Center
127 Public Square
Cleveland, Ohio 44114-1230
(216) 515-1660
(216) 515-1650 (facsimile)

and

Nicholas A. Klinefeldt (BBO # 647422)
nklinefeldt@klhboston.com
KELLY, LIBBY & HOOPES, P.C.
175 Federal Street
Boston, Massachusetts 02110
(617) 338-9300
(617) 338-9911 (facsimile)

Attorneys for Defendant New Penn Motor
Express, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Notice of Filing Deposition Transcript served upon Scott A. Lathrop, Esq. of Scott A. Lathrop & Associates, Attorney for Plaintiff, 122 Old Ayer Road, Groton, MA 01450 and Kathleen Pennini, Esq. of Dwyer, Duddy, Facklam, Attorney for Teamsters Local 25, One Center Plaza, Suite 360, Boston, MA 02108, via electronic filing and ordinary U.S. mail, postage prepaid, this 13th day of January, 2006.

/s/ Carl H. Gluek
Carl H. Gluek, Esq.

1-107

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * *
                                  *
CRAIG GOULET,                     *
                                  *
      Plaintiff,                  *
                                  *
- vs. -                           *    C.A. # 04-12577-JLT
                                  *
NEW PENN MOTOR EXPRESS,           *
                                  *
and                               *
                                  *
TEAMSTERS LOCAL 25                *
INTERNATIONAL BROTHERHOOD OF      *
TEAMSTERS,                        *
                                  *
      Defendant.                  *
                                  *
* * * * * * * * * * * * * * * * * *
```

DEPOSITION of CRAIG GOULET, a witness called by and

on behalf of the defendants, pursuant to the provisions of

the Massachusetts Rules of Civil Procedure, before Michael

C. Janey, a Professional Reporter and Notary Public in and

for the Commonwealth of Massachusetts, at the offices of

Dwyer, Duddy and Facklam, P.C., Two Center Plaza, Suite

430, Boston, Massachusetts, 02108 on Tuesday, October 4,

2005, commencing at 10:05 a.m.

JANEY ASSOCIATES

P. O. Box 365355
Boston, MA 02136-0003
(617) 364-5555
Fax (617) 364-5550

APPEARANCES:

Scott A. Lathrop, Esquire, law office of SCOTT A. LATHROP, 122 Old Ayer Road, Groton, Massachusetts, 01450, (978) 448-8234; on behalf of the Plaintiff.

Kathleen A. Pennini, Esquire, law offices of DWYER, DUDDY AND FACKLAM, Two Center Plaza, Suite 430, Boston, Massachusetts, 02108, (617) 723-9777; on behalf of the Defendant, International Brotherhood of Teamsters, Local 25.

Carl H. Gluek, Esquire, law office of FRANTZ WARD, LLP, 2500 Key Center, 127 Public Square, Cleveland, Ohio, 44114-1230, (216) 515-1660; on behalf of Defendant, New Penn Motor Express.

Also Present: Mark Harrington

I N D E X

DEPOSITION OF:                                          Page

CRAIG GOULET

Examination by Ms. Pennini                                6

Examination by Mr. Gluek                                 65

Examination by Ms. Pennini                               96

Examination by Mr. Lathrop                              103


EXHIBITS:                                               Page

#1      (Grievance Decision)                             25

#2      (Grievance Report dated 4/7/03)                  41

#3      (Letter to M. Harrington from C. Goulet,
         dated 7/25/03)                                  42

#4      (Letter to M. Harrington from C. Goulet,
         dated 11/24/03)                                 49

JANEY ASSOCIATES

1          S T I P U L A T I O N S

2                    It is hereby stipulated and agreed by and

3          between counsel for the respective parties that the

4          reading and signing of the deposition by the witness

5          is not waived, but that the deposition may be signed

6          under the pains and penalties of perjury within

7          forty-five days of receipt of the transcript.

8                    It is further stipulated and agreed that

9          all objections, except as to the form of the

10         questions, and motions to strike shall be reserved

11         until the time of hearing or trial in this matter.

12                   CRAIG GOULET, having duly affirmed that

13         his testimony would be the truth, the whole truth, and

14         nothing but the truth, testified as follows in answer

15         to direct interrogatories:

16                   MS. PENNINI: Before we begin, do we

17         stipulate to the usual stipulations, objections except

18         as to form reserved until trial?

19                   MR. LATHROP: And motions to strike.

20                   MS. PENNINI: And motions to strike, I'm

21         sorry.  And regarding the signing of the deposition?

22                   MR. LATHROP: Mr. Goulet will read it and

23         sign it, and if we can waive the requirement that he

24         sign it in front of a notary and still simply sign it

1        under the pains and penalties of perjury, that would

2        be acceptable to me.

3                    MS. PENNINI: That's fine with me.

4                    MR. GLUEK: That's fine.

5                    MS. PENNINI: Will that be thirty days from

6        receipt of the deposition?

7                    MR. LATHROP: If we want to do it by

8        agreement, let's make it just forty-five.

9                    MS. PENNINI: Okay.  Forty-five days is

10       fine.

11                   MR. GLUEK: We don't have a motion date

12       pending, correct?

13                   MS. PENNINI: I'm sorry.

14                   MR. GLUEK: There is no motion date

15       pending.

16                   MR. LATHROP: I don't believe so.  I

17       believe all we have is November 1st.

18                   MR. GLUEK: Right.  That is our pretrial,

19       so conceivably this judge, he could schedule a very

20       short time line.

21                   MR. LATHROP: The flip side is he gave us

22       until the end of the month to complete discovery

23       anyway, so I don't think he could -- I mean, I would

24       support you and say, this is too short a deadline, we

1          don't even have the transcript back yet if he tries to

2          do it.

3                        MR. GLUEK: Okay.  That's fine.

4                        MS. PENNINI: I was under the impression

5          after the first scheduling conference that this is

6          more of a status conference to see whether discovery

7          has been completed before setting any additional

8          deadlines.

9                        MR. LATHROP: I'm sure that is the case.

10         Unlike other pretrial conferences in Massachusetts

11         where you establish in advance all the motion

12         deadlines and so forth.

13                        MS. PENNINI: Right, because we only solely

14         discussed discovery at the first scheduling

15         conference.

16                        MR. LATHROP: If you are concerned about

17         that I will support you in the notion that an early

18         cut off time is unfair to you.

19                        MR. GLUEK: Okay

20    EXAMINATION

21                  BY MS. PENNINI:

22    Q.          Could you please state your name?

23    A.          Craig Steven Goulet, Sr.

24    Q.          Could you spell your last name, please?

```
 1    A.              G-O-U-L-E-T.

 2    Q.              And where do you currently live?

 3    A.              305 Cox Street, Hudson, Massachusetts.

 4    Q.              Are you currently employed?

 5    A.              No.

 6    Q.              Are you currently a member of Teamsters Local

 7              25?

 8    A.              Yes, I am.

 9    Q.              How long have you been a member of Teamsters

10              Local 25?

11    A.              Since 1987.

12    Q.              Were you ever a member of any other Teamsters

13              local?

14    A.              Yes, I was.

15    Q.              And what local?

16    A.              Local 170.

17    Q.              When were you a member of Local 170?

18    A.              1979.

19    Q.              Until what time?

20    A.              Until 1987.

21    Q.              What employers did you work for while a member

22              of Local 170?

23    A.              I worked for McLean Trucking.

24    Q.              And where is that located?
```

```
 1    A.          It was on Route 20 in Shrewsbury.

 2    Q.          What did you do at McLean Trucking?

 3    A.          I worked on the loading dock.

 4    Q.          How long did you work there?

 5    A.          Off and on until they went out of business

 6                sometime in the early 80's.

 7    Q.          So beginning in '79?

 8    A.          Um-hum.

 9    Q.          Anyplace else?

10    A.          Pilot Freight Carriers.

11    Q.          And when did you work there?

12    A.          From 1979 until they went out of business.

13    Q.          So you ended your employment there because they

14                went out of business?

15    A.          Yes.

16    Q.          Anyplace else?

17    A.          Roadway Express.

18    Q.          And when did you work there?

19    A.          From 1979 until approximately 1984.

20    Q.          Did you work for McLean, Pilot, and Roadway all

21                at the loading dock?

22    A.          Yes.

23    Q.          And why did you stop working for Roadway

24                Express?
```

JANEY ASSOCIATES

```
 1    A.          I made the list with Sanborns Motor Express.

 2    Q.          I'm sorry, could you repeat that?

 3    A.          Sanborns.  I made the list, the seniority list

 4                with Sanborns Motor Express.

 5    Q.          And how is that related to Roadway?

 6    A.          Separate company.

 7    Q.          Did you work with these companies at the same

 8                time or one after the other?

 9    A.          No, I worked with them all at the same time.

10    Q.          And you said you made the seniority list with

11                Sanborn?

12    A.          Yes.

13    Q.          And how long did you work for Sanborn?

14    A.          I worked for Sanborns from 1984 up until the

15                time they were bought out by APA Transport.

16    Q.          And when was that?

17    A.          October, 1986.

18    Q.          What facility did you work for for Sanborn?

19    A.          Out of their Wrentham, Mass facility.

20    Q.          Did you work at Sanborn on the loading dock, as

21                well?

22    A.          I was a -- I worked the loading dock and I drove

23                for them.

24    Q.          Did you continue to work in Wrentham when you
```

| 1 | | began working for Sanborn Trucking -- I mean, when |
| 2 | | Sanborn was bought out by APA? |
| 3 | A. | No, I went to work at the APA Canton facility. |
| 4 | Q. | When did you begin work at APA in Canton? |
| 5 | A. | October of 1986. |
| 6 | Q. | How long did you work for APA? |
| 7 | A. | I worked for them from October, 1986 until March |
| 8 | | 11th, 1987. |
| 9 | Q. | And what happened on March 11th, 1987? |
| 10 | A. | I was involved in a industrial accident. |
| 11 | Q. | Could you explain this industrial accident for |
| 12 | | me, please? |
| 13 | A. | I was loading a -- unloading a truck with a |
| 14 | | forklift and the truck pulled away from the loading |
| 15 | | dock. |
| 16 | Q. | How did that result in injury to you? |
| 17 | A. | Myself and the forklift both went off the |
| 18 | | loading dock and I ended with a herniated disc in my |
| 19 | | neck, lower back, torn rotator cuff in my shoulder, |
| 20 | | torn ligament in my knee. |
| 21 | Q. | Did you go to the hospital on March 11th |
| 22 | | following this injury? |
| 23 | A. | Yes, I did. |
| 24 | Q. | And what hospital? |

JANEY ASSOCIATES

| 1  | A. | Goddard Memorial Hospital. |
|----|----|----|
| 2  | Q. | Where is Goddard Memorial? |
| 3  | A. | Stoughton. |
| 4  | Q. | Had you previously been terminated from your |
| 5  |    | employment at APA by letter on February 25th, 1987? |
| 6  | A. | Yes. |
| 7  | Q. | And what precipitated that termination? |
| 8  | A. | I think there was an argument between me and the |
| 9  |    | night boss, a disagreement. |
| 10 | Q. | Do you recall the date on which this argument |
| 11 |    | with the night boss happened? |
| 12 | A. | No, not offhand I don't. |
| 13 | Q. | Was it on February 25th? |
| 14 | A. | It could've been. |
| 15 | Q. | Could it have been before February 25th? |
| 16 | A. | I don't recall. |
| 17 | Q. | Had you ever received any written warnings from |
| 18 |    | the terminal manager at APA prior to February 25th? |
| 19 | A. | Yes, I had. |
| 20 | Q. | And for what reason were you given a written |
| 21 |    | warning? |
| 22 | A. | Misloading freight, I think. |
| 23 | Q. | Do you recall if there were any other |
| 24 |    | disciplinary issues while you were working for APA? |

1    A.         Yeah, I think there was.

2    Q.         Could you tell me what those are?

3    A.         Not offhand, no.

4    Q.         Do you recall approximately when they occurred?

5    A.         Sometime between October of '86 and March 11th

6          of '87.

7    Q.         Do you recall how many disciplinary issues you

8          had during that time?

9    A.         I do not.

10   Q.         Do you recall whether they were written warnings

11         or suspensions?

12   A.         There was a written warning.  May have been

13         several written warnings and a discharge.

14   Q.         And was the discharge you are speaking of the

15         one on February 25th?

16   A.         Yes.

17   Q.         Do you recall how your termination of February

18         25th was resolved?

19   A.         Yes.

20   Q.         How was it resolved?

21   A.         It went to the Joint Area Committee.

22   Q.         And what was the result?

23   A.         I was put back to work.

24   Q.         When did you come back to work after the

| 1 | | February 25th termination? |
|---|---|---|
| 2 | A. | I'm not sure offhand. |
| 3 | Q. | Do you recall whether it was in February or |
| 4 | | March? |
| 5 | A. | I believe it was March. |
| 6 | Q. | Do you recall if it was more than a week prior |
| 7 | | to March 11th? |
| 8 | A. | No, as I recall I think it was March 11th. |
| 9 | Q. | So you think you returned back to work on the |
| 10 | | day you were injured? |
| 11 | A. | Yes. |
| 12 | Q. | What time of the day was the accident with the |
| 13 | | forklift during the unloading of a truck? |
| 14 | A. | It was approximately 7:30 at night. |
| 15 | Q. | And you said after that you went to the Goddard |
| 16 | | Memorial Hospital in Stoughton? |
| 17 | A. | Yes. |
| 18 | Q. | Were you kept at the hospital? |
| 19 | A. | No. |
| 20 | Q. | What sort of procedures did they do when you |
| 21 | | were at the hospital during that night? |
| 22 | A. | They took an x-ray of my leg.  I believe they |
| 23 | | took an x-ray of my neck.  Told me to follow up with |
| 24 | | my doctor. |

JANEY ASSOCIATES

1   Q.        Did you inform APA of what had occurred at the

2             hospital?

3   A.        Yes.

4   Q.        And what did they tell you?  Did you return back

5             to work on March 12th?

6   A.        No.

7   Q.        And why didn't you return back to work on March

8             12th?

9   A.        I went out on an industrial accident, Workman's

10            Comp.

11  Q.        Had you informed APA that you were unable to

12            return to work on the 12th?

13  A.        Yes.

14  Q.        Were you soon thereafter terminated for the

15            events of March 11th, 1987?

16  A.        Yes.

17  Q.        And do you recall when you were terminated?

18  A.        March 12th.

19  Q.        Do you know what sort of Worker's Compensation

20            benefits you received?

21  A.        Partial disability.

22  Q.        And do you recall why you received partial

23            disability?

24  A.        I don't think I understand the question.

1    Q.        Do you understand the difference between partial

2              disability benefits and full disability benefits?

3    A.        Yes.

4    Q.        And starting soon after March 12th you began to

5              receive partial disability benefits?

6    A.        Yes.

7    Q.        Do you know why you received partial disability

8              benefits as opposed to full disability benefits?

9    A.        That's what the judge ordered.

10   Q.        And what judge was this?

11   A.        Judge Scannell.

12   Q.        When was that ordered by Judge Scannell?

13   A.        In June, 1987.

14   Q.        Is Judge Scannell an administrative law judge

15             for the Department of Industrial Accident?

16   A.        She was at the time, yes.

17   Q.        Did you file a grievance as a result of your

18             termination on March 12th?

19   A.        The union hall filed a complaint.  My business

20             agent at the time filed a complaint.

21   Q.        And who was the business agent?

22   A.        George Cashman.

23   Q.        Do you recall when this complaint was heard?

24   A.        Yes.

1    Q.              When was that?

2    A.              October 16th, 2001.

3    Q.              Could you tell me why there was a lapse of 14

4                    years between the time the complaint was filed and the

5                    date of the hearing in this matter?

6    A.              Because I was on Workman's Compensation, and the

7                    rules of procedure with the grievance committee

8                    stipulated that they wouldn't hear the case as long as

9                    it was pending in another venue.

10   Q.              Following the order of Judge Scannell in 1987,

11                   did you appeal her granting of partial disability

12                   benefits?

13   A.              Yes, I believe I did.

14   Q.              What was the result of that appeal?

15   A.              I'm not quite sure.

16   Q.              Did you continue to receive partial disability

17                   benefits?

18   A.              Yes, I did.

19   Q.              Do you recall whether there are any additional

20                   appeals besides the initial appeal?

21                         MR. LATHROP: You are speaking about the

22                   industrial accident?

23                         MS. PENNINI: I'm sorry, I'm speaking about

24                   the industrial accident appeal.

