UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CRAIG GOULET, | ) | Civil Action No. 04-12577 JLT |
| | ) | |
| Plaintiff, | ) | JUDGE TAURO |
| | ) | |
| vs. | ) | **AMENDED NOTICE OF FILING** |
| | ) | **DEPOSITION TRANSCRIPT OF** |
| NEW PENN MOTOR EXPRESS, INC., | ) | **PLAINTIFF CRAIG GOULET** |
| et. al., | ) | |
| | ) | |
| Defendants. | ) | |

Please take notice that on Tuesday, January 17, 2006, Defendant New Penn Motor Express, Inc., filed with this Court the complete deposition transcript and errata sheet of Plaintiff Craig Goulet.

Respectfully submitted,

/s/ Carl H. Gluek
T. Merritt Bumpass, Jr. (Ohio Bar # 0015189)
mbumpass@frantzward.com
Carl H. Gluek (Ohio Bar #0029531)
cgluek@frantzward.com
FRANTZ WARD LLP
2500 Key Center
127 Public Square
Cleveland, Ohio 44114-1230
(216) 515-1660
(216) 515-1650 (facsimile)

and

Nicholas A. Klinefeldt (BBO # 647422)
nklinefeldt@klhboston.com
KELLY, LIBBY & HOOPES, P.C.
175 Federal Street
Boston, Massachusetts 02110
(617) 338-9300
(617) 338-9911 (facsimile)

Attorneys for Defendant New Penn Motor
Express, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Amended Notice of Filing Deposition Transcript of Plaintiff Craig Goulet served upon Scott A. Lathrop, Esq. of Scott A. Lathrop & Associates, Attorney for Plaintiff, 122 Old Ayer Road, Groton, MA 01450 and Kathleen Pennini, Esq. of Dwyer, Duddy, Facklam, Attorney for Teamsters Local 25, One Center Plaza, Suite 360, Boston, MA 02108, via electronic filing and ordinary U.S. mail, postage prepaid, this 17th day of January, 2006.

/s/ Carl H. Gluek
Carl H. Gluek, Esq.

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * *
                                  *
CRAIG GOULET,                     *
                                  *
        Plaintiff,                *
                                  *
- vs. -                           *    C.A. # 04-12577-JLT
                                  *
NEW PENN MOTOR EXPRESS,           *
                                  *
and                               *
                                  *
TEAMSTERS LOCAL 25                *
INTERNATIONAL BROTHERHOOD OF      *
TEAMSTERS,                        *
                                  *
        Defendant.                *
                                  *
* * * * * * * * * * * * * * * * * *

        DEPOSITION of CRAIG GOULET, a witness called by and

on behalf of the defendants, pursuant to the provisions of

the Massachusetts Rules of Civil Procedure, before Michael

C. Janey, a Professional Reporter and Notary Public in and

for the Commonwealth of Massachusetts, at the offices of

Dwyer, Duddy and Facklam, P.C., Two Center Plaza, Suite

430, Boston, Massachusetts, 02108 on Tuesday, October 4,

2005, commencing at 10:05 a.m.

JANEY ASSOCIATES

P. O. Box 365355
Boston, MA 02136-0003
(617) 364-5555
Fax (617) 364-5550

APPEARANCES:

Scott A. Lathrop, Esquire, law office of SCOTT A. LATHROP, 122 Old Ayer Road, Groton, Massachusetts, 01450, (978) 448-8234; on behalf of the Plaintiff.

Kathleen A. Pennini, Esquire, law offices of DWYER, DUDDY AND FACKLAM, Two Center Plaza, Suite 430, Boston, Massachusetts, 02108, (617) 723-9777; on behalf of the Defendant, International Brotherhood of Teamsters, Local 25.

Carl H. Gluek, Esquire, law office of FRANTZ WARD, LLP, 2500 Key Center, 127 Public Square, Cleveland, Ohio, 44114-1230, (216) 515-1660; on behalf of Defendant, New Penn Motor Express.


Also Present: Mark Harrington

I N D E X

DEPOSITION OF:                                          Page

CRAIG GOULET

Examination by Ms. Pennini                                6

Examination by Mr. Gluek                                 65

Examination by Ms. Pennini                               96

Examination by Mr. Lathrop                              103

EXHIBITS:                                               Page

#1    (Grievance Decision)                               25

#2    (Grievance Report dated 4/7/03)                    41

#3    (Letter to M. Harrington from C. Goulet,
       dated 7/25/03)                                    42

#4    (Letter to M. Harrington from C. Goulet,
       dated 11/24/03)                                   49

1                     S T I P U L A T I O N S

2                          It is hereby stipulated and agreed by and

3              between counsel for the respective parties that the

4              reading and signing of the deposition by the witness

5              is not waived, but that the deposition may be signed

6              under the pains and penalties of perjury within

7              forty-five days of receipt of the transcript.

8                          It is further stipulated and agreed that

9              all objections, except as to the form of the

10             questions, and motions to strike shall be reserved

11             until the time of hearing or trial in this matter.

12                         CRAIG GOULET, having duly affirmed that

13             his testimony would be the truth, the whole truth, and

14             nothing but the truth, testified as follows in answer

15             to direct interrogatories:

16                         MS. PENNINI: Before we begin, do we

17             stipulate to the usual stipulations, objections except

18             as to form reserved until trial?

19                         MR. LATHROP: And motions to strike.

20                         MS. PENNINI: And motions to strike, I'm

21             sorry.  And regarding the signing of the deposition?

22                         MR. LATHROP: Mr. Goulet will read it and

23             sign it, and if we can waive the requirement that he

24             sign it in front of a notary and still simply sign it

1        under the pains and penalties of perjury, that would

2        be acceptable to me.

3                    MS. PENNINI: That's fine with me.

4                    MR. GLUEK: That's fine.

5                    MS. PENNINI: Will that be thirty days from

6        receipt of the deposition?

7                    MR. LATHROP: If we want to do it by

8        agreement, let's make it just forty-five.

9                    MS. PENNINI: Okay.  Forty-five days is

10       fine.

11                   MR. GLUEK: We don't have a motion date

12       pending, correct?

13                   MS. PENNINI: I'm sorry.

14                   MR. GLUEK: There is no motion date

15       pending.

16                   MR. LATHROP: I don't believe so.  I

17       believe all we have is November 1st.

18                   MR. GLUEK: Right.  That is our pretrial,

19       so conceivably this judge, he could schedule a very

20       short time line.

21                   MR. LATHROP: The flip side is he gave us

22       until the end of the month to complete discovery

23       anyway, so I don't think he could -- I mean, I would

24       support you and say, this is too short a deadline, we

```
 1          don't even have the transcript back yet if he tries to
 2          do it.
 3                    MR. GLUEK: Okay.  That's fine.
 4                    MS. PENNINI: I was under the impression
 5          after the first scheduling conference that this is
 6          more of a status conference to see whether discovery
 7          has been completed before setting any additional
 8          deadlines.
 9                    MR. LATHROP: I'm sure that is the case.
10          Unlike other pretrial conferences in Massachusetts
11          where you establish in advance all the motion
12          deadlines and so forth.
13                    MS. PENNINI: Right, because we only solely
14          discussed discovery at the first scheduling
15          conference.
16                    MR. LATHROP: If you are concerned about
17          that I will support you in the notion that an early
18          cut off time is unfair to you.
19                    MR. GLUEK: Okay
20   EXAMINATION
21                    BY MS. PENNINI:
22   Q.               Could you please state your name?
23   A.               Craig Steven Goulet, Sr.
24   Q.               Could you spell your last name, please?
```

```
 1    A.          G-O-U-L-E-T.

 2    Q.          And where do you currently live?

 3    A.          305 Cox Street, Hudson, Massachusetts.

 4    Q.          Are you currently employed?

 5    A.          No.

 6    Q.          Are you currently a member of Teamsters Local

 7          25?

 8    A.          Yes, I am.

 9    Q.          How long have you been a member of Teamsters

10          Local 25?

11    A.          Since 1987.

12    Q.          Were you ever a member of any other Teamsters

13          local?

14    A.          Yes, I was.

15    Q.          And what local?

16    A.          Local 170.

17    Q.          When were you a member of Local 170?

18    A.          1979.

19    Q.          Until what time?

20    A.          Until 1987.

21    Q.          What employers did you work for while a member

22          of Local 170?

23    A.          I worked for McLean Trucking.

24    Q.          And where is that located?
```

JANEY ASSOCIATES

```
1    A.        It was on Route 20 in Shrewsbury.

2    Q.        What did you do at McLean Trucking?

3    A.        I worked on the loading dock.

4    Q.        How long did you work there?

5    A.        Off and on until they went out of business

6              sometime in the early 80's.

7    Q.        So beginning in '79?

8    A.        Um-hum.

9    Q.        Anyplace else?

10   A.        Pilot Freight Carriers.

11   Q.        And when did you work there?

12   A.        From 1979 until they went out of business.

13   Q.        So you ended your employment there because they

14             went out of business?

15   A.        Yes.

16   Q.        Anyplace else?

17   A.        Roadway Express.

18   Q.        And when did you work there?

19   A.        From 1979 until approximately 1984.

20   Q.        Did you work for McLean, Pilot, and Roadway all

21             at the loading dock?

22   A.        Yes.

23   Q.        And why did you stop working for Roadway

24             Express?
```

JANEY ASSOCIATES

1    A.        I made the list with Sanborns Motor Express.

2    Q.        I'm sorry, could you repeat that?

3    A.        Sanborns.  I made the list, the seniority list

4              with Sanborns Motor Express.

5    Q.        And how is that related to Roadway?

6    A.        Separate company.

7    Q.        Did you work with these companies at the same

8              time or one after the other?

9    A.        No, I worked with them all at the same time.

10   Q.        And you said you made the seniority list with

11             Sanborn?

12   A.        Yes.

13   Q.        And how long did you work for Sanborn?

14   A.        I worked for Sanborns from 1984 up until the

15             time they were bought out by APA Transport.

16   Q.        And when was that?

17   A.        October, 1986.

18   Q.        What facility did you work for for Sanborn?

19   A.        Out of their Wrentham, Mass facility.

20   Q.        Did you work at Sanborn on the loading dock, as

21             well?

22   A.        I was a -- I worked the loading dock and I drove

23             for them.

24   Q.        Did you continue to work in Wrentham when you

| | | |
|---|---|---|
| 1 | | began working for Sanborn Trucking -- I mean, when |
| 2 | | Sanborn was bought out by APA? |
| 3 | A. | No, I went to work at the APA Canton facility. |
| 4 | Q. | When did you begin work at APA in Canton? |
| 5 | A. | October of 1986. |
| 6 | Q. | How long did you work for APA? |
| 7 | A. | I worked for them from October, 1986 until March |
| 8 | | 11th, 1987. |
| 9 | Q. | And what happened on March 11th, 1987? |
| 10 | A. | I was involved in a industrial accident. |
| 11 | Q. | Could you explain this industrial accident for |
| 12 | | me, please? |
| 13 | A. | I was loading a -- unloading a truck with a |
| 14 | | forklift and the truck pulled away from the loading |
| 15 | | dock. |
| 16 | Q. | How did that result in injury to you? |
| 17 | A. | Myself and the forklift both went off the |
| 18 | | loading dock and I ended with a herniated disc in my |
| 19 | | neck, lower back, torn rotator cuff in my shoulder, |
| 20 | | torn ligament in my knee. |
| 21 | Q. | Did you go to the hospital on March 11th |
| 22 | | following this injury? |
| 23 | A. | Yes, I did. |
| 24 | Q. | And what hospital? |

| 1  | A. | Goddard Memorial Hospital. |
|----|----|----|
| 2  | Q. | Where is Goddard Memorial? |
| 3  | A. | Stoughton. |
| 4  | Q. | Had you previously been terminated from your |
| 5  |    | employment at APA by letter on February 25th, 1987? |
| 6  | A. | Yes. |
| 7  | Q. | And what precipitated that termination? |
| 8  | A. | I think there was an argument between me and the |
| 9  |    | night boss, a disagreement. |
| 10 | Q. | Do you recall the date on which this argument |
| 11 |    | with the night boss happened? |
| 12 | A. | No, not offhand I don't. |
| 13 | Q. | Was it on February 25th? |
| 14 | A. | It could've been. |
| 15 | Q. | Could it have been before February 25th? |
| 16 | A. | I don't recall. |
| 17 | Q. | Had you ever received any written warnings from |
| 18 |    | the terminal manager at APA prior to February 25th? |
| 19 | A. | Yes, I had. |
| 20 | Q. | And for what reason were you given a written |
| 21 |    | warning? |
| 22 | A. | Misloading freight, I think. |
| 23 | Q. | Do you recall if there were any other |
| 24 |    | disciplinary issues while you were working for APA? |

1    A.        Yeah, I think there was.

2    Q.        Could you tell me what those are?

3    A.        Not offhand, no.

4    Q.        Do you recall approximately when they occurred?

5    A.        Sometime between October of '86 and March 11th

6              of '87.

7    Q.        Do you recall how many disciplinary issues you

8              had during that time?

9    A.        I do not.

10   Q.        Do you recall whether they were written warnings

11             or suspensions?

12   A.        There was a written warning.  May have been

13             several written warnings and a discharge.

14   Q.        And was the discharge you are speaking of the

15             one on February 25th?

16   A.        Yes.

17   Q.        Do you recall how your termination of February

18             25th was resolved?

19   A.        Yes.

20   Q.        How was it resolved?

21   A.        It went to the Joint Area Committee.

22   Q.        And what was the result?

23   A.        I was put back to work.

24   Q.        When did you come back to work after the

JANEY ASSOCIATES

1           February 25th termination?

2    A.         I'm not sure offhand.

3    Q.         Do you recall whether it was in February or

4           March?

5    A.         I believe it was March.

6    Q.         Do you recall if it was more than a week prior

7           to March 11th?

