# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CRAIG GOULET** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **NEW PENN MOTOR EXPRESS** ) | |
| **Defendant** ) | |
| ) | |
| **and** ) | |
| ) | |
| **TEAMSTERS LOCAL 25** ) | |
| **INTERNATIONAL BROTHERHOOD OF** ) | |
| **TEAMSTERS** ) | |
| ) | **CIVIL ACTION** |
| **Defendant,** ) | **NO. 04-12577-JLT** |
| ) | |

## TEAMSTERS LOCAL 25's CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendant Teamsters Local 25, International Brotherhood of

Teamsters "hereinafter, "Local 25" or "the Union", hereby submits the following Concise

Statement of Material Facts in support of its Motion for Summary Judgment.

## STATEMENT OF FACTS

1.  The Plaintiff, Craig Goulet, "hereinafter "Goulet" or "the Plaintiff) began working for

    A.P.A. Transport Company (hereinafter, "APA") on or about October 1986 when

    Sanborn Trucking, the company for which he had been working, was bought out by APA.

    (Deposition of Craig Goulet (hereinafter, "Goulet Depo."), pp. 9-10).[1]

---

[1] A true copy of the deposition of Craig Goulet is attached hereto as Exhibit 1.

2.   A.P.A. was a corporation engaged in the trucking business, with several terminals, including terminals in Canton, Massachusetts, and Dracut Massachusetts. (Deposition of Paul Dubiel (hereinafter, "Dubiel Depo."), pp. 6-12).[2]

3.   Employees at A.P.A.'s Canton and Dracut facilities, at all times relevant, were represented by Local 25 in Boston, Massachusetts. (Deposition of Mark Harrington (hereinafter, "Harrington Depo."), pp. 9-10).[3]

4.   In February 1987, the Plaintiff was terminated from his employment with APA, but was reinstated. (Goulet Depo., p. 14).

5.   On March 11, 1987, while an employee of APA, the Plaintiff injured himself while he was unloading freight from a truck with a forklift and the truck pulled away from the loading dock, causing Mr. Goulet, while still on the forklift, to fall with the forklift, from the loading dock. (Local 25's Presentation Brief in Case No. 87-404, attached Local 25's Responses to Plaintiff's First Request for Production of Documents as Exhibit 11).[4]

6.   APA investigated this incident, and determined that the accident was caused by the negligence of Mr. Goulet. (APA's Presentation Brief in case No. 87-404, attached to Local 25's Responses to Plaintiff's First Request for Production of Documents, as Exhibit 14).[5]

7.   On March 12, 1987, as a result of its finding of gross negligence by the Plaintiff, APA terminated Mr. Goulet's employment. (March 12, 1987 letter from Justin Poor to Craig Goulet, attached to Plaintiff's Automatic Disclosures).[6]

---

[2] Cited excerpts from the Dubiel Depo are attached hereto as Exhibit 2.
[3] Harrington's Deposition is attached hereto as Exhibit 3.
[4] A true copy of Local 25's Presentation Brief in Case No. 87-404 is attached hereto as Exhibit 4.
[5] A true copy of APA's Presentation Brief in Case No. 87-404 is attached hereto as Exhibit 5.
[6] A true copy of the March 12, 1987 letter from Justin Poor, APA terminal manager, to Craig Goulet is attached hereto as Exhibit 6.

8.  Teamsters Local 25 filed a grievance on Mr. Goulet's behalf, challenging Mr. Goulet's termination. (Goulet Depo., p. 15).

9.  Mr. Goulet received workers compensation benefits as a result of the injuries he suffered on March 11, 1987. (Goulet Depo., pp. 14-16).

10. In June 1987, Judge Scannell of the Massachusetts Department of Industrial Accidents, found that Mr. Goulet should receive partial disability benefits as a result of the injuries that Mr. Goulet suffered on March 11, 1987. (Goulet Depo., pp. 14-15).

11. Mr. Goulet appealed the finding of Judge Scannell as he believed that he was entitled to total disability benefits, and not merely partial disability benefits. (Goulet Depo., pp. 15-16).

12. Mr. Goulet received partial worker's compensation benefits from 1987 through December 14, 2000, at which time his benefits terminated because he had received the maximum of 600 weeks of benefits allowed by Massachusetts law. (Goulet Depo., pp. 15-16; APA's Point of Order, dated October 16, 2001 regarding Case No. 87-404, attached as Exhibit 12 to Local 25's Responses to Plaintiff's First Request for Production of Documents).[7]

13. Although Mr. Goulet sought light duty work at APA around 1991 or 1992, Mr. Goulet never sought any light duty work or employment opportunities with any other employers whatsoever. (See Goulet Depo., p. 18).

14. Pursuant to the rules of the Joint Area Grievance Committee, a member's grievance cannot be heard by the Joint Committee while it is pending in another forum or jurisdiction.

---

[7] A true copy of APA's Point of Order, dated October 16, 2001, is attached hereto as Exhibit 7.

15. In 2001, Mr. Goulet informed Local 25 that his workers compensation benefits had been exhausted, and that he wished for his grievance to be heard at the New England Joint Area Committee. (Goulet Depo., pp. 23-24).

16. On October 16, 2001, Mr. Goulet's grievance was heard by the Southern New England Joint Area Committee (hereinafter, "SNEJAC"). (Harrington Depo., p. 11; Goulet Depo., p. 24).

17. The decision of the New England Joint Area Committee stated, in pertinent part:

> The Panel after hearing the case, motion made, seconded and carried that **upon submitting acceptable documentation to the Company of his ability to return to unrestricted duties, the grievant shall serve a ten (10) day suspension. Upon completion of the suspension,** he shall be reinstated to the list in his original position. (emphasis added).

(October 16, 2001 decision of the Southern New England Joint Area Committee, attached to Local 25's Response to Plaintiff's Request for Production of Documents as Exhibit 15).[8]

18. Mr. Goulet never submitted any documentation to APA concerning his ability to return to unrestricted duties. (Goulet Depo., p. 26; Harrington Depo., pp. 29-30).

19. Mr. Goulet never served a ten (10) day suspension for APA following the submittal of documentation regarding the ability to return to unrestricted duties. (Goulet Depo., p. 26).

20. Mr. Goulet never completed the prerequisites necessary to have his name returned to the APA seniority list in his original position. (Harrington Depo., p. 11).

21. Despite Mr. Goulet's failure to perform the actions required for his name to be returned to the APA seniority list for the Canton, Massachusetts facility, Mr. Goulet's name nonetheless appeared on the corporation's seniority list dated November 2001.

(November 2001 Seniority List for Canton, Massachusetts, attached to Local 25's

Responses to Plaintiff's First Request for Production of Documents as Exhibit 22).[9]

22. Two seniority lists were ordinarily generated for each A.P.A. facility: one generated by

the corporate office, and the other generated at each individual terminal. (Affidavit of

Burton Trebour (hereinafter, "Trebour Affidavit"), ¶ 6).[10]

23. The corporate seniority list contained only the employee's name and date of seniority, and

such lists were not necessarily available to employees at the terminal. (Trebour

Affidavit, ¶ 7).

24. The seniority list produced by the terminal would list only the employees with active

seniority, meaning that they were available to for day-to-day work, and would be posted

for the employees' perusal. (Trebour Affidavit, ¶ 8.)

25. APA's corporate office returned Mr. Goulet's name to the corporate seniority list because

it anticipated that Mr. Goulet would be returning to work, shortly following the decision

of the Southern New England Joint Area Committee in October 2001. (Trebour

Affidavit, ¶ 9).

26. The corporate office updated the corporate seniority list in November 2001 the decision

of the Southern New England Joint Area Committee's decision concerning the grievance

of Mr. Goulet. (Trebour Affidavit, ¶ 10).

27. A.P.A.'s inclusion of Mr. Goulet's name on the November 2001 corporate seniority list

was not due to any decision by A.P.A. to waive the requirements set forth by the

Southern New England Joint Area Committee concerning Mr. Goulet's re-employment.

---

[8] A true copy of the October 16, 2001 decision of the southern New England Joint Area Committee is attached
hereto as Exhibit 8.
[9] A true copy of the November 2001 seniority list for the APA facility in Canton, Massachusetts is attached hereto as
Exhibit 9.
[10] A true copy of the Trebour Affidavit is attached hereto as Exhibit 10.

28. A.P.A. never waived the requirements that Mr. Goulet provide medical documentation of his ability to return to unrestricted duties and serve a ten (10) days suspension prior to being returned to the seniority list for the Canton, Massachusetts terminal. (Trebour Affidavit, ¶ 12).

29. If A.P.A. had been aware that Mr. Goulet was not intending to provide medical documentation of his ability to return to duties immediately following the decision of the Southern New England Joint Area Committee, it would not have reinserted his name in the November 2001 corporate seniority list for A.P.A.'s Canton, Massachusetts facility. (Trebour Affidavit, ¶ 13).

30. On or about February 13, 2002, APA Transport announced that it would be ceasing operations. (Deposition of Douglas Francey (hereinafter, "Francey Depo."), p. 7).[11]

31. Mr. Goulet was not working at APA when it announced that it was ceasing operations or when its operations ceased. (Goulet Depo., p. 26).

32. An agreement was negotiated by APA Transport, New Penn Motor Express, and the Teamsters National Freight Industry Negotiating Committee (TNFINC) whereby employees of APA would be allowed to place their names on a call list to work for New Penn Motor Express. (Agreement between TNFINC and New Penn (hereinafter, "TNFINC/New Penn Agreement") attached to Local 25's Responses to Plaintiff's First Request for Production of Documents as Exhibit 21).[12]

33. Under the terms of the TNFINC/New Penn Agreement, an APA employee who worked thirty (30) days in a two (2) month period between March 1, 2002 and March 31, 2003, would receive seniority at New Penn. (TNFINC/New Penn Agreement).

---

[11] Excerpts of Francey Depo., are attached hereto as Exhibit 11.
[12] A true copy of the TNFINC/New Penn Agreement is attached hereto as Exhibit 12.

34. By letter dated February 14, 2002, the Union received a list from APA of all teh employees that would be effected by the closure of APA's facility in Canton, Massachusetts. (Letter, dated February 14, 2002 from Burton Trebour to George Cashman, attached to Local 25's Response to Plaintiff's First Request for Production of Documents as Exhibit 24).[13]

35. As for February 13, 2002, Mr. Goulet had neither received medical clearance to return to work nor served his ten (10) days suspension. (Goulet Depo., p. 26).

36. Employees of APA were given approximately one (1) week to relate their terminal preferences for NPME terminals. (Francey Depo., p. 11).

37. At the Canton, Massachusetts APA facility, the Union's steward, Doug Francey, gathered the employees' preferences concerning NPME terminals. (Francey Depo., p. 11).

38. In order to compile such list, Mr. Francey took the seniority list that was posted on the employees' bulletin board and attempted to ask each person whose name appeared on this list, at which New Penn terminal did they wish to have their name placed on the call list. (Francey Depo., pp. 15-16).

39. Mr. Goulet became aware that APA was closing from his sister-in-law, who had heard this news from another person. (Goulet Depo., pp. 19-24, 30-31).

40. After Mr. Goulet learned that APA was closing, he called Mr. Francey because he knew that Mr. Francey was the Union steward at the APA facility in Canton, Massachusetts, in February 2002. (Goulet Depo., pp. 31-33).

41. Mr. Goulet contacted Mr. Francey and told him that he wished to be placed on the call list for the New Penn Motor Express Billerica terminal. (Francey Depo., pp. 16-17).

---

[13] A true copy of the February 14, 2002 letter from Burton Trebour to George Cashman is attached hereto as Exhibit 13.

42. Mr. Goulet's name did not appear on the list that Mr. Francey was using for listing preferences, so he wrote in Mr. Goulet's name and preference. (Francey Depo., pp. 16-17; See Francey Deposition Exhibit 1).[14]

43. Mr. Goulet's name was not on the seniority list that was used by Mr. Francey to record terminal preferences. As such, Mr. Francey handwrote Mr. Goulet's name on the list. (Francey Depo., p. 19).

44. APA does not recall whether the November 2001 corporate seniority list for A.P.A.'s Canton, Massachusetts facility was sent to the Union. (Trebour Affidavit, ¶ 16).

45. It is possible that the A.P.A. facility in Canton, Massachusetts did not receive the November 2001 seniority list prior to its closing in February 2002. (Trebour Affidavit, ¶ 17.)

46. When New Penn Motor Express requested terminal seniority lists in order to create its call lists, it asked for seniority lists from the corporate office, and thus received the corporate seniority list. (Trebour Affidavit, ¶ 18).

47. According to the terms of the agreement reached by New Penn Motor Express, Inc. (hereinafter, "New Penn" or "NPME"), in order for an APA employee to receive seniority at New Penn, such an employee needed to work thirty (30) days within a two (2) month period between March 1, 2002 and March 31, 2003. (TNFINC/New Penn Agreement).

48. Mr. Goulet's name was not on the call list that was received by New Penn Motor Express.

49. Since his termination from employment in 1987, Mr. Goulet has not had any employment.

---

[14] A true copy of the seniority list on which Francey designated employees' call list preferences is attached hereto as Exhibit 14.

50. Mr. Goulet had not received medical clearance to return to work prior to March 31, 2003. (Gouelt Depo., p. 42).

51. Mr. Goulet has never applied for any employment opportunities between 1987 and the present. (Goulet Depo., p. 69).

52. As of October 4, 2005, the date of the Plaintiff's deposition in this matter, the Plaintiff claimed that he still suffered from a variety of physical injuries that significantly limited his ability to function and work. (Goulet Depo., pp. 70-74).

53. As of October 4, 2005, the Plaintiff was still suffering from a herniated disk in his lower back and a herniated disk in his neck, and had issues with a ligament in his knee. (Goulet Depo., pp. 71-74).

54. The Plaintiff stated that the herniated disk in his back occasionally affects his ability to sit and negatively affects his ability to lift, turn and bend. (Goulet Depo., p. 72).

55. The Plaintiff is awaiting surgical reconstruction of his knee. (Goulet Depo., p. 71).

56. During his deposition, the Plaintiff admitted that he did not know whether he would be able to perform dock work, at the present time, due to the functional limitations of his injuries. (Goulet Depo., p. 74).

57. The Plaintiff has represented himself as totally disabled and unable to work. (Goulet Depo., p. 75).

58. The Plaintiff has made no effort since 1987 to seek any alternative employment. (Goulet Depo., p. 17).

59. The Plaintiff did not hold any other employment while he was receiving partial disability workers compensation benefits. (Goulet Depo., p. 17).

60. The Plaintiff never attempted to find any additional employment between March 11, 1987 and October 16, 2001. (Goulet Depo., p. 17).

61. The Plaintiff has not held any employment since his accident at APA on March 11, 1987. (Goulet Depo., p. 17).

62. The Plaintiff has not been employed since the date March 31, 2003, the date on which New Penn's obligation to call APA employees from the call list of former APA employees expired. (Goulet Depo., pp. 69-70).

63. Since March 1, 2002, the Plaintiff has not filed any applications for employment. (Goulet Depo., p. 69).

64. Since March 1, 2002, the Plaintiff has not contacted any employment counselors in order to help him find opportunities for employment. (Goulet Depo., p. 70).

65. Since March 1, 2002, the Plaintiff has not attempted to do any searches at the library or on a computer of employment opportunities. (Goulet Depo., p. 70).

66. Since March 1, 2002, the Plaintiff has not made any attempts whatsoever to find employment. (Goulet Depo., pp. 69-70).

67. Mr. Goulet filed a grievance dated, April 7, 2003, with the Union. (Goulet Depo., p. 43)..

68. Mr. Goulet's grievance dated April 7, 2003 was not mailed to the Union until April 15, 2003. (See copy of envelope and grievance sent to Local 25 by Craig Goulet, attached to the New Penn's Responses to Plaintiff's First Request for Production of Documents).[15]

69. When William Carnes spoke with Mr. Goulet about the filing of a possible grievance for New Penn's failure to call Goulet from the call list, Mr. Carnes was not aware that Mr. Goulet had never complied with the terms of the October 16, 2001 decision of the SNEJAC. (Deposition of Williams Carnes (hereinafter, "Carnes Depo."), p. 52).[16]

---

[15] A true copy of the envelope in which Mr. Goulet's April 7, 2002 grievance was enclosed is attached hereto as Exhibit 15.
[16] Excerpts from Carnes Depo. are attached hereto as Exhibit 16.

