# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CRAIG GOULET** )<br><br>**Plaintiff,** )<br><br>**v.** )<br><br>**NEW PENN MOTOR EXPRESS** )<br>**Defendant** )<br><br>**and** )<br><br>**TEAMSTERS LOCAL 25** )<br>**INTERNATIONAL BROTHERHOOD OF** )<br>**TEAMSTERS** )<br><br>**Defendant,** ) | **CIVIL ACTION**<br>**NO. 04-12577-JLT** |

## NOTICE OF FILING OF DEPOSITION TRANSCRIPTS OF CRAIG GOULET AND MARK HARRINGTON

Please take note that on January 24, 2006, Defendant, Teamsters Local 25, International Brotherhood of Teamsters filed the complete transcripts of Craig Goulet and Mark Harrington. The transcript of the deposition of Craig Goulet is meant to constitute Exhibit 1 of Local 25's Statement of Material Facts in Support of its Motion for Summary Judgment and its Memorandum in Support of its Motion for Summary Judgment. Transcript of the deposition of Mark Harrington is meant to constitute Exhibit 3 of Local 25's Statement of Material facts in Support of Its Motion for Summary Judgment and its Memorandum in Support of its Motion for Summary Judgment.

For the Defendant,
**INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL UNION NO. 25,**
By its attorneys,


  /s/ Kathleen A. Pennini
Matthew E. Dwyer (B.B.O. # 139840)
Kathleen A. Pennini (b.B.O. # 654573)
Dwyer, Duddy and Facklam, P.C.
Two Center Plaza, Suite 430
Boston, MA 02108-1804
Date:   January 24, 2006        (617) 723-9777


## CERTIFICATE OF SERVICE

I, Kathleen A. Pennini, do hereby certify I have electronically filed this motion on January 24, 2006, with delivery to :

Scott Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA  01450

Carl H. Gluek, Esq.
Frantz Ward, LLP
55 Public Square Building, 19th Floor
Cleveland, OH  44113-1999


                                    /s/ Kathleen A. Pennini
                                    Kathleen A. Pennini


f:\l25\goulet\pldg\memo.supp.l25.mot.sj.doc:blg

# In The Matter Of:

*Craig Goulet,  v.*
*New Penn Motor Express, et al.,*

---

*Craig Goulet*
*October 4, 2005*

---

*JANEY ASSOCIATES*
*Court Reporting Services*
*P.O. Box 365355*
*BOSTON, MA  02136-0003*
*(617) 364-5555    FAX: (617) 364-5550*

*Original File CGOU.ASC, 107 Pages*
*Min-U-Script® File ID: 1567331494*

# Word Index included with this Min-U-Script®

1-107
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRAIG GOULET,
    Plaintiff,
- vs. -     C.A. # 04-12577-JLT
NEW PENN MOTOR EXPRESS,
and
TEAMSTERS LOCAL 25
INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
    Defendant.

DEPOSITION of CRAIG GOULET, a witness called by and on behalf of the defendants, pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Michael C. Janey, a Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Dwyer, Duddy and Facklam, P.C., Two Center Plaza, Suite 430, Boston, Massachusetts, 02108 on Tuesday, October 4, 2005, commencing at 10:05 a.m.

Page 2

APPEARANCES:

Scott A. Lathrop, Esquire, law office of SCOTT A. LATHROP, 122 Old Ayer Road, Groton, Massachusetts, 01450,
(978) 448-8234; on behalf of the Plaintiff.

Kathleen A. Pennini, Esquire, law offices of DWYER, DUDDY AND FACKLAM, Two Center Plaza, Suite 430, Boston,
Massachusetts, 02108, (617) 723-9777; on behalf of the Defendant, International Brotherhood of Teamsters, Local 25.

Carl H. Gluek, Esquire, law office of FRANTZ WARD, LLP, 2500 Key Center, 127 Public Square, Cleveland, Ohio, 44114-1230, (216) 515-1660; on behalf of Defendant, New Penn Motor Express.

Also Present: Mark Harrington
JANEY ASSOCIATES

Page 3

INDEX
DEPOSITION OF:    Page
CRAIG GOULET
Examination by Ms. Pennini    6
Examination by Mr. Gluek    65
Examination by Ms. Pennini    96
Examination by Mr. Lathrop    103
EXHIBITS:    Page
#1  (Grievance Decision)    25
#2  (Grievance Report dated 4/7/03)  41
#3  (Letter to M. Harrington from C. Goulet, dated 7/25/03)  42
#4  (Letter to M. Harrington from C. Goulet, dated 11/24/03)  49
JANEY ASSOCIATES

Page 4

[1] **STIPULATIONS**

[2] It is hereby stipulated and agreed by and [3] between counsel for the respective parties that the [4] reading and signing of the deposition by the witness [5] is not waived, but that the deposition may be signed [6] under the pains and penalties of perjury within [7] forty-five days of receipt of the transcript.

[8] It is further stipulated and agreed that [9] all objections, except as to the form of the [10] questions, and motions to strike shall be reserved [11] until the time of hearing or trial in this matter.

[12] CRAIG GOULET, having duly affirmed that [13] his testimony would be the truth, the whole truth, and [14] nothing but the truth, testified as follows in answer [15] to direct interrogatories:

[16] MS. PENNINI: Before we begin, do we [17] stipulate to the usual stipulations, objections except [18] as to form reserved until trial?

[19] MR. LATHROP: And motions to strike.

[20] MS. PENNINI: And motions to strike, I m [21] sorry. And regarding the signing of the deposition?

[22] MR. LATHROP: Mr. Goulet will read it and [23] sign it, and if we can waive the requirement that he [24] sign it in front of a notary and still simply sign it

Page 5

[1] under the pains and penalties of perjury, that would [2] be acceptable to me.

[3] MS. PENNINI: That s fine with me.

[4] MR. GLUEK: That s fine.

[5] MS. PENNINI: Will that be thirty days from [6] receipt of the deposition?

[7] MR. LATHROP: If we want to do it by [8] agreement, let s make it just forty-five.

[9] MS. PENNINI: Okay. Forty-five days is [10] fine.

[11] MR. GLUEK: We don t have a motion date [12] pending, correct?

[13] MS. PENNINI: I m sorry.

[14] MR. GLUEK: There is no motion date [15] pending.

[16] MR. LATHROP: I don t believe so. I [17] believe all we have is November 1st.

[18] MR. GLUEK: Right. That is our pretrial, [19] so conceivably this judge, he could schedule a very [20] short time line.

[21] MR. LATHROP: The flip side is he gave us [22] until the end of the month to complete discovery [23] anyway, so I don t think he could — I mean, I would [24] support you and say, this is too short a deadline, we

Page 6

[1] don t even have the transcript back yet if he tries to [2] do it.

[3] MR. GLUEK: Okay. That s fine.

[4] MR. LATHROP: I was under the impression [5] after the first scheduling conference that this is [6] more of a status conference to see whether discovery [7] has been completed before setting any additional [8] deadlines.

[9] MR. LATHROP: I m sure that is the case. [10] Unlike other pretrial conferences in Massachusetts [11] where you establish in advance all the motion [12] deadlines and so forth.

[13] MS. PENNINI: Right, because we only solely [14] discussed discovery at the first scheduling [15] conference.

[16] MR. LATHROP: If you are concerned about [17] that I will support you in the notion that an early [18] cut off time is unfair to you.

[19] MR. GLUEK: Okay [20] EXAMINAT-ION [21] BY MS. PENNINI:

[22] Q: Could you please state your name?

Page 7

[23] A: Craig Steven Goulet, Sr.

[24] Q: Could you spell your last name, please?

Page 7

[1] A: G-O-U-L-E-T.

[2] Q: And where do you currently live?

[3] A: 305 Cox Street, Hudson, Massachusetts.

[4] Q: Are you currently employed?

[5] A: No.

[6] Q: Are you currently a member of Teamsters Local [7] 25?

[8] A: Yes, I am.

[9] Q: How long have you been a member of Teamsters [10] Local 25?

[11] A: Since 1987.

[12] Q: Were you ever a member of any other Teamsters [13] local?

[14] A: Yes, I was.

[15] Q: And what local?

[16] A: Local 170.

[17] Q: When were you a member of Local 170?

[18] A: 1979.

[19] Q: Until what time?

[20] A: Until 1987.

[21] Q: What employers did you work for while a member [22] of Local 170?

[23] A: I worked for McLean Trucking.

[24] Q: And where is that located?

Page 8

[1] A: It was on Route 20 in Shrewsbury.

[2] Q: What did you do at McLean Trucking?

[3] A: I worked on the loading dock.

[4] Q: How long did you work there?

[5] A: Off and on until they went out of business [6] sometime in the early 80's.

[7] Q: So beginning in 79?

[8] A: Um-hum.

[9] Q: Anyplace else?

[10] A: Pilot Freight Carriers.

[11] Q: And when did you work there?

[12] A: From 1979 until they went out of business.

[13] Q: So you ended your employment there because they [14] went out of business?

[15] A: Yes.

[16] Q: Anyplace else?

[17] A: Roadway Express.

[18] Q: And when did you work there?

[19] A: From 1979 until approximately 1984.

[20] Q: Did you work for McLean, Pilot, and Roadway all [21] at the loading dock?

[22] **A:** Yes.

[23] **Q:** And why did you stop working for Roadway [24] Express?

[1] **A:** I made the list with Sanborns Motor Express.

[2] **Q:** I m sorry, could you repeat that?

[3] **A:** Sanborns. I made the list, the seniority list [4] with Sanborns Motor Express.

[5] **Q:** And how is that related to Roadway?

[6] **A:** Separate company.

[7] **Q:** Did you work with these companies at the same [8] time or one after the other?

[9] **A:** No, I worked with them all at the same time.

[10] **Q:** And you said you made the seniority list with [11] Sanborn?

[12] **A:** Yes.

[13] **Q:** And how long did you work for Sanborn?

[14] **A:** I worked for Sanborns from 1984 up until the [15] time they were bought out by APA Transport.

[16] **Q:** And when was that?

[17] **A:** October, 1986.

[18] **Q:** What facility did you work for for Sanborn?

[19] **A:** Out of their Wrentham, Mass facility.

[20] **Q:** Did you work at Sanborn on the loading dock, as [21] well?

[22] **A:** I was a — I worked the loading dock and I drove [23] for them.

[24] **Q:** Did you continue to work in Wrentham when you

[1] began working for Sanborn Trucking — I mean, when [2] Sanborn was bought out by APA?

[3] **A:** No, I went to work at the APA Canton facility.

[4] **Q:** When did you begin work at APA in Canton?

[5] **A:** October of 1986.

[6] **Q:** How long did you work for APA?

[7] **A:** I worked for them from October, 1986 until March [8] 11th, 1987.

[9] **Q:** And what happened on March 11th, 1987?

[10] **A:** I was involved in a industrial accident.

[11] **Q:** Could you explain this industrial accident for [12] me, please?

[13] **A:** I was loading a — unloading a truck with a [14] forklift and the truck pulled away from the loading [15] dock.

[16] **Q:** How did that result in injury to you?

[17] **A:** Myself and the forklift both went off the [18] loading dock and I ended with a herniated disc in my [19] neck, lower back, torn rotator cuff in my shoulder, [20] torn ligament in my knee.

[21] **Q:** Did you go to the hospital on March 11th [22] following this injury?

[23] **A:** Yes, I did.

[24] **Q:** And what hospital?

[1] **A:** Goddard Memorial Hospital.

[2] **Q:** Where is Goddard Memorial?

[3] **A:** Stoughton.

[4] **Q:** Had you previously been terminated from your [5] employment at APA by letter on February 25th, 1987?

[6] **A:** Yes.

[7] **Q:** And what precipitated that termination?

[8] **A:** I think there was an argument between me and the [9] night boss, a disagreement.

[10] **Q:** Do you recall the date on which this argument [11] with the night boss happened?

[12] **A:** No, not offhand I don t.

[13] **Q:** Was it on February 25th?

[14] **A:** It could ve been.

[15] **Q:** Could it have been before February 25th?

[16] **A:** I don t recall.

[17] **Q:** Had you ever received any written warnings from [18] the terminal manager at APA prior to February 25th?

[19] **A:** Yes, I had.

[20] **Q:** And for what reason were you given a written [21] warning?

[22] **A:** Misloading freight, I think.

[23] **Q:** Do you recall if there were any other [24] disciplinary issues while you were working for APA?

[1] **A:** Yeah, I think there was.

[2] **Q:** Could you tell me what those are?

[3] **A:** Not offhand, no.

[4] **Q:** Do you recall approximately when they occurred?

[5] **A:** Sometime between October of 86 and March 11th [6] of 87.

[7] **Q:** Do you recall how many disciplinary issues you [8] had during that time?

[9] **A:** I do not.

[10] **Q:** Do you recall whether they were written warnings [11] or suspensions?

[12] **A:** There was a written warning. May have been [13] several written warnings

and a discharge.

[14] **Q:** And was the discharge you are speaking of the [15] one on February 25th?

[16] **A:** Yes.

[17] **Q:** Do you recall how your termination of February [18] 25th was resolved?

[19] **A:** Yes.

[20] **Q:** How was it resolved?

[21] **A:** It went to the Joint Area Committee.

[22] **Q:** And what was the result?

[23] **A:** I was put back to work.

[24] **Q:** When did you come back to work after the

[1] February 25th termination?

[2] **A:** I m not sure offhand.

[3] **Q:** Do you recall whether it was in February or [4] March?

[5] **A:** I believe it was March.

[6] **Q:** Do you recall if it was more than a week prior [7] to March 11th?

[8] **A:** No, as I recall I think it was March 11th.

[9] **Q:** So you think you returned back to work on the [10] day you were injured?

[11] **A:** Yes.

[12] **Q:** What time of the day was the accident with the [13] forklift during the unloading of a truck?

[14] **A:** It was approximately 7:30 at night.

[15] **Q:** And you said after that you went to the Goddard [16] Memorial Hospital in Stoughton?

[17] **A:** Yes.

[18] **Q:** Were you kept at the hospital?

[19] **A:** No.

[20] **Q:** What sort of procedures did they do when you [21] were at the hospital during that night?

[22] **A:** They took an x-ray of my leg. I believe they [23] took an x-ray of my neck. Told me to follow up with [24] my doctor.

[1] **Q:** Did you inform APA of what had occurred at the [2] hospital?

[3] **A:** Yes.

[4] **Q:** And what did they tell you? Did you return back [5] to work on March 12th?

[6] **A:** No.

[7] **Q:** And why didn t you return back to work on March [8] 12th?

[9] **A:** I went out on an industrial accident, Workman s [10] Comp.

[11] **Q:** Had you informed APA that you were unable to [12] return to work on the

Craig Goulet
Case 1:04-cv-12577-WGY    Document 40-2    Filed 01/24/2006    Page 5 of 11
New Penn Motor Express, et al.,
Craig Goulet
October 4, 2005

12th?

[13] **A:** Yes.

[14] **Q:** Were you soon thereafter terminated for the [15] events of March 11th, 1987?

[16] **A:** Yes.

[17] **Q:** And do you recall when you were terminated?

[18] **A:** March 12th.

[19] **Q:** Do you know what sort of Worker s Compensation [20] benefits you received?

[21] **A:** Partial disability.

[22] **Q:** And do you recall why you received partial [23] disability?

[24] **A:** I don t think I understand the question.

---
Page 15

[1] **Q:** Do you understand the difference between partial [2] disability benefits and full disability benefits?

[3] **A:** Yes.

[4] **Q:** And starting soon after March 12th you began to [5] receive partial disability benefits?

[6] **A:** Yes.

[7] **Q:** Do you know why you received partial disability [8] benefits as opposed to full disability benefits?

[9] **A:** That s what the judge ordered.

[10] **Q:** And what judge was this?

[11] **A:** Judge Scannell.

[12] **Q:** When was that ordered by Judge Scannell?

[13] **A:** In June, 1987.

[14] **Q:** Is Judge Scannell an administrative law judge [15] for the Department of Industrial Accident?

[16] **A:** She was at the time, yes.

[17] **Q:** Did you file a grievance as a result of your [18] termination on March 12th?

[19] **A:** The union hall filed a complaint. My business [20] agent at the time filed a complaint.

[21] **Q:** And who was the business agent?

[22] **A:** George Cashman.

[23] **Q:** Do you recall when this complaint was [24] heard?

[24] **A:** Yes.

---
Page 16

[1] **Q:** When was that?

[2] **A:** October 16th, 2001.

[3] **Q:** Could you tell me why there was a lapse of 14 [4] years between the time the complaint was filed and the [5] date of the hearing in this matter?

[6] **A:** Because I was on Workman s Compensation, and the [7] rules of procedure with the grievance committee [8] stip-

ulated that they wouldn t hear the case as long as [9] it was pending in another venue.

[10] **Q:** Following the order of Judge Scannell in 1987, [11] did you appeal her granting of partial disability [12] benefits?

[13] **A:** Yes, I believe I did.

[14] **Q:** What was the result of that appeal?

[15] **A:** I m not quite sure.

[16] **Q:** Did you continue to receive partial disability [17] benefits?

[18] **A:** Yes, I did.

[19] **Q:** Do you recall whether there are any additional [20] appeals besides the initial appeal?

[21] **MR. LATHROP:** You are speaking about the [22] industrial accident?

[23] **MS. PENNINI:** I m sorry, I m speaking about [24] the industrial accident appeal.

---
Page 17

[1] **THE WITNESS:** Yes, I believe there was.

[2] **BY MS. PENNINI:**

[3] **Q:** Do you recall how many appeals there were?

[4] **A:** No.

[5] **Q:** Were all the appeals filed by you or your [6] attorney?

[7] **A:** My attorney.

[8] **Q:** And when were these appeals finally resolved [9] with a final decision, do you recall?

[10] **A:** No.

[11] **Q:** Were there numerous appeals between 1987 and [12] 2001?

[13] **A:** I don t know how many appeals there were, maybe [14] one.

[15] **Q:** And that was heard before 2001?

[16] **A:** Yes.

[17] **Q:** While you were receiving partial Worker s [18] Compensation benefits, did you hold any other [19] employment?

[20] **A:** No.

[21] **Q:** Did you look for additional employment between [22] March 11th, 1987 and October of 2001?

[23] **A:** No.

[24] **Q:** Did you seek any light duty work of any sort?

---
Page 18

[1] **A:** Yes.

[2] **Q:** And where did you seek light duty work?

[3] **A:** With APA.

[4] **Q:** And what was their response, APA s [5] response?

[5] **A:** APA s response was that I was discharged. I was [6] a discharged

employee.

[7] **Q:** When did you seek light duty work with APA?

[8] **A:** Sometime in early 1991 or 2 maybe.

[9] **Q:** Did you seek any light duty employment with any [10] other company?

[11] **A:** Nope.

[12] **Q:** In 1991-1992, had you received any documentation [13] from any doctor concerning your ability to return to [14] work?

[15] **A:** I don t recall.

[16] **Q:** Between 1987 and 1991, were there any [17] restrictions concerning your ability to work placed on [18] you by your doctor?

[19] **A:** Yes.

[20] **Q:** And what were those restrictions?

[21] **A:** That I was unable to work.

[22] **Q:** Can you be anymore specific?

[23] **A:** No, not offhand I can t.

[24] **Q:** Did you have any restrictions concerning the

---
Page 19

[1] amount that you could lift?

[2] **A:** Yes.

[3] **Q:** And what was that restriction?

[4] **A:** 35 pounds.

[5] **Q:** Do you recall any other restrictions?

[6] **A:** No, I don t.

[7] **Q:** Do you recall if there were more restrictions [8] than you could not lift more than 35 pounds?

[9] **A:** I don t recall offhand, no.

[10] **Q:** I m sorry, you don t recall what the other [11] restrictions were or you don t recall whether there [12] was more than that one restriction?

[13] **A:** I don t recall at all.

[14] **Q:** So you do not recall whether there was — I m [15] just trying to understand you. You do not recall if [16] there were any other restrictions?

[17] **A:** Yeah, I had a lot of doctor s reports.

[18] **Q:** Did you continue to receive health benefits [19] while you were on Worker s Compensation leave?

[20] **A:** I did up until a point, up until sometime.

[21] **Q:** And when was that time?

[22] **A:** It may have been a year after I got hurt.

[23] **Q:** Do you not recall the exact date?

[24] **A:** I can t be sure. The health and welfare was

---

Page 20

[1] paid on my behalf for a period of one year, so I was [2] covered for a year and then possibly six months after [3] that.

[4] **Q:** And after that time did you not have any health [5] benefits?

[6] **A:** I did not.

[7] **Q:** Did you receive any compensation in addition to [8] your partial disability benefits between the years of [9] 1987 and 2001?

[10] **A:** Yes.

[11] **Q:** What form of compensation did you receive?

[12] **A:** Social Security Disability.

[13] **Q:** And when did you receive that, what years?

[14] **A:** I think it was 1995.

[15] **Q:** You began to receive it in 95 or you only [16] received it in 1995?

[17] **A:** No, I began to receive it in 1995.

[18] **Q:** Did you receive any other compensation besides [19] Social Security?

[20] **A:** No.

[21] **Q:** So just to be clear, between 1987 and 2001 the [22] only compensation that you received was from Social [23] Security Disability benefits and Worker s Comp partial [24] disability benefits?

Page 21

[1] **A:** Yes.

[2] **Q:** Did you keep in contact with anyone at Teamsters [3] Local 25 while you were out on Worker s Compensation [4] leave?

[5] **A:** Yes.

[6] **Q:** With whom did you keep in contact?

[7] **A:** I spoke with George Cashman over the years.

[8] **Q:** Anybody else?

[9] **A:** Mark Harrington.

[10] **Q:** Do you recall what years you spoke with Mark [11] Harrington?

[12] **A:** Sometime in 2001.

[13] **Q:** So the first time you spoke with Mark Harrington [14] was about 2001?

[15] **A:** Yeah.

[16] **Q:** Do you recall approximately when you would speak [17] to George Cashman?

[18] **A:** No, I don t remember approximately when. Just [19] there was conversation over the years. We talked.

[20] **Q:** How often did you speak with Mr. Cashman?

[21] **A:** About every few months.

[22] **Q:** Would you stop by the union hall to speak with [23] Mr. Cashman?

[24] **A:** I did.

Page 22

[1] **Q:** Did you keep in contact with him through any [2] other means?

[3] **A:** No.

[4] **Q:** Would you ever telephone Mr. Cashman?

[5] **A:** Yes.

[6] **Q:** Besides George Cashman and Mark Harrington, did [7] you keep in contact with anyone else at Local 25?

[8] **A:** No.

[9] **Q:** How often would you go to the union hall during [10] that time?

[11] **MR. LATHROP:** I m sorry, what time frame [12] are we talking about here?

[13] **MS. PENNINI:** I m sorry, between 1987 and [14] 2001.

