UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12577 JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
CRAIG GOULET,                                    \*
   Plaintiff                                     \*
                                                  \*
  v.                                               \*
                                                  \*
NEW PENN MOTOR EXPRESS, INC., and                \*
TEAMSTERS LOCAL 25,                              \*
INTERNATIONAL BROTHERHOOD OF                     \*
TEAMSTERS,                                 \*
   Defendants                                    \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S OPPOSITION TO DEFENDANT TEAMSTERS LOCAL 25'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Craig Goulet hereby opposes the Motion of defendant Teamsters Local 25 for Summary Judgment.

**I.       Background**

This is an action under 29 U.S.C. §185 against a labor organization for breach of its duty of fair representation and against an employer for breach of a labor agreement. Plaintiff Craig Goulet is a member of defendant Teamsters Local 25. He was an employee of a trucking company called A.P.A. Transport Corporation when it ceased operations. In February, 2002, defendant New Penn Motor Express negotiated an agreement with Teamsters Local 25 whereby all employees with seniority at A.P.A. Transport Corporation had the right to be put on a New Penn Motor Express call list within the area where they were then employed. Despite being on A.P.A. Transport Corporation's seniority list, New Penn Motor Express never put Goulet on its call list.

On April 7, 2003, Goulet filed a grievance with Teamsters Local 25 against New Penn Motor Express. However, on July 28, 2004, the Eastern Region Joint Area Committee rendered a decision in favor

1

of New Penn Motor Express on the basis that Teamsters Local 25 had not docketed the case within thirty (30) days as required. This lawsuit then ensued.

## II.     **Statement of Facts** [1]

Goulet has been a member of Teamsters Local 25 since 1987. He worked for Sanborn Motor Express from 1984 up until it was bought out by APA Transport in October, 1986. He then began working worked at APA ("APA") at its Canton, Massachusetts, terminal. The Local 25 business agent assigned to the APA Canton terminal was Mark Harrington. (Ex. 1: Goulet Dep. p. 7, 9-10; Ex. 3: Dubiel Dep. p. 10)

On March 11, 1987, Goulet was involved in a industrial accident at APA. He was unloading a truck with a forklift, and the truck pulled away from the loading dock. Goulet and the forklift both went off the loading dock. Goulet ended up with a herniated disc in his neck and lower back, a torn rotator cuff in his shoulder, and a torn ligament in his knee. (Ex. 1: Goulet Dep. p. 10)

Due to this injury Goulet received partial disability worker's compensation benefits. (Ex. 1: Goulet Dep. p. 14)

Because of this accident, APA terminated Goulet's employment on March 12, 1987. Local 25 filed a grievance over the termination. (Ex. 1: Goulet Dep. p. 14-15)

Previous to his grievance being heard, in the early 1990's Goulet sought light duty work from APA. However, APA's response was that he was discharged. By that time Goulet's limitation was simply that he could not lift over 35 pounds. (Ex. 1: Goulet Dep. p. 17-19)

In 1995 Goulet began to receive Social Security Disability benefits. (Ex. 1: Goulet Dep. p. 20) The impairments which Goulet had that the Social Security Administration deemed to be severe were: dysthymia [depression], personality disorder, low back pain, status post rotator cuff tear, right knee pain, and alcohol dependence. (Ex. 25: Decision of Social Security Administration, dated August 21, 1995) Goulet's

---

[1] Record citations are to the Plaintiff's Appendix to Opposition to Motion for Summary Judgment, filed simultaneously herewith. Many of the facts cited herein are in dispute. Given that defendants have filed a motion for summary judgment, the facts are stated in the light most favorable to the plaintiff.

2

depression, personality disorder and alcohol dependence are a function and result of Goulet having been fired and not been able to work since then. (Ex. 26: Consultative Examination Report of Stephan Simonian, M.D., dated May 2, 2003)

In 2001 Goulet began communicating with his business agent Mark Harrington. Goulet had exhausted all of his partial disability worker's compensation benefits. Therefore Goulet now wanted his termination grievance against APA to be heard. (Ex. 1: Goulet Dep. p. 23-24)

Goulet's grievance case could not be heard until October 16, 2001. This delay was due to the fact that up until that time Goulet was still on worker's compensation. The grievance committee's rules of procedure provide that the committee will not hear a case as long as it was pending in another venue, such as worker's compensation. (Ex. 1: Goulet Dep. p. 15-16)

Goulet's termination grievance against APA was eventually heard by the Southern New England Joint Area Committee. (Ex. 1: Goulet Dep. p. 24)

The October 16, 2001, decision in relevant part reads as follows:

"The Panel after hearing the case, motion made, seconded and carried that upon submitting acceptable documentation to the Company of his ability to return to unrestricted duties, the grievant shall serve a ten (10) day suspension. Upon completion of the suspension he shall be reinstated to the seniority list in his original position." (Ex. 4: APA Decision)

As a result of this grievance, APA reinstated Goulet's seniority in November, 2001, without requiring Goulet to submit any documentation as to his ability to return to unrestricted duties and without requiring him to serve a ten day suspension. (Ex. 1: Goulet Dep. p. 25)

