UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12577 JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CRAIG GOULET,                              \*
    Plaintiff                              \*
                                           \*
    v.                                     \*
                                           \*
NEW PENN MOTOR EXPRESS, INC., and  \*
TEAMSTERS LOCAL 25,                        \*
INTERNATIONAL BROTHERHOOD OF       \*
TEAMSTERS,                                 \*
    Defendants                             \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S STATEMENT OF DISPUTED FACTS
AND RELEVANT FACTS IGNORED BY DEFENDANT TEAMSTERS LOCAL 25**

1.    Undisputed

2.    Undisputed

3.    Undisputed

4.    Undisputed

5.    Undisputed

6.    Undisputed

7.    Undisputed

8.    Undisputed

9.    Undisputed

10.    Undisputed

11.    Undisputed

12.     Undisputed

13.     Disputed.  Goulet has continuously sought employment with New Penn, which had a contractual obligation to hire him and a legal obligation to minimally accommodate any limitation he had.   No other employer had such obligations.

     a.     Goulet admittedly still had some outstanding medical issues. Goulet has a knee that needs to be reconstructed.  He had a herniated disc in his lower back, which affects his ability to sit on occasion, to stand, lift, turn or to bend.  Nevertheless Goulet was able to drive.  Goulet has a current commercial drivers license.  Even if he was unable to resolve those medical issues, New Penn was obligated under the contract and the Americans with Disabilities Act to provide light duty work or a reasonable accommodation to qualified individuals.  (Ex. 1: Goulet Dep. p. 57, 70-73;  Ex. 2: Goulet Errata Sheet)

     b.     Furthermore, Goulet knew that under Social Security Administration guidelines, he could have tried to return to work had he been given the opportunity.  If New Penn called and offered him a job, Social Security would have allowed him to try and return to work. (Ex. 1: Goulet Dep. p. 74; Ex. 2: Goulet Errata Sheet)

     c.     Therefore, had New Penn called him back to work sometime between March 1, 2002, and March 30, 2003, as it was required to do, he would have tried to work 30 days in a two month period in order to gain seniority at New Penn.  He would have made every effort to go to work and get clearance from the doctors (Ex. 1: Goulet Dep. p. 80, 104-105; Ex. 2: Goulet Errata Sheet)

14.    Undisputed

15.    Undisputed

16.    Undisputed

17.    Undisputed

18.    Undisputed

19.    Undisputed

20.    Undisputed

21.    Undisputed

22.    Disputed.  In fact, APA reinstated Goulet's seniority.  Here are the full facts in support of this.

    a.    As a result of this grievance, APA reinstated Goulet's seniority in November, 2001, without requiring Goulet to submit any documentation as to his ability to return to unrestricted duties and without requiring him to serve a ten day suspension.  (Ex. 1: Goulet Dep. p. 25)

    b.    Several Local 25 business agents confirmed that Goulet's name had been put back on APA's seniority list.  Both business agents William Carnes and Mark Harrington told Goulet that he had been placed back on APA's seniority list. (Ex. 1: Goulet Dep. p. 28-29)

    c.    Carnes has testified that around November, 2001, the APA seniority list for Canton, Massachusetts, with Goulet's name on it, was forwarded to Carnes. (Ex. 5: Carnes Dep. p. 18)

    d.    Harrington has admitted that Local 25's office received this Canton seniority list with

        Goulet's name it from APA in approximately November, 2001. (Ex. 6: Harrington Dep. p. 40)

e.     In fact, Goulet saw an APA seniority list, dated November, 2001, for the terminal in Canton, Massachusetts, with his name on it. (Ex. 1: Goulet Dep. p. 29)

f.     And indeed, the November, 2001, Local Union 25 Canton Seniority List has Goulet's name on it. (Ex. 7: Canton Seniority List)

g.     APA (not the Union) was responsible for creating the seniority lists. (Ex. 3: Dubiel Dep. p. 11-12)

h.     Harrington admitted that he knew that APA had put Goulet back on the seniority list in November, 2001, without requiring him to serve a suspension or supplying medical documentation. Harrington further admitted that Local 25 does not have the right to take someone off the APA seniority list. And Harrington admitted that if APA did not insist on a suspension or medical documentation, Local 25 could not insist that Goulet serve a suspension. (Ex. 6: Harrington Dep. p. 64-65)

i.     No one within Local 25 ever objected to the fact that APA had put Goulet on its November, 2001, Canton seniority list. (Ex. 6: Harrington Dep. p. 73)