```
 1                    THE WITNESS: Yes, I believe there was.
 2                    BY MS. PENNINI:
 3    Q.        Do you recall how many appeals there were?
 4    A.        No.
 5    Q.        Were all the appeals filed by you or your
 6              attorney?
 7    A.        My attorney.
 8    Q.        And when were these appeals finally resolved
 9              with a final decision, do you recall?
10    A.        No.
11    Q.        Were there numerous appeals between 1987 and
12              2001?
13    A.        I don't know how many appeals there were, maybe
14              one.
15    Q.        And that was heard before 2001?
16    A.        Yes.
17    Q.        While you were receiving partial Worker's
18              Compensation benefits, did you hold any other
19              employment?
20    A.        No.
21    Q.        Did you look for additional employment between
22              March 11th, 1987 and October of 2001?
23    A.        No.
24    Q.        Did you seek any light duty work of any sort?
```

| 1  | A. | Yes. |
|----|----|------|

1    A.        Yes.

2    Q.        And where did you seek light duty work?

3    A.        With APA.

4    Q.        And what was their response, APA's response?

5    A.        APA's response was that I was discharged.  I was

6              a discharged employee.

7    Q.        When did you seek light duty work with APA?

8    A.        Sometime in early 1991 or 2 maybe.

9    Q.        Did you seek any light duty employment with any

10             other company?

11   A.        Nope.

12   Q.        In 1991-1992, had you received any documentation

13             from any doctor concerning your ability to return to

14             work?

15   A.        I don't recall.

16   Q.        Between 1987 and 1991, were there any

17             restrictions concerning your ability to work placed on

18             you by your doctor?

19   A.        Yes.

20   Q.        And what were those restrictions?

21   A.        That I was unable to work.

22   Q.        Can you be anymore specific?

23   A.        No, not offhand I can't.

24   Q.        Did you have any restrictions concerning the

```
 1              amount that you could lift?

 2   A.         Yes.

 3   Q.         And what was that restriction?

 4   A.         35 pounds.

 5   Q.         Do you recall any other restrictions?

 6   A.         No, I don't.

 7   Q.         Do you recall if there were more restrictions

 8              than you could not lift more than 35 pounds?

 9   A.         I don't recall offhand, no.

10   Q.         I'm sorry, you don't recall what the other

11              restrictions were or you don't recall whether there

12              was more than that one restriction?

13   A.         I don't recall at all.

14   Q.         So you do not recall whether there was -- I'm

15              just trying to understand you.  You do not recall if

16              there were any other restrictions?

17   A.         Yeah, I had a lot of doctor's reports.

18   Q.         Did you continue to receive health benefits

19              while you were on Worker's Compensation leave?

20   A.         I did up until a point, up until sometime.

21   Q.         And when was that time?

22   A.         It may have been a year after I got hurt.

23   Q.         Do you not recall the exact date?

24   A.         I can't be sure.  The health and welfare was
```

JANEY ASSOCIATES

1          paid on my behalf for a period of one year, so I was

2          covered for a year and then possibly six months after

3          that.

4     Q.        And after that time did you not have any health

5          benefits?

6     A.        I did not.

7     Q.        Did you receive any compensation in addition to

8          your partial disability benefits between the years of

9          1987 and 2001?

10    A.        Yes.

11    Q.        What form of compensation did you receive?

12    A.        Social Security Disability.

13    Q.        And when did you receive that, what years?

14    A.        I think it was 1995.

15    Q.        You began to receive it in '95 or you only

16         received it in 1995?

17    A.        No, I began to receive it in 1995.

18    Q.        Did you receive any other compensation besides

19         Social Security?

20    A.        No.

21    Q.        So just to be clear, between 1987 and 2001 the

22         only compensation that you received was from Social

23         Security Disability benefits and Worker's Comp partial

24         disability benefits?

```
 1    A.        Yes.

 2    Q.        Did you keep in contact with anyone at Teamsters

 3              Local 25 while you were out on Worker's Compensation

 4              leave?

 5    A.        Yes.

 6    Q.        With whom did you keep in contact?

 7    A.        I spoke with George Cashman over the years.

 8    Q.        Anybody else?

 9    A.        Mark Harrington.

10    Q.        Do you recall what years you spoke with Mark

11              Harrington?

12    A.        Sometime in 2001.

13    Q.        So the first time you spoke with Mark Harrington

14              was about 2001?

15    A.        Yeah.

16    Q.        Do you recall approximately when you would speak

17              to George Cashman?

18    A.        No, I don't remember approximately when.  Just

19              there was conversation over the years.  We talked.

20    Q.        How often did you speak with Mr. Cashman?

21    A.        About every few months.

22    Q.        Would you stop by the union hall to speak with

23              Mr. Cashman?

24    A.        I did.
```

1    Q.        Did you keep in contact with him through any

2              other means?

3    A.        No.

4    Q.        Would you ever telephone Mr. Cashman?

5    A.        Yes.

6    Q.        Besides George Cashman and Mark Harrington, did

7              you keep in contact with anyone else at Local 25?

8    A.        No.

9    Q.        How often would you go to the union hall during

10             that time?

11                  MR. LATHROP: I'm sorry, what time frame

12             are we talking about here?

13                  MS. PENNINI: I'm sorry, between 1987 and

14             2001.

15                  THE WITNESS: I don't recall.

16                  BY MS. PENNINI:

17   Q.        But occasionally you would go to the union hall?

18   A.        Occasionally, yes.  I used to stop by to pay my

19             dues, something like that.

20   Q.        Were you ever a steward for a Teamsters local?

21   A.        No.

22   Q.        What sorts of discussions would you have with

23             Mr. Cashman?

24   A.        I don't know offhand.

```
 1    Q.         You don't recall any general topics of
 2               conversations?
 3    A.         Nope.
 4    Q.         Would you ever discuss whether you would be
 5               returning back to work with Mr. Cashman?
 6    A.         Nope.
 7    Q.         Would you discuss what was going on with
 8               different employers over at Local 25 with Mr. Cashman?
 9    A.         Yeah, I think maybe I might've attended some
10               meetings.  You know, general union meetings.
11    Q.         Do you recall anything else concerning your
12               correspondence or interaction with Mr. Cashman between
13               1987 and 2001?
14    A.         No.
15    Q.         And you said you began to speak or see
16               Mr. Harrington in 2001?
17    A.         Yes.
18    Q.         Do you recall why you began to speak with
19               Mr. Harrington?
20    A.         I had exhausted all my partial disability
21               benefits.
22    Q.         Okay.  And how is that related to
23               Mr. Harrington?
24    A.         Well in order to have my discharge case heard at
```

```
 1              the panel, I needed to discuss it with Mr. Harrington
 2              who was the business agent at that time.
 3    Q.        And you said you had exhausted your partial
 4              disability benefits, could you explain to me what you
 5              mean by that?
 6    A.        My benefits came to an end.
 7    Q.        Is that because you had received a certain
 8              number of weeks of benefits?
 9    A.        Yes.
10    Q.        And you said you contacted Mr. Harrington
11              because you wanted your grievance to be heard?
12    A.        Yes.
13    Q.        Was your grievance subsequently heard?
14    A.        Yes, it was.
15    Q.        And what's the date of that?
16    A.        October 16th, 2001.
17    Q.        Where was this grievance heard?
18    A.        At the union hall.
19    Q.        Do you recall who it was heard by?
20    A.        It was heard by the committee.
21    Q.        And what committee was this?
22    A.        It was the Southern New England Joint Area
23              Committee.
24    Q.        And you said it was held at the union hall,
```

```
 1              which union hall are you referring to?
 2    A.        At the Teamsters Local 25.
 3    Q.        Do you recall what the result of this hearing
 4              was?
 5    A.        Yes.
 6    Q.        And what was the result?
 7    A.        My seniority was reinstated.
 8    Q.        Do you recall anything else concerning the
 9              result of the Joint Area Committee grievance decision?
10    A.        No.
11                        MS. PENNINI: Can I just have one second?
12                        (A brief recess was taken)
13                        MS. PENNINI: Could I have this marked as
14              an Exhibit, please?
15                               (The document above-referred
16                               to was marked Deposition
17                               Exhibit No. 1 for Identification)
18              BY MS. PENNINI:
19    Q.        If you could please look at deposition Exhibit
20              1, Mr. Goulet?
21    A.        Yeah.
22    Q.        Have you seen this document before?
23    A.        Yes, I have.
24    Q.        Could you tell me what this document is?
```

1  A.        It's the decision from the Southern New England

2            Committee.

3  Q.        When did you first see this decision?

4  A.        When it was mailed to me.

5  Q.        And do you recall approximately when you

6            received it?

7  A.        Yeah, maybe two weeks after the hearing.

8  Q.        Could you explain to me what the decision was?

9            MR. LATHROP: Objection.

10           THE WITNESS: The decision was, put me back

11           on the seniority list and it states that upon me

12           giving the company documentation of my ability to work

13           to unrestricted duties, I had to serve a 10-day

14           suspension.

15           BY MS. PENNINI:

16  Q.       Did you ever submit any documentation to APA

17           regarding your ability to return to unrestricted

18           duties?

19  A.        No.

20  Q.        Did you ever serve a 10-day suspension at APA?

21  A.        No.

22  Q.        Did you understand this decision to immediately

23           reinstate you onto the seniority list for APA?

24  A.        Yes, I did.

JANEY ASSOCIATES

```
 1     Q.          Did you --

 2     A.          I received a phone call by Bill Carnes --

 3     Q.          I'm sorry, I'm asking you a question.

 4                 MR. LATHROP: But nonetheless, if he needs

 5                 to expand upon his answer he has a right to do that.