8    A.         No, as I recall I think it was March 11th.

9    Q.         So you think you returned back to work on the

10          day you were injured?

11   A.         Yes.

12   Q.         What time of the day was the accident with the

13          forklift during the unloading of a truck?

14   A.         It was approximately 7:30 at night.

15   Q.         And you said after that you went to the Goddard

16          Memorial Hospital in Stoughton?

17   A.         Yes.

18   Q.         Were you kept at the hospital?

19   A.         No.

20   Q.         What sort of procedures did they do when you

21          were at the hospital during that night?

22   A.         They took an x-ray of my leg.  I believe they

23          took an x-ray of my neck.  Told me to follow up with

24          my doctor.

1    Q.        Did you inform APA of what had occurred at the

2              hospital?

3    A.        Yes.

4    Q.        And what did they tell you?  Did you return back

5              to work on March 12th?

6    A.        No.

7    Q.        And why didn't you return back to work on March

8              12th?

9    A.        I went out on an industrial accident, Workman's

10             Comp.

11   Q.        Had you informed APA that you were unable to

12             return to work on the 12th?

13   A.        Yes.

14   Q.        Were you soon thereafter terminated for the

15             events of March 11th, 1987?

16   A.        Yes.

17   Q.        And do you recall when you were terminated?

18   A.        March 12th.

19   Q.        Do you know what sort of Worker's Compensation

20             benefits you received?

21   A.        Partial disability.

22   Q.        And do you recall why you received partial

23             disability?

24   A.        I don't think I understand the question.

JANEY ASSOCIATES

```
 1    Q.         Do you understand the difference between partial
 2         disability benefits and full disability benefits?
 3    A.         Yes.
 4    Q.         And starting soon after March 12th you began to
 5         receive partial disability benefits?
 6    A.         Yes.
 7    Q.         Do you know why you received partial disability
 8         benefits as opposed to full disability benefits?
 9    A.         That's what the judge ordered.
10    Q.         And what judge was this?
11    A.         Judge Scannell.
12    Q.         When was that ordered by Judge Scannell?
13    A.         In June, 1987.
14    Q.         Is Judge Scannell an administrative law judge
15         for the Department of Industrial Accident?
16    A.         She was at the time, yes.
17    Q.         Did you file a grievance as a result of your
18         termination on March 12th?
19    A.         The union hall filed a complaint.  My business
20         agent at the time filed a complaint.
21    Q.         And who was the business agent?
22    A.         George Cashman.
23    Q.         Do you recall when this complaint was heard?
24    A.         Yes.
```

| 1  | Q. | When was that? |
|----|----|----|
| 2  | A. | October 16th, 2001. |
| 3  | Q. | Could you tell me why there was a lapse of 14 |
| 4  |    | years between the time the complaint was filed and the |
| 5  |    | date of the hearing in this matter? |
| 6  | A. | Because I was on Workman's Compensation, and the |
| 7  |    | rules of procedure with the grievance committee |
| 8  |    | stipulated that they wouldn't hear the case as long as |
| 9  |    | it was pending in another venue. |
| 10 | Q. | Following the order of Judge Scannell in 1987, |
| 11 |    | did you appeal her granting of partial disability |
| 12 |    | benefits? |
| 13 | A. | Yes, I believe I did. |
| 14 | Q. | What was the result of that appeal? |
| 15 | A. | I'm not quite sure. |
| 16 | Q. | Did you continue to receive partial disability |
| 17 |    | benefits? |
| 18 | A. | Yes, I did. |
| 19 | Q. | Do you recall whether there are any additional |
| 20 |    | appeals besides the initial appeal? |
| 21 |    | MR. LATHROP: You are speaking about the |
| 22 |    | industrial accident? |
| 23 |    | MS. PENNINI: I'm sorry, I'm speaking about |
| 24 |    | the industrial accident appeal. |

```
 1                    THE WITNESS: Yes, I believe there was.
 2                BY MS. PENNINI:
 3      Q.        Do you recall how many appeals there were?
 4      A.        No.
 5      Q.        Were all the appeals filed by you or your
 6                attorney?
 7      A.        My attorney.
 8      Q.        And when were these appeals finally resolved
 9                with a final decision, do you recall?
10      A.        No.
11      Q.        Were there numerous appeals between 1987 and
12                2001?
13      A.        I don't know how many appeals there were, maybe
14                one.
15      Q.        And that was heard before 2001?
16      A.        Yes.
17      Q.        While you were receiving partial Worker's
18                Compensation benefits, did you hold any other
19                employment?
20      A.        No.
21      Q.        Did you look for additional employment between
22                March 11th, 1987 and October of 2001?
23      A.        No.
24      Q.        Did you seek any light duty work of any sort?
```

1    A.        Yes.

2    Q.        And where did you seek light duty work?

3    A.        With APA.

4    Q.        And what was their response, APA's response?

5    A.        APA's response was that I was discharged.  I was

6              a discharged employee.

7    Q.        When did you seek light duty work with APA?

8    A.        Sometime in early 1991 or 2 maybe.

9    Q.        Did you seek any light duty employment with any

10             other company?

11   A.        Nope.

12   Q.        In 1991-1992, had you received any documentation

13             from any doctor concerning your ability to return to

14             work?

15   A.        I don't recall.

16   Q.        Between 1987 and 1991, were there any

17             restrictions concerning your ability to work placed on

18             you by your doctor?

19   A.        Yes.

20   Q.        And what were those restrictions?

21   A.        That I was unable to work.

22   Q.        Can you be anymore specific?

23   A.        No, not offhand I can't.

24   Q.        Did you have any restrictions concerning the

| | | |
|---|---|---|
| 1 | | amount that you could lift? |
| 2 | A. | Yes. |
| 3 | Q. | And what was that restriction? |
| 4 | A. | 35 pounds. |
| 5 | Q. | Do you recall any other restrictions? |
| 6 | A. | No, I don't. |
| 7 | Q. | Do you recall if there were more restrictions |
| 8 | | than you could not lift more than 35 pounds? |
| 9 | A. | I don't recall offhand, no. |
| 10 | Q. | I'm sorry, you don't recall what the other |
| 11 | | restrictions were or you don't recall whether there |
| 12 | | was more than that one restriction? |
| 13 | A. | I don't recall at all. |
| 14 | Q. | So you do not recall whether there was -- I'm |
| 15 | | just trying to understand you.  You do not recall if |
| 16 | | there were any other restrictions? |
| 17 | A. | Yeah, I had a lot of doctor's reports. |
| 18 | Q. | Did you continue to receive health benefits |
| 19 | | while you were on Worker's Compensation leave? |
| 20 | A. | I did up until a point, up until sometime. |
| 21 | Q. | And when was that time? |
| 22 | A. | It may have been a year after I got hurt. |
| 23 | Q. | Do you not recall the exact date? |
| 24 | A. | I can't be sure.  The health and welfare was |

```
 1              paid on my behalf for a period of one year, so I was

 2              covered for a year and then possibly six months after

 3              that.

 4     Q.       And after that time did you not have any health

 5              benefits?

 6     A.       I did not.

 7     Q.       Did you receive any compensation in addition to

 8              your partial disability benefits between the years of

 9              1987 and 2001?

10     A.       Yes.

11     Q.       What form of compensation did you receive?

12     A.       Social Security Disability.

13     Q.       And when did you receive that, what years?

14     A.       I think it was 1995.

15     Q.       You began to receive it in '95 or you only

16              received it in 1995?

17     A.       No, I began to receive it in 1995.

18     Q.       Did you receive any other compensation besides

19              Social Security?

20     A.       No.

21     Q.       So just to be clear, between 1987 and 2001 the

22              only compensation that you received was from Social

23              Security Disability benefits and Worker's Comp partial

24              disability benefits?
```

1    A.        Yes.

2    Q.        Did you keep in contact with anyone at Teamsters

3              Local 25 while you were out on Worker's Compensation

4              leave?

5    A.        Yes.

6    Q.        With whom did you keep in contact?

7    A.        I spoke with George Cashman over the years.

8    Q.        Anybody else?

9    A.        Mark Harrington.

10   Q.        Do you recall what years you spoke with Mark

11             Harrington?

12   A.        Sometime in 2001.

13   Q.        So the first time you spoke with Mark Harrington

14             was about 2001?

15   A.        Yeah.

16   Q.        Do you recall approximately when you would speak

17             to George Cashman?

18   A.        No, I don't remember approximately when.  Just

19             there was conversation over the years.  We talked.

20   Q.        How often did you speak with Mr. Cashman?

21   A.        About every few months.

22   Q.        Would you stop by the union hall to speak with

23             Mr. Cashman?

24   A.        I did.

1    Q.        Did you keep in contact with him through any

2              other means?

3    A.        No.

4    Q.        Would you ever telephone Mr. Cashman?

5    A.        Yes.

6    Q.        Besides George Cashman and Mark Harrington, did

7              you keep in contact with anyone else at Local 25?

8    A.        No.

9    Q.        How often would you go to the union hall during

10             that time?

11                       MR. LATHROP: I'm sorry, what time frame

12             are we talking about here?

13                       MS. PENNINI: I'm sorry, between 1987 and

14             2001.

15                       THE WITNESS: I don't recall.

16                       BY MS. PENNINI:

17   Q.        But occasionally you would go to the union hall?

18   A.        Occasionally, yes.  I used to stop by to pay my

19             dues, something like that.

20   Q.        Were you ever a steward for a Teamsters local?

21   A.        No.

22   Q.        What sorts of discussions would you have with

23             Mr. Cashman?

24   A.        I don't know offhand.

1   Q.       You don't recall any general topics of

2          conversations?

3   A.       Nope.

4   Q.       Would you ever discuss whether you would be

5          returning back to work with Mr. Cashman?

6   A.       Nope.

7   Q.       Would you discuss what was going on with

8          different employers over at Local 25 with Mr. Cashman?

9   A.       Yeah, I think maybe I might've attended some

10        meetings.  You know, general union meetings.

11   Q.      Do you recall anything else concerning your

12        correspondence or interaction with Mr. Cashman between

13        1987 and 2001?

14   A.      No.

15   Q.      And you said you began to speak or see

16        Mr. Harrington in 2001?

17   A.      Yes.

18   Q.      Do you recall why you began to speak with

19        Mr. Harrington?

20   A.      I had exhausted all my partial disability

21        benefits.

22   Q.      Okay.  And how is that related to

23        Mr. Harrington?

24   A.      Well in order to have my discharge case heard at

```
 1              the panel, I needed to discuss it with Mr. Harrington

 2              who was the business agent at that time.

 3    Q.        And you said you had exhausted your partial

 4              disability benefits, could you explain to me what you

 5              mean by that?

 6    A.        My benefits came to an end.

 7    Q.        Is that because you had received a certain

 8              number of weeks of benefits?

 9    A.        Yes.

10    Q.        And you said you contacted Mr. Harrington

11              because you wanted your grievance to be heard?

12    A.        Yes.

13    Q.        Was your grievance subsequently heard?

14    A.        Yes, it was.

15    Q.        And what's the date of that?

16    A.        October 16th, 2001.

17    Q.        Where was this grievance heard?

18    A.        At the union hall.

19    Q.        Do you recall who it was heard by?

20    A.        It was heard by the committee.

21    Q.        And what committee was this?

22    A.        It was the Southern New England Joint Area

23              Committee.

24    Q.        And you said it was held at the union hall,
```

| 1 | | which union hall are you referring to? |
|---|---|---|
| 2 | A. | At the Teamsters Local 25. |
| 3 | Q. | Do you recall what the result of this hearing |
| 4 | | was? |
| 5 | A. | Yes. |
| 6 | Q. | And what was the result? |
| 7 | A. | My seniority was reinstated. |
| 8 | Q. | Do you recall anything else concerning the |
| 9 | | result of the Joint Area Committee grievance decision? |
| 10 | A. | No. |
| 11 | | MS. PENNINI: Can I just have one second? |
| 12 | | (A brief recess was taken) |
| 13 | | MS. PENNINI: Could I have this marked as |
| 14 | | an Exhibit, please? |
| 15 | | (The document above-referred |
| 16 | | to was marked Deposition |
| 17 | | Exhibit No. 1 for Identification) |
| 18 | | BY MS. PENNINI: |
| 19 | Q. | If you could please look at deposition Exhibit |
| 20 | | 1, Mr. Goulet? |
| 21 | A. | Yeah. |
| 22 | Q. | Have you seen this document before? |
| 23 | A. | Yes, I have. |
| 24 | Q. | Could you tell me what this document is? |

JANEY ASSOCIATES

1    A.        It's the decision from the Southern New England

2              Committee.

3    Q.        When did you first see this decision?

4    A.        When it was mailed to me.

5    Q.        And do you recall approximately when you

6              received it?

7    A.        Yeah, maybe two weeks after the hearing.

8    Q.        Could you explain to me what the decision was?

9              MR. LATHROP: Objection.

10             THE WITNESS: The decision was, put me back

11             on the seniority list and it states that upon me

12             giving the company documentation of my ability to work

13             to unrestricted duties, I had to serve a 10-day

14             suspension.

15             BY MS. PENNINI:

16   Q.        Did you ever submit any documentation to APA

17             regarding your ability to return to unrestricted

18             duties?

19   A.        No.

20   Q.        Did you ever serve a 10-day suspension at APA?

21   A.        No.

22   Q.        Did you understand this decision to immediately

23             reinstate you onto the seniority list for APA?