70. If Mr. Carnes had been aware that Mr. Goulet had not complied with the terms of the SNEJAC's decision, he would have told Mr. Goulet that he was not entitled to have been called from the call list. (Carnes Depo., pp. 54-44).

71. When Mr. Goulet spoke with Mark Harrington in May 2003, Mark Harrington asked him about whether he had fulfilled the requirements of the October 16, 2001 decision of the SNEJAC. (Goulet Depo., pp. 47-48).

72. In July 2003, Mr. Goulet was aware that Local 25 had never filed his April 7, 2003 grievance with any grievance committee. (Goulet Depo., pp. 47-49; July 25, 2003 letter from Craig Goulet to Mark Harrington).[17]

73. By letter dated July 25, 2003, Mr. Goulet wrote the following to Mr. Harrington:

> Let's not lose sight of the real issue here. This grievance is about seniority rights under the agreement, not weather (*sic*) one is capable of working or not.

(July 25, 2003 letter from Craig Goulet to Mark Harrington).

74. Mr. Goulet was aware, prior to July 25, 2003, that the Union had expressed concerns regarding whether Mr. Goulet's grievance was meritorious. (See July 25, 2003 letter from Craig Goulet to Mark Harrington).

75. Although the National Master Freight Agreement (NMFA) dictates that grievances are to be docketed within thirty (30) days from the date on which a grievance is filed with the Local Union, in practice this time frame was often extended by mutual agreement. (Carnes Depo., pp. 8, 35).

76. William Carnes was the Local 25 Business Agent for New Penn Motor Express from 1982 until 2003. (Carnes Depo., p. 9).

---

[17] A true copy of Craig Goulet's July 25, 2003 letter to Mark Harrington is attached hereto as Exhibit 17.

77. Between 1982 and 2003, when there were grievances against New Penn filed by Local 25 members, it was common practice for Local 25 and New Penn to extend the time period for the filing docketing of grievances, sometimes even for several months. (Carnes Depo., pp. 44-45).

78. When Local 25 had grievances with New Penn, the parties would ordinarily attempt to settle the grievance through phone calls, and if the phone calls were not successful at settling the matter, meetings with the grievant and terminal manager were held before resorting to docketing the grievance with the appropriate grievance committee. (Carnes Depo., pp. 28-29).

79. New Penn considered the original filing of the grievance by Mr. Goulet on April 7, 2003, which they received by letter dated April 18, 2003, to be untimely. (Defendant New Penn Motor Express, Inc.'s Responses to Plaintiff's First Set of Interrogatories, Response #10).[18]

80. Local 25 did not believe that Mr. Goulet's April 7, 2003 grievance was meritorious because Mr. Goulet had not complied with the requirements necessary to have him reinstated to the APA seniority list pursuant to the October 16, 2001 decision of the Southern New England Joint Area Committee, but nonetheless docketed Mr. Goulet's April 2003 grievance with the Southern New England Joint Area Committee due to Mr. Goulet's persistence that his grievance should be filed. (Harrington Depo., pp. 29-30, 58; July 25, 2003 letter from Craig Goulet to Mark Harrington).

81. Employees at the APA terminal in Canton, Massachusetts never saw the November 2001 seniority list which had Mr. Goulet's name on it as it was not the seniority list that was posted on the bulletin board. (Francey Depo., p. 28).

---

[18] A true copy of New Penn's Responses to Plaintiff's First Set of Interrogatories is attached hereto as Exhibit 18.

82. Mr. Goulet has been receiving social security disability benefits since 1995, retroactive to

1987.

> For the Defendant,
> **INTERNATIONAL BROTHERHOOD OF**
> **TEAMSTERS, LOCAL UNION NO. 25,**
> By its attorneys,
>
> *Kathleen A. Pennini*
> Matthew E. Dwyer (B.B.O. # 139840)
> Kathleen A. Pennini (b.B.O. # 654573)
> Dwyer, Duddy and Facklam, P.C.
> Two Center Plaza, Suite 430
> Boston, MA 02108-1804

Date:   January 23, 2006                (617) 723-9777

## CERTIFICATE OF SERVICE

I, Kathleen A. Pennini, hereby certify that I have electronically filed this motion on January 23, 2006, with delivery to :

Scott Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA  01450

Carl H. Gluek, Esq.
Frantz Ward, LLP
55 Public Square Building, 19th Floor
Cleveland, OH  44113-1999

*Kathleen A Pennini*
Kathleen A. Pennini

f:\l25\goulet\pldg\rule56.facts.doc:blg

13

1

Volume I
Pages 1 to 47
Exhibits 1 to 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
CRAIG GOULET,                    :
          Plaintiff,             :
                                 :
     vs.                         :   Civil Action
                                 :   No. 04-12577 JLT
NEW PENN MOTOR EXPRESS, INC.;    :
and TEAMSTERS LOCAL 25,          :
INTERNATIONAL BROTHERHOOD OF     :
TEAMSTERS,                       :
          Defendants.            :
                                 :
- - - - - - - - - - - - - - - - -x

          DEPOSITION OF PAUL DUBIEL, a witness called
on behalf of the Plaintiff, taken pursuant to the
Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Scott A. Lathrop & Associates,
122 Old Ayer Road, Groton, Massachusetts, on
Tuesday, November 15, 2005, commencing at 1:18 p.m.

PRESENT:

     Scott A. Lathrop & Associates
          (by Scott A. Lathrop, Esq.)
          122 Old Ayer Road, Groton, MA 01450,
          for the Plaintiff.

     Frantz Ward LLP
          (by Carl H. Gluek, Esq.)
          2500 Key Center, 127 Public Square,
          Cleveland, OH 44114-1230, for the Defendant
          New Penn Motor Express, Inc.


(Continued on Next Page)

PRESENT:   (Continued)

    Dwyer, Duddy and Facklam, P.C.
        (by Kathleen A. Pennini, Esq.)
        Two Center Plaza, Suite 430, Boston, MA
        02108-1804, for the Defendant Teamsters
        Local 25, International Brotherhood of
        Teamsters.

ALSO PRESENT:  Craig Goulet

                *  *  *  *  *

6

1     A.    Yes.

2     Q.    More than one union?

3     A.    No.

4     Q.    What is the union that represents --

5     A.    Local 25.

6     Q.    Of the Teamsters?

7     A.    Yes.

8     Q.    Has that been true throughout your duration

9  at New Penn Motor Express?

10    A.    Yes.

11    Q.    Is there a business agent for Local 25 that

12 has responsibility for the Billerica terminal?

13    A.    Yes.

14    Q.    Who is that?

15    A.    Mark Harrington.

16    Q.    Has that been true since March of 2002?

17    A.    No.

18    Q.    When did Mr. Harrington, according to your

19 recollection, begin as the business agent

20 responsible for the Billerica terminal?

21    A.    I would have to say sometime during 2003,

22 late 2003.

23    Q.    Who was the business agent, if anyone,

24 prior to Mr. Harrington?

1          A.    William Carnes.

2          Q.    Was he the business agent covering the

3    Billerica New Penn terminal since March 2002 through

4    late 2003?

5          A.    Yes.

6          Q.    Did you know Mr. Harrington prior to late

7    2003?

8          A.    Yes.

9          Q.    Did you know Mr. Carnes prior to March

10   2002?

11         A.    No.

12         Q.    Where did you work, if at all, prior to

13   becoming terminal manager at New Penn in March of

14   2002?

15         A.    APA Transport.

16         Q.    What was your date of hire?

17         A.    June of '76.

18         Q.    What was your original position?

19         A.    I started off as a driver.

20         Q.    How long did you remain a driver?

21         A.    12 years.

22         Q.    So sometime in approximately '88?

23         A.    Yes.

24         Q.    What position did you assume then with APA

1  Transport?

2      A.    Supervisor.

3      Q.    Where were you a supervisor?

4      A.    New Jersey.

5      Q.    How long did you remain a supervisor in New

6  Jersey?

7      A.    Two years.

8      Q.    Then what happened?

9      A.    I became a terminal manager in Buffalo, New

10  York.

11      Q.    How long did you remain a terminal manager

12  in Buffalo, New York?

13      A.    I believe it was 12 years -- no.  It was

14  about 10 years.

15      Q.    Okay, let's say approximately ten years.

16      A.    Right.

17      Q.    What was your next position after terminal

18  manager in Buffalo, New York?

19      A.    I was a terminal manager in Dracut,

20  Massachusetts.

21      Q.    From when to when were you the terminal

22  manager in Dracut, Massachusetts, as best you can

23  recall?

24      A.    About a year and a half.  The dates I'm off

1   on a little bit.  I want to say it was around 2000,

2   until the later part of 2000 -- '99 to 2001 maybe,

3   latter part of 2001.

4       Q.   Was that the last position you held with

5   APA Transport?

6       A.   No.

7       Q.   Let me ask you this way.  When did you stop

8   being the terminal manager in Dracut?

9       A.   November of 2001.

10      Q.   What position did you then hold?

11      A.   Terminal manager in Canton, Massachusetts.

12      Q.   I take it you began that in 11/01?

13      A.   Yes.

14      Q.   That ended when?

15      A.   February of 2002.

16      Q.   Did you go straight from being the terminal

17  manager in Canton for APA Transport to being the

18  terminal manager in Billerica for New Penn Motor

19  Express?

20      A.   Yes.

21      Q.   When you were the terminal manager in

22  Canton, Massachusetts, were any of your employees

23  unionized?

24      A.   Yes.

10

1        Q.    Which union?

2        A.    Local 25 Teamsters.

3        Q.    Was there a business agent assigned to the

4    Canton terminal?

5        A.    Yes.

6        Q.    Who was that?

7        A.    Mark Harrington.

8        Q.    When you were the terminal manager in

9    Dracut, Massachusetts, was Local 25 representing

10   employees there?

11       A.    Yes.

12       Q.    Was there a business agent?

13       A.    Yes.

14       Q.    Who was that?

15       A.    Mark Harrington.

16       Q.    Did you know Mr. Harrington prior to

17   becoming the terminal manager in Dracut

18   Massachusetts?

19       A.    No.

20       Q.    Was the terminal in Buffalo, New York

21   unionized?

22       A.    Yes.

23       Q.    What was the --

24       A.    Local 375 Teamsters.

11

1      Q.    When you were the terminal manager for

2    Dracut, did you have seniority lists for your

3    drivers?

4      A.    Yes.

5      Q.    Let me restate that.  Did you have

6    seniority lists that covered also dock workers?

7      A.    There was one seniority list.

8      Q.    One seniority list?

9      A.    Right.

10     Q.    Let me back up.  Local 25 represented

11   drivers and dock workers in Dracut?

12     A.    They do, yes.

13     Q.    Local 25 represented drivers and dock

14   workers in Canton?

15     A.    Yes.

16     Q.    And in Billerica?

17     A.    Yes.

18     Q.    Going back, in Dracut, there was one

19   seniority list for all unionized employees?

20     A.    That's correct.

21     Q.    Whether you be a driver or a dock worker,

22   correct?

23     A.    Correct.

24     Q.    During your tenure in Dracut, which persons

1    or entities had the responsibility for compiling a

2    seniority list?

3         A.    Corporate office.

4         Q.    Of APA Transport?

5         A.    Yes.

6         Q.    Where was the corporate office when you

7    were in Dracut?

8         A.    North Bergen, New Jersey.

9         Q.    I take it you received from the corporate

10   office then these seniority lists?

11        A.    Yes.

12        Q.    How were they delivered to you?

13        A.    By truck mail.

14        Q.    Did you in any way distribute or post these

15   seniority lists?

16        A.    Yes.  One had to be posted in the drivers'

17   room.

18        Q.    Did you send a copy of these seniority

19   lists to any representative of the union as a matter

20   of practice?

21        A.    Not from the local terminal, no.

22        Q.    Did you have some understanding from some

23   other source these seniority lists were sent to the

24   union?



# Teamsters Local 25
## International Brotherhood of Teamsters

544 MAIN STREET • BOSTON, MASSACHUSETTS 02129-1113 • 617-241-8825 • Fax 617-242-4284
www.teamsterslocal25.com

GEORGE W. CASHMAN
*President / Principal Officer*

JOSEPH C. CONLON
*Secretary-Treasurer*

WILLIAM H. CARNES
*Vice President / Business Agent*

RITCHIE E. REARDON
*Recording Secretary / Business Agent*

MARK A. HARRINGTON
*Trustee / Business Agent*

LOU DiGIAMPAOLO
*Trustee / Director of Organizing / Field Representative*

ERNEST C. SHEEHAN JR.
*Trustee / Business Agent*

VINCENT J. PISACRETA
*Business Agent*

JOHN A. MURPHY
*Business Agent*

ARTHUR J. LAZAZZERO
*Field Representative*

## TEAMSTERS LOCAL 25
## VS.
## APA TRANSPORT CORP.
## CASE # 87-404

**Issue:** Unjust Termination of Craig Goulet

**Grievant:** Craig Goulet

### Background and Statement of the Facts:

Brother Goulet has been a Teamster since 1979. He was employed by Sanborn's Transportation earning seniority in August of 1984. After the acquisition of Sanborn's by APA, he went to work in the Canton, MA terminal in October of 1987.

Brother Goulet, during his career, worked for many reputable union carriers. On March 11, 1987 he was discharged by A.P.A. Transport for gross negligence, allegedly as a result of a serious accident. (The alleged incident was that Brother Goulet drove a forklift off the dock).

On the night in question, Brother Goulet reported for duty at 7:00 p.m. He was on the 7:00 p.m. dock bid and was given an assignment to unload the # 38 door. He proceeded to the loading dock area and rolled up the overhead doors of both the dock and the truck. He observed that the stripper was a palletized load and required the use of a forklift. He placed his bills on a dock desk and pulled up the dock plate. He then secured a forklift and drove onto the truck, which was a straight job.

As he proceeded to enter the truck the vehicle started to roll away. Upon realizing what was going on he grabbed the track of the roll-up door of the straight job. The forklift then crashed into the yard on all fours and Goulet fell onto the

**2/8/05   CG    17**

*We will only accept deliveries from UNION carriers! All other deliveries will be refused!*

ground. He fell approximately eight feet and sustained many serious injuries; a torn rotator cuff, two herniated disks as well as a torn ligament in his right knee.

He was laying on the ground and supervisor Tom Whitels came around the corner almost immediately and inquired as to what had occurred. He went back on the dock and was notified that he was terminated. A mechanic took Craig to the Goddard Memorial Hospital in Stoughton, MA for treatment. He was observed at the hospital and sent home. The company called a few days later and said he was required to go to New Jersey to be evaluated by their doctors. Brother Goulet was unable to travel due to his injuries and he informed the company that he would seek treatment from his own doctor.

Brother Goulet went out on an industrial accident and his case had been pending on committee hold since that time.

### Union's Position:

It is Local 25's position that the discharge of Craig Goulet is without merit. He should be reinstated with his proper seniority and made whole for all lost earnings and benefits.

It is inconceivable that Brother Goulet would willfully drive a forklift off the dock. The facts of the case do not support that Brother Goulet would take such action. In fact, in reviewing the circumstances that had been ongoing at APA, one would question if some sort of conspiracy actually were invoked against Brother Goulet.

Upon reviewing the activities that had occurred at the terminal during that time span one comes away with the notion that Brother Goulet was not wanted by APA.

Also, upon reviewing the notes that Brother Goulet compiled regarding an incident on February 5, 1987 it is apparent that management at APA took exception to Brother Goulet's desire to certain legal and contractual rights. For example, on February 5, 1987 he was told to report to the terminal manager's office. Upon entering the office Brother Goulet was immediately confronted by the terminal manager, Jack Poor. Mr. Poor said to Goulet "you are going to lose Craig, sooner or later you're going to lose. It may not be today or tomorrow, but you can't win. Bigger men than you have gone through that door."

This type of attitude towards Brother Goulet certainly speaks of the hostile environment that was in existence at the time of the incident.

Local 25 does not believe that Brother Goulet would willfully drive himself off the end of the dock riding on a six thousand pound Brama bull which resulted in over fourteen years of injuries, lost pension and health benefits, earning opportunity



# A-P-A TRANSPORT CORP.

2100 88th Street, North Bergen, New Jersey 07047 • 201-869-6600 212-564-3130
Fax 201-869-5472

October 16, 2001

**NEJAC**
**Case #87-404**
**Craig Goulet vs. A-P-A Transport Corp.**

Gentlemen:

On March 11, 1987, Mr. Goulet was discharged for his gross negligence which caused a serious accident (Exhibit A).