[15] **THE WITNESS:** I don t recall.

[16] BY MS. PENNINI:

[17] **Q:** But occasionally you would go to the union hall?

[18] **A:** Occasionally, yes. I used to stop by to pay my [19] dues, something like that.

[20] **Q:** Were you ever a steward for a Teamsters local?

[21] **A:** No.

[22] **Q:** What sorts of discussions would you have with [23] Mr. Cashman?

[24] **A:** I don t know offhand.

Page 23

[1] **Q:** You don t recall any general topics of [2] conversations?

[3] **A:** Nope.

[4] **Q:** Would you ever discuss whether you would be [5] returning back to work with Mr. Cashman?

[6] **A:** Nope.

[7] **Q:** Would you discuss what was going on with [8] different employers over at Local 25 with Mr. Cashman?

[9] **A:** Yeah, I think maybe I might ve attended some [10] meetings. You know, general union meetings.

[11] **Q:** Do you recall anything else concerning your [12] correspondence or interaction with Mr. Cashman between [13] 1987 and 2001?

[14] **A:** No.

[15] **Q:** And you said you began to speak or see [16] Mr. Harrington in 2001?

[17] **A:** Yes.

[18] **Q:** Do you recall why you began to speak with [19] Mr. Harrington?

[20] **A:** I had exhausted all my partial disability [21] benefits.

[22] **Q:** Okay. And how is that related to [23] Mr. Harrington?

[24] **A:** Well in order to have my discharge case heard at

Page 24

[1] the panel, I needed to discuss it with Mr. Harrington [2] who was the business agent at that time.

[3] **Q:** And you said you had exhausted your partial [4] disability benefits, could you explain to me what you [5] mean by that?

[6] **A:** My benefits came to an end.

[7] **Q:** Is that because you had received a certain [8] number of weeks of benefits?

[9] **A:** Yes.

[10] **Q:** And you said you contacted Mr. Harrington [11] because you wanted your grievance to be heard?

[12] **A:** Yes.

[13] **Q:** Was your grievance subsequently heard?

[14] **A:** Yes, it was.

[15] **Q:** And what s the date of that?

[16] **A:** October 16th, 2001.

[17] **Q:** Where was this grievance heard?

[18] **A:** At the union hall.

[19] **Q:** Do you recall who it was heard by?

[20] **A:** It was heard by the committee.

[21] **Q:** And what committee was this?

[22] **A:** It was the Southern New England Joint Area [23] Committee.

[24] **Q:** And you said it was held at the union hall,

Page 25

[1] which union hall are you referring to?

[2] **A:** At the Teamsters Local 25.

[3] **Q:** Do you recall what the result of this hearing [4] was?

[5] **A:** Yes.

[6] **Q:** And what was the result?

[7] **A:** My seniority was reinstated.

[8] **Q:** Do you recall anything else concerning the [9] result of the Joint Area Committee grievance decision?

[10] **A:** No.

[11] **MS. PENNINI:** Can I just have one second?

[12] (A brief recess was taken)

[13] **MS. PENNINI:** Could I have this marked as [14] an Exhibit, please?

[15] (The document above-referred [16] to was marked Deposition [17] Exhibit No. 1 for Identification)

[18] BY MS. PENNINI:

[19] **Q:** If you could please look at deposition Exhibit [20] 1, Mr. Goulet?

[21] **A:** Yeah.

[22] **Q:** Have you seen this document before?

[23] **A:** Yes, I have.

[24] **Q:** Could you tell me what this doc-

Craig Goulet
Case 1:04-cv-12577-WGY    Document 40-2    Filed 01/24/2006    Page 7 of 11
New Penn Motor Express, et al.,
Craig Goulet
October 4, 2005

ument is?

Page 26

[1] **A:** It s the decision from the Southern New England [2] Committee.

[3] **Q:** When did you first see this decision?

[4] **A:** When it was mailed to me.

[5] **Q:** And do you recall approximately when you [6] received it?

[7] **A:** Yeah, maybe two weeks after the hearing.

[8] **Q:** Could you explain to me what the decision was?

[9] **MR. LATHROP:** Objection.

[10] **THE WITNESS:** The decision was, put me back [11] on the seniority list and it states that upon me [12] giving the company documentation of my ability to work [13] to unrestricted duties, I had to serve a 10-day [14] suspension.

[15] **BY MS. PENNINI:**

[16] **Q:** Did you ever submit any documentation to APA [17] regarding your ability to return to unrestricted [18] duties?

[19] **A:** No.

[20] **Q:** Did you ever serve a 10-day suspension at APA?

[21] **A:** No.

[22] **Q:** Did you understand this decision to immediately [23] reinstate you onto the seniority list for APA?

[24] **A:** Yes, I did.

Page 27

[1] **Q:** Did you —

[2] **A:** I received a phone call by Bill Carnes —

[3] **Q:** I m sorry, I m asking you a question.

[4] **MR. LATHROP:** But nonetheless, if he needs [5] to expand upon his answer he has a right to do that.

[6] **MS. PENNINI:** Well I will allow you to do [7] that in one second. I m sorry, I was in the middle of [8] trying to get a question out.

[9] **BY MS. PENNINI:**

[10] **Q:** So you said that you believed your seniority was [11] immediately reinstated and you should have been placed [12] on the seniority list immediately upon the decision of [13] the New England Joint Area Grievance Committee?

[14] **A:** I was put back on the seniority list [15] immediately.

[16] **Q:** How do you know that you were immediately put [17] back on the seniority list?

[18] **A:** I received a phone call from Bill Carnes —

[19] **Q:** And what did Bill —

[20] **A:** — that afternoon, and also from Mr. Harrington.

[21] **Q:** I m sorry, what afternoon?

[22] **A:** The afternoon they heard the case on October [23] 16th, congratulating me and telling me that I won.

[24] **Q:** Did you receive one phone call or two separate

Page 28

[1] phone calls?

[2] **A:** Two separate phone calls.

[3] **Q:** Do you recall what Mr. Carnes had said during [4] his phone call?

[5] **A:** Congratulations, you won your case.

[6] **Q:** Did he explain to you what the decision said?

[7] **A:** Yes.

[8] **Q:** And what did he say?

[9] **A:** He said, You have to serve a 10-day suspension [10] before you can go back to work.

[11] **Q:** Did Mr. Carnes tell you that you had been placed [12] back on the seniority list?

[13] **A:** Yes, that was my understanding.

[14] **Q:** Did he say that?

[15] **A:** I believe he did.

[16] **Q:** You don t recall whether he said precisely, You [17] have been returned to the seniority list at APA Canton [18] facility. ?

[19] **A:** Precisely, I do not know.

[20] **Q:** And you said you also received a call from [21] Mr. Harrington?

[22] **A:** Yes.

[23] **Q:** Could you tell me what Mr. Harrington said to [24] you on the phone that day?

Page 29

[1] **A:** Basically, the same. You know, it had the same [2] context. It was, You won your case. [3] Congratulations, you won your case.

[4] **Q:** Did Mr. Harrington say anything else?

[5] **A:** Nope.

[6] **Q:** Did he tell you you would have to serve a 10-day [7] suspension?

[8] **A:** Yes, I believe he did.

[9] **Q:** Did he tell you you were back on the seniority [10] list at APA?

[11] **A:** Yes, I believe he did.

[12] **Q:** Do you recall whether he said, You re back on [13] the seniority list. ?

[14] **A:** No, I don t recall.

[15] **Q:** Did you ever work for APA after October 16th, [16] 2001?

[17] **A:** No.

[18] **Q:** Did you ever see a seniority list for the APA [19] terminal in Canton, Massachusetts with your name on [20] the seniority list?

[21] **A:** Yes.

[22] **Q:** Were you working at APA at the time that it [23] ceased operating?

[24] **A:** No.

Page 30

[1] **Q:** Do you know when APA ceased its operations?

[2] **A:** Sometime in February of 2002.

[3] **Q:** And how did you learn that APA was closing its [4] operations?

[5] **A:** I had spoke with the steward.

[6] **Q:** Did the steward call you to inform you?

[7] **A:** Yes, he did.

[8] **Q:** And who was the steward?

[9] **A:** Doug Francie.

[10] **Q:** Do you recall when he called you?

[11] **A:** No. Approximately — there may have been [12] several phone calls. One initially is the word, Get [13] out, that the company was closing.

[14] **Q:** And Francie called you to let you know the [15] company was closing?

[16] **A:** I think probably I called him initially.

[17] **Q:** How did you get word that APA was closing?

[18] **A:** Someone called me.

[19] **Q:** Do you recall who called you?

[20] **A:** My sister-in-law.

[21] **Q:** And how did your sister-in-law know that APA was [22] closing?

[23] **A:** She worked for a company and had spoke with [24] another truck driver.

Page 31

[1] **Q:** Your sister-in-law worked for APA, is that what [2] you said?

[3] **A:** No, she worked for another company.

[4] **Q:** What company did she work for?

[5] **A:** Vincent Metal Goods.

[6] **Q:** Vincent Metal Goods, is that what you said?

[7] **A:** Yeah, um-hum.

[8] **Q:** And she became aware that APA was closing?

[9] **A:** Yes.

[10] **Q:** And could I have your sister-in-law s name?

[11] **A:** Dawn.

[12] **Q:** And her last name?

[13] **A:** Goulet.

[14] **Q:** Is it D-A-W-N?

[15] **A:** Yes.

[16] Q: And Goulet as you previously spelled it?

[17] A: Um-hum.

[18] Q: Where is Vincent Metal Goods located?

[19] A: I believe they re in Fort Devins now at Devins. [20] They were in Marlboro at the time.

[21] Q: So after your sister-in-law informed you that [22] APA was closing you called Doug Francie?

[23] A: Yes.

[24] Q: How did you know to contact Doug Francie?

Page 32

[1] A: Doug Francie was the union steward.

[2] Q: And where was he the union steward for?

[3] A: For APA, at the Canton facility.

[4] Q: How did you know that he was the APA union [5] steward at the Canton facility?

[6] A: As I said, I had been to union meetings and kept [7] in contact with the — you know, other workers.

[8] Q: Other workers at APA?

[9] A: Yes.

[10] Q: What other workers did you keep in contact with?

[11] A: Jerry Hurley was a mechanic. I d spoke with [12] Kevin Power over the years.

[13] Q: Are Jerry Hurley and Kevin Power both APA [14] workers at the Canton facility?

[15] A: Yes.

[16] Q: I m sorry, go on, I didn t mean to interrupt [17] you.

[18] A: There was another fellow, Mike Cruz, drove a [19] truck in the Hudson area. I would see him from time [20] to time.

[21] Q: Was he at the APA Canton facility as well?

[22] A: Yes.

[23] Q: How did you get Doug Francie s telephone number?

[24] A: Oh, I had the phone number.

Page 33

[1] Q: Did you call him at home?

[2] A: Yes.

[3] Q: How did you have his home phone number?

[4] A: As I said, he was the union steward.

[5] Q: Had you known Doug Francie prior to February of [6] 2002?

[7] A: Yes.

[8] Q: And how did you know him?

[9] A: I worked with him at Sanborns Motor Express.

[10] Q: What did you speak with Mr. Francie about?

[11] A: Well it was general conversation about the [12] company was closing.

[13] Q: Did you tell Mr. Francie you had heard that the [14] company was closing?

[15] A: Yes.

[16] Q: Do you recall what else you said to him?

[17] A: We just discussed in general the fact that the [18] company was going out of business.

[19] Q: Did you ask Mr. Francie if you could be put on a [20] call list for New Penn Motor Express?

[21] A: Doug Francie called me — Doug Francie called [22] me, and I m going to say it was probably February 15th [23] or 16th, maybe the 17th.

[24] Q: And what did he say to you?

Page 34

[1] A: He relayed to me that there was a meeting with [2] the APA men and he wanted to know what my call list [3] preference was.

[4] Q: Did he tell you whether or not you were on his [5] list of people to determine what their preference for [6] a call list facilities were?

[7] A: Yes.

[8] Q: He said you were on the list?

[9] A: I believe that s why he called me.

[10] Q: So Mr. Francie said he thought you were on the [11] Canton facility call list and, therefore, called you [12] to find out your terminal preference, is that an [13] accurate statement?

[14] A: Not entirely.

[15] Q: Okay.

[16] A: I was on the Canton seniority list, the APA [17] Canton seniority list.

[18] Q: Okay.

[19] A: And he called me to ask me what my preference [20] would be as far as the New Penn call list went.

[21] Q: And your conversation with Mr. Francie, when you [22] called him, do you recall what date that occurred on?

[23] A: I don t offhand recall, no.

[24] Q: But you believe you spoke with him on February

Page 35

[1] 15th or possibly the 16th or the 17th?

[2] A: I m going to say it was the 17th of February.

[3] Q: That you spoke with Mr. Francie?

[4] A: Yes.

[5] MR. GLUEK: Could you say what year

it is?

[6] MS. PENNINI: I m sorry.

[7] BY MS. PENNINI:

[8] Q: Was it February 17th of 2002?

[9] A: Yes, 2002.

[10] Q: Do you know for sure that it was February 17th, [11] 2002?

[12] A: I m pretty sure it was February 17th, 2002, yes.

[13] Q: But it may have been the 16th or the 15th?

[14] A: No, it was after the 16th.

[15] Q: And how do you know it was after the 16th?

[16] A: Because they had a meeting at the union hall and [17] he called me after the meeting.

[18] Q: Do you know the date of the meeting at the union [19] hall?

[20] A: February 16th.

[21] Q: Did you receive any notification regarding the [22] closure of APA in the mail?

[23] A: Yes.

[24] Q: When did you receive this notification?

Page 36

[1] A: Sometime in February of 2002.

[2] Q: And by whom was this information sent?

[3] A: Local 25.

[4] Q: After you gave Mr. Francie your terminal [5] preference, did you ever check with Local 25 to make [6] sure that your name was on the call list for New Penn?

[7] A: I made a follow up phone call, I did, to the [8] union hall, yes.

[9] Q: Do you recall with whom you spoke?

[10] A: Mark Harrington.

[11] Q: And when was that?

[12] A: Sometime in March.

[13] Q: In March of what year?

[14] A: 2002.

[15] Q: Do you recall what you spoke about during this [16] telephone call?

[17] A: Yes.

[18] Q: And what was that?

[19] A: With regards to the call list and what was going [20] on with the APA people and New Penn agreement.

[21] Q: In February and March of 2002, had you been [22] medically cleared to return to work?

[23] A: No.

[24] Q: Besides your telephone conversation with Mark

Page 37

[1] Harrington in March of 2002, did you have any other [2] contact with Local 25?

[3] A: Yes.

[4] Q: What sort of contact did you have?

[5] A: When I spoke with Mr. Harrington he told me that [6] he no longer handled the men at APA, and I would have [7] to speak with Bill Carnes.

[8] Q: And when did this occur?

[9] A: Sometime right around March.

[10] Q: March of?

[11] A: 2002.

[12] Q: Was this during the same conversation that you [13] spoke about previously where you asked Mr. Harrington [14] about the call list?

[15] A: Yes.

[16] Q: Did you have any additional contact with anyone [17] at Local 25 after —

[18] A: Not that I recall.

[19] MR. LATHROP: Let her finish the question.

[20] BY MS. PENNINI:

[21] Q: After March of 2002?

[22] A: Yes.

[23] Q: What contact did you have?

[24] A: There were several phone calls to Bill Carnes.

Page 38

[1] Q: When did these phone calls occur?

[2] A: I can t be sure right offhand.

[3] Q: Can you tell me, did you have any [4] contact with Mr. Carnes during the spring of 2002?

[5] A: Yes.

[6] Q: What sort of contact did you have with him [7] during the spring of 2002?

[8] A: With regards to the agreement that they had with [9] the New Penn people.

[10] Q: What did he tell you concerning the agreement [11] with the New Penn people?

[12] A: He said that he was going to look into it.

[13] Q: Did you only have one conversation with [14] Mr. Carnes during the spring of 2002?

[15] A: No, I don t think so. There was probably two.

[16] Q: Two conversations?

[17] A: Yeah.

[18] Q: And what did you speak about during the second [19] conversation?

[20] A: Same issues.

[21] Q: Did you have any contact with him during the [22] summer of 2002?

[23] A: Yes.

Page 39

[1] 2002?

[2] A: More follow up, more of the same.

[3] Q: During the summer of 2002, had you been [4] medically cleared to return to work?

[5] A: No.

[6] Q: Did you alert Mr. Carnes that you had not been [7] medically cleared to return to work?

[8] A: No.

[9] Q: Did you tell Mr. Carnes whether you had ever [10] served your 10-day suspension with APA?

[11] A: No.

[12] Q: And approximately how often did you speak to him [13] during the summer of 2002?

[14] A: Several times. Two.

[15] Q: Several times or two times?

[16] A: Two times.

[17] Q: Did you speak to him during the fall of 2002?

[18] A: I don t recall.

[19] Q: The winter of 2002?

[20] A: I can t be sure.

[21] Q: You are not sure whether you had any [22] contact with Mr. Carnes during the winter of 2002?

[23] A: No, we had — like I said, we had conversations [24] throughout the year. There was initial phone call,

Page 40

[1] follow up phone call, subsequently I think there was a [2] third phone call in the spring of 2002, March.

[3] Q: Had you been medically cleared to return to work [4] during the winter of 2002?

[5] A: No.

[6] Q: Had you been medically cleared to return to work [7] prior to March 1st of 2003?

[8] A: No.

[9] Q: And you said you spoke with Mr. Carnes in March [10] of 2003?

[11] A: Yes.

[12] Q: What sort of contact did you have with [13] Mr. Carnes?

[14] A: I called him, it was probably M-arch 31st, 2003 [15] when the agreement expired.

[16] Q: What agreement are you —

[17] A: The agreement that the New Penn people had with [18] the Teamsters negotiating committee, the freight [19] industry negotiating committee and the APA operation.

Page 41

[20] Q: What else did you discuss during this [21] conversation?

[22] A: The fact that I hadn t been called.

[23] Q: And what did Mr. Carnes tell you?

[24] A: He told me to send a grievance in.

Page 41

[1] Q: And did you send a grievance into Mr. Carnes?

[2] A: I did.

[3] MS. PENNINI: Would you mark this as an [4] Exhibit, please?

[5] (The document above-referred [6] to was marked Deposition [7] Exhibit No. 2 for Identification)

[8] BY MS. PENNINI:

[9] Q: If you could please look at deposition Exhibit [10] No. 2?

[11] A: Um-hum.

[12] Q: Have you seen this document before?

[13] A: Yes.

[14] Q: Were you the author of this document?

[15] A: Yes.

[16] Q: Could you please tell me what this document is?

[17] A: It s a grievance.

[18] Q: A grievance concerning what?

[19] A: It s a grievance concerning my seniority rights.

[20] Q: I m sorry, what do you mean by a grievance [21] concerning your seniority rights ?

[22] A: Just as it states. Would you like me to read [23] it?

[24] Q: Sure.

Page 42

[1] A: Okay. In accordance with the National Master [2] Freight Agreement, Article V, and all of Article V [3] subsections, along with the New England Supplemental [4] Freight Agreement, Article No. XLIII, Seniority, [5] including all of Article XLIII subsections, I am [6] filing a grievance against New Penn Motor Express to [7] include all time lost, back pay, seniority and [8] contractual benefits under the contract agreement [9] March 1st, 2002 up to and continuing past March 1st, [10] 2003 based on the agreement between TNFINC and New [11] Penn Motor Express as a result of the closure of APA [12] operations.

[13] Q: And had you been medically cleared to work [14] between March 1st, 2002 and March 1st, 2003?

[15] A: No.

[16] MS. PENNINI: If I could just have one [17] second. Would you please mark that as an Exhibit, [18] please?

[19] (The document above-referred [20] to

was marked Deposition [21] Exhibit No. 3 for Identification)

[22] **BY MS. PENNINI:**

[23] **Q:** Did you have any additional contact with [24] Mr. Carnes following your March 31st telephone

**Page 43**

[1] conversation with him?

[2] **A:** I filed a grievance with him.

[3] **Q:** When was this grievance filed?

[4] **A:** November 7th.

[5] **MR. LATHROP:** November?

[6] **THE WITNESS:** I mean, April 7th.

[7] **BY MS. PENNINI:**

[8] **Q:** And did you have any contact with Mr. Carnes [9] following your sending of the April 7th, 2003 [10] grievance?

[11] **A:** No.

[12] **Q:** Did you attempt to contact Mr. Carnes at anytime [13] after the time you sent the April 7th, 2003 grievance?

[14] **A:** No, I did not.

[15] **Q:** Following the sending of the April 7th, 2003 [16] grievance, what was the next time you had any contact [17] with anyone at Local 25?

[18] **A:** I spoke to Mark Harrington.

[19] **Q:** And when did you speak with Mark Harrington?

[20] **A:** Sometime after May 2nd, 2003.

[21] **Q:** Why did you speak with Mark Harrington after May [22] 2nd, 2003?

[23] **A:** Bill Carnes had left office.

[24] **Q:** How did you know to contact Mr. Harrington?

**Page 44**

[1] **A:** Mr. Harrington was the business agent that was [2] put in charge of the New Penn people.

[3] **Q:** How did you know that Mr. Harrington had been [4] put in charge of the New Penn employees?

[5] **A:** I don t recall.

[6] **Q:** Sorry, just to back up a little bit. Before you [7] sent Mr. Carnes your April 7th, 2003 letter, did you [8] inform Mr. Carnes that you were on an APA seniority [9] list?

[10] **A:** Yes.

[11] **Q:** And did you speak with Mr. Carnes during the [12] spring of 2003, on March 31st I believe you said it [13] was, 2003?

[14] **A:** Yes.

[15] **Q:** Did you speak with him at all about your [16] October, 2001 grievance decision?

[17] **A:** No.

[18] **Q:** So Mr. Carnes was not aware of whether you had [19] been medically

cleared to work or had served the [20] 10-day suspension as of March 31st, 2003?

[21] **A:** I don t know what Mr. Carnes knew, what he was [22] aware of. I have no idea.

[23] **Q:** You said you spoke with Mr. Harrington sometime [24] after May 2nd, 2003?

**Page 45**

[1] **A:** Yes.

[2] **Q:** What sort of contact did you have with [3] Mr. Harrington?

[4] **A:** It was a follow up conversation with regards to [5] the grievance I filed.

[6] **Q:** A telephone call?

[7] **A:** Yes.

[8] **Q:** And do you recall when this telephone call [9] occurred?

[10] **A:** Sometime after Bill Carnes had left office.

[11] **Q:** Do you recall when after May 2nd, 2003 such [12] contact occurred?

[13] **A:** No, not exactly.

[14] **Q:** Do you recall what you said during this — was [15] it a telephone conversation?

[16] **A:** It was a telephone conversation, yes.