Several Local 25 business agents confirmed that Goulet's name had been put back on APA's seniority list. Both business agents William Carnes and Mark Harrington told Goulet that he had been placed back on APA's seniority list. (Ex. 1: Goulet Dep. p. 28-29) Carnes has testified that around November, 2001, the APA seniority list for Canton, Massachusetts, with Goulet's name on it, was forwarded to Carnes. (Ex. 5: Carnes Dep. p. 18) Harrington has admitted that Local 25's office received this Canton seniority list with Goulet's name it from APA in approximately November, 2001. (Ex. 6: Harrington Dep. p. 40) The APA seniority list, dated November, 2001, which had Goulet' name on it, was in the same

3

format that APA normally sent directly to Local 25. (Ex. 6: Harrington Dep. p. 74)

Goulet himself saw the APA seniority list, dated November, 2001, for the terminal in Canton, Massachusetts, with his name on it. (Ex. 1: Goulet Dep. p. 29) And indeed, during the discovery the parties all produced the November, 2001, Local Union 25 Canton Seniority List with Goulet's name on it. (Ex. 7: Canton Seniority List)

In any case, it is undisputed that it was the responsibility of APA (not the Union) for creating the seniority lists. (Ex. 3: Dubiel Dep. p. 11-12)

On Valentine's Day, 2002, Paul Dubiel, the APA terminal manager for the Canton terminal, told the APA employees that APA was going out of business. (Ex. 8: Francey Dep. p. 9)

On February 13, 2002, the Teamsters negotiated an Agreement with defendant New Penn Motor Express whereby each APA employee had the right to place his name on a call list for New Penn. (Ex. 9: Teamsters & New Penn Agreement) This Agreement in section 8(h), paragraph 2, also states that:

> "If during the term of the current 1998 - 2003 NMFA, but not later than March 31, 2003, the list of former A.P.A. NMFA employees at any terminal is exhausted, those A.P.A. NMFA employees on other terminal lists in that local supplement, who have not obtained seniority at NPME, will be offered a second opportunity to place their name on the call list of such terminal." (Ex. 9: Teamsters & New Penn Agreement)

William Carnes was another business agent for Local 25. Carnes had responsibility for New Penn Motor Express from 1982 until 2003. (Ex. 5: Carnes Dep. p. 7, 9) As stated, Mark Harrington was the business agent for APA until it closed. Harrington later became the business agent for New Penn when Carnes left office in 2003. (Ex. 6: Harrington Dep. p. 6, 8-10) Doug Francey worked in Canton, Massachusetts, until APA closed in February, 2002. He was the steward at the APA facility from February, 2001, until February, 2002. (Ex. 8: Francey Dep. p. 7-8)

When APA announced its closing, Harrington told Francey that New Penn was offering work to APA employees on a seniority basis. There were New Penn two terminals that the APA employees had choice of – Billerica, Massachusetts, or Providence, Rhode Island. One of Francey's duties as the steward was to take the APA seniority list and ask everybody where they wanted to go, which he did. (Ex. 8:

4

Francey Dep. p. 11-12)

Francey also went to the Local 25 Union hall at 544 Main Street, Charlestown, Massachusetts, for a meeting for the Dracut and Canton APA drivers. Present were Harrington, Carnes, anther business agent, and George Cashman, President of Local 25. They also mentioned that New Penn was offering work on a seniority basis to APA employees. (Ex. 8: Francey Dep. p. 13-15)

Francey contacted all the APA employees and asked them what terminal they wanted to go to and wrote it down next to their name. Francey spoke directly with Goulet, who gave Francey his pick of New Penn terminals. Francey wrote Goulet's name on the bottom of this document and listed where Goulet wanted to go and his phone number. Francey put an arrow up the side and inserted it where Goulet's name should be on the seniority list. Goulet selected the Billerica terminal. (Ex. 8: Francey Dep. p. 15-18)

Goulet testified that after he learned in February, 2002, that APA was going out of business, he initially called Francey. Later, on February 17, 2002, Francey called Goulet and told him that there had been a Union meeting with the APA men, and that Francey wanted to know what Goulet's preference for terminals was as it related to New Penn's call list. (Ex. 1: Goulet Dep. p. 30-35)

After Francey got everyone's preference, he gave a copy of this preference list – with Goulet's name and his preference for the Billerica terminal listed on it – directly to Harrington. Francey kept the original (and brought it to his deposition.) (Ex. 8: Francey Dep. p. 20; Ex. 10: Francey's Preference List)

Harrington disputes Francey's testimony, however. Harrington claims that Francey's list with Goulet's preference was provided, not to him personally, but to Local 25's office clericals, who, in turn, forwarded Francey's list (with Goulet's name on it) to the Eastern Region of the Teamsters. (Ex. 6: Harrington Dep. p. 21) In any case, Harrington admitted that it was Local 25's job to submit the APA employee preferences to New Penn. (Ex. 6: Harrington Dep. p. 66)