23.    Disputed. Goulet's name was fully restored to the APA seniority list. See, No. 22, above.

24.    Disputed. Goulet's name was fully restored to the APA seniority list. See, No. 22, above.

25.    Disputed. Goulet's name was fully restored to the APA seniority list. See, No. 22, above.

26.    Undisputed.

27.    Disputed. Goulet's name was fully restored to the APA seniority list. See, No. 22, above.

28.    Disputed. Goulet's name was fully restored to the APA seniority list. See, No. 22, above.

4

29.     Disputed.  Goulet's name was fully restored to the APA seniority list.  See, No. 22, above.

30.     Undisputed.

31.     Undisputed.

32.     Disputed.

    a.     This Agreement in section 8(h), paragraph 2, further states that: "If during the term of the current 1998 - 2003 NMFA, but not later than March 31, 2003, the list of former A.P.A. NMFA employees at any terminal is exhausted, those A.P.A. NMFA employees on other terminal lists in that local supplement, who have not obtained seniority at NPME, will be offered a second opportunity to place their name on the call list of such terminal."  (Ex. 9: Teamsters & New Penn Agreement)

33.     Disputed.

    a.     This Agreement in section 8(h), paragraph 2, further states that: "If during the term of the current 1998 - 2003 NMFA, but not later than March 31, 2003, the list of former A.P.A. NMFA employees at any terminal is exhausted, those A.P.A. NMFA employees on other terminal lists in that local supplement, who have not obtained seniority at NPME, will be offered a second opportunity to place their name on the call list of such terminal."  (Ex. 9: Teamsters & New Penn Agreement)

34.     Disputed.   Teamsters Local 25 ignores other relevant evidence.

    a.     Doug Francey worked in Canton, Massachusetts, until APA closed in February, 2002.  He  was the steward at the APA facility from February, 2001, until February, 2002. (Ex. 8: Francey Dep. p. 7-8)

    b.     Local 25 Business Agent Mark Harrington told Francey that New Penn was offering

work to APA employees on a seniority basis. There were two terminals that the APA employees had choice of – Billerica, Massachusetts, or Providence, Rhode Island. One of Francey's duties as the steward was to take the APA seniority list and ask everybody where they wanted to go, which he did. (Ex. 8: Francey Dep. p. 11-12)

c.      Francey also went to the Local 25 Union hall at 544 Main Street, Charlestown, Massachusetts, for a meeting for the Dracut and Canton APA drivers. Present were Harrington, Carnes, anther business agent, and George Cashman, President of Local 25. They mentioned that New Penn was offering work on a seniority basis to APA employees. (Ex. 8: Francey Dep. p. 13-15)

d.      Francey had a copy of an APA seniority list. He went to everybody and asked them what terminal they wanted to go to and wrote it down next to their name. When he was done with that, he handed it into Harrington. Francey spoke with Goulet, who gave Francey his pick of New Penn terminals. Francey wrote Goulet's name on the bottom of this document and listed where Goulet wanted to go and his phone number. Francey put an arrow up the side and inserted it where Goulet's name should be on the seniority list. Goulet selected the Billerica terminal. (Ex. 8: Francey Dep. p. 15-18)

e.      Goulet testified that after he learned in February, 2002, that APA was going out of business, he initially called Francey. Later, on February 17, 2002, Francey called Goulet and told him that there had been a Union meeting with the APA men, and that Francey wanted to know what Goulet's preference for terminal was as it related to

New Penn's call list.  (Ex. 1: Goulet Dep. p. 30-35)

f.      After Francey got everyone's preference, he gave a copy of this document – with

Goulet and his preference listed on it – to Harrington.  Francey kept the original (and

brought it to his deposition.) (Ex. 8: Francey Dep. p. 20)

g.      As Francey testified, the preference list which he gave to Harrington does in fact

have Goulet's name on it, his telephone number and his preference for the Billerica

New Penn terminal. (Ex. 10: Francey's Preference List)

h.      In March, 2002, Goulet made a follow up phone call to Harrington.  Goulet spoke

with Harrington also about the call list and what was going on with the APA people

and the New Penn agreement.   Harrington told Goulet that he no longer handled the

men at APA, and that Goulet would have to speak with business agent William

Carnes. (Ex. 1: Goulet Dep. p. 36-37)

i.      Carnes was a business agent for Local 25.  Carnes had responsibility for New Penn