 6                 MS. PENNINI: Well I will allow you to do

 7                 that in one second.  I'm sorry, I was in the middle of

 8                 trying to get a question out.

 9                 BY MS. PENNINI:

10     Q.          So you said that you believed your seniority was

11                 immediately reinstated and you should have been placed

12                 on the seniority list immediately upon the decision of

13                 the New England Joint Area Grievance Committee?

14     A.          I was put back on the seniority list

15                 immediately.

16     Q.          How do you know that you were immediately put

17                 back on the seniority list?

18     A.          I received a phone call from Bill Carnes --

19     Q.          And what did Bill --

20     A.          -- that afternoon, and also from Mr. Harrington.

21     Q.          I'm sorry, what afternoon?

22     A.          The afternoon they heard the case on October

23                 16th, congratulating me and telling me that I won.

24     Q.          Did you receive one phone call or two separate
```

JANEY ASSOCIATES

1          phone calls?

2    A.       Two separate phone calls.

3    Q.       Do you recall what Mr. Carnes had said during

4          his phone call?

5    A.       "Congratulations, you won your case."

6    Q.       Did he explain to you what the decision said?

7    A.       Yes.

8    Q.       And what did he say?

9    A.       He said, "You have to serve a 10-day suspension

10        before you can go back to work."

11   Q.       Did Mr. Carnes tell you that you had been placed

12       back on the seniority list?

13   A.       Yes, that was my understanding.

14   Q.       Did he say that?

15   A.       I believe he did.

16   Q.       You don't recall whether he said precisely, "You

17       have been returned to the seniority list at APA Canton

18       facility."?

19   A.       Precisely, I do not know.

20   Q.       And you said you also received a call from

21       Mr. Harrington?

22   A.       Yes.

23   Q.       Could you tell me what Mr. Harrington said to

24       you on the phone that day?

| 1 | A. | Basically, the same. You know, it had the same |
|---|---|---|
| 2 | | context. It was, "You won your case. |
| 3 | | Congratulations, you won your case." |
| 4 | Q. | Did Mr. Harrington say anything else? |
| 5 | A. | Nope. |
| 6 | Q. | Did he tell you you would have to serve a 10-day |
| 7 | | suspension? |
| 8 | A. | Yes, I believe he did. |
| 9 | Q. | Did he tell you you were back on the seniority |
| 10 | | list at APA? |
| 11 | A. | Yes, I believe he did. |
| 12 | Q. | Do you recall whether he said, "You're back on |
| 13 | | the seniority list."? |
| 14 | A. | No, I don't recall. |
| 15 | Q. | Did you ever work for APA after October 16th, |
| 16 | | 2001? |
| 17 | A. | No. |
| 18 | Q. | Did you ever see a seniority list for the APA |
| 19 | | terminal in Canton, Massachusetts with your name on |
| 20 | | the seniority list? |
| 21 | A. | Yes. |
| 22 | Q. | Were you working at APA at the time that it |
| 23 | | ceased operating? |
| 24 | A. | No. |

JANEY ASSOCIATES

1    Q.        Do you know when APA ceased its operations?

2    A.        Sometime in February of 2002.

3    Q.        And how did you learn that APA was closing its

4              operations?

5    A.        I had spoke with the steward.

6    Q.        Did the steward call you to inform you?

7    A.        Yes, he did.

8    Q.        And who was the steward?

9    A.        Doug Francie.

10   Q.        Do you recall when he called you?

11   A.        No.  Approximately -- there may have been

12             several phone calls.  One initially is the word, "Get

13             out, that the company was closing."

14   Q.        And Francie called you to let you know the

15             company was closing?

16   A.        I think probably I called him initially.

17   Q.        How did you get word that APA was closing?

18   A.        Someone called me.

19   Q.        Do you recall who called you?

20   A.        My sister-in-law.

21   Q.        And how did your sister-in-law know that APA was

22             closing?

23   A.        She worked for a company and had spoke with

24             another truck driver.

```
 1    Q.            Your sister-in-law worked for APA, is that what

 2          you said?

 3    A.            No, she worked for another company.

 4    Q.            What company did she work for?

 5    A.            Vincent Metal Goods.

 6    Q.            Vincent Metal Goods, is that what you said?

 7    A.            Yeah, um-hum.

 8    Q.            And she became aware that APA was closing?

 9    A.            Yes.

10    Q.            And could I have your sister-in-law's name?

11    A.            Dawn.

12    Q.            And her last name?

13    A.            Goulet.

14    Q.            Is it D-A-W-N?

15    A.            Yes.

16    Q.            And Goulet as you previously spelled it?

17    A.            Um-hum.

18    Q.            Where is Vincent Metal Goods located?

19    A.            I believe they're in Fort Devins now at Devins.

20          They were in Marlboro at the time.

21    Q.            So after your sister-in-law informed you that

22          APA was closing you called Doug Francie?

23    A.            Yes.

24    Q.            How did you know to contact Doug Francie?
```

JANEY ASSOCIATES

| 1  | A.  | Doug Francie was the union steward. |
|----|-----|-------------------------------------|
| 2  | Q.  | And where was he the union steward for? |
| 3  | A.  | For APA, at the Canton facility. |
| 4  | Q.  | How did you know that he was the APA union |
| 5  |     | steward at the Canton facility? |
| 6  | A.  | As I said, I had been to union meetings and kept |
| 7  |     | in contact with the -- you know, other workers. |
| 8  | Q.  | Other workers at APA? |
| 9  | A.  | Yes. |
| 10 | Q.  | What other workers did you keep in contact with? |
| 11 | A.  | Jerry Hurley was a mechanic.  I'd spoke with |
| 12 |     | Kevin Power over the years. |
| 13 | Q.  | Are Jerry Hurley and Kevin Power both APA |
| 14 |     | workers at the Canton facility? |
| 15 | A.  | Yes. |
| 16 | Q.  | I'm sorry, go on, I didn't mean to interrupt |
| 17 |     | you. |
| 18 | A.  | There was another fellow, Mike Cruz, drove a |
| 19 |     | truck in the Hudson area.  I would see him from time |
| 20 |     | to time. |
| 21 | Q.  | Was he at the APA Canton facility as well? |
| 22 | A.  | Yes. |
| 23 | Q.  | How did you get Doug Francie's telephone number? |
| 24 | A.  | Oh, I had the phone number. |

| 1 | Q. | Did you call him at home? |
|---|---|---|

1    Q.        Did you call him at home?

2    A.        Yes.

3    Q.        How did you have his home phone number?

4    A.        As I said, he was the union steward.

5    Q.        Had you known Doug Francie prior to February of

6             2002?

7    A.        Yes.

8    Q.        And how did you know him?

9    A.        I worked with him at Sanborns Motor Express.

10   Q.        What did you speak with Mr. Francie about?

11   A.        Well it was general conversation about the

12            company was closing.

13   Q.        Did you tell Mr. Francie you had heard that the

14            company was closing?

15   A.        Yes.

16   Q.        Do you recall what else you said to him?

17   A.        We just discussed in general the fact that the

18            company was going out of business.

19   Q.        Did you ask Mr. Francie if you could be put on a

20            call list for New Penn Motor Express?

21   A.        Doug Francie called me -- Doug Francie called

22            me, and I'm going to say it was probably February 15th

23            or 16th, maybe the 17th.

24   Q.        And what did he say to you?

| | | |
|---|---|---|
| 1 | A. | He relayed to me that there was a meeting with |
| 2 | | the APA men and he wanted to know what my call list |
| 3 | | preference was. |
| 4 | Q. | Did he tell you whether or not you were on his |
| 5 | | list of people to determine what their preference for |
| 6 | | a call list facilities were? |
| 7 | A. | Yes. |
| 8 | Q. | He said you were on the list? |
| 9 | A. | I believe that's why he called me. |
| 10 | Q. | So Mr. Francie said he thought you were on the |
| 11 | | Canton facility call list and, therefore, called you |
| 12 | | to find out your terminal preference, is that an |
| 13 | | accurate statement? |
| 14 | A. | Not entirely. |
| 15 | Q. | Okay. |
| 16 | A. | I was on the Canton seniority list, the APA |
| 17 | | Canton seniority list. |
| 18 | Q. | Okay. |
| 19 | A. | And he called me to ask me what my preference |
| 20 | | would be as far as the New Penn call list went. |
| 21 | Q. | And your conversation with Mr. Francie, when you |
| 22 | | called him, do you recall what date that occurred on? |
| 23 | A. | I don't offhand recall, no. |
| 24 | Q. | But you believe you spoke with him on February |

| 1 | | 15th or possibly the 16th or the 17th? |
|---|---|---|
| 2 | A. | I'm going to say it was the 17th of February. |
| 3 | Q. | That you spoke with Mr. Francie? |
| 4 | A. | Yes. |
| 5 | | MR. GLUEK: Could you say what year it is? |
| 6 | | MS. PENNINI: I'm sorry. |
| 7 | | BY MS. PENNINI: |
| 8 | Q. | Was it February 17th of 2002? |
| 9 | A. | Yes, 2002. |
| 10 | Q. | Do you know for sure that it was February 17th, |
| 11 | | 2002? |
| 12 | A. | I'm pretty sure it was February 17th, 2002, yes. |
| 13 | Q. | But it may have been the 16th or the 15th? |
| 14 | A. | No, it was after the 16th. |
| 15 | Q. | And how do you know it was after the 16th? |
| 16 | A. | Because they had a meeting at the union hall and |
| 17 | | he called me after the meeting. |
| 18 | Q. | Do you know the date of the meeting at the union |
| 19 | | hall? |
| 20 | A. | February 16th. |
| 21 | Q. | Did you receive any notification regarding the |
| 22 | | closure of APA in the mail? |
| 23 | A. | Yes. |
| 24 | Q. | When did you receive this notification? |

JANEY ASSOCIATES

1    A.        Sometime in February of 2002.

2    Q.        And by whom was this information sent?

3    A.        Local 25.

4    Q.        After you gave Mr. Francie your terminal

5              preference, did you ever check with Local 25 to make

6              sure that your name was on the call list for New Penn?

7    A.        I made a follow up phone call, I did, to the

8              union hall, yes.

9    Q.        Do you recall with whom you spoke?

10   A.        Mark Harrington.

11   Q.        And when was that?

12   A.        Sometime in March.

13   Q.        In March of what year?

14   A.        2002.

15   Q.        Do you recall what you spoke about during this

16             telephone call?

17   A.        Yes.

18   Q.        And what was that?

19   A.        With regards to the call list and what was going

20             on with the APA people and New Penn agreement.

21   Q.        In February and March of 2002, had you been

22             medically cleared to return to work?

23   A.        No.

24   Q.        Besides your telephone conversation with Mark

JANEY ASSOCIATES

```
 1              Harrington in March of 2002, did you have any other

 2              contact with Local 25?

 3    A.        Yes.

 4    Q.        What sort of contact did you have?

 5    A.        When I spoke with Mr. Harrington he told me that

 6              he no longer handled the men at APA, and I would have

 7              to speak with Bill Carnes.

 8    Q.        And when did this occur?

 9    A.        Sometime right around March.

10    Q.        March of?

11    A.        2002.

12    Q.        Was this during the same conversation that you

13              spoke about previously where you asked Mr. Harrington

14              about the call list?