24   A.        Yes, I did.

1    Q.        Did you --

2    A.        I received a phone call by Bill Carnes --

3    Q.        I'm sorry, I'm asking you a question.

4              MR. LATHROP: But nonetheless, if he needs

5              to expand upon his answer he has a right to do that.

6              MS. PENNINI: Well I will allow you to do

7              that in one second.  I'm sorry, I was in the middle of

8              trying to get a question out.

9              BY MS. PENNINI:

10   Q.        So you said that you believed your seniority was

11             immediately reinstated and you should have been placed

12             on the seniority list immediately upon the decision of

13             the New England Joint Area Grievance Committee?

14   A.        I was put back on the seniority list

15             immediately.

16   Q.        How do you know that you were immediately put

17             back on the seniority list?

18   A.        I received a phone call from Bill Carnes --

19   Q.        And what did Bill --

20   A.        -- that afternoon, and also from Mr. Harrington.

21   Q.        I'm sorry, what afternoon?

22   A.        The afternoon they heard the case on October

23             16th, congratulating me and telling me that I won.

24   Q.        Did you receive one phone call or two separate

```
 1              phone calls?

 2     A.       Two separate phone calls.

 3     Q.       Do you recall what Mr. Carnes had said during

 4              his phone call?

 5     A.       "Congratulations, you won your case."

 6     Q.       Did he explain to you what the decision said?

 7     A.       Yes.

 8     Q.       And what did he say?

 9     A.       He said, "You have to serve a 10-day suspension

10              before you can go back to work."

11     Q.       Did Mr. Carnes tell you that you had been placed

12              back on the seniority list?

13     A.       Yes, that was my understanding.

14     Q.       Did he say that?

15     A.       I believe he did.

16     Q.       You don't recall whether he said precisely, "You

17              have been returned to the seniority list at APA Canton

18              facility."?

19     A.       Precisely, I do not know.

20     Q.       And you said you also received a call from

21              Mr. Harrington?

22     A.       Yes.

23     Q.       Could you tell me what Mr. Harrington said to

24              you on the phone that day?
```

JANEY ASSOCIATES

```
 1   A.         Basically, the same.  You know, it had the same

 2              context.  It was, "You won your case.

 3              Congratulations, you won your case."

 4   Q.         Did Mr. Harrington say anything else?

 5   A.         Nope.

 6   Q.         Did he tell you you would have to serve a 10-day

 7              suspension?

 8   A.         Yes, I believe he did.

 9   Q.         Did he tell you you were back on the seniority

10              list at APA?

11   A.         Yes, I believe he did.

12   Q.         Do you recall whether he said, "You're back on

13              the seniority list."?

14   A.         No, I don't recall.

15   Q.         Did you ever work for APA after October 16th,

16              2001?

17   A.         No.

18   Q.         Did you ever see a seniority list for the APA

19              terminal in Canton, Massachusetts with your name on

20              the seniority list?

21   A.         Yes.

22   Q.         Were you working at APA at the time that it

23              ceased operating?

24   A.         No.
```

```
 1    Q.         Do you know when APA ceased its operations?

 2    A.         Sometime in February of 2002.

 3    Q.         And how did you learn that APA was closing its

 4               operations?

 5    A.         I had spoke with the steward.

 6    Q.         Did the steward call you to inform you?

 7    A.         Yes, he did.

 8    Q.         And who was the steward?

 9    A.         Doug Francie.

10    Q.         Do you recall when he called you?

11    A.         No.  Approximately -- there may have been

12               several phone calls.  One initially is the word, "Get

13               out, that the company was closing."

14    Q.         And Francie called you to let you know the

15               company was closing?

16    A.         I think probably I called him initially.

17    Q.         How did you get word that APA was closing?

18    A.         Someone called me.

19    Q.         Do you recall who called you?

20    A.         My sister-in-law.

21    Q.         And how did your sister-in-law know that APA was

22               closing?

23    A.         She worked for a company and had spoke with

24               another truck driver.
```

```
 1   Q.           Your sister-in-law worked for APA, is that what
 2        you said?
 3   A.           No, she worked for another company.
 4   Q.           What company did she work for?
 5   A.           Vincent Metal Goods.
 6   Q.           Vincent Metal Goods, is that what you said?
 7   A.           Yeah, um-hum.
 8   Q.           And she became aware that APA was closing?
 9   A.           Yes.
10   Q.           And could I have your sister-in-law's name?
11   A.           Dawn.
12   Q.           And her last name?
13   A.           Goulet.
14   Q.           Is it D-A-W-N?
15   A.           Yes.
16   Q.           And Goulet as you previously spelled it?
17   A.           Um-hum.
18   Q.           Where is Vincent Metal Goods located?
19   A.           I believe they're in Fort Devins now at Devins.
20        They were in Marlboro at the time.
21   Q.           So after your sister-in-law informed you that
22        APA was closing you called Doug Francie?
23   A.           Yes.
24   Q.           How did you know to contact Doug Francie?
```

```
 1    A.        Doug Francie was the union steward.

 2    Q.        And where was he the union steward for?

 3    A.        For APA, at the Canton facility.

 4    Q.        How did you know that he was the APA union

 5              steward at the Canton facility?

 6    A.        As I said, I had been to union meetings and kept

 7              in contact with the -- you know, other workers.

 8    Q.        Other workers at APA?

 9    A.        Yes.

10    Q.        What other workers did you keep in contact with?

11    A.        Jerry Hurley was a mechanic.  I'd spoke with

12              Kevin Power over the years.

13    Q.        Are Jerry Hurley and Kevin Power both APA

14              workers at the Canton facility?

15    A.        Yes.

16    Q.        I'm sorry, go on, I didn't mean to interrupt

17              you.

18    A.        There was another fellow, Mike Cruz, drove a

19              truck in the Hudson area.  I would see him from time

20              to time.

21    Q.        Was he at the APA Canton facility as well?

22    A.        Yes.

23    Q.        How did you get Doug Francie's telephone number?

24    A.        Oh, I had the phone number.
```

```
 1    Q.         Did you call him at home?

 2    A.         Yes.

 3    Q.         How did you have his home phone number?

 4    A.         As I said, he was the union steward.

 5    Q.         Had you known Doug Francie prior to February of

 6               2002?.

 7    A.         Yes.

 8    Q.         And how did you know him?

 9    A.         I worked with him at Sanborns Motor Express.

10    Q.         What did you speak with Mr. Francie about?

11    A.         Well it was general conversation about the

12               company was closing.

13    Q.         Did you tell Mr. Francie you had heard that the

14               company was closing?

15    A.         Yes.

16    Q.         Do you recall what else you said to him?

17    A.         We just discussed in general the fact that the

18               company was going out of business.

19    Q.         Did you ask Mr. Francie if you could be put on a

20               call list for New Penn Motor Express?

21    A.         Doug Francie called me -- Doug Francie called

22               me, and I'm going to say it was probably February 15th

23               or 16th, maybe the 17th.

24    Q.         And what did he say to you?
```

1    A.        He relayed to me that there was a meeting with

2              the APA men and he wanted to know what my call list

3              preference was.

4    Q.        Did he tell you whether or not you were on his

5              list of people to determine what their preference for

6              a call list facilities were?

7    A.        Yes.

8    Q.        He said you were on the list?

9    A.        I believe that's why he called me.

10   Q.        So Mr. Francie said he thought you were on the

11             Canton facility call list and, therefore, called you

12             to find out your terminal preference, is that an

13             accurate statement?

14   A.        Not entirely.

15   Q.        Okay.

16   A.        I was on the Canton seniority list, the APA

17             Canton seniority list.

18   Q.        Okay.

19   A.        And he called me to ask me what my preference

20             would be as far as the New Penn call list went.

21   Q.        And your conversation with Mr. Francie, when you

22             called him, do you recall what date that occurred on?

23   A.        I don't offhand recall, no.

24   Q.        But you believe you spoke with him on February

```
 1              15th or possibly the 16th or the 17th?
 2    A.        I'm going to say it was the 17th of February.
 3    Q.        That you spoke with Mr. Francie?
 4    A.        Yes.
 5              MR. GLUEK: Could you say what year it is?
 6              MS. PENNINI: I'm sorry.
 7              BY MS. PENNINI:
 8    Q.        Was it February 17th of 2002?
 9    A.        Yes, 2002.
10    Q.        Do you know for sure that it was February 17th,
11              2002?
12    A.        I'm pretty sure it was February 17th, 2002, yes.
13    Q.        But it may have been the 16th or the 15th?
14    A.        No, it was after the 16th.
15    Q.        And how do you know it was after the 16th?
16    A.        Because they had a meeting at the union hall and
17              he called me after the meeting.
18    Q.        Do you know the date of the meeting at the union
19              hall?
20    A.        February 16th.
21    Q.        Did you receive any notification regarding the
22              closure of APA in the mail?
23    A.        Yes.
24    Q.        When did you receive this notification?
```

JANEY ASSOCIATES

1    A.        Sometime in February of 2002.

2    Q.        And by whom was this information sent?

3    A.        Local 25.

4    Q.        After you gave Mr. Francie your terminal

5              preference, did you ever check with Local 25 to make

6              sure that your name was on the call list for New Penn?

7    A.        I made a follow up phone call, I did, to the

8              union hall, yes.

9    Q.        Do you recall with whom you spoke?

10   A.        Mark Harrington.

11   Q.        And when was that?

12   A.        Sometime in March.

13   Q.        In March of what year?

14   A.        2002.

15   Q.        Do you recall what you spoke about during this

16             telephone call?

17   A.        Yes.

18   Q.        And what was that?

19   A.        With regards to the call list and what was going

20             on with the APA people and New Penn agreement.

21   Q.        In February and March of 2002, had you been

22             medically cleared to return to work?

23   A.        No.

24   Q.        Besides your telephone conversation with Mark

| 1  |    | Harrington in March of 2002, did you have any other |
|----|----|-----|
| 2  |    | contact with Local 25? |
| 3  | A. | Yes. |
| 4  | Q. | What sort of contact did you have? |
| 5  | A. | When I spoke with Mr. Harrington he told me that |
| 6  |    | he no longer handled the men at APA, and I would have |
| 7  |    | to speak with Bill Carnes. |
| 8  | Q. | And when did this occur? |
| 9  | A. | Sometime right around March. |
| 10 | Q. | March of? |
| 11 | A. | 2002. |
| 12 | Q. | Was this during the same conversation that you |
| 13 |    | spoke about previously where you asked Mr. Harrington |
| 14 |    | about the call list? |
| 15 | A. | Yes. |
| 16 | Q. | Did you have any additional contact with anyone |
| 17 |    | at Local 25 after -- |
| 18 | A. | Not that I recall. |
| 19 |    | MR. LATHROP: Let her finish the question. |
| 20 |    | BY MS. PENNINI: |
| 21 | Q. | After March of 2002? |
| 22 | A. | Yes. |
| 23 | Q. | What contact did you have? |
| 24 | A. | There were several phone calls to Bill Carnes. |

1    Q.        When did these phone calls occur?

2    A.        I can't be sure right offhand.

3    Q.        Can you tell me, did you have any contact with

4              Mr. Carnes during the spring of 2002?

5    A.        Yes.

6    Q.        What sort of contact did you have with him

7              during the spring of 2002?

8    A.        With regards to the agreement that they had with

9              the New Penn people.

10   Q.        What did he tell you concerning the agreement

11             with the New Penn people?

12   A.        He said that he was going to look into it.

13   Q.        Did you only have one conversation with

14             Mr. Carnes during the spring of 2002?

15   A.        No, I don't think so.  There was probably two.

16   Q.        Two conversations?

17   A.        Yeah.

18   Q.        And what did you speak about during the second

19             conversation?

20   A.        Same issues.

21   Q.        Did you have any contact with him during the

22             summer of 2002?

23   A.        Yes.

24   Q.        What did you speak about during the summer of

JANEY ASSOCIATES

```
 1              2002?

 2      A.      More follow up, more of the same.

 3      Q.      During the summer of 2002, had you been

 4              medically cleared to return to work?

 5      A.      No.

 6      Q.      Did you alert Mr. Carnes that you had not been

 7              medically cleared to return to work?

 8      A.      No.

 9      Q.      Did you tell Mr. Carnes whether you had ever

10              served your 10-day suspension with APA?

11      A.      No.

12      Q.      And approximately how often did you speak to him

13              during the summer of 2002?

14      A.      Several times.  Two.

15      Q.      Several times or two times?

16      A.      Two times.

17      Q.      Did you speak to him during the fall of 2002?

18      A.      I don't recall.

19      Q.      The winter of 2002?

20      A.      I can't be sure.

21      Q.      You are not sure whether you had any contact

22              with Mr. Carnes during the winter of 2002?

23      A.      No, we had -- like I said, we had conversations

24              throughout the year.  There was initial phone call,
```

```
 1              follow up phone call, subsequently I think there was a
 2              third phone call in the spring of 2002, March.
 3      Q.      Had you been medically cleared to return to work
 4              during the winter of 2002?
 5      A.      No.
 6      Q.      Had you been medically cleared to return to work
 7              prior to March 1st of 2003?
 8      A.      No.
 9      Q.      And you said you spoke with Mr. Carnes in March
10              of 2003?
11      A.      Yes.
12      Q.      What sort of contact did you have with
13              Mr. Carnes?
14      A.      I called him, it was probably March 31st, 2003
15              when the agreement expired.
16      Q.      What agreement are you --
17      A.      The agreement that the New Penn people had with
18              the Teamsters negotiating committee, the freight
19              industry negotiating committee and the APA operation.
20      Q.      What else did you discuss during this
21              conversation?
22      A.      The fact that I hadn't been called.
23      Q.      And what did Mr. Carnes tell you?
24      A.      He told me to send a grievance in.
```

1    Q.        And did you send a grievance into Mr. Carnes?

2    A.        I did.

3              MS. PENNINI: Would you mark this as an

4        Exhibit, please?

5                        (The document above-referred

6                         to was marked Deposition

7                         Exhibit No. 2 for Identification)

8              BY MS. PENNINI:

9    Q.        If you could please look at deposition Exhibit

10       No. 2?

11   A.        Um-hum.

12   Q.        Have you seen this document before?

13   A.        Yes.

14   Q.        Were you the author of this document?

15   A.        Yes.

16   Q.        Could you please tell me what this document is?

17   A.        It's a grievance.

18   Q.        A grievance concerning what?

19   A.        It's a grievance concerning my seniority rights.

20   Q.        I'm sorry, what do you mean by "a grievance

21       concerning your seniority rights"?