At approximately 7:45 p.m. on March 11, 1987, Mr. Goulet was operating a forklift at 38 Door and was attempting to remove a skid of printed forms from Truck #1237 when the truck rolled forward and the forklift fell to the ground and Mr. Goulet jumped off and fell to the ground. Mr. Goulet was also the person who backed Truck #1237 into the platform.

The forklift wound up three (3) feet away from the dock in an upright position and the truck approximately 35 feet from the dock.

I will now read into the record Exhibit B which is Supervisor T. Whittles's report:

The supervisor's report of injury (Exhibit C) reflects that Mr. Goulet had a bruised right shin and no other findings of visible injury were noted. Although the forklift was damaged, it was driveable and Mr. Goulet was instructed to take it to the garage, which he did and to return back to 38 Door (Exhibit D).

Gentlemen, Mr. Goulet exhibited gross negligence resulting in a serious accident because he failed to properly secure Truck #1237. Furthermore, besides damaging the forklift, and during 14 years of intermittent hearings, appeals, and rehearings, Mr. Goulet has caused A-P-A Transport to expend over $200,000 in partial disability benefits (600 weeks), medical bills and legal costs, all because of his gross negligence for not properly securing the vehicle which rolled away.

Gentlemen, based upon all of the facts presented, we respectfully request the Claim of the Union be denied and the discharge upheld.

Very truly yours,

A-P-A TRANSPORT CORP.

Burton C. Trebour
Vice President
Labor & Administration

BCT/th

2/8/05    CG    42

A   GREAT   ORGANIZATION   —   BUILT   ON   KEPT   PROMISES



# A-P-A TRANSPORT CORP.

30 Industrial Drive, Canton, Mass. 02021 • (617) 828-8530

March 12, 1987

Mr. Craig Goulet
305 Cox Street          S.S.#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      Cert. Let. #P383 777 988
Hudson, MA 01749

Craig Goulet:

On March 11, 1987, while performing your work assignment at the Canton Terminal, your gross negligence was the cause of a serious accident.

This letter is to confirm your discharge of March 11, 1987, under the provisions of the N.M.F.A., N.E. Supplement.

Justin W. PoorIII
Terminal Manager

cc Armand Pohan
   Andrew Park
   Burt Trebour
   Robert Reichenberg
   Employers Group
   George Cashman, B.A.,Local#25, Cert. Let. P383 777 987
   Robert Yetman
   File

2/8/05  CG   15

A  GREAT  ORGANIZATION  —  BUILT  ON  KEPT  PROMISES



# A-P-A TRANSPORT CORP.

2100 88th Street, North Bergen, New Jersey 07047 • 201-869-6600  212-564-3130
Fax 201-869-5472

## POINT OF ORDER

October 16, 2001

<u>Craig Goulet vs. A-P-A Transport Corp.</u>
Case #87-404

Gentlemen:

Mr. Goulet was discharged and on Workers' Compensation from March 11, 1987 through December 14, 2000 which was when he reached the maximum of 600 weeks partial benefits under Massachusetts Law.

To this date, Mr. Goulet has never given the company any documentation in writing indicating that he is physically capable of driving or having the necessary CDL license and/or endorsements required to drive for the company.

It is the company's contention that Mr. Goulet's discharge cannot be heard by this committee if there is no proof that he is physically capable and qualified to work.

Very truly yours,

A-P-A TRANSPORT CORP.

Burton C. Trebour
Vice President
Labor & Administration

BCT/th

2/8/05    CG    41

A    GREAT    ORGANIZATION    —    BUILT    ON    KEPT    PROMISES

**EXHIBIT 1**

# NEW ENGLAND JOINT AREA GRIEVANCE COMMITTEE
## DECISION FORM

Established in accordance with the terms and conditions of the National Master Freight Agreement and the New England Supplemental Freight Agreement, entered into by and between the Local Unions and Carriers engaged in City Pickup and Delivery and/or Over-the-Road Freight Operations.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Teamster Local(s) No./Agent: **2 5 / M Harrington**

Grievant: **Craig Goulet**

CASE NO.: **8 7 - 4 0 4**

Employer: **APA Transport Corp.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

We, the undersigned parties to the National Master Freight Agreement and the New England Supplemental Freight Agreement hereby agree to submit the dispute to arbitration under the Rules of Procedure prescribed by the NE Joint Area Grievance Committee, by virtue of its authority, as set forth in Articles 7 and 8 of the National Master Freight Agreement and Articles 45 and 46 of the New England Supplemental Freight Agreement, the following:

Alleged violation of Article 47. **Union seeks man to be returned to work will all lost wages, H, W and Pension. 3/01- Union request this case be placed back on the SNE JAC docket for hearing.**

The undersigned further agree that a majority decision of the NE Joint Area Committee in the above dispute will be final, conclusive and binding with no appeal and, further, that neither party will attempt through any overt acts, to void the decision rendered. Failure to comply may result in economic action within the confines of Article 8 of the National Master Freight Agreement and Article 45 and 46 of the New England Supplemental Freight Agreement.

Employer: **APA Transport Corp.**

Signed: **B Trebour**

Local Union(s): **2 5**

Signed: **M Harrington**

This is the Official Award and Decision of the New England Joint Area Grievance Committee. Decision must be promptly complied with and all Monetary Awards must be paid in pay period for the week following receipt of Decision.

## - DECISION -

The Panel in Executive Session, motion made, seconded and carried the Company's Point of Order was not upheld. The Panel after hearing the case, motion made, seconded and carried that upon submitting acceptable documentation to the Company of his ability to return to unrestricted duties, the grievant shall serve a ten (10) day suspension. Upon completion of the suspension he shall be reinstated to the seniority list in his original position.

DECISION DATE: **10/16/2001**

EMPLOYER PANEL:

**Scalzo**

**Picarello**

UNION PANEL:

**Mundy\***

**Fenlason**

2/8/05    CG    59

## CANTON SENIORITY LIST

### LOCAL UNION 25    NOVEMBER 2001

| | | |
|---|---|---|
| 1 | Prout, R. | 11/12/68 |
| 2 | Burrill, P. | 06/30/70 |
| 3 | McCaffrey, M. | 10/07/70 |
| 4 | Mastropietro, R. | 06/14/73 |
| 5 | Setterland, D. | 11/05/73 |
| 6 | Loud, D. | 01/11/74 |
| 7 | Petit, A. | 03/11/74 |
| 8 | Petit, R. | 09/15/75 |
| 9 | Durette, M. | 09/30/75 |
| 10 | Hoyt, H. | 08/17/76 |
| 11 | Pitts, R. | 08/27/76 |
| 12 | D'Eramo, M. | 02/22/77 |
| 13 | Sullivan, T. | 10/24/77 |
| 14 | Rabideau, R. | 01/04/78 |
| 15 | Kelley, Jr., W. | 03/22/78 |
| 16 | Monahan, H. | 11/14/78 |
| 17 | Petit, Jr., E. | 04/23/79 |
| 18 | Pickering, G. | 08/03/81 |
| 19 | Tisbert, B. | 05/17/83 |
| 20 | Damiano, J. | 07/20/83 |
| 21 | Gwynn, N. | 05/14/84 |
| 22 | Goulet, C. | 06/28/84 |
| 23 | Cardoza, P. | 09/24/84 |
| 24 | Bouffard, R. | 09/30/85 |
| 25 | Coull, D. | 04/06/73 |
| 26 | McGee, R. | 05/20/82 |
| 27 | Francey, G. | 10/25/82 |
| 28 | Cruise, M. | 04/30/84 |
| 29 | Power, K. | 11/15/84 |
| 30 | Fennelly, E. | 02/25/85 |
| 31 | McGrath, H. | 08/26/85 |
| 32 | Bain, S. | 03/09/87 |
| 33 | Holderried, J. | 05/08/89 |
| 34 | Howe, T. | 05/15/89 |
| 35 | Howe, S. | 05/31/90 |
| 36 | Berry, S. | 05/31/90 |
| 37 | Sullivan, C. | 12/09/91 |
| 38 | MacDonald, J. | 12/09/91 |
| 39 | Hulbert, M | 12/09/91 |
| 40 | O'Meara, W. | 03/01/93 |

2/8/05    CG    60

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CRAIG GOULET** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**NEW PENN MOTOR EXPRESS** )<br>    **Defendant** )<br>)<br>**and** )<br>)<br>**TEAMSTERS LOCAL 25** )<br>**INTERNATIONAL BROTHERHOOD OF** )<br>**TEAMSTERS** )<br>)<br>    **Defendant,** )<br>) | **CIVIL ACTION**<br>**NO. 04-12577-JLT** |

## AFFIDAVIT OF BURTON TREBOUR

1. In 2001-2002, I was the Vice President of Labor and Administration for A.P.A. Transport, Inc.

2. I am familiar with the grievance filed by Teamsters Local 25 on behalf of Craig Goulet in March 1987, and was heard by the Southern New England Joint Area Committee on October 21, 2001.

3. As the Vice President of Labor and Administration for A.P.A. in October 2001, I represented A.P.A. at the Southern New England Joint Area Committee hearing, and argued that Mr. Goulet's termination should not be reversed.

4. On October 16, 2001, the Southern New England Joint Area Committee made the following ruling concerning the grievance of Mr. Goulet:

5. A.P.A interpreted that decision to mean that it was not required to return Mr. Goulet to the active work roster until and unless he produced documentation concerning his medical clearance to return to unrestricted duties with A.P.A.

6. Two seniority lists were ordinarily generated for each A.P.A. facility: one generated by the corporate office, and the other generated at each individual terminal.

7. The corporate seniority list contained only the employee's name and date of seniority, and such lists were not necessarily available to employees at the terminal.

8.  The seniority list produced by the terminal would list only the employees with active seniority, meaning that they were available to for day-to-day work, and would be posted for the employees perusal.

9.  The corporate office returned Mr. Goulet's name to the corporate seniority list because it anticipated that Mr. Goulet would be returning to work, shortly following the decision of the Southern New England Joint Area Committee in October 2001.

10. The corporate office updated the corporate seniority list in November 2001 following the decision of the Southern New England Joint Area Committee's decision concerning the grievance of Mr. Goulet.

11. A.P.A.'s inclusion of Mr. Goulet's name on the November 2001 corporate seniority list was not due to any decision by A.P.A. to waive the requirements set forth by the Southern New England Joint Area Committee concerning Mr. Goulet's re-employment.

12. A.P.A. never waived the requirements that Mr. Goulet provide medical documentation of his ability to return to unrestricted duties and serve a ten (10) days suspension prior to being returned to the seniority list for the Canton, Massachusetts terminal.

13. If A.P.A. had been aware that Mr. Goulet was not intending to provide medical documentation of his ability to return to duties immediately following the decision of the Southern New England Joint Area Committee, it would not have reinserted his name in the November 2001 corporate seniority list for A.P.A.'s Canton, Massachusetts facility.

14. Mr. Goulet never presented any documentation to A.P.A. concerning his ability to return to unrestricted duties.

15. Mr. Goulet never served a ten (10) day suspension.

16. I do not recall whether the November 2001 corporate seniority list for A.P.A.'s Canton, Massachusetts facility was sent to the Union.

17. It is possible that the A.P.A. facility in Canton, Massachusetts did not receive the November 2001 seniority list prior to its closing in February 2002.

18. When New Penn Motor Express requested terminal seniority lists in order to create its call lists, it asked for seniority lists from the corporate office, and thus received the corporate seniority list.

Signed under the pains and penalties of perjury this ___ day of January 2006

.

_____

Burton Trebour

1

Volume I
Pages 1 to 35
Exhibits 1 to 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                   :
CRAIG GOULET,                      :
          Plaintiff,               :
                                   :
     vs.                           :   Civil Action
                                   :   No. 04-12577 JLT
NEW PENN MOTOR EXPRESS, INC.;      :
and TEAMSTERS LOCAL 25,            :
INTERNATIONAL BROTHERHOOD OF       :
TEAMSTERS,                         :
          Defendants.              :
                                   :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF GEORGE D. FRANCEY, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Scott A. Lathrop & Associates,
122 Old Ayer Road, Groton, Massachusetts, on
Wednesday, October 12, 2005, commencing at 9:10 a.m.

PRESENT:

     Scott A. Lathrop & Associates
          (by Scott A. Lathrop, Esq.)
          122 Old Ayer Road, Groton, MA 01450,
          for the Plaintiff.

     Frantz Ward LLP
          (by Carl H. Gluek, Esq.)
          2500 Key Center, 127 Public Square,
          Cleveland, OH 44114-1230, for the Defendant
          New Penn Motor Express Inc.

(Continued on Next Page)

2

PRESENT:   (Continued)

    Dwyer, Duddy and Facklam
        (by Kathleen A. Pennini, Esq.)
        Two Center Plaza, Suite 430, Boston, MA
        02108-1804, for the Defendant Teamsters
        Local 25, International Brotherhood of
        Teamsters.

ALSO PRESENT:  Craig Goulet


                  * * * * *

3

# I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| GEORGE D. FRANCEY | | | | |
| BY MR. LATHROP | 5 | | | |
| BY MR. GLUEK | | 29 | | |

\* \* \* \*

# E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | Seniority list | 18 |
| 2 | Statement by George Francey | 22 |
| 3 | Seniority list for Canton, dated 11/01 | 22 |

\* \* \* \*

4

1              P R O C E E D I N G S

2          MR. LATHROP:  Any stipulations?

3          MS. PENNINI:  Yes.

4          MR. GLUEK:  What are they?

5          MS. PENNINI:  Objections, except as to

6    form, reserved for trial.

7          MR. LATHROP:  And shall we reserve motions

8    to strike?

9          MS. PENNINI:  Yes.

10         MR. LATHROP:  How about reading and

11   signing?

12         MS. PENNINI:  45 days.  We can waive the

13   notary.

14         MR. LATHROP:  If it's not signed within 45

15   days of receipt, the reading and signing are deemed

16   waived?

17         MS. PENNINI:  Okay.

18                    GEORGE D. FRANCEY

19   a witness called for examination by counsel for the

20   Plaintiff, having been satisfactorily identified by

21   the production of his driver's license and being

22   first duly sworn by the Notary Public, was examined

23   and testified as follows:

24

5

1                    DIRECT EXAMINATION

2      BY MR. LATHROP:

3      Q.    Morning, sir.

4      A.    Morning.

5      Q.    Could you please state your full name and

6    address for the record.

7      A.    George Douglas Francey, 324 Flagg Street,

8    Bridgewater, Mass.

9      Q.    What is your date of birth, sir?

10     A.    3/17/55.

11     Q.    Are you or have you ever been a member of

12   Local 25 of the Teamsters?

13     A.    Yep.

14     Q.    That's a yes?

15     A.    Oh, yes.

16     Q.    Are you currently a member?

17     A.    Yes.

18     Q.    When were you first a member of Local 25?

19     A.    I want to say it was November '78.  And I

20   was in Local 170 for four years, so from '82 to '86.

21     Q.    How did you happen to join Local 25?

22     A.    Working for Beacon Fast Freight.  It was a

23   union barn.  I had to join.

24     Q.    Where were you based when you worked for

6

1    Beacon Fast Freight?

2        A.    Avon, Mass.

3        Q.    How long did you work for Beacon Fast

4    Freight?

5        A.    Until '82.

6        Q.    What happened in '82?

7        A.    Work was falling off, so I started sparing

8    over at Sanborn's.  Then I made the list over there,

9    so I transferred the locals and went over to

10   Sanborn's.

11       Q.    What's the full name of Sanborn's?

12       A.    Sanborn's Motor Express.

13       Q.    Where were you based?

14       A.    I worked out of the Wrentham terminal, but

15   their headquarters was in Portland, Maine.

16       Q.    Wrentham, Mass.?

17       A.    Yes.

18       Q.    When did you make the list?

19       A.    Let's see, I think it was in October of

20   1982.