[17] **Q:** And do you recall what you said during this [18] telephone conversation?

[19] **A:** Regarding my grievance, What was the status of [20] my grievance? .

[21] **Q:** Did you specifically ask Mr. Harrington what was [22] the status of your grievance?

[23] **A:** Yes.

[24] **Q:** And what did Mr. Harrington say?

**Page 46**

[1] **A:** He said he didn t — wasn t aware of a [2] grievance.

[3] **Q:** Do you recall whether this conversation took [4] place during the summer of 2003?

[5] **A:** It was in May. As I said, after Mr. Carnes left [6] office I was calling to follow up on the status of the [7] grievance.

[8] **Q:** At this time did Mr. Harrington ask you if you [9] had been medically cleared to return to work?

[10] **A:** No.

[11] **Q:** Did you tell Mr. Harrington whether you had been [12] medically cleared to work?

[13] **A:** No.

[14] **Q:** Did you tell Mr. Harrington whether you had [15] served the 10-day suspension?

[16] **A:** No.

[17] **Q:** Did he ask you about the 10-day

suspension that [18] was listed in the decision of October 16th, 2001?

[19] **A:** I think he — he may have mentioned it, yes.

[20] **Q:** Do you recall what he said concerning that [21] suspension?

[22] **A:** He said that I had a 10-day suspension to serve.

[23] **Q:** During this May conversation Mr. Harrington told [24] you you had to serve a 10-day suspension?

**Page 47**

[1] **A:** Yes.

[2] **Q:** Did he tell you — I m sorry, strike that. Did [3] you have any subsequent contact with Mr. Harrington [4] following the May, 2003 telephone conversation?

[5] **A:** Yes, I forwarded him copies of the grievance.

[6] **Q:** And when did you do that?

[7] **A:** Initially, probably right in May. And then [8] there was follow up conversation in July, a telephone [9] conversation.

[10] **Q:** Do you recall when in July you had this follow [11] up conversation?

[12] **A:** Maybe a week before I wrote the letter.

[13] **Q:** Do you recall whether it was a week before you [14] wrote the letter?

[15] **A:** Yeah, it was probably a week before I wrote the [16] letter.

[17] **Q:** And what did you speak about during this [18] conversation?

[19] **A:** The grievance.

[20] **Q:** Did Mr. Harrington tell you that there might be [21] an issue with the grievance because you had not been [22] medically cleared to return to work?

[23] **A:** No.

[24] **Q:** I m sorry, Mr. Harrington did not mention that?

**Page 48**

[1] **A:** Nope.

[2] **Q:** Did Mr. Harrington say anything concerning the [3] 10-day suspension that you had spoken about during the [4] May, 2003 telephone call?

[5] **A:** No, I don t think so.

[6] **Q:** So what did Mr. Harrington speak about during [7] this telephone conversation?

[8] **A:** We were trying to find out what became of the [9] grievance that was filed.

[10] **Q:** And was there any resolution concerning what had [11] happened to the grievance you had sent in April of [12] 2003?

[13] **A:** I had sent him copies of it.

[14] Q: But was there any resolution?

[15] A: It was to my understanding that he was [16] negotiating with the company over the grievance.

[17] Q: And by the company do you mean New Penn Motor [18] Express?

[19] A: Yes.

[20] Q: If you could please look at dep-osition Exhibit [21] No. 3? If you could look at the second paragraph, it [22] starts with Let s not lose sight of the real issue [23] here ?

[24] A: Um-hum.

---

Page 49

[1] Q: And in this paragraph you speak about the issue [2] being seniority rights not whether you were capable of [3] returning to work, or capable of work-ing, is that [4] correct?

[5] A: That s what it says.

[6] Q: Do you recall why you wrote this paragraph?

[7] A: I don t recall exactly what my thought process [8] was at the time, no.

[9] Q: Had you ever had a conversation with [10] Mr. Harrington in which he discussed that there would [11] be an issue concerning whether or not you were capable [12] of returning to work?

[13] A: No.

[14] Q: Did you think there was an issue concerning [15] whether you were med-ically capable of returning to [16] work?

[17] A: No.

[18] MS. PENNINI: Please mark this as an [19] Exhibit?

[20] (The document above-referred [21] to was marked Deposition [22] Exhibit No. 4 for Identification?)

[23] BY MS. PENNINI:

[24] Q: Did you have any additional con-tact with

---

Page 50

[1] Mr. Harrington during the summer of 2003 besides the [2] July telephone conversation you spoke about and the [3] letter of July 25th, 2003?

[4] A: Yes, I believe there was another phone call.

[5] Q: And when was this phone call?

[6] A: Oh, I can t be sure.

[7] Q: Can you give me an approximate date, was it [8] still during the summer of 2003?

[9] A: August, maybe.

[10] Q: Did you call Mr. Harrington or did [11] Mr. Harrington call you?

[12] A: I believe I probably called Mr. Harrington.

[13] Q: Did you call Mr. Harrington for any particular [14] reason in August of 2003?

---

[15] A: Yes.

[16] Q: And why was that?

[17] A: To find out what the status of my grievance was.

[18] Q: And what did Mr. Harrington tell you regarding [19] the status of your grievance?

[20] A: I don t recall exactly what the conversation was [21] about. They were, to my understanding, again [22] dis-cussing things with the company with regards to the [23] grievance.

[24] Q: Did Mr. Harrington ever send you any

---

Page 51

[1] correspondence during the summer of 2003?

[2] A: No.

[3] Q: Did you speak with Mr. Harrington at all during [4] the fall of 2003?

[5] A: I believe I did.

[6] Q: When did you have contact with Mr. Harrington [7] during the fall of 2003?

[8] A: As I said, it was August. Sometime in August.

[9] Q: What about during the fall of 2003?

[10] A: September. Maybe August or Sep-tember.

[11] Q: Was there an additional phone call in August [12] besides the phone call you already mentioned?

[13] A: No.

[14] Q: Was there an additional phone call in September [15] besides the August phone call you have already [16] men-tioned?

[17] A: I don t recall.

[18] Q: Do you recall if you spoke with Mr. Harrington [19] in October of 2003?

[20] A: Yes, I might ve.

[21] Q: Do you recall whether you did?

[22] A: As I said, I might have.

[23] Q: Do you recall whether you spoke with [24] Mr. Harrington in November of 2003?

---

Page 52

[1] A: I believe I did.

[2] Q: Do you know whether you spoke with him in [3] November of 2003?

[4] A: I m sure I did.

[5] Q: And do you recall what you spoke about during [6] November of 2003?

[7] A: The status of my grievance.

[8] Q: And what did Mr. Harrington tell you?

[9] A: That he was going to file a griev-ance.

[10] Q: Did he say why he was filing a grievance?

---

[11] A: That was his duty.

[12] Q: So did he tell you in November of 2003 that he [13] was filing a grievance in November of 2003?

[14] A: He was going to file the grievance with the [15] appropriate committee.

[16] Q: Do you recall when in November this telephone [17] conversation took place?

[18] A: No.

[19] Q: During this November, 2003 tele-phone [20] conversation, did Mr. Har-rington ask you whether you [21] had been medically cleared to return to work?

[22] A: No.

[23] Q: Did you tell Mr. Harrington whe-ther you had been [24] medically cleared to return to work?

---

Page 53

[1] A: Nope.

[2] Q: Prior to November of 2003, you had said that [3] Mr. Harrington had been in negotiations with the [4] company concerning your grievance?

[5] A: That s my understanding.

[6] Q: And did your understanding chan-ge in November of [7] 2003?

[8] A: No.

[9] Q: Did Mr. Harrington, in November of 2003, tell [10] you that he no longer wanted to negotiate with the [11] com-pany concerning this grievance?

[12] A: No.

[13] Q: Did Mr. Harrington just tell you that he was [14] going to file a grievance at this time?

[15] A: I filed the grievance. It was Mr. Harrington s [16] job —

[17] Q: I m sorry, file the grievance with the —

[18] MR. LATHROP: I think Mr. Goulet was [19] attempting to answer your quest-ion, so if you would [20] allow him please.

[21] MS. PENNINI: Okay.

[22] THE WITNESS: I filed the grievance with [23] the local union. It was their job to docket the case [24] before the com-mittee to have it heard.

---

Page 54

[1] BY MS. PENNINI:

[2] Q: Had you ever filed other griev-ances with the [3] local union prior to 2003?

[4] A: Yes.

[5] Q: And when did you file prior griev-ances?

[6] A: 1987.

[7] Q: And what was this grievance con-cerning?

[8] A: Working conditions.

[9] Q: When you filed this grievance, did you [10] immediately file it with the local?

[11] A: Yes.

[12] Q: To whom did you give your grievance?

[13] A: I m going to say George Cashman.

[14] Q: In 1987, do you recall whether there was a [15] steward at the APA facility in Canton?

[16] A: Yes. Yes, there was.

[17] Q: Do you recall who this was?

[18] A: His last name was Yettman. I m not sure what [19] his first name was. Bobby.

[20] Q: Did you file a grievance with Mr. Yettman in [21] 1987?

[22] A: I believe I filed it with George Cashman.

[23] Q: And why did you file it with George Cashman?

[24] A: I had been discharged, Mr. Yettman was at home.

Page 55

[1] Q: I m sorry, I thought you said working [2] conditions?

[3] A: It was working conditions. I think there was a [4] discharge that may have been involved with it.

[5] Q: Did you file more than one grievance in 1987?

[6] A: No, I don t think so.

[7] Q: So it was the grievance you were discussing [8] concerning the February 25th termination?

[9] A: No.

[10] MR. LATHROP: Did you say February 25th?

[11] MS. PENNINI: The 1987 termination.

[12] MR. LATHROP: Objection.

[13] THE WITNESS: Nope.

[14] BY MS. PENNINI:

[15] Q: Did you file a grievance concerning the February [16] 25th, 1987 termination?

[17] MR. LATHROP: Objection.

[18] THE WITNESS: The union filed the response [19] to the discharge.

[20] BY MS. PENNINI:

[21] Q: Okay. You said you filed a grievance in 1987 [22] concerning working conditions, just to clarify, and [23] that you filed this with George Cashman because [24] Mr. Yettman was unavailable?

Page 56

[1] A: Right.

[2] Q: Do you know why Mr. Yettman was unavailable?

[3] A: Mr. Yettman worked on the day shift and I worked [4] on the night shift.

[5] Q: Was there a steward on the night shift, as well?

[6] A: No.

[7] Q: Do you recall when in 1987 this grievance was [8] filed?

[9] A: November — no, that s not right. Maybe it was [10] January.

[11] Q: If you could please look at deposition Exhibit [12] No. 4? Did you write this letter?

[13] A: Yes.

[14] Q: Did you send this letter to Mr. Harrington?

[15] A: Yes.

[16] Q: And was this letter written before or after your [17] telephone conversation with him in November of 2003?

[18] A: Afterwards.

[19] Q: Do you recall why you wrote this letter?

[20] A: Yes.

[21] Q: And why is that?

[22] A: Again, to follow up on the grievance that I had [23] filed.

[24] Q: Following your termination on March 12, 1987 you

Page 57

[1] said you were on Worker s Compensation leave, correct?

[2] A: Say that again.

[3] Q: Following the March 12th, 1987 termination from [4] APA, you said you were on industrial accident leave or [5] Worker s Compensation leave?

[6] A: Yes.

[7] Q: During your time on Worker s Compensation leave, [8] were you able to drive?

[9] A: Yes.

[10] Q: Did you have any issues concerning your ability [11] to drive?

[12] A: No.

[13] Q: Did you have any problem concerning your ability [14] to lift any objects?

[15] A: Yes.

[16] Q: And what was that inability?

[17] A: I had certain restrictions on lifting heavy [18] objects as a result of the herniated disc in my back [19] and my neck.

[20] Q: And you had mentioned that there was a 35 pound [21] restriction as a result of that?

[22] A: Yes.

[23] Q: Have you been able to remember any additional [24] restrictions?

Page 58

[1] A: No.

[2] Q: Do you recall whether that was the only [3] restriction now — do you still not recall whether [4] there were any additional specific restrictions?

[5] A: No, offhand I don t.

[6] Q: Were you incapacitated for any time following the [7] March, 1987 termination?

[8] MR. LATHROP: Objection.

[9] THE WITNESS: Could you say that again?

[10] BY MS. PENNINI:

[11] Q: Following the March 12th, 1987 termination, were [12] you able to walk and get around?

[13] A: I did, yes.

[14] Q: Following this termination did you ever seek any [15] additional education?

[16] A: No.

[17] Q: Did you graduate from high school?

[18] A: Yes, I did.

[19] Q: When did you graduate from high school?

[20] A: 1978.

[21] Q: Where did you graduate from high school?

[22] A: Hudson High School.

[23] Q: Did you attend any college or other institution [24] following your graduation from high school?

Page 59

[1] A: No.

[2] Q: In what year were you born?

[3] A: 1960.

[4] Q: And what is the date of your birth?

[5] A: 6/11/1960.

[6] Q: Would that be June 11th, 1960?

[7] A: Yes, it would be.

[8] Q: And you said you currently live in Hudson, [9] Massachusetts?

[10] A: Yes, I do.

[11] Q: And you said Cox Street, Hudson, Massachusetts?

[12] A: C-O-X, yeah.

[13] Q: Have you lived in any other places besides Cox [14] Street in Hudson, Massachusetts between 1978 and the [15] present?

[16] A: Yes.

[17] Q: Where else did you live?

[18] A: I lived in Marlboro for a time.

[19] Q: And what was your address?

[20] A: 750 Farm Road.

[21] Q: When did you live on Farm Road in Marlboro?

[22] A: 1982 til 1986.

[23] Q: Did you live on Cox Street between 1978 and [24] 1986?

Page 60

[1] A: Yes. Not until 1986. Did you say 1986?

[2] Q: I m sorry, where did you live between 1978 and [3] 1982?

[4] A: I lived on Cox Street.

[5] Q: Where did you live between 1960 and 1978?

[6] A: At Cox Street.

[7] Q: The same place on Cox Street?

[8] A: Yes.

[9] Q: Where did you live after 1986? You said you [10] lived in Marlboro from 1982 to 1986, where did you [11] live after Farm Road in Marlboro?

[12] A: Back to Hudson, Cox Street.

[13] Q: Have you lived anyplace else besides Cox Street [14] in Hudson, Massachusetts between 1986 and the present?

[15] A: No.

[16] Q: Do you own the house on Cox Street?

[17] A: Yes.

[18] Q: I m sorry, do you live in a house on Cox Street?

[19] A: Yes.

[20] Q: How long have you owned this house?

[21] A: How long have I owned the house?

[22] Q: Yes.

[23] A: Since I ve lived there.

[24] Q: I m sorry, I thought you said you lived there

Page 61

[1] since 1960?

[2] A: Since I moved back there in 1987 — 86.

[3] Q: Do you have any particular hobbies that you [4] engage in?

[5] A: I go to my daughter s field hockey games, I like [6] to go to the races.

[7] Q: What races do you —

[8] A: Stock cars.

[9] Q: I m sorry, stock cars?

[10] A: Race cars, yes.

[11] Q: So do you watch stock car races?

[12] A: Yes.

[13] Q: Do you participate in stock car races?

[14] A: I own a stock car.

[15] Q: How long have you owned a stock car?

[16] A: The family s had stock cars since the 50's.

[17] Q: I m sorry, what do you mean by

your family has [18] had stock cars? Could you explain to me what you mean [19] by that?

[20] A: Yeah, my family owned a junk yard and they had [21] stock cars, and we were involved with stock cars as [22] kids. And me and my brothers had cars all our lives.

[23] Q: So you said you own — do you own one stock car?

[24] A: Yes.

Page 62

[1] Q: Have you ever owned another car besides the one [2] you currently own?

[3] A: No.

[4] Q: I m sorry, was that no ?

[5] A: No.

[6] Q: How long have you owned the stock car that you [7] currently own?

[8] A: Since 1996.

[9] Q: Not to be ignorant here, what kind of stock car [10] is it? Could you explain to me what a stock car is?

[11] A: It s a race car.

[12] Q: Is it a particular kind of race car? Could you [13] explain to me a little more.

[14] A: It goes around in circles.

[15] Q: What is it that makes a stock car different than [16] a typical sedan?

[17] A: It s one that they use to race in circles. It s [18] not a dragster.

[19] Q: Okay. Does that mean there is a different size [20] engine in a stock car than in a typical sedan?

[21] A: Oh, I don t know.

[22] Q: I know you said you owned a stock car and you [23] watched stock car racing. Do you also drive a stock [24] car?

Page 63

[1] A: No.

[2] Q: Did you ever participate in stock car racing as [3] a driver?

[4] A: No.

[5] Q: Is there someone that does race your stock car?

[6] A: Yes.

[7] Q: And who is that?

[8] A: His name is Jeff.

[9] Q: Does Jeff have a last name?

[10] A: Yeah, Crowley.

[11] Q: How often does Jeff Crowley race in your stock [12] car?

[13] A: He hasn t raced at all this year. It s been —[14] not since last year.

[15] Q: But you still own this car?

[16] A: Yes.

[17] Q: Can you win money owning a stock car?

[18] MR. LATHROP: I m sorry, what did

you say?

[19] MS. PENNINI: Can you, as a stock car [20] owner, win money based on how Mr. Crowley does in a [21] stock car race?

[22] THE WITNESS: I think — yes, there s a [23] payoff for the finish.

[24] BY MS. PENNINI:

Page 64

[1] Q: Has Mr. Crowley ever placed well in a stock car [2] race?

[3] A: Yes.

[4] Q: And what is the most that Mr. Crowley has ever [5] won for his stock car racing?

[6] A: Oh, I don t know.

[7] Q: Or as the stock car owner are you entitled to a [8] portion of whatever is earned by Mr. Crowley s [9] finishes?

[10] A: Mr. Crowley got the checks.

[11] Q: As the owner of the car are you entitled a [12] portion of that money?

[13] A: Mr. Crowley got the checks. I didn t get [14] anything.

[15] Q: Are you entitled, as a stock car owner, to part [16] of that money?

[17] A: I suppose I could be.

[18] MS. PENNINI: I have no further questions [19] at this time.

[20] MR. GLUEK: Can we take a break for five [21] minutes?

[22] MS. PENNINI: Yes, please.

[23] (A brief recess was taken)

[24] MR. GLUEK: Back on the record.

Page 65

[1] EXAMINATION

[2] BY MR. GLUEK:

[3] Q: The ground rules are the same. I don t [4] anticipate this taking too long, but if you don t [5] understand one of my questions, please tell me. If [6] you cannot hear one of my questions, please tell me. [7] If you answer one of my questions, I am going to [8] assume that you both heard and understood the [9] question, is that fair?

[10] A: Yes.

[11] Q: This is not supposed to be an endurance contest. [12] If you need to take a break, just tell me, we ll take [13] a break, okay?

[14] A: Okay.

[15] Q: If you need to talk to your lawyer, as long as [16] there is a question not pending, just say you need to [17] take a break, okay?

[18] A: Yeah.

[19] Q: Have you ever been convicted of any crimes?

[20] A: Have I ever been convicted of any crimes? I m [21] not sure I understand the

question.

[22] Q: Do you know what a crime is?

[23] A: Yes.

[24] Q: Do you know what a conviction is?

Page 66

[1] A: I think so.

[2] Q: Okay. Have you been convicted of any crimes?

[3] A: I don t think so.

[4] Q: Do you have anything that would refresh your [5] recollection?

[6] A: No.

[7] Q: Are you married?

[8] A: Yes.

[9] Q: To whom?

[10] A: Ann M. Goulet.

[11] Q: How long have you been married?

[12] A: 15 years.

[13] Q: Any prior marriages?

[14] A: No.

[15] Q: Does she work?

[16] A: Yes.

[17] Q: Where does she work?

[18] A: She works for herself.

[19] Q: What does she do?

[20] A: She drives a coffee truck.

[21] Q: Does she have a d/b/a, doing business as?

[22] A: Yes.

[23] Q: And what is that?

[24] A: Ann s Quality Catering.

Page 67

[1] Q: Does she employ anyone?

[2] A: No.

[3] Q: Do you help her out on the truck?

[4] A: No.

[5] Q: How long has she been operating Ann s Quality [6] Catering?

[7] A: Five years.

[8] Q: Before that was she employed?

[9] A: Yes.

[10] Q: By whom?

[11] A: She was in the restaurant business, she was a [12] waitress/bartender.

[13] Q: And for how long did she do that?

[14] A: Ten or twelve years.

[15] Q: One particular restaurant/bar or several during [16] that period?

[17] A: Several.

[18] Q: Can you name them, please?

[19] A: The 401 Club.

[20] Q: Where is that?

[21] A: Marlboro, Mass.

[22] Q: Okay.

[23] A: Scaletti s Restaurant.

[24] Q: Can you spell that?

Page 68

[1] A: I can t.

[2] Q: Can you say it slowly then?

[3] A: Scaletti s.

[4] Q: And where is that located?

[5] A: Hudson.

[6] Q: Any others?

[7] A: Nope.

[8] Q: No others or no others that you remember?

[9] A: No others.

[10] Q: Do you have children?

[11] A: Yes.

[12] Q: How many?

[13] A: Two.

[14] Q: Names?

[15] A: Craig, Jr.

[16] Q: How old?

[17] A: 23.

[18] Q: Is he dependant upon you?

[19] A: No.

[20] Q: And your other child?

[21] A: Nicole.

[22] Q: Nicole is how old?

[23] A: 17.

[24] Q: Is she dependant upon you?

Page 69

[1] A: Yes.

[2] Q: Other than this lawsuit, have you filed any [3] other lawsuits?

[4] A: No.

[5] Q: Have you been a defendant in any lawsuit?

[6] A: No.

[7] Q: I believe I understood your tes-timony that since [8] your accident at APA until March 1st, 2002 you had not [9] worked, is that correct?

[10] A: Yes.

[11] Q: Since March 1st, 2002 to the present, have you [12] been employed?

[13] A: No.

[14] Q: Since March 1st, 2002 until the present, have [15] you been offered employment by any employer?

[16] A: No.

[17] Q: Since March 1st, 2002 until the present, have [18] you had any interviews for employment?

[19] A: No.

[20] Q: Since March 1st, 2002 until the present, have [21] you filed any applica-tions for employment?

[22] A: No.

[23] Q: Since March 1st, 2002 until the present, have [24] you sent out any resumes?

Page 70

[1] A: No.

[2] Q: Since March 1st, 2002 until the present, have [3] you contacted any employment counselors?

[4] A: Nope.

[5] Q: Since March 1st, 2002 until the present, have [6] you gone to the library or purchased any books in [7] terms of how one goes about finding employm-ent?

[8] A: No.

[9] Q: Since March 1st, 2002 until the present, have [10] you gotten on the computer to look for employment?