Discovery has shown, however, that something else happened. On February 22, 2002, Local 25 President Cashman brought several documents to his Executive Assistant Janet McLaughlin and told her to fax them to Irene at the Teamsters' International Office in Washington. Cashman told her to write on the

cover sheet: "Per request of the Eastern Region Freight Department, attached please find seniority list (preference list) with the most up-to-date information that we have at the present time. Any questions please call." (Ex. 11: Teamsters Dep. p. 7, 18)

These preference lists which McLaughlin faxed to the Teamster's International Office at Cashman's instruction strangely do not list Goulet, despite the fact that both Francey and Harrington acknowledge that Goulet's name and preference were given to Local 25. Furthermore, Local 25's current office staff now denies ever having even seen this preference list which omits Goulet's name and was faxed to the Teamsters' International Office in Washington. (Ex. 11: Teamsters Dep. p. 10,16, 23, 28; Ex. 12: McLaughlin Fax)

On February 28, 2002, Cashman wrote directly to Dan Schmidt, the Vice President of Labor Relations for New Penn. He enclosed an "updated list of former employees of A.P.A. in Canton, Massachusetts." He noted that the area code number had changed for one employee and that another employee had changed his preference of terminals. Once again, Cashman left Goulet's name off of this list. (Ex. 13: Cashman Letter to Schmidt)

Cashman is currently incarcerated and is not available to be deposed. (Ex. 11: Teamsters Dep. p. 25) Therefore Local 25 was not able to present any evidence or defense as to why Cashman left Goulet's name off the preference lists.

In March, 2002, Goulet made a follow up phone call to Harrington about the call list and what was going on with the APA people and the New Penn agreement. Harrington told Goulet that he no longer handled the men at APA, and that Goulet would have to speak with business agent Carnes. (Ex. 1: Goulet Dep. p. 36-37)

Goulet then contacted Carnes in the spring of 2002 about being on the New Penn call list. Carnes said that he was going to look into it. Goulet reminded Carnes that he had been placed back on APA seniority list. (Ex. 1: Goulet Dep. p. 38, 44)

Carnes also recalled that Goulet had called sometime after the agreement was made with New Penn,

saying that he wished to be on a call list for New Penn, that he wanted to be put back to work at New Penn and that he wanted Carnes to help him. As a result Carnes called New Penn. (Ex. 5: Carnes Dep. p. 21, 23-24) Carnes then telephoned the manager at the Billerica New Penn terminal and told him: "I have an APA employee who's looking to go back to work." Carnes identified Goulet by name. The New Penn terminal manager told Carnes to go fuck himself. (Ex. 5: Carnes Dep. p. 25)

Paul Dubiel has been the terminal manager for New Penn at its Billerica, Massachusetts, terminal since March, 2002. Prior to that Dubiel had been the terminal manager for APA, first in Dracut, Massachusetts, as of November, 2001, and then in Canton, Massachusetts, until APA went out of business in February, 2002. (Ex. 3: Dubiel Dep. p. 5, 9)

Carnes then spoke to Mark Harrington at the union hall about Goulet. Carnes told Harrington: "I got a call from one of your members, and you need to deal with this." Harrington told Carnes that he would take care of it. (Ex. 5: Carnes Dep. p. 26-27) As will be seen, however, Harrington did nothing until September, 2003, when it was too late.

Goulet spoke to Carnes about being on New Penn's call list again that spring, twice more during the summer of 2002, and throughout the year. Between March 1, 2002 and March 30, 2003, Goulet had several discussions with Carnes about Goulet not being called by New Penn. (Ex. 1: Goulet Dep. p. 39, 81)

According to Goulet, Carnes said he had several conversations with the New Penn about calling Goulet to work. New Penn first told Carnes that Goulet's name was not on the seniority list. Carnes said that indeed Goulet's name was on the seniority list. Carnes even showed New Penn the APA seniority list with Goulet's name on it. New Penn then admitted that Goulet was on the seniority list, but then claimed that Goulet was collecting worker's compensation. Carnes told New Penn that Goulet was no longer collecting worker's compensation at that time. (Ex. 1: Goulet Dep. p. 85, 91; Ex. 2: Goulet Errata Sheet)

Meanwhile New Penn had developed a call list of former APA employees to be used as workers at the Billerica terminal. If New Penn needed extra help, it would start with the top man and work down the call list. New Penn ended up using all the names on this call list. Nine people on this call list became

7

permanent employees of New Penn, including the last man on the list. Goulet's name does not appear on this call list. (Ex. 3: Dubiel Dep. p. 24-25, 28, 42, 44-45; Ex. 14: New Penn Call List)

New Penn never called Goulet for work despite the fact it had exhausted all the names on the call list and despite the fact that its Agreement with the Teamsters provided that:

> "If during the term of the current 1998 - 2003 NMFA, but not later than March 31, 2003, the list of former A.P.A. NMFA employees at any terminal is exhausted, those A.P.A. NMFA employees on other terminal lists in that local supplement, who have not obtained seniority at NPME, will be offered a second opportunity to place their name on the call list of such terminal." (Ex. 3: Dubiel Dep. p. 33; Ex. 9: Teamsters & New Penn Agreement)

In answer to Interrogatory Nos. 7 and 23, New Penn admitted that it had received the APA Canton Seniority List for November, 2001 (which list contained Goulet's name on it) prior to March 1, 2002, at its corporate office from APA. (Ex. 15: New Penn Answers to Interrogatories)

Defendant Teamsters Local 25 just filed its Motion for Summary Judgment. Interestingly, in support of its Motion, it supplied the Affidavit of Burton Trebour, the former Vice President of Labor and Administration for APA. In paragraph 18 of his Affidavit, Trebour states: "When New Penn Motor Express requested terminal seniority lists to create its call lists, it asked for seniority lists from the corporate office, and thus received the corporate seniority list." This so-called corporate seniority list is the list on which Goulet's name appears. (Ex. 24: Affidavit of Burton Trebour). So even APA affirms that New Penn received Goulet's name when New Penn was putting together its call lists.