Motor Express from 1982 until 2003.  (Ex. 5: Carnes Dep. p. 7, 9)

j.      Goulet then contacted Carnes in the spring of 2002 about the agreement that the

Union had with New Penn and about being on the call list.  Carnes said that he was

going to look into it.  Goulet had reminded Carnes that he was on an APA seniority

list. (Ex. 1: Goulet Dep. p. 38, 44)

k.      Carnes also recalled that Goulet had called him sometime after the agreement was

made between the Teamsters and New Penn, saying that he wished to be on a call list

for New Penn.  Goulet wanted to be put back to work at New Penn and wanted

Carnes to help him.  As a result Carnes called New Penn.  (Ex. 5: Carnes Dep. p. 21,

23-24)

    l.       Carnes then spoke to New Penn on Goulet's behalf.  Carnes telephoned the manager at the Billerica New Penn terminal and told him: "I have an APA  employee who's looking to go back to work."  Carnes identified Goulet by name.  The New Penn terminal manager told Carnes to go fuck himself.  (Ex. 5: Carnes Dep. p. 25)

35.     Disputed.   Teamster Local 25 ignores the fact that APA had nevertheless restored Goulet to the Seniority List.  See, No. 22, above.

36.     Undisputed.

37.     Undisputed.

38.     Disputed.

    a.      Contrary to the assertion of Teamsters Local 25, he did not testify that he "took the seniority list that was posted on the employees' bulletin board."  Francey merely testified that he had a copy of a seniority list.  (Ex. 8: Francey Dep. p. 15-16)

39.     Undisputed.

40.     Undisputed,

41.     Undisputed.

42.     Undisputed.

43.     Undisputed.

44.     Disputed.  Local 25 knows full well that it received the November, 2001, seniority list for APA's Canton, Massachusetts, facility, and that this list had Goulet's name on it.

    a.      As a result of this grievance, APA reinstated Goulet's seniority in November, 2001, without requiring Goulet to submit any documentation as to his ability to return to

unrestricted duties and without requiring him to serve a ten day suspension. (Ex. 1: Goulet Dep. p. 25)

b.    Several Local 25 business agents confirmed that Goulet's name had been put back on APA's seniority list. Both business agents William Carnes and Mark Harrington told Goulet that he had been placed back on APA's seniority list. (Ex. 1: Goulet Dep. p. 28-29)

c.    Carnes has testified that around November, 2001, the APA seniority list for Canton, Massachusetts, with Goulet's name on it, was forwarded to Carnes. (Ex. 5: Carnes Dep. p. 18)

d.    Harrington has admitted that Local 25's office received this Canton seniority list with Goulet's name it from APA in approximately November, 2001. (Ex. 6: Harrington Dep. p. 40)

e.    In fact, Goulet saw an APA seniority list, dated November, 2001, for the terminal in Canton, Massachusetts, with his name on it. (Ex. 1: Goulet Dep. p. 29)

f.    And indeed, the November, 2001, Local Union 25 Canton Seniority List has Goulet's name on it. (Ex. 7: Canton Seniority List)

g.    Furthermore, Paul Dubiel, the APA terminal manager for Canton, Massachusetts, testified that the APA seniority list, dated November, 2001, for the terminal in Canton, Massachusetts, with Goulet's name on it was in the format that was the format used by APA Transport for its terminal seniority list and that this type of document was posted in the drivers' room. (Ex. 3: Dubiel Dep. p. 20, 35)

h.    The APA seniority list, dated November, 2001, for the terminal in Canton,

Massachusetts, which had Goulet' name on it was the same form that APA normally

sent directly to Local 25. (Ex. 6: Harrington Dep. p. 74)

45.    Disputed.    Teamsters Local 25 claims that it is possible that the APA facility in Canton,

Massachusetts, did not receive the November, 2001, seniority list prior to its closing in

February, 2002.  That "possibility" is conjecture and irrelevant. It has been admitted that

Local 25, which after all represented APA at its Canton, Massachusetts, facility received this

November 2001 seniority list with Goulet's name on it.