15    A.        Yes.

16    Q.        Did you have any additional contact with anyone

17              at Local 25 after --

18    A.        Not that I recall.

19                   MR. LATHROP: Let her finish the question.

20                   BY MS. PENNINI:

21    Q.        After March of 2002?

22    A.        Yes.

23    Q.        What contact did you have?

24    A.        There were several phone calls to Bill Carnes.
```

| 1 | Q. | When did these phone calls occur? |
|---|---|---|

2    A.        I can't be sure right offhand.

3    Q.        Can you tell me, did you have any contact with

4             Mr. Carnes during the spring of 2002?

5    A.        Yes.

6    Q.        What sort of contact did you have with him

7             during the spring of 2002?

8    A.        With regards to the agreement that they had with

9             the New Penn people.

10   Q.        What did he tell you concerning the agreement

11             with the New Penn people?

12   A.        He said that he was going to look into it.

13   Q.        Did you only have one conversation with

14             Mr. Carnes during the spring of 2002?

15   A.        No, I don't think so.  There was probably two.

16   Q.        Two conversations?

17   A.        Yeah.

18   Q.        And what did you speak about during the second

19             conversation?

20   A.        Same issues.

21   Q.        Did you have any contact with him during the

22             summer of 2002?

23   A.        Yes.

24   Q.        What did you speak about during the summer of

1              2002?

2    A.        More follow up, more of the same.

3    Q.        During the summer of 2002, had you been

4              medically cleared to return to work?

5    A.        No.

6    Q.        Did you alert Mr. Carnes that you had not been

7              medically cleared to return to work?

8    A.        No.

9    Q.        Did you tell Mr. Carnes whether you had ever

10             served your 10-day suspension with APA?

11   A.        No.

12   Q.        And approximately how often did you speak to him

13             during the summer of 2002?

14   A.        Several times.  Two.

15   Q.        Several times or two times?

16   A.        Two times.

17   Q.        Did you speak to him during the fall of 2002?

18   A.        I don't recall.

19   Q.        The winter of 2002?

20   A.        I can't be sure.

21   Q.        You are not sure whether you had any contact

22             with Mr. Carnes during the winter of 2002?

23   A.        No, we had -- like I said, we had conversations

24             throughout the year.  There was initial phone call,

```
 1              follow up phone call, subsequently I think there was a
 2              third phone call in the spring of 2002, March.
 3      Q.      Had you been medically cleared to return to work
 4              during the winter of 2002?
 5      A.      No.
 6      Q.      Had you been medically cleared to return to work
 7              prior to March 1st of 2003?
 8      A.      No.
 9      Q.      And you said you spoke with Mr. Carnes in March
10              of 2003?
11      A.      Yes.
12      Q.      What sort of contact did you have with
13              Mr. Carnes?
14      A.      I called him, it was probably March 31st, 2003
15              when the agreement expired.
16      Q.      What agreement are you --
17      A.      The agreement that the New Penn people had with
18              the Teamsters negotiating committee, the freight
19              industry negotiating committee and the APA operation.
20      Q.      What else did you discuss during this
21              conversation?
22      A.      The fact that I hadn't been called.
23      Q.      And what did Mr. Carnes tell you?
24      A.      He told me to send a grievance in.
```

```
1    Q.           And did you send a grievance into Mr. Carnes?

2    A.           I did.

3                       MS. PENNINI: Would you mark this as an

4          Exhibit, please?

5                            (The document above-referred

6                            to was marked Deposition

7                            Exhibit No. 2 for Identification)

8                  BY MS. PENNINI:

9    Q.           If you could please look at deposition Exhibit

10         No. 2?

11   A.           Um-hum.

12   Q.           Have you seen this document before?

13   A.           Yes.

14   Q.           Were you the author of this document?

15   A.           Yes.

16   Q.           Could you please tell me what this document is?

17   A.           It's a grievance.

18   Q.           A grievance concerning what?

19   A.           It's a grievance concerning my seniority rights.

20   Q.           I'm sorry, what do you mean by "a grievance

21         concerning your seniority rights"?

22   A.           Just as it states.  Would you like me to read

23         it?

24   Q.           Sure.
```

1    A.          Okay.  "In accordance with the National Master

2                Freight Agreement, Article V, and all of Article V

3                subsections, along with the New England Supplemental

4                Freight Agreement, Article No. XLIII, Seniority,

5                including all of Article XLIII subsections, I am

6                filing a grievance against New Penn Motor Express to

7                include all time lost, back pay, seniority and

8                contractual benefits under the contract agreement from

9                March 1st, 2002 up to and continuing past March 1st,

10               2003 based on the agreement between TNFINC and New

11               Penn Motor Express as a result of the closure of APA

12               operations."

13   Q.          And had you been medically cleared to work

14               between March 1st, 2002 and March 1st, 2003?

15   A.          No.

16                    MS. PENNINI: If I could just have one

17               second.  Would you please mark that as an Exhibit,

18               please?

19                              (The document above-referred

20                               to was marked Deposition

21                               Exhibit No. 3 for Identification)

22                    BY MS. PENNINI:

23   Q.          Did you have any additional contact with

24               Mr. Carnes following your March 31st telephone

JANEY ASSOCIATES

1                conversation with him?

2     A.          I filed a grievance with him.

3     Q.          When was this grievance filed?

4     A.          November 7th.

5                MR. LATHROP: November?

6                THE WITNESS: I mean, April 7th.

7                BY MS. PENNINI:

8     Q.          And did you have any contact with Mr. Carnes

9                following your sending of the April 7th, 2003

10              grievance?

11    A.          No.

12    Q.          Did you attempt to contact Mr. Carnes at anytime

13              after the time you sent the April 7th, 2003 grievance?

14    A.          No, I did not.

15    Q.          Following the sending of the April 7th, 2003

16              grievance, what was the next time you had any contact

17              with anyone at Local 25?

18    A.          I spoke to Mark Harrington.

19    Q.          And when did you speak with Mark Harrington?

20    A.          Sometime after May 2nd, 2003.

21    Q.          Why did you speak with Mark Harrington after May

22              2nd, 2003?

23    A.          Bill Carnes had left office.

24    Q.          How did you know to contact Mr. Harrington?

1   A.        Mr. Harrington was the business agent that was

2             put in charge of the New Penn people.

3   Q.        How did you know that Mr. Harrington had been

4             put in charge of the New Penn employees?

5   A.        I don't recall.

6   Q.        Sorry, just to back up a little bit. Before you

7             sent Mr. Carnes your April 7th, 2003 letter, did you

8             inform Mr. Carnes that you were on an APA seniority

9             list?

10  A.        Yes.

11  Q.        And did you speak with Mr. Carnes during the

12            spring of 2003, on March 31st I believe you said it

13            was, 2003?

14  A.        Yes.

15  Q.        Did you speak with him at all about your

16            October, 2001 grievance decision?

17  A.        No.

18  Q.        So Mr. Carnes was not aware of whether you had

19            been medically cleared to work or had served the

20            10-day suspension as of March 31st, 2003?

21  A.        I don't know what Mr. Carnes knew, what he was

22            aware of. I have no idea.

23  Q.        You said you spoke with Mr. Harrington sometime

24            after May 2nd, 2003?

```
 1   A.          Yes.

 2   Q.          What sort of contact did you have with

 3               Mr. Harrington?

 4   A.          It was a follow up conversation with regards to

 5               the grievance I filed.

 6   Q.          A telephone call?

 7   A.          Yes.

 8   Q.          And do you recall when this telephone call

 9               occurred?

10   A.          Sometime after Bill Carnes had left office.

11   Q.          Do you recall when after May 2nd, 2003 such

12               contact occurred?

13   A.          No, not exactly.

14   Q.          Do you recall what you said during this -- was

15               it a telephone conversation?

16   A.          It was a telephone conversation, yes.

17   Q.          And do you recall what you said during this

18               telephone conversation?

19   A.          Regarding my grievance, "What was the status of

20               my grievance?".

21   Q.          Did you specifically ask Mr. Harrington what was

22               the status of your grievance?

23   A.          Yes.

24   Q.          And what did Mr. Harrington say?
```

JANEY ASSOCIATES

1    A.          He said he didn't -- wasn't aware of a

2               grievance.

3    Q.          Do you recall whether this conversation took

4               place during the summer of 2003?

5    A.          It was in May.  As I said, after Mr. Carnes left

6               office I was calling to follow up on the status of the

7               grievance.

8    Q.          At this time did Mr. Harrington ask you if you

9               had been medically cleared to return to work?

10   A.          No.

11   Q.          Did you tell Mr. Harrington whether you had been

12              medically cleared to work?

13   A.          No.

14   Q.          Did you tell Mr. Harrington whether you had

15              served the 10-day suspension?

16   A.          No.

17   Q.          Did he ask you about the 10-day suspension that

18              was listed in the decision of October 16th, 2001?

19   A.          I think he -- he may have mentioned it, yes.

20   Q.          Do you recall what he said concerning that

21              suspension?

22   A.          He said that I had a 10-day suspension to serve.

23   Q.          During this May conversation Mr. Harrington told

24              you you had to serve a 10-day suspension?

```
 1    A.          Yes.

 2    Q.          Did he tell you -- I'm sorry, strike that.  Did

 3                you have any subsequent contact with Mr. Harrington

 4                following the May, 2003 telephone conversation?

 5    A.          Yes, I forwarded him copies of the grievance.

 6    Q.          And when did you do that?

 7    A.          Initially, probably right in May.  And then

 8                there was follow up conversation in July, a telephone

 9                conversation.

10    Q.          Do you recall when in July you had this follow

11                up conversation?

12    A.          Maybe a week before I wrote the letter.

13    Q.          Do you recall whether it was a week before you

14                wrote the letter?

15    A.          Yeah, it was probably a week before I wrote the

16                letter.

17    Q.          And what did you speak about during this

18                conversation?

19    A.          The grievance.

20    Q.          Did Mr. Harrington tell you that there might be

21                an issue with the grievance because you had not been

22                medically cleared to return to work?

23    A.          No.

24    Q.          I'm sorry, Mr. Harrington did not mention that?
```

1    A.        Nope.

2    Q.        Did Mr. Harrington say anything concerning the

3              10-day suspension that you had spoken about during the

4              May, 2003 telephone call?

5    A.        No, I don't think so.

6    Q.        So what did Mr. Harrington speak about during

7              this telephone conversation?

8    A.        We were trying to find out what became of the

9              grievance that was filed.

10   Q.        And was there any resolution concerning what had

11             happened to the grievance you had sent in April of

12             2003?

13   A.        I had sent him copies of it.

14   Q.        But was there any resolution?

15   A.        It was to my understanding that he was

16             negotiating with the company over the grievance.

17   Q.        And by "the company" do you mean New Penn Motor

18             Express?

19   A.        Yes.

20   Q.        If you could please look at deposition Exhibit

21             No. 3?  If you could look at the second paragraph, it

22             starts with "Let's not lose sight of the real issue

23             here"?

24   A.        Um-hum.

```
 1    Q.              And in this paragraph you speak about the issue

 2                    being seniority rights not whether you were capable of

 3                    returning to work, or capable of working, is that

 4                    correct?

 5    A.              That's what it says.

 6    Q.              Do you recall why you wrote this paragraph?

 7    A.              I don't recall exactly what my thought process

 8                    was at the time, no.

 9    Q.              Had you ever had a conversation with

10                    Mr. Harrington in which he discussed that there would

11                    be an issue concerning whether or not you were capable

12                    of returning to work?

13    A.              No.

14    Q.              Did you think there was an issue concerning

15                    whether you were medically capable of returning to

16                    work?

17    A.              No.

18                         MS. PENNINI: Please mark this as an

19                    Exhibit?

20                              (The document above-referred

21                               to was marked Deposition

22                               Exhibit No. 4 for Identification)

23                    BY MS. PENNINI:

24    Q.              Did you have any additional contact with
```

JANEY ASSOCIATES

1          Mr. Harrington during the summer of 2003 besides the

2          July telephone conversation you spoke about and the

3          letter of July 25th, 2003?

4     A.        Yes, I believe there was another phone call.

5     Q.        And when was this phone call?

6     A.        Oh, I can't be sure.

7     Q.        Can you give me an approximate date, was it

8          still during the summer of 2003?

9     A.        August, maybe.

10    Q.        Did you call Mr. Harrington or did

11         Mr. Harrington call you?

12    A.        I believe I probably called Mr. Harrington.

13    Q.        Did you call Mr. Harrington for any particular

14         reason in August of 2003?

15    A.        Yes.

16    Q.        And why was that?

17    A.        To find out what the status of my grievance was.

18    Q.        And what did Mr. Harrington tell you regarding

19         the status of your grievance?

20    A.        I don't recall exactly what the conversation was

21         about.  They were, to my understanding, again

22         discussing things with the company with regards to the

23         grievance.

24    Q.        Did Mr. Harrington ever send you any

|     |     |     |
|-----|-----|-----|
| 1   |     | correspondence during the summer of 2003? |
| 2   | A.  | No. |
| 3   | Q.  | Did you speak with Mr. Harrington at all during |
| 4   |     | the fall of 2003? |
| 5   | A.  | I believe I did. |
| 6   | Q.  | When did you have contact with Mr. Harrington |
| 7   |     | during the fall of 2003? |
| 8   | A.  | As I said, it was August. Sometime in August. |
| 9   | Q.  | What about during the fall of 2003? |
| 10  | A.  | September. Maybe August or September. |
| 11  | Q.  | Was there an additional phone call in August |
| 12  |     | besides the phone call you already mentioned? |
| 13  | A.  | No. |
| 14  | Q.  | Was there an additional phone call in September |
| 15  |     | besides the August phone call you have already |
| 16  |     | mentioned? |
| 17  | A.  | I don't recall. |
| 18  | Q.  | Do you recall if you spoke with Mr. Harrington |
| 19  |     | in October of 2003? |
| 20  | A.  | Yes, I might've. |
| 21  | Q.  | Do you recall whether you did? |
| 22  | A.  | As I said, I might have. |
| 23  | Q.  | Do you recall whether you spoke with |
| 24  |     | Mr. Harrington in November of 2003? |

JANEY ASSOCIATES

1    A.         I believe I did.

2    Q.         Do you know whether you spoke with him in

3              November of 2003?

4    A.         I'm sure I did.

5    Q.         And do you recall what you spoke about during

6              November of 2003?

7    A.         The status of my grievance.

8    Q.         And what did Mr. Harrington tell you?

9    A.         That he was going to file a grievance.

10   Q.         Did he say why he was filing a grievance?

11   A.         That was his duty.

12   Q.         So did he tell you in November of 2003 that he

13             was filing a grievance in November of 2003?

14   A.         He was going to file the grievance with the

15             appropriate committee.

16   Q.         Do you recall when in November this telephone

17             conversation took place?

18   A.         No.

19   Q.         During this November, 2003 telephone

20             conversation, did Mr. Harrington ask you whether you

21             had been medically cleared to return to work?

22   A.         No.

23   Q.         Did you tell Mr. Harrington whether you had been

24             medically cleared to return to work?