22   A.        Just as it states.  Would you like me to read

23       it?

24   Q.        Sure.

1    A.          Okay. "In accordance with the National Master

2                Freight Agreement, Article V, and all of Article V

3                subsections, along with the New England Supplemental

4                Freight Agreement, Article No. XLIII, Seniority,

5                including all of Article XLIII subsections, I am

6                filing a grievance against New Penn Motor Express to

7                include all time lost, back pay, seniority and

8                contractual benefits under the contract agreement from

9                March 1st, 2002 up to and continuing past March 1st,

10               2003 based on the agreement between TNFINC and New

11               Penn Motor Express as a result of the closure of APA

12               operations."

13   Q.          And had you been medically cleared to work

14               between March 1st, 2002 and March 1st, 2003?

15   A.          No.

16                    MS. PENNINI: If I could just have one

17               second. Would you please mark that as an Exhibit,

18               please?

19                         (The document above-referred

20                          to was marked Deposition

21                          Exhibit No. 3 for Identification)

22               BY MS. PENNINI:

23   Q.          Did you have any additional contact with

24               Mr. Carnes following your March 31st telephone

| 1 | | conversation with him? |
|---|---|---|
| 2 | A. | I filed a grievance with him. |
| 3 | Q. | When was this grievance filed? |
| 4 | A. | November 7th. |
| 5 | | MR. LATHROP: November? |
| 6 | | THE WITNESS: I mean, April 7th. |
| 7 | | BY MS. PENNINI: |
| 8 | Q. | And did you have any contact with Mr. Carnes |
| 9 | | following your sending of the April 7th, 2003 |
| 10 | | grievance? |
| 11 | A. | No. |
| 12 | Q. | Did you attempt to contact Mr. Carnes at anytime |
| 13 | | after the time you sent the April 7th, 2003 grievance? |
| 14 | A. | No, I did not. |
| 15 | Q. | Following the sending of the April 7th, 2003 |
| 16 | | grievance, what was the next time you had any contact |
| 17 | | with anyone at Local 25? |
| 18 | A. | I spoke to Mark Harrington. |
| 19 | Q. | And when did you speak with Mark Harrington? |
| 20 | A. | Sometime after May 2nd, 2003. |
| 21 | Q. | Why did you speak with Mark Harrington after May |
| 22 | | 2nd, 2003? |
| 23 | A. | Bill Carnes had left office. |
| 24 | Q. | How did you know to contact Mr. Harrington? |

 1   A.        Mr. Harrington was the business agent that was

 2             put in charge of the New Penn people.

 3   Q.        How did you know that Mr. Harrington had been

 4             put in charge of the New Penn employees?

 5   A.        I don't recall.

 6   Q.        Sorry, just to back up a little bit.  Before you

 7             sent Mr. Carnes your April 7th, 2003 letter, did you

 8             inform Mr. Carnes that you were on an APA seniority

 9             list?

10   A.        Yes.

11   Q.        And did you speak with Mr. Carnes during the

12             spring of 2003, on March 31st I believe you said it

13             was, 2003?

14   A.        Yes.

15   Q.        Did you speak with him at all about your

16             October, 2001 grievance decision?

17   A.        No.

18   Q.        So Mr. Carnes was not aware of whether you had

19             been medically cleared to work or had served the

20             10-day suspension as of March 31st, 2003?

21   A.        I don't know what Mr. Carnes knew, what he was

22             aware of.  I have no idea.

23   Q.        You said you spoke with Mr. Harrington sometime

24             after May 2nd, 2003?

| 1  | A. | Yes. |
|----|----|------|

2    Q.    What sort of contact did you have with

3          Mr. Harrington?

4    A.    It was a follow up conversation with regards to

5          the grievance I filed.

6    Q.    A telephone call?

7    A.    Yes.

8    Q.    And do you recall when this telephone call

9          occurred?

10   A.    Sometime after Bill Carnes had left office.

11   Q.    Do you recall when after May 2nd, 2003 such

12         contact occurred?

13   A.    No, not exactly.

14   Q.    Do you recall what you said during this -- was

15         it a telephone conversation?

16   A.    It was a telephone conversation, yes.

17   Q.    And do you recall what you said during this

18         telephone conversation?

19   A.    Regarding my grievance, "What was the status of

20         my grievance?".

21   Q.    Did you specifically ask Mr. Harrington what was

22         the status of your grievance?

23   A.    Yes.

24   Q.    And what did Mr. Harrington say?

JANEY ASSOCIATES

1    A.          He said he didn't -- wasn't aware of a

2                grievance.

3    Q.          Do you recall whether this conversation took

4                place during the summer of 2003?

5    A.          It was in May.  As I said, after Mr. Carnes left

6                office I was calling to follow up on the status of the

7                grievance.

8    Q.          At this time did Mr. Harrington ask you if you

9                had been medically cleared to return to work?

10   A.          No.

11   Q.          Did you tell Mr. Harrington whether you had been

12               medically cleared to work?

13   A.          No.

14   Q.          Did you tell Mr. Harrington whether you had

15               served the 10-day suspension?

16   A.          No.

17   Q.          Did he ask you about the 10-day suspension that

18               was listed in the decision of October 16th, 2001?

19   A.          I think he -- he may have mentioned it, yes.

20   Q.          Do you recall what he said concerning that

21               suspension?

22   A.          He said that I had a 10-day suspension to serve.

23   Q.          During this May conversation Mr. Harrington told

24               you you had to serve a 10-day suspension?

| 1 | A. | Yes. |
|---|----|----|

2  Q.       Did he tell you -- I'm sorry, strike that.  Did

3          you have any subsequent contact with Mr. Harrington

4          following the May, 2003 telephone conversation?

5  A.       Yes, I forwarded him copies of the grievance.

6  Q.       And when did you do that?

7  A.       Initially, probably right in May.  And then

8          there was follow up conversation in July, a telephone

9          conversation.

10  Q.       Do you recall when in July you had this follow

11          up conversation?

12  A.       Maybe a week before I wrote the letter.

13  Q.       Do you recall whether it was a week before you

14          wrote the letter?

15  A.       Yeah, it was probably a week before I wrote the

16          letter.

17  Q.       And what did you speak about during this

18          conversation?

19  A.       The grievance.

20  Q.       Did Mr. Harrington tell you that there might be

21          an issue with the grievance because you had not been

22          medically cleared to return to work?

23  A.       No.

24  Q.       I'm sorry, Mr. Harrington did not mention that?

1    A.        Nope.

2    Q.        Did Mr. Harrington say anything concerning the

3              10-day suspension that you had spoken about during the

4              May, 2003 telephone call?

5    A.        No, I don't think so.

6    Q.        So what did Mr. Harrington speak about during

7              this telephone conversation?

8    A.        We were trying to find out what became of the

9              grievance that was filed.

10   Q.        And was there any resolution concerning what had

11             happened to the grievance you had sent in April of

12             2003?

13   A.        I had sent him copies of it.

14   Q.        But was there any resolution?

15   A.        It was to my understanding that he was

16             negotiating with the company over the grievance.

17   Q.        And by "the company" do you mean New Penn Motor

18             Express?

19   A.        Yes.

20   Q.        If you could please look at deposition Exhibit

21             No. 3?  If you could look at the second paragraph, it

22             starts with "Let's not lose sight of the real issue

23             here"?

24   A.        Um-hum.

1    Q.        And in this paragraph you speak about the issue

2              being seniority rights not whether you were capable of

3              returning to work, or capable of working, is that

4              correct?

5    A.        That's what it says.

6    Q.        Do you recall why you wrote this paragraph?

7    A.        I don't recall exactly what my thought process

8              was at the time, no.

9    Q.        Had you ever had a conversation with

10             Mr. Harrington in which he discussed that there would

11             be an issue concerning whether or not you were capable

12             of returning to work?

13   A.        No.

14   Q.        Did you think there was an issue concerning

15             whether you were medically capable of returning to

16             work?

17   A.        No.

18                  MS. PENNINI: Please mark this as an

19             Exhibit?

20                       (The document above-referred

21                       to was marked Deposition

22                       Exhibit No. 4 for Identification)

23             BY MS. PENNINI:

24   Q.        Did you have any additional contact with

JANEY ASSOCIATES

```
 1              Mr. Harrington during the summer of 2003 besides the

 2              July telephone conversation you spoke about and the

 3              letter of July 25th, 2003?

 4    A.        Yes, I believe there was another phone call.

 5    Q.        And when was this phone call?

 6    A.        Oh, I can't be sure.

 7    Q.        Can you give me an approximate date, was it

 8              still during the summer of 2003?

 9    A.        August, maybe.

10    Q.        Did you call Mr. Harrington or did

11              Mr. Harrington call you?

12    A.        I believe I probably called Mr. Harrington.

13    Q.        Did you call Mr. Harrington for any particular

14              reason in August of 2003?

15    A.        Yes.

16    Q.        And why was that?

17    A.        To find out what the status of my grievance was.

18    Q.        And what did Mr. Harrington tell you regarding

19              the status of your grievance?

20    A.        I don't recall exactly what the conversation was

21              about.  They were, to my understanding, again

22              discussing things with the company with regards to the

23              grievance.

24    Q.        Did Mr. Harrington ever send you any
```

JANEY ASSOCIATES

```
 1              correspondence during the summer of 2003?
 2    A.        No.
 3    Q.        Did you speak with Mr. Harrington at all during
 4              the fall of 2003?
 5    A.        I believe I did.
 6    Q.        When did you have contact with Mr. Harrington
 7              during the fall of 2003?
 8    A.        As I said, it was August.  Sometime in August.
 9    Q.        What about during the fall of 2003?
10    A.        September.  Maybe August or September.
11    Q.        Was there an additional phone call in August
12              besides the phone call you already mentioned?
13    A.        No.
14    Q.        Was there an additional phone call in September
15              besides the August phone call you have already
16              mentioned?
17    A.        I don't recall.
18    Q.        Do you recall if you spoke with Mr. Harrington
19              in October of 2003?
20    A.        Yes, I might've.
21    Q.        Do you recall whether you did?
22    A.        As I said, I might have.
23    Q.        Do you recall whether you spoke with
24              Mr. Harrington in November of 2003?
```

1    A.        I believe I did.

2    Q.        Do you know whether you spoke with him in

3              November of 2003?

4    A.        I'm sure I did.

5    Q.        And do you recall what you spoke about during

6              November of 2003?

7    A.        The status of my grievance.

8    Q.        And what did Mr. Harrington tell you?

9    A.        That he was going to file a grievance.

10   Q.        Did he say why he was filing a grievance?

11   A.        That was his duty.

12   Q.        So did he tell you in November of 2003 that he

13             was filing a grievance in November of 2003?

14   A.        He was going to file the grievance with the

15             appropriate committee.

16   Q.        Do you recall when in November this telephone

17             conversation took place?

18   A.        No.

19   Q.        During this November, 2003 telephone

20             conversation, did Mr. Harrington ask you whether you

21             had been medically cleared to return to work?

22   A.        No.

23   Q.        Did you tell Mr. Harrington whether you had been

24             medically cleared to return to work?

JANEY ASSOCIATES

```
 1   A.              Nope.

 2   Q.              Prior to November of 2003, you had said that

 3                   Mr. Harrington had been in negotiations with the

 4                   company concerning your grievance?

 5   A.              That's my understanding.

 6   Q.              And did your understanding change in November of

 7                   2003?

 8   A.              No.

 9   Q.              Did Mr. Harrington, in November of 2003, tell

10                   you that he no longer wanted to negotiate with the

11                   company concerning this grievance?

12   A.              No.

13   Q.              Did Mr. Harrington just tell you that he was

14                   going to file a grievance at this time?

15   A.              I filed the grievance.  It was Mr. Harrington's

16                   job --

17   Q.              I'm sorry, file the grievance with the --

18                       MR. LATHROP: I think Mr. Goulet was

19                   attempting to answer your question, so if you would

20                   allow him please.

21                       MS. PENNINI: Okay.

22                       THE WITNESS: I filed the grievance with

23                   the local union.  It was their job to docket the case

24                   before the committee to have it heard.
```

```
 1                       BY MS. PENNINI:

 2    Q.      Had you ever filed other grievances with the

 3            local union prior to 2003?

 4    A.      Yes.

 5    Q.      And when did you file prior grievances?

 6    A.      1987.

 7    Q.      And what was this grievance concerning?

 8    A.      Working conditions.

 9    Q.      When you filed this grievance, did you

10            immediately file it with the local?

11    A.      Yes.

12    Q.      To whom did you give your grievance?

13    A.      I'm going to say George Cashman.

14    Q.      In 1987, do you recall whether there was a

15            steward at the APA facility in Canton?

16    A.      Yes.  Yes, there was.

17    Q.      Do you recall who this was?

18    A.      His last name was Yettman.  I'm not sure what

19            his first name was.  Bobby.

20    Q.      Did you file a grievance with Mr. Yettman in

21            1987?

22    A.      I believe I filed it with George Cashman.

23    Q.      And why did you file it with George Cashman?

24    A.      I had been discharged, Mr. Yettman was at home.
```

JANEY ASSOCIATES

1    Q.        I'm sorry, I thought you said working

2              conditions?