21       Q.    How long did you continue to work for

22   Sanborn's?

23       A.    Until APA Transport bought Sanborn's Motor

24   Express in I believe October or thereabouts of '86.

1    Q.    Where were you first based when you worked
2    for APA Transport?
3    A.    Canton, Mass.
4    Q.    How long did you work in Canton, Mass.?
5    A.    I worked in Canton until APA closed their
6    doors in 2002, February.
7    Q.    Where did you work after that?
8    A.    I currently work at Atlantic Plant
9    Maintenance in Watertown.
10    MR. GLUEK:    Could you repeat that.
11    THE WITNESS:    Atlantic Plant Maintenance in
12    Watertown, Mass.
13    Q.    Is that a union?
14    A.    Yes, Local 25.
15    Q.    When did you start with Atlantic Plant
16    Maintenance?
17    A.    Let's see, APA went out in February.    I
18    spared around for a while, like working where I
19    could get work.    I was not on anybody's list, and I
20    started there in May of 2002.
21    Q.    What do you do for them?
22    A.    Rigor, truck driver.
23    Q.    You currently work for them?
24    A.    Yes.

8

1          Q.   Have you held any positions in Local 25?

2          A.   I was the steward at the APA facility from

3    February 2001 until we went out of business in

4    February of 2002.  It was just about a year.

5          Q.   Did you hold any other positions with

6    Local 25?

7          A.   No.

8          Q.   Was that an elected position?

9          A.   Yep.

10         Q.   Is that yes?

11         A.   Yes.

12         Q.   Are you familiar with the plaintiff in this

13   case, Craig Goulet?

14         A.   Yes.

15         Q.   When did you first become familiar with

16   Craig Goulet?

17         A.   When did I first meet him?

18         Q.   Yes.

19         A.   At Sanborn's in Wrentham probably.  Was

20   that 1982?  Yes.

21         Q.   Was he working at the time?

22         A.   Yes.  That's how I met him.

23         Q.   Let's talk about APA Transport and its

24   closure.

1      A.    Sure.

2      Q.    How did you first come to learn that APA

3   Transport would be closing?

4      A.    I came in off the street one night, and

5   they said, "We're out of business."

6      Q.    Who is that?

7      A.    It was Valentine's Day.  The terminal

8   manager told us.

9      Q.    Who was the terminal manager?

10      A.    What is the name...  I know it.  Give me a

11   minute here.  He was not terminal manager that long,

12   only maybe a year before that, if that.  What was

13   the name...  It will come to me eventually.

14      Q.    Did you have some communications with the

15   Local 25 leadership with regard to --

16      A.    Oh, yes.  Mark Harrington was the business

17   agent for us at the time.

18          Paul Dubiel was the terminal manager's

19   name.

20      Q.    You said Mark Harrington was the business

21   agent?

22      A.    Right.

23      Q.    He was the business agent covering APA

24   Transport?

1    A.    Yes.

2    Q.    How long had he been the business agent for

3  APA Transport, as you recall?

4    A.    I want to say he was always our business

5  agent since he was a business agent.  I can't

6  remember exactly.

7         We were there for, what 16, 17 years, as

8  far I remember.  I think maybe T. Eddie Sheehan

9  might have been a business agent before him.  When I

10 was the steward, Harrington was the business agent,

11 and for the steward before me, Harrington was the

12 business agent.

13   Q.    Did you know a William Carnes?

14   A.    Not personally.  I know he was the vice

15 president of Local 25.

16   Q.    After you heard from the terminal manager

17 that APA Transport was closing, did you have any

18 communications with Mr. Harrington?

19   A.    Oh, yes.

20   Q.    What communications do you recall having

21 with Mr. Harrington relative to the closing?

22   A.    Just in general.  I mean, I can't remember

23 exactly.  Obviously, you know, he said, "Hey, we're

24 out of business."

11

1          He, you know, communicated to me that New

2   Penn Motor Transport was offering work to APA

3   employees on a seniority basis.  There were two

4   terminals that you had your choice of.  There was

5   Billerica or Cranston, I think it was called.  The

6   Providence terminal I believe was in Cranston.  One

7   of my duties as the steward was to take the

8   seniority list and ask everybody where they wanted

9   to go, which I did.

10      Q.   When you communicated with Mr. Harrington

11  concerning the idea that New Penn Motor Express was

12  offering work at two different terminals, was

13  Mr. Harrington telling you this in person, by

14  telephone, by letter, or some other means?

15      A.   Could have been in person, could have been

16  by telephone.  I mean, he was there.  He came down

17  to the barn a few times.

18          They told us on Valentine's Day they were

19  closing the doors the following Tuesday.  I don't

20  remember whether Valentine's Day was a Wednesday or

21  Thursday.  The following Tuesday, the doors were

22  closing.

23          Of course, we had to get rid of freight in

24  the system.  Guys started getting laid off.  That

12

1   goes by seniority.

2           Being the steward, the steward has super

3   seniority for layoff purposes.  He wanted me to be

4   the last guy out of there because he wanted to be

5   sure APA -- they had a reputation for not doing

6   things on the up and up.  I mean, what are you going

7   to do, we're going out of business.  That's what he

8   wanted me to do.  I mean, it was work for me.  I

9   stayed.

10          I think I was the last one to work there

11  that Friday after Valentine's-- not the Friday

12  after.  It was a Wednesday or Thursday.  The

13  following week I think was my last day on a Friday,

14  whatever that was.  I would have to look at a

15  calendar.

16      Q.   You had a seniority list?

17      A.   Yes.

18      Q.   Where did the list come from?

19      A.   APA.

20      Q.   At some point in time, was there some sort

21  of vote?

22      A.   A vote?  About what?

23      Q.   Any sort of ratification vote?

24      A.   Of what?

13

1      Q.    With regard to New Penn.

2      A.    What do you mean?  I'm not following you.

3  What's a ratification vote?

4      Q.    Did you have a meeting with --

5      A.    Me, no.  With New Penn, no.

6      Q.    Did you attend a meeting of APA drivers?

7      A.    Oh, yes.  We went to the union hall, yes.

8      Q.    Let's talk about that.  Do you recall when

9  this meeting at the union hall took place?

10      A.    Not the exact day, no.

11      Q.    Was it before your last day at APA?

12      A.    Good question.  I don't remember.

13      Q.    But do you recall that there was --

14      A.    I mean, I could not swear to when it was.

15  You know what I'm saying?

16      Q.    You do recall a meeting at the union hall?

17      A.    Yes.

18      Q.    For the record, where is the union hall?

19      A.    Charlestown.  I think it's at 544 Main

20  Street.

21      Q.    Who was present at this meeting?

22      A.    Mark Harrington.  This is to the best of my

23  recollection.  I believe Shawn O'Brien was there.

24  I'm pretty sure George Cashman was there.

14

1      Q.    Do you know if Mr. Carnes was there?

2      A.    Good possibility.  I don't remember talking

3  to him, but he was probably there.

4      Q.    Could you identify for the record who

5  George Cashman was at the time.

6      A.    President of Local 25.

7      Q.    And who was Shawn O'Brien?

8      A.    Business agent.

9      Q.    Do you know for what --

10     A.    Oh, he didn't have anything to do with us.

11 I mean, these guys were there simply because they

12 are the Local 25 leadership.

13          APA going out of business was a pretty big

14 hit for Local 25 because we had two terminals, one

15 in Dracut and then the Canton facility.  You are

16 talking, what, 72 guys in Canton, and I don't know

17 how many up in Dracut.  There was probably over 30

18 anyway.

19     Q.    Was this meeting at the union hall

20 therefore for the Dracut and Canton APA drivers?

21     A.    I believe we were all together, I believe.

22     Q.    When you say "all together," you mean both

23 the Dracut and the Canton employees?

24     A.    I believe so.

15

1     Q.    Do you recall what was said or done during

2   this meeting?

3     A.    We talked about getting work, because, I

4   mean, everybody was out of a job.  I believe that

5   was probably one of the times that they mentioned

6   New Penn offering work on a seniority basis to APA

7   employees.

8     Q.    Do you know if a seniority list was shown

9   or used at this meeting?

10    A.    At this meeting, I don't recall.  I don't

11  recall.

12    Q.    At this meeting, did any of the Local 25

13  members express their preferences for New Penn

14  terminals?

15    A.    No.  The way I did it, in Canton, I had a

16  copy of the seniority list, and I went to everybody,

17  asked them what terminal they wanted to go to.  I

18  wrote it down next to their name.  When I was done

19  with that, I handed it into Mark Harrington.  That's

20  the last I had anything to do with it.

21    Q.    Did you do that before or after --

22    A.    No.  While I was working, not at this

23  meeting.

24    Q.    Let me ask the full question.

1          A.    Go ahead.

2          Q.    Did you do it before or after this meeting?

3          A.    Probably before and after.  You know what

4   I'm saying?  It was like as I could get ahold of

5   people.  Like the guys were still coming into work

6   until everything dried up.  I would get ahold of

7   them and ask them.  Some of them I may have called

8   on the phone.

9              This went on continually until probably the

10  last day I was there, getting everybody's pick.

11         Q.    At this union meeting, do you recall

12  whether or not Craig Goulet was discussed?

13         A.    I can't remember, to tell you the truth.  I

14  had not seen him in years, and I know I communicated

15  with him because -- I don't remember whether I

16  called him or he called me, but he gave me a pick.

17  I wrote it down.

18              Because his name was not carried on the

19  seniority list.  They took it off long before I was

20  the steward.  I really never understood what his

21  position was, whether he was on comp, whether he was

22  off.  I didn't think he was off the list.  I knew he

23  had a case against APA.

24              You know, I mean, officially his name was

17

1    not on the list.  I wrote his name in on the bottom

2    where he wanted to go and his phone number.  I drew

3    an arrow up the side.  I inserted it into where his

4    name should be on the seniority list.

5        Q.    Do you recall when it was you contacted

6    or --

7              MR. GLUEK:  Objection.

8        Q.    Let me restate it.  Do you recall when you

9    were in contact with Mr. Goulet?

10       A.    No.

11       Q.    Do you recall if it was before or after

12   this meeting?

13       A.    I don't recall, to tell you the truth,

14   honestly.

15       Q.    Correct me if I'm wrong, but I believe you

16   said the contact was by telephone?

17       A.    It would have been, I believe.  I mean, I

18   had not seen him.  I don't recall seeing him at the

19   meeting.  Maybe he was there.  I really don't

20   recall.

21       Q.    Correct me if I'm wrong, but you said in

22   this conversation you had with Mr. Goulet, his

23   preference for terminals with New Penn was

24   expressed?

18

1     A.   Yes.

2     Q.   Do you recall the terminal that he

3   selected?

4     A.   Yes.  I have a copy.  I have the original

5   right here.  It's Billerica.

6     Q.   May I see that.

7     A.   Yes.  That's the original handwritten one

8   that I used.

9         MR. LATHROP:  I'm going to make copies of

10   this.

11         (Pause)

12     Q.   Mr. Francey, let me return the original to

13   you and have this copy marked.

14              (Document marked as Francey

15               Exhibit 1 for identification)

16     Q.   Mr. Francey, I'm showing you a photocopy of

17   what you had just handed me.  We marked it for

18   purposes of identification as Exhibit No. 1.  This

19   is a photocopy of the document you just handed me,

20   correct?

21     A.   (Examines document)  Correct.

22     Q.   Let's now talk a little bit about this

23   document.  In terms of what I will call the

24   typewritten portion, where did that come from?

1        A.    APA.

2        Q.    Do you remember when you got it?

3        A.    Well, they always have to have the

4    seniority list posted on the bulletin board.  I may

5    have just photocopied that.  I might have got one

6    out of the office.

7              I mean, I would have had one as the steward

8    anyway.  I don't know whether I had been carrying

9    this one all along or what.

10       Q.    The handwriting that appears on this

11   document, is that all yours?

12       A.    That's all mine.

13       Q.    How did you get Mr. Goulet's telephone

14   number?

15       A.    I don't remember whether he called me or I

16   called him.  I know I spoke to him.

17       Q.    By B-i-l --

18       A.    That stands for Billerica.  If you look at

19   the top, you will see Providence.  B-i-l is for

20   Billerica.

21       Q.    When you say between 28, is that 28 and

22   29 --

23       A.    That's where his name used to be on the

24   seniority list.

1    Q.    I take it you attempted to go through

2    approximately 75 persons to get their preferences?

3        A.    Yep.

4        Q.    That's a yes?

5        A.    Yes.

6        Q.    After you got everyone's preference, you

7    gave this document to Mr. Harrington?

8        A.    Yes.  I gave him a copy.

9        Q.    You kept the original?

10       A.    That's the original that you just

11   photocopied.

12       Q.    Did you have any later dealings with

13   Mr. Goulet after you got his preference?

14       A.    I don't recall any.

15       Q.    After you gave this list to Mr. Harrington,

16   did you do anything further in terms of working on

17   employees' selection of New Penn preferences?

18       A.    No, because I was nobody after -- APA went

19   out of business.  I was not steward anymore.  I was

20   trying to get myself a job.

21       Q.    You did not go to New Penn?

22       A.    No.  They called me, but I was working at

23   the time.

24              Billerica is just too long of a haul for

1    me.  I didn't want to change locals.  Cranston would

2    have been just as far.  By then I was working in the

3    rigging business, and I kind of liked it.

4         Q.   Help me out here.  I assume your name is on

5    this list?

6         A.   Yes.

7         Q.   What number are you?

8         A.   Good question.  I don't have my glasses.

9    Let's see here, where am I...  Right here.  I'm

10   number -- what's that?  I can't read it.

11        Q.   27?

12        A.   I believe so, yes.

13        Q.   You had at least listed Providence for

14   yourself?

15        A.   I did, but I had no intention of going

16   there.

17        Q.   You did get a call?

18        A.   They did call me.  I believe it was the

19   following, I want to say, June maybe.  It was warm

20   weather by the time they got around to calling me.

21             Like I said, I was already employed in the

22   rigging business, so I was not interested.

23        Q.   At some point in time, did you sign a

24   statement?

1      A.    I would have to look at it, because she
2   said that to me (indicating).  I don't recall
3   signing it.
4      Q.    She being Attorney Pennini?
5      A.    Yes.
6                  (Document marked as Francey
7                   Exhibit 2 for identification)
8      Q.    Mr. Francey, I'm showing you what was
9   marked as Exhibit 2 in this deposition.  This
10  purports to be something signed by you on July 22,
11  2004.
12     A.    (Examines document)  Definitely.
13     Q.    Is that your signature?
14     A.    It is my signature.
15     Q.    That's an accurate statement, that you
16  spoke with Craig Goulet regarding the closure of
17  APA?
18     A.    Sure, that's an accurate statement.
19     Q.    It says, "When I spoke with Mr. Goulet, he
20  indicated to me his choice was the Billerica MA
21  terminal"?
22     A.    Yes.
23                 (Document marked as Francey
24                  Exhibit 3 for identification)

23

```
 1        Q.   Mr. Francey, I'm showing you what was
 2    marked as Exhibit 3, which is another purported
 3    seniority list for Canton, Local 25, November 2001.
 4    Have you ever seen this document before?
 5        A.   (Examines document)  Probably in the past,
 6    yes.  That appears to be an older seniority list.
 7        Q.   When you say "older," what do you mean by
 8    older?
 9        A.   Well, there doesn't appear to be as many
10    names on it as on this one, just looking at it
11    (indicating).  Yes, it's from November 2001.
12        Q.   The list that you used, is it dated?
13        A.   No.
14        Q.   Do you see Mr. Goulet's name on Exhibit 3?
15        A.   Oh, yes.
16        Q.   Do you have any understanding as to who put
17    together Exhibit 3?
18        A.   I would not know.
19        Q.   Did you have any communication with anyone
20    other than Mark Harrington concerning APA employees'
21    preference with regard to the New Penn terminal?
22        A.   No.  I mean, I had no power.  All I was
23    doing was making out a list for him basically.
24        Q.   Just to be clear, you spoke to no other
```

1    officer of Local 25 with regard to the preferences

2    of the Canton employees?

3         A.    I don't recall speaking with anybody.  I

4    don't know why I would have spoke with anybody else.

5    Maybe in passing, maybe in conversation, but

6    officially?  I don't recall.

7         Q.    Did you ever have any dealings with New

8    Penn representatives?

9         A.    No.

10        Q.    Did you ever have any dealings with APA

11   representatives with regard to APA employees and

12   their New Penn selections?

13        A.    No.

14        Q.    Other than giving Exhibit 1 to

15   Mr. Harrington, did you do anything else with regard

16   to employee selection?

17        A.    No.

18        Q.    Did Mr. Harrington ever ask you any

19   questions about Exhibit 1?

20        A.    I don't recall any.

21        Q.    Did he discuss Craig Goulet with you?

22        A.    I don't recall discussing Craig Goulet at

23   all.  He may have just in passing, but I don't

24   recall it.