[11] A: No.

[12] Q: Since March 1st, 2002 until the present, have [13] you made any efforts to find employment?

[14] A: No.

[15] Q: Why not?

[16] A: I ve got some outstanding issues with regard to [17] my industrial accident.

[18] Q: What are those outstanding issues you have [19] regarding your industrial accident?

[20] A: I ve got a knee that needs to be reconstructed.

[21] Q: Is that from the blown out tendon?

[22] A: Yes.

[23] Q: Do you have any plans to get that knee [24] reconstructed?

Page 71

[1] A: Yes.

[2] Q: When?

[3] A: As soon as they resolve all the issues with the [4] insurance company with the old employer.

[5] Q: Any other outstanding issues you have regarding [6] your industrial acci-dent?

[7] A: No.

[8] Q: Just your knee?

[9] A: Yes.

[10] Q: From March 1st, 2002 until the present, do you [11] have any restrictions regarding your ability to work?

[12] A: Could you repeat the question?

[13] MR. GLUEK: Can you repeat it, please?

[14] (Question read back)

[15] THE WITNESS: I m not under any doctor s [16] care at this time.

[17] BY MR. GLUEK:

[18] Q: The question still remains, since March 1st, [19] 2002 until the present, do

[20] you have any restrictions [20] that effects your ability to work?

[21] A: Yes.

[22] Q: What are those restrictions?

[23] A: I have a herniated disc in my lower back.

[24] Q: Still?

---

Page 72

[1] A: Still.

[2] Q: Any other restrictions?

[3] A: A herniated disc in my neck.

[4] Q: Still?

[5] A: Still.

[6] Q: Any other restrictions?

[7] A: And the ligament in my knee.

[8] Q: Now your herniated disc in your lower back, does [9] that effect your ability to sit?

[10] A: On occasion, yes.

[11] Q: Does that effect your ability to stand?

[12] A: Yes.

[13] Q: Does that effect your ability to lift?

[14] A: Yes.

[15] Q: Does it effect your ability to turn?

[16] A: Yes.

[17] Q: Does it effect your ability to bend?

[18] A: Yes.

[19] Q: All in negative ways?

[20] A: Yes.

[21] Q: With respect to your herniated disc in your [22] neck, does that effect your ability to bend?

[23] A: No.

[24] Q: What limitations does the herniated disc in your

---

Page 73

[1] neck have on you?

[2] A: It depends on the level of pain I m having on [3] any particular day.

[4] Q: So it s painful?

[5] A: Very painful.

[6] Q: Do you take medication for your herniated disc [7] in the neck?

[8] A: Yes, I do.

[9] Q: And what kind of medication?

[10] A: Naprosin, Soma.

[11] Q: And what else?

[12] A: Anti-inflammatory pain medication.

[13] Q: And with respect to your herniated disc to your [14] lower back, is that also painful?

[15] A: Yes.

[16] Q: Do you take medication for that?

[17] A: The same medications.

---

[18] Q: Only the two medications?

[19] A: Yes.

[20] Q: Do you have a commercial driver s license?

[21] A: Yes, I do.

[22] Q: Is it still current?

[23] A: Yes.

[24] Q: Are you required to take a physical periodically

---

Page 74

[1] to keep that current?

[2] A: No.

[3] Q: With respect to your knee, what limitations does [4] that cause on you?

[5] A: Well it s tough to get around some days.

[6] Q: With your limitations, could you currently do [7] dock work?

[8] A: I could try.

[9] Q: That is not the question. Do you know if you [10] could currently do dock work with your limitations?

[11] A: I do not know.

[12] Q: With your limitations, do you know if you could [13] currently do driving work?

[14] A: I do not know.

[15] Q: You testified that you appealed your award of [16] partial disability, is that correct?

[17] A: Yes.

[18] Q: Why did you appeal it?

[19] A: Why did I appeal it?

[20] Q: Is it because you thought you should have gotten [21] total disability?

[22] A: Yes.

[23] Q: Do you still believe you should have gotten [24] total disability?

---

Page 75

[1] A: Yes.

[2] Q: Do you believe that you are currently totally [3] disabled?

[4] A: Yes.

[5] Q: You testified that in 1995 you received Social [6] Security benefits, correct?

[7] A: Yes.

[8] Q: Are you currently receiving Social Security [9] benefits?

[10] A: Yes, I am.

[11] Q: Now when you received the Social [12] Security benefits in 1995, did it go retroactive?

[13] A: Yes.

[14] Q: To what period?

[15] A: March 11th, 1987.

[16] Q: What is your monthly benefit on your Social [17] Security currently?

---

[18] A: $2,160.00.

[19] Q: And has that remained the same or has that gone [20] up?

[21] A: It goes up every year.

[22] Q: Do you remember what the lowest amount was?

[23] A: Not offhand.

[24] Q: And I am assuming your children were also

---

Page 76

[1] receiving Social Security benefits when they were [2] minors?

[3] A: That s included.

[4] Q: The 2,160 includes their benefit?

[5] A: Yes.

[6] Q: Does your non-minor child still get Social [7] Security benefits?

[8] A: Yes.

[9] Q: Do you have to periodically re-apply for Social [10] Security benefits?

[11] A: No.

[12] Q: Do you have to update Social Security with [13] respect to your status?

[14] A: No.

[15] Q: Where did you apply for these Social Security [16] benefits?

[17] A: Framingham.

[18] Q: Were you or are you currently assigned a case [19] worker for Social Security?

[20] A: No.

[21] Q: And you were never assigned a case worker?

[22] A: No.

[23] Q: Do you know who your contact person was at [24] Social Security when you applied?

---

Page 77

[1] A: No.

[2] Q: Do you have any documents regarding Social [3] Security and your application for Social Security?

[4] A: Do I have any documents?

[5] Q: Correct.

[6] A: What kind of documents?

[7] Q: Any piece of paper.

[8] A: Saying what?

[9] Q: That relates to your Social Security benefits [10] and/or your application for Social Security.

[11] A: I have documents that pertain to my Social [12] Security, yes.

[13] Q: Do you have a lawyer that represented you when [14] you applied for Social Security?

[15] A: Yes.

[16] Q: And what is his name?

[17] A: The law firm was Ellis & Ellis out of

---

Worcester.

[18] **Q:** And which lawyer at Ellis & Ellis did you deal [19] with?

[20] **A:** I believe it was Bob Marque.

[21] **Q:** When was the last time you talked to Mr. Marque?

[22] **A:** I don t recall.

[23] **Q:** Since 1995?

[24] **A:** Yeah, probably.

Page 78

[1] **Q:** Since last year?

[2] **A:** Nope, not last year.

[3] **Q:** The last five years?

[4] **A:** Nope.

[5] **Q:** The last ten years?

[6] **A:** 1995.

[7] **Q:** Okay. Have you talked to anybody at New Penn [8] since March 1st, 2002?

[9] **A:** No.

[10] **Q:** Have you called up New Penn and asked if you are [11] going to be called?

[12] **A:** No.

[13] **Q:** Have you ever filled out an application at New [14] Penn?

[15] **A:** Nope.

[16] **Q:** Do you know Mr. Carnes?

[17] **A:** Yes.

[18] **Q:** Do you believe that he had any ill will towards [19] you?

[20] **A:** I don t know that.

[21] **Q:** You don t have an opinion one way or the other?

[22] **A:** Nope.

[23] **Q:** Do you have any facts that would suggest that he [24] had any ill will towards you?

Page 79

[1] **A:** No.

[2] **Q:** Do you have any facts that Mr. Carnes was [3] prejudiced against you in someway?

[4] **A:** No.

[5] **Q:** Do you have any facts that Mr. Carnes disliked [6] you in any respect?

[7] **A:** Nope.

[8] **Q:** You know Mr. Harrington, correct?

[9] **A:** Yes.

[10] **Q:** Do you have any facts to believe that [11] Mr. Harrington has any ill will towards you?

[12] **A:** Nope.

[13] **Q:** Do you have any facts to believe that [14] Mr. Harrington had any prejudice towards you in any [15] respect?

[16] **A:** Nope.

[17] **Q:** Do you have any facts that Mr. Harrington [18] somehow wanted to see you damaged?

[19] **A:** Nope.

[20] **Q:** Do you have any facts that anyone connected with [21] the union had any ill will towards you?

[22] **A:** No.

[23] **Q:** Do you have any facts that anybody connected [24] with the union had any prejudices towards you?

Page 80

[1] **A:** No.

[2] **Q:** Do you have any facts that anyone connected with [3] the union had any hatred towards you?

[4] **A:** Nope.

[5] **Q:** Between March 1, 2002 and March 30, 2003, do you [6] know if you could have worked 30 days at New Penn?

[7] **A:** Nope.

[8] **Q:** Let me rephrase the question. Between March 1, [9] 2002 and March 30, 2003, do you know if you could have [10] worked 30 days in a two month period at New Penn?

[11] **A:** No.

[12] **Q:** I think I understood your testimony, sir, that [13] after you filed a grievance on April 7th, 2003 you had [14] no discussions with Mr. Carnes?

[15] **MR. LATHROP:** I m sorry, could I have that [16] date again?

[17] **MR. GLUEK:** After April 7th, 2003, which is [18] the date your grievance is dated.

[19] **THE WITNESS:** Um-hum.

[20] **BY MR. GLUEK:**

[21] **Q:** You had no conversations with Mr. Carnes, is [22] that correct?

[23] **A:** I don t believe I did.

[24] **Q:** Do you have anything that would refresh your

Page 81

[1] recollection?

[2] **A:** Nope.

[3] **Q:** Do you have any documents memorializing any [4] conversations that you had with Mr. Carnes?

[5] **A:** Nope.

[6] **Q:** Did Mr. Carnes ever tell you to wait until after [7] the agreement with New Penn and the union expired [8] before you filed a grievance?

[9] **A:** No.

[10] **Q:** Did anybody have any discussion with you from [11] the union with respect to the timing of when the [12] grievance should be filed by you?

[13] **A:** No.

[14] **Q:** It is your testimony, isn t it sir, that for the [15] period between March 1,

2002 and March 30, 2003 you [16] had several discussions with Mr. Carnes?

[17] **A:** Yes.

[18] **Q:** And those were follow up discussions about you [19] not being called by New Penn, correct?

[20] **A:** Yes.

[21] **Q:** So during that time period you were aware that [22] there was at least an issue, correct?

[23] **A:** No.

[24] **Q:** Then why did you make these calls?

Page 82

[1] **A:** To find out what the status of things were.

[2] **Q:** And what did Mr. Carnes tell you the status was?

[3] **A:** At first he said he wasn t sure and he would [4] look into it.

[5] **Q:** That was in the springtime?

[6] **A:** Yes.

[7] **Q:** Did he say anything else in the springtime?

[8] **A:** Nope.

[9] **Q:** And I believe your testimony was two [10] conversations you had in the spring, correct?

[11] **A:** Was it two in the spring? It may have been. [12] Initial phone call — there was an initial phone call [13] with Mark Harrington, who told me that he no longer [14] represented the men at APA, I need to speak with Bill [15] Carnes.

[16] **Q:** Right. And then you had, in the spring of 2002, [17] how many conversations with Mr. Carnes did you have?

[18] **A:** I had a follow up phone call from the Mark [19] Harrington call with Mr. Carnes, and then one more [20] after that.

[21] **Q:** In the spring?

[22] **A:** Early summer, spring. Late spring, early [23] summer.

[24] **Q:** And I apologize. We have already been over

Page 83

[1] this, but now I am confused. Mr. Harrington called [2] you up in the spring of 2002 to say he was no long —

[3] **A:** No, I called Mr. Harrington.

[4] **Q:** And he said he is no long responsible for APA, [5] correct?

[6] **A:** Right.

[7] **Q:** Then you called Mr. Carnes, correct?

[8] **A:** Yes.

[9] **Q:** And Mr. Carnes said that he didn t know and he [10] would follow up?

[11] **A:** Right.

Craig Goulet v.
New Penn Motor Express, et al.,
Case 1:04-cv-12577-WGY     Document 40-3     Filed 01/24/2006     Page 6 of 9
Craig Goulet
October 4, 2005

[12] Q: Did he say anything else?

[13] A: No.

[14] Q: And that took place in the spring of 2002, [15] correct?

[16] A: Yes.

[17] Q: And it is your testimony that he said — that [18] you can recall that he said nothing other than he [19] didn t know?

[20] A: General conversation about what was going on, [21] the whole issue.

[22] Q: What else do you remember that he said?

[23] A: He said that he was going to look into it.

[24] Q: Do you remember anything else?

Page 84

[1] A: No.

[2] Q: When was the next time you talked to Mr. Carnes?

[3] A: I can t be sure.

[4] Q: But there was a subsequent time?

[5] A: Yes.

[6] Q: And was this by telephone?

[7] A: Yes.

[8] Q: Did you call him?

[9] A: Yes.

[10] Q: Did you take any notes of that conversation?

[11] A: I didn t take any written notes.

[12] Q: What was the substance of that conversation?

[13] A: The fact that he had spoke with New Penn with [14] regards to my situation. He had conversations with [15] the New Penn people. I m not sure if it was with the [16] terminal manager or Dan Schmidt and possibly Charlie [17] Zaccaria, but that was six months in advance from [18] getting the grievance.

[19] Q: So he said he talked to New Penn?

[20] A: Yeah.

[21] Q: Did he say to whom he talked to?

[22] A: No.

[23] Q: Did he say what he said to New Penn?

[24] A: He — yes.

Page 85

[1] Q: What did he say he said?

[2] A: That he had an APA employee that was looking to [3] be put to work.

[4] Q: Did he say anything else to you?

[5] A: He talked about, I guess they told him that my [6] name wasn t on the list, on the seniority list and he [7] said it was on the seniority list. He said, I ll [8] show you the decision from the New England Joint [9] Committee that puts him on the list.

[10] Q: Did he say anything else?

[11] A: Nope, just that he would get back to me.

[12] Q: That is all that you remember of the [13] conversation?

[14] A: Yes.

[15] Q: Nothing else?

[16] A: No.

[17] Q: When was the next conversation you had with [18] Mr. Carnes?

[19] A: March.

[20] Q: Of 2003?

[21] A: Yes.

[22] Q: Who initiated that conversation?

[23] A: I believe I did.

[24] Q: And what do you recall of that conversation?

Page 86

[1] A: I called and asked him what my status was as far [2] as being called. The agreement, in effect, ended and [3] I hadn t received a phone call.

[4] Q: What else of that conversation do you recall?

[5] A: He said to me, pardon my french, They fucked [6] yah. Send the grievance in.

[7] Q: Did you say anything else?

[8] A: Nope, I wrote the grievance.

[9] Q: Did he say anything else?

[10] A: Nope.

[11] Q: That was it of the conversation?

[12] A: Um-hum.

[13] Q: Do you have any notes of that conversation?

[14] A: Nope.

[15] Q: Could you look at, please, what has been marked [16] as Goulet Exhibit 2? Is that your grievance?

[17] A: Yes.

[18] Q: Is that your handwriting?

[19] A: Yes, it is.

[20] Q: Did anybody assist you in preparing this [21] grievance?

[22] A: Nobody.

[23] Q: Between the conversation that you had with [24] Mr. Carnes where he said, They fucked you. Send in

Page 87

[1] the grievance. and the time that you sent in the [2] grievance, did you have any other conversations with [3] Mr. Carnes?

[4] A: Don t believe I did.

[5] Q: You do not believe you did?

[6] A: I don t think so.

[7] Q: Okay. After you sent in the grievance, your [8] next contact was with Mr. Harrington, is that correct?

[9] A: Yes.

[10] Q: Did you initiate that?

[11] A: Yes.

[12] Q: Do you recall when that occurred?

[13] A: Sometime after Bill Carnes left office.

[14] Q: But it was in May?

[15] A: I believe so.

[16] Q: May, 2003?

[17] A: Yes.

[18] Q: And do you have any notes of that conversation?

[19] A: Nope.

[20] Q: What was said during that conversation?

[21] A: Basically, I was following up on the status of [22] the grievance. Like I said, I filed a grievance with [23] the union —

[24] Q: And I think your prior testimony was

Page 88

[1] Mr. Harrington said he didn t know anything about it, [2] correct?

[3] A: He said he didn t have any copies of the [4] grievance.

[5] Q: Do you know if he knew about the grievance [6] before your phone call?

[7] A: Yes, I m sure he did.

[8] Q: Do you know that for a fact?

[9] A: No.

[10] Q: As best you can recall, what were [11] Mr. Harrington s exact words to you during that [12] conversation?

[13] A: That he didn t have a copy of the grievance. [14] That Bill Carnes didn t file it with the committee, [15] that s why it didn t get filed. Pretty basic.

[16] Q: Do you recall anything else he said?

[17] A: Nope.

[18] Q: When was your next conversation with [19] Mr. Harrington?

[20] A: Maybe sometime in June.

[21] Q: And did you initiate that conversation?

[22] A: I m sure I did, yes.

[23] Q: Do you have any notes of that conversation?

[24] A: No.

Page 89

[1] Q: What was the substance of that conversation?

[2] A: Again, to follow up on what happened to my [3] grievance.

[4] Q: And what did Mr. Harrington say?

[5] A: I don t recall.

[6] Q: You don t recall anything he said?

[7] A: No.

[8] **Q:** Do you recall anything that you said?

[9] **A:** Just trying to find out what happened to the [10] grievance.

[11] **Q:** And that s all that you recall from that [12] conversation?

[13] **A:** Yeah.

[14] **Q:** When was your next conversation with [15] Mr. Harrington?

[16] **A:** I think I followed that up with the letter I [17] wrote.

[18] **Q:** So that is the July 25th letter?

[19] **A:** Yeah.

[20] **Q:** Could you look at Exhibit 3, please?

[21] **A:** Um-hum.

[22] **Q:** Is it still your sworn testimony that you do not [23] recall why you wrote Let s not lose sight of the real [24] issue here. The grievance is about seniority rights

---

Page 90

[1] under the agreement not whether one was capable of [2] working or not.

[3] **MR. LATHROP:** Objection.

[4] **THE WITNESS:** Is it my sworn testimony what [5] now?

[6] **BY MR. GLUEK:**

[7] **Q:** Is it still your sworn testimony that you have [8] no recollection as to why you wrote that?

[9] **MR. LATHROP:** Objection.

[10] **THE WITNESS:** Again, you know, I m not sure [11] what my thought process was at the time. Like I said, [12] I was trying to follow up on the grievance that I had [13] submitted and maybe there was some conversation about [14] I was on comp or something, and I think I told them I [15] wasn t on comp. I wasn t collecting a Workman s [16] Compensation check.

[17] **BY MR. GLUEK:**

[18] **Q:** So isn t it a fact that Mr. Harrington had [19] conversations with you prior to you writing Exhibit 3 [20] where he indicated to you that you may not be able for [21] recall because you were not able to work?

[22] **A:** No.

[23] **Q:** Do you know whether or not the union ever [24] supplied New Penn with your name on the seniority

---

Page 91

[1] list?

[2] **A:** Yes, they did.

[3] **Q:** How do you know that?

[4] **A:** I have a copy of that, and I have a copy of the [5] letter from the freight director that was sent out to [6] the locals with my name on it.

[7] **Q:** Do you know if that was given to New Penn?

---

[8] **A:** Yes, it was.

[9] **Q:** And how do you know that?

[10] **A:** It was forwarded to New Penn from APA. From [11] their corporate offices to New Penn s corporate [12] offices.

[13] **Q:** Okay. So APA forwarded it to New Penn?

[14] **A:** Yes.

[15] **Q:** Listen to my question. My question, sir, was [16] whether the union — do you know if the union ever [17] forwarded your name on a seniority list to New Penn?

[18] **A:** I don t know that.

[19] **Q:** Okay. After your conversation with [20] Mr. Harrington in June of 2003, when was the next time [21] you talked to him?

[22] **A:** As I said, I wrote the letter and I didn t hear [23] anything. So I probably called him sometime in early [24] November, I m going to say, before I wrote the second

---

Page 92

[1] letter.

[2] **Q:** And do you have any notes of that conversation?

[3] **A:** No.

[4] **Q:** What was discussed during that conversation?

[5] **A:** Same thing, what happened to my grievance.

[6] **Q:** And what was his response?

[7] **A:** That they were going to file it. They were [8] going to file it with the committee and get it heard.

[9] **Q:** Anything else that you recall?

[10] **A:** Nope.

[11] **Q:** Nothing else?

[12] **A:** No.

[13] **Q:** Did you have an understanding as to why the [14] grievance had not been previously filed?

[15] **A:** No.

[16] **Q:** Were you ever told why the grievance was not [17] previously filed?

[18] **A:** I was told that Bill Carnes didn t file the [19] grievance, that s why it wasn t filed.

[20] **Q:** Were you ever told why the grievance was not [21] filed after Mr. Carnes left office?

[22] **A:** No.

[23] **Q:** Doug, I can t remember his last name, Francie?

[24] **A:** Yes.

---

Page 93

[1] **Q:** How do you pronounce it?

[2] **A:** Francie.

---

[3] **Q:** Francie?

[4] **A:** Francie.

[5] **Q:** When was the last time you talked to him?

[6] **A:** February of 2002.

[7] **Q:** So that was during the phone call that he asked [8] you what?

[9] **A:** What my preference was.

[10] **Q:** And my preference was Billerica?

[11] **A:** Yes.

[12] **Q:** Do you know if Doug is currently employed?

[13] **A:** I don t know.

[14] **Q:** After your conversation with Mr. Harrington [15] sometime in the November time period, do you have any [16] subsequent conversation with him?

[17] **MR. LATHROP:** I m sorry, with [18] Mr. Harrington?

[19] **MR. GLUEK:** Yes.

[20] **THE WITNESS:** Nope. I sent that letter to [21] him and then I think we spoke again in the fall and [22] spring. Had met several times with regards to the [23] case being presented to the committee.

[24] **BY MR. GLUEK:**

---

Page 94

[1] **Q:** So you personally met Mr. Harrington?

[2] **A:** Yes.

[3] **Q:** And did you take any notes of those [4] conversations?

[5] **A:** No.

[6] **Q:** Or meetings?

[7] **A:** Nope.

[8] **Q:** Did Mr. Harrington ever imply to you as to the [9] merits in your case?

[10] **A:** No.

[11] **Q:** Did Mr. Harrington ever indicate that he thought [12] your case was a strong case or a weak case?

[13] **A:** I think that he said we had a good case.

[14] **Q:** The question is, did he ever tell you you had a [15] good case or a bad case?

[16] **A:** Yes.

[17] **Q:** In what context did he say that?

[18] **A:** How do you mean? What do you mean context , in [19] what context?

[20] **Q:** Was this in a phone conversation or —

[21] **A:** No, this was in person.

[22] **Q:** When you were preparing for the case?

[23] **A:** Yes.