Around March 31, 2003, Goulet called Carnes again when the agreement with New Penn expired. Goulet told Carnes that he still had not been called to work by New Penn. Carnes told him to send a grievance in. (Ex. 1: Goulet Dep. p. 40) Goulet then sent a grievance to Carnes dated April 7, 2003, and Carnes forwarded it to New Penn. (Ex. 1: Goulet Dep. p. 41, 43; Ex. 5: Carnes Dep. p. 27, 39; Ex. 16: Goulet Grievance) On April 18, 2003, Cashman also forwarded a copy of Goulet's grievance to Charles Zaccaria, New Penn's Vice President in Billerica, Massachusetts. (Ex. 17: Cashman Letter to Zaccaria)

Carnes testified that he had a conversation with somebody at New Penn regarding Goulet's grievance because New Penn declined to move on it. New Penn told him that it was looking into the

grievance. That as far as Carnes took Goulet's grievance. (Ex. 5: Carnes Dep. p. 31-32)

Carnes knew that under the labor contract a grievance must be docketed with the appropriate committee within 30 days after the grievance was received by the union. (Ex. 5: Carnes Dep. p. 34-35, 46-48) However, Carnes never docketed Goulet's grievance with any grievance committee. (Ex. 5: Carnes Dep. p. 35; Ex. 6: Harrington Dep. p. 50) Furthermore, Carnes has admitted that New Penn and Local 25 had <u>not</u> agreed to any extension of the time lines within which actions had to be taken with regard to Goulet's grievance. Previously, that had been done only by "mutual agreement." (Ex. 5: Carnes Dep. p. 8, 45)

On May 2, 2003, Carnes left office. According to Carnes, no one from Local 25 came to him in the days and weeks before May 2, 2003, to ask for any of his grievance files. Carnes claims that if he had an active grievance, it would have been left with his secretary. (Ex. 5: Carnes Dep. p. 35-38)

Sometime after Carnes left office, Goulet spoke to Harrington and asked about the status of his grievance. Harrington said he was not aware of a grievance. Harrington admitted that Carnes had not filed Goulet's grievance with any grievance committee. Harrington asked Goulet to send him a copy of the grievance. (Ex. 1: Goulet Dep. p. 43, 45-46, 88; Ex. 2: Goulet Errata Sheet; Ex. 6: Harrington Dep. p. 26-28)

Harrington knew that Goulet had sufficient seniority to be called for work by New Penn. Harrington knew that people who had less seniority than Goulet had had been called to work by New Penn. (Ex. 6: Harrington Dep. p. 45-46)

Harrington in deposition also admitted that he knew that APA had put Goulet back on the seniority list in November, 2001, without requiring him to serve a suspension or to supply medical documentation. Harrington further admitted that Local 25 does not have the right to take someone off the APA seniority list. And Harrington admitted that he knew that if APA did not insist on a suspension or medical documentation, Local 25 could not insist that Goulet serve a suspension or supply medical documentation. (Ex. 6: Harrington Dep. p. 64-65)

In fact, Harrington conceded that no one within Local 25 ever objected to the fact that APA had put

9

Goulet back on its November, 2001, Canton seniority list. (Ex. 6: Harrington Dep. p. 73)

In any case, Goulet immediately forwarded to Harrington copies of his grievance after Harrington said he was unaware of Goulet's grievance. (Ex. 1: Goulet Dep. p. 47)

In July, 2003, Goulet had a follow up telephone conversation with Harrington and sent him another letter about his grievance. Harrington still had not docketed Goulet's grievance with the appropriate committee. (Ex. 1: Goulet Dep. p. 47;Ex. 18: Goulet Letter to Harrington)

Goulet called Harrington again in August, 2003, to find out the status of his grievance. Harrington <u>still</u> had not docketed the grievance with the appropriate committee. (Ex. 1: Goulet Dep. p. 50)

Harrington he did not file Goulet's grievance with the Southern Joint Area Committee until <u>September 3, 2003</u>. Harrington waited many months to file Goulet's grievance even though he well knew that there was a time limit in the collective bargaining agreement requiring the docketing of grievances within 30 days from the filing of the grievance. (Ex. 6: Harrington Dep. p. 29, 34-35; Ex. 19: Southern New England Joint Area Committee Pre-Hearing Information)

It is uncontested that  was Local 25's responsibility to timely docket the grievance before the committee to have it heard. (Ex. 1: Goulet Dep. p. 53)