  a.    As a result of this grievance, APA reinstated Goulet's seniority in November, 2001,

without requiring Goulet to submit any documentation as to his ability to return to

unrestricted duties and without requiring him to serve a ten day suspension.  (Ex. 1:

Goulet Dep. p. 25)

  b.    Several Local 25 business agents confirmed that Goulet's name had been put back

on APA's seniority list.  Both business agents William Carnes and Mark Harrington

told Goulet that he had been placed back on APA's seniority list. (Ex. 1: Goulet Dep.

p. 28-29)

  c.    Carnes has testified that around November, 2001, the APA seniority list for Canton,

Massachusetts, with Goulet's name on it, was forwarded to Carnes. (Ex. 5: Carnes

Dep. p. 18)

  d.    Harrington has admitted that Local 25's office received this Canton seniority list with

Goulet's name it from APA in approximately November, 2001.  (Ex. 6: Harrington

Dep. p. 40)

  e.    In fact, Goulet saw an APA seniority list, dated November, 2001, for the terminal in

Canton, Massachusetts, with his name on it.  (Ex. 1: Goulet Dep. p. 29)

f.    And indeed, the November, 2001, Local Union 25 Canton Seniority List has Goulet's name on it. (Ex. 7: Canton Seniority List)

46.    Undisputed.  But more importantly, New Penn has admitted that it received a Seniority List with Goulet's name on it.

a.    In answer to Interrogatory Nos. 7 and 23, New Penn admitted that it received the APA Canton Seniority List for November,  2001 (which list contained Goulet's name on it) prior to March 1, 2002, at its corporate office from APA. (Ex. 15: New Penn Answers to Interrogatories)

47.    Undisputed.

48.    Disputed.  But more importantly, New Penn has admitted that it received a Seniority List with Goulet's name on it.

a.    In answer to Interrogatory Nos. 7 and 23, New Penn admitted that it received the APA Canton Seniority List for November, 2001 (which list contained Goulet's name on it) prior to March 1, 2002, at its corporate office from APA. (Ex. 15: New Penn Answers to Interrogatories)

b.    Defendant Teamsters Local 25 just filed its Motion for Summary Judgment.  In support of its Motion, it supplied the Affidavit of Burton Trebour, the former Vice President of Labor and Administration for APA.  In paragraph 18 of his Affidavit, Trebour states:   "When New Penn Motor Express requested terminal seniority lists to create its call lists, it asked for seniority lists from the corporate office, and thus received the corporate seniority list."   This so-called corporate seniority list is the

list on which Goulet's name appears. (Ex. 24: Affidavit of Burton Trebour).

49.    Undisputed.

50.    Disputed.

    a.    Goulet knew that under Social Security Administration guidelines, he could have tried to return to work had he been given the opportunity. If New Penn called and offered him a job, Social Security would have allowed him to try and return to work. (Ex. 1: Goulet Dep. p. 74; Ex. 2: Goulet Errata Sheet)

    b.    Therefore, had New Penn called him back to work sometime between March 1, 2002, and March 30, 2003, as it was required to do, he would have tried to work 30 days in a two month period in order to gain seniority at New Penn. He would have made every effort to go to work and get clearance from the doctors (Ex. 1: Goulet Dep. p. 80, 104-105; Ex. 2: Goulet Errata Sheet)

51.    Disputed.

    a.    Goulet sought light duty work at APA around 1991 or 1992. (Ex. 1: Goulet Dep. p. 18)

52.    Disputed.

    a.    Goulet had still had some outstanding medical issues. Goulet has a knee that needs to be reconstructed. He had herniated disc in his lower back, which affects his ability to sit on occasion, to stand, lift, turn or to bend. Nevertheless Goulet was able to drive. Goulet has a current commercial drivers license. Even if he was unable to resolve those medical issues, New Penn was obligated under the contract and the ADA to provide light duty work or a reasonable accommodation to qualified

12

individuals.  (Ex. 1: Goulet Dep. p. 57, 70-73;  Ex. 2: Goulet Errata Sheet)

b.      Furthermore, Goulet knew that under Social Security Administration guidelines, he could have tried to return to work had he been given the opportunity.  If New Penn called and offered him a job, Social Security would have allowed him to try and return to work. (Ex. 1: Goulet Dep. p. 74; Ex. 2: Goulet Errata Sheet)

c.      Therefore, had New Penn call Goulet back to work sometime between March 1, 2002 and March 30, 2003, as it was required to do, he would have tried to work 30 days in a two month period in order to gain seniority at New Penn.  He would have made every effort to go to work and get clearance from the doctors. (Ex. 1: Goulet Dep. p. 80, 104-105; Ex. 2: Goulet Errata Sheet)