```
 1    A.          Nope.

 2    Q.          Prior to November of 2003, you had said that

 3                Mr. Harrington had been in negotiations with the

 4                company concerning your grievance?

 5    A.          That's my understanding.

 6    Q.          And did your understanding change in November of

 7                2003?

 8    A.          No.

 9    Q.          Did Mr. Harrington, in November of 2003, tell

10                you that he no longer wanted to negotiate with the

11                company concerning this grievance?

12    A.          No.

13    Q.          Did Mr. Harrington just tell you that he was

14                going to file a grievance at this time?

15    A.          I filed the grievance.  It was Mr. Harrington's

16                job --

17    Q.          I'm sorry, file the grievance with the --

18                     MR. LATHROP: I think Mr. Goulet was

19                attempting to answer your question, so if you would

20                allow him please.

21                     MS. PENNINI: Okay.

22                     THE WITNESS: I filed the grievance with

23                the local union.  It was their job to docket the case

24                before the committee to have it heard.
```

JANEY ASSOCIATES

```
 1                    BY MS. PENNINI:

 2    Q.             Had you ever filed other grievances with the

 3                   local union prior to 2003?

 4    A.             Yes.

 5    Q.             And when did you file prior grievances?

 6    A.             1987.

 7    Q.             And what was this grievance concerning?

 8    A.             Working conditions.

 9    Q.             When you filed this grievance, did you

10                   immediately file it with the local?

11    A.             Yes.

12    Q.             To whom did you give your grievance?

13    A.             I'm going to say George Cashman.

14    Q.             In 1987, do you recall whether there was a

15                   steward at the APA facility in Canton?

16    A.             Yes.  Yes, there was.

17    Q.             Do you recall who this was?

18    A.             His last name was Yettman.  I'm not sure what

19                   his first name was.  Bobby.

20    Q.             Did you file a grievance with Mr. Yettman in

21                   1987?

22    A.             I believe I filed it with George Cashman.

23    Q.             And why did you file it with George Cashman?

24    A.             I had been discharged, Mr. Yettman was at home.
```

```
 1    Q.          I'm sorry, I thought you said working
 2              conditions?
 3    A.          It was working conditions.  I think there was a
 4              discharge that may have been involved with it.
 5    Q.          Did you file more than one grievance in 1987?
 6    A.          No, I don't think so.
 7    Q.          So it was the grievance you were discussing
 8              concerning the February 25th termination?
 9    A.          No.
10                        MR. LATHROP: Did you say February 25th?
11                        MS. PENNINI: The 1987 termination.
12                        MR. LATHROP: Objection.
13                        THE WITNESS: Nope.
14                BY MS. PENNINI:
15    Q.          Did you file a grievance concerning the February
16              25th, 1987 termination?
17                        MR. LATHROP: Objection.
18                        THE WITNESS: The union filed the response
19              to the discharge.
20                BY MS. PENNINI:
21    Q.          Okay.  You said you filed a grievance in 1987
22              concerning working conditions, just to clarify, and
23              that you filed this with George Cashman because
24              Mr. Yettman was unavailable?
```

JANEY ASSOCIATES

1    A.        Right.

2    Q.        Do you know why Mr. Yettman was unavailable?

3    A.        Mr. Yettman worked on the day shift and I worked

4              on the night shift.

5    Q.        Was there a steward on the night shift, as well?

6    A.        No.

7    Q.        Do you recall when in 1987 this grievance was

8              filed?

9    A.        November -- no, that's not right.  Maybe it was

10             January.

11   Q.        If you could please look at deposition Exhibit

12             No. 4?  Did you write this letter?

13   A.        Yes.

14   Q.        Did you send this letter to Mr. Harrington?

15   A.        Yes.

16   Q.        And was this letter written before or after your

17             telephone conversation with him in November of 2003?

18   A.        Afterwards.

19   Q.        Do you recall why you wrote this letter?

20   A.        Yes.

21   Q.        And why is that?

22   A.        Again, to follow up on the grievance that I had

23             filed.

24   Q.        Following your termination on March 12, 1987 you

```
 1              said you were on Worker's Compensation leave, correct?

 2     A.          Say that again.

 3     Q.          Following the March 12th, 1987 termination from

 4              APA, you said you were on industrial accident leave or

 5              Worker's Compensation leave?

 6     A.          Yes.

 7     Q.          During your time on Worker's Compensation leave,

 8              were you able to drive?

 9     A.          Yes.

10     Q.          Did you have any issues concerning your ability

11              to drive?

12     A.          No.

13     Q.          Did you have any problem concerning your ability

14              to lift any objects?

15     A.          Yes.

16     Q.          And what was that inability?

17     A.          I had certain restrictions on lifting heavy

18              objects as a result of the herniated disc in my back

19              and my neck.

20     Q.          And you had mentioned that there was a 35 pound

21              restriction as a result of that?

22     A.          Yes.

23     Q.          Have you been able to remember any additional

24              restrictions?
```

```
 1    A.          No.

 2    Q.          Do you recall whether that was the only

 3                restriction now -- do you still not recall whether

 4                there were any additional specific restrictions?

 5    A.          No, offhand I don't.

 6    Q.          Were you incapacitated for anytime following the

 7                March, 1987 termination?

 8                          MR. LATHROP: Objection.

 9                          THE WITNESS: Could you say that again?

10                          BY MS. PENNINI:

11    Q.          Following the March 12th, 1987 termination, were

12                you able to walk and get around?

13    A.          I did, yes.

14    Q.          Following this termination did you ever seek any

15                additional education?

16    A.          No.

17    Q.          Did you graduate from high school?

18    A.          Yes, I did.

19    Q.          When did you graduate from high school?

20    A.          1978.

21    Q.          Where did you graduate from high school?

22    A.          Hudson High School.

23    Q.          Did you attend any college or other institution

24                following your graduation from high school?
```

```
 1    A.          No.

 2    Q.          In what year were you born?

 3    A.          1960.

 4    Q.          And what is the date of your birth?

 5    A.          6/11/1960.

 6    Q.          Would that be June 11th, 1960?

 7    A.          Yes, it would be.

 8    Q.          And you said you currently live in Hudson,

 9                Massachusetts?

10    A.          Yes, I do.

11    Q.          And you said Cox Street, Hudson, Massachusetts?

12    A.          C-O-X, yeah.

13    Q.          Have you lived in any other places besides Cox

14                Street in Hudson, Massachusetts between 1978 and the

15                present?

16    A.          Yes.

17    Q.          Where else did you live?

18    A.          I lived in Marlboro for a time.

19    Q.          And what was your address?

20    A.          750 Farm Road.

21    Q.          When did you live on Farm Road in Marlboro?

22    A.          1982 'til 1986.

23    Q.          Did you live on Cox Street between 1978 and

24                1986?
```

JANEY ASSOCIATES

|    |    |                                                      |
|----|----|------------------------------------------------------|
| 1  | A. | Yes.  Not until 1986.  Did you say 1986?             |
| 2  | Q. | I'm sorry, where did you live between 1978 and       |
| 3  |    | 1982?                                                |
| 4  | A. | I lived on Cox Street.                               |
| 5  | Q. | Where did you live between 1960 and 1978?            |
| 6  | A. | At Cox Street.                                       |
| 7  | Q. | The same place on Cox Street?                        |
| 8  | A. | Yes.                                                 |
| 9  | Q. | Where did you live after 1986?  You said you         |
| 10 |    | lived in Marlboro from 1982 to 1986, where did you   |
| 11 |    | live after Farm Road in Marlboro?                    |
| 12 | A. | Back to Hudson, Cox Street.                          |
| 13 | Q. | Have you lived anyplace else besides Cox Street      |
| 14 |    | in Hudson, Massachusetts between 1986 and the present? |
| 15 | A. | No.                                                  |
| 16 | Q. | Do you own the house on Cox Street?                  |
| 17 | A. | Yes.                                                 |
| 18 | Q. | I'm sorry, do you live in a house on Cox Street?     |
| 19 | A. | Yes.                                                 |
| 20 | Q. | How long have you owned this house?                  |
| 21 | A. | How long have I owned the house?                     |
| 22 | Q. | Yes.                                                 |
| 23 | A. | Since I've lived there.                              |
| 24 | Q. | I'm sorry, I thought you said you lived there        |

JANEY ASSOCIATES

61

```
 1                since 1960?
 2    A.          Since I moved back there in 1987 -- '86.
 3    Q.          Do you have any particular hobbies that you
 4                engage in?
 5    A.          I go to my daughter's field hockey games, I like
 6                to go to the races.
 7    Q.          What races do you --
 8    A.          Stock cars.
 9    Q.          I'm sorry, stock cars?
10    A.          Race cars, yes.
11    Q.          So do you watch stock car races?
12    A.          Yes.
13    Q.          Do you participate in stock car races?
14    A.          I own a stock car.
15    Q.          How long have you owned a stock car?
16    A.          The family's had stock cars since the 50's.
17    Q.          I'm sorry, what do you mean by your family has
18                had stock cars?  Could you explain to me what you mean
19                by that?
20    A.          Yeah, my family owned a junk yard and they had
21                stock cars, and we were involved with stock cars as
22                kids.  And me and my brothers had cars all our lives.
23    Q.          So you said you own -- do you own one stock car?
24    A.          Yes.
```

1    Q.         Have you ever owned another car besides the one

2               you currently own?

3    A.         No.

4    Q.         I'm sorry, was that "no"?

5    A.         No.

6    Q.         How long have you owned the stock car that you

7               currently own?

8    A.         Since 1996.

9    Q.         Not to be ignorant here, what kind of stock car

10              is it?  Could you explain to me what a stock car is?

11   A.         It's a race car.

12   Q.         Is it a particular kind of race car?  Could you

13              explain to me a little more.

14   A.         It goes around in circles.

15   Q.         What is it that makes a stock car different than

16              a typical sedan?

17   A.         It's one that they use to race in circles.  It's

18              not a dragster.

19   Q.         Okay.  Does that mean there is a different size

20              engine in a stock car than in a typical sedan?

21   A.         Oh, I don't know.

22   Q.         I know you said you owned a stock car and you

23              watched stock car racing.  Do you also drive a stock

24              car?

```
 1    A.         No.

 2    Q.         Did you ever participate in stock car racing as

 3               a driver?

 4    A.         No.

 5    Q.         Is there someone that does race your stock car?

 6    A.         Yes.

 7    Q.         And who is that?

 8    A.         His name is Jeff.

 9    Q.         Does Jeff have a last name?

10    A.         Yeah, Crowley.

11    Q.         How often does Jeff Crowley race in your stock

12               car?

13    A.         He hasn't raced at all this year.  It's been --

14               not since last year.

15    Q.         But you still own this car?

16    A.         Yes.

17    Q.         Can you win money owning a stock car?

18                     MR. LATHROP: I'm sorry, what did you say?

19                     MS. PENNINI: Can you, as a stock car

20               owner, win money based on how Mr. Crowley does in a

21               stock car race?

22                     THE WITNESS: I think -- yes, there's a

23               payoff for the finish.

24                     BY MS. PENNINI:
```

1    Q.        Has Mr. Crowley ever placed well in a stock car

2              race?

3    A.        Yes.

4    Q.        And what is the most that Mr. Crowley has ever

5              won for his stock car racing?

6    A.        Oh, I don't know.

7    Q.        Or as the stock car owner are you entitled to a

8              portion of whatever is earned by Mr. Crowley's

9              finishes?

10   A.        Mr. Crowley got the checks.

11   Q.        As the owner of the car are you entitled a

12             portion of that money?

13   A.        Mr. Crowley got the checks.  I didn't get

14             anything.

15   Q.        Are you entitled, as a stock car owner, to part

16             of that money?

17   A.        I suppose I could be.

18                  MS. PENNINI: I have no further questions

19             at this time.

20                  MR. GLUEK: Can we take a break for five

21             minutes?

22                  MS. PENNINI: Yes, please.

23                  (A brief recess was taken)

24                  MR. GLUEK: Back on the record.

                    JANEY ASSOCIATES

1    EXAMINATION

2                        BY MR. GLUEK:

3    Q.        The ground rules are the same.  I don't

4              anticipate this taking too long, but if you don't

5              understand one of my questions, please tell me.  If

6              you cannot hear one of my questions, please tell me.

7              If you answer one of my questions, I am going to

8              assume that you both heard and understood the

9              question, is that fair?

10   A.        Yes.

11   Q.        This is not supposed to be an endurance contest.

12             If you need to take a break, just tell me, we'll take

13             a break, okay?

14   A.        Okay.

15   Q.        If you need to talk to your lawyer, as long as

16             there is a question not pending, just say you need to

17             take a break, okay?

18   A.        Yeah.

19   Q.        Have you ever been convicted of any crimes?

20   A.        Have I ever been convicted of any crimes?  I'm

21             not sure I understand the question.

22   Q.        Do you know what a crime is?

23   A.        Yes.

24   Q.        Do you know what a conviction is?