3    A.        It was working conditions.  I think there was a

4              discharge that may have been involved with it.

5    Q.        Did you file more than one grievance in 1987?

6    A.        No, I don't think so.

7    Q.        So it was the grievance you were discussing

8              concerning the February 25th termination?

9    A.        No.

10                      MR. LATHROP: Did you say February 25th?

11                      MS. PENNINI: The 1987 termination.

12                      MR. LATHROP: Objection.

13                      THE WITNESS: Nope.

14             BY MS. PENNINI:

15   Q.        Did you file a grievance concerning the February

16             25th, 1987 termination?

17                      MR. LATHROP: Objection.

18                      THE WITNESS: The union filed the response

19             to the discharge.

20             BY MS. PENNINI:

21   Q.        Okay.  You said you filed a grievance in 1987

22             concerning working conditions, just to clarify, and

23             that you filed this with George Cashman because

24             Mr. Yettman was unavailable?

| | | |
|---|---|---|
| 1 | A. | Right. |
| 2 | Q. | Do you know why Mr. Yettman was unavailable? |
| 3 | A. | Mr. Yettman worked on the day shift and I worked |
| 4 | | on the night shift. |
| 5 | Q. | Was there a steward on the night shift, as well? |
| 6 | A. | No. |
| 7 | Q. | Do you recall when in 1987 this grievance was |
| 8 | | filed? |
| 9 | A. | November -- no, that's not right.  Maybe it was |
| 10 | | January. |
| 11 | Q. | If you could please look at deposition Exhibit |
| 12 | | No. 4?  Did you write this letter? |
| 13 | A. | Yes. |
| 14 | Q. | Did you send this letter to Mr. Harrington? |
| 15 | A. | Yes. |
| 16 | Q. | And was this letter written before or after your |
| 17 | | telephone conversation with him in November of 2003? |
| 18 | A. | Afterwards. |
| 19 | Q. | Do you recall why you wrote this letter? |
| 20 | A. | Yes. |
| 21 | Q. | And why is that? |
| 22 | A. | Again, to follow up on the grievance that I had |
| 23 | | filed. |
| 24 | Q. | Following your termination on March 12, 1987 you |

1           said you were on Worker's Compensation leave, correct?

2    A.        Say that again.

3    Q.        Following the March 12th, 1987 termination from

4           APA, you said you were on industrial accident leave or

5           Worker's Compensation leave?

6    A.        Yes.

7    Q.        During your time on Worker's Compensation leave,

8           were you able to drive?

9    A.        Yes.

10   Q.        Did you have any issues concerning your ability

11          to drive?

12   A.        No.

13   Q.        Did you have any problem concerning your ability

14          to lift any objects?

15   A.        Yes.

16   Q.        And what was that inability?

17   A.        I had certain restrictions on lifting heavy

18          objects as a result of the herniated disc in my back

19          and my neck.

20   Q.        And you had mentioned that there was a 35 pound

21          restriction as a result of that?

22   A.        Yes.

23   Q.        Have you been able to remember any additional

24          restrictions?

1    A.        No.

2    Q.        Do you recall whether that was the only

3              restriction now -- do you still not recall whether

4              there were any additional specific restrictions?

5    A.        No, offhand I don't.

6    Q.        Were you incapacitated for anytime following the

7              March, 1987 termination?

8                        MR. LATHROP: Objection.

9                        THE WITNESS: Could you say that again?

10                       BY MS. PENNINI:

11   Q.        Following the March 12th, 1987 termination, were

12             you able to walk and get around?

13   A.        I did, yes.

14   Q.        Following this termination did you ever seek any

15             additional education?

16   A.        No.

17   Q.        Did you graduate from high school?

18   A.        Yes, I did.

19   Q.        When did you graduate from high school?

20   A.        1978.

21   Q.        Where did you graduate from high school?

22   A.        Hudson High School.

23   Q.        Did you attend any college or other institution

24             following your graduation from high school?

JANEY ASSOCIATES

```
 1    A.          No.

 2    Q.          In what year were you born?

 3    A.          1960.

 4    Q.          And what is the date of your birth?

 5    A.          6/11/1960.

 6    Q.          Would that be June 11th, 1960?

 7    A.          Yes, it would be.

 8    Q.          And you said you currently live in Hudson,

 9                Massachusetts?

10    A.          Yes, I do.

11    Q.          And you said Cox Street, Hudson, Massachusetts?

12    A.          C-O-X, yeah.

13    Q.          Have you lived in any other places besides Cox

14                Street in Hudson, Massachusetts between 1978 and the

15                present?

16    A.          Yes.

17    Q.          Where else did you live?

18    A.          I lived in Marlboro for a time.

19    Q.          And what was your address?

20    A.          750 Farm Road.

21    Q.          When did you live on Farm Road in Marlboro?

22    A.          1982 'til 1986.

23    Q.          Did you live on Cox Street between 1978 and

24                1986?
```

JANEY ASSOCIATES

| | | |
|---|---|---|
| 1 | A. | Yes.  Not until 1986.  Did you say 1986? |
| 2 | Q. | I'm sorry, where did you live between 1978 and |
| 3 | | 1982? |
| 4 | A. | I lived on Cox Street. |
| 5 | Q. | Where did you live between 1960 and 1978? |
| 6 | A. | At Cox Street. |
| 7 | Q. | The same place on Cox Street? |
| 8 | A. | Yes. |
| 9 | Q. | Where did you live after 1986?  You said you |
| 10 | | lived in Marlboro from 1982 to 1986, where did you |
| 11 | | live after Farm Road in Marlboro? |
| 12 | A. | Back to Hudson, Cox Street. |
| 13 | Q. | Have you lived anyplace else besides Cox Street |
| 14 | | in Hudson, Massachusetts between 1986 and the present? |
| 15 | A. | No. |
| 16 | Q. | Do you own the house on Cox Street? |
| 17 | A. | Yes. |
| 18 | Q. | I'm sorry, do you live in a house on Cox Street? |
| 19 | A. | Yes. |
| 20 | Q. | How long have you owned this house? |
| 21 | A. | How long have I owned the house? |
| 22 | Q. | Yes. |
| 23 | A. | Since I've lived there. |
| 24 | Q. | I'm sorry, I thought you said you lived there |

1             since 1960?

2      A.      Since I moved back there in 1987 -- '86.

3      Q.      Do you have any particular hobbies that you

4             engage in?

5      A.      I go to my daughter's field hockey games, I like

6             to go to the races.

7      Q.      What races do you --

8      A.      Stock cars.

9      Q.      I'm sorry, stock cars?

10     A.      Race cars, yes.

11     Q.      So do you watch stock car races?

12     A.      Yes.

13     Q.      Do you participate in stock car races?

14     A.      I own a stock car.

15     Q.      How long have you owned a stock car?

16     A.      The family's had stock cars since the 50's.

17     Q.      I'm sorry, what do you mean by your family has

18            had stock cars?  Could you explain to me what you mean

19            by that?

20     A.      Yeah, my family owned a junk yard and they had

21            stock cars, and we were involved with stock cars as

22            kids.  And me and my brothers had cars all our lives.

23     Q.      So you said you own -- do you own one stock car?

24     A.      Yes.

1    Q.        Have you ever owned another car besides the one

2              you currently own?

3    A.        No.

4    Q.        I'm sorry, was that "no"?

5    A.        No.

6    Q.        How long have you owned the stock car that you

7              currently own?

8    A.        Since 1996.

9    Q.        Not to be ignorant here, what kind of stock car

10             is it?  Could you explain to me what a stock car is?

11   A.        It's a race car.

12   Q.        Is it a particular kind of race car?  Could you

13             explain to me a little more.

14   A.        It goes around in circles.

15   Q.        What is it that makes a stock car different than

16             a typical sedan?

17   A.        It's one that they use to race in circles.  It's

18             not a dragster.

19   Q.        Okay.  Does that mean there is a different size

20             engine in a stock car than in a typical sedan?

21   A.        Oh, I don't know.

22   Q.        I know you said you owned a stock car and you

23             watched stock car racing.  Do you also drive a stock

24             car?

```
 1    A.        No.

·2    Q.        Did you ever participate in stock car racing as

 3              a driver?

 4    A.        No.

 5    Q.        Is there someone that does race your stock car?

 6    A.        Yes.

 7    Q.        And who is that?

 8    A.        His name is Jeff.

 9    Q.        Does Jeff have a last name?

10    A.        Yeah, Crowley.

11    Q.        How often does Jeff Crowley race in your stock

12              car?

13    A.        He hasn't raced at all this year.  It's been --

14              not since last year.

15    Q.        But you still own this car?

16    A.        Yes.

17    Q.        Can you win money owning a stock car?

18              MR. LATHROP: I'm sorry, what did you say?

19              MS. PENNINI: Can you, as a stock car

20              owner, win money based on how Mr. Crowley does in a

21              stock car race?

22              THE WITNESS: I think -- yes, there's a

23              payoff for the finish.

24              BY MS. PENNINI:
```

1    Q.        Has Mr. Crowley ever placed well in a stock car

2              race?

3    A.        Yes.

4    Q.        And what is the most that Mr. Crowley has ever

5              won for his stock car racing?

6    A.        Oh, I don't know.

7    Q.        Or as the stock car owner are you entitled to a

8              portion of whatever is earned by Mr. Crowley's

9              finishes?

10   A.        Mr. Crowley got the checks.

11   Q.        As the owner of the car are you entitled a

12             portion of that money?

13   A.        Mr. Crowley got the checks.  I didn't get

14             anything.

15   Q.        Are you entitled, as a stock car owner, to part

16             of that money?

17   A.        I suppose I could be.

18                  MS. PENNINI: I have no further questions

19             at this time.

20                  MR. GLUEK: Can we take a break for five

21             minutes?

22                  MS. PENNINI: Yes, please.

23                  (A brief recess was taken)

24                  MR. GLUEK: Back on the record.

JANEY ASSOCIATES

1    EXAMINATION

2                    BY MR. GLUEK:

3    Q.        The ground rules are the same.  I don't

4              anticipate this taking too long, but if you don't

5              understand one of my questions, please tell me.  If

6              you cannot hear one of my questions, please tell me.

7              If you answer one of my questions, I am going to

8              assume that you both heard and understood the

9              question, is that fair?

10   A.        Yes.

11   Q.        This is not supposed to be an endurance contest.

12             If you need to take a break, just tell me, we'll take

13             a break, okay?

14   A.        Okay.

15   Q.        If you need to talk to your lawyer, as long as

16             there is a question not pending, just say you need to

17             take a break, okay?

18   A.        Yeah.

19   Q.        Have you ever been convicted of any crimes?

20   A.        Have I ever been convicted of any crimes?  I'm

21             not sure I understand the question.

22   Q.        Do you know what a crime is?

23   A.        Yes.

24   Q.        Do you know what a conviction is?

```
 1    A.        I think so.

 2    Q.        Okay.  Have you been convicted of any crimes?

 3    A.        I don't think so.

 4    Q.        Do you have anything that would refresh your

 5              recollection?

 6    A.        No.

 7    Q.        Are you married?

 8    A.        Yes.

 9    Q.        To whom?

10    A.        Ann M. Goulet.

11    Q.        How long have you been married?

12    A.        15 years.

13    Q.        Any prior marriages?

14    A.        No.

15    Q.        Does she work?

16    A.        Yes.

17    Q.        Where does she work?

18    A.        She works for herself.

19    Q.        What does she do?

20    A.        She drives a coffee truck.

21    Q.        Does she have a d/b/a, doing business as?

22    A.        Yes.

23    Q.        And what is that?

24    A.        Ann's Quality Catering.
```

| 1  | Q. | Does she employ anyone? |
|----|----|----|
| 2  | A. | No. |
| 3  | Q. | Do you help her out on the truck? |
| 4  | A. | No. |
| 5  | Q. | How long has she been operating Ann's Quality |
| 6  |    | Catering? |
| 7  | A. | Five years. |
| 8  | Q. | Before that was she employed? |
| 9  | A. | Yes. |
| 10 | Q. | By whom? |
| 11 | A. | She was in the restaurant business, she was a |
| 12 |    | waitress/bartender. |
| 13 | Q. | And for how long did she do that? |
| 14 | A. | Ten or twelve years. |
| 15 | Q. | One particular restaurant/bar or several during |
| 16 |    | that period? |
| 17 | A. | Several. |
| 18 | Q. | Can you name them, please? |
| 19 | A. | The 401 Club. |
| 20 | Q. | Where is that? |
| 21 | A. | Marlboro, Mass. |
| 22 | Q. | Okay. |
| 23 | A. | Scaletti's Restaurant. |
| 24 | Q. | Can you spell that? |

| 1  | A. | I can't. |
|----|----|----------|
| 2  | Q. | Can you say it slowly then? |
| 3  | A. | Scaletti's. |
| 4  | Q. | And where is that located? |
| 5  | A. | Hudson. |
| 6  | Q. | Any others? |
| 7  | A. | Nope. |
| 8  | Q. | No others or no others that you remember? |
| 9  | A. | No others. |
| 10 | Q. | Do you have children? |
| 11 | A. | Yes. |
| 12 | Q. | How many? |
| 13 | A. | Two. |
| 14 | Q. | Names? |
| 15 | A. | Craig, Jr. |
| 16 | Q. | How old? |
| 17 | A. | 23. |
| 18 | Q. | Is he dependant upon you? |
| 19 | A. | No. |
| 20 | Q. | And your other child? |
| 21 | A. | Nicole. |
| 22 | Q. | Nicole is how old? |
| 23 | A. | 17. |
| 24 | Q. | Is she dependant upon you? |