25

1      Q.    Do you know who the steward was in the

2    Dracut terminal?

3      A.    Oh, I can see his face...  I can't recall

4    his name.  I didn't know him that well.

5           MR. LATHROP:  Let me just take a few

6    minutes.

7           (Recess)

8      BY MR. LATHROP:

9      Q.    Looking at Exhibit 1, Mr. Francey, you

10   talked about inserting Craig Goulet's name there.

11   Do you recall whether or not there was any

12   discussion among APA employees about --

13     A.    Where his name was on the seniority list?

14   I would have had to have asked someone, because I

15   didn't know.

16           I mean, I knew he was a Sanborn employee,

17   but I was not sure exactly where his name was

18   because his name had not been on there for many

19   years.  I don't know why APA took his name off of

20   the seniority list, but it was not carried.  A lot

21   of years went by.

22           I don't recall.  I either put it there

23   because that's what Craig told me where he was or

24   whether the former steward told me where he was or

1   whether the guys in general just said that that's
2   where he should be.  I don't recall.
3           And I may have injected his name on the
4   wrong spot, but that was an accident if I did.  At
5   least I got the name on there.
6       Q.   Do you recall whether or not there was any
7   discussion about the propriety of Craig's name being
8   on the list?
9       A.   The way it was explained to me is that -- I
10  knew he was out on a comp case, and he was hurt in I
11  believe '87.  I don't know, but that's my
12  recollection.  I knew he had a case going against
13  APA.
14          Before Dubiel was the terminal manager,
15  John Conti was.  I remember him calling me into the
16  office and asking me who Craig Goulet was because
17  his name wasn't on the seniority list.  I guess he
18  had just found out that Craig must have won his case
19  against APA, was supposed to be coming back to work,
20  because this was -- well, I don't know how many
21  years that was, 14, 15 years.  John Conti, you know,
22  was not terminal manager when Craig Goulet worked
23  there.
24          I remember Harrington telling me the same

1   thing in a telephone conversation, that Craig Goulet
2   won his case and that he was going to be coming back
3   to work.  Everybody was kind of surprised, seeing he
4   had been gone for so many years.
5          That's what I recall about hearing that.
6   That was not very long before we went out of
7   business.  It was a matter of months, but I can't
8   remember exactly, you know, whether it was six
9   months, three months.  I think it could have been
10  six months, but I don't know.
11      Q.   At the time you heard about the APA
12  closure, do you remember whether there was any
13  discussion among the APA men about Craig's name
14  being on the seniority list?
15      A.   A lot of them, the older guys, like knew he
16  existed; the younger guys never saw his name
17  probably.
18      Q.   Do you recall whether there were any
19  complaints about him being on the list?
20      A.   No.  Before I was the steward, that was not
21  something that I concerned myself with.  His name
22  had not been carried on there for a long time.  I
23  don't recall when they took it off.
24          Now, I'm talking about the seniority list

28

1    that they post on the bulletin board.  I mean,

2    that's the only seniority list I ever saw.

3           What APA had in their office, what Local 25

4    had in their office, I have no clue.  I only go by

5    what they post and I just assume that that's the

6    official seniority list, as far as I know.

7       Q.    Just to be clear, Exhibit 3, do you

8    recognize that?

9       A.    (Examines document)  I have never seen

10   this, but I see there's a mistake here where his

11   name should be, if this is accurate, because I have

12   him a few slots below that.  I mean, that would have

13   been a mistake, an innocent mistake.  I mean, I was

14   trying to do the right thing here.

15      Q.    At the union hall meeting, were there

16   seniority lists that were presented at that time?

17      A.    I don't recall, to be honest.  I don't

18   recall much of that meeting.  Everybody was kind of

19   bummed out, you know what I mean, after losing your

20   job after 18 years.  Everybody is worried about

21   where they are going to go.

22           I really don't recall much about that

23   meeting.

24           MR. LATHROP:  I have nothing further.

1                    CROSS EXAMINATION

2       BY MR. GLUEK:

3       Q.    Good morning.  My name is Carl Gluek.  I

4    represent New Penn.

5       A.    Morning.

6       Q.    If you could look at Exhibit 1 and

7    Exhibit 3.  They are the two different seniority

8    lists.  I notice that Exhibit 3 is different in form

9    in terms of the information that's provided from

10   Exhibit 1; is that correct?

11      A.    Wait a minute.  Is this 3?

12      Q.    Correct.

13      A.    And this is 1?

14      Q.    Correct.

15      A.    Yes, I see that, too.

16      Q.    You previously testified about their being

17   a seniority list that is posted.  In your mind,

18   that's the official one, correct?

19      A.    That is the only one I ever saw.

20      Q.    The one that's marked Exhibit 3, is that in

21   the format that would be posted, or is Exhibit 1 in

22   the format that would be posted?

23      A.    This is the one that would be posted, but

24   APA would have probably cut the phone numbers off

1    (indicating).

2        Q.    Just so the record is clear, you were

3    pointing at Exhibit 1?

4        A.    This one, yes, Exhibit 1.

5        Q.    If you could look at Exhibit 1, No. 36.

6    What's that handwriting say?

7        A.    I don't have my glasses on.  Good question.

8    I can't see.

9        Q.    Maybe you can go over by the light.

10       A.    Well, I need something.  36?

11       Q.    Correct.

12       A.    Let's see, 36...  "Steve Hurley," oh, "Not

13   going" is what I wrote.  He didn't make a pick.

14       Q.    He decided he didn't want to go to either

15   terminal?  He had no preference?

16       A.    Right.

17       Q.    Could you look at No. 48 and tell me what

18   that says.

19       A.    "Dennis Carvalho, No. 48, Not going."

20       Q.    He, too, decided he didn't want --

21       A.    He didn't want any part of it.  He must

22   have got another job.

23       Q.    No. 66, I notice that person is crossed

24   out?

1    A.    Oh, yes.  I don't know whether he was fired

2   or whether he quit.  We couldn't get ahold of him.

3   This was even before this situation developed with

4   New Penn, too.  He was not returning calls.  I don't

5   know if he voluntarily quit or whatever.  We

6   couldn't get ahold of him.

7         He had problems.  He had issues with APA.

8   I could not get ahold of him even before this

9   because we wanted to know if he was coming back to

10  work.

11    Q.    75, the handwriting, is that supposed to be

12  B-i-l?

13    A.    No.  75?

14    Q.    Yes.

15    A.    Yes, Billerica, B-i-l.

16    Q.    Then there were several people that

17  retired.  Is that Ret --

18    A.    Yes, R-e-t is retirees.  They decided to

19  take a pension.

20    Q.    They had no preference then?

21    A.    No, no.  They didn't pick anything.

22         There's one with an arrow stick, Mark

23  Hurley.  He was in the Gulf.  He was on active duty.

24  I couldn't get ahold of him.  I never heard from him

32

1  again.

2     Q.   You can sit down now.  I'm done with the

3  list.

4     A.   Thank you.

5     Q.   With respect to Mr. Goulet, did you

6  unilaterally decide to contact him or put him on the

7  list, or did somebody tell you to put him on the

8  list?

9     A.   You know, I don't recall the exact events

10 that led up to that.  I may have discussed it with

11 the former steward.  He may have said, "Technically

12 he's still on the list.  We don't know."

13         I don't recall exactly.  I knew, though,

14 that if he had won his case, I knew that from, you

15 know, previously, that he was coming back to APA.

16         Why he hadn't come back, I never knew.  I

17 mean, you know, it was just, you know, scuttlebutt,

18 or whatever you want to call it, that he was not

19 medically cleared to come back or whatever, and then

20 in the interim, we go out of business.

21         I must have thought it was the right thing

22 to do, though.

23     Q.   Just to make sure I understood the

24 testimony, you had no discussions with any

33

1    representative of New Penn with respect to anybody's

2    preference?

3        A.    No.   That would not have been my job.

4              MR. GLUEK:   Nothing further.

5              MS. PENNINI:   May I have a couple of

6    minutes.

7              MR. LATHROP:   Sure.

8              (Pause)

9              MS. PENNINI:   I have no questions.

10                  (Whereupon, the deposition

11                  was concluded at 9:56 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

34

1                    C E R T I F I C A T E

2       I, GEORGE D. FRANCEY, do hereby certify that I

3   have read the foregoing transcript of my testimony,

4   and further certify under the pains and penalties of

5   perjury that said transcript (with/without)

6   suggested corrections is a true and accurate record

7   of said testimony.

8       Dated at _____, this ____ day of _____,

9   2005.

10

11                        _____

12

13

14

15

16

17

18

19

20

21

22

23

24

35

1   COMMONWEALTH OF MASSACHUSETTS)

2   SUFFOLK, SS.                    )

3       I, Ken A. DiFraia, Registered Professional

4   Reporter and Notary Public in and for the

5   Commonwealth of Massachusetts, do hereby certify

6   that there came before me on the 12th day of Oct.,

7   2005, at 9:10 a.m., the person hereinbefore named,

8   who was by me duly sworn to testify to the truth and

9   nothing but the truth of his knowledge touching and

10  concerning the matters in controversy in this cause;

11  that he was thereupon examined upon his oath, and

12  his examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this 27th day of

21  October, 2005.

22                  _Ken A. D. Fraia_

23                      Notary Public

24              My commission expires 4/3/09

**FEBRUARY 13, 2002**

### AGREEMENT BETWEEN
### THE TEAMSTERS NATIONAL FREIGHT
### INDUSTRY NEGOTIATING COMMITTEE
### AND NEW PENN MOTOR EXPRESS, INC.

1.     APA has notified TNFINC that the company intends to cease operations immediately. Absent the efforts contemplated by this Agreement, APA's existing customers will be divided among many competitors, most of them non-union regional carriers.  This will result in the loss of many NMFA-covered jobs in the industry.   New Penn Motor Express (NPME) had no involvement in APA's decision to terminate operations and has no independent obligation, contractual, statutory or otherwise, to APA, TNFINC or APA's employees in connection with this closure.

2.     After being advised of APA's decision to close, however, NPME began negotiations with APA to explore the possibility of acquiring certain customer information.   Obtaining this customer information would allow NPME to capture a portion of APA's LTL business and keep that business with a NMFA carrier.   Any arrangement between NPME and APA regarding customer information is contingent upon approval of this Agreement by TNFINC.

3.     Under the contingent agreement between NPME and APA, NPME is seeking customer information and access.  NPME is not a purchaser and does not seek to purchase any of APA's equipment or terminals from APA.  NPME is not seeking or  participating in any merger or acquisition of APA or any of its rights or authority or stock.  NPME is not the legal successor employer of APA.

4.     NPME does not believe its contingent agreement with APA creates any obligation to TNFINC or to APA NMFA employees, either legally or under the NMFA.  However, NPME will extend an opportunity to those APA NMFA employees who are employed in the local supplemental areas where NPME has an established terminal operation to become NPME employees under terms and conditions hereinafter described.   In return for extending such opportunities, TNFINC will agree that NPME has fulfilled all contractual or legal obligations, if any, to TNFINC and the APA NMFA employees.

5.     NPME's discussions with APA regarding its customer lists and NPME's offer to extend opportunities to APA NMFA employees is voluntary.   NPME is undertaking these efforts because it believes there is some benefit to APA NMFA employees as well as a benefit to NPME.  However, NPME has negotiated with APA contingent upon reaching agreement with TNFINC.  Absent such agreements and approvals, NPME will abandon any further discussions with APA and will not extend the opportunities outlined herein, and shall have no obligation to TNFINC or the APA NMFA employees.

1

6.    Because of the serious and urgent nature of APA's current financial condition and the need to avoid the immediate erosion of APA's customer base, the timing of this agreement is of the essence.

7.    As of February 20, 2002 APA will cease to make any pick ups of LTL freight. APA will continue to make deliveries of that freight in their system. It is not the intent or the plan of NPME to deliver any APA freight but will make itself available to do so on a limited basis.

8.    Following the termination of APA's operations, NPME will provide opportunities to APA NMFA employees as described herein:

    a.    NPME and APA have terminals in different locations. NPME will provide to TNFINC and APA a list of its terminals and a general description of its pick up and delivery territory for each terminal as well as will advise which NPME terminals have road operations and which NPME terminals do not in an effort to assist APA NMFA employees.

    b.    Thereafter each APA NMFA employee, whether active or inactive, employed in the same local supplemental area where NPME has existing direct terminal operations, shall have the right to place his/her name on the call list of only ONE NPME terminal (or the classification seniority list, where applicable) within the same local supplement where they currently are employed.  APA NMFA over-the-road drivers, active or inactive on separate over-the-road seniority at the Buffalo, NY, Philadelphia, PA and North Bergen, NJ terminals, shall only have the right to place his/her name on the over-the-road terminal seniority call list at one of the following NPME terminals where such same separate seniority exists. Albany, NY, Cinnaminson, NJ (Philadelphia area), Newburgh, NY and Trenton, NJ. (Footnote: In the event NPME opens a Burlington VT terminal, APA NMFA employees on the Burlington VT terminal seniority list shall be provided an opportunity to place their names on the list for the NPME Burlington VT terminal and gain seniority in accordance with the terms of this Agreement). NPME does not have any operations in Central States, nor does NPME have any operations in the Maritime Provinces of Canada as does APA, and thus those APA NMFA employees are not covered by this Agreement. It is clearly understood that during the period between the date of APA's termination of operations and the effective date of this Agreement, NPME shall be able to utilize APA NMFA employees as necessary without regard to seniority.

    c.    No APA NMFA employee shall be required to place his/her name on any NPME terminal call list. NPME shall have no obligation to any APA NMFA employee who chooses to not place his/her name on a NPME terminal call list by March 1, 2002. Additionally, NPME shall have no obligation to APA NMFA employees until TNFINC provides the APA NMFA terminal selection call lists in accordance with this Agreement.

    d.    When an APA NMFA employee places his/her name on a NPME terminal call list, it will appear below all NPME employees names on that terminal seniority list (end-tailed). APA NMFA employees shall be arranged (and called as casuals) according to their current APA NMFA seniority.  If more than one employee has the same seniority date, their positioning on the list will be decided by "coin-tossing" conducted by union officials. NPME is not obligated to hire any APA employee not covered by the NMFA.

2

e.     Employees who are on a NPME terminal call list, will be offered work in accordance with their seniority position and qualifications. NPME shall not be penalized for passing an employee for work opportunity if the employee cannot perform all of the duties required of the job being filled or until APA NMFA employees meet all government pre-employment requirements.

f.     APA NMFA employees shall have work opportunity ahead of NPME casual employees, but shall not have work opportunity ahead of any probationary or preferred casual employees, if applicable.

g.     APA NMFA employees added to the NPME terminal call lists as described above shall be treated and paid as casual employees in accordance with the local supplement and shall establish seniority at NPME in accordance with the following provision. Any APA NMFA employee who works thirty (30) days within any two (2) consecutive calendar month period shall be deemed to have obtained seniority and shall be placed on the NPME seniority list in accordance with that established seniority date, end-tailed after the NPME seniority employees on such seniority list.

h.     NPME shall only be obligated to offer work to APA NMFA employees as outlined above until March 31, 2003 at which time such obligation will no longer exist.

If during the term of the current 1998-2003 NMFA, but not later than March 31, 2003, the list of former APA NMFA employees at any terminal is exhausted, those APA NMFA employees on other terminal lists in that local supplement, who have not obtained seniority at NPME, will be offered a second opportunity to place their name on the call list of such terminal.

i.     APA NMFA employees on a NPME terminal call list shall be paid in accordance with the casual rate listed in the NMFA until such time as they obtain NPME seniority. Thereafter they shall be paid ninety (90%) of the current NMFA rate for the first six (6) months and thereafter, one-hundred percent (100%) of the current rate in effect.

j.     Any APA NMFA employee who achieves seniority status at NPME and qualifies for vacation will receive one (1) bonus week of vacation in addition to the vacation earned under the local supplement unless or until such APA NMFA employee qualifies for three (3) weeks vacation, in which case the bonus week shall no longer apply. Under no circumstances shall any APA NMFA employee receive more than one bonus week of vacation in any vacation year. The vacation year being contract or calendar in accordance with the Local Supplemental Agreement.

k.     NPME shall have no obligation to relocate any APA NMFA employee.

l.     NPME shall have no responsibility, obligation or liability for any claim or for anything of any kind or nature regarding or involving APA NMFA employees added to NPME seniority lists as described prior to the time they are added to such NPME seniority list. This includes but is not limited to, unemployment or workers compensation claims, short-paid or

3

underpaid wages, short-paid or under paid health and welfare or pension contributions, any unfunded or withdrawal pension liability, or claims or any kind against APA or others.

m.    NPME will make contributions for each APA NMFA employee into the respective Health and Welfare and Pension fund where such APA NMFA employee is currently enrolled. All payments of Health and Welfare and Pension contributions made by NPME on behalf of the APA NMFA employee shall be made in accordance with the requirements of the NMFA and applicable Local Supplements. NPME shall not be obligated for Health and Welfare and Pension contributions on behalf of any APA NMFA employee on disability or workers compensation.

n.    APA NMFA employees added to the NPME seniority lists shall be eligible to participate in the Teamsters 401-K program as do other NPME employees.