[24] **Q:** Did he indicate to you why he thought it was a

---

Craig Goulet, v.
New Penn Motor Express, et al,
Case 1:04-cv-12577-WGY    Document 40-3    Filed 01/24/2006    Page 8 of 8

Craig Goulet
October 4, 2005

Page 95

[1] strong case?

[2] **A:** Just based on the merits of the case.

[3] **Q:** Do you recall anything else?

[4] **A:** No.

[5] **Q:** Do you think the union just made a simple [6] mistake by not filing your grievance timely?

[7] **MR. LATHROP:** Objection.

[8] **THE WITNESS:** I don t know.

[9] **BY MR. GLUEK:**

[10] **Q:** Do you have any facts that would suggest that [11] the union did anything more than just a simple [12] mistake not filing your grievance timely?

[13] **MR. LATHROP:** Objection.

[14] **THE WITNESS:** I don t know what they did.

[15] **BY MR. GLUEK:**

[16] **Q:** Do you have an understanding that with respect [17] to your decision the decision of the committee is [18] final and binding?

[19] **A:** That s what the decision says.

[20] **Q:** Is that your understanding going into it?

[21] **A:** Yes.

[22] **Q:** Now when you were being questioned by the [23] union s lawyer you said that you had an understanding [24] that Mr. Harrington was negotiating with the company?

Page 96

[1] **A:** Yes.

[2] **Q:** Why did you have that understanding?

[3] **A:** Through the phone conversations that we had that [4] there was dialogue between Mr. Carnes and [5] Mr. Harrington with New Penn.

[6] **Q:** Did he indicate to you what the dialogue was?

[7] **A:** No.

[8] **Q:** Did he indicate to with whom he would speak at [9] New Penn?

[10] **A:** Nope.

[11] **Q:** Other than the two medications that you [12] previously testified about, have you taken any other [13] medication since March 1, 2002?

[14] **A:** No.

[15] **Q:** And they are just anti-inflammatories is your [16] testimony?

[17] **A:** Yes, muscle relaxers.

[18] **MR. GLUEK:** I have nothing further.

[19] **RE-EXAMINATION**

[20] **BY MS. PENNINI:**

[21] **Q:** Following your November, 2003 conversation with [22] Mr. Harrington in

which you discussed the filing of [23] the grievance, did he ever speak to you regarding any [24] issues as to the proper joint area committee where

Page 97

[1] this grievance could be brought or could be heard?

[2] **A:** No.

[3] **Q:** He never mentioned anything to you about the [4] difference between Southern New England Joint Area [5] Committee and the Eastern Region Committee?

[6] **A:** No. I think the case had been scheduled to be [7] heard in April, and I got a phone call saying that it [8] was rescheduled to be heard at the Eastern Region.

[9] **Q:** Prior to the November, 2003 conversation and [10] letter to Mr. Harrington, did he ever have any [11] discussions with you concerning whether a grievance [12] could be brought concerning the failure to be called [13] off of a call list pursuant to the TNFINC/New Penn [14] agreement?

[15] **A:** No.

[16] **Q:** And I believe you previously indicated that you [17] are awaiting surgery on your knee?

[18] **A:** Yes.

[19] **Q:** Is it the left or the right knee?

[20] **A:** Right knee.

[21] **Q:** And you said that you continued with the [22] insurance benefits for a year following your injury, [23] is that correct?

[24] **A:** My pension was paid for a year, I m not sure

Page 98

[1] about my insurance. It was 1987, quite some time so I [2] don t recall.

[3] **Q:** You do not recall whether you had any health [4] insurance benefits?

[5] **A:** I did for a period of six months, I know.

[6] **Q:** So you are sure you had it for six months but —

[7] **A:** Yes.

[8] **Q:** — you may have had it for a longer period?

[9] **A:** Yes.

[10] **Q:** During the period under which you were positive [11] that you had insurance coverage did you have any [12] surgeries to your knee?

[13] **A:** No.

[14] **Q:** Did you have any surgeries to your back?

[15] **A:** No.

[16] **Q:** Did you have any surgeries on the herniated disc [17] in your neck?

[18] **A:** No.

[19] **Q:** At that time had any of the doctors recommended [20] surgeries on the herniated disc in your neck?

[21] **A:** I don t believe so, nope.

[22] **Q:** What about the herniated disc in your back?

[23] **A:** No.

[24] **Q:** And any recommendation of surgery on the torn,

Page 99

[1] I m sorry, is it a ligament or a torn tendon in your [2] knee?

[3] **A:** Ligament.

[4] **Q:** Did the doctors recommend any surgery concerning [5] the torn ligament in your knee?

[6] **A:** Not at that time.

[7] **Q:** When did you first become aware that you would [8] need surgery on the ligament in your knee?

[9] **A:** Oh, I can t be sure, positively sure.

[10] **Q:** Can you give me an approximate time? Was it [11] during the 1980's?

[12] **A:** I honestly don t remember. I don t know.

[13] **Q:** Was it during the first half of the 1990's?

[14] **A:** Yes.

[15] **Q:** Do you recall if it was in 1990?

[16] **A:** No.

[17] **Q:** Do you recall whether it was in 1991?

[18] **A:** Nope.

[19] **Q:** Is there any document that would help refresh [20] your memory concerning this fact?

[21] **A:** I m not sure.

[22] **Q:** Do you recall the name of the doctor who told [23] you you would need surgery on your knee?

[24] **A:** Yes.

Page 100

[1] **Q:** And what doctor was that?

[2] **A:** Dr. Solomon.

[3] **Q:** Do you have a first name for Dr. Solomon?

[4] **A:** Alan.

[5] **Q:** Where does Dr. Solomon practice?

[6] **A:** Out of Leonard Morse in Natick.

[7] **Q:** Is Leonard Morse a hospital?

[8] **A:** Yes.

[9] **Q:** Does he currently practice out of Leonard Morse [10] in Natick?

[11] **A:** I m not sure of that.

[12] **Q:** When was it that you would see Dr. Solomon?

[13] **A:** Dr. Solomon operated on my

**Craig Goulet**
**October 4, 2005** Case 1:04-cv-12577-WGY    Document 40-3    Filed 01/24/2006    Page 9 of 9    Craig Goulet,   v.
New Penn Motor Express, et al.,

shoulder.

[14] **Q:** Well when would you see Dr. Solomon concerning [15] your knee?

[16] **A:** Periodically, when I was treating with him.

[17] **Q:** And during what time period was that?

[18] **A:** Right after my industrial accident.

[19] **Q:** And what time did you stop seeing Dr. Solomon?

[20] **A:** Oh, again, I can t be sure.

[21] **Q:** Is there anything that would help you as to when [22] you stopped seeing Dr. Solomon?

[23] **A:** Probably when the insurance company stopped [24] paying.

---

Page 101

[1] **Q:** And you also had a rotator cuff injury, is that [2] correct?

[3] **A:** Yes.

[4] **Q:** And you had surgery concerning this injury?

[5] **A:** Yes.

[6] **Q:** When did you have that surgery?

[7] **A:** 89, 1990 maybe.

[8] **Q:** I m sorry, in 1989, is that what you said?

[9] **A:** 89 or 90, somewhere thereabouts.

[10] **Q:** And was this surgery performed by Dr. Solomon?

[11] **A:** Yes.

[12] **Q:** And where was it performed?

[13] **A:** On my left shoulder.

[14] **Q:** I m sorry, the location of the hospital?

[15] **A:** Natick.

[16] **Q:** Is it at the Leonard Morse Hospital in Natick?

[17] **A:** Yes.

[18] **Q:** Did you also see Dr. Solomon concerning your [19] knee?

[20] **A:** Yes.

[21] **Q:** When did you stop seeing Dr. Solomon concerning [22] your knee?

[23] **A:** I don t recall.

[24] **Q:** Did you continue to see Dr. Solomon concerning

---

Page 102

[1] your knee after you stopped seeing him concerning your [2] rotator cuff injury?

[3] **A:** Like I said, the insurance company did not pay [4] the bills so therefore he wouldn t see me.

[5] **Q:** Do you know when the insurance company stopped [6] paying the bills to Dr. Solomon?

[7] **A:** They still haven t paid him.

[8] **Q:** But do you recall when they stopped paying the [9] bills?

[10] **A:** They never paid him.

[11] **Q:** When did you begin seeing Dr. Solomon?

[12] **A:** Sometime shortly after the accident.

[13] **Q:** So you began to see Dr. Solomon in about 1987, [14] is that correct?

[15] **A:** 1988.

[16] **Q:** Do you recall what month you had your rotator [17] cuff surgery?

[18] **A:** No.

[19] **Q:** Is there anything that would help you remember [20] when you had this surgery?

[21] **A:** Not offhand.

[22] **Q:** How soon after you had your surgery did you stop [23] seeing Dr. Solomon?

[24] **A:** Six months maybe.

---

Page 103

[1] **Q:** Do you recall if your surgery was in the summer?

[2] **A:** No.

[3] **Q:** Winter?

[4] **A:** I don t remember.

[5] **Q:** Do you currently have any limitations concerning [6] your rotator cuff injury, physical limitation?

[7] **A:** Yes, it still bothers me.

[8] **Q:** You said it still bother you, do you take any [9] medication concerning the pain of your rotator cuff?

[10] **A:** Yes.

[11] **Q:** And what medications are those?

[12] **A:** Motrin, Advil.

[13] **Q:** Have you seen any doctor for this injury since [14] you stopped seeing Dr. Solomon?

[15] **A:** No.

[16] **MS. PENNINI:** That s all I have.

[17] **MR. LATHROP:** Well I am going to take a [18] break to decide whether or not I am going to have any [19] questions.

[20] (A brief recess was taken)

[21] **EXAMINATION**

[22] **BY MR. LATHROP:**

[23] **Q:** Mr. Goulet, what date is today?

[24] **A:** October 4th, 2005.

---

Page 104

[1] **Q:** Is discovery over in this case?

[2] **A:** No.

[3] **Q:** Is discovery with regard to the union over in [4] this case?

[5] **A:** No.

[6] **Q:** As of the time that the APA decision was issued [7] were you receiving Worker

---

s Compensation benefits?

[8] **A:** No.

[9] **Q:** You were off Worker s Compensation by the time [10] of the APA decision?

[11] **A:** Yes.

[12] **Q:** As of the time of the APA decision were you [13] under the active care of any physicians for your [14] Worker s Compensation injuries?

[15] **A:** Nope.

[16] **Q:** At anytime after March 1st, 2002 did you receive [17] a call from New Penn to go to work?

[18] **A:** No.

[19] **Q:** If you had received a call from New Penn at [20] anytime after March 1st, 2002 to go to work, what [21] would you have done?

[22] **MR. GLUEK:** Objection.

[23] **THE WITNESS:** I would ve made every effort [24] to go to work and get clearance from the doctors, had

---

Page 105

[1] they called.

[2] **MR. LATHROP:** Thank you. I have nothing [3] else.

[4] (Whereupon, the deposition in the above- [5] entitled matter was concluded at 12:45 p.m.)

---

Page 106

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

I, Michael C. Janey, a Massachusetts Verbatim Court Reporter and Notary Public duly commissioned and qualified in

and for the Commonwealth of Massachusetts, do hereby certify

that there came before me on the 4th day of October, 2005, at 10:05 a.m., the person hereinbefore named, who was by me duly

sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined under his oath and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further testify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 15th day of October, 2005.

My Commission expires on October 28, 2005.

     Michael C. Janey, CR, Notary Public

---

Page 107

I have read the foregoing transcript
of the testimony and the same
contains a true and accurate
recording of my answers given to the
questions therein set forth.
Signed under the pains and penalties
of perjury.

Date

JANEY ASSOCIATES

107

I have read the foregoing transcript of the testimony and the same contains a true and accurate recording of my answers given to the questions therein set forth.

_____

Signed under the pains and penalties of perjury.

12/21/2005
_____
Date

ERRATA SHEET

DEPONENT'S NAME   CRAIG S. GOULET SR.

DATE OF DEPOSITION


PAGE 11 LINE 6 READS,   YES

SHOULD READ,   YES BUT THE DATE
OF THE LETTER WAS FEBRUARY 6th 1987


PAGE 12 LINE 16 READS., YES.

SHOULD READ,   YES BUT THE DATE
WAS FEBRUARY 6th 1987.

AGe 28 line 19 ReADS,   PREcIsely I DO NOT KNOW

hould READ;   YES HE DID.

AGe 29 line 14 READS,   NO I DON'T RECALL

hould READ,   YES HE DID SAY I WAS BACK ON THE

SENIORITY LIST.

Ge 66 line 12 READS,   15 YEARS.

hould READ,   17 YEARS.

In 70 line 16 READS,   I'VE got SOME outstanding issues

with REGARD to MY INDUSTRIAl ACCIDENT.

hould READ.   I'VE got SOME outstanding issues with

REGARDS TO MY INDUSTRIAl ACCIDENT. IF I WAS

INAblE TO RESOlVE THOSE issues, NEW PENN WAS

OblIGATED UNDER THE CONTRACT AND THE A.D.A. TO

PROVIDE lIGHT DTY WORK OR A REASONAblE ACCOMIDATION

TO QUALFIED INDIVIDUAlS.

PAGE 74 lINE 11 READS,      I DO NOT KNOW.

SHOULD READ,    I KNOW  UNDER SOCIAL SECURITY

ADMINISTRATION GUIDE lINES I COULD HAVE TRIED TO

RETURN TO WORK  HAD I BEEN GIVEN the OPPORTUNITY.

PAGE 74 lINE 14 READS.   I DONT KNOW.

SHOULD READ.    I KNOW IF NEW PENN CALLED

AND OFFERED ME A DRIVING JOB, SOCIAL SECURITY

WOULD HAVE ALLOWED ME TO TRY AND RETURN TO

WORK.

PAGE 76 lINE 14 READS,     NO

SHOULD READ,              yes

PAGE 80 lINE 7 READS,     NOPE

SHOULD READ.    I KNOW BETWEEN MARCH 1ST 2002 AND

MARCH 30, 2003, IF NEW PENN CALLED I WOULD

HAVE TRIED TO WORK 30 DAYS.

PAGE 80 lINE 11 READS,  NO

SHOULD READ.    WHAT I KNOW IS NEW PENN DID

NOT CALL BETWEEN MARCH 1ST 2002 AND MARCH

30, 2003, AND IF THEY HAD CALLED I WOULD

HAVE TRIED TO WORK 30 DAYS IN A TWO

MONTH PERIOD.

PAGE 85 LINE 16 READS, NO.

SHOULD READ, YES, I RECALL MR. CARNES TELLING ME DURING THIS CONVERSATION WHEN HE TOLD NEW PENN THAT I WAS INFACT ON THE A.P.A. SENIORITY LIST, NEW PENN TOLD MR CARNES YES HE'S ON THE SENIORITY LIST BUT HE IS COLLECTING WORKMANS COMPENSATION. AND MR CARNES TOLD NEW PENN THAT I WAS NOT COLLECTING WORKMANS COMPENSATION AT THAT TIME. THEN MR. CARNES ASKED ME, CRAIG WHAT WILL YOU DO IF NEW PENN CALLS YOU? AND I TOLD MR. CARNES AT THAT TIME TELL NEW PENN TO CALL ME THEN WE WILL ALL KNOW WHAT I WILL DO.

PAGE 88 LINE 17 READS, NOPE

SHOULD READ, YES, SEND ME A COPY OF THE GRIEVANCE.

PAGE 91 LINE 18 READS, I DON'T KNOW THAT.

SHOULD READ, I KNOW MR CARNES SHOWED NEW PENN THE SENIORITY LIST WITH MY NAME ON IT

PAGE 92 LINE 10 READS, NOPE

SHOULD READ, YES, I RECALL ACTUALLY MEETING WITH MR. HARRINGTON IN PERSON AT THE UNION HALL TO DISCUSS THE PREPARATION OF THE CASE WITH THE GRIEVANCE COMMITTEE, AND AT THAT TIME I REMEMBER MR. HARRINGTON SUGGESTING THAT MAYBE I SHOULD WAIT UNTIL AFTER I HAD MY KNEE DONE BEFORE PURSUING THE GRIEVANCE AGAINST NEW PENN. HE ACTUALLY OFFERED TO FIND ME ANOTHER JOB ALSO

PAGE 95 line 4 READS, NO

SHOULD READ, YES I RECALL MR. HARRINGTON telling me you know if you push This GRIEVANCE AGAINST New PENN you will Probably NEVER WORK in the FREIGHT INDUSTRIES AGAIN. AND I SAID TO MR HARRINGTON you KNOW if New PENN WOULD PUT ME ON THE SENIORITY LIST IN MY RIGHTFUL SPOT then WE WOULDN'T HAVE TO TAKE the CASE TO the COMMITTEE, AND MR HARRINGTON TOLD ME NEW PENN IS NOT GOING TO DO THAT.

PAGE 95 line 8 READS, I DON'T KNOW.

SHOULD READ. NO I DON'T Think THAT the UNION JUST MADE A SIMPLE MISTAKE.

PAGE 95 line 14 READS, I DON'T KNOW WHAT THEY DID.

SHOULD READ, YES, the FACT that I CALLED MR. CARNES AND MR. HARRINGTON WHEN THE AGREEMENT TOOK EFFECT MARCH 1ST 2002, the FACT that the UNION PUT NEW PENN ON NOTICE while THE AGREEMENT WAS IN EFFECT, WELL BEFORE the GRIEVANCE WAS FILED with LOCAL 25 THESE FACTS ALONE SUGGEST THAT this WAS NO SIMPLE MISTAKE, NEVER MIND the FACT that BOTH NEW PENN AND the UNION SAID TIMELYNESS WAS NEVER AN ISSUE IN THE PAST.

Page 1

Volume I
Pages 1 to 76
Exhibits 1 to 12
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CRAIG GOULET,                    :
        Plaintiff,              :
    vs.                         : Civil Action
                                : No. 04-12577 JLT
NEW PENN MOTOR EXPRESS, INC.;   :
and TEAMSTERS LOCAL 25,         :
INTERNATIONAL BROTHERHOOD OF    :
TEAMSTERS,                      :
        Defendants.             :

DEPOSITION OF MARK A. HARRINGTON, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Scott A. Lathrop & Associates,
    122 Old Ayer Road, Groton, Massachusetts, on
Wednesday, October 12, 2005, commencing at
    10:15 a.m.
    PRESENT:
        Scott A. Lathrop & Associates
        (by Scott A. Lathrop, Esq.)
    122 Old Ayer Road, Groton, MA 01450,
        for the Plaintiff.
        Frantz Ward LLP
        (by Carl H. Gluek, Esq.)
    2500 Key Center, 127 Public Square,
Cleveland, OH 44114-1230, for the Defendant
        New Penn Motor Express, Inc.
    (Continued on Next Page)

Page 2

PRESENT:  (Continued)
    Dwyer, Duddy and Facklam
        (by Kathleen A. Pennini, Esq.)
    Two Center Plaza, Suite 430, Boston, MA
02108-1804, for the Defendant Teamsters
    Local 25, International Brotherhood of
    Teamsters.
ALSO PRESENT:  Craig Goulet

Page 3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARK A. HARRINGTON | | | | |
| BY MR. LATHROP | 5 | 61 | | |
| | 73 | | | |
| | 74 | | | |
| BY MR. GLUEK | 52 | 69 | | |
| BY MS. PENNINI | 58 | 72 | | |
| | 73 | | | |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Memo to Local 25 and others dated 11 2/14/05 | 11 |
| 2 | Agreement between TNFINC and New Penn Motor Express, Inc., dated 2/13/02 | 13 |
| 3 | Summary of agreement between TNFINC and New Penn Motor Express, Inc. | 14 |
| 4 | Employee list for Canton terminal | 20 |
| 5 | Letter to Irene from George Cashman dated 2/22/02, with attached list | 22 |
| 6 | Letter to Dan Schmidt from George Cashman dated 2/28/02, with enclosure | 24 |
| 7 | Handwritten grievance dated 4/7/03 | 28 |
| 8 | Handwritten letter to Mark dated 7/25/03 | 31 |

Page 4

EXHIBITS, Continued

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 9 | Southern New England Joint Area Committee prehearing information | 33 |
| 10 | Letter to Mark Harrington from Craig Goulet dated 11/24/03 | 35 |
| 11 | Eastern Region Joint Area Committee grievance form dated 4/20/04 | 36 |
| 12 | Letter to Gentlemen from Mark Harrington dated 7/22/04, with attachments | 38 |

PROCEEDINGS

[1]
[2]    MR. LATHROP: Same stipulations as with
[3] Mr. Francey's deposition?
[4]    MS. PENNINI: Yes, read and sign, 45 days.
[5] Save objections, except as to form, and motions to
[6] strike.
[7]            MARK A. HARRINGTON
[8] a witness called for examination by counsel for the
[9] Plaintiff, having been satisfactorily identified by
[10] the production of his driver's license and being
[11] first duly sworn by the Notary Public, was examined
[12] and testified as follows:
[13]            DIRECT EXAMINATION
[14]            BY MR. LATHROP:
[15]    Q: Good morning, sir.
[16]    A: Morning.
[17]    Q: Could you please state your full name and
[18] address for the record.
[19]    A: Mark Arthur Harrington.
[20]    Q: Your address, sir?
[21]    A: It's 86 Briarwood Drive, Hanover,
[22] Massachusetts.
[23]    Q: What is your date of birth?
[24]    A: 4/28/54.

[1]    Q: Are you a member of Local 25 for the
[2] Teamsters?
[3]    A: Yes.
[4]    Q: When did you first become a member?
[5]    A: 1977.
[6]    Q: Under what circumstances did you become a
[7] member?
[8]    A: I was employed by St. Johnsburry Trucking
[9] Company in Cambridge, Massachusetts.
[10]    Q: How long were you employed by
[11] St. Johnsburry in Cambridge?
[12]    A: Until 1991.
[13]    Q: What happened at that time?
[14]    A: I was elected into office, Teamsters
[15] Local 25.
[16]    Q: What office were you elected into?
[17]    A: Trustee. I was appointed to be a field
[18] representative and organizer.
[19]    Q: How long did you remain a trustee?
[20]    A: I remained a trustee until 2002. I was
[21] also elected business agent in 1994. I served as a
[22] trustee and as a business agent from 1994 until
[23] 2002.
[24]    Q: As of 1994, when you became a business

[1] agent, did you cease being a field representative
[2] and organizer?
[3]    A: Yes, but the functions of the field
[4] representative and the business agent are pretty
[5] much the same. In 1991, I represented — basically
[6] I functioned as a business agent. It was just that
[7] it was not an elected position. The trustee was an
[8] elected position.
[9]    Q: I lost you. When you became a business
[10] agent, was that an elected position?
[11]    A: I was elected to two positions, trustee,
[12] then business agent.
[13]    Q: You remained a business agent through some
[14] point in 2002?
[15]    A: Uh-huh.
[16]    Q: That's yes?
[17]    A: Yes.
[18]    Q: Did you have any positions with Teamsters
[19] Local 25 thereafter?
[20]    A: I became the secretary treasurer.
[21]    Q: When did you become the secretary
[22] treasurer?
[23]    A: 2002.
[24]    Q: Is that your current position?