Goulet met with Harrington at the union hall to discuss the preparation of the case against New Penn with the grievance committee. Harrington told Goulet: "You know, if you push this grievance against New Penn, you will probably never work in the freight industry again." (Ex. 1: Goulet Dep. p. 95; Ex. 2: Goulet Errata Sheet)

On July 22, 2004, Harrington submitted his written argument to grievance committee in support of Goulet's grievance. In there he noted that:

    A.       Goulet was placed back on the APA seniority list as of November, 2001;

    B.       However, on the call list Goulet's name was omitted;

    C.       Goulet notified the steward Doug Francey of his desire to go to the Billerica, MA terminal;

    D.       Goulet had sufficient seniority to be called to work; and

  E. Since Goulet was never contacted by New Penn, it failed to abide by its agreement with the Teamsters. (Ex. 20: Harrington Submission)

At the grievance hearing held on July 28, 2004, Daniel Schmidt on behalf of New Penn argued that Goulet's April, 2003, grievance had not been docketed by Local 25 until September 3, 2003, while the labor agreement required that grievances must be docketed in thirty days. (Ex. 21: Hearing Transcript)

On July 28, 2004, the Eastern Region Join Area Committee denied Goulet's grievance against New Penn on the basis that: "The Panel, in executive session, motion made, seconded and carried, the initial docketing of the case was not within thirty (30) days; therefore, the Company's point of order is upheld." (Ex. 22: New Penn Decision)

At the time this was going on Goulet still had some outstanding medical issues. Goulet has a knee that needs to be reconstructed. He had a herniated disc in his lower back, which affects his ability to sit on occasion, to stand, lift, turn or to bend. Nevertheless Goulet was able to drive a truck; he has a current commercial drivers license. Even if he was unable to resolve those medical issues, New Penn was obligated under the labor agreement and the Americans with Disability Act to provide him with either light duty work or a reasonable accommodation. (Ex. 1: Goulet Dep. p. 57, 70-73; Ex. 2: Goulet Errata Sheet; Ex. 23: National Master Freight Agreement)

As noted above, part of Goulet's continuing eligibility for Social Security disability benefits is the fact that he suffers from depression, personality disorder and alcohol dependence due to Goulet having been fired and not been able to obtain work since then. (Ex. 26: Consultative Examination Report of Stephan Simonian, M.D., dated May 2, 2003)

Furthermore, Goulet knew that under Social Security Administration guidelines, he could have tried to return to work had he been given the opportunity. If New Penn called and offered him a job, Social Security would have allowed him to try and return to work. (Ex. 1: Goulet Dep. p. 74; Ex. 2: Goulet Errata Sheet)

Furthermore, Goulet is receiving Social Security benefits in part because of his depression,

personality disorder and alcohol dependence cause by his inability of to obtain work since he was fired by APA back in 1987. (Ex. 26: Consultative Examination Report of Stephan Simonian, M.D., dated May 2, 2003) If New Penn has offered him employment (as it was required to do), major causes for his disability would have been cured and Goulet would have been able to return to work.

Therefore, had New Penn called Goulet back to work sometime between March 1, 2002, and March 30, 2003, as it was required to do, he would have tried to work 30 days in a two month period in order to gain seniority at New Penn as several other APA employees had done. He would have made every effort to go to work and get clearance from the doctors. (Ex. 1: Goulet Dep. p. 80, 104-105; Ex. 2: Goulet Errata Sheet)

### III. Argument

#### A. Applicable Law – The Duty of Fair Representation

Because this case largely concerns the duty of fair representation, a summary of the law on this issue is relevant.

In the case of Vaca v. Sipes, 386 U.S. 171 (1967), the U. S. Supreme Court established the principle that, as the exclusive bargaining representative, a union has a statutory duty to fairly represent all of those employees, both in its collective bargaining with the employer and in its enforcement of the resulting collective bargaining agreement. Id. at 177. Thus a union may not, for example, arbitrarily ignore a meritorious grievance or process it in perfunctory fashion. Id. at 191.

Thus, in the First Circuit it has been ruled that a labor organization will be liable for violation of its duty of fair representation if it significantly harms its members through actions that are arbitrary, reckless, or in bad faith. "Reckless disregard" of an employee's interests is actionable breach of duty of fair representation. Achilli v. John J. Nissen Baking Co., 989 F.2d 561, 563 (1st Cir. 1993). Union members are entitled to a bargaining agent in possession of all relevant facts and arguments; and to real, as opposed to perfunctory, efforts to protect their welfare. Berrigan v. Greyhound Lines, Inc., 782 F.2d 295, 298 (1st

Cir. 1986).

For example, in <u>Velez v. Puerto Rico Marine Management, Inc.</u>, 957 F.2d 933, 940 (1st Cir. 1992), the union violated its duty of fair representation because the Local took virtually no action with respect to the discharges of the plaintiffs or to the subsequent subcontracting, which action was deemed to be perfunctory and illegal.  See also <u>Soto Segarra v. Sea-Land Service, Inc.</u>, 581 F.2d 291 (1st Cir. 1978) (finding breach of duty of fair representation in union's failure to respond to employee's repeated requests that the union investigate and process his discharge grievance); <u>De Arroyo v. Sindicato De Trabajadores Packinghouse, AFL-CIO</u>, 425 F.2d 281 (1st Cir.), <u>cert. denied</u>, 400 U.S. 877 (1970) (finding breach of duty of fair representation in union's failure to discern an obvious basis under the contract for pressing a number of grievances).