53.    Undisputed.  But see No. 52, above.

54.    Undisputed.  But see No. 52, above

55.    Undisputed.  But see No. 52, above

56.    Disputed.

a.      Goulet had still had some outstanding medical issues. Goulet has a knee that needs to be reconstructed.  He had herniated disc in his lower back, which affects his ability to sit on occasion, to stand, lift, turn or to bend.  Nevertheless Goulet was able to drive.  Goulet has a current commercial drivers license.  Even if he was unable to resolve those medical issues, New Penn was obligated under the contract and the ADA to provide light duty work or a reasonable accommodation to qualified individuals.  (Ex. 1: Goulet Dep. p. 57, 70-73;  Ex. 2: Goulet Errata Sheet)

b.      Furthermore, Goulet knew that under Social Security Administration guidelines, he

could have tried to return to work had he been given the opportunity.  If New Penn called and offered him a job, Social Security would have allowed him to try and return to work. (Ex. 1: Goulet Dep. p. 74; Ex. 2: Goulet Errata Sheet)

c.      Therefore, had New Penn call Goulet back to work sometime between March 1, 2002 and March 30, 2003, as it was required to do, he would have tried to work 30 days in a two month period in order to gain seniority at New Penn.  He would have made every effort to go to work and get clearance from the doctors. (Ex. 1: Goulet Dep. p. 80, 104-105; Ex. 2: Goulet Errata Sheet)

57.     Disputed.  See No. 52, above.

58.     Disputed.

a.      Goulet sought light duty work at APA around 1991 or 1992. (Ex. 1: Goulet Dep. p. 18)

b.      Goulet has continuously sought employment with New Penn, which had a contractual obligation to hire him and a legal obligation to minimally accommodate any limitation he had.   No other employer had such obligations.

i.      Around March 31, 2003, Goulet called Carnes again when the agreement with New  Penn expired.  Goulet told Carnes that he had not been called.  Carnes told him to send a grievance in. (Ex. 1: Goulet Dep. p. 40)

ii.     Goulet testified that after he learned in February, 2002, that APA was going out of business, he initially called Francey.  Later, on February 17, 2002, Francey called Goulet and told him that there had been a Union meeting with the APA men, and that Francey wanted to know what Goulet's preference for

14

terminal was as it related to New Penn's call list.  (Ex. 1: Goulet Dep. p. 30-35)

iii.    After Francey got everyone's preference, he gave a copy of this document – with Goulet and his preference listed on it – to Harrington.  Francey kept the original (and brought it to his deposition.) (Ex. 8: Francey Dep. p. 20)

iv.    As Francey testified, the preference list which he gave to Harrington does in fact have Goulet's name on it, his telephone number and his preference for the Billerica New Penn terminal. (Ex. 10: Francey's Preference List)

v.    In March, 2002, Goulet made a follow up phone call to Harrington.  Goulet spoke with Harrington also about the call list and what was going on with the APA people and the New Penn agreement.   Harrington told Goulet that he no longer handled the men at APA, and that Goulet would have to speak with business agent William Carnes. (Ex. 1: Goulet Dep. p. 36-37)

vi.    Carnes was a business agent for Local 25.  Carnes had responsibility for New Penn Motor Express from 1982 until 2003.  (Ex. 5: Carnes Dep. p. 7, 9)

vii.    Goulet then contacted Carnes in the spring of 2002 about the agreement that the Union had with New Penn and about being on the call list.  Carnes said that he was going to look into it.  Goulet had reminded Carnes that he was on an APA seniority list. (Ex. 1: Goulet Dep. p. 38, 44)

viii.    Carnes also recalled that Goulet had called him sometime after the agreement was made between the Teamsters and New Penn, saying that he wished to be on a call list for New Penn.  Goulet wanted to be put back to work at New