```
 1    A.        I think so.

 2    Q.        Okay.  Have you been convicted of any crimes?

 3    A.        I don't think so.

 4    Q.        Do you have anything that would refresh your

 5              recollection?

 6    A.        No.

 7    Q.        Are you married?

 8    A.        Yes.

 9    Q.        To whom?

10    A.        Ann M. Goulet.

11    Q.        How long have you been married?

12    A.        15 years.

13    Q.        Any prior marriages?

14    A.        No.

15    Q.        Does she work?

16    A.        Yes.

17    Q.        Where does she work?

18    A.        She works for herself.

19    Q.        What does she do?

20    A.        She drives a coffee truck.

21    Q.        Does she have a d/b/a, doing business as?

22    A.        Yes.

23    Q.        And what is that?

24    A.        Ann's Quality Catering.
```

| | | |
|---|---|---|
| 1 | Q. | Does she employ anyone? |
| 2 | A. | No. |
| 3 | Q. | Do you help her out on the truck? |
| 4 | A. | No. |
| 5 | Q. | How long has she been operating Ann's Quality |
| 6 | | Catering? |
| 7 | A. | Five years. |
| 8 | Q. | Before that was she employed? |
| 9 | A. | Yes. |
| 10 | Q. | By whom? |
| 11 | A. | She was in the restaurant business, she was a |
| 12 | | waitress/bartender. |
| 13 | Q. | And for how long did she do that? |
| 14 | A. | Ten or twelve years. |
| 15 | Q. | One particular restaurant/bar or several during |
| 16 | | that period? |
| 17 | A. | Several. |
| 18 | Q. | Can you name them, please? |
| 19 | A. | The 401 Club. |
| 20 | Q. | Where is that? |
| 21 | A. | Marlboro, Mass. |
| 22 | Q. | Okay. |
| 23 | A. | Scaletti's Restaurant. |
| 24 | Q. | Can you spell that? |

| 1  | A. | I can't. |
|----|----|----------|
| 2  | Q. | Can you say it slowly then? |
| 3  | A. | Scaletti's. |
| 4  | Q. | And where is that located? |
| 5  | A. | Hudson. |
| 6  | Q. | Any others? |
| 7  | A. | Nope. |
| 8  | Q. | No others or no others that you remember? |
| 9  | A. | No others. |
| 10 | Q. | Do you have children? |
| 11 | A. | Yes. |
| 12 | Q. | How many? |
| 13 | A. | Two. |
| 14 | Q. | Names? |
| 15 | A. | Craig, Jr. |
| 16 | Q. | How old? |
| 17 | A. | 23. |
| 18 | Q. | Is he dependant upon you? |
| 19 | A. | No. |
| 20 | Q. | And your other child? |
| 21 | A. | Nicole. |
| 22 | Q. | Nicole is how old? |
| 23 | A. | 17. |
| 24 | Q. | Is she dependant upon you? |

1    A.        Yes.

2    Q.        Other than this lawsuit, have you filed any

3              other lawsuits?

4    A.        No.

5    Q.        Have you been a defendant in any lawsuit?

6    A.        No.

7    Q.        I believe I understood your testimony that since

8              your accident at APA until March 1st, 2002 you had not

9              worked, is that correct?

10   A.        Yes.

11   Q.        Since March 1st, 2002 to the present, have you

12             been employed?

13   A.        No.

14   Q.        Since March 1st, 2002 until the present, have

15             you been offered employment by any employer?

16   A.        No.

17   Q.        Since March 1st, 2002 until the present, have

18             you had any interviews for employment?

19   A.        No.

20   Q.        Since March 1st, 2002 until the present, have

21             you filed any applications for employment?

22   A.        No.

23   Q.        Since March 1st, 2002 until the present, have

24             you sent out any resumes?

```
 1    A.        No.

 2    Q.        Since March 1st, 2002 until the present, have

 3              you contacted any employment counselors?

 4    A.        Nope.

 5    Q.        Since March 1st, 2002 until the present, have

 6              you gone to the library or purchased any books in

 7              terms of how one goes about finding employment?

 8    A.        No.

 9    Q.        Since March 1st, 2002 until the present, have

10              you gotten on the computer to look for employment?

11    A.        No.

12    Q.        Since March 1st, 2002 until the present, have

13              you made any efforts to find employment?

14    A.        No.

15    Q.        Why not?

16    A.        I've got some outstanding issues with regard to

17              my industrial accident.

18    Q.        What are those outstanding issues you have

19              regarding your industrial accident?

20    A.        I've got a knee that needs to be reconstructed.

21    Q.        Is that from the blown out tendon?

22    A.        Yes.

23    Q.        Do you have any plans to get that knee

24              reconstructed?
```

JANEY ASSOCIATES

1    A.         Yes.

2    Q.         When?

3    A.         As soon as they resolve all the issues with the

4               insurance company with the old employer.

5    Q.         Any other outstanding issues you have regarding

6               your industrial accident?

7    A.         No.

8    Q.         Just your knee?

9    A.         Yes.

10   Q.         From March 1st, 2002 until the present, do you

11              have any restrictions regarding your ability to work?

12   A.         Could you repeat the question?

13              MR. GLUEK: Can you repeat it, please?

14              (Question read back)

15              THE WITNESS: I'm not under any doctor's

16              care at this time.

17              BY MR. GLUEK:

18   Q.         The question still remains, since March 1st,

19              2002 until the present, do you have any restrictions

20              that effects your ability to work?

21   A.         Yes.

22   Q.         What are those restrictions?

23   A.         I have a herniated disc in my lower back.

24   Q.         Still?

1    A.        Still.

2    Q.        Any other restrictions?

3    A.        A herniated disc in my neck.

4    Q.        Still?

5    A.        Still.

6    Q.        Any other restrictions?

7    A.        And the ligament in my knee.

8    Q.        Now your herniated disc in your lower back, does

9              that effect your ability to sit?

10   A.        On occasion, yes.

11   Q.        Does that effect your ability to stand?

12   A.        Yes.

13   Q.        Does that effect your ability to lift?

14   A.        Yes.

15   Q.        Does it effect your ability to turn?

16   A.        Yes.

17   Q.        Does it effect your ability to bend?

18   A.        Yes.

19   Q.        All in negative ways?

20   A.        Yes.

21   Q.        With respect to your herniated disc in your

22             neck, does that effect your ability to bend?

23   A.        No.

24   Q.        What limitations does the herniated disc in your

```
1              neck have on you?

2     A.            It depends on the level of pain I'm having on

3              any particular day.

4     Q.            So it's painful?

5     A.            Very painful.

6     Q.            Do you take medication for your herniated disc

7              in the neck?

8     A.            Yes, I do.

9     Q.            And what kind of medication?

10    A.            Naprosin, Soma.

11    Q.            And what are those?

12    A.            Anti-inflammatory pain medication.

13    Q.            And with respect to your herniated disc to your

14             lower back, is that also painful?

15    A.            Yes.

16    Q.            Do you take medication for that?

17    A.            The same medications.

18    Q.            Only the two medications?

19    A.            Yes.

20    Q.            Do you have a commercial driver's license?

21    A.            Yes, I do.

22    Q.            Is it still current?

23    A.            Yes.

24    Q.            Are you required to take a physical periodically
```

JANEY ASSOCIATES

1              to keep that current?

2    A.        No.

3    Q.        With respect to your knee, what limitations does

4              that cause on you?

5    A.        Well it's tough to get around some days.

6    Q.        With your limitations, could you currently do

7              dock work?

8    A.        I could try.

9    Q.        That is not the question.  Do you know if you

10             could currently do dock work with your limitations?

11   A.        I do not know.

12   Q.        With your limitations, do you know if you could

13             currently do driving work?

14   A.        I do not know.

15   Q.        You testified that you appealed your award of

16             partial disability, is that correct?

17   A.        Yes.

18   Q.        Why did you appeal it?

19   A.        Why did I appeal it?

20   Q.        Is it because you thought you should have gotten

21             total disability?

22   A.        Yes.

23   Q.        Do you still believe you should have gotten

24             total disability?

```
 1    A.           Yes.

 2    Q.           Do you believe that you are currently totally

 3                 disabled?

 4    A.           Yes.

 5    Q.           You testified that in 1995 you received Social

 6                 Security benefits, correct?

 7    A.           Yes.

 8    Q.           Are you currently receiving Social Security

 9                 benefits?

10    A.           Yes, I am.

11    Q.           Now when you received the Social Security

12                 benefits in 1995, did it go retroactive?

13    A.           Yes.

14    Q.           To what period?

15    A.           March 11th, 1987.

16    Q.           What is your monthly benefit on your Social

17                 Security currently?

18    A.           $2,160.00.

19    Q.           And has that remained the same or has that gone

20                 up?

21    A.           It goes up every year.

22    Q.           Do you remember what the lowest amount was?

23    A.           Not offhand.

24    Q.           And I am assuming your children were also
```

```
 1              receiving Social Security benefits when they were

 2              minors?

 3      A.          That's included.

 4      Q.          The 2,160 includes their benefit?

 5      A.          Yes.

 6      Q.          Does your non-minor child still get Social

 7              Security benefits?

 8      A.          Yes.

 9      Q.          Do you have to periodically reapply for Social

10              Security benefits?

11      A.          No.

12      Q.          Do you have to update Social Security with

13              respect to your status?

14      A.          No.

15      Q.          Where did you apply for these Social Security

16              benefits?

17      A.          Framingham.

18      Q.          Were you or are you currently assigned a case

19              worker for Social Security?

20      A.          No.

21      Q.          And you were never assigned a case worker?

22      A.          No.

23      Q.          Do you know who your contact person was at

24              Social Security when you applied?
```

| 1  | A. | No. |
|----|-----|-----|

1    A.         No.

2    Q.         Do you have any documents regarding Social

3               Security and your application for Social Security?

4    A.         Do I have any documents?

5    Q.         Correct.

6    A.         What kind of documents?

7    Q.         Any piece of paper.

8    A.         Saying what?

9    Q.         That relates to your Social Security benefits

10              and/or your application for Social Security.

11   A.         I have documents that pertain to my Social

12              Security, yes.

13   Q.         Do you have a lawyer that represented you when

14              you applied for Social Security?

15   A.         Yes.

16   Q.         And what is his name?

17   A.         The law firm was Ellis & Ellis out of Worcester.

18   Q.         And which lawyer at Ellis & Ellis did you deal

19              with?

20   A.         I believe it was Bob Marque.

21   Q.         When was the last time you talked to Mr. Marque?

22   A.         I don't recall.

23   Q.         Since 1995?

24   A.         Yeah, probably.

| | | |
|---|---|---|
| 1 | Q. | Since last year? |
| 2 | A. | Nope, not last year. |
| 3 | Q. | The last five years? |
| 4 | A. | Nope. |
| 5 | Q. | The last ten years? |
| 6 | A. | 1995. |
| 7 | Q. | Okay.  Have you talked to anybody at New Penn |
| 8 | | since March 1st, 2002? |
| 9 | A. | No. |
| 10 | Q. | Have you called up New Penn and asked if you are |
| 11 | | going to be called? |
| 12 | A. | No. |
| 13 | Q. | Have you ever filled out an application at New |
| 14 | | Penn? |
| 15 | A. | Nope. |
| 16 | Q. | Do you know Mr. Carnes? |
| 17 | A. | Yes. |
| 18 | Q. | Do you believe that he had any ill will towards |
| 19 | | you? |
| 20 | A. | I don't know that. |
| 21 | Q. | You don't have an opinion one way or the other? |
| 22 | A. | Nope. |
| 23 | Q. | Do you have any facts that would suggest that he |
| 24 | | had any ill will towards you? |

```
 1    A.           No.

 2    Q.           Do you have any facts that Mr. Carnes was

 3                 prejudiced against you in someway?

 4    A.           No.

 5    Q.           Do you have any facts that Mr. Carnes disliked

 6                 you in any respect?

 7    A.           Nope.

 8    Q.           You know Mr. Harrington, correct?

 9    A.           Yes.

10    Q.           Do you have any facts to believe that

11                 Mr. Harrington has any ill will towards you?

12    A.           Nope.

13    Q.           Do you have any facts to believe that

14                 Mr. Harrington had any prejudice towards you in any

15                 respect?