JANEY ASSOCIATES

|   |   |   |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Other than this lawsuit, have you filed any |
| 3 |   | other lawsuits? |
| 4 | A. | No. |
| 5 | Q. | Have you been a defendant in any lawsuit? |
| 6 | A. | No. |
| 7 | Q. | I believe I understood your testimony that since |
| 8 |   | your accident at APA until March 1st, 2002 you had not |
| 9 |   | worked, is that correct? |
| 10 | A. | Yes. |
| 11 | Q. | Since March 1st, 2002 to the present, have you |
| 12 |   | been employed? |
| 13 | A. | No. |
| 14 | Q. | Since March 1st, 2002 until the present, have |
| 15 |   | you been offered employment by any employer? |
| 16 | A. | No. |
| 17 | Q. | Since March 1st, 2002 until the present, have |
| 18 |   | you had any interviews for employment? |
| 19 | A. | No. |
| 20 | Q. | Since March 1st, 2002 until the present, have |
| 21 |   | you filed any applications for employment? |
| 22 | A. | No. |
| 23 | Q. | Since March 1st, 2002 until the present, have |
| 24 |   | you sent out any resumes? |

```
 1   A.        No.

 2   Q.        Since March 1st, 2002 until the present, have

 3             you contacted any employment counselors?

 4   A.        Nope.

 5   Q.        Since March 1st, 2002 until the present, have

 6             you gone to the library or purchased any books in

 7             terms of how one goes about finding employment?

 8   A.        No.

 9   Q.        Since March 1st, 2002 until the present, have

10             you gotten on the computer to look for employment?

11   A.        No.

12   Q.        Since March 1st, 2002 until the present, have

13             you made any efforts to find employment?

14   A.        No.

15   Q.        Why not?

16   A.        I've got some outstanding issues with regard to

17             my industrial accident.

18   Q.        What are those outstanding issues you have

19             regarding your industrial accident?

20   A.        I've got a knee that needs to be reconstructed.

21   Q.        Is that from the blown out tendon?

22   A.        Yes.

23   Q.        Do you have any plans to get that knee

24             reconstructed?
```

1    A.        Yes.

2    Q.        When?

3    A.        As soon as they resolve all the issues with the

4              insurance company with the old employer.

5    Q.        Any other outstanding issues you have regarding

6              your industrial accident?

7    A.        No.

8    Q.        Just your knee?

9    A.        Yes.

10   Q.        From March 1st, 2002 until the present, do you

11             have any restrictions regarding your ability to work?

12   A.        Could you repeat the question?

13             MR. GLUEK: Can you repeat it, please?

14             (Question read back)

15             THE WITNESS: I'm not under any doctor's

16        care at this time.

17             BY MR. GLUEK:

18   Q.        The question still remains, since March 1st,

19             2002 until the present, do you have any restrictions

20             that effects your ability to work?

21   A.        Yes.

22   Q.        What are those restrictions?

23   A.        I have a herniated disc in my lower back.

24   Q.        Still?

```
 1    A.          Still.

 2    Q.          Any other restrictions?

 3    A.          A herniated disc in my neck.

 4    Q.          Still?

 5    A.          Still.

 6    Q.          Any other restrictions?

 7    A.          And the ligament in my knee.

 8    Q.          Now your herniated disc in your lower back, does

 9         that effect your ability to sit?

10    A.          On occasion, yes.

11    Q.          Does that effect your ability to stand?

12    A.          Yes.

13    Q.          Does that effect your ability to lift?

14    A.          Yes.

15    Q.          Does it effect your ability to turn?

16    A.          Yes.

17    Q.          Does it effect your ability to bend?

18    A.          Yes.

19    Q.          All in negative ways?

20    A.          Yes.

21    Q.          With respect to your herniated disc in your

22         neck, does that effect your ability to bend?

23    A.          No.

24    Q.          What limitations does the herniated disc in your
```

1            neck have on you?

2    A.          It depends on the level of pain I'm having on

3            any particular day.

4    Q.          So it's painful?

5    A.          Very painful.

6    Q.          Do you take medication for your herniated disc

7            in the neck?

8    A.          Yes, I do.

9    Q.          And what kind of medication?

10   A.          Naprosin, Soma.

11   Q.          And what are those?

12   A.          Anti-inflammatory pain medication.

13   Q.          And with respect to your herniated disc to your

14           lower back, is that also painful?

15   A.          Yes.

16   Q.          Do you take medication for that?

17   A.          The same medications.

18   Q.          Only the two medications?

19   A.          Yes.

20   Q.          Do you have a commercial driver's license?

21   A.          Yes, I do.

22   Q.          Is it still current?

23   A.          Yes.

24   Q.          Are you required to take a physical periodically

1               to keep that current?

2    A.         No.

3    Q.         With respect to your knee, what limitations does

4               that cause on you?

5    A.         Well it's tough to get around some days.

6    Q.         With your limitations, could you currently do

7               dock work?

8    A.         I could try.

9    Q.         That is not the question.  Do you know if you

10              could currently do dock work with your limitations?

11   A.         I do not know.

12   Q.         With your limitations, do you know if you could

13              currently do driving work?

14   A.         I do not know.

15   Q.         You testified that you appealed your award of

16              partial disability, is that correct?

17   A.         Yes.

18   Q.         Why did you appeal it?

19   A.         Why did I appeal it?

20   Q.         Is it because you thought you should have gotten

21              total disability?

22   A.         Yes.

23   Q.         Do you still believe you should have gotten

24              total disability?

JANEY ASSOCIATES

```
 1    A.         Yes.

 2    Q.         Do you believe that you are currently totally

 3               disabled?

 4    A.         Yes.

 5    Q.         You testified that in 1995 you received Social

 6               Security benefits, correct?

 7    A.         Yes.

 8    Q.         Are you currently receiving Social Security

 9               benefits?

10    A.         Yes, I am.

11    Q.         Now when you received the Social Security

12               benefits in 1995, did it go retroactive?

13    A.         Yes.

14    Q.         To what period?

15    A.         March 11th, 1987.

16    Q.         What is your monthly benefit on your Social

17               Security currently?

18    A.         $2,160.00.

19    Q.         And has that remained the same or has that gone

20               up?

21    A.         It goes up every year.

22    Q.         Do you remember what the lowest amount was?

23    A.         Not offhand.

24    Q.         And I am assuming your children were also
```

```
 1              receiving Social Security benefits when they were

 2              minors?

 3    A.          That's included.

 4    Q.          The 2,160 includes their benefit?

 5    A.          Yes.

 6    Q.          Does your non-minor child still get Social

 7              Security benefits?

 8    A.          Yes.

 9    Q.          Do you have to periodically reapply for Social

10              Security benefits?

11    A.          No.

12    Q.          Do you have to update Social Security with

13              respect to your status?

14    A.          No.

15    Q.          Where did you apply for these Social Security

16              benefits?

17    A.          Framingham.

18    Q.          Were you or are you currently assigned a case

19              worker for Social Security?

20    A.          No.

21    Q.          And you were never assigned a case worker?

22    A.          No.

23    Q.          Do you know who your contact person was at

24              Social Security when you applied?
```

JANEY ASSOCIATES

1    A.        No.

2    Q.        Do you have any documents regarding Social

3              Security and your application for Social Security?

4    A.        Do I have any documents?

5    Q.        Correct.

6    A.        What kind of documents?

7    Q.        Any piece of paper.

8    A.        Saying what?

9    Q.        That relates to your Social Security benefits

10             and/or your application for Social Security.

11   A.        I have documents that pertain to my Social

12             Security, yes.

13   Q.        Do you have a lawyer that represented you when

14             you applied for Social Security?

15   A.        Yes.

16   Q.        And what is his name?

17   A.        The law firm was Ellis & Ellis out of Worcester.

18   Q.        And which lawyer at Ellis & Ellis did you deal

19             with?

20   A.        I believe it was Bob Marque.

21   Q.        When was the last time you talked to Mr. Marque?

22   A.        I don't recall.

23   Q.        Since 1995?

24   A.        Yeah, probably.

| | | |
|---|---|---|
| 1 | Q. | Since last year? |
| 2 | A. | Nope, not last year. |
| 3 | Q. | The last five years? |
| 4 | A. | Nope. |
| 5 | Q. | The last ten years? |
| 6 | A. | 1995. |
| 7 | Q. | Okay. Have you talked to anybody at New Penn |
| 8 | | since March 1st, 2002? |
| 9 | A. | No. |
| 10 | Q. | Have you called up New Penn and asked if you are |
| 11 | | going to be called? |
| 12 | A. | No. |
| 13 | Q. | Have you ever filled out an application at New |
| 14 | | Penn? |
| 15 | A. | Nope. |
| 16 | Q. | Do you know Mr. Carnes? |
| 17 | A. | Yes. |
| 18 | Q. | Do you believe that he had any ill will towards |
| 19 | | you? |
| 20 | A. | I don't know that. |
| 21 | Q. | You don't have an opinion one way or the other? |
| 22 | A. | Nope. |
| 23 | Q. | Do you have any facts that would suggest that he |
| 24 | | had any ill will towards you? |

1    A.        No.

2    Q.        Do you have any facts that Mr. Carnes was

3              prejudiced against you in someway?

4    A.        No.

5    Q.        Do you have any facts that Mr. Carnes disliked

6              you in any respect?

7    A.        Nope.

8    Q.        You know Mr. Harrington, correct?

9    A.        Yes.

10   Q.        Do you have any facts to believe that

11             Mr. Harrington has any ill will towards you?

12   A.        Nope.

13   Q.        Do you have any facts to believe that

14             Mr. Harrington had any prejudice towards you in any

15             respect?

16   A.        Nope.

17   Q.        Do you have any facts that Mr. Harrington

18             somehow wanted to see you damaged?

19   A.        Nope.

20   Q.        Do you have any facts that anyone connected with

21             the union had any ill will towards you?

22   A.        No.

23   Q.        Do you have any facts that anybody connected

24             with the union had any prejudices towards you?

1   A.        No.

2   Q.        Do you have any facts that anyone connected with

3             the union had any hatred towards you?

4   A.        Nope.

5   Q.        Between March 1, 2002 and March 30, 2003, do you

6             know if you could have worked 30 days at New Penn?

7   A.        Nope.

8   Q.        Let me rephrase the question.  Between March 1,

9             2002 and March 30, 2003, do you know if you could have

10            worked 30 days in a two month period at New Penn?

11  A.        No.

12  Q.        I think I understood your testimony, sir, that

13            after you filed a grievance on April 7th, 2003 you had

14            no discussions with Mr. Carnes?

15                     MR. LATHROP: I'm sorry, could I have that

16            date again?

17                     MR. GLUEK: After April 7th, 2003, which is

18            the date your grievance is dated.

19                     THE WITNESS: Um-hum.

20                     BY MR. GLUEK:

21  Q.        You had no conversations with Mr. Carnes, is

22            that correct?

23  A.        I don't believe I did.

24  Q.        Do you have anything that would refresh your

```
 1              recollection?

 2    A.        Nope.

 3    Q.        Do you have any documents memorializing any

 4              conversations that you had with Mr. Carnes?

 5    A.        Nope.

 6    Q.        Did Mr. Carnes ever tell you to wait until after

 7              the agreement with New Penn and the union expired

 8              before you filed a grievance?

 9    A.        No.

10    Q.        Did anybody have any discussion with you from

11              the union with respect to the timing of when the

12              grievance should be filed by you?

13    A.        No.

14    Q.        It is your testimony, isn't it sir, that for the

15              period between March 1, 2002 and March 30, 2003 you

16              had several discussions with Mr. Carnes?

17    A.        Yes.

18    Q.        And those were follow up discussions about you

19              not being called by New Penn, correct?

20    A.        Yes.

21    Q.        So during that time period you were aware that

22              there was at least an issue, correct?

23    A.        No.

24    Q.        Then why did you make these calls?
```

```
 1   A.        To find out what the status of things were.

 2   Q.        And what did Mr. Carnes tell you the status was?

 3   A.        At first he said he wasn't sure and he would

 4             look into it.

 5   Q.        That was in the springtime?

 6   A.        Yes.

 7   Q.        Did he say anything else in the springtime?

 8   A.        Nope.

 9   Q.        And I believe your testimony was two

10             conversations you had in the spring, correct?

11   A.        Was it two in the spring?  It may have been.

12             Initial phone call -- there was an initial phone call

13             with Mark Harrington, who told me that he no longer

14             represented the men at APA, I need to speak with Bill

15             Carnes.

16   Q.        Right.  And then you had, in the spring of 2002,

17             how many conversations with Mr. Carnes did you have?

18   A.        I had a follow up phone call from the Mark

19             Harrington call with Mr. Carnes, and then one more

20             after that.

21   Q.        In the spring?

22   A.        Early summer, spring.  Late spring, early

23             summer.

24   Q.        And I apologize.  We have already been over
```

```
 1              this, but now I am confused.  Mr. Harrington called

 2              you up in the spring of 2002 to say he was no long --

 3     A.       No, I called Mr. Harrington.

 4     Q.       And he said he is no long responsible for APA,

 5              correct?

 6     A.       Right.

 7     Q.       Then you called Mr. Carnes, correct?

 8     A.       Yes.

 9     Q.       And Mr. Carnes said that he didn't know and he

10              would follow up?

11     A.       Right.

12     Q.       Did he say anything else?

13     A.       No.

14     Q.       And that took place in the spring of 2002,

15              correct?

16     A.       Yes.

17     Q.       And it is your testimony that he said -- that

18              you can recall that he said nothing other than he

19              didn't know?

20     A.       General conversation about what was going on,

21              the whole issue.

22     Q.       What else do you remember that he said?

23     A.       He said that he was going to look into it.

24     Q.       Do you remember anything else?
```