8.    It is acknowledged that the benefits provided to the APA NMFA employees under this Agreement are greater than would otherwise be provided under the NMFA for these employees under these circumstances, and that NPME has fulfilled any legal or contractual obligation it had or may have to these APA NMFA employees.

9.    This Agreement will become effective February 25, 2002, but only if (i) there is an agreement finalized between NPME and APA regarding customer lists and (ii) there is approval by the affected APA NMFA employees.

**TNFINC**                                    **NEW PENN MOTOR EXPRESS, INC.**


_____              _____
Phil Young - Co-Chairman               Stephen M. O'Kane - President


_____              _____
James McCall - IBT Counsel             John Ring - Counsel



# A-P-A TRANSPORT CORP.

2100 88th Street, North Bergen, New Jersey 07047 • 201-869-6600 212-564-3130
Fax 201-869-5472

February 14, 2002

RECEIVED
02 FEB 21 PH 1:00
TEAMSTERS
LOCAL 25

**VIA FEDERAL EXPRESS**

George Cashman
President
Teamsters Local 25
544 Main Street
Charlestown, Massachusetts 02129

Re:  __Canton Terminal Closing__

Dear Mr. Cashman:

    In accord with the Worker Adjustment and Retraining Notification Act ("WARN"), you are being provided notice that, effective Wednesday, February 20, 2002, APA Transport Corp. ("APA") will be permanently closing down its terminal located at 30 Industrial Drive - B, Canton, Massachusetts. Almost all of the Teamsters employed at this terminal will be permanently laid off next week, although we may need a handful of your members for a few weeks to assist in the winding down of our operations. I will be contacting you shortly regarding same.  Attached as Exhibit A is a list of the job titles of the Teamsters positions that will be eliminated at the above-referenced terminal, and the names of the employees currently in those positions.

    The reason for the shortened WARN notice period is as follows:  APA had been actively seeking financial assistance to alleviate its severe economic problems.  If APA had provided an earlier shutdown notice, it would have precluded our ability to obtain the financing necessary to continue in business. APA has now been notified that its request for this critical financing has been rejected and, accordingly, it can no longer afford to operate.

    As you may also be aware, certain APA employees may be employed by New Penn within the same multi-employer bargaining unit under the National Master Freight Agreement.  We understand that employment will be based upon the extent to which New Penn is able to obtain former APA accounts, and in accord with terms and conditions that New Penn and the Teamsters may jointly determine, without regard to APA.

    You may contact Jonathan Raymond, President, Commonwealth Corporation, Schraft Center, 529 Main Street, Suite 110, Boston, Massachusetts to obtain assistance for the Teamsters employed at the Canton terminal. Mr. Raymond's telephone number is 617-727-8158.

    If you need any additional information, please contact me at 201-869-6600.

Sincerely,

Burton C. Trebour
Vice President, Labor and Administration

## EXHIBIT A

| POSITION | LAST NAME | FIRST NAME |
|---|---|---|
| CITY DRIVER | BAIN | SCOTT |
| CITY DRIVER | BLAKE | RICHARD |
| CITY DRIVER | CAREY | PATRICK |
| CITY DRIVER | CARVALHO | DENNIS |
| CITY DRIVER | CHOINIERE JR | ROGER |
| CITY DRIVER | COULL | DENNIS |
| CITY DRIVER | CREIGHTON | ROBERT |
| CITY DRIVER | CRUISE | MICHAEL |
| CITY DRIVER | D'ERAMO | MARIO |
| CITY DRIVER | DESOUZA | BRAD |
| CITY DRIVER | FENNELLY | EDWARD |
| CITY DRIVER | FONTES | MARK |
| CITY DRIVER | FRANCEY | GEORGE |
| CITY DRIVER | FRIEL | PADHRAIC |
| CITY DRIVER | GILMORE | MICHAEL |
| CITY DRIVER | HAMILTON | DAVID |
| CITY DRIVER | HOLDERRIED | JOSEPH |
| CITY DRIVER | HOUDE | GERALD |
| CITY DRIVER | HOWE | TIMOTHY |
| CITY DRIVER | JOHNSON JR. | RICHARD |
| CITY DRIVER | KEARLEY | MARK |
| CITY DRIVER | KELLEY | GEORGE |
| CITY DRIVER | KELLEY JR | RICHARD |
| CITY DRIVER | LEHAN | DANIEL |
| CITY DRIVER | MC GEE | RONALD |
| CITY DRIVER | MC GRATH | HAROLD |
| CITY DRIVER | MONAHAN | HUBERT |
| CITY DRIVER | O'MEARA | WILLIAM |
| CITY DRIVER | PALM | WAYNE |
| CITY DRIVER | PENDLETON | JAMES |
| CITY DRIVER | PETIT | ALAN |
| CITY DRIVER | PETIT | ROBERT |
| CITY DRIVER | PETIT JR | EDMUND |
| CITY DRIVER | PICKERING | GARY |
| CITY DRIVER | RABIDEAU | RAYMOND |
| CITY DRIVER | ROCHE | JAMES |

| | | |
|---|---|---|
| CITY DRIVER | SETTERLAND | DAVID |
| CITY DRIVER | SPANO JR | JAMES |
| CITY DRIVER | STEPHEN | JOHN |
| CITY DRIVER | SULLIVAN | THOMAS |
| CITY DRIVER | TISBERT | BRIAN |
| CITY DRIVER | WERTZ | ERIC |
| CITY DRIVER | ZUTAUT JR | BERNARD |
| ROAD DRIVER | BOSSE | FRANCIS |
| ROAD DRIVER | BOUFFARD | ROBERT |
| ROAD DRIVER | BURRILL | PETER |
| ROAD DRIVER | CLARK | DAVID |
| ROAD DRIVER | CRAWFORD | HENRY |
| ROAD DRIVER | GOULD | DAVID |
| ROAD DRIVER | HOYT | HERBERT |
| ROAD DRIVER | KELLEHER | TIMOTHY |
| ROAD DRIVER | MC CAFFREY | MICHAEL |
| ROAD DRIVER | MORRIS | TERRENCE |
| ROAD DRIVER | OSMER | JOHN |
| ROAD DRIVER | POWER | KEVIN |
| ROAD DRIVER | PROUT | ROBERT |
| ROAD DRIVER | WINQUIST | PETER |
| DOCKWORKER | BERRY | STEPHEN |
| DOCKWORKER | CARDOZA | PHILIP |
| DOCKWORKER | DAMIANO | JOHN |
| DOCKWORKER | DOLAN | JOSEPH |
| DOCKWORKER | DURETTE | MICHAEL |
| DOCKWORKER | GWYNN | NORMAN |
| DOCKWORKER | HOWE | STEPHEN |
| DOCKWORKER | HULBERT III | MILTON |
| DOCKWORKER | KELLEY JR | WILLIAM |
| DOCKWORKER | LOUD | DONALD |
| DOCKWORKER | MAC DONALD | JEFFREY |
| DOCKWORKER | MASTROPIETRO | RICHARD |
| DOCKWORKER | PARQUETTE | DAVID |
| DOCKWORKER | PERRY | JOHN |
| DOCKWORKER | PIMENTEL | JORGE |
| DOCKWORKER | PITTS | ROBERT |
| DOCKWORKER | SULLIVAN | COLIN |