[1]    A: It is.
[2]    Q: What were your duties as a business agent
[3] for Local 25?
[4]    A: I negotiated contracts, handled grievances,
[5] arbitrations, et cetera.
[6]    Q: Were you assigned a certain geographical
[7] area or certain employers?
[8]    A: Certain employers, certain crafts.
[9]    Q: Throughout your tenure as a business agent,
[10] were you assigned to the same crafts, or did it
[11] change?
[12]    A: It changes from term to term, depending on
[13] people, you know, retiring within the organization,
[14] reassignments by the principal officer.
[15]    Q: What crafts did you represent originally?
[16]    A: I represented the laundry division, I
[17] represented healthcare, car rental, car haul,
[18] building materials, tank haul, freight, public
[19] sector, maintenance, oil, heating oil division,
[20] office clerical, and whatever else I was assigned
[21] to.
[22]       That's probably pretty much the gamut of
[23] what we had.
[24]    Q: Are you familiar with a company called "APA

Craig Goulet ...
New Penn Motor Express, Inc., et al.
Case 1:04-cv-12577-WGY   Document 40-5   Filed 01/24/2006   Page 3 of 9
Vol. 1, October 12, 2005
Mark R. Harrington

---

Page 9

[1] Transport"?

[2] **A:** Yes.

[3] **Q:** Did you have any responsibility with regard

[4] to APA Transport?

[5] **A:** I took over for them as business agent I

[6] think around 1994 because the fellow that handled

[7] that retired. He was an APA employee, and then when

[8] he came on to the job, he was assigned to APA. His

[9] name is Ed Sheehan. When he retired as a field

[10] representative, George Cashman assigned me over to

[11] APA.

[12] **Q:** How long did you continue to represent or

[13] deal with APA?

[14] **A:** Right up until the closure.

[15] **Q:** Are you familiar with a company called "New

[16] Penn Motor Express"?

[17] **A:** Yes.

[18] **Q:** Did you ever have any responsibilities with

[19] regard to New Penn Motor Express?

[20] **A:** Starting in 2002, May.

[21] **THE WITNESS:** I guess Billy left in 2002,

[22] right?

[23] **A:** I'm just trying to get my years right.

[24] **Q:** Are you referring to a time when

---

Page 10

[1] Mr. Cashman left?

[2] **A:** Yes.

[3] **Q:** You said George?

[4] **A:** Uh-huh.

[5] **Q:** Is that yes?

[6] **A:** Yes.

[7] **Q:** You are saying at the time Mr. Cashman left

[8] is when you assumed responsibilities for New Penn

[9] Motor Express?

[10] **A:** Well, when Mr. Carnes left.

[11] **Q:** Mr. Cashman and Mr. Carnes left at the same

[12] time, did they not?

[13] **A:** That's correct.

[14] **Q:** Had Mr. Carnes previously been responsible

[15] for New Penn Motor Express?

[16] **A:** Yes.

[17] **Q:** Are you familiar with the plaintiff in this

[18] case, Craig Goulet?

[19] **A:** Yes.

[20] **Q:** When did you first meet Mr. Goulet?

[21] **A:** Mr. Goulet came across to me when he

[22] reached out and told me he had settled his workers'

[23] comp case or he was no longer on workers' comp and

[24] he wanted to have his discharge case heard.

---

Page 11

[1] **Q:** This was with regard to a discharge from

[2] APA Transport?

[3] **A:** Yes.

[4] **Q:** Did you handle that case?

[5] **A:** Yes.

[6] **Q:** Do you recall the result of that case?

[7] **A:** He was reinstated pending certain

[8] stipulations.

[9] **Q:** At some point in time, APA Transport

[10] closed, did it not?

[11] **A:** Yes.

[12] **Q:** How did you come to learn that APA

[13] Transport was going to close?

[14] **A:** Well, Bill Carnes had been notified by

[15] representatives of Eastern Region vis-a-vis TNFINC,

[16] and then Mr. Carnes then contacted me. That's how I

[17] was notified.

[18] **Q:** Mr. Carnes was what?

[19] **A:** Billy was the chairman of the Southern New

[20] England Joint Area Committee. He was notified

[21] because he handled — I believe he was notified

[22] because he handled the locals under that umbrella.

[23] (Document marked as Harrington

[24] Exhibit 1 for identification)

---

Page 12

[1] **Q:** I'm showing you what was marked as Exhibit

[2] No. 1 in your deposition. This purports to be a

[3] memo to Local Union 25 and others dated February 14,

[4] 2002. Have you seen this document before this

[5] litigation?

[6] **A:** (Examines document) I may have. I don't

[7] recall specifically. It was part of the packet I

[8] guess that was given to us regarding the settlement

[9] with APA.

[10] **Q:** Do you have any specific recollection of

[11] seeing this around February 14, 2002?

[12] **A:** No.

[13] **Q:** This document references that each local

[14] union with APA Transport members is requested to

[15] conduct a secret ballot ratification vote. Do you

[16] see that reference in the middle of the first

[17] paragraph?

[18] **A:** (Examines document) Uh-huh.

[19] **Q:** Do you recall whether or not there was, in

[20] fact, a ratification vote by Local 25?

[21] **A:** I recall we had a meeting with the members.

[22] I don't recall specifically if we had a ratification

[23] vote.

[24] **Q:** This document references that there should

---

Page 13

[1] be a ratification vote on February 16, 2002. Is
[2] that when the meeting you recall occurred?
[3]    **A:** Yes.
[4]    **Q:** Where did that meeting take place?
[5]    **A:** At the Local 25.
[6]    **Q:** Do you recall what terminals of APA
[7] Transport were covered by Local 25?
[8]    **A:** Canton, Massachusetts; Dracut,
[9] Massachusetts.
[10]    **Q:** Before we talk about that particular
[11] meeting, let's look at a couple of more documents.
[12]    (Document marked as Harrington
[13] Exhibit 2 for identification)
[14]    **Q:** Mr. Harrington, I'm showing you what was
[15] marked as Exhibit 2 to your deposition, which
[16] purports to be a February 13, 2002 agreement between
[17] the Teamsters National Freight Industry Negotiating
[18] Committee and New Penn Motor Express, Inc.
[19]    Have you seen this document before?
[20]    **A:** (Examines document) Yes.
[21]    **Q:** Did you see it on or about February 13,
[22] 2002?
[23]    **A:** Yes.
[24]    **Q:** Did you see it prior to the union meeting

Page -

[1]    **Q:** As a result of being advised by Mr. Carnes
[2] that APA was going to be closed, what, if anything,
[3] did you do?
[4]    **A:** At that particular moment? I don't quite
[5] understand the question.
[6]    **Q:** You testified that Mr. Carnes notified you
[7] that APA was going to be closed, correct?
[8]    **A:** Yes.
[9]    **Q:** As a result of receiving that information,
[10] did you do anything?
[11]    **A:** Well, we got notified, you know, within —
[12] well, this is dated February 14th. We were notified
[13] the 15th, or thereabouts. We were told to have a
[14] meeting on the 16th. We had like one day's notice.
[15]    We notified the stewards. We really didn't
[16] have time to send out a letter. I don't recall if I
[17] went to the terminals or not. We got the word out
[18] we were having a meeting that Saturday. That was
[19] that.
[20]    We received the documents. We went through
[21] them the best we could. It was very, very short
[22] notice. Obviously we were under pressure to get
[23] this done, as you can see by the timeline we were
[24] on. We just did the best we could to get everybody

Page 14

[1] that you said took place on February 16, 2002?
[2]    **A:** Probably.
[3]    (Document marked as Harrington
[4] Exhibit 3 for identification)
[5]    **Q:** I'm showing you what was the marked as
[6] Exhibit 3, which purports to be a summary of the
[7] tentative agreement between TNFINC and NPME as a
[8] result of the closure of APA operations. Are you
[9] familiar with this document?
[10]    **A:** (Examines document) Yes.
[11]    **Q:** Did you see this also around the same time
[12] of February 13th through February 16 of 2002?
[13]    **A:** More than likely.
[14]    **Q:** Was this document handed out at the meeting
[15] on February 16, 2002?
[16]    **A:** Yes.
[17]    **Q:** Going back, looking at Exhibit 1, the
[18] February 14, 2002 memo, if you look at the second
[19] page, it refers to an "enclosure of a current
[20] seniority roster for your APA terminal." Do you
[21] remember seeing at or prior to the February 16, 2002
[22] meeting a seniority list covering Dracut and/or
[23] Canton?
[24]    **A:** No.

Page 16

[1] at the meeting.
[2]    **Q:** Did you attend this meeting?
[3]    **A:** Yes.
[4]    **Q:** Do you recall who among the Local 25
[5] officials were present besides yourself, if anyone?
[6]    **A:** Bill Carnes, George Cashman, probably as
[7] many people that were able to attend. Obviously it
[8] was a big group.
[9]    We also I believe had some people in from
[10] unemployment to help facilitate people receiving
[11] unemployment benefits.
[12]    **Q:** What do you recall being said and done at
[13] this meeting?
[14]    **A:** The packets were handed out.
[15]    **Q:** What were the packets that were handed out?
[16]    **A:** What you just provided me.
[17]    **Q:** I provided you with several documents.
[18]    **A:** They were all handed out.
[19]    **Q:** Exhibits 1, 2 and 3 were handed out?
[20]    **A:** Probably not Exhibit 1, but Exhibits 2 and
[21] 3 were because it was the agreement with APA
[22] regarding the closure. Then it was the agreement
[23] with New Penn regarding work opportunity.
[24]    **Q:** What else was said during this meeting, and

Page 17

[1] done?
[2]   A: Just went over this information, and,
[3] again, we had I believe the people from unemployment
[4] give a presentation.
[5]     We went over the documents regarding
[6] closure and any work opportunity that may come as a
[7] result of the New Penn settlement.
[8]   Q: Do you remember if any vote actually took
[9] place?
[10]   A: I don't recall.
[11]   Q: Under the agreement with New Penn, APA
[12] drivers could choose a terminal to work out of,
[13] correct?
[14]   A: Yep.
[15]   Q: That's a yes?
[16]   A: Yes.
[17]   Q: Was that discussed at this meeting?
[18]   A: Yes. That was part of the agreement.
[19]   Q: Do you recall if there was any discussion
[20] about individual APA employees and their preferences
[21] as to which New Penn terminal, if any, they wanted
[22] to work out of?
[23]   MR. GLUEK: Objection.
[24]   A: We just outlined the agreement and went by

Page 18

[1] what the agreement said.
[2]   Q: Did anyone solicit from the Local 25
[3] members their New Penn preferences at this meeting,
[4] if you recall?
[5]   A: Well, we did over the course of some time.
[6] It might have been some done at that meeting, but,
[7] you know, over the few days — as it being a
[8] Saturday, we didn't have the clerical staff in
[9] there, so we had a couple of days, because not
[10] everyone was present at the meeting.
[11]     It was short notice. I mean, I believe the
[12] stewards over the course of a few days after the
[13] meeting tried to compile a list.
[14]   Q: Were you involved at all in the effort of
[15] compiling a list as to APA drivers and employees and
[16] their preferences?
[17]   A: No.
[18]   Q: It's your understanding it was the
[19] stewards' responsibility to ascertain that
[20] information?
[21]   A: Yes.
[22]   Q: Who were the stewards for the different APA
[23] terminals?
[24]   A: I believe at the time Doug Francey in

Page 19

[1] Canton. I think it was Rich Johnson for Dracut.
[2]   Q: At some point in time, did Mr. Francey
[3] indicate what the preferences were for the APA
[4] employees at the Canton terminal?
[5]   A: I believe he did.
[6]   Q: Did he let you know what those preferences
[7] were?
[8]   A: No.
[9]   Q: What is your understanding as to what
[10] Mr. Francey did with regard to the information as to
[11] the APA Canton employees and their terminal
[12] preferences?
[13]   A: I believe he polled the people and
[14] forwarded that information to our office, to our
[15] clerical staff, compiling the list and trying to get
[16] it together and get it to the region.
[17]   Q: Did you ever see a list compiled by
[18] Mr. Francey?
[19]   A: I don't recall.
[20]   Q: At the union meeting, do you recall if
[21] Mr. Goulet was discussed?
[22]   A: I don't believe he was, no.
[23]   Q: Do you recall any discussion about
[24] Mr. Goulet's placement on the seniority list?

Page 20

[1]   A: At that meeting?
[2]   Q: Yes.
[3]   A: No. There was no discussion.
[4]   Q: Do you recall at any time around the APA
[5] closure there being any discussion concerning
[6] Mr. Goulet being on the APA seniority list?
[7]   A: I don't recall.
[8]     (Document marked as Harrington
[9] Exhibit 4 for identification)
[10]   Q: Mr. Harrington, I'm going to show you what
[11] was marked as Exhibit 4 in your deposition, and I
[12] would ask you whether or not you recognize that
[13] document?
[14]   A: (Examines document) Well, I do recognize
[15] the names on the document.
[16]   Q: What do you recognize those names as?
[17]   A: It's pretty blurry, but they look to be
[18] employees of APA. I can't tell if — it's going to
[19] take me a moment to look through it. It looks like
[20] a list for Canton.
[21]   Q: Have you ever seen this document before?
[22]   A: I might have.
[23]   Q: You are not certain?
[24]   A: Right. I mean, this process was being done

Page 21

[1] by the stewards. There were a lot of documents
[2] going through the office at the time. I may or may
[3] not have looked at it.
[4]     I acknowledge it is a list of employees at
[5] the Canton terminal, though.
[6]     **Q:** Do you have any recollection of Mr. Francey
[7] giving this document to you?
[8]     **A:** No.
[9]     **Q:** Around the time of the APA closure, do you
[10] recall seeing any documents that listed the APA
[11] employees' preference with regard to New Penn
[12] terminals?
[13]     **A:** No.
[14]     **Q:** What is your understanding as to what
[15] happened with the steward's list of APA employees'
[16] preferences?
[17]     **A:** They were provided to our office clerical.
[18] Then they, in turn, were forwarded to the Eastern
[19] Region because the Eastern Region had to coordinate
[20] it and turn it over to New Penn to start the calling
[21] process.
[22]     **Q:** What is the basis for your understanding
[23] that that's the way the lists were handled?
[24]     **A:** It's my personal knowledge.

Page 22

[1]     **Q:** How did you come to have that personal
[2] knowledge?
[3]     **A:** Discussions within the office. I mean, the
[4] office manager, you know, coordinating the sending
[5] of the list: "Mark, I'm sending the list to Dan
[6] Virtue." "Okay."
[7]     **Q:** Who was the office manager that so told you
[8] that?
[9]     **A:** Probably Sheila McLaughlin.
[10]     **Q:** Is Ms. McLaughlin still an employee of
[11] Local 25?
[12]     **A:** Yes.
[13]     **Q:** In what capacity is she employed?
[14]     **A:** Office manager.
[15]     **Q:** She was the office manager in February
[16] 2002?
[17]     **A:** I'm not sure if she was at that time, but
[18] for the sake of the term, probably the head
[19] secretary.
[20]     (Document marked as Harrington
[21] Exhibit 5 for identification)
[22]     **Q:** I'm now showing you Exhibit 5,
[23] Mr. Harrington, which purports to be a fax cover
[24] sheet with five pages of an attachment, the cover

Page 23

[1] sheet being dated February 22, 2002, to Irene from
[2] George W. Cashman, I believe.
[3]     Are you familiar with any of these
[4] documents?
[5]     **A:** (Examines document) No.
[6]     **Q:** Do you know who Irene is?
[7]     **A:** No.
[8]     **Q:** Looking at the second page of the Dracut
[9] seniority list, have you ever seen that document
[10] before?
[11]     **A:** (Witness reviews document) No.
[12]     **MR. GLUEK:** You are on a different page
[13] than he is.
[14]     **Q:** It's the second page.
[15]     **A:** (Witness reviews document) No.
[16]     **Q:** Have you ever seen that form before, one
[17] with numbers, name, seniority date, Preference 1 and
[18] Preference 2?
[19]     **A:** No.
[20]     **Q:** Do you recognize any of the handwriting?
[21]     **A:** Handwriting?
[22]     **Q:** Yes.
[23]     **A:** No.
[24]     **Q:** Looking at Page No. 3, which has

Page 24

[1] handwriting on the side, "APA Dracut,
[2] Massachusetts," have you ever seen that document
[3] before?
[4]     **A:** Not to the best of my recollection.
[5]     **Q:** Have you ever seen that form before?
[6]     **A:** No.
[7]     **Q:** Looking at the next to last page, I think
[8] it's cut off, but I believe it's "APA Canton,
[9] Massachusetts" on the side that's written.
[10]     **A:** (Examines document) Okay.
[11]     **Q:** Have you ever seen that document before?
[12]     **A:** No.
[13]     **Q:** Have you seen that form, that kind of form
[14] before?
[15]     **A:** No.
[16]     (Document marked as Harrington
[17] Exhibit 6 for identification)
[18]     **Q:** I'm now showing you, Mr. Harrington, what
[19] was marked as Exhibit 6, purporting to be a
[20] February 28, 2002 letter to Dan Schmidt from
[21] George W. Cashman, with a two-page enclosure.
[22]     Have you ever seen any of these documents
[23] before?
[24]     **A:** (Examines documents) No.

**Mark A. Harrington**
**Vol. 1, October 12, 2005**

New Penn Motor Express, Inc., et al.
Case 1:04-cv-12577-WGY   Document 40-5   Filed 01/24/2006   Page 7 of 61

Page 25

[1]   **Q:** Do you know who Dan Schmidt is?
[2]   **A:** Yes.
[3]   **Q:** Was he as of February 2002 the vice
[4] president of labor relations for New Penn Motor
[5] Express?
[6]   **A:** That's what it says.
[7]   **Q:** Have you ever dealt with Dan Schmidt?
[8]   **A:** Yes.
[9]   **Q:** When you dealt with him, was he indeed an
[10] employee of New Penn Motor Express?
[11]   **A:** Not all the time.
[12]   **Q:** Sorry?
[13]   **A:** Not all the time.
[14]   **Q:** During what period of time was he an
[15] employee of New Penn Motor Express?
[16]   **A:** I don't know when he was hired, but I've
[17] dealt with him since I've taken over the assignment,
[18] since May of 2002.
[19]   **Q:** Looking at the second and third pages of
[20] this exhibit, have you ever seen those documents
[21] before?
[22]   **A:** I may have. I don't recall specifically
[23] when I saw them, or if I saw them.
[24]   **Q:** Do you have any understanding as to who

Page 26

[1] prepared this document?
[2]   **A:** No.
[3]   **Q:** Around this period of time, did you have
[4] any communications with Craig Goulet?
[5]   **A:** No.
[6]   **Q:** Did you speak to him after or shortly after
[7] the employee meeting on February 16, 2002?
[8]   **A:** I don't recall.
[9]   **Q:** You handled his APA discharge grievance,
[10] correct?
[11]   **A:** Right.
[12]   **Q:** That case had been decided prior to the APA
[13] closure, correct?
[14]   **A:** Yes.
[15]   **Q:** Prior to the APA closure, had you seen
[16] Mr. Goulet's name on any seniority list?
[17]   **A:** No.
[18]   **Q:** Are you certain about that?
[19]   **A:** Yes.
[20]   **Q:** Did you speak to Mr. Goulet about his
[21] terminal preference?
[22]   **A:** No.
[23]   **Q:** What's the first communication that you
[24] recall having with Mr. Goulet following the APA

Page 27

[1] closure?
[2]   **A:** His inquiry of what the status of his
[3] grievance was that he had filed with Mr. Carnes. It
[4] would be in May of 2002, or sometime after May of
[5] 2002.
[6]   **Q:** What do you recall about that inquiry?
[7]   **A:** He wanted to know the status of his
[8] grievance.
[9]   **Q:** Was this a telephone conversation?
[10]   **A:** Actually, was that 2002? Yes, it was a
[11] telephone conversation.
[12]   I guess it was 2003. 2003 is when I heard
[13] from Mr. Goulet. That's when Billy and George left,
[14] 2003.
[15]   **Q:** Could you recount for us as best you can
[16] recall what was said during this telephone
[17] conversation.
[18]   **A:** He wanted to know what the status of his
[19] grievance was. I said, "I never saw your grievance.
[20] I will have to investigate it and find out what's
[21] going on with it."
[22]   **Q:** Do you recall anything else about this
[23] telephone conversation?
[24]   **A:** Maybe some chit-chat about Billy and

Page 28

[1] George, but other than that, no.
[2]   Craig would call and ask me how George was
[3] doing or how Billy was doing and other officers of
[4] the local that he knew. Other than that, I have no
[5] other recollection of the conversation.
[6]   **Q:** What, if anything, did you do next with
[7] regard to Mr. Goulet's inquiry about his grievance?
[8]   **A:** Actually, I think I asked him to forward me
[9] a copy of the grievance in the mail. I couldn't
[10] find it. He did that I believe.
[11]   (Document marked as Harrington
[12] Exhibit 7 for identification)
[13]   **Q:** Mr. Harrington, I'm showing you what was
[14] marked as Exhibit 7, which purports to be a
[15] handwritten Teamsters Union Local 25 grievance
[16] report dated April 7, 2003.
[17]   Is this the grievance that Mr. Goulet
[18] forwarded to you?
[19]   **A:** (Examines document) Yes.
[20]   **Q:** Was this the first time you had seen this
[21] grievance?
[22]   **A:** Yes.
[23]   **Q:** This was sometime after May 2003?
[24]   **A:** Yes.

Page 29

[1] **Q:** Upon receipt of this grievance, what, if
[2] anything, did you do?

[3] **A:** Well, I looked at it. I didn't think it
[4] really had any merit since Mr. Goulet had never
[5] completed his original decision — complied with his
[6] decision.

[7]  I was not quite certain if I wanted to file
[8] or not because, as I said, I didn't think it had any
[9] merit. Mr. Goulet continued to contact me, pressed
[10] the issue. Then — well, that's it. You can ask
[11] your questions.

[12] **Q:** Over what period of time did Mr. Goulet
[13] continue to contact you?

[14] **A:** Throughout the — a couple of times over
[15] the summer of that year.

[16] **Q:** What happened next?

[17] **A:** Through pretty much his persistence and
[18] insistence, to appease him, I filed the case for the
[19] Southern Joint Area Committee in September.

[20] **Q:** Did you ever communicate to Mr. Goulet in
[21] writing about your opinion about the merits of the
[22] grievance?