Also, a plaintiff can establish a breach of the duty of fair representation if it is shown that the handling of his grievances was materially deficient. <u>Early v. Eastern Transfer</u>, 699 F.2d 552, 556 (1st Cir. 1983)  Furthermore, the duty of fair representation mandates that a union conduct at least a minimal investigation into an employee's grievance.  <u>Emmanual v. International Brotherhood of Teamsters, Local Union No. 25</u>, 426 F.3d 416, 420 (1st Cir. 2005)

**B.      There Is Evidence That Teamsters Local 25 Knew Goulet Was On The Seniority List.**

Teamsters Local 25 now argues in its Memorandum in Support of its Motion for Summary Judgment that there is no evidence that the Teamsters Local 25 violated its duty of fair representation by failing to put Goulet's name on the preference list submitted to New Penn because "the Union reasonably believed, based on the information available to it, that because the Plaintiff had not fulfilled the requirements to be returned to the seniority list, that he was therefore, not eligible to have his name place on any of New Penn's call lists." (Memorandum, p. 14)  This factual claim is in dispute, however.

First and foremost, during discovery Teamsters Local 25 presented absolutely no evidence as to why Cashman (who is now incarcerated) left Goulet's name off of the call list he submitted to New Penn.  It has

provided no record support – other than its attorney's brand new argument – for the new found suggestion that the reason that Cashman left Goulet's name off the call list sent to New Penn was because Goulet supposedly had not fulfilled the requirements to be returned to APA's seniority list.  This factual assertion is totally fabricated.  In fact during discovery none of the witnesses for Teamsters Local 25 would or did offer any rationale as to why Cashman left Goulet's name off of the list he had forwarded to New Penn.

    Furthermore, there is ample evidence that Cashman should have forwarded Goulet's name to New Penn.  All witnesses acknowledged that Goulet's name was on the APA seniority list .  APA reinstated Goulet's seniority in November, 2001, without requiring Goulet to submit any documentation as to his ability to return to unrestricted duties and without requiring him to serve a ten day suspension.  (Ex. 1: Goulet Dep. p. 25, 29) Both business agents Carnes and Harrington confirmed that Goulet's name had been put back on APA's seniority list. (Ex. 1: Goulet Dep. p. 28-29; Ex. 5: Carnes Dep. p. 18;  Ex. 6: Harrington Dep. p. 40)  And indeed, the November, 2001, Local Union 25 Canton Seniority List has Goulet's name on it. (Ex. 7: Canton Seniority List)  Doug Francey testified that the preference list which he gave to Harrington had Goulet's name on it. (Ex. 10: Francey's Preference List)  And Harrington admitted in deposition that when APA put Goulet back on the seniority list in November, 2001, without requiring him to serve a suspension or supply medical documentation, Local 25 did not have the right to Goulet off the APA seniority list.  (Ex. 6: Harrington Dep. p. 64-65)

    The actions of other Local 25 officers at the time are inconsistent with counsel for Local 25's new and unfounded argument that Cashman left Goulet's name off the call list sent to New Penn was because Goulet supposedly had not fulfilled the requirements to be returned to APA's seniority list.   It should be recalled that  Carnes testified that he telephoned the manager at the Billerica New Penn terminal and told him that Goulet, an APA employee, was looking to go back to work and should be called be on the call list. (Ex. 1: Goulet Dep. p. 85, 91; Ex. 2: Goulet Errata Sheet Ex. 5: Carnes Dep. p. 21, 23-25)  And Harrington, when he (finally) Harrington submitted his written argument to the grievance committee in support of Goulet's grievance, he noted that Goulet had placed back on the APA seniority list as of November, 2001.

(Ex. 20: Harrington Submission)

Therefore Local 25's new assertion that Cashman purposefully left off Goulet's name from the preference list given to New Penn because Goulet had not served a suspension with APA or supplied APA medical documentation both has no support whatsoever in the record and totally contradicts that evidence which is in the record.

Furthermore, by Cashman leaving Goulet's name off of the preference list given to New Penn, the Union did violate its duty of fair representation. By leaving Goulet's name off of the call list, Teamster Local 25 acted both recklessly in disregard of Goulet's rights and acted in a perfunctory manner. As noted above, such reckless disregard of and perfunctory handling of a unit employee's interests is actionable breach of duty of fair representation. Achilli v. John J. Nissen Baking Co., supra at 563; Berrigan v. Greyhound Lines, Inc., supra at 298; Velez v. Puerto Rico Marine Management, Inc., supra at 940; Soto Segarra v. Sea-Land Service, Inc., supra; De Arroyo v. Sindicato De Trabajadores Packinghouse, AFL-CIO, supra.