Penn and wanted Carnes to help him. As a result Carnes called New Penn. (Ex. 5: Carnes Dep. p. 21, 23-24)

    ix.    Carnes then spoke to New Penn on Goulet's behalf. Carnes telephoned the manager at the Billerica New Penn terminal and told him: "I have an APA employee who's looking to go back to work." Carnes identified Goulet by name. The New Penn terminal manager told Carnes to go fuck himself. (Ex. 5: Carnes Dep. p. 25)

59.    Undisputed.

60.    Disputed.

    a.    Goulet sought light duty work at APA around 1991 or 1992. (Ex. 1: Goulet Dep. p. 18)

61.    Undisputed.

62.    Undisputed.

63.    Disputed.

    a.    Goulet has been seeking employment from New Penn consistently since February, 2002. See No. 58, above.

64.    Undisputed.

65.    Undisputed.

66.    Disputed.

    a.    Goulet has been seeking employment from New Penn consistently since February, 2002. See No. 58, above.

67.    Undisputed.

68.    Undisputed.

69.    Disputed.

      a.    Teamster Local 25 ignores the fact that Carnes knew that APA had nevertheless restored Goulet to its seniority list as of November, 2001.  Back in the fall of 2001 Carnes told Goulet that he had been placed back on APA's seniority list. (Ex. 1: Goulet Dep. p. 28-29)

      b.    Carnes has testified that around November, 2001, the APA seniority list for Canton, Massachusetts, with Goulet's name on it, was forwarded to Carnes. (Ex. 5: Carnes Dep. p. 18)

70.    Disputed.

      a.    Defendant Teamsters Local 25 further admitted that Local 25 does not have the right to take someone off the APA seniority list and that if APA did not insist on a suspension or medical documentation, Local 25 could not insist that Goulet serve a suspension or supply medical documentation.  (Ex. 6: Harrington Dep. p. 64-65)

      b.    No one within Local 25 ever objected to the fact that APA had put Goulet on its November, 2001, Canton seniority list. (Ex. 6: Harrington Dep. p. 73)

71.    Undisputed.

72.    Undisputed.

73.    Undisputed.

74.    Disputed.

      a.    In this letter Goulet merely explained his grievance to Harrington, who was not aware of Goulet's grievance.  Contrary to the assertion of Teamsters Local 25

17

Harrington had not raised any issues about the merits of the grievance.  (Ex. 1: Goulet Dep. p. 46-49)

b.    In this letter Goulet stated:

> "I have enclosed for you copies of the grievance I sent to Bill Carnes along with the postal receipt and letter which was sent to the Co.
> Let's not lose sight of the real issue here.  This grievance is about seniority rights under the agreement, not whether one was capable of working or not.  It is my understanding that I in fact was an employee of A.P.A.  My name should have been on there list and therefore I should have been called Period.
> Summary Agreement states that all employees with seniority which I had. Therefore one would have to agree that my rights were disregarded for whatever reason which you and I might better understand.
> I would also argue that under the NMFA Article 14, Section 3 that the Co did not meet there obligation or at the very least recognize it, which leaves another issue to address.
> Over the years I had asked APA to put me back to work light duty or otherwise and there defense was that I was no longer an employee.  I was discharged 3/11/87.  As you know the Joint Area Committee put the case on hold because it was held in another venue (DIA)?" (Ex. 18: Goulet Letter to Harrington)

75.    Disputed.   Defendant Teamsters Local 25 ignores the fact that it did not obtain "mutual agreement" to extend the time frame for filing grievances and as a result lost Goulet's grievance.  The details of this are as follows:

a.    Around March 31, 2003, Goulet called Carnes again when the agreement with New Penn expired.  Goulet told Carnes that he had not been called.  Carnes told him to send a grievance in. (Ex. 1: Goulet Dep. p. 40)

b.    Following this conversation, Goulet sent a grievance to Carnes dated April 7, 2003. Goulet brought the grievance to Carnes, and he forwarded it to New Penn. (Ex. 1: Goulet Dep. p. 41, 43; Ex. 5: Carnes Dep. p. 27, 39; Ex. 16: Goulet Grievance)

c.    On April 18, 2003, Cashman forwarded a copy of Goulet's grievance to Charles Zaccaria, New Penn's Vice President in Billerica, Massachusetts. (Ex. 17: Cashman