16    A.           Nope.

17    Q.           Do you have any facts that Mr. Harrington

18                 somehow wanted to see you damaged?

19    A.           Nope.

20    Q.           Do you have any facts that anyone connected with

21                 the union had any ill will towards you?

22    A.           No.

23    Q.           Do you have any facts that anybody connected

24                 with the union had any prejudices towards you?
```

JANEY ASSOCIATES

1    A.        No.

2    Q.        Do you have any facts that anyone connected with

3              the union had any hatred towards you?

4    A.        Nope.

5    Q.        Between March 1, 2002 and March 30, 2003, do you

6              know if you could have worked 30 days at New Penn?

7    A.        Nope.

8    Q.        Let me rephrase the question.  Between March 1,

9              2002 and March 30, 2003, do you know if you could have

10             worked 30 days in a two month period at New Penn?

11   A.        No.

12   Q.        I think I understood your testimony, sir, that

13             after you filed a grievance on April 7th, 2003 you had

14             no discussions with Mr. Carnes?

15             MR. LATHROP: I'm sorry, could I have that

16             date again?

17             MR. GLUEK: After April 7th, 2003, which is

18             the date your grievance is dated.

19             THE WITNESS: Um-hum.

20             BY MR. GLUEK:

21   Q.        You had no conversations with Mr. Carnes, is

22             that correct?

23   A.        I don't believe I did.

24   Q.        Do you have anything that would refresh your

                      JANEY ASSOCIATES

```
 1              recollection?

 2      A.      Nope.

 3      Q.      Do you have any documents memorializing any

 4              conversations that you had with Mr. Carnes?

 5      A.      Nope.

 6      Q.      Did Mr. Carnes ever tell you to wait until after

 7              the agreement with New Penn and the union expired

 8              before you filed a grievance?

 9      A.      No.

10      Q.      Did anybody have any discussion with you from

11              the union with respect to the timing of when the

12              grievance should be filed by you?

13      A.      No.

14      Q.      It is your testimony, isn't it sir, that for the

15              period between March 1, 2002 and March 30, 2003 you

16              had several discussions with Mr. Carnes?

17      A.      Yes.

18      Q.      And those were follow up discussions about you

19              not being called by New Penn, correct?

20      A.      Yes.

21      Q.      So during that time period you were aware that

22              there was at least an issue, correct?

23      A.      No.

24      Q.      Then why did you make these calls?
```

```
 1    A.              To find out what the status of things were.

 2    Q.              And what did Mr. Carnes tell you the status was?

 3    A.              At first he said he wasn't sure and he would

 4          look into it.

 5    Q.              That was in the springtime?

 6    A.              Yes.

 7    Q.              Did he say anything else in the springtime?

 8    A.              Nope.

 9    Q.              And I believe your testimony was two

10          conversations you had in the spring, correct?

11    A.              Was it two in the spring?  It may have been.

12          Initial phone call -- there was an initial phone call

13          with Mark Harrington, who told me that he no longer

14          represented the men at APA, I need to speak with Bill

15          Carnes.

16    Q.              Right.  And then you had, in the spring of 2002,

17          how many conversations with Mr. Carnes did you have?

18    A.              I had a follow up phone call from the Mark

19          Harrington call with Mr. Carnes, and then one more

20          after that.

21    Q.              In the spring?

22    A.              Early summer, spring.  Late spring, early

23          summer.

24    Q.              And I apologize.  We have already been over
```

| 1 | | this, but now I am confused.  Mr. Harrington called |
| 2 | | you up in the spring of 2002 to say he was no long -- |
| 3 | A. | No, I called Mr. Harrington. |
| 4 | Q. | And he said he is no long responsible for APA, |
| 5 | | correct? |
| 6 | A. | Right. |
| 7 | Q. | Then you called Mr. Carnes, correct? |
| 8 | A. | Yes. |
| 9 | Q. | And Mr. Carnes said that he didn't know and he |
| 10 | | would follow up? |
| 11 | A. | Right. |
| 12 | Q. | Did he say anything else? |
| 13 | A. | No. |
| 14 | Q. | And that took place in the spring of 2002, |
| 15 | | correct? |
| 16 | A. | Yes. |
| 17 | Q. | And it is your testimony that he said -- that |
| 18 | | you can recall that he said nothing other than he |
| 19 | | didn't know? |
| 20 | A. | General conversation about what was going on, |
| 21 | | the whole issue. |
| 22 | Q. | What else do you remember that he said? |
| 23 | A. | He said that he was going to look into it. |
| 24 | Q. | Do you remember anything else? |

| 1 | A. | No. |
|---|----|-----|
| 2 | Q. | When was the next time you talked to Mr. Carnes? |
| 3 | A. | I can't be sure. |
| 4 | Q. | But there was a subsequent time? |
| 5 | A. | Yes. |
| 6 | Q. | And was this by telephone? |
| 7 | A. | Yes. |
| 8 | Q. | Did you call him? |
| 9 | A. | Yes. |
| 10 | Q. | Did you take any notes of that conversation? |
| 11 | A. | I didn't take any written notes. |
| 12 | Q. | What was the substance of that conversation? |
| 13 | A. | The fact that he had spoke with New Penn with |

regards to my situation.  He had conversations with
the New Penn people.  I'm not sure if it was with the
terminal manager or Dan Schmidt and possibly Charlie
Zaccaria, but that was six months in advance from
getting the grievance.

| 19 | Q. | So he said he talked to New Penn? |
|----|----|-----------------------------------|
| 20 | A. | Yeah. |
| 21 | Q. | Did he say to whom he talked to? |
| 22 | A. | No. |
| 23 | Q. | Did he say what he said to New Penn? |
| 24 | A. | He -- yes. |

1    Q.           What did he say he said?

2    A.           That he had an APA employee that was looking to

3                 be put to work.

4    Q.           Did he say anything else to you?

5    A.           He talked about, I guess they told him that my

6                 name wasn't on the list, on the seniority list and he

7                 said it was on the seniority list.  He said, "I'll

8                 show you the decision from the New England Joint

9                 Committee that puts him on the list."

10   Q.           Did he say anything else?

11   A.           Nope, just that he would get back to me.

12   Q.           That is all that you remember of the

13                conversation?

14   A.           Yes.

15   Q.           Nothing else?

16   A.           No.

17   Q.           When was the next conversation you had with

18                Mr. Carnes?

19   A.           March.

20   Q.           Of 2003?

21   A.           Yes.

22   Q.           Who initiated that conversation?

23   A.           I believe I did.

24   Q.           And what do you recall of that conversation?

```
1    A.        I called and asked him what my status was as far

2              as being called.  The agreement, in effect, ended and

3              I hadn't received a phone call.

4    Q.        What else of that conversation do you recall?

5    A.        He said to me, pardon my french, "They fucked

6         yah.  Send the grievance in."

7    Q.        Did you say anything else?

8    A.        Nope, I wrote the grievance.

9    Q.        Did he say anything else?

10   A.        Nope.

11   Q.        That was it of the conversation?

12   A.        Um-hum.

13   Q.        Do you have any notes of that conversation?

14   A.        Nope.

15   Q.        Could you look at, please, what has been marked

16             as Goulet Exhibit 2?  Is that your grievance?

17   A.        Yes.

18   Q.        Is that your handwriting?

19   A.        Yes, it is.

20   Q.        Did anybody assist you in preparing this

21             grievance?

22   A.        Nobody.

23   Q.        Between the conversation that you had with

24             Mr. Carnes where he said, "They fucked you.  Send in
```

```
 1                 the grievance." and the time that you sent in the

 2                 grievance, did you have any other conversations with

 3                 Mr. Carnes?

 4       A.        Don't believe I did.

 5       Q.        You do not believe you did?

 6       A.        I don't think so.

 7       Q.        Okay.  After you sent in the grievance, your

 8                 next contact was with Mr. Harrington, is that correct?

 9       A.        Yes.

10       Q.        Did you initiate that?

11       A.        Yes.

12       Q.        Do you recall when that occurred?

13       A.        Sometime after Bill Carnes left office.

14       Q.        But it was in May?

15       A.        I believe so.

16       Q.        May, 2003?

17       A.        Yes.

18       Q.        And do you have any notes of that conversation?

19       A.        Nope.

20       Q.        What was said during that conversation?

21       A.        Basically, I was following up on the status of

22                 the grievance.  Like I said, I filed a grievance with

23                 the union --

24       Q.        And I think your prior testimony was
```

```
 1                 Mr. Harrington said he didn't know anything about it,
 2            correct?
 3    A.            He said he didn't have any copies of the
 4            grievance.
 5    Q.            Do you know if he knew about the grievance
 6            before your phone call?
 7    A.            Yes, I'm sure he did.
 8    Q.            Do you know that for a fact?
 9    A.            No.
10    Q.            As best you can recall, what were
11            Mr. Harrington's exact words to you during that
12            conversation?
13    A.            That he didn't have a copy of the grievance.
14            That Bill Carnes didn't file it with the committee,
15            that's why it didn't get filed.  Pretty basic.
16    Q.            Do you recall anything else he said?
17    A.            Nope.
18    Q.            When was your next conversation with
19            Mr. Harrington?
20    A.            Maybe sometime in June.
21    Q.            And did you initiate that conversation?
22    A.            I'm sure I did, yes.
23    Q.            Do you have any notes of that conversation?
24    A.            No.
```

| 1 | Q. | What was the substance of that conversation? |
| 2 | A. | Again, to follow up on what happened to my |
| 3 | | grievance. |
| 4 | Q. | And what did Mr. Harrington say? |
| 5 | A. | I don't recall. |
| 6 | Q. | You don't recall anything he said? |
| 7 | A. | No. |
| 8 | Q. | Do you recall anything that you said? |
| 9 | A. | Just trying to find out what happened to the |
| 10 | | grievance. |
| 11 | Q. | And that's all that you recall from that |
| 12 | | conversation? |
| 13 | A. | Yeah. |
| 14 | Q. | When was your next conversation with |
| 15 | | Mr. Harrington? |
| 16 | A. | I think I followed that up with the letter I |
| 17 | | wrote. |
| 18 | Q. | So that is the July 25th letter? |
| 19 | A. | Yeah. |
| 20 | Q. | Could you look at Exhibit 3, please? |
| 21 | A. | Um-hum. |
| 22 | Q. | Is it still your sworn testimony that you do not |
| 23 | | recall why you wrote "Let's not lose sight of the real |
| 24 | | issue here. The grievance is about seniority rights |

1       under the agreement not whether one was capable of

2       working or not."

3                    MR. LATHROP: Objection.

4                    THE WITNESS: Is it my sworn testimony what

5       now?

6                    BY MR. GLUEK:

7    Q.      Is it still your sworn testimony that you have

8       no recollection as to why you wrote that?

9                    MR. LATHROP: Objection.

10                   THE WITNESS: Again, you know, I'm not sure

11      what my thought process was at the time. Like I said,

12      I was trying to follow up on the grievance that I had

13      submitted and maybe there was some conversation about

14      I was on comp or something, and I think I told them I

15      wasn't on comp. I wasn't collecting a Workman's

16      Compensation check.

17                   BY MR. GLUEK:

18   Q.      So isn't it a fact that Mr. Harrington had

19      conversations with you prior to you writing Exhibit 3

20      where he indicated to you that you may not be able for

21      recall because you were not able to work?

22   A.      No.

23   Q.      Do you know whether or not the union ever

24      supplied New Penn with your name on the seniority

```
 1              list?
 2    A.        Yes, they did.
 3    Q.        How do you know that?
 4    A.        I have a copy of that, and I have a copy of the
 5              letter from the freight director that was sent out to
 6              the locals with my name on it.
 7    Q.        Do you know if that was given to New Penn?
 8    A.        Yes, it was.
 9    Q.        And how do you know that?
10    A.        It was forwarded to New Penn from APA.  From
11              their corporate offices to New Penn's corporate
12              offices.
13    Q.        Okay.  So APA forwarded it to New Penn?
14    A.        Yes.
15    Q.        Listen to my question.  My question, sir, was
16              whether the union -- do you know if the union ever
17              forwarded your name on a seniority list to New Penn?
18    A.        I don't know that.
19    Q.        Okay.  After your conversation with
20              Mr. Harrington in June of 2003, when was the next time
21              you talked to him?
22    A.        As I said, I wrote the letter and I didn't hear
23              anything.  So I probably called him sometime in early
24              November, I'm going to say, before I wrote the second
```

```
 1                letter.

 2      Q.        And do you have any notes of that conversation?

 3      A.        No.

 4      Q.        What was discussed during that conversation?

 5      A.        Same thing, what happened to my grievance.

 6      Q.        And what was his response?

 7      A.        That they were going to file it.  They were

 8                going to file it with the committee and get it heard.