| 1  | A. | No. |
|----|----|----|
| 2  | Q. | When was the next time you talked to Mr. Carnes? |
| 3  | A. | I can't be sure. |
| 4  | Q. | But there was a subsequent time? |
| 5  | A. | Yes. |
| 6  | Q. | And was this by telephone? |
| 7  | A. | Yes. |
| 8  | Q. | Did you call him? |
| 9  | A. | Yes. |
| 10 | Q. | Did you take any notes of that conversation? |
| 11 | A. | I didn't take any written notes. |
| 12 | Q. | What was the substance of that conversation? |
| 13 | A. | The fact that he had spoke with New Penn with |
| 14 |    | regards to my situation.  He had conversations with |
| 15 |    | the New Penn people.  I'm not sure if it was with the |
| 16 |    | terminal manager or Dan Schmidt and possibly Charlie |
| 17 |    | Zaccaria, but that was six months in advance from |
| 18 |    | getting the grievance. |
| 19 | Q. | So he said he talked to New Penn? |
| 20 | A. | Yeah. |
| 21 | Q. | Did he say to whom he talked to? |
| 22 | A. | No. |
| 23 | Q. | Did he say what he said to New Penn? |
| 24 | A. | He -- yes. |

```
 1   Q.        What did he say he said?

 2   A.        That he had an APA employee that was looking to

 3             be put to work.

 4   Q.        Did he say anything else to you?

 5   A.        He talked about, I guess they told him that my

 6             name wasn't on the list, on the seniority list and he

 7             said it was on the seniority list.  He said, "I'll

 8             show you the decision from the New England Joint

 9             Committee that puts him on the list."

10   Q.        Did he say anything else?

11   A.        Nope, just that he would get back to me.

12   Q.        That is all that you remember of the

13             conversation?

14   A.        Yes.

15   Q.        Nothing else?

16   A.        No.

17   Q.        When was the next conversation you had with

18             Mr. Carnes?

19   A.        March.

20   Q.        Of 2003?

21   A.        Yes.

22   Q.        Who initiated that conversation?

23   A.        I believe I did.

24   Q.        And what do you recall of that conversation?
```

| 1 | A. | I called and asked him what my status was as far |
| 2 | | as being called.  The agreement, in effect, ended and |
| 3 | | I hadn't received a phone call. |
| 4 | Q. | What else of that conversation do you recall? |
| 5 | A. | He said to me, pardon my french, "They fucked |
| 6 | | yah.  Send the grievance in." |
| 7 | Q. | Did you say anything else? |
| 8 | A. | Nope, I wrote the grievance. |
| 9 | Q. | Did he say anything else? |
| 10 | A. | Nope. |
| 11 | Q. | That was it of the conversation? |
| 12 | A. | Um-hum. |
| 13 | Q. | Do you have any notes of that conversation? |
| 14 | A. | Nope. |
| 15 | Q. | Could you look at, please, what has been marked |
| 16 | | as Goulet Exhibit 2?  Is that your grievance? |
| 17 | A. | Yes. |
| 18 | Q. | Is that your handwriting? |
| 19 | A. | Yes, it is. |
| 20 | Q. | Did anybody assist you in preparing this |
| 21 | | grievance? |
| 22 | A. | Nobody. |
| 23 | Q. | Between the conversation that you had with |
| 24 | | Mr. Carnes where he said, "They fucked you.  Send in |

| 1 | | the grievance." and the time that you sent in the |
| 2 | | grievance, did you have any other conversations with |
| 3 | | Mr. Carnes? |
| 4 | A. | Don't believe I did. |
| 5 | Q. | You do not believe you did? |
| 6 | A. | I don't think so. |
| 7 | Q. | Okay.  After you sent in the grievance, your |
| 8 | | next contact was with Mr. Harrington, is that correct? |
| 9 | A. | Yes. |
| 10 | Q. | Did you initiate that? |
| 11 | A. | Yes. |
| 12 | Q. | Do you recall when that occurred? |
| 13 | A. | Sometime after Bill Carnes left office. |
| 14 | Q. | But it was in May? |
| 15 | A. | I believe so. |
| 16 | Q. | May, 2003? |
| 17 | A. | Yes. |
| 18 | Q. | And do you have any notes of that conversation? |
| 19 | A. | Nope. |
| 20 | Q. | What was said during that conversation? |
| 21 | A. | Basically, I was following up on the status of |
| 22 | | the grievance.  Like I said, I filed a grievance with |
| 23 | | the union -- |
| 24 | Q. | And I think your prior testimony was |

```
 1              Mr. Harrington said he didn't know anything about it,
 2              correct?
 3    A.          He said he didn't have any copies of the
 4              grievance.
 5    Q.          Do you know if he knew about the grievance
 6              before your phone call?
 7    A.          Yes, I'm sure he did.
 8    Q.          Do you know that for a fact?
 9    A.          No.
10    Q.          As best you can recall, what were
11              Mr. Harrington's exact words to you during that
12              conversation?
13    A.          That he didn't have a copy of the grievance.
14              That Bill Carnes didn't file it with the committee,
15              that's why it didn't get filed.  Pretty basic.
16    Q.          Do you recall anything else he said?
17    A.          Nope.
18    Q.          When was your next conversation with
19              Mr. Harrington?
20    A.          Maybe sometime in June.
21    Q.          And did you initiate that conversation?
22    A.          I'm sure I did, yes.
23    Q.          Do you have any notes of that conversation?
24    A.          No.
```

JANEY ASSOCIATES

```
 1    Q.           What was the substance of that conversation?

 2    A.           Again, to follow up on what happened to my

 3                 grievance.

 4    Q.           And what did Mr. Harrington say?

 5    A.           I don't recall.

 6    Q.           You don't recall anything he said?

 7    A.           No.

 8    Q.           Do you recall anything that you said?

 9    A.           Just trying to find out what happened to the

10                 grievance.

11    Q.           And that's all that you recall from that

12                 conversation?

13    A.           Yeah.

14    Q.           When was your next conversation with

15                 Mr. Harrington?

16    A.           I think I followed that up with the letter I

17                 wrote.

18    Q.           So that is the July 25th letter?

19    A.           Yeah.

20    Q.           Could you look at Exhibit 3, please?

21    A.           Um-hum.

22    Q.           Is it still your sworn testimony that you do not

23                 recall why you wrote "Let's not lose sight of the real

24                 issue here.  The grievance is about seniority rights
```

1          under the agreement not whether one was capable of

2          working or not."

3                    MR. LATHROP: Objection.

4                    THE WITNESS: Is it my sworn testimony what

5          now?

6                    BY MR. GLUEK:

7     Q.        Is it still your sworn testimony that you have

8          no recollection as to why you wrote that?

9                    MR. LATHROP: Objection.

10                   THE WITNESS: Again, you know, I'm not sure

11         what my thought process was at the time.  Like I said,

12         I was trying to follow up on the grievance that I had

13         submitted and maybe there was some conversation about

14         I was on comp or something, and I think I told them I

15         wasn't on comp.  I wasn't collecting a Workman's

16         Compensation check.

17                   BY MR. GLUEK:

18    Q.        So isn't it a fact that Mr. Harrington had

19         conversations with you prior to you writing Exhibit 3

20         where he indicated to you that you may not be able for

21         recall because you were not able to work?

22    A.        No.

23    Q.        Do you know whether or not the union ever

24         supplied New Penn with your name on the seniority

```
 1                 list?

 2      A.         Yes, they did.

 3      Q.         How do you know that?

 4      A.         I have a copy of that, and I have a copy of the

 5                 letter from the freight director that was sent out to

 6                 the locals with my name on it.

 7      Q.         Do you know if that was given to New Penn?

 8      A.         Yes, it was.

 9      Q.         And how do you know that?

10      A.         It was forwarded to New Penn from APA.   From

11                 their corporate offices to New Penn's corporate

12                 offices.

13      Q.         Okay.  So APA forwarded it to New Penn?

14      A.         Yes.

15      Q.         Listen to my question.  My question, sir, was

16                 whether the union -- do you know if the union ever

17                 forwarded your name on a seniority list to New Penn?

18      A.         I don't know that.

19      Q.         Okay.  After your conversation with

20                 Mr. Harrington in June of 2003, when was the next time

21                 you talked to him?

22      A.         As I said, I wrote the letter and I didn't hear

23                 anything.  So I probably called him sometime in early

24                 November, I'm going to say, before I wrote the second
```

```
1              letter.

2    Q.        And do you have any notes of that conversation?

3    A.        No.

4    Q.        What was discussed during that conversation?

5    A.        Same thing, what happened to my grievance.

6    Q.        And what was his response?

7    A.        That they were going to file it.  They were

8              going to file it with the committee and get it heard.

9    Q.        Anything else that you recall?

10   A.        Nope.

11   Q.        Nothing else?

12   A.        No.

13   Q.        Did you have an understanding as to why the

14             grievance had not been previously filed?

15   A.        No.

16   Q.        Were you ever told why the grievance was not

17             previously filed?

18   A.        I was told that Bill Carnes didn't file the

19             grievance, that's why it wasn't filed.

20   Q.        Were you ever told why the grievance was not

21             filed after Mr. Carnes left office?

22   A.        No.

23   Q.        Doug, I can't remember his last name, Francie?

24   A.        Yes.
```

```
 1    Q.         How do you pronounce it?

 2    A.         Francie.

 3    Q.         Francie?

 4    A.         Francie.

 5    Q.         When was the last time you talked to him?

 6    A.         February of 2002.

 7    Q.         So that was during the phone call that he asked

 8         you what?

 9    A.         What my preference was.

10    Q.         And my preference was Billerica?

11    A.         Yes.

12    Q.         Do you know if Doug is currently employed?

13    A.         I don't know.

14    Q.         After your conversation with Mr. Harrington

15         sometime in the November time period, do you have any

16         subsequent conversation with him?

17                   MR. LATHROP: I'm sorry, with

18         Mr. Harrington?

19                   MR. GLUEK: Yes.

20                   THE WITNESS: Nope.  I sent that letter to

21         him and then I think we spoke again in the fall and

22         spring.  Had met several times with regards to the

23         case being presented to the committee.

24                   BY MR. GLUEK:
```

```
 1    Q.         So you personally met Mr. Harrington?

 2    A.         Yes.

 3    Q.         And did you take any notes of those

 4               conversations?

 5    A.         No.

 6    Q.         Or meetings?

 7    A.         Nope.

 8    Q.         Did Mr. Harrington ever imply to you as to the

 9               merits in your case?

10    A.         No.

11    Q.         Did Mr. Harrington ever indicate that he thought

12               your case was a strong case or a weak case?

13    A.         I think that he said we had a good case.

14    Q.         The question is, did he ever tell you you had a

15               good case or a bad case?

16    A.         Yes.

17    Q.         In what context did he say that?

18    A.         How do you mean?  What do you mean "context", in

19               what context?

20    Q.         Was this in a phone conversation or --

21    A.         No, this was in person.

22    Q.         When you were preparing for the case?

23    A.         Yes.

24    Q.         Did he indicate to you why he thought it was a
```

```
 1            strong case?

 2      A.          Just based on the merits of the case.

 3      Q.          Do you recall anything else?

 4      A.          No.

 5      Q.          Do you think the union just made a simple

 6            mistake by not filing your grievance timely?

 7                       MR. LATHROP: Objection.

 8                       THE WITNESS: I don't know.

 9                       BY MR. GLUEK:

10      Q.          Do you have any facts that would suggest that

11            the union did anything more than just make a simple

12            mistake not filing your grievance timely?

13                       MR. LATHROP: Objection.

14                       THE WITNESS: I don't know what they did.

15                       BY MR. GLUEK:

16      Q.          Do you have an understanding that with respect

17            to your decision the decision of the committee is

18            final and binding?

19      A.          That's what the decision says.

20      Q.          Is that your understanding going into it?

21      A.          Yes.

22      Q.          Now when you were being questioned by the

23            union's lawyer you said that you had an understanding

24            that Mr. Harrington was negotiating with the company?
```

JANEY ASSOCIATES

1    A.         Yes.

2    Q.         Why did you have that understanding?

3    A.         Through the phone conversations that we had that

4               there was dialogue between Mr. Carnes and

5               Mr. Harrington with New Penn.

6    Q.         Did he indicate to you what the dialogue was?

7    A.         No.

8    Q.         Did he indicate to with whom he would speak at

9               New Penn?

10   A.         Nope.

11   Q.         Other than the two medications that you

12              previously testified about, have you taken any other

13              medication since March 1, 2002?

14   A.         No.

15   Q.         And they are just anti-inflammatories is your

16              testimony?

17   A.         Yes, muscle relaxers.

18              MR. GLUEK: I have nothing further.

19   RE-EXAMINATION

20              BY MS. PENNINI:

21   Q.         Following your November, 2003 conversation with

22              Mr. Harrington in which you discussed the filing of

23              the grievance, did he ever speak to you regarding any

24              issues as to the proper joint area committee where

JANEY ASSOCIATES

 1          this grievance could be brought or could be heard?

 2    A.         No.

 3    Q.         He never mentioned anything to you about the

 4          difference between Southern New England Joint Area

 5          Committee and the Eastern Region Committee?

 6    A.         No.   I think the case had been scheduled to be

 7          heard in April, and I got a phone call saying that it

 8          was rescheduled to be heard at the Eastern Region.