PROV - PROVIDENCE RI
BIL - BILLERICA MA
RET - RETIRING

* ACTIVE MILITARY CAN'T CONTACT
# 38 CAN'T CONTACT

| NO | NAME | ADDRESS | CITY/STATE | ZIP | DATE | PHONE |
|---|---|---|---|---|---|---|
| 1 | ROTMAN FRED, ROBERT | 88 SPRING ST | BRAINTREE, MA | 02184 | 11/13/88 | 781-848-4391 |
| 2 | PROV. BURRILL, PETER | 6 GREAT WOODS CIRCLE | NORTON, MA | 02766 | 6/3/70 | 508-285-9452 |
| 3 | BIL McCAFFREY, MICHAEL | 29 B SHAW ST | BRAINTREE, MA | 02184 | 10/7/70 | 781-848-9223 |
| 4 | * BROUX | | | | | |
| 5 | ROMASTRO, PIETRO RICHARD | 215 FOREST TRAIL | HANSON, MA | 02341 | 6/14/73 | 781-447-9455 |
| 6 | BIL SETTERLAND, DAVID | 93 PAUL ROAD | HANOVER, MA | 02339 | 11/3/73 | 781-871-4525 |
| 7 | Ret. LOUD, DONALD | 560 BEDFORD STREET | ABINGTON, MA | 02351 | 1/11/74 | 781-871-0416 |
| 8 | RET PETIT, ALAN | 11 HINSON ROAD | WEYMOUTH, MA | 02188 | 3/11/74 | 781-337-4553 |
| 9 | BIL PETIT, ROBERT | 145 HIGHLAND AVE. | QUINCY, MA | 02169 | 9/15/75 | 781-471-0098 |
| 10 | PROV DURETTE, MICHAEL | 114 FORD STREET | SWANSEA, MA | 02777 | 9/30/75 | 508-674-7683 |
| 11 | Ret. HOYT, HERBERT | 23 GARFIELD STREET | FOXBORO, MA | 02035 | 8/17/76 | 508-543-2978 |
| 12 | Ret. PITTS, ROBERT | 1573 LIBERTY STREET | BRAINTREE, MA | 02184 | 8/27/76 | 781-843-1540 |
| 13 | BIL DIBRAMO, MARIO | 31 WASHINGTON STREET | SHERBORN, MA | 01770 | 2/22/77 | 508-653-6086 |
| 14 | PROV SULLIVAN, THOMAS | 345 HILLSIDE DRIVE | PLYMOUTH, MA | 02360 | 10/24/77 | 508-224-5884 |
| 15 | BIL RABIDEAU, RAYMOND | P.O. BOX 265 | EASTON, MA | 02334 | 1/4/78 | 508-230-2436 |
| 16 | RET KELLEY, WILLIAM | 308 FIELD STREET | BROCKTON, MA | 02403 | 3/27/78 | 508-583-0861 |
| 17 | PROV MONAHAN, ROBERT | 4 KATHY LANE | HANSON, MA | 02341 | 11/14/78 | 781-826-2751 |
| 18 | BIL BUTLER, EDMUND | 693 KING STREET | HANOVER, MA | 02339 | 4/23/79 | 781-871-7648 |
| 19 | BIL PICKERING, GARY | 53 ROSALIND STREET | N WEYMOUTH, MA | 02188 | 8/3/81 | 781-337-6278 |
| 20 | PROV BEATTY, BRIAN | 21 MARSH LANE | BALI, MA | 02366 | 2/1/83 | 603-886-0144 |
| 21 | PROV. DAMIANO, JOHN | 32 BERRY DRIVE | E.BRIDGEWATER, MA | 02333 | 7/20/83 | 508-378-3792 |
| 22 | PROV GWYNN, NORMAN | 883 CENTRAL STREET | E.BRIDGEWATER, MA | 02333 | 3/14/84 | 508-378-0466 |
| 23 | PROV CARLOZZI, PHILIP | 808 MAPLE STREET | MANSFIELD, MA | 02048 | 9/24/84 | 508-339-5134 |
| 24 | BIL BOUFFARD, ROBERT | 188 EMERSON STREET | BROCKTON, MA | 02301 | 3/30/85 | 508-588-6340 |
| 25 | Ret. GOULD, DENNIS | 2130 STATE ROAD | PLYMOUTH, MA | 02360 | 4/6/73 | 508-888-6964 |
| 26 | RET RICHER, RONALD | 437 COMMONWEALTH RD | WAYLAND, MA | 01778 | 3/30/82 | 508-655-8174 |
| 27 | PROV FRANCEY, GEORGE | 324 FLAGG STREET | BRIDGEWATER, MA | 02324 | 10/25/82 | 508-697-9620 |
| 28 | PROV DRUBE, MICHAEL | 163 SOUTH PERKINS ST | CAREVILLE, MA | 02347 | 1/3/84 | 508-946-0336 |
| 29 | BIL POWER, KEVIN | 16 CARVER ROAD | WATERTOWN, MA | 02472 | 11/15/84 | 617-926-5324 |
| 30 | PROV REILLY, EDWARD | 166 WASHINGTON ST UNIT 68 | PLAINVILLE, MA | 02763 | 2/23/85 | 508-695-5078 |
| 31 | PROV MCGRATH, HAROLD | 1165 MAIN STREET | WALPOLE, MA | 02081 | 8/26/85 | 508-668-0244 |
| 32 | BIL HALE, SCOTT | 28 POOLE CIRCLE | HOLBROOK, MA | 02343 | 1/3/86 | 781-767-0239 |
| 33 | BIL HOLDERIED, JOSEPH | 139 CHURCH STREET | WESTWOOD, MA | 02090 | 5/8/89 | 781-329-3587 |
| 34 | PROV HAYES, TIMOTHY | 122 EVERETT STREET | STOUGHTON, MA | 02072 | 3/1/79 | 781-344-1904 |
| 35 | PROV HEWEY, STEPHEN | 53 BRADFORD STREET | STOUGHTON, MA | 02072 | 5/31/90 | 781-341-0297 |
| 36 | RET HENRY, STEPHEN | 347 FORD STREET | BIL WEYMOUTH, MA | 02190 | 7/31/90 | 781-331-4137 |
| 37 | BIL SULLIVAN, COLIN | 4 HADLEY ROAD | NORTON, MA | 02766 | 12/91 | 508-285-4918 |
| 38 | PROV MACDONALD, JEFFERY | 1 FEEBLE PATH | FORESTDALE, MA | 02644 | 12/3/91 | 508-477-5324 |
| 39 | BIL HULBERT, MILTON | 4 FIRST STREET | MANSFIELD, MA | 02048 | 12/9/91 | 508-339-8545 |
| 40 | PROV OHARA, WILLIAM | 73 CHESTNUT WEST | RANDOLPH, MA | 02368 | 3/1/93 | 781-986-8088 |
| 41 | PROV FONTES, DAVID | 755 WASHINGTON STREET | WALPOLE, MA | 02081 | 9/3/93 | 508-668-5435 |
| 42 | PROV PIMENTEL, JOSE | 38 BROWN STREET | FAIRHAVEN, MA | 02719 | 9/8/93 | 508-994-5614 |
| 43 | PROV FRIEL, PADHRAIC | 5 FALL LANE | CANTON, MA | 02021 | 9/9/93 | 781-828-3354 |
| 44 | PROV LEHAN, DANIEL | 4 SOUTH STREET | CANTON, MA | 02021 | 9/9/93 | 781-828-8593 |
| 45 | PROV BOURDE, GERALD | 360 CEDAR STREET | NEW BEDFORD, MA | 02740 | 9/14/93 | 508-996-6028 |
| 46 | PROV RIBEIRO, JAMES | 4 BUTTERNUT LANE | MIDDWAY, MA | 02053 | 3/16/95 | 508-533-7248 |
| 47 | PROV STEPHEN, JOHN | 29 JESSIE AVE | SO. ATTLEBORO, MA | 02703 | 9/17/93 | 508-761-6979 |
| 48 | PROV CARVALHO, DENNIS GEO | 361 WAREHAM STREET | MIDDLEBORO, MA | 02346 | 3/16/95 | 508-947-8137 |
| 49 | PROV CAREY, PATRICK | 19 CRIST MILL LANE | FREEBORO, MA | 02359 | 10/27/93 | 781-829-8773 |
| 50 | PROV BRIGHTON, ROBERT | 42 BRUCE TERRACE | WEYMOUTH, MA | 02188 | 3/1/94 | 781-335-8818 |
| 51 | PROV EBERT, JOHN | 59 YELLOWSTONE AVE. | WARWICK, RI | 02886 | 3/10/94 | 401-463-8145 |
| 52 | PROV DUARTE, MICHAEL | 17 BLUEFIELD ROAD | NO. ATTLEBORO, MA | 02760 | 3/18/95 | 508-644-2240 |
| 53 | * BEARLEY, MARK | 30 CAROL STREET | ACUSHNET, MA | 02743 | 4/4/95 | 508-763-4960 |
| 54 | PROV DESOUZA, BRAD | 80 MOORE STREET | SO. DARTMOUTH, MA | 02748 | 4/3/95 | 508-763-0680 |
| 55 | BIL BAKER, JOHN | 31 ARLINGTON STREET APT #3 | NASHUA, NH | 03060 | 7/24/95 | 603-598-2982 |
| 56 | PROV DELANDREUIL | 440 WILLOWBEAN AVE | W. ROXBURY, MA | 02132 | 7/31/95 | 617-323-2032 |
| 57 | PROV BUSLEYDON, JAMES | 1540 BROADWAY LOT #3 | RAYNHAM, MA | 02767 | 7/8/96 | 508-822-9740 |
| 58 | PROV CHURCH, MICHAEL | 34 KEITH AVE | BROCKTON, MA | 02301 | 9/23/96 | 508-588-1327 |
| 59 | PROV DUBUC, DAVID | 105 HART STREET | TAUNTON, MA | 02780 | 9/24/96 | 508-823-7150 |
| 60 | PROV SPANG, JAMES | 5 WEST CHESTNUT STREET | BROCKTON, MA | 02301 | 10/1/96 | 508-559-0189 |
| 61 | BIL KELLEY, RICHARD | | | 02301 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 13 | BIL | TERLAGO MARIO | 31 WASHINGTON STREET | SHERBORN, MA | 01770 | 2/22/77 | 508-653-6086 |
| 14 | | | 147 HILL SIDE DRIVE | PLYMOUTH, MA | 02360 | 10/24/77 | 508-224-5384 |
| 15 | BIL | RABIDEAU RAYMOND | P.O. BOX 265 | EASTON, MA | 02334 | 3/4/78 | 508-230-2436 |
| 16 | BIT | KELLY WILLIAM | 308 FIELD STREET | BROCKTON, MA | 02403 | 3/21/78 | 508-583-0861 |
| 17 | PROJ | MONAHAN HUBERT | 4 KATHY LANE | HANSON, MA | 02341 | 11/14/78 | 781-826-2751 |
| 18 | BIT | BUTTAR EDMUND | 633 KING STREET | HANOVER, MA | 02339 | 3/21/79 | 781-871-7648 |
| 19 | BIT | PICKERING GARY | 53 ROSALIND STREET | N.WEYMOUTH, MA | 02188 | 8/3/81 | 781-337-6278 |
| 20 | BIT | TIBBERT BRIAN | 17 MARSH AVE | SALEM, NH | 03079 | 3/17/83 | 603-890-8183 |
| 21 | PROJ | DAMIANO JOHN | 22 BIXBY DRIVE | E.BRIDGEWATER, MA | 02333 | 7/20/83 | 508-378-3792 |
| 22 | PROJ | GWYNN NORMAN | 383 CENTRAL STREET | E.BRIDGEWATER, MA | 02333 | 3/14/84 | 508-378-0466 |
| 23 | PROJ | GARDOZA PHILIP | 808 MAPLE STREET | MANSFIELD, MA | 02048 | 9/24/84 | 508-339-5134 |
| 24 | BIT | BUFFARD ROBERT | 42 EMERSON STREET | BROCKTON, MA | 02401 | 3/26/85 | 508-588-6340 |
| 25 | GET | DEBLIES HENRIK | 2130 STATE ROAD | PLYMOUTH, MA | 02360 | 4/6/73 | 508-888-6964 |
| 26 | GET | MACIER RONALD | 3812 CRANBERRY HWY | WAREHAM, MA | 02571 | 5/22/81 | 508-833-8174 |
| 27 | PROJ | FRANCEY GEORGE | 324 FLAGG STREET | BRIDGEWATER, MA | 02324 | 10/25/82 | 508-697-9620 |
| 28 | PROJ | CRUISE MICHAEL | 163 SOUTH PICKENS ST | LAKEVILLE, MA | 02347 | 3/30/84 | 508-946-0356 |
| 29 | BIL | POWER KEVIN | 16 CARVER ROAD | WATERTOWN, MA | 02472 | 11/15/84 | 617-926-5324 |
| 30 | PROJ | CERINELLI HOWARD | 180 WASHINGTON ST UNIT#8 | PLAINVILLE, MA | 02762 | 3/28/85 | 508-695-3078 |
| 31A | PROJ | McGRATH HAROLD | 1165 MAIN STREET | WALPOLE, MA | 02081 | 8/26/85 | 508-668-0244 |
| 32 | BIL | BAIN SCOTT | 28 POOLE CIRCLE | HOLBROOK, MA | 02343 | 3/31/87 | 781-767-0228 |
| 33 | BIL | HOLDERIED JOSEPH | 139 CHURCH STREET | WESTWOOD, MA | 02090 | 5/8/89 | 781-329-3587 |
| 34 | PROJ | HOWE TIMOTHY | 123 EVERETT CIRCLE | STOUGHTON, MA | 02072 | 3/13/90 | 781-344-1904 |
| 35 | PROJ | HOWE STEPHEN | 53 BRADFORD STREET | STOUGHTON, MA | 02072 | 5/31/90 | 781-344-1904 |
| 36 | USA | BERRY STEPHEN | 463 POND STREET | SO. WEYMOUTH, MA | 02190 | 7/31/86 | 781-335-4137 |
| 37 | BIL | SULLIVAN COLIN | 4 HADLEY ROAD | NORTON, MA | 02766 | 12/9/91 | 508-285-4918 |
| 38 | PROJ | McDONALD ALBERT | 1 PEBBLE PATH | FOREST DALE, MA | 02644 | 12/9/91 | 508-477-5334 |
| 39 | BIL | HULBERT MILTON | 4 FIRST STREET | MANSFIELD, MA | 02048 | 12/9/91 | 508-339-8545 |
| 40 | PROJ | DOLLAR WILLIAM | 75 CHESTNUT WEST | RANDOLPH, MA | 02368 | 3/1/93 | 781-986-8606 |
| 41 | PROJ | PORTER MARK | 755 WASHINGTON STREET | WALPOLE, MA | 02081 | 7/1/93 | 508-668-5435 |
| 42 | PROJ | PIMENTEL JORGE | 33 BROWN STREET | FAIRHAVEN, MA | 02719 | 9/8/93 | 508-994-3814 |
| 43 | PROJ | FRIEL PADHRAIC | 5 FALL LANE | CANTON, MA | 02021 | 9/9/93 | 781-828-3354 |
| 44 | PROJ | LEHAN DANIEL | 14 SOUTH STREET | CANTON, MA | 02021 | 9/10/93 | 781-828-8503 |
| 45 | PROJ | HOUDE GERALD | 360 CEDAR STREET | NEW BEDFORD, MA | 02740 | 9/14/93 | 508-996-6028 |
| 46 | PROJ | ROBERT JOHN | 3 BUTTERCUP LANE | MIDDWAY, MA | 02053 | 9/18/93 | 508-533-7248 |
| 47 | PROJ | STEPHEN JOHN | 29 JESSIE AVE | SO. ATTLEBORO, MA | 02703 | 9/17/93 | 508-761-6979 |
| 48 | USA | CARVALHO DENNIS | 363 WAREHAM STREET | MIDDLEBORO, MA | 02346 | 3/10/93 | 508-947-4137 |
| 49 | PROJ | CAREY PATRICK | 19 GRIST MILL LANE | PEMBROKE, MA | 02359 | 10/27/93 | 781-829-8773 |
| 50 | PROJ | BRIGHTON JOHN | 32 BROOK TERRACE | WEYMOUTH, MA | 02188 | 3/1/94 | 781-335-8818 |
| 51 | PROJ | PERRY JOHN | 59 YELLOWSTONE AVE | WARWICK, RI | 02886 | 9/10/94 | 401-463-8145 |
| 52 | PROJ | WARE HERMAN | 17 GLENFIELD ROAD | NO. ATTLEBORO, MA | 02760 | 1/13/95 | 508-643-2239 |
| 53 | PROJ | RILLIER BERNARD | 30 CAROL STREET | ACUSHNET, MA | 02743 | 4/4/95 | 508-763-4060 |
| 54 | PROJ | BROUX DANIEL | 61 BROOK STREET | SO. DARTMOUTH, MA | 02748 | 4/5/95 | 508-763-0680 |
| 55 | BIL | BISBEE JOHN | 31 ARLINGTON STREET APT#3 | NASHUA, NH | 03060 | 7/24/95 | 603-598-2982 |
| 56 | BIL | DELANO JOSEPH | 29 WILLOWBEAR AVE | W.ROXBURY, MA | 02132 | 5/13/95 | 617-323-1024 |
| 57 | PROJ | PENDLETON JAMES | 140 BROADWAY LOT 33 | RAYNHAM, MA | 02767 | 7/8/96 | 508-823-9240 |
| 58 | PROJ | GILMORE MICHAEL | 24 EDITH AVE | BROCKTON, MA | 02301 | 9/23/96 | 508-588-7327 |
| 59 | PROJ | MARQUETTE DAVID | 40 HART STREET | TAUNTON, MA | 02780 | 9/24/96 | 508-823-7150 |
| 60 | PROJ | BRANG JAMES | 33 WEST CHESTNUT STREET | BROCKTON, MA | 02301 | 10/1/96 | 508-559-0189 |
| 61 | BIL | KELLEY JR. RICHARD | 675 HANCOCK STREET | ABINGTON, MA | 02351 | 3/25/97 | 781-982-9338 |
| 62 | PROJ | JOHNSON JR. RICHARD | 180 WAREHAM STREET | MIDDLEBORO, MA | 02346 | 4/15/97 | 508-946-1129 |
| 63 | PROJ | CHOINIERE JR. ROGER | 43 PROSPECT AVE | ATTLEBORO, MA | 02703 | 12/30/98 | 508-222-5778 |
| 64 | GET | CRAWFORD HENRY | 4 WEST BELCHER ROAD | FOXBORO, MA | 02035 | 12/31/98 | 508-543-2196 |
| 65 | GET | BRIGGS JOHN | 7 GARDEN STREET | RANDOLPH, MA | 02368 | 1/3/99 | 781-963-3137 |
| 66 | GET | | STANDARD STREET | DEDHAM, MA | 02026 | 8/26/99 | 781-326-4527 |
| 67 | PROJ | BELCHER TIMOTHY | 33 WINTER STREET | BROCKTON, MA | 02302 | 9/14/99 | 508-588-8499 |
| 68 | PROJ | WROUST PETER | 41 BURSLEY HILL LANE | DUXBURY, MA | 02332 | 9/17/99 | 781-834-5908 |
| 69 | PROJ | GOULD DAVID | 28 ROXBERRY LANE | ROCHESTER, MA | 02770 | 9/17/99 | 508-763-4731 |
| 70 | PROJ | MORRIS TERRENCE | 23 LAKE STREET | REHOBOTH, MA | 02769 | 10/24/99 | 508-336-6919 |
| 71 | PROJ | HAMILTON DAVID | 6 JONATHAN ROAD | W.WAREHAM, MA | 02576 | 11/9/99 | 508-295-4079 |
| 72 | BIL | KELLEY GEORGE | 104 BEECHWOOD CIRCLE | PLYMOUTH, MA | 02360 | 12/22/99 | 508-224-7012 |
| 73 | PROJ | WRITE ERIC | 38 HAWTHORNE STREET | BROCKTON, MA | 02301 | 12/23/99 | 508-588-1847 |
| 74 | PROJ | PALM WAYNE | 15 LESLIE RD. | BROCKTON, MA | 02301 | 11/28/00 | 508-586-6682 |
| 75 | BIL | HEATH BERNARD JR. | 198 ORANGE ST. | BRIDGEWATER, MA | 02324 | 12/4/00 | 508-284-1398 |

Bil CRAIG Goulet   978-5625880
Between 28-29

Cell



CERTIFIED MAIL

7002 3150 0001 9650 9246

Govig F.
CRAIG
305 Cox ST
Hudson, MA 01749

U.S. POSTAGE
PhD
HUDSON, MA
APR 15, 03
$4.42
0004.43-02
AMOUNT

UNITED STATES POSTAL SERVICE

9264      02129

Teamster's Union Local 25
544 Main Street
Boston, Massachusetts
02129 - 1113

Attention: William H. Carnes

02129*1113 16

D032

TEAMSTERS UNION LOCAL 25
GRIEVANCE REPORT

COMPANY: NEW PENN MOTOR EXPRESS

NAME. CRAIG GOULET

ADDRESS  305 COX ST. HUDSON, MA. 01749

BUSINESS AGENTS NAME: WILLIAM H. CARNES
DATE of COMPLAINT  APRIL 7th 2003
NATURE of GRIEVANCE. SENIORITY RIGHTS.

IN ACCORDANCE with THE NATIONAL MASTER FREIGHT
AGREEMENT ARTICLE #5 AND All of ARTICLE #5 SUBSECTION
ALONG with the NEW ENGLAND SUPPLEMENTAL FREIGHT AGREEMENT
ARTICLE # 43 - SENIORITY including All of ARTICLE 43's
SUBSECTIONS, I AM FILING A GRIEVANCE AGAINST
NEW PENN MOTOR EXPRESS TO include AIL TIME LOST,
BACK PAY, SENIORITY AND CONTRACTUAL BENIFITS UNDER
THE CONTRACT AGREEMENT, FROM MARCH 1ST 2002 UP TO
AND CONTINUING PAST MARCH 1ST 2003, BASED ON
AGREEMENT BETWEEN TNFINC AND NPME AS A
RESULT of the CLOSURE of A.P.A. OPERATIONS

Craig Goulet.

D033

8

1      A.    That's correct.

2      Q.    As the business agent for Local 25, what

3    generally were your job duties?

4      A.    Well, I had assignments for various

5    companies and various industries.  I negotiated

6    their contracts.  I handled their grievances and

7    arbitrations, and the everyday business of dealing

8    with these companies and with the members.

9      Q.    As a business agent, what were your

10   responsibilities vis-a-vis the handling of

11   grievances?

12     A.    To follow the guidelines of the contract

13   and to take grievances forward to a hearing and to

14   adjudicate them.

15          In some cases, you know, depending on the

16   relationship with the companies, you know, there

17   would be where time periods and time frames could be

18   extended by mutual agreement, and pretty often those

19   things did happen.

20     Q.    Are you familiar with a company called

21   "APA"?

22     A.    Yes.

23     Q.    Did you ever have any responsibility as a

24   Teamsters business agent for APA?

9

1      A.    No.

2      Q.    Are you familiar with a company called "New

3  Penn Motor Express"?

4      A.    Yes.

5      Q.    Did you ever have responsibility for New

6  Penn Motor Express?

7      A.    Yes.

8      Q.    Over what period of time did you have

9  responsibility for New Penn Motor Express?

10      A.    From 1982 until 2003.

11      Q.    At any point in time, did you hold any

12  other positions with the Teamsters, other than as a

13  business agent for Local 25?

14      A.    Yes.  I was elected vice president in 1991,

15  and business agent.  I held both positions.

16      Q.    Vice president of Local 25?

17      A.    That's right.

18      Q.    How long did you remain vice president of

19  Local 25?

20      A.    Until 2003.

21      Q.    Did you hold any other positions with the

22  Teamsters, whether it be Local 25 or any other

23  Teamster-related entity?

24      A.    I'm not sure I understand the question.

28

1    from Mr. Craig Goulet to Teamsters Union Local 25.

2          The third page purports to be a handwritten

3    Teamsters Union Local 25 grievance report.

4          Do you recognize any of these pages?

5          A.   I recognize this as a grievance.  I don't

6    recall seeing this specifically, but I probably did.

7    It is addressed to me at the Local.  I forwarded it.

8    It would have went out under George Cashman's cover.

9          Q.   Let's just talk about the general procedure

10   in existence in approximately April of 2003.  If a

11   member of Local 25 wanted to file a grievance

12   against a company that you dealt with, what was the

13   procedure, as you understood it, for the employee to

14   do that?