[23] **A:** No.

[24] **Q:** Did you ever make any internal notes about

Page 30

[1] your opinion concerning the merits of the grievance?

[2] **A:** No.

[3] **Q:** Do you have anything that would support
[4] your contention that you did not believe the
[5] grievance was meritorious?

[6] **A:** Anything to support it?

[7] **Q:** Yes.

[8] **A:** Yes, the fact that he didn't fulfill his
[9] original award.

[10] **Q:** Anything that you had that opinion at the
[11] time?

[12] **A:** Excuse me?

[13] **Q:** Do you have any evidence that indeed that
[14] was the opinion you had at the time, in the summer
[15] of 2003?

[16] **A:** Just personal belief.

[17] **Q:** You made no record of that personal belief,
[18] though?

[19] **A:** Well, we had a conversation over the phone.
[20] There was a document introduced at Mr. Goulet's
[21] deposition. Certainly the body of the letter they
[22] wrote certainly indicates we had some disagreement
[23] about the merits of his grievance.

[24] **Q:** What document are you referencing?

Page 31

[1] **A:** It was put in as an exhibit at Craig's
[2] deposition at the offices of Dwyer, Duddy and
[3] Facklam.

[4]  **MR. LATHROP:** Let's mark this as our next
[5] exhibit in line.

[6]  (Document marked as Harrington
[7] Exhibit 8 for identification)

[8] **Q:** I'm showing what was marked as Exhibit 8 in
[9] this deposition, purporting to be a handwritten
[10] letter dated July 25, 2003 from Mark. Is this the
[11] document you are referencing?

[12] **A:** You said, "from Mark."

[13] **Q:** Sorry. I meant to Mark.

[14] **A:** Yes.

[15] **Q:** This is the document you contend indicates
[16] a disagreement over the merits of the case?

[17] **A:** Yes.

[18] **Q:** What particularly are you looking at to
[19] indicate there's a disagreement over the merits of
[20] the case?

[21] **A:** "Not whether one was capable of working or
[22] not."

[23] **Q:** Anything else within this letter?

[24] **A:** "Let's not lose sight of the real issue

Page 32

[1] here." Obviously we were having some disagreement
[2] about the issue.

[3] **Q:** Anything else within the body of this
[4] letter that you contend shows that you had a
[5] disagreement about the merits of the case?

[6] **A:** Well, in the last paragraph, "Over the
[7] years, I've asked APA to put me back to work light
[8] duty or otherwise." I mean, I used to tell Craig
[9] all the time that he was not entitled to light duty,
[10] but he used to press me on the issue.

[11]  Under the light duty clause in the National
[12] Master Freight, it's a preparation for people that
[13] are preparing for returning to work within a short
[14] period of time.

[15]  At no time did Mr. Goulet ever say he was
[16] going to return to work.

[17]  It was for a transitional period for people
[18] that were going off the job on an injury and were in
[19] the process of returning to work. I kept telling
[20] him he was not entitled to that benefit under the
[21] contract.

[22] **Q:** You had those discussions before his
[23] arbitration case was decided?

[24] **A:** Yes.

Page 33

[1] **Q:** Is there anything else within the body of
[2] this letter from which you deduce that there was a
[3] difference of opinion about Mr. Goulet's current
[4] grievance?
[5] **A:** No.
[6] **Q:** Do you recall any discussions that you had
[7] with Mr. Goulet about his grievance other than what
[8] you have already testified to?
[9] **A:** No.
[10]     (Document marked as Harrington
[11] Exhibit 9 for identification)
[12]     **Q:** Mr. Harrington, I'm showing you what was
[13] marked as Exhibit 9, which purports to be a Southern
[14] New England Joint Area Committee prehearing
[15] information document.
[16]     Is that your signature on there?
[17]     **A:** (Examines document) No.
[18]     **Q:** Is that someone who signed it with your
[19] permission?
[20]     **A:** Yes.
[21]     **Q:** Who was it that signed this with your
[22] permission?
[23]     **A:** Probably Maureen Henry, the office
[24] secretary. She handles the filing of the cases.

Page 34

[1]     **Q:** Is this the filing of the case?
[2]     **A:** Yes.
[3]     **Q:** You see the language under the Position of
[4] Filing Party?
[5]     **A:** (Examines document) Uh-huh.
[6]     **Q:** Who drafted that language, if you know?
[7]     **A:** Myself.
[8]     **Q:** Is it your testimony you really didn't
[9] believe what you wrote there?
[10]     **A:** Yes.
[11]     **Q:** But you filed the grievance anyway?
[12]     **A:** Yes.
[13]     **Q:** Does this constitute a docketing of the
[14] grievance?
[15]     **A:** Yes.
[16]     **Q:** Had this grievance been docketed prior to
[17] September 3, 2003?
[18]     **A:** No.
[19]     **Q:** Do you know if there was a time limit in
[20] the collective bargaining agreement with regard to
[21] the docketing of grievances?
[22]     **A:** Yes.
[23]     **Q:** What is the time limit?
[24]     **A:** 30 days from the time of the filing of the

Page 35

[1] grievance.
[2]     (Document marked as Harrington
[3] Exhibit 10 for identification)
[4]     **Q:** Mr. Harrington, I'm showing you what was
[5] marked as Exhibit 10, purporting to be a letter to
[6] you from Craig Goulet dated November 24, 2003.
[7]     Do you recognize this document?
[8]     **A:** Yes, only because you introduced it at the
[9] last deposition that I attended. Other than that, I
[10] have no recollection of it.
[11]     **Q:** I introduced it?
[12]     **A:** Or that Kathleen introduced. I'm sorry.
[13]     **Q:** You don't have an independent memory of
[14] receiving this document?
[15]     **A:** No.
[16]     **Q:** Was Mr. Goulet's grievance heard at the
[17] Southern New England Joint Area Committee level?
[18]     **A:** No.
[19]     **Q:** Do you know why not?
[20]     **A:** Yes.
[21]     **Q:** What is the reason why not?
[22]     **A:** Because it was a multi-local agreement.
[23] Because we really didn't have a home for it, so to
[24] speak, under the contract because it was outside the

Page 36

[1] contract agreement as far as this affects
[2] bargaining, so to speak, of the agreement between
[3] APA, New Penn and TNFINC.
[4]     We filed it originally at the Southern New
[5] England under the guise of seniority, but because it
[6] was a multi-local issue as far as the whole
[7] settlement, they referred it over to the Eastern
[8] Region.
[9]     **Q:** And who is "they"?
[10]     **A:** The clearing house that, you know — the
[11] local cochair, John Murphy, who was the cochair from
[12] the union side; Bob Schafer, who was the cochair for
[13] the employer's side; and I believe they had
[14] conversation with Dan Virtue; maybe Pete Hassler
[15] from the employer's side, exactly where this
[16] grievance should be heard.
[17]     **Q:** Did you then file a document with the
[18] Eastern Region Joint Area Committee?
[19]     **A:** I don't recall if we filed one or it was
[20] just referred to. Anyway, it was moved to that
[21] committee.
[22]     (Document marked as Harrington
[23] Exhibit 11 for identification)
[24]     **Q:** Mr. Harrington, I'm showing you what was

---

Page 37

[1] marked as Exhibit 11, purporting to be a form used
[2] in the filing of all grievances with the Eastern
[3] Region Joint Area Committee.
[4]    **A:** (Examines document) Right.
[5]    **Q:** This purports to be signed by yourself on
[6] April 20, 2004. Do you recognize this document?
[7]    **A:** Yes.
[8]    **Q:** Is that, in fact, your signature?
[9]    **A:** No.
[10]    **Q:** Did someone sign your name with your
[11] approval?
[12]    **A:** Yes.
[13]    **Q:** Do you know who signed this one with your
[14] approval?
[15]    **A:** Looks like Maureen Henry.
[16]    **Q:** Under Union Position, could you read that,
[17] please.
[18]    **A:** "Per the APA New Penn agreement, Craig
[19] should have been called for work at New Penn Motor
[20] Express. Union seeks that Brother Goulet be
[21] returned to his seniority."
[22]    It's actually hard to read.
[23]    **Q:** Do you know who composed that language?
[24]    **A:** Yes.

---

Page 38

[1]    **Q:** Who?
[2]    **A:** Myself.
[3]    **Q:** At some point in time, was this grievance
[4] heard?
[5]    **A:** Yes.
[6]    **Q:** Do you recall where it was heard?
[7]    **A:** Myrtle Beach, South Carolina.
[8]    **Q:** Do you recall when it was heard?
[9]    **A:** I think it was July of 2004.
[10]    **Q:** In advance of it being heard, did you
[11] submit any sort of argument in favor of the
[12] grievance?
[13]    **A:** In advance?
[14]    **Q:** Yes.
[15]    **A:** No.
[16]    **Q:** At the hearing, did you submit any writings
[17] in favor of the grievance?
[18]    **A:** Yes.
[19]    (Document marked as Harrington
[20] Exhibit 12 for identification)
[21]    **Q:** I'm showing you what was marked as Exhibit
[22] No. 12, purporting to be a multiple page document
[23] dated July 22, 2004, addressed to Gentlemen,
[24] purportedly over your signature, in the matter of

---

Page 39

[1] Teamsters Local 25 versus New Penn Motor Express
[2] involving Craig Goulet.
[3]    **A:** (Examines document) Right.
[4]    **Q:** Looking at the second page, is that your
[5] signature?
[6]    **A:** (Examines document) No.
[7]    **Q:** Is that someone who has signed your name
[8] with your permission?
[9]    **A:** Yes.
[10]    **Q:** Did you compose Exhibit No. 12?
[11]    **A:** Yes.
[12]    **Q:** Would you please look at what is attached
[13] as Exhibit 2 to this document. Do you see that
[14] document?
[15]    **A:** (Examines document) Uh-huh.
[16]    **Q:** That's a Canton seniority list, is it not?
[17]    **A:** Right.
[18]    **Q:** For Local Union 25?
[19]    **A:** Yes.
[20]    **Q:** Dated November of 2001?
[21]    **A:** Yes.
[22]    **Q:** Mr. Goulet's name appears on that, does it
[23] not?
[24]    **A:** Yes.

---

Page 40

[1]    **Q:** Where did you get this document?
[2]    **A:** I didn't. You just gave it to me.
[3]    **Q:** It was attached as Exhibit 2, was it not?
[4]    **A:** Oh, yes. Well, periodically companies
[5] remit seniority lists to the local union,
[6] submit/remit.
[7]    **Q:** Is it your testimony that in the normal
[8] course of events, you had received this Canton
[9] seniority list from APA Transport?
[10]    **A:** The office did, yes.
[11]    **Q:** So on or about November of 2001, the
[12] Local 25 office received this Canton seniority list
[13] with Mr. Goulet's name on it?
[14]    **A:** I don't know when they received it. It's
[15] dated November 2001.
[16]    **Q:** Do you have any reason to believe that it
[17] was not received in the normal course in
[18] approximately November of 2001?
[19]    **A:** No.
[20]    **Q:** It's your testimony that this seniority
[21] list was in the office and that's from where you
[22] retrieved it?
[23]    **A:** Yes.
[24]    **Q:** Do you remember specifically where within

---

Page 41

[1] the office you retrieved it?
[2] A: Probably from the files, from the secretary
[3] that keeps the files on seniority lists.
[4] Q: Was there a secretary within the Local 25
[5] office who had the responsibility for maintaining
[6] seniority lists?
[7] A: No. The union doesn't maintain seniority
[8] lists.
[9] Q: Then I'm confused by the answer.
[10] A: The union receives seniority lists from the
[11] company.
[12] Q: Help clarify your prior answer, please.
[13] Where did you get this document from?
[14] A: From the office.
[15] Q: Where?
[16] A: Local 25 office.
[17] Q: But where within the office, sir, did you
[18] get this document?
[19] A: Probably it would be from Irene, who keeps
[20] the 250 companies that we have. She keeps records
[21] of seniority lists that are sent in to the local.
[22] Q: Does Irene have a last name?
[23] A: Hanlon.
[24] Q: Does she still work for Local 25?

Page 42

[1] A: Yes.
[2] Q: Is she still a secretary?
[3] A: Yes.
[4] Q: Just to make sure I'm clear, in the normal
[5] course of events in the year 2001, Iran Hanlon kept
[6] files on employer seniority lists?
[7] A: Yes.
[8] Q: For how long has Irene Hanlon been doing
[9] that?
[10] A: As long as she's been employed there.
[11] Q: To your knowledge, how long has Irene
[12] Hanlon been employed there?
[13] A: Around four or five years.
[14] Q: Since approximately the year 2000?
[15] A: Possibly. I don't recall her exact hire
[16] date. I didn't hire her at the time.
[17] I was not in the capacity to even recall
[18] when she was hired. It had nothing to do with me.
[19] I just know she came over from the AFLCIO somewhere
[20] around that time period.
[21] Currently she does it. She may not have
[22] done it at the time. She currently does it, but at
[23] that time, I don't recall if it was Kathleen, you or
[24] him, just that I need the information.

Page 43

[1] Whoever was responsible for it at the
[2] period of time gave it to me.
[3] Q: To whom does Irene report now?
[4] A: Sheila.
[5] Q: Sheila?
[6] A: Yes, McLaughlin.
[7] Q: As of November 2001, did Irene report to
[8] Sheila McLaughlin at that point?
[9] A: Probably.
[10] Q: Sheila is the office manager?
[11] A: Yes.
[12] Q: Speaking at least currently, does anyone
[13] other than Irene Hanlon keep the files of the
[14] company seniority lists?
[15] A: No.
[16] Q: As of November 2001, did anyone other than
[17] Irene Hanlon keep the files of the company seniority
[18] lists?
[19] A: I don't know.
[20] Q: Would you look at Exhibit 3 that's attached
[21] to your document.
[22] A: (Examines document) Okay.
[23] Q: Where did you get that document from?
[24] A: The office.

Page 44

[1] Q: Do you know who had prepared this document?
[2] A: No.
[3] Q: Did you also get this from Irene Hanlon, or
[4] whoever else was holding the employer seniority
[5] lists?
[6] A: Probably not.
[7] Q: Do you recall from whom within the office
[8] you got this document then?
[9] A: Sheila.
[10] Q: Why do you say that?
[11] A: Because she coordinates communication
[12] between the region, any pending litigation that we
[13] have.
[14] Also, we are also pursuing WARN Act
[15] violations against the APA, so she would keep that
[16] type of information in her possession.
[17] Q: Do you have any understanding as to who
[18] prepared what you attached as Exhibit 3 to this
[19] document?
[20] MS. PENNINI: Objection.
[21] A: No.
[22] Q: Do you know if it was prepared by someone
[23] at Local 25?
[24] A: More than likely.

Page 45

[1] Q: Does Mr. Goulet's name appear on Exhibit 3?
[2] A: No.
[3] Q: Do you know why it doesn't appear on
[4] Exhibit 3?
[5] A: No idea.
[6] Q: Even though this is a document more than
[7] likely prepared by Local 25?
[8] A: Right.
[9] Q: Do you have any understanding as to how one
[10] could learn who prepared Exhibit 3?
[11] A: No.
[12] Q: What persons in February 2002 do you
[13] understand were involved in preparing the terminal
[14] preference lists?
[15] A: The stewards, and then the office staff
[16] would compile it and send it over to the Eastern
[17] Region.
[18] Q: Would you look at the second page where it
[19] says, "Mr. Goulet has sufficient seniority to be
[20] called for work," correct?
[21] A: Uh-huh.
[22] Q: Do you recall what was the basis for your
[23] saying that?
[24] A: People that had been called with less than

Page 46

[1] seniority than him.
[2] Q: People from the Canton APA terminal who had
[3] less seniority than Mr. Goulet had been called by
[4] New Penn?
[5] A: Both terminals, Dracut and Canton.
[6] Q: Do you know of any people with less
[7] seniority than Mr. Goulet who made the call list
[8] from New Penn?
[9] A: I don't understand "call list."
[10] MS. PENNINI: Objection.
[11] Q: Do you know of any persons who were lower
[12] on the APA seniority list than Mr. Goulet who made
[13] the New Penn seniority list?
[14] A: People that were physically qualified and
[15] available?
[16] Q: Yes.
[17] A: Yes.
[18] Q: Do you have a medical degree?
[19] MR. GLUEK: Objection.
[20] MS. PENNINI: Objection.
[21] A: Not recently. It's a term under the
[22] contract.
[23] Q: What, a medical degree is?
[24] MR. GLUEK: Objection.

Page 47

[1] A: No, "physically available."
[2] Q: Following the APA closure, did you have any
[3] discussions with Mr. Goulet concerning his ability,
[4] physical ability to return to work?
[5] A: Yes.
[6] Q: When did those discussions take place?
[7] A: Well, via phone calls, met with him in
[8] preparation for his case at Picadilli Pub in
[9] Westboro, Mass., and continued to stress to him that
[10] I had concerns about his case and his ability to
[11] even return to work, and I pressed him on it.
[12] He was vague that he wanted to go back to
[13] work, vague that he could even qualify to go back to
[14] work.
[15] I told him I would take his case on. He
[16] felt as though he had gotten neglected by the
[17] situation, and, you know, I told him I would take
[18] his case in. He felt as though he had been, you
[19] know, denied.
[20] I continued to tell him — and we had
[21] several disagreements about it when we met — that
[22] he could even qualify or that he would have a desire
[23] to actually go back to work.
[24] Q: You said he was vague. Could you tell me

Page 48

[1] specifically what, in fact, Mr. Goulet said that you
[2] characterize as being "vague."
[3] A: Well, sometimes he said he wanted to go
[4] back. Other times he said he couldn't go back
[5] because of his limitations with his knee, the
[6] various injuries. He said had to get his knee done.
[7] I said, "I don't know if you can do the
[8] work if you have to get your knee done. I don't
[9] know if you can pass or get qualified. I mean, you
[10] still have to get examined and get a return to duty
[11] evaluation from a company doctor."
[12] Given the fact that he had concerns over
[13] his injuries and the fact that over a year's time he
[14] didn't attempt to get cleared, I questioned whether
[15] or not he was able to go back to work.
[16] Q: You questioned it, and sometimes he told
[17] you he could?
[18] A: In the same breath he would say, "I have to
[19] get my knee done," "I have to get this," that. I
[20] would say, "Can you go back?" "I don't know. I
[21] don't want to drive. I might be able to do dock
[22] work."
[23] I said, "Craig, you have still not
[24] fulfilled your award. You still haven't been

---

Page 49

[1] medically cleared to go back to work" or "You
[2] haven't fulfilled your ten-day suspension."
[3]   Q: What did he say in response to that?
[4]   A: He would continue to say, you know, that he
[5] wants his day in court. He wants to be heard.
[6]   Q: Did you know whether or not Mr. Goulet was
[7] still on workers' compensation?
[8]   A: Yes.
[9]   Q: Was he still on workers' compensation?
[10]   A: According to him, no, because his case
[11] couldn't have got heard —
[12]   Q: Do you have any reason to dispute that?
[13]   MR. GLUEK: Objection. He was still
[14] answering.
[15]   A: He couldn't have had his case heard at the
[16] Southern New England if he was still collecting.
[17] That question was asked of him at that hearing if he
[18] was still collecting workers' compensation.
[19]   Q: Do you recall his answer?
[20]   A: It was no.
[21]   Q: Do you have any reason to dispute his
[22] answer?
[23]   A: No.
[24]   Q: Do you know if he was on Social Security?

---

Page 50

[1]   A: No.
[2]   Q: No, he was not, or —
[3]   A: I have no knowledge of that, is what I'm
[4] saying.
[5]   Q: That topic didn't come up?
[6]   A: I don't believe so.
[7]   Q: Did Mr. Goulet say, "Let them call me, and
[8] let's see if I can do the work"?
[9]   A: He may have.
[10]   Q: But you understood that New Penn had not,
[11] in fact, called him to work?
[12]   A: Yes.
[13]   Q: Do you have any understanding whether or
[14] not Mr. Carnes ever docketed Mr. Goulet's grievance?
[15]   A: No.
[16]   Q: Do you have any understanding as to why it
[17] was not docketed?
[18]   A: No.
[19]   Q: As of April 7, 2003, whose responsibility
[20] within Local 25, if anyone, was it to docket
[21] Mr. Goulet's grievance?
[22]   A: Whoever the business agent was that's
[23] assigned to the company.
[24]   Q: Who was the business agent as of April 7,

---

Page 51

[1] 2003 who was assigned to New Penn?
[2]   A: Bill Carnes.
[3]   Q: Did you ever have any conversation with
[4] Mr. Carnes concerning Mr. Goulet's grievance?
[5]   A: No.
[6]   Q: Did you ever ask him about the docketing of
[7] the grievance?
[8]   A: No.
[9]   Q: You took over for Mr. Carnes in May of
[10] 2003?
[11]   A: Uh-huh.
[12]   Q: That's a yes?
[13]   A: Yes.
[14]   Q: Was that on May 3, 2003?
[15]   A: I don't recall the specific date.
[16]   Q: Was Mr. Carnes also responsible for the
[17] Dracut terminal?
[18]   A: No. Well, for what time period? I don't
[19] know what time period.
[20]   Q: Sorry. Prior to the Dracut terminal
[21] closing, was Mr. Carnes responsible for that?
[22]   MR. GLUEK: Objection.
[23]   A: No.
[24]   Q: I'm sorry. You were responsible for the

---

Page 52

[1] Dracut terminal?
[2]   A: APA Dracut terminal?
[3]   Q: Yes.
[4]   A: Yes.
[5]   Q: Do you know if Mr. Goulet's name was left
[6] off the seniority list because he had been out on
[7] workers' compensation?
[8]   A: I have no idea.
[9]   Q: Was there anyone responsible in the Local
[10] 25 office for supervising the secretaries as they
[11] put together the APA preference list?
[12]   A: I have no idea.
[13]   MR. LATHROP: Let's take a few minutes.
[14]   (Recess)
[15]   MR. LATHROP: I have no further questions.
[16]       CROSS EXAMINATION
[17]       BY MR. GLUEK:
[18]   Q: Morning. I'm Carl Gluek. I represent New
[19] Penn Motor Express.
[20]   Since you've been a BA, I think you
[21] testified since 1994 —
[22]   A: Yes.
[23]   Q: — approximately how many grievances have
[24] you pursued to either the regional committee or at

---

**Page 53**

[1] the local committee level?

[2] **A:** Handful.

[3] **Q:** A handful?

[4] **A:** Yes.

[5] **Q:** When you drafted what's been previously

[6] marked as —

[7] **A:** Excuse me, did you say docketed or put on?

[8] **Q:** Put on.

[9] **A:** Handful.

[10] **Q:** When you drafted what's been previously

[11] marked as Harrington Exhibit 12, to whom were you

[12] writing this to?