**C.   The Union's Failure To Timely Docket Goulet's Grievance Violated The Duty Of Fair Representation.**

As noted above, a plaintiff can establish a breach of the duty of fair representation if it is shown that the handling of his grievances was materially deficient. Early v. Eastern Transfer, supra at 556. See also Soto Segarra v. Sea-Land Service, Inc., supra (finding breach of duty of fair representation in union's failure to respond to employee's repeated requests that the union investigate and process his discharge grievance); De Arroyo v. Sindicato De Trabajadores Packinghouse, AFL-CIO, supra, (finding breach of duty of fair representation in union's failure to discern an obvious basis under the contract for pressing a number of grievances). This authority is applicable to this case.

In the instant case, because the Union did not timely docket Goulet's grievance, his grievance was denied. Business Agent Carnes knew that he had 30 days after he received Goulet's grievance to docket it with the grievance committee. But Carnes never docketed Goulet's grievance. (Ex. 5: Carnes Dep. p. 34-

35, 46-48, 50) Likewise, Business Harrington also knew that collective bargaining agreement require him to docket Goulet's grievance within 30 days after it was filed. Yet, Harrington did not file Goulet's grievance with the Southern Joint Area Committee until September 3, 2003. (Ex. 1: Goulet Dep. p. 47; Ex. 6: Harrington Dep. p. 29, 34-35; Ex. 18: Goulet Letter to Harrington; Ex. 19: Southern New England Joint Area Committee Pre-Hearing Information)

And because of Carnes' and Harrington's materially deficient and perfunctory handling of Goulet's grievance, it was denied. (Ex. 21: Hearing Transcript; Ex. 22: New Penn Decision)

Teamster Local 25 now suggests that the "Union relied on the parties' past practice of waiving the docketing deadlines for grievances with New Penn." (Memorandum, p. 18) This is another assertion by counsel that is not supported by the record. This is not what was testified to by the Union witnesses. In fact, Business Agent Carnes actually testified that at times the parties had extended the docketing deadlines by "mutual agreement." Carnes further admitted that New Penn and Local 25 had not agreed to any extension of the time lines within which actions had to be taken with regard to Goulet's grievance. (Ex. 5: Carnes Dep. p. 8, 45) So contrary to the new, unfounded assertion in Teamsters Local 25's Memorandum, there was no unilateral "past practice of waiving the docketing deadlines." Because Teamsters Local 25 did not obtain any "mutual agreement" to extend the docketing deadlines, Goulet's grievance was denied. Teamsters Local 25's handling of Goulet's grievance was materially deficient. Therefore it is liable for breach of the duty of fair representation.

Lastly, Local 25's reliance on Emmanual v. International Brotherhood of Teamsters, Local Union No. 25, supra, is misplaced. It that case "the Union did actively investigate Emmanuel's claim." Supra at 421. And the "Union unsuccessfully pursued Emmanuel's grievance through arbitration." Supra at 418. However, the arbitrator "concluded that Emmanuel's discharge was justified under the CBA." Supra at 419. In the instant case, however, Local 25 by knowingly failing to timely docket Goulet's grievance was, to be kind, "materially deficient."

16

### D.    The Union Did Not Decide Goulet's Grievance Lacked Merit

In its Memorandum, Teamsters Local 25 now also claims that: "As the Plaintiff cannot show any evidence that the Union's decision not to pursue his grievance was arbitrary or in bad faith, Local 25 is entitled to judgment as a matter of law."(Memorandum, p. 22)

Once again Teamsters Local 25 misrepresents the factual record. Its new found assertion to the effect that Union decided not to pursue Goulet's grievance is not supported anywhere in the record. In fact, the Union decided to pursue Goulet's grievance and argued to the grievance committee that it had merit. It is undisputed that Harrington filed Goulet's grievance with the Southern Joint Area Committee on September 3, 2003. (Ex. 19: Southern New England Joint Area Committee Pre-Hearing Information) It is undisputed that on July 22, 2004, Harrington submitted his written argument to grievance committee in support of Goulet's grievance. In there he noted, inter alia, that since Goulet was never contacted by New Penn, it failed to abide by its agreement with the Teamsters. (Ex. 20: Harrington Submission)

Counsel for Local 25 cannot now assert in good faith to this Court that the Union decided not to pursue Goulet's grievance. It did (eventually) pursue his grievance, argued that it had merit, but lost the case because it did not docket the case in time and did not get any mutual agreement to extend the filing deadline.

Furthermore, after attempting to pursue Goulet's grievance and representing to the Southern New England Joint Area Committee and to the Eastern Region Joint Area Committee that Goulet's grievance had merit, Local 25 cannot now assert in a Rule 56 context that indisputably Goulet's grievance lacked merit. Harrington has admitted under oath that he knew that APA had put Goulet back on the seniority list in November, 2001, without requiring him to serve a suspension or to supply medical documentation. Harrington further admitted that Local 25 does not have the right to take someone off the APA seniority list. (Ex. 6: Harrington Dep. p. 64-65) So counsel's new found argument that Goulet's grievance lacked merit (which is in dispute) is not even consistent with its own witnesses' testimony.