18

Letter to Zaccaria)

d.  Carnes testified that he had conversation  with somebody at New Penn regarding Goulet's grievance because New Penn declined to move on it.  New Penn told him that it was looking into the grievance.  That as far as Carnes took the grievance.  (Ex. 5: Carnes Dep. p. 31-32)

e.  Carnes knew that under the labor contract a grievance has to be docketed with the appropriate committee within 30 days after the grievance was received by the union.  (Ex. 5: Carnes Dep. p. 34-35, 46-48)

f.  Carnes never docketed Goulet's grievance with any grievance committee.  (Ex. 5: Carnes Dep. p. 35; Ex. 6: Harrington Dep. p. 50)

g.  On May 2, 2003, Carnes left office.  According to Carnes, no one from Local 25 came to him in the days and weeks before May 2, 2003, to ask for any of his grievance files.  Carnes claims that if he had an active grievance, it would have been left with his secretary.  (Ex. 5: Carnes Dep. p. 35-38)

h.  Carnes has admitted that New Penn and Local 25 had <u>not</u> agreed to any extension of the timelines within which actions had to be taken with regard to Goulet's grievance.  Previously, that had been done only by "mutual agreement."  (Ex. 5: Carnes Dep. p. 8, 45)

i.  Sometime after Carnes left office, Goulet spoke to Harrington and asked about the status of his grievance.  Harrington said he was not aware of a grievance.  Harrington said that Carnes did not file Goulet's grievance with any grievance committee.  Harrington asked to send a copy of the grievance. (Ex. 1: Goulet Dep. p. 43, 45-46,

88; Ex. 2: Goulet Errata Sheet; Ex. 6: Harrington Dep. p. 26-28)

j.      Goulet immediately forwarded to Harrington copies of his grievance. (Ex. 1: Goulet Dep. p. 47)

k.      In July, 2003, Goulet had a follow up telephone conversation with Harrington and sent him another letter about his grievance. Harrington still had not docketed Goulet's grievance with the appropriate committee. (Ex. 1: Goulet Dep. p. 47;Ex. 18: Goulet Letter to Harrington)

l.      Goulet had to call Harrington again in August, 2003, to find out the status of his grievance. Harrington still had not docketed the grievance with the appropriate committee. (Ex. 1: Goulet Dep. p. 50)

m.      Harrington admitted that he did not file Goulet's grievance with the Southern Joint Area Committee until September 3, 2003. Harrington waited until September 3, 2003, to file Goulet's grievance even though he knew that there was a time limit in the collective bargaining agreement requiring the docketing of grievances within 30 days from the filing of the grievance. (Ex. 6: Harrington Dep. p. 29, 34-35; Ex. 19: Southern New England Joint Area Committee Pre-Hearing Information)

n.      Goulet had filed the grievance with the local union. It was Local 25's job to docket the case before the committee to have it heard. (Ex. 1: Goulet Dep. p. 53)

o.      On July 22, 2004, Harrington submitted his written argument to grievance committee in support of Goulet's grievance. In there he noted that:

        i.      Goulet was placed back on the APA seniority list as of November, 2001;

        ii.     However, on the call list Goulet's name was omitted;

20

      iii.    Goulet notified the steward Doug Francey of his desire to go to the Billerica, MA terminal;

      iv.    Goulet had sufficient seniority to be called to work; and

      v.    Since Goulet was never contacted by New Penn, it failed to abide by its agreement with the Teamsters. (Ex. 20: Harrington Submission)

    p.    At the grievance hearing held on July 28, 2004, Daniel Schmidt on behalf of New Penn argued that the April, 2003, grievance had not been docketed by the Union until September 3, 2003, while the labor agreement required that grievances must be docketed in thirty days. (Ex. 21: Hearing Transcript)

    q.    On July 28, 2004, the Eastern Region Join Area Committee denied Goulet's grievance against New Penn on the basis that: "The Panel, in executive session, motion made, seconded and carried, the initial docketing of the case was not within thirty (30) days; therefore, the Company's point of order is upheld." (Ex. 22: New Penn Decision)

76.    Undisputed.

77.    Disputed.

    a.    The time period for docketing agreements was extended only by "mutual agreement." Defendant Teamsters Local 25 never even tried to obtain such "mutual agreement." See Nos. 75, above.

    b.    In fact, Carnes has admitted that New Penn and Local 25 had <u>not</u> agreed to any extension of the time lines within which actions had to be taken with regard to Goulet's grievance. (Ex. 5: Carnes Dep. p. 45)

78.  Undisputed.  But note that the time period for docketing agreements was extended only by "mutual agreement."  Defendant Teamsters Local 25 never even tried to obtain such "mutual agreement." See Nos. 75, above.