 9      Q.        Anything else that you recall?

10      A.        Nope.

11      Q.        Nothing else?

12      A.        No.

13      Q.        Did you have an understanding as to why the

14                grievance had not been previously filed?

15      A.        No.

16      Q.        Were you ever told why the grievance was not

17                previously filed?

18      A.        I was told that Bill Carnes didn't file the

19                grievance, that's why it wasn't filed.

20      Q.        Were you ever told why the grievance was not

21                filed after Mr. Carnes left office?

22      A.        No.

23      Q.        Doug, I can't remember his last name, Francie?

24      A.        Yes.
```

| | | |
|---|---|---|
| 1 | Q. | How do you pronounce it? |
| 2 | A. | Francie. |
| 3 | Q. | Francie? |
| 4 | A. | Francie. |
| 5 | Q. | When was the last time you talked to him? |
| 6 | A. | February of 2002. |
| 7 | Q. | So that was during the phone call that he asked |
| 8 | | you what? |
| 9 | A. | What my preference was. |
| 10 | Q. | And my preference was Billerica? |
| 11 | A. | Yes. |
| 12 | Q. | Do you know if Doug is currently employed? |
| 13 | A. | I don't know. |
| 14 | Q. | After your conversation with Mr. Harrington |
| 15 | | sometime in the November time period, do you have any |
| 16 | | subsequent conversation with him? |
| 17 | | MR. LATHROP: I'm sorry, with |
| 18 | | Mr. Harrington? |
| 19 | | MR. GLUEK: Yes. |
| 20 | | THE WITNESS: Nope.  I sent that letter to |
| 21 | | him and then I think we spoke again in the fall and |
| 22 | | spring.  Had met several times with regards to the |
| 23 | | case being presented to the committee. |
| 24 | | BY MR. GLUEK: |

JANEY ASSOCIATES

```
 1    Q.         So you personally met Mr. Harrington?

 2    A.         Yes.

 3    Q.         And did you take any notes of those

 4               conversations?

 5    A.         No.

 6    Q.         Or meetings?

 7    A.         Nope.

 8    Q.         Did Mr. Harrington ever imply to you as to the

 9               merits in your case?

10    A.         No.

11    Q.         Did Mr. Harrington ever indicate that he thought

12               your case was a strong case or a weak case?

13    A.         I think that he said we had a good case.

14    Q.         The question is, did he ever tell you you had a

15               good case or a bad case?

16    A.         Yes.

17    Q.         In what context did he say that?

18    A.         How do you mean?  What do you mean "context", in

19               what context?

20    Q.         Was this in a phone conversation or --

21    A.         No, this was in person.

22    Q.         When you were preparing for the case?

23    A.         Yes.

24    Q.         Did he indicate to you why he thought it was a
```

JANEY ASSOCIATES

1              strong case?

2    A.        Just based on the merits of the case.

3    Q.        Do you recall anything else?

4    A.        No.

5    Q.        Do you think the union just made a simple

6              mistake by not filing your grievance timely?

7                        MR. LATHROP: Objection.

8                        THE WITNESS: I don't know.

9                        BY MR. GLUEK:

10   Q.        Do you have any facts that would suggest that

11             the union did anything more than just make a simple

12             mistake not filing your grievance timely?

13                       MR. LATHROP: Objection.

14                       THE WITNESS: I don't know what they did.

15                       BY MR. GLUEK:

16   Q.        Do you have an understanding that with respect

17             to your decision the decision of the committee is

18             final and binding?

19   A.        That's what the decision says.

20   Q.        Is that your understanding going into it?

21   A.        Yes.

22   Q.        Now when you were being questioned by the

23             union's lawyer you said that you had an understanding

24             that Mr. Harrington was negotiating with the company?

1    A.         Yes.

2    Q.         Why did you have that understanding?

3    A.         Through the phone conversations that we had that

4               there was dialogue between Mr. Carnes and

5               Mr. Harrington with New Penn.

6    Q.         Did he indicate to you what the dialogue was?

7    A.         No.

8    Q.         Did he indicate to with whom he would speak at

9               New Penn?

10   A.         Nope.

11   Q.         Other than the two medications that you

12              previously testified about, have you taken any other

13              medication since March 1, 2002?

14   A.         No.

15   Q.         And they are just anti-inflammatories is your

16              testimony?

17   A.         Yes, muscle relaxers.

18              MR. GLUEK: I have nothing further.

19   RE-EXAMINATION

20              BY MS. PENNINI:

21   Q.         Following your November, 2003 conversation with

22              Mr. Harrington in which you discussed the filing of

23              the grievance, did he ever speak to you regarding any

24              issues as to the proper joint area committee where

                    JANEY ASSOCIATES

```
 1              this grievance could be brought or could be heard?
 2   A.         No.
 3   Q.         He never mentioned anything to you about the
 4              difference between Southern New England Joint Area
 5              Committee and the Eastern Region Committee?
 6   A.         No.  I think the case had been scheduled to be
 7              heard in April, and I got a phone call saying that it
 8              was rescheduled to be heard at the Eastern Region.
 9   Q.         Prior to the November, 2003 conversation and
10              letter to Mr. Harrington, did he ever have any
11              discussions with you concerning whether a grievance
12              could be brought concerning the failure to be called
13              off of a call list pursuant to the TNFINC/New Penn
14              agreement?
15   A.         No.
16   Q.         And I believe you previously indicated that you
17              are awaiting surgery on your knee?
18   A.         Yes.
19   Q.         Is it the left or the right knee?
20   A.         Right knee.
21   Q.         And you said that you continued with the
22              insurance benefits for a year following your injury,
23              is that correct?
24   A.         My pension was paid for a year, I'm not sure
```

```
 1              about my insurance.  It was 1987, quite some time so I
 2              don't recall.
 3      Q.      You do not recall whether you had any health
 4              insurance benefits?
 5      A.      I did for a period of six months, I know.
 6      Q.      So you are sure you had it for six months but --
 7      A.      Yes.
 8      Q.      -- you may have had it for a longer period?
 9      A.      Yes.
10      Q.      During the period under which you were positive
11              that you had insurance coverage did you have any
12              surgeries to your knee?
13      A.      No.
14      Q.      Did you have any surgeries to your back?
15      A.      No.
16      Q.      Did you have any surgeries on the herniated disc
17              in your neck?
18      A.      No.
19      Q.      At that time had any of the doctors recommended
20              surgeries on the herniated disc in your neck?
21      A.      I don't believe so, nope.
22      Q.      What about the herniated disc in your back?
23      A.      No.
24      Q.      And any recommendation of surgery on the torn,
```

```
 1              I'm sorry, is it a ligament or a torn tendon in your

 2         knee?

 3    A.         Ligament.

 4    Q.         Did the doctors recommend any surgery concerning

 5         the torn ligament in your knee?

 6    A.         Not at that time.

 7    Q.         When did you first become aware that you would

 8         need surgery on the ligament in your knee?

 9    A.         Oh, I can't be sure, positively sure.

10    Q.         Can you give me an approximate time?  Was it

11         during the 1980's?

12    A.         I honestly don't remember.  I don't know.

13    Q.         Was it during the first half of the 1990's?

14    A.         Yes.

15    Q.         Do you recall if it was in 1990?

16    A.         No.

17    Q.         Do you recall whether it was in 1991?

18    A.         Nope.

19    Q.         Is there any document that would help refresh

20         your memory concerning this fact?

21    A.         I'm not sure.

22    Q.         Do you recall the name of the doctor who told

23         you you would need surgery on your knee?

24    A.         Yes.
```

1    Q.         And what doctor was that?

2    A.         Dr. Solomon.

3    Q.         Do you have a first name for Dr. Solomon?

4    A.         Alan.

5    Q.         Where does Dr. Solomon practice?

6    A.         Out of Leonard Morse in Natick.

7    Q.         Is Leonard Morse a hospital?

8    A.         Yes.

9    Q.         Does he currently practice out of Leonard Morse

10        in Natick?

11   A.         I'm not sure of that.

12   Q.         When was it that you would see Dr. Solomon?

13   A.         Dr. Solomon operated on my shoulder.

14   Q.         Well when would you see Dr. Solomon concerning

15        your knee?

16   A.         Periodically, when I was treating with him.

17   Q.         And during what time period was that?

18   A.         Right after my industrial accident.

19   Q.         And what time did you stop seeing Dr. Solomon?

20   A.         Oh, again, I can't be sure.

21   Q.         Is there anything that would help you as to when

22        you stopped seeing Dr. Solomon?

23   A.         Probably when the insurance company stopped

24        paying.

JANEY ASSOCIATES

1    Q.         And you also had a rotator cuff injury, is that

2               correct?

3    A.         Yes.

4    Q.         And you had surgery concerning this injury?

5    A.         Yes.

6    Q.         When did you have that surgery?

7    A.         '89, 1990 maybe.

8    Q.         I'm sorry, in 1989, is that what you said?

9    A.         '89 or '90, somewhere thereabouts.

10   Q.         And was this surgery performed by Dr. Solomon?

11   A.         Yes.

12   Q.         And where was it performed?

13   A.         On my left shoulder.

14   Q.         I'm sorry, the location of the hospital?

15   A.         Natick.

16   Q.         Is it at the Leonard Morse Hospital in Natick?

17   A.         Yes.

18   Q.         Did you also see Dr. Solomon concerning your

19               knee?

20   A.         Yes.

21   Q.         When did you stop seeing Dr. Solomon concerning

22               your knee?

23   A.         I don't recall.

24   Q.         Did you continue to see Dr. Solomon concerning

```
 1              your knee after you stopped seeing him concerning your

 2              rotator cuff injury?

 3    A.             Like I said, the insurance company did not pay

 4              the bills so therefore he wouldn't see me.

 5    Q.             Do you know when the insurance company stopped

 6              paying the bills to Dr. Solomon?

 7    A.             They still haven't paid him.

 8    Q.             But do you recall when they stopped paying the

 9              bills?

10    A.             They never paid him.

11    Q.             When did you begin seeing Dr. Solomon?

12    A.             Sometime shortly after the accident.

13    Q.             So you began to see Dr. Solomon in about 1987,

14              is that correct?

15    A.             1988.

16    Q.             Do you recall what month you had your rotator

17              cuff surgery?

18    A.             No.

19    Q.             Is there anything that would help you remember

20              when you had this surgery?

21    A.             Not offhand.

22    Q.             How soon after you had your surgery did you stop

23              seeing Dr. Solomon?

24    A.             Six months maybe.
```

1    Q.          Do you recall if your surgery was in the summer?

2    A.          No.

3    Q.          Winter?

4    A.          I don't remember.

5    Q.          Do you currently have any limitations concerning

6                your rotator cuff injury, physical limitation?

7    A.          Yes, it still bothers me.

8    Q.          You said it still bother you, do you take any

9                medication concerning the pain of your rotator cuff?

10   A.          Yes.

11   Q.          And what medications are those?

12   A.          Motrin, Advil.

13   Q.          Have you seen any doctor for this injury since

14               you stopped seeing Dr. Solomon?

15   A.          No.

16                         MS. PENNINI: That's all I have.

17                         MR. LATHROP: Well I am going to take a

18               break to decide whether or not I am going to have any

19               questions.

20                         (A brief recess was taken)

21   EXAMINATION

22                         BY MR. LATHROP:

23   Q.          Mr. Goulet, what date is today?

24   A.          October 4th, 2005.

JANEY ASSOCIATES

1    Q.        Is discovery over in this case?

2    A.        No.

3    Q.        Is discovery with regard to the union over in

4              this case?

5    A.        No.

6    Q.        As of the time that the APA decision was issued

7              were you receiving Worker's Compensation benefits?

8    A.        No.

9    Q.        You were off Worker's Compensation by the time

10             of the APA decision?

11   A.        Yes.

12   Q.        As of the time of the APA decision were you

13             under the active care of any physicians for your

14             Worker's Compensation injuries?

15   A.        Nope.

16   Q.        At anytime after March 1st, 2002 did you receive

17             a call from New Penn to go to work?

18   A.        No.

19   Q.        If you had received a call from New Penn at

20             anytime after March 1st, 2002 to go to work, what

21             would you have done?

22             MR. GLUEK: Objection.

23             THE WITNESS: I would've made every effort

24             to go to work and get clearance from the doctors, had

1          they called.

2                    MR. LATHROP: Thank you.  I have nothing

3          else.

4                    (Whereupon, the deposition in the above-

5          entitled matter was concluded at 12:45 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

I, Michael C. Janey, a Massachusetts Verbatim Court Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 4th day of October, 2005, at 10:05 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined under his oath and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further testify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 15th day of October, 2005.

My Commission expires on
October 28, 2005.

_____

Michael C. Janey, CR, Notary Public


JANEY ASSOCIATES

I have read the foregoing transcript
of the testimony and the same
contains a true and accurate
recording of my answers given to the
questions therein set forth.

_____

Signed under the pains and penalties
of perjury.

_____
      Date