 9    Q.         Prior to the November, 2003 conversation and

10          letter to Mr. Harrington, did he ever have any

11          discussions with you concerning whether a grievance

12          could be brought concerning the failure to be called

13          off of a call list pursuant to the TNFINC/New Penn

14          agreement?

15    A.         No.

16    Q.         And I believe you previously indicated that you

17          are awaiting surgery on your knee?

18    A.         Yes.

19    Q.         Is it the left or the right knee?

20    A.         Right knee.

21    Q.         And you said that you continued with the

22          insurance benefits for a year following your injury,

23          is that correct?

24    A.         My pension was paid for a year, I'm not sure

```
 1                about my insurance.  It was 1987, quite some time so I

 2                don't recall.

 3      Q.            You do not recall whether you had any health

 4                insurance benefits?

 5      A.            I did for a period of six months, I know.

 6      Q.            So you are sure you had it for six months but --

 7      A.            Yes.

 8      Q.            -- you may have had it for a longer period?

 9      A.            Yes.

10      Q.            During the period under which you were positive

11                that you had insurance coverage did you have any

12                surgeries to your knee?

13      A.            No.

14      Q.            Did you have any surgeries to your back?

15      A.            No.

16      Q.            Did you have any surgeries on the herniated disc

17                in your neck?

18      A.            No.

19      Q.            At that time had any of the doctors recommended

20                surgeries on the herniated disc in your neck?

21      A.            I don't believe so, nope.

22      Q.            What about the herniated disc in your back?

23      A.            No.

24      Q.            And any recommendation of surgery on the torn,
```

JANEY ASSOCIATES

1                    I'm sorry, is it a ligament or a torn tendon in your

2               knee?

3      A.          Ligament.

4      Q.          Did the doctors recommend any surgery concerning

5               the torn ligament in your knee?

6      A.          Not at that time.

7      Q.          When did you first become aware that you would

8               need surgery on the ligament in your knee?

9      A.          Oh, I can't be sure, positively sure.

10     Q.          Can you give me an approximate time?  Was it

11              during the 1980's?

12     A.          I honestly don't remember.  I don't know.

13     Q.          Was it during the first half of the 1990's?

14     A.          Yes.

15     Q.          Do you recall if it was in 1990?

16     A.          No.

17     Q.          Do you recall whether it was in 1991?

18     A.          Nope.

19     Q.          Is there any document that would help refresh

20              your memory concerning this fact?

21     A.          I'm not sure.

22     Q.          Do you recall the name of the doctor who told

23              you you would need surgery on your knee?

24     A.          Yes.

| | | |
|---|---|---|
| 1 | Q. | And what doctor was that? |
| 2 | A. | Dr. Solomon. |
| 3 | Q. | Do you have a first name for Dr. Solomon? |
| 4 | A. | Alan. |
| 5 | Q. | Where does Dr. Solomon practice? |
| 6 | A. | Out of Leonard Morse in Natick. |
| 7 | Q. | Is Leonard Morse a hospital? |
| 8 | A. | Yes. |
| 9 | Q. | Does he currently practice out of Leonard Morse |
| 10 | | in Natick? |
| 11 | A. | I'm not sure of that. |
| 12 | Q. | When was it that you would see Dr. Solomon? |
| 13 | A. | Dr. Solomon operated on my shoulder. |
| 14 | Q. | Well when would you see Dr. Solomon concerning |
| 15 | | your knee? |
| 16 | A. | Periodically, when I was treating with him. |
| 17 | Q. | And during what time period was that? |
| 18 | A. | Right after my industrial accident. |
| 19 | Q. | And what time did you stop seeing Dr. Solomon? |
| 20 | A. | Oh, again, I can't be sure. |
| 21 | Q. | Is there anything that would help you as to when |
| 22 | | you stopped seeing Dr. Solomon? |
| 23 | A. | Probably when the insurance company stopped |
| 24 | | paying. |

JANEY ASSOCIATES

1    Q.        And you also had a rotator cuff injury, is that

2              correct?

3    A.        Yes.

4    Q.        And you had surgery concerning this injury?

5    A.        Yes.

6    Q.        When did you have that surgery?

7    A.        '89, 1990 maybe.

8    Q.        I'm sorry, in 1989, is that what you said?

9    A.        '89 or '90, somewhere thereabouts.

10   Q.        And was this surgery performed by Dr. Solomon?

11   A.        Yes.

12   Q.        And where was it performed?

13   A.        On my left shoulder.

14   Q.        I'm sorry, the location of the hospital?

15   A.        Natick.

16   Q.        Is it at the Leonard Morse Hospital in Natick?

17   A.        Yes.

18   Q.        Did you also see Dr. Solomon concerning your

19             knee?

20   A.        Yes.

21   Q.        When did you stop seeing Dr. Solomon concerning

22             your knee?

23   A.        I don't recall.

24   Q.        Did you continue to see Dr. Solomon concerning

```
 1              your knee after you stopped seeing him concerning your
 2              rotator cuff injury?
 3    A.        Like I said, the insurance company did not pay
 4              the bills so therefore he wouldn't see me.
 5    Q.        Do you know when the insurance company stopped
 6              paying the bills to Dr. Solomon?
 7    A.        They still haven't paid him.
 8    Q.        But do you recall when they stopped paying the
 9              bills?
10    A.        They never paid him.
11    Q.        When did you begin seeing Dr. Solomon?
12    A.        Sometime shortly after the accident.
13    Q.        So you began to see Dr. Solomon in about 1987,
14              is that correct?
15    A.        1988.
16    Q.        Do you recall what month you had your rotator
17              cuff surgery?
18    A.        No.
19    Q.        Is there anything that would help you remember
20              when you had this surgery?
21    A.        Not offhand.
22    Q.        How soon after you had your surgery did you stop
23              seeing Dr. Solomon?
24    A.        Six months maybe.
```

JANEY ASSOCIATES

| 1 | Q. | Do you recall if your surgery was in the summer? |
| 2 | A. | No. |
| 3 | Q. | Winter? |
| 4 | A. | I don't remember. |
| 5 | Q. | Do you currently have any limitations concerning |
| 6 | | your rotator cuff injury, physical limitation? |
| 7 | A. | Yes, it still bothers me. |
| 8 | Q. | You said it still bother you, do you take any |
| 9 | | medication concerning the pain of your rotator cuff? |
| 10 | A. | Yes. |
| 11 | Q. | And what medications are those? |
| 12 | A. | Motrin, Advil. |
| 13 | Q. | Have you seen any doctor for this injury since |
| 14 | | you stopped seeing Dr. Solomon? |
| 15 | A. | No. |
| 16 | | MS. PENNINI: That's all I have. |
| 17 | | MR. LATHROP: Well I am going to take a |
| 18 | | break to decide whether or not I am going to have any |
| 19 | | questions. |
| 20 | | (A brief recess was taken) |
| 21 | EXAMINATION | |
| 22 | | BY MR. LATHROP: |
| 23 | Q. | Mr. Goulet, what date is today? |
| 24 | A. | October 4th, 2005. |

JANEY ASSOCIATES

```
 1   Q.          Is discovery over in this case?

 2   A.          No.

 3   Q.          Is discovery with regard to the union over in

 4        this case?

 5   A.          No.

 6   Q.          As of the time that the APA decision was issued

 7        were you receiving Worker's Compensation benefits?

 8   A.          No.

 9   Q.          You were off Worker's Compensation by the time

10        of the APA decision?

11   A.          Yes.

12   Q.          As of the time of the APA decision were you

13        under the active care of any physicians for your

14        Worker's Compensation injuries?

15   A.          Nope.

16   Q.          At anytime after March 1st, 2002 did you receive

17        a call from New Penn to go to work?

18   A.          No.

19   Q.          If you had received a call from New Penn at

20        anytime after March 1st, 2002 to go to work, what

21        would you have done?

22                    MR. GLUEK: Objection.

23                    THE WITNESS: I would've made every effort

24        to go to work and get clearance from the doctors, had
```

1          they called.

2                    MR. LATHROP: Thank you.  I have nothing

3          else.

4                    (Whereupon, the deposition in the above-

5          entitled matter was concluded at 12:45 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

I have read the foregoing transcript
of the testimony and the same
contains a true and accurate
recording of my answers given to the
questions therein set forth.


_____
Signed under the pains and penalties
of perjury.


_12/21/2005_____
       Date

ERRATA SHEET

DEPONENT'S NAME    CRAIG S. GOULET SR.

DATE OF DEPOSITION

PAGE 11 line 6 READS,    YES

SHOULD READ,    YES BUT the DATE
OF the letter WAS FEBRUARY 6th 1987

PAGE 12 line 16 READS.,    YES.

SHOULD READ,    YES BUT the DATE
WAS FEBRUARY 6th 1987.

PAGE 28 line 19 READS, PRECISELY I DO NOT KNOW

SHOULD READ, YES HE DID.

PAGE 29 line 14 READS, NO I DON'T RECALL

SHOULD READ, YES HE DID SAY I WAS BACK ON THE

SENIORITY LIST.

PAGE 66 line 12 READS, 15 YEARS.

SHOULD READ, 17 YEARS.

PG. 70 line 16 READS, I'VE GOT SOME OUTSTANDING ISSUES

with REGARD to MY INDUSTRIAL ACCIDENT.

SHOULD READ, I'VE GOT SOME OUTSTANDING ISSUES WITH

REGARDS TO MY INDUSTRIAL ACCIDENT. IF I WAS

UNABLE TO RESOLVE THOSE ISSUES, NEW PENN WAS

OBLIGATED UNDER THE CONTRACT AND THE A.D.A. TO

PROVIDE LIGHT DUTY WORK OR A REASONABLE ACCOMMODATION

TO QUALIFIED INDIVIDUALS.

SHOULD READ,  I KNOW UNDER SOCIAL SECURITY ADMINISTRATION GUIDE LINES I COULD HAVE TRIED TO RETURN TO WORK HAD I BEEN GIVEN the OPPORTUNITY.

PAGE 74 line 14 READS.  I DONT KNOW.

SHOULD READ,  I KNOW IF NEW PENN CALLED AND OFFERED ME A DRIVING JOB, SOCIAL SECURITY WOULD HAVE ALLOWED me TO TRY AND RETURN TO WORK.

PAGE 76 line 14 READS,  NO

SHOULD READ,  YES

PAGE 80 line 7 READS,  NOPE

SHOULD READ,  I KNOW BETWEEN MARCH 1ST 2002 AND MARCH 30, 2003, IF NEW PENN CALLED I WOULD HAVE TRIED TO WORK 30 DAYS.

PAGE 80 line 11 READS,  NO

SHOULD READ.  WHAT I KNOW IS NEW PENN DID NOT CALL BETWEEN MARCH 1ST 2002 AND MARCH 30, 2003, AND IF THEY HAD CALLED I WOULD HAVE TRIED TO WORK 30 DAYS IN A TWO MONTH PERIOD.

SHOULD READ, YES. I RECALL MR. CARNES TELLING ME DURING THIS CONVERSATION WHEN HE TOLD NEW PENN THAT I WAS INFACT ON THE A.P.A. SENIORITY LIST, NEW PENN TOLD MR CARNES YES HE'S ON THE SENIORITY LIST BUT HE IS COLLECTING WORKMANS COMPENSATION. AND MR CARNES TOLD NEW PENN THAT I WAS NOT COLLECTING WORKMANS COMPENSATION AT THAT TIME. THEN MR. CARNES ASKED ME, CRAIG WHAT WILL YOU DO IF NEW PENN CALLS YOU? AND I TOLD MR. CARNES AT THAT TIME TELL NEW PENN TO CALL ME THEN WE WILL ALL KNOW WHAT I WILL DO.

PAGE 88 LINE 17 READS, NOPE

SHOULD READ, YES, SEND ME A COPY OF THE GRIEVANCE.

PAGE 91 LINE 18 READS, I DONT KNOW THAT.

SHOULD READ, I KNOW MR CARNES SHOWED NEW PENN THE SENIORITY LIST WITH MY NAME ON IT

PAGE 92 LINE 10 READS, NOPE

SHOULD READ, YES, I RECALL ACTUALLY MEETING WITH MR. HARRINGTON IN PERSON AT THE UNION HALL TO DISCUSS THE PREPARATION OF THE CASE WITH THE GRIEVANCE COMMITTEE, AND AT THAT TIME I REMEMBER MR. HARRINGTON SUGGESTING THAT MAYBE I SHOULD WAIT UNTIL AFTER I HAD MY KNEE DONE BEFORE PURSUING THE GRIEVANCE AGAINST NEW PENN. HE ACTUALLY OFFERED TO FIND ME ANOTHER JOB ALSO

<u>Page 95 line 4 reads,</u> No

<u>Should Read,</u> Yes I recall Mr. Harrington telling me you know if you push this grievance against New Penn you will probably never work in the freight industrie again. And I said to Mr Harrington you know if New Penn would put me on the seniority list in my rightful spot then we wouldn't have to take the case to the committee, And Mr Harrington told me New Penn is not going to do that.

<u>Page 95 line 8 reads,</u> I dont know.

<u>Should Read.</u> No I dont think that the union just made a simple mistake.

<u>Page 95 line 14 Reads,</u> I dont know what they did.

<u>Should Read,</u> Yes, the fact that I called Mr. Carnes and Mr. Harrington when the agreement took effect March 1st 2002, the fact that the union put New Penn on Notice while the agreement was in effect, well before the grievance was filed with Local 25 these facts alone suggest that this was No simple mistake, Never mind the fact that both New Penn and the union said timelyness was never an issue in the past.