15         A.   He would go see a shop steward and initiate

16   a grievance.  The shop steward would then meet with

17   the company and try to settle the grievance.  If

18   that didn't happen, they would notify the business

19   agent.

20         Q.   Which would be you?

21         A.   Which would be me, right.  Then I would get

22   involved in the grievance and ask for a hearing to

23   try and settle it.  If we were not able to settle

24   it, we would then file it for hearing at the

29

1    committee.

2        Q.    Correct me if I'm wrong, but I think you

3    said you would get involved in it if it was not

4    settled by the union steward?

5        A.    That's correct.

6        Q.    Typically what was the nature of your

7    getting involved if it couldn't be settled by the

8    union steward?

9        A.    The first thing I would do is to call the

10   company and attempt to straighten it out over the

11   telephone if possible.  If not, then we would go

12   forward and schedule a meeting to sit down with the

13   grievant, the steward and the manager and attempt to

14   settle it at that point.  If that was not possible,

15   we would go forward and either file it for a hearing

16   at the committee or not, depending on the issue.

17       Q.    At what point in the process, if any, was

18   the grievance reduced to writing?

19       A.    Well, let's start over.  The grievant would

20   go to the steward to try to settle something.  The

21   steward could talk to the manager.  If the manager

22   told him to piss off, then he would reduce it to

23   writing.

24       Q.    It would usually be in writing by the time

35

1      A.    I believe 30 days, yes.

2      Q.    Do you have any understanding as to whether

3   or not Mr. Goulet's grievance was filed with any

4   committee?

5      A.    No, I don't.

6      Q.    I think you told me the month, but do you

7   recall what your last day -- the last date was in

8   your role as a business agent for Local 25?

9      A.    May 2, 2003.

10     Q.    Did someone take over your role, shall we

11  say, on May 3rd of 2003, to your knowledge and

12  understanding?

13     A.    Take over my role?

14     Q.    Yes.

15     A.    Which role?  Would you be specific.

16     Q.    As business agent for Local 25.

17     A.    As a business agent?

18     Q.    Yes.

19     A.    I can't say exactly who took over my

20  positions at that time, but there were people that

21  were named as business agents following May 2nd.

22     Q.    Who took over for New Penn?

23     A.    I'm not sure.  I don't know who has New

24  Penn now.

44

1    keeping the manager there late, keeping the

2    employees over, we would do that.

3         That's the way the relationship went.  It

4    was a pretty good relationship for a number of

5    years.  I think I probably have met most of the

6    people in that company.

7        Q.    When you forwarded this particular

8    grievance by Mr. Goulet, did you consider it to be

9    untimely?

10       A.    No, I didn't.  I was not aware of all the

11   facts in the case really.  I believe there had been

12   a hearing prior, and I didn't know what the

13   situation was.  All I knew is Mr. Goulet was

14   attempting to get back to work at New Penn Motor

15   Express based on the agreement.

16                    (Document marked as Carnes

17                     Exhibit 8 for identification)

18       Q.    Mr. Carnes, I'm showing you Exhibit 8,

19   which purports to be a letter to the Great Members

20   of Teamsters Local 25 dated April of 2003,

21   purporting to be over your signature and

22   Mr. Cashman's.

23            I'm simply going to ask you, is that your

24   signature on the bottom right?

45

1     A.    Uh-huh.

2     Q.    Is that yes?

3     A.    No, it's not my signature, but I agreed to

4  have somebody sign it.

5     Q.    What was your understanding of the status

6  of Mr. Goulet's grievance then as of the time -- as

7  of May 2, 2003?

8     A.    I hadn't heard back.

9         MR. LATHROP:  Let me take a few minutes to

10  see where we're at.

11         (Recess)

12     BY MR. LATHROP:

13     Q.    With regard to Mr. Goulet's grievance that

14  was attached to Exhibit 7, do you have any

15  recollection that the company and the union agreed

16  to any extension of the timelines within which

17  actions had to be taken?

18     A.    No, I don't.

19     Q.    Is it your recollection that the time limit

20  under the collective bargaining agreement for filing

21  with the appropriate grievance committee is based

22  upon when the company receives -- sorry -- when the

23  union receives a response from the company?

24     A.    That's always been my understanding.

52

1    duties, plaintiff shall serve a ten-day suspension"?

2           MR. LATHROP:  Objection.

3    A.    Yes, sir.

4    Q.    Are you aware that that was the decision?

5           MR. LATHROP:  Objection.

6    A.    Yes, sir.

7    Q.    And that the decision went on to say, "Upon

8    completion of the suspension, he shall be reinstated

9    to the seniority listed in his original position"?

10          MR. LATHROP:  Objection.

11   A.    Yes.

12   Q.    Do you know if Mr. Goulet ever submitted

13   the acceptable documentation to APA of his ability

14   to return to unrestricted duties?

15   A.    No, I don't.

16   Q.    Do you know if Mr. Goulet ever served a

17   ten-day suspension?

18   A.    No, I don't.

19   Q.    Do you know if Mr. Goulet was ever returned

20   to the seniority list at APA?

21   A.    No, I don't.

22   Q.    You testified that you had a conversation

23   with John, last name unknown, who was a terminal

24   manager at New Penn?

July 25th 2003

Mark:

I have enclosed for you copies of the Grievence I sent to Bill Carnes along with the postal reciept and letter which was sent to the CO.

Lets not lose sight of the real issue here this Grievance is about Seniority rights under the agreement, not weather one was capable of working or not It is my understanding that I infact was an Employee of A.PA. my name should have been on there list and therefor I should have been called Period.

Summary Agreement states All Employees with Seniority. Which I had, therefore one would have to agree that my rights were disregarded for what ever reason which you and I might

2005-1 CG-51

UNDERSTAND.

I WOULD ALSO ARGUE THAT
UNDER THE NMFA Article 14
SECTION 3 THAT the CO DID NOT
meet there obligation or AT the
very LEAST RECOGNIZE it, which
leaves YET Another issue TO
ADDRESS

OVER the YEARS I HAD ASKED
APA TO PUT me BACK TO Work
Light DUTY or otherwise AND there
Defense was THAT I WAS NO Longer
An Employee I WAS DISCHARGED 3/11/87
AS You Know the AREA COURT
Committee PUT the CASE in hold
BECAUSE it was held up IN Another
VENIVE (DIA)

2/8/05   CG   52

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **CRAIG GOULET,** | ) | **CASE NO. 04-12577 JLT** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **DEFENDANT'S RESPONSE TO** |
| | ) | **PLAINTIFF'S FIRST SET OF** |
| **NEW PENN MOTOR EXPRESS, INC.,** | ) | **INTERROGATORIES TO DEFENDANT** |
| **et. al.,** | ) | <u>**NEW PENN MOTOR EXPRESS**</u> |
| | ) | |
| **Defendant.** | ) | |

1.      Please provide the occupation, job title and relations (if any) to you and identify

consistent with the above definition each person whom you expect to call as an expert witness at

trial and state as to each such person:

    a.      All background information by which you intend to qualify each such person as

an expert witness;

    b.      The subject matter on which each such expert is expected to testify;

    c.      The substance of the facts to which each such expert is expected to testify;

    d.      The substance of opinions to which each such expert is expected to testify; and

    e.      A summary of the grounds for each opinion to which each such expert is expected

to testify.

    <u>**ANSWER**</u>:      At this time, Defendant has not retained an expert witness. Defendant will
    supplement as required by the Federal Rules of Civil Procedure and any
    local court rule.

2.    Please state the name and address of every person who has any knowledge relating to the matters referred to in the pending lawsuit including, but not limited to, any witness to or participants in the incidents or with knowledge of the allegations at issue or participants in the incidents at issue, and for each such person state:

      a.    the substance of the knowledge the person has; and

      b.    The source of the person's knowledge.

      **ANSWER**:    See Defendant's initial disclosures. In addition, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, see the documents already produced by the Defendant.

3.    Please describe in detail the substance of any communications which Defendant's employees and/or agents had with the Plaintiff or any other person relating in any way to the incidents alleged in the Complaint, and for each such communication, kindly provide the approximate date, time, place, form and substance of the communication and identify all persons present or who have knowledge of the communication.

      **ANSWER**:    Outside of the grievance proceeding, to Defendant's knowledge, Defendant's employees have not had any communications with the Plaintiff.

4.    Please describe in detail the substance of any communications which Defendant's employees and/or agents had with defendant Teamsters Local 25's employees and/or agents or any other person relating in any way to the incidents alleged in the Complaint, and for each such communication, kindly provide the approximate date, time, place, form and substance of the communication and identify all persons present or who have knowledge of the communication.

      **ANSWER**:    Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, see the documents already produced by the Defendant. In addition, in approximately May 2003, Paul Dubiel asked William Carnes why the grievance was filed against the Defendant.

5.    Please describe all facts within your knowledge of the defenses described above or alleged in your Answer, and for each identify any witnesses and/or documents supporting said defenses, and provide a brief summary of facts of which each such witnesses has knowledge relative to each such defense, if not provided in response to a previous interrogatory(ies).

      **ANSWER**:    Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, see the documents already produced.

6.    Please describe in detail defendant New Penn Motor Express' procedure for possessing grievances received by it, for the years 2001 to date.

      **ANSWER**:    Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, see the collective bargaining agreements that have already been produced.

7.    Attached as Exhibit 1 is the A.P.A. Transport Corp. Canton Seniority List for November, 2001 (which document was produced by defendant Teamsters Local 25). With regard to this document, please state if defendant New Penn Motor Express ever received this document. If so, please:

      a.    Identify who received this Seniority List;

      b.    When this Seniority List was received; and

      c.    The method whereby it was received.

      **ANSWER**:    Objection. The document attached is marked as Exhibit 2. Assuming that Exhibit 2 is the document intended to be referred to in Interrogatory No. 7, Defendant states that it received the document at some point in time, although it does not recall precisely when, at its corporate office from A.P.A.

8.    Please describe in detail all actions taken by defendant Teamsters Local 25 to put Craig

Goulet on the defendant New Penn Motor Express call list for the Billerica, Massachusetts,

terminal.

     **ANSWER**:    Defendant is not aware of any action taken by Teamsters Local 25.


9.    Please describe in detail all communications between defendant Teamsters Local 25 and

defendant New Penn Motor Express with regard to Craig Goulet from March 1, 2002, to date.

     **ANSWER**:    See response to Interrogatory No. 4.


10.    Please state whether defendant New Penn Motor Express ever received a grievance filed

by Craig Goulet with regard to his not being put on the defendant New Penn Motor Express call

list for the Billerica, Massachusetts, terminal.  If so, please state:

    a.    When this grievance was first received;

    b.    Who first received this grievance;

    c.    The method whereby it was received; and

    d.    all actions taken by defendant New Penn Motor Express to respond to this

grievance.

     **ANSWER**:    The grievance was received by U.S. mail on or after April 18, 2003 at the
Billerica terminal by Paul Dubiel.  Mr. Dubiel discussed the matter with
Daniel Schmidt and it was determined to be untimely.


11.    Please identify the person at defendant New Penn Motor Express who was assigned to

handle the contractual affairs between defendant New Penn Motor Express and defendant

Teamsters Local 25 from April 1, 1998, to date.

     **ANSWER**:    Daniel Schmidt, V.P. Labor Relations
Charles Zaccaria, Regional Manager
Paul Dubiel, Terminal Manager

12.    Did defendant Teamsters Local 25 refer Craig Goulet to defendant New Penn Motor Express for work opportunity.  If so, please:

      a.    State the date on which this was done; and

      b.    Describe in detail all actions taken with regard to such referral.

      **ANSWER**:    No.


13.    Please state whether defendant New Penn Motor Express purchased the A.P.A. Transport Corp. customer list.  If so, please state the date when this purchase was completed.

      **ANSWER**:    The customer list was not purchased from A.P.A.


14.    Please describe in detail what action, if any, that defendant New Penn Motor Express took upon receipt of the letter dated April 18, 2003, from defendant Teamsters Local 25 to Mr. Charles Zaccaria, Vice President of New Penn Motor Express Inc., which letter was in regard to Craig Goulet.

      **ANSWER**:    Objection.  Without the letter being attached, Defendant cannot answer this interrogatory.


15.    Please state whether A.P.A. Transport Corp. ever provide defendant New Penn Motor Express with any seniority list for any A.P.A. Transport Corp. terminals.  If so, please:

      a.    State when the list(s) was (were) received;

      b.    Identify who received the list(s);

      c.    Describe in detail what, if anything, was done with the list(s);

      d.    Describe in detail what actions were taken, if any, with regard to the list(s); and

      e.    Identify the actual list(s) received.

      **ANSWER**:    See response to Interrogatory No. 7.  Also, Defendant used the list to check seniority.

5

16.    When and how was defendant New Penn Motor Express first put on notice that Craig

Goulet wished to be placed on defendant New Penn Motor Express' Billerica, Massachusetts,

terminal call list.

> **ANSWER**:    Defendant first learned that Plaintiff wished to be placed on the terminal
> call list when it received a copy of the grievance on or about April 18,
> 2003.

17.    At any time prior to March 31, 2003, was the list of former A.P.A. Transport Corp.

employees on the defendant New Penn Motor Express Billerica, Massachusetts, terminal call list

exhausted?  If so, please state when.

> **ANSWER**:    Yes.  Defendant does not recall at this time when it was exhausted.

18.    Were any A.P.A. Transport Corp. employees offered a second opportunity to place their

names on any call list with defendant New Penn Motor Express between March 1, 2002, and

March 31, 2003?  If so, please:

   a.    Identify each employee; and

   b.    Stat the date when such second opportunity was offered.

> **ANSWER**:    Not to Defendant's knowledge.

19.    Please state whether defendant New Penn Motor Express was ever provided with any list

or identification of A.P.A. Transport Corp. employees who were collecting worker's

compensation benefits or disability.  If so, please:

   a.    Identify who provided this list or identification;

   b.    State when this list or identification was provided; and

   c.    Identify who received this list or identification.

> **ANSWER**:    No.

6

20.    Please state the number of times, if any, that defendant New Penn Motor Express

postponed the grievance hearing before the Southern New England Joint Area Committee

regarding grievance filed by Craig Goulet.

**ANSWER**:    Once.


21.    Please state whether defendant New Penn Motor Express ever directly notified any

A.P.A. Transport Corp. employee regarding being placed on a call list.  If so, please:

      a.    State when the notification was made;

      b.    Identify who made the notification;

      c.    Describe in detail what the notification indicated; and

      d.    Identify the actual notification.

**ANSWER**:    No.


22.    Please state whether defendant New Penn Motor Express ever offered any A.P.A.

Transport Corp. employees work opportunities covered by article 14, section 2, and article 14,

section 3, of the 1998-2003 National Master Freight Agreement.  If so, please:

      a.    Identify those employees;

      b.    State the date when such work opportunities were offered;

      c.    Identify the terminals for which such work opportunities were offered.

**ANSWER**:    No.

**AS TO OBJECTIONS:**

Craig Goulet

By his attorney

_____
Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA  01450
(978) 448-8234
BBO No. 287820

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2005, a copy of *Defendant's Response to Plaintiff's First Set of Interrogatories to Defendant New Penn Motor Express* was sent via facsimile and regular U.S. mail, postage prepaid to Scott A. Lathrop, Esq., *Attorney for Plaintiff*, Scott A. Lathrop & Associates, 122 Old Ayer Road, Groton, MA 01450 and Matthew E. Dwyer, Esq., *Attorney for Teamsters Local 25*, Dwyer, Duddy, Facklam, One Center Plaza, Suite 360, Boston, MA 02108.

*Attorney for Defendants*

9

STATE OF PENNSYLVANIA )
                              ) SS:
COUNTY OF _LEBANON_ )

## **VERIFICATION**

     Andrew J. Kerlik, VP Risk Management & Human Resources, for New Penn Motor Express, Inc. being first duly sworn according to law, states that he has reviewed Defendant's Responses to Plaintiff's First Set of Interrogatories in the case captioned *Craig Goulet v. New Penn Motor Express, Inc., et al.* Case No. 04-12577 JLT, in the United States District Court, District of Massachusetts, and that the same are true to the best of his knowledge.

FURTHER AFFIANT SAYETH NAUGHT,

                                      _____
                                      Andrew J. Kerlik

     SWORN TO before me and subscribed in my presence this _11_ day of August, 2005.

                                        _____
                                        Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Elita M. Galbraith, Notary Public
City Of Lebanon, Lebanon County
My Commission Expires July 22, 2009
Member, Pennsylvania Association of Notaries