[13] **A:** Members of the committee of the Eastern

[14] Region, employees in the union.

[15] **Q:** Were you writing this in your role as an

[16] advocate?

[17] **A:** Yes.

[18] **Q:** Did you believe it was your responsibility

[19] to draft Exhibit 12 and tell the committee the

[20] weaknesses of your case?

[21] **MR. LATHROP:** Objection.

[22] **A:** No.

[23] **Q:** Were you ever instructed that when you

[24] wrote a letter to the committee, you were supposed

**Page 54**

[1] to be balanced in your writing?

[2] **A:** No.

[3] **Q:** If you would take a look at what was marked

[4] as Exhibit 2 to Exhibit 12, the Canton seniority

[5] list. I notice there's only 40 names.

[6] **A:** (Examines document) Right.

[7] **Q:** Could you compare that to what was marked

[8] as Harrington Exhibit 4.

[9] **A:** (Examines document) Okay.

[10] **Q:** There's approximately 75 names?

[11] **A:** (Examines document) Okay.

[12] **Q:** Do you know what explains the difference?

[13] **A:** It's probably just the first page here of

[14] the seniority list in Exhibit 12, No. 2.

[15] **Q:** So it was not your intent to give the

[16] entire seniority list with respect to Exhibit 12?

[17] **A:** Right.

[18] **Q:** In your role as a BA or as a secretary

[19] treasurer, do you have discretion as to what

[20] grievances you pursue to the committees?

[21] **A:** Yes.

[22] **Q:** Is there anything that requires you to

[23] pursue each and every grievance at a committee

[24] level?

**Page 55**

[1] **A:** No.

[2] **Q:** What are some of the factors you use to

[3] determine whether or not a grievance is going to be

[4] pursued to the committee level?

[5] **A:** If it's not a violation of the contract;

[6] settlement, offer of settlement by the company prior

[7] to going into arbitration; criminal, somebody

[8] convicted of a crime regarding termination or

[9] something to that effect, we probably would not

[10] pursue it since it's already been adjudicated.

[11]     It's things of that nature.

[12] **Q:** So you look at a multitude of factors?

[13] **A:** Yes.

[14] **Q:** When you were pursuing Mr. Goulet's

[15] grievance with respect to New Penn, did you have any

[16] animosity towards him?

[17] **A:** No.

[18] **Q:** Any ill will towards him?

[19] **A:** No.

[20] **Q:** Any prejudices towards him?

[21] **A:** No.

[22] **Q:** Could you look at what's been marked as

[23] Harrington Exhibit 5, please. Can you look at the

[24] top. Do you see the fax numbers? The first one is

**Page 56**

[1] a 717 number?

[2] **A:** (Examines document) Right.

[3] **Q:** Do you know whose fax that is?

[4] **A:** Well, it goes on to say here, "Teamsters

[5] 776."

[6] **Q:** Do you see down below where there appears

[7] to be a fax number, 202?

[8] **A:** (Examines document) Right.

[9] **Q:** Do you know whose fax number that is?

[10] **A:** It's a Washington number. It says, "IBT

[11] National Freight." It's probably going over at the

[12] IBT headquarters.

[13] **Q:** To the best you can tell from the fax

[14] numbers, it's coming from Teamsters 776 to the

[15] International?

[16] **MR. LATHROP:** Objection.

[17] **Q:** I'm sorry. To the National Freight

[18] Division?

[19] **A:** Yes.

[20] **Q:** On the first page, do you see where it

[21] says, "To Irene"?

[22] **A:** (Examines document) Yes.

[23] **Q:** To your knowledge, is that a different

[24] Irene than the secretary in your office?

Page 57

[1] **A:** Yes.

[2] **Q:** To your knowledge, was New Penn ever
[3] provided between March 1, 2002 and March 31, 2003
[4] with Mr. Goulet's name and/or preference?

[5] **A:** I have no knowledge.

[6] **Q:** Could you look again at what's been marked
[7] as Exhibit 12. Take a look at Exhibit 1 to that
[8] document.

[9] **A:** (Examines document) Okay.

[10] **Q:** Just read the decision to yourself.

[11] **A:** (Examines document) Okay.

[12] **Q:** I think you already testified that to your
[13] knowledge, Mr. Goulet never provided the company
[14] with documentation that he could return to work
[15] without restrictions; is that correct?

[16] **A:** That's correct.

[17] **Q:** To your knowledge, Mr. Goulet never served
[18] a suspension?

[19] **A:** That's correct.

[20] **Q:** Therefore, under the decision, is it your
[21] understanding that Mr. Goulet would not be on the
[22] seniority?

[23] **A:** Correct.

[24] **MR. GLUEK:** Nothing further.

Page 58

[1] **CROSS EXAMINATION**
[2] **BY MS. PENNINI:**

[3] **Q:** Mr. Harrington, why did you docket
[4] Mr. Goulet's grievance to the Southern New England
[5] Joint Area Committee in September of 2003?

[6] **A:** Because that's usually the first step of
[7] the grievance procedure — arbitration procedure,
[8] under the contract.

[9] **Q:** Why did you decide to file this grievance?

[10] **A:** Well, Mr. Goulet's insistence that it be
[11] filed. As I understand it, he had reached out to
[12] some people within the International union and
[13] thought he was getting a raw deal or whatever.
[14]     I docketed the case just to appease him
[15] really. I can't say anything else. I mean, as I
[16] say, he never really completed or fulfilled the
[17] original case.

[18] **Q:** If not for Mr. Goulet's insistence, would
[19] this have been a case you would have otherwise ever
[20] docketed as a grievance?

[21] **MR. LATHROP:** Objection.

[22] **A:** Probably not.

[23] **Q:** If you could look at Exhibit 2 of
[24] Deposition Exhibit No. 12. You said that you

Page 59

[1] received this list from Irene. Was that Irene
[2] Hanlon in the Local 25 office?

[3] **A:** I received it from a secretary in the Local
[4] 25 office, so if Irene was employed at the time and
[5] handling it. As in her capacity currently, it would
[6] have been through her.

[7] **Q:** Do you recall when the first time you saw
[8] the list was?

[9] **A:** Probably in preparation for the case.

[10] **Q:** Do you recall whether you ever saw this
[11] list prior to the filing — prior to filing and
[12] docketing the grievance with the Joint Area
[13] Committee?

[14] **A:** I don't recall.

[15] **Q:** Do you recall whether you saw this list in
[16] November of 2001?

[17] **A:** I don't recall.

[18] **Q:** Prior to the arbitration before the Joint
[19] Area Committee in October of 2001, did you speak to
[20] Mr. Goulet about his ability to return to work?

[21] **A:** I don't recall if I did or not.

[22] **Q:** Do you recall what you said to Mr. Goulet
[23] after the decision was rendered in October of 2001?

[24] **A:** I told him that he was reinstated back to

Page 60

[1] work conditional upon the requirements.

[2] **Q:** Did you tell him what the requirements
[3] were?

[4] **A:** Yes.

[5] **Q:** What were those requirements?

[6] **MR. LATHROP:** Objection.

[7] **A:** He needed to demonstrate an ability to
[8] return unrestricted and to serve a ten-day
[9] suspension.

[10] **Q:** Do you know whether he ever submitted any
[11] documentation about his ability to return to work?

[12] **A:** I have no idea.

[13] **Q:** I believe you said his case could not have
[14] been heard before the Joint Area Committee if he was
[15] still receiving workers' compensation; is that
[16] correct?

[17] **A:** That's correct.

[18] **Q:** Would this case have been able to go
[19] forward if the committee was aware that he receiving
[20] Social Security benefits?

[21] **A:** I'm not sure.

[22] **Q:** Following the October arbitration award,
[23] did Mr. Goulet say whether he would be returning to
[24] work?

Mark A. Harrington                                                  Craig Goulet
Vol. 1, October 12, 2005
Case 1:04-cv-12577-WGY    Document 40-6    Filed 01/24/2006    Page 7 of 10
New Penn Motor Express, Inc., et a

Page 61

[1]  **A:** No.
[2]  **Q:** Did he give any indication as to whether he
[3]  was trying get clearance to return to work?
[4]  **A:** No.
[5]  **Q:** You said that you spoke with Mr. Goulet
[6]  during the summer of 2003 concerning his failure to
[7]  be called from the New Penn call list, correct?
[8]  **A:** Yes.
[9]  **Q:** When he spoke with you, did he ever ask for
[10] any assistance regarding looking for other
[11] employment?
[12] **A:** No.
[13] **MS. PENNINI:** That's all the questions I
[14] have. Thanks.
[15]            **REDIRECT EXAMINATION**
[16]            **BY MR. LATHROP:**
[17] **Q:** Do you have an understanding whether or not
[18] someone on Social Security benefits has up to a year
[19] to try to go back to work without putting their
[20] benefits at risk?
[21] **A:** No.
[22] **Q:** You don't know that one way or the other?
[23] **A:** (Witness shakes head)
[24] **Q:** You never had that discussion with

Page 62

[1]  Mr. Goulet?
[2]  **A:** No.
[3]  **Q:** I would also ask you to look at Exhibit 12,
[4]  which is your brief dated July 22, 2004. I believe
[5]  Attorney Pennini had you look at some of the
[6]  exhibits.
[7]      Exhibit 1 to that brief is the decision
[8]  with regard to Mr. Goulet's termination from APA,
[9]  correct?
[10] **A:** (Examines document) Right.
[11] **Q:** The date of that is October 16, 2001?
[12] **A:** Okay.
[13] **Q:** Correct?
[14] **A:** Yes.
[15] *Q. It's your understanding that based upon
[16] this decision, APA Transport could insist that
[17] Mr. Goulet submit acceptable documentation of his
[18] ability to return to unrestricted duties.
[19] **MR. GLUEK:** Objection.
[20] **MS. PENNINI:** Objection.
[21] **Q:** Please answer the question.
[22] **MR. GLUEK:** What is the question?
[23] **MR. LATHROP:** Please read back the
[24] question.

Page 63

[1]  *(Question read)
[2]  **MR. GLUEK:** Objection. There's still no
[3]  question.
[4]  **Q:** That was your understanding, correct?
[5]  **MR. GLUEK:** Objection.
[6]  **Q:** You still have to answer the question.
[7]  **A:** My understanding is the award.
[8]  **Q:** Right. Let me read the second sentence.
[9]  It says, "The panel after hearing the case, motion
[10] made, second carried, that upon submitting
[11] acceptable documentation to the company of his
[12] ability to return to unrestricted duties, the
[13] grievant shall serve a ten-day suspension." Do you
[14] understand that sentence?
[15] **A:** Yes.
[16] **Q:** What's that mean to you?
[17] **A:** It means upon his unrestricted clearance to
[18] go back to work, he would then serve a ten-day
[19] suspension and then would be placed on the seniority
[20] list.
[21] **Q:** Did you understand that the company could
[22] put him on a seniority list without insisting on the
[23] conditions?
[24] **MR. GLUEK:** Objection. There's no

Page 64

[1]  question.
[2]  **MR. LATHROP:** If you listen to it, you will
[3]  hear the question.
[4]  **MR. GLUEK:** No, there is no question.
[5]  **Q:** Did you understand that APA could waive
[6]  those requirements?
[7]  **MR. GLUEK:** Objection.
[8]  **A:** No.
[9]  **Q:** In fact, isn't that exactly what APA did?
[10] APA put him on the seniority list in November of
[11] 2001 without him serving the suspension, correct?
[12] **A:** I don't know. But they did, yes.
[13] **Q:** They did, didn't they?
[14] **MR. GLUEK:** Objection.
[15] **A:** (No response)
[16] **Q:** APA Transport put him on the seniority list
[17] in November of 2001 without ever asking for or
[18] seeing medical documentation, correct?
[19] **MR. GLUEK:** Objection.
[20] **MS. PENNINI:** Objection.
[21] **A:** I guess.
[22] **Q:** So Exhibit 2, the Canton seniority list for
[23] November 2001, was prepared by APA Transport; is
[24] that correct?

New Penn Motor Express, Inc., et al.
Mark A. Harrington
Case 1:04-cv-12577-WGY   Document 40-6   Filed 01/24/2006   Page 81 of 100   Vol. 1, October 12, 2005

Page 65

[1]   A: Correct.

[2]   Q: Are you saying Local 25 has the right to
[3] take someone off the APA Transport seniority list?

[4]   A: No.

[5]   Q: So if APA Transport doesn't insist on a
[6] ten-day suspension, would Local 25 insist that
[7] Mr. Goulet serve a ten-day suspension?

[8]   A: No.

[9]   Q: If APA Transport doesn't insist on medical
[10] documentation, is Local 25 going to insist?

[11]   A: No. Local 25 doesn't call him to go to
[12] work.

[13]   Q: As of November 2001, based upon your
[14] Exhibit 2 to your brief, Mr. Goulet was on the
[15] seniority list in Canton for APA Transport, correct?

[16]   A: I think that was the union's position in
[17] the brief.

[18]   Q: So the answer to the question is indeed he
[19] was on the seniority list already as of November of
[20] 2001?

[21]   A: His name was placed on a piece of paper.

[22]   Q: Called the "seniority list"?

[23]   A: Yes.

[24]   Q: Are you telling me that Local 25 wanted to

Page 66

[1] take Mr. Goulet off the seniority list?

[2]   A: No.

[3]   Q: Did Local 25 have any authority to take
[4] Mr. Goulet off the seniority list?

[5]   A: No. We didn't take him off the seniority
[6] list.

[7]   Q: Did Local 25 submit Mr. Goulet's name to
[8] New Penn?

[9]   A: I have no idea.

[10]   Q: It didn't, did it?

[11]   MR. GLUEK: Objection.

[12]   MS. PENNINI: Objection.

[13]   A: (No response)

[14]   Q: Do you have any evidence that it did?

[15]   A: I don't know.

[16]   Q: Was it Local 25's job to submit APA
[17] employee preferences to New Penn?

[18]   A: Yes.

[19]   Q: Was it Local 25's job to submit the APA
[20] preferences to New Penn for all employees appearing
[21] on the APA seniority list?

[22]   MR. GLUEK: Objection.

[23]   MS. PENNINI: Objection.

[24]   A: I don't know.

Page 67

[1]   Q: Who would?

[2]   A: I don't know.

[3]   Q: Do you know if Mr. Carnes left Mr. Goulet's
[4] name off the APA preference list?

[5]   A: Do I know?

[6]   Q: Yes.

[7]   MS. PENNINI: Objection.

[8]   A: No, I don't know.

[9]   Q: When you were preparing the brief that's
[10] been marked as Exhibit 12, did you attempt to
[11] determine how Mr. Goulet's name was omitted from the
[12] call list?

[13]   A: No.

[14]   Q: Is there any particular reason why you
[15] didn't investigate how Mr. Goulet's name was omitted
[16] from the call list?

[17]   A: No.

[18]   Q: Do you think it was incumbent upon you as
[19] his advocate to find out how Mr. Goulet's name was
[20] omitted from the call list?

[21]   A: No. That was our case.

[22]   Q: The case was that Mr. Goulet's name should
[23] not have been omitted from the call list; that was
[24] your case, right?

Page 68

[1]   A: That's right.

[2]   Q: But somebody did omit his name.

[3]   MR. GLUEK: Objection.

[4]   MS. PENNINI: Objection.

[5]   MR. GLUEK: Is there a question?

[6]   Q: Somebody did omit his name, correct?

[7]   A: I don't know.

[8]   Q: Well, you argued that somebody left off his
[9] name.

[10]   MR. GLUEK: Objection.

[11]   A: I argued a lot of things in this case.

[12]   Q: Let's go back then. Do you have any
[13] evidence that Local 25 ever forwarded Mr. Goulet's
[14] name or preference to New Penn?

[15]   A: No.

[16]   Q: Do you have any understanding as to why
[17] Local 25 did not forward Mr. Goulet's name to New
[18] Penn?

[19]   A: No.

[20]   Q: Was it because Local 25 —

[21]   A: I just answered your question.

[22]   Q: Was it because Local 25 felt that that he
[23] should serve a suspension first?

[24]   MR. GLUEK: Objection.

Page 69

[1]    MS. PENNINI: Objection.
[2]    A: No.
[3]    Q: Was it because Local 25 felt that he needed
[4] to submit medical documentation first?
[5]    MS. PENNINI: Objection.
[6]    A: No.
[7]    MR. LATHROP: I have nothing further.
[8]    RECROSS EXAMINATION
[9]    BY MR. GLUEK:
[10]    Q: Under the collective bargaining agreement,
[11] an employer is supposed to give the union seniority
[12] lists, correct?
[13]    A: Yes.
[14]    Q: It's the union's responsibility, or one of
[15] the union's responsibilities is to make sure that
[16] those seniority lists are correct?
[17]    A: No.
[18]    Q: For what purpose do you get the seniority
[19] lists? Why?
[20]    MR. LATHROP: Objection.
[21]    MR. GLUEK: What basis, please, so I can
[22] correct it?
[23]    MR. LATHROP: As to his knowledge as to why
[24] the employer submits a seniority list.

Page 7

[1]    A: Yes.
[2]    Q: Now, let's take a look at what was marked
[3] as Exhibit 2 to Harrington Exhibit No. 12. Let's
[4] assume Exhibit 2 is a correct seniority list.
[5]    A: Okay.
[6]    Q: Would it be fair for Mr. Power to have been
[7] called by New Penn prior to Mr. Hoyt, No. 10?
[8]    A: Yes.
[9]    Q: Even though Mr. Power had less seniority
[10] than Mr. Hoyt, it would be fair for him to be called
[11] first?
[12]    A: He could be, yes.
[13]    Q: On what basis?
[14]    A: Qualifications.
[15]    Q: Let's assume the qualifications are the
[16] same. Would it be fair for Mr. Power to be called
[17] before Mr. Hoyt?
[18]    A: No.
[19]    Q: Would it be fair for an individual with no
[20] seniority to be called before somebody who's listed
[21] on Exhibit 2?
[22]    A: No.
[23]    Q: So if Mr. Goulet had no seniority, it
[24] wouldn't be fair for him to be called before

Page 70

[1]    MR. GLUEK: What's objectionable about
[2] that?
[3]    MR. LATHROP: You are talking about the
[4] mental rationale.
[5]    Q: Why in the collective bargaining agreement
[6] does the union get a seniority list?
[7]    MR. LATHROP: I think the appropriate
[8] question would be does the collective bargaining
[9] agreement state —
[10]    MR. GLUEK: He already testified it did.
[11]    MR. LATHROP: It didn't state why.
[12]    A: First of all, for continuity purposes, I
[13] mean, the seniority list is posted at the terminal.
[14] Therefore, we get a copy of it, because it's posted.
[15]    Q: If someone has a problem with where they
[16] are placed on the seniority list, they have the
[17] ability to file a grievance; is that correct?
[18]    A: Correct.
[19]    Q: Through the grievance procedure, that
[20] seniority list can be corrected; is that correct?
[21]    A: Yes.
[22]    Q: Therefore, the union does have a mechanism
[23] to ensure that the seniority lists are correct; is
[24] that correct?

Page 72

[1] somebody listed on Exhibit 2?
[2]    A: That's correct.
[3]    MR. GLUEK: Nothing further.
[4]    RECROSS EXAMINATION
[5]    BY MS. PENNINI:
[6]    Q: Was it your understanding that APA waived
[7] the requirement, that APA ever waived the
[8] requirement that Mr. Goulet submit acceptable
[9] documentation about his ability to return to
[10] unrestricted duties?
[11]    MR. LATHROP: Objection.
[12]    A: No.
[13]    Q: Is it your understanding that APA ever
[14] waived the requirement that Mr. Goulet serve a
[15] ten-day suspension?
[16]    MR. LATHROP: Objection.
[17]    A: No.
[18]    Q: Were you ever informed by APA Transport
[19] that they had waived the requirement that Mr. Goulet
[20] present acceptable documentation to the company
[21] regarding his ability to return to unrestricted
[22] duties?
[23]    A: No.
[24]    Q: Did APA ever inform you that Mr. Goulet was

Craig Goulet    v.
New Penn Motor Express, et al.    Document 40-6    Filed 01/24/2006    Page 1 of 1

Mark A. Harrington
Vol. 1, October 12, 2005

---

Page 73

[1] not required to serve a ten-day suspension prior to
[2] being placed on the seniority list?
[3]    **A:** No.
[4]    **MS. PENNINI:** That's all I have.
[5]          **REDIRECT EXAMINATION**
[6]             **BY MR. LATHROP:**
[7]    **Q:** Mr. Harrington, did you personally ever
[8] challenge the fact that Mr. Goulet's name appears on
[9] the APA Canton seniority list for November 2001?
[10]    **MS. PENNINI:** Objection.
[11]    **A:** No.
[12]    **Q:** Do you have any understanding as to whether
[13] or not anyone within Local 25 objected to the fact
[14] that APA Transport put Mr. Goulet on its November
[15] 2001 Canton seniority list?
[16]    **A:** No.
[17]    **MR. LATHROP:** Nothing further.
[18]      **FURTHER RECROSS EXAMINATION**
[19]             **BY MS. PENNINI:**
[20]    **Q:** Mr. Harrington, are you aware of whether
[21] this seniority list was ever posted in this form at
[22] the APA Transport facility in Canton, Massachusetts?
[23]    **A:** No.
[24]

Page 74

[1]      **FURTHER REDIRECT EXAMINATION**
[2]             **BY MR. LATHROP:**
[3]    **Q:** Exhibit 2 to your brief to the committee,
[4] that is the form of a seniority list that APA
[5] normally sent directly to Local 25?
[6]    **A:** Yes.
[7]    **MR. LATHROP:** Thank you. I have nothing
[8] further.
[9]       (Whereupon the deposition
[10] was concluded at 12:06 p.m.)
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 75

[1]             **CERTIFICATE**
[2]    I, MARK A. HARRINGTON, do hereby certify that I
[3] have read the foregoing transcript of my testimony,
[4] and further certify under the pains and penalties of
[5] perjury that said transcript (with/without)
[6] suggested corrections is a true and accurate record
[7] of said testimony.
[8]      Dated at __, this day of ,
[9] 2005.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 76

[1] COMMONWEALTH OF MASSACHUSETTS)
[2] SUFFOLK, SS.                          )
[3]    I, Ken A. DiFraia, Registered Professional
[4] Reporter and Notary Public in and for the
[5] Commonwealth of Massachusetts, do hereby certify
[6] that there came before me on the 12th day of Oct.,
[7] 2005, at 10:15 a.m., the person hereinbefore named,
[8] who was by me duly sworn to testify to the truth and
[9] nothing but the truth of his knowledge touching and
[10] concerning the matters in controversy in this cause;
[11] that he was thereupon examined upon his oath, and
[12] his examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15]    I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19]    In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this _____ day of
[21] October, 2005.
[22]
[23]             Notary Public
[24]       My commission expires 4/3/09