17

**E.     Goulet's Receipt Of Social Security Benefits Is Not Inconsistent With Pursing This Case.**

In its Memorandum (p. 22) Local 25 adopts the same argument that New Penn makes; namely, that Goulet's receipt of Social Security benefits is inconsistent with his claim for damages and that Goulet has failed to mitigate his damages. Goulet's response here is the same as it was to New Penn.

As detailed above, while Goulet certainly has some physical and mental issues, it hardly is undisputed as a matter of fact that he could not have performed any labor for New Penn. These are the relevant facts in the record.

As stated, Goulet still had some outstanding medical and mental issues. Nevertheless Goulet was and is able to drive a truck for New Penn. Goulet has a current commercial drivers license. Goulet had been injured as a docker worker for APA. And even if Goulet somehow was unable to resolve those medical issues with regard to driving a truck, New Penn was still obligated under the contract and the Americans with Disability Act to provide Goulet with light duty work or a reasonable accommodation. Furthermore, under Social Security Administration guidelines, Goulet could have tried to return to work had New Penn given him the opportunity. Therefore, had New Penn called Goulet back to work sometime between March 1, 2002 and March 30, 2003, as it was required to do, – with the approval and encouragement of Social Security – Goulet would have tried to work 30 days in a two month period in order to gain seniority at New Penn as other APA employees had done. (Ex. 1: Goulet Dep. p. 57, 70-74, 80, 104-105; Ex. 2: Goulet Errata Sheet; Ex. 23: National Master Freight Agreement)

The fact that Goulet is receiving Social Security benefits does not mean that he cannot engage in any meaningful labor. As Goulet testified at his deposition, under Social Security Administration guidelines, he could have tried to return to work had he been given the opportunity.
In fact, Social Security encourages persons receiving benefits to try to go back to work. Under 20 C.F.R. § 404.1592, Social Security, under a trial period concept, allows persons receiving benefits to perform services for as long nine months before Social Security will even try to determine whether the disability has ended. That regulation reads, in relevant part:

18

"404.1592 The trial work period.

> (a) Definition of the trial work period. The trial work period is a period during which you may test your ability to work and still be considered disabled. It begins and ends as described in paragraph (e) of this section. During this period, you may perform services (see paragraph (b) of this section) in as many as 9 months, but these months do not have to be consecutive. We will not consider those services as showing that your disability has ended until you have performed services in at least 9 months. However, after the trial work period has ended we will consider the work you did during the trial work period in determining whether your disability ended at any time after the trial work period.
>
> (b) What we mean by services. When used in this section, services means any activity (whether legal or illegal), even though it is not substantial gainful activity, which is done in employment or self-employment for pay or profit, or is the kind normally done for pay or profit. We generally do not consider work done without remuneration to be services if it is done merely as therapy or training or if it is work usually done in a daily routine around the house or in self-care. We will not consider work you have done as a volunteer in the federal programs described in section 404.1574(d) in determining whether you have performed services in the trial work period.
>
> . . ."

Because Social Security as a matter of its practice and regulation encourages people receiving benefits to attempt to go back to work, there is nothing inconsistent about Goulet stating that as a matter of fact and law, if New Penn had offered him a work opportunity – as it was required to do by contract – he would have attempted to go back to work, if nothing else, as a driver. It should be recalled that Goulet was injured in a forklift accident when he was working on the dock. Goulet also had and still has a commercial drivers license, and his injuries, suffered as a dock worker, do not necessarily prevent him from driving vehicles for New Penn. Because Goulet was receiving disability benefits due to in large part his depression, personality disorder and alcohol dependence cause by his inability of to obtain work since he was fired by APA back in 1987, major causes for his disability would have been cured if New Penn has offered him employment (as it was required to do).

With regard to the failure to mitigate damages claim, that issue relates to his damages – not to Local 25's liability. Therefore that issue is irrelevant to defendant's general argument in summary judgment that as a matter of law it has no liability to Goulet. And Goulet has mitigated his damages. Goulet has sought

and received Social Security disability benefits. If and when Goulet demonstrates to a jury that Local 25 is liable for violating its duty of fair representation, any and all of Goulet's Social Security benefits would offset any damages that he would otherwise recover against New Penn. Hence, Goulet has mitigated his damages, and the award against Local 25 will be less than they would otherwise had been if Goulet had not been receiving Social Security disability benefits.

**WHEREFORE** for all of the above reasons, Teamsters Local 25's Motion for Summary Judgment should be denied.

                                                   Craig Goulet
                                                   By his attorney

                                                 */s/ Scott A. Lathrop*
                                                 Scott A. Lathrop, Esq.
                                                 Scott A. Lathrop & Associates
                                                 122 Old Ayer Road
                                                 Groton, MA 01450
                                                 (978) 448-8234
Dated: February 11, 2006                          BBO No. 287820


Certificate of Service

I, Scott A. Lathrop, hereby certify that I have served the foregoing Opposition on the defendants by mailing this day a copy to the last known address of their Attorneys of Record.

                                                 */s/ Scott A. Lathrop*
                                                 _____
                                                 Scott A. Lathrop

Dated: February 11, 2006