79.  Disputed.   New Penn considered the docketing of the grievance by defendant Teamster Local 25 on September 3, 2003, to be untimely and so successfully argued to the grievance committee.

   a.  At the grievance hearing held on July 28, 2004, Daniel Schmidt on behalf of New Penn argued that the April, 2003, grievance had not been docketed by the Union until September 3, 2003, while the labor agreement required that grievances must be docketed in thirty days. (Ex. 21: Hearing Transcript)

   b.  On July 28, 2004, the Eastern Region Join Area Committee denied Goulet's grievance against New Penn on the basis that: "The Panel, in executive session, motion made, seconded and carried, the initial docketing of the case was not within thirty (30) days; therefore, the Company's point of order is upheld." (Ex. 22: New Penn Decision)

80.  Disputed.

   a.  Harrington admitted that he knew that APA had put Goulet back on the seniority list in November, 2001, without requiring him to serve a suspension or supply medical documentation.  Harrington further admitted that Local 25 does not have the right to take someone off the APA seniority list.  And Harrington admitted that if APA did not insist on a suspension or medical documentation, Local 25 could not insist that Goulet serve a suspension.  (Ex. 6: Harrington Dep. p. 64-65)

b.      No one within Local 25 ever objected to the fact that APA had put Goulet on its November, 2001, Canton seniority list. (Ex. 6: Harrington Dep. p. 73)

81.    Disputed.  Carnes, Harrington, Goulet, APA and New Penn had seen the November, 2001, seniority list with Goulet's name on it, and it was the type of seniority list posted on the bulletin board.

a.      Several Local 25 business agents confirmed that Goulet's name had been put back on APA's seniority list.  Both business agents William Carnes and Mark Harrington told Goulet that he had been placed back on APA's seniority list. (Ex. 1: Goulet Dep. p. 28-29)

b.      Carnes has testified that around November, 2001, the APA seniority list for Canton, Massachusetts, with Goulet's name on it, was forwarded to Carnes. (Ex. 5: Carnes Dep. p. 18)

c.      Harrington has admitted that Local 25's office received this Canton seniority list with Goulet's name it from APA in approximately November, 2001.  (Ex. 6: Harrington Dep. p. 40)

d.      In fact, Goulet saw an APA seniority list, dated November, 2001, for the terminal in Canton, Massachusetts, with his name on it.  (Ex. 1: Goulet Dep. p. 29)

e.      In answer to Interrogatory Nos. 7 and 23, New Penn admitted that it received the APA Canton Seniority List for November, 2001 (which list contained Goulet's name on it) prior to March 1, 2002, at its corporate office from APA. (Ex. 15: New Penn Answers to Interrogatories)

f.      Defendant Teamsters Local 25 just filed its Motion for Summary Judgment.  In

support of its Motion, it supplied the Affidavit of Burton Trebour, the former Vice President of Labor and Administration for APA.  In paragraph 18 of his Affidavit, Trebour states:   "When New Penn Motor Express requested terminal seniority lists to create its call lists, it asked for seniority lists from the corporate office, and thus received the corporate seniority list."   This so-called corporate seniority list is the list on which Goulet's name appears. (Ex. 24: Affidavit of Burton Trebour).

g.     Furthermore, Paul Dubiel, the APA terminal manager for Canton, Massachusetts, testified that the APA seniority list, dated November, 2001, for the terminal in Canton, Massachusetts, with Goulet's name on it was in the format that was the format used by APA Transport for its terminal seniority list and that this type of document was posted in the drivers' room. (Ex.  3: Dubiel Dep. p. 20, 35)

82.    Undisputed.

Craig Goulet

By his attorney

_Scott A. Lathrop_

_____
Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450
(978) 448-8234
BBO No. 287820

Dated:  February 11, 2006

<u>Certificate of Service</u>

I, Scott A. Lathrop, hereby certify that I have served the foregoing Statement on the defendants by mailing this day a copy to the last known address of their Attorneys of Record.

_Scott A. Lathrop_

_____
Scott A. Lathrop

Dated:  February 11, 2006