UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12577 JLT

*****************************************
CRAIG GOULET,                              *
    Plaintiff                          *
                                       *
    v.                                 *
                                       *
NEW PENN MOTOR EXPRESS, INC., and *
TEAMSTERS LOCAL 25,                        *
INTERNATIONAL BROTHERHOOD OF     *
TEAMSTERS,                                 *
    Defendants                         *
*****************************************

## PLAINTIFF'S APPENDIX TO HIS OPPOSITIONS TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

1.      Goulet Deposition

2.      Goulet Errata Sheet

3.      Dubiel Deposition

4.      APA Decision

5.      Carnes Deposition

6.      Harrington Deposition

7.      Canton Seniority List

8.      Francey Deposition

9.      Teamsters & New Penn Agreement

10.     Francey's Preference List

11.     Teamsters Deposition

12.    McLaughlin Fax

13.    Cashman Letter to Schmidt

14.    New Penn Call List

15.    New Penn Answers to Interrogatories

16.    Goulet Grievance

17.    Cashman Letter to Zaccaria

18.    Goulet Letter to Harrington

19.    Southern New England Joint Area Committee Pre-Hearing Information

20.    Harrington Submission

21.    Hearing Transcript

22.    New Penn Decision

23.    National Master Freight Agreement

24.    Affidavit of Burton Trebour

25.    Decision of Social Security Administration, dated August 21, 1995.

26.    Consultative Examination Report of Stephan Simonian, M.D., dated May 2, 2003.

Craig Goulet

By his attorney

_____
Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450
(978) 448-8234
BBO No. 287820

Dated:  February 11, 2006

2

<u>Certificate of Service</u>

I, Scott A. Lathrop, hereby certify that I have served the foregoing Appendix on the defendants by mailing this day a copy to the last known address of their Attorneys of Record.

_____
Scott A. Lathrop

Dated:  February 11, 2006

1-107

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


```
* * * * * * * * * * * * * * * * * *
                                  *
CRAIG GOULET,                     *
                                  *
      Plaintiff,                  *
                                  *
- vs. -                           *   C.A. # 04-12577-JLT
                                  *
NEW PENN MOTOR EXPRESS,           *
                                  *
and                               *
                                  *
TEAMSTERS LOCAL 25                *
INTERNATIONAL BROTHERHOOD OF      *
TEAMSTERS,                        *
                                  *
      Defendant.                  *
                                  *
* * * * * * * * * * * * * * * * * *
```

DEPOSITION of CRAIG GOULET, a witness called by and on behalf of the defendants, pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Michael C. Janey, a Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Dwyer, Duddy and Facklam, P.C., Two Center Plaza, Suite 430, Boston, Massachusetts, 02108 on Tuesday, October 4, 2005, commencing at 10:05 a.m.

2

APPEARANCES:

    Scott A. Lathrop, Esquire, law office of SCOTT A.
LATHROP, 122 Old Ayer Road, Groton, Massachusetts, 01450,
(978) 448-8234; on behalf of the Plaintiff.

    Kathleen A. Pennini, Esquire, law offices of DWYER,
DUDDY AND FACKLAM, Two Center Plaza, Suite 430, Boston,
Massachusetts, 02108, (617) 723-9777; on behalf of the
Defendant, International Brotherhood of Teamsters, Local 25.

    Carl H. Gluek, Esquire, law office of FRANTZ WARD, LLP,
2500 Key Center, 127 Public Square, Cleveland, Ohio,
44114-1230, (216) 515-1660; on behalf of Defendant, New Penn
Motor Express.


Also Present: Mark Harrington

JANEY ASSOCIATES

3

I N D E X

DEPOSITION OF:                                    Page

CRAIG GOULET

Examination by Ms. Pennini                        6

Examination by Mr. Gluek                          65

Examination by Ms. Pennini                        96

Examination by Mr. Lathrop                        103



EXHIBITS:                                         Page

#1     (Grievance Decision)                       25

#2     (Grievance Report dated 4/7/03)            41

#3     (Letter to M. Harrington from C. Goulet,
        dated 7/25/03)                            42

#4     (Letter to M. Harrington from C. Goulet,
        dated 11/24/03)                           49

JANEY ASSOCIATES

4

```
 1               S T I P U L A T I O N S

 2               It is hereby stipulated and agreed by and

 3     between counsel for the respective parties that the

 4     reading and signing of the deposition by the witness

 5     is not waived, but that the deposition may be signed

 6     under the pains and penalties of perjury within

 7     forty-five days of receipt of the transcript.

 8               It is further stipulated and agreed that

 9     all objections, except as to the form of the

10     questions, and motions to strike shall be reserved

11     until the time of hearing or trial in this matter.

12               CRAIG GOULET, having duly affirmed that

13     his testimony would be the truth, the whole truth, and

14     nothing but the truth, testified as follows in answer

15     to direct interrogatories:

16               MS. PENNINI: Before we begin, do we

17     stipulate to the usual stipulations, objections except

18     as to form reserved until trial?

19               MR. LATHROP: And motions to strike.

20               MS. PENNINI: And motions to strike, I m

21     sorry.  And regarding the signing of the deposition?

22               MR. LATHROP: Mr. Goulet will read it and

23     sign it, and if we can waive the requirement that he

24     sign it in front of a notary and still simply sign it
```

JANEY ASSOCIATES

5

1          under the pains and penalties of perjury, that would

2          be acceptable to me.

3                    MS. PENNINI: That s fine with me.

4                    MR. GLUEK: That s fine.

5                    MS. PENNINI: Will that be thirty days from

6          receipt of the deposition?

7                    MR. LATHROP: If we want to do it by

8          agreement, let s make it just forty-five.

9                    MS. PENNINI: Okay.  Forty-five days is

10         fine.

11                   MR. GLUEK: We don t have a motion date

12         pending, correct?

13                   MS. PENNINI: I m sorry.

14                   MR. GLUEK: There is no motion date

15         pending.

16                   MR. LATHROP: I don t believe so.  I

17         believe all we have is November 1st.

18                   MR. GLUEK: Right.  That is our pretrial,

19         so conceivably this judge, he could schedule a very

20         short time line.

21                   MR. LATHROP: The flip side is he gave us

22         until the end of the month to complete discovery

23         anyway, so I don t think he could -- I mean, I would

24         support you and say, this is too short a deadline, we

JANEY ASSOCIATES

6

1        don t even have the transcript back yet if he tries to

2        do it.

3                        MR. GLUEK: Okay.  That s fine.

4                        MS. PENNINI: I was under the impression

5        after the first scheduling conference that this is

6        more of a status conference to see whether discovery

7        has been completed before setting any additional

8        deadlines.

9                        MR. LATHROP: I m sure that is the case.

10       Unlike other pretrial conferences in Massachusetts

11       where you establish in advance all the motion

12       deadlines and so forth.

13                       MS. PENNINI: Right, because we only solely

14       discussed discovery at the first scheduling

15       conference.

16                       MR. LATHROP: If you are concerned about

17       that I will support you in the notion that an early

18       cut off time is unfair to you.

19                       MR. GLUEK: Okay

20       EXAMINATION

21                       BY MS. PENNINI:

22       Q.        Could you please state your name?

23       A.        Craig Steven Goulet, Sr.

24       Q.        Could you spell your last name, please?

                        JANEY ASSOCIATES

7

| | | |
|---|---|---|
| 1 | A. | G-O-U-L-E-T. |
| 2 | Q. | And where do you currently live? |
| 3 | A. | 305 Cox Street, Hudson, Massachusetts. |
| 4 | Q. | Are you currently employed? |
| 5 | A. | No. |
| 6 | Q. | Are you currently a member of Teamsters Local |
| 7 | | 25? |
| 8 | A. | Yes, I am. |
| 9 | Q. | How long have you been a member of Teamsters |
| 10 | | Local 25? |
| 11 | A. | Since 1987. |
| 12 | Q. | Were you ever a member of any other Teamsters |
| 13 | | local? |
| 14 | A. | Yes, I was. |
| 15 | Q. | And what local? |
| 16 | A. | Local 170. |
| 17 | Q. | When were you a member of Local 170? |
| 18 | A. | 1979. |
| 19 | Q. | Until what time? |
| 20 | A. | Until 1987. |
| 21 | Q. | What employers did you work for while a member |
| 22 | | of Local 170? |
| 23 | A. | I worked for McLean Trucking. |
| 24 | Q. | And where is that located? |

JANEY ASSOCIATES

8

| 1 | A. | It was on Route 20 in Shrewsbury. |
|---|----|------|
| 2 | Q. | What did you do at McLean Trucking? |
| 3 | A. | I worked on the loading dock. |
| 4 | Q. | How long did you work there? |
| 5 | A. | Off and on until they went out of business |
| 6 |    | sometime in the early 80's. |
| 7 | Q. | So beginning in  79? |
| 8 | A. | Um-hum. |
| 9 | Q. | Anyplace else? |
| 10 | A. | Pilot Freight Carriers. |
| 11 | Q. | And when did you work there? |
| 12 | A. | From 1979 until they went out of business. |
| 13 | Q. | So you ended your employment there because they |
| 14 |    | went out of business? |
| 15 | A. | Yes. |
| 16 | Q. | Anyplace else? |
| 17 | A. | Roadway Express. |
| 18 | Q. | And when did you work there? |
| 19 | A. | From 1979 until approximately 1984. |
| 20 | Q. | Did you work for McLean, Pilot, and Roadway all |
| 21 |    | at the loading dock? |
| 22 | A. | Yes. |
| 23 | Q. | And why did you stop working for Roadway |
| 24 |    | Express? |

JANEY ASSOCIATES

9

1     A.          I made the list with Sanborns Motor Express.

2     Q.          I m sorry, could you repeat that?

3     A.          Sanborns.  I made the list, the seniority list

4                 with Sanborns Motor Express.

5     Q.          And how is that related to Roadway?

6     A.          Separate company.

7     Q.          Did you work with these companies at the same

8                 time or one after the other?

9     A.          No, I worked with them all at the same time.

10    Q.          And you said you made the seniority list with

11                Sanborn?

12    A.          Yes.

13    Q.          And how long did you work for Sanborn?

14    A.          I worked for Sanborns from 1984 up until the

15                time they were bought out by APA Transport.

16    Q.          And when was that?

17    A.          October, 1986.

18    Q.          What facility did you work for for Sanborn?

19    A.          Out of their Wrentham, Mass facility.

20    Q.          Did you work at Sanborn on the loading dock, as

21                well?

22    A.          I was a -- I worked the loading dock and I drove

23                for them.

24    Q.          Did you continue to work in Wrentham when you

JANEY ASSOCIATES

10

```
1              began working for Sanborn Trucking -- I mean, when

2              Sanborn was bought out by APA?

3    A.        No, I went to work at the APA Canton facility.

4    Q.        When did you begin work at APA in Canton?

5    A.        October of 1986.

6    Q.        How long did you work for APA?

7    A.        I worked for them from October, 1986 until March

8              11th, 1987.

9    Q.        And what happened on March 11th, 1987?

10   A.        I was involved in a industrial accident.

11   Q.        Could you explain this industrial accident for

12             me, please?

13   A.        I was loading a -- unloading a truck with a

14             forklift and the truck pulled away from the loading

15             dock.

16   Q.        How did that result in injury to you?

17   A.        Myself and the forklift both went off the

18             loading dock and I ended with a herniated disc in my

19             neck, lower back, torn rotator cuff in my shoulder,

20             torn ligament in my knee.

21   Q.        Did you go to the hospital on March 11th

22             following this injury?

23   A.        Yes, I did.

24   Q.        And what hospital?
```

JANEY ASSOCIATES

11

| | | |
|---|---|---|
| 1 | A. | Goddard Memorial Hospital. |
| 2 | Q. | Where is Goddard Memorial? |
| 3 | A. | Stoughton. |
| 4 | Q. | Had you previously been terminated from your |
| 5 | | employment at APA by letter on February 25th, 1987? |
| 6 | A. | Yes. |
| 7 | Q. | And what precipitated that termination? |
| 8 | A. | I think there was an argument between me and the |
| 9 | | night boss, a disagreement. |
| 10 | Q. | Do you recall the date on which this argument |
| 11 | | with the night boss happened? |
| 12 | A. | No, not offhand I don t. |
| 13 | Q. | Was it on February 25th? |
| 14 | A. | It could ve been. |
| 15 | Q. | Could it have been before February 25th? |
| 16 | A. | I don t recall. |
| 17 | Q. | Had you ever received any written warnings from |
| 18 | | the terminal manager at APA prior to February 25th? |
| 19 | A. | Yes, I had. |
| 20 | Q. | And for what reason were you given a written |
| 21 | | warning? |
| 22 | A. | Misloading freight, I think. |
| 23 | Q. | Do you recall if there were any other |
| 24 | | disciplinary issues while you were working for APA? |

JANEY ASSOCIATES

12

1    A.        Yeah, I think there was.

2    Q.        Could you tell me what those are?

3    A.        Not offhand, no.

4    Q.        Do you recall approximately when they occurred?

5    A.        Sometime between October of  86 and March 11th

6              of  87.

7    Q.        Do you recall how many disciplinary issues you

8              had during that time?

9    A.        I do not.

10   Q.        Do you recall whether they were written warnings

11             or suspensions?

12   A.        There was a written warning.  May have been

13             several written warnings and a discharge.

14   Q.        And was the discharge you are speaking of the

15             one on February 25th?

16   A.        Yes.

17   Q.        Do you recall how your termination of February

18             25th was resolved?

19   A.        Yes.

20   Q.        How was it resolved?

21   A.        It went to the Joint Area Committee.

22   Q.        And what was the result?

23   A.        I was put back to work.

24   Q.        When did you come back to work after the

                         JANEY ASSOCIATES

13

```
 1              February 25th termination?

 2      A.         I m not sure offhand.

 3      Q.         Do you recall whether it was in February or

 4           March?

 5      A.         I believe it was March.

 6      Q.         Do you recall if it was more than a week prior

 7           to March 11th?

 8      A.         No, as I recall I think it was March 11th.

 9      Q.         So you think you returned back to work on the

10           day you were injured?

11      A.         Yes.

12      Q.         What time of the day was the accident with the

13           forklift during the unloading of a truck?

14      A.         It was approximately 7:30 at night.

15      Q.         And you said after that you went to the Goddard

16           Memorial Hospital in Stoughton?

17      A.         Yes.

18      Q.         Were you kept at the hospital?

19      A.         No.

20      Q.         What sort of procedures did they do when you

21           were at the hospital during that night?

22      A.         They took an x-ray of my leg.  I believe they

23           took an x-ray of my neck.  Told me to follow up with

24           my doctor.
```

JANEY ASSOCIATES

14

1    Q.        Did you inform APA of what had occurred at the

2              hospital?

3    A.        Yes.

4    Q.        And what did they tell you?  Did you return back

5              to work on March 12th?

6    A.        No.

7    Q.        And why didn t you return back to work on March

8              12th?

9    A.        I went out on an industrial accident, Workman s

10             Comp.

11   Q.        Had you informed APA that you were unable to

12             return to work on the 12th?

13   A.        Yes.

14   Q.        Were you soon thereafter terminated for the

15             events of March 11th, 1987?

16   A.        Yes.

17   Q.        And do you recall when you were terminated?

18   A.        March 12th.

19   Q.        Do you know what sort of Worker s Compensation

20             benefits you received?

21   A.        Partial disability.

22   Q.        And do you recall why you received partial

23             disability?

24   A.        I don t think I understand the question.

                        JANEY ASSOCIATES

15

| | | |
|---|---|---|
| 1 | Q. | Do you understand the difference between partial |
| 2 | | disability benefits and full disability benefits? |
| 3 | A. | Yes. |
| 4 | Q. | And starting soon after March 12th you began to |
| 5 | | receive partial disability benefits? |
| 6 | A. | Yes. |
| 7 | Q. | Do you know why you received partial disability |
| 8 | | benefits as opposed to full disability benefits? |
| 9 | A. | That s what the judge ordered. |
| 10 | Q. | And what judge was this? |
| 11 | A. | Judge Scannell. |
| 12 | Q. | When was that ordered by Judge Scannell? |
| 13 | A. | In June, 1987. |
| 14 | Q. | Is Judge Scannell an administrative law judge |
| 15 | | for the Department of Industrial Accident? |
| 16 | A. | She was at the time, yes. |
| 17 | Q. | Did you file a grievance as a result of your |
| 18 | | termination on March 12th? |
| 19 | A. | The union hall filed a complaint.  My business |
| 20 | | agent at the time filed a complaint. |
| 21 | Q. | And who was the business agent? |
| 22 | A. | George Cashman. |
| 23 | Q. | Do you recall when this complaint was heard? |
| 24 | A. | Yes. |

JANEY ASSOCIATES

**Goulet Deposition**                                    **Page 15**

16

```
1    Q.        When was that?

2    A.        October 16th, 2001.

3    Q.        Could you tell me why there was a lapse of 14

4              years between the time the complaint was filed and the

5              date of the hearing in this matter?

6    A.        Because I was on Workman s Compensation, and the

7              rules of procedure with the grievance committee

8              stipulated that they wouldn t hear the case as long as

9              it was pending in another venue.

10   Q.        Following the order of Judge Scannell in 1987,

11             did you appeal her granting of partial disability

12             benefits?

13   A.        Yes, I believe I did.

14   Q.        What was the result of that appeal?

15   A.        I m not quite sure.

16   Q.        Did you continue to receive partial disability

17             benefits?

18   A.        Yes, I did.

19   Q.        Do you recall whether there are any additional

20             appeals besides the initial appeal?

21             MR. LATHROP: You are speaking about the

22             industrial accident?

23             MS. PENNINI: I m sorry, I m speaking about

24             the industrial accident appeal.
```

JANEY ASSOCIATES

17

```
1                      THE WITNESS: Yes, I believe there was.

2               BY MS. PENNINI:

3      Q.       Do you recall how many appeals there were?

4      A.       No.

5      Q.       Were all the appeals filed by you or your

6               attorney?

7      A.       My attorney.

8      Q.       And when were these appeals finally resolved

9               with a final decision, do you recall?

10     A.       No.

11     Q.       Were there numerous appeals between 1987 and

12              2001?

13     A.       I don t know how many appeals there were, maybe

14              one.

15     Q.       And that was heard before 2001?

16     A.       Yes.

17     Q.       While you were receiving partial Worker s

18              Compensation benefits, did you hold any other

19              employment?

20     A.       No.

21     Q.       Did you look for additional employment between

22              March 11th, 1987 and October of 2001?

23     A.       No.

24     Q.       Did you seek any light duty work of any sort?
```

JANEY ASSOCIATES

18

| 1 | A. | Yes. |
|---|----|------|

2    Q.    And where did you seek light duty work?

3    A.    With APA.

4    Q.    And what was their response, APA s response?

5    A.    APA s response was that I was discharged.  I was

6          a discharged employee.

7    Q.    When did you seek light duty work with APA?

8    A.    Sometime in early 1991 or 2 maybe.

9    Q.    Did you seek any light duty employment with any

10         other company?

11   A.    Nope.

12   Q.    In 1991-1992, had you received any documentation

13         from any doctor concerning your ability to return to

14         work?

15   A.    I don t recall.

16   Q.    Between 1987 and 1991, were there any

17         restrictions concerning your ability to work placed on

18         you by your doctor?

19   A.    Yes.

20   Q.    And what were those restrictions?

21   A.    That I was unable to work.

22   Q.    Can you be anymore specific?

23   A.    No, not offhand I can t.

24   Q.    Did you have any restrictions concerning the

                        JANEY ASSOCIATES

19

1           amount that you could lift?

2      A.        Yes.

3      Q.        And what was that restriction?

4      A.        35 pounds.

5      Q.        Do you recall any other restrictions?

6      A.        No, I don t.

7      Q.        Do you recall if there were more restrictions

8           than you could not lift more than 35 pounds?

9      A.        I don t recall offhand, no.

10     Q.        I m sorry, you don t recall what the other

11          restrictions were or you don t recall whether there

12          was more than that one restriction?

13     A.        I don t recall at all.

14     Q.        So you do not recall whether there was -- I m

15          just trying to understand you.  You do not recall if

16          there were any other restrictions?

17     A.        Yeah, I had a lot of doctor s reports.

18     Q.        Did you continue to receive health benefits

19          while you were on Worker s Compensation leave?

20     A.        I did up until a point, up until sometime.

21     Q.        And when was that time?

22     A.        It may have been a year after I got hurt.

23     Q.        Do you not recall the exact date?

24     A.        I can t be sure.  The health and welfare was

JANEY ASSOCIATES

20

```
 1              paid on my behalf for a period of one year, so I was

 2              covered for a year and then possibly six months after

 3              that.

 4      Q.      And after that time did you not have any health

 5              benefits?

 6      A.      I did not.

 7      Q.      Did you receive any compensation in addition to

 8              your partial disability benefits between the years of

 9              1987 and 2001?

10      A.      Yes.

11      Q.      What form of compensation did you receive?

12      A.      Social Security Disability.

13      Q.      And when did you receive that, what years?

14      A.      I think it was 1995.

15      Q.      You began to receive it in  95 or you only

16              received it in 1995?

17      A.      No, I began to receive it in 1995.

18      Q.      Did you receive any other compensation besides

19              Social Security?

20      A.      No.

21      Q.      So just to be clear, between 1987 and 2001 the

22              only compensation that you received was from Social

23              Security Disability benefits and Worker s Comp partial

24              disability benefits?
```

JANEY ASSOCIATES

21

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Did you keep in contact with anyone at Teamsters |
| 3 | | Local 25 while you were out on Worker s Compensation |
| 4 | | leave? |
| 5 | A. | Yes. |
| 6 | Q. | With whom did you keep in contact? |
| 7 | A. | I spoke with George Cashman over the years. |
| 8 | Q. | Anybody else? |
| 9 | A. | Mark Harrington. |
| 10 | Q. | Do you recall what years you spoke with Mark |
| 11 | | Harrington? |
| 12 | A. | Sometime in 2001. |
| 13 | Q. | So the first time you spoke with Mark Harrington |
| 14 | | was about 2001? |
| 15 | A. | Yeah. |
| 16 | Q. | Do you recall approximately when you would speak |
| 17 | | to George Cashman? |
| 18 | A. | No, I don t remember approximately when.  Just |
| 19 | | there was conversation over the years.  We talked. |
| 20 | Q. | How often did you speak with Mr. Cashman? |
| 21 | A. | About every few months. |
| 22 | Q. | Would you stop by the union hall to speak with |
| 23 | | Mr. Cashman? |
| 24 | A. | I did. |

JANEY ASSOCIATES

22

```
 1    Q.         Did you keep in contact with him through any

 2          other means?

 3    A.         No.

 4    Q.         Would you ever telephone Mr. Cashman?

 5    A.         Yes.

 6    Q.         Besides George Cashman and Mark Harrington, did

 7          you keep in contact with anyone else at Local 25?

 8    A.         No.

 9    Q.         How often would you go to the union hall during

10          that time?

11               MR. LATHROP: I m sorry, what time frame

12          are we talking about here?

13               MS. PENNINI: I m sorry, between 1987 and

14          2001.

15               THE WITNESS: I don t recall.

16          BY MS. PENNINI:

17    Q.         But occasionally you would go to the union hall?

18    A.         Occasionally, yes.  I used to stop by to pay my

19          dues, something like that.

20    Q.         Were you ever a steward for a Teamsters local?

21    A.         No.

22    Q.         What sorts of discussions would you have with

23          Mr. Cashman?

24    A.         I don t know offhand.
```

JANEY ASSOCIATES

23

| | | |
|---|---|---|
| 1 | Q. | You don t recall any general topics of |
| 2 | | conversations? |
| 3 | A. | Nope. |
| 4 | Q. | Would you ever discuss whether you would be |
| 5 | | returning back to work with Mr. Cashman? |
| 6 | A. | Nope. |
| 7 | Q. | Would you discuss what was going on with |
| 8 | | different employers over at Local 25 with Mr. Cashman? |
| 9 | A. | Yeah, I think maybe I might ve attended some |
| 10 | | meetings.  You know, general union meetings. |
| 11 | Q. | Do you recall anything else concerning your |
| 12 | | correspondence or interaction with Mr. Cashman between |
| 13 | | 1987 and 2001? |
| 14 | A. | No. |
| 15 | Q. | And you said you began to speak or see |
| 16 | | Mr. Harrington in 2001? |
| 17 | A. | Yes. |
| 18 | Q. | Do you recall why you began to speak with |
| 19 | | Mr. Harrington? |
| 20 | A. | I had exhausted all my partial disability |
| 21 | | benefits. |
| 22 | Q. | Okay.  And how is that related to |
| 23 | | Mr. Harrington? |
| 24 | A. | Well in order to have my discharge case heard at |

JANEY ASSOCIATES

24

1           the panel, I needed to discuss it with Mr. Harrington

2           who was the business agent at that time.

3      Q.        And you said you had exhausted your partial

4           disability benefits, could you explain to me what you

5           mean by that?

6      A.        My benefits came to an end.

7      Q.        Is that because you had received a certain

8           number of weeks of benefits?

9      A.        Yes.

10     Q.        And you said you contacted Mr. Harrington

11          because you wanted your grievance to be heard?

12     A.        Yes.

13     Q.        Was your grievance subsequently heard?

14     A.        Yes, it was.

15     Q.        And what s the date of that?

16     A.        October 16th, 2001.

17     Q.        Where was this grievance heard?

18     A.        At the union hall.

19     Q.        Do you recall who it was heard by?

20     A.        It was heard by the committee.

21     Q.        And what committee was this?

22     A.        It was the Southern New England Joint Area

23          Committee.

24     Q.        And you said it was held at the union hall,

                        JANEY ASSOCIATES

25

1              which union hall are you referring to?

2       A.          At the Teamsters Local 25.

3       Q.          Do you recall what the result of this hearing

4              was?

5       A.          Yes.

6       Q.          And what was the result?

7       A.          My seniority was reinstated.

8       Q.          Do you recall anything else concerning the

9              result of the Joint Area Committee grievance decision?

10      A.          No.

11                  MS. PENNINI: Can I just have one second?

12                  (A brief recess was taken)

13                  MS. PENNINI: Could I have this marked as

14             an Exhibit, please?

15                         (The document above-referred

16                         to was marked Deposition

17                         Exhibit No. 1 for Identification)

18             BY MS. PENNINI:

19      Q.          If you could please look at deposition Exhibit

20             1, Mr. Goulet?

21      A.          Yeah.

22      Q.          Have you seen this document before?

23      A.          Yes, I have.

24      Q.          Could you tell me what this document is?

                    JANEY ASSOCIATES

26

1    A.        It s the decision from the Southern New England

2              Committee.

3    Q.        When did you first see this decision?

4    A.        When it was mailed to me.

5    Q.        And do you recall approximately when you

6              received it?

7    A.        Yeah, maybe two weeks after the hearing.

8    Q.        Could you explain to me what the decision was?

9              MR. LATHROP: Objection.

10             THE WITNESS: The decision was, put me back

11             on the seniority list and it states that upon me

12             giving the company documentation of my ability to work

13             to unrestricted duties, I had to serve a 10-day

14             suspension.

15             BY MS. PENNINI:

16   Q.        Did you ever submit any documentation to APA

17             regarding your ability to return to unrestricted

18             duties?

19   A.        No.

20   Q.        Did you ever serve a 10-day suspension at APA?

21   A.        No.

22   Q.        Did you understand this decision to immediately

23             reinstate you onto the seniority list for APA?

24   A.        Yes, I did.

JANEY ASSOCIATES

27

| | | |
|---|---|---|
| 1 | Q. | Did you -- |
| 2 | A. | I received a phone call by Bill Carnes -- |
| 3 | Q. | I m sorry, I m asking you a question. |
| 4 | | MR. LATHROP: But nonetheless, if he needs |
| 5 | | to expand upon his answer he has a right to do that. |
| 6 | | MS. PENNINI: Well I will allow you to do |
| 7 | | that in one second.  I m sorry, I was in the middle of |
| 8 | | trying to get a question out. |
| 9 | | BY MS. PENNINI: |
| 10 | Q. | So you said that you believed your seniority was |
| 11 | | immediately reinstated and you should have been placed |
| 12 | | on the seniority list immediately upon the decision of |
| 13 | | the New England Joint Area Grievance Committee? |
| 14 | A. | I was put back on the seniority list |
| 15 | | immediately. |
| 16 | Q. | How do you know that you were immediately put |
| 17 | | back on the seniority list? |
| 18 | A. | I received a phone call from Bill Carnes -- |
| 19 | Q. | And what did Bill -- |
| 20 | A. | -- that afternoon, and also from Mr. Harrington. |
| 21 | Q. | I m sorry, what afternoon? |
| 22 | A. | The afternoon they heard the case on October |
| 23 | | 16th, congratulating me and telling me that I won. |
| 24 | Q. | Did you receive one phone call or two separate |

JANEY ASSOCIATES

28

1              phone calls?

2       A.         Two separate phone calls.

3       Q.         Do you recall what Mr. Carnes had said during

4              his phone call?

5       A.          Congratulations, you won your case.

6       Q.         Did he explain to you what the decision said?

7       A.         Yes.

8       Q.         And what did he say?

9       A.         He said,  You have to serve a 10-day suspension

10             before you can go back to work.

11      Q.         Did Mr. Carnes tell you that you had been placed

12             back on the seniority list?

13      A.         Yes, that was my understanding.

14      Q.         Did he say that?

15      A.         I believe he did.

16      Q.         You don t recall whether he said precisely,  You

17             have been returned to the seniority list at APA Canton

18             facility. ?

19      A.         Precisely, I do not know.

20      Q.         And you said you also received a call from

21             Mr. Harrington?

22      A.         Yes.

23      Q.         Could you tell me what Mr. Harrington said to

24             you on the phone that day?

JANEY ASSOCIATES

29

```
 1    A.        Basically, the same.  You know, it had the same

 2              context.  It was,  You won your case.

 3              Congratulations, you won your case.

 4    Q.        Did Mr. Harrington say anything else?

 5    A.        Nope.

 6    Q.        Did he tell you you would have to serve a 10-day

 7              suspension?

 8    A.        Yes, I believe he did.

 9    Q.        Did he tell you you were back on the seniority

10              list at APA?

11    A.        Yes, I believe he did.

12    Q.        Do you recall whether he said,  You re back on

13              the seniority list. ?

14    A.        No, I don t recall.

15    Q.        Did you ever work for APA after October 16th,

16              2001?

17    A.        No.

18    Q.        Did you ever see a seniority list for the APA

19              terminal in Canton, Massachusetts with your name on

20              the seniority list?

21    A.        Yes.

22    Q.        Were you working at APA at the time that it

23              ceased operating?

24    A.        No.
```

JANEY ASSOCIATES

30

| 1 | Q. | Do you know when APA ceased its operations? |

2    A.    Sometime in February of 2002.

3    Q.    And how did you learn that APA was closing its

4          operations?

5    A.    I had spoke with the steward.

6    Q.    Did the steward call you to inform you?

7    A.    Yes, he did.

8    Q.    And who was the steward?

9    A.    Doug Francie.

10   Q.    Do you recall when he called you?

11   A.    No.  Approximately -- there may have been

12         several phone calls.  One initially is the word,  Get

13         out, that the company was closing.

14   Q.    And Francie called you to let you know the

15         company was closing?

16   A.    I think probably I called him initially.

17   Q.    How did you get word that APA was closing?

18   A.    Someone called me.

19   Q.    Do you recall who called you?

20   A.    My sister-in-law.

21   Q.    And how did your sister-in-law know that APA was

22         closing?

23   A.    She worked for a company and had spoke with

24         another truck driver.

JANEY ASSOCIATES

31

| 1 | Q. | Your sister-in-law worked for APA, is that what |
| 2 | | you said? |
| 3 | A. | No, she worked for another company. |
| 4 | Q. | What company did she work for? |
| 5 | A. | Vincent Metal Goods. |
| 6 | Q. | Vincent Metal Goods, is that what you said? |
| 7 | A. | Yeah, um-hum. |
| 8 | Q. | And she became aware that APA was closing? |
| 9 | A. | Yes. |
| 10 | Q. | And could I have your sister-in-law s name? |
| 11 | A. | Dawn. |
| 12 | Q. | And her last name? |
| 13 | A. | Goulet. |
| 14 | Q. | Is it D-A-W-N? |
| 15 | A. | Yes. |
| 16 | Q. | And Goulet as you previously spelled it? |
| 17 | A. | Um-hum. |
| 18 | Q. | Where is Vincent Metal Goods located? |
| 19 | A. | I believe they re in Fort Devins now at Devins. |
| 20 | | They were in Marlboro at the time. |
| 21 | Q. | So after your sister-in-law informed you that |
| 22 | | APA was closing you called Doug Francie? |
| 23 | A. | Yes. |
| 24 | Q. | How did you know to contact Doug Francie? |

JANEY ASSOCIATES

32

```
1     A.          Doug Francie was the union steward.

2     Q.          And where was he the union steward for?

3     A.          For APA, at the Canton facility.

4     Q.          How did you know that he was the APA union

5                 steward at the Canton facility?

6     A.          As I said, I had been to union meetings and kept

7                 in contact with the -- you know, other workers.

8     Q.          Other workers at APA?

9     A.          Yes.

10    Q.          What other workers did you keep in contact with?

11    A.          Jerry Hurley was a mechanic.  I d spoke with

12                Kevin Power over the years.

13    Q.          Are Jerry Hurley and Kevin Power both APA

14                workers at the Canton facility?

15    A.          Yes.

16    Q.          I m sorry, go on, I didn t mean to interrupt

17                you.

18    A.          There was another fellow, Mike Cruz, drove a

19                truck in the Hudson area.  I would see him from time

20                to time.

21    Q.          Was he at the APA Canton facility as well?

22    A.          Yes.

23    Q.          How did you get Doug Francie s telephone number?

24    A.          Oh, I had the phone number.
```

JANEY ASSOCIATES

33

```
 1      Q.          Did you call him at home?

 2      A.          Yes.

 3      Q.          How did you have his home phone number?

 4      A.          As I said, he was the union steward.

 5      Q.          Had you known Doug Francie prior to February of

 6                  2002?

 7      A.          Yes.

 8      Q.          And how did you know him?

 9      A.          I worked with him at Sanborns Motor Express.

10      Q.          What did you speak with Mr. Francie about?

11      A.          Well it was general conversation about the

12                  company was closing.

13      Q.          Did you tell Mr. Francie you had heard that the

14                  company was closing?

15      A.          Yes.

16      Q.          Do you recall what else you said to him?

17      A.          We just discussed in general the fact that the

18                  company was going out of business.

19      Q.          Did you ask Mr. Francie if you could be put on a

20                  call list for New Penn Motor Express?

21      A.          Doug Francie called me -- Doug Francie called

22                  me, and I m going to say it was probably February 15th

23                  or 16th, maybe the 17th.

24      Q.          And what did he say to you?
```

JANEY ASSOCIATES

34

```
1    A.        He relayed to me that there was a meeting with

2              the APA men and he wanted to know what my call list
3              preference was.

4    Q.        Did he tell you whether or not you were on his
5              list of people to determine what their preference for
6              a call list facilities were?

7    A.        Yes.

8    Q.        He said you were on the list?

9    A.        I believe that s why he called me.

10   Q.        So Mr. Francie said he thought you were on the

11             Canton facility call list and, therefore, called you
12             to find out your terminal preference, is that an
13             accurate statement?

14   A.        Not entirely.

15   Q.        Okay.

16   A.        I was on the Canton seniority list, the APA
17             Canton seniority list.

18   Q.        Okay.

19   A.        And he called me to ask me what my preference

20             would be as far as the New Penn call list went.

21   Q.        And your conversation with Mr. Francie, when you
22             called him, do you recall what date that occurred on?

23   A.        I don t offhand recall, no.

24   Q.        But you believe you spoke with him on February
```

JANEY ASSOCIATES

35

1          15th or possibly the 16th or the 17th?

2     A.      I m going to say it was the 17th of February.

3     Q.      That you spoke with Mr. Francie?

4     A.      Yes.

5               MR. GLUEK: Could you say what year it is?

6               MS. PENNINI: I m sorry.

7          BY MS. PENNINI:

8     Q.      Was it February 17th of 2002?

9     A.      Yes, 2002.

10    Q.      Do you know for sure that it was February 17th,

11         2002?

12    A.      I m pretty sure it was February 17th, 2002, yes.

13    Q.      But it may have been the 16th or the 15th?

14    A.      No, it was after the 16th.

15    Q.      And how do you know it was after the 16th?

16    A.      Because they had a meeting at the union hall and

17         he called me after the meeting.

18    Q.      Do you know the date of the meeting at the union

19         hall?

20    A.      February 16th.

21    Q.      Did you receive any notification regarding the

22         closure of APA in the mail?

23    A.      Yes.

24    Q.      When did you receive this notification?

                    JANEY ASSOCIATES

36

| | | |
|---|---|---|
| 1 | A. | Sometime in February of 2002. |
| 2 | Q. | And by whom was this information sent? |
| 3 | A. | Local 25. |
| 4 | Q. | After you gave Mr. Francie your terminal |
| 5 | | preference, did you ever check with Local 25 to make |
| 6 | | sure that your name was on the call list for New Penn? |
| 7 | A. | I made a follow up phone call, I did, to the |
| 8 | | union hall, yes. |
| 9 | Q. | Do you recall with whom you spoke? |
| 10 | A. | Mark Harrington. |
| 11 | Q. | And when was that? |
| 12 | A. | Sometime in March. |
| 13 | Q. | In March of what year? |
| 14 | A. | 2002. |
| 15 | Q. | Do you recall what you spoke about during this |
| 16 | | telephone call? |
| 17 | A. | Yes. |
| 18 | Q. | And what was that? |
| 19 | A. | With regards to the call list and what was going |
| 20 | | on with the APA people and New Penn agreement. |
| 21 | Q. | In February and March of 2002, had you been |
| 22 | | medically cleared to return to work? |
| 23 | A. | No. |
| 24 | Q. | Besides your telephone conversation with Mark |

JANEY ASSOCIATES

37

```
1              Harrington in March of 2002, did you have any other

2              contact with Local 25?

3    A.            Yes.

4    Q.            What sort of contact did you have?

5    A.            When I spoke with Mr. Harrington he told me that

6              he no longer handled the men at APA, and I would have

7          to speak with Bill Carnes.

8    Q.            And when did this occur?

9    A.            Sometime right around March.

10   Q.            March of?

11   A.            2002.

12   Q.            Was this during the same conversation that you

13             spoke about previously where you asked Mr. Harrington

14             about the call list?

15   A.            Yes.

16   Q.            Did you have any additional contact with anyone

17         at Local 25 after --

18   A.            Not that I recall.

19                 MR. LATHROP: Let her finish the question.

20                 BY MS. PENNINI:

21   Q.            After March of 2002?

22   A.            Yes.

23   Q.            What contact did you have?

24   A.            There were several phone calls to Bill Carnes.
```

JANEY ASSOCIATES

38

```
1     Q.          When did these phone calls occur?

2     A.          I can t be sure right offhand.

3     Q.          Can you tell me, did you have any contact with

4                 Mr. Carnes during the spring of 2002?

5     A.          Yes.

6     Q.          What sort of contact did you have with him

7                 during the spring of 2002?

8     A.          With regards to the agreement that they had with

9                 the New Penn people.

10    Q.          What did he tell you concerning the agreement

11                with the New Penn people?

12    A.          He said that he was going to look into it.

13    Q.          Did you only have one conversation with

14                Mr. Carnes during the spring of 2002?

15    A.          No, I don t think so.  There was probably two.

16    Q.          Two conversations?

17    A.          Yeah.

18    Q.          And what did you speak about during the second

19                conversation?

20    A.          Same issues.

21    Q.          Did you have any contact with him during the

22                summer of 2002?

23    A.          Yes.

24    Q.          What did you speak about during the summer of
```

JANEY ASSOCIATES

39

```
1               2002?

2       A.          More follow up, more of the same.

3       Q.          During the summer of 2002, had you been

4               medically cleared to return to work?

5       A.          No.

6       Q.          Did you alert Mr. Carnes that you had not been

7               medically cleared to return to work?

8       A.          No.

9       Q.          Did you tell Mr. Carnes whether you had ever

10              served your 10-day suspension with APA?

11      A.          No.

12      Q.          And approximately how often did you speak to him

13              during the summer of 2002?

14      A.          Several times.  Two.

15      Q.          Several times or two times?

16      A.          Two times.

17      Q.          Did you speak to him during the fall of 2002?

18      A.          I don t recall.

19      Q.          The winter of 2002?

20      A.          I can t be sure.

21      Q.          You are not sure whether you had any contact

22              with Mr. Carnes during the winter of 2002?

23      A.          No, we had -- like I said, we had conversations

24              throughout the year.  There was initial phone call,
```

40

```
 1              follow up phone call, subsequently I think there was a

 2              third phone call in the spring of 2002, March.

 3      Q.          Had you been medically cleared to return to work

 4              during the winter of 2002?

 5      A.          No.

 6      Q.          Had you been medically cleared to return to work

 7              prior to March 1st of 2003?

 8      A.          No.

 9      Q.          And you said you spoke with Mr. Carnes in March

10              of 2003?

11      A.          Yes.

12      Q.          What sort of contact did you have with

13              Mr. Carnes?

14      A.          I called him, it was probably March 31st, 2003

15              when the agreement expired.

16      Q.          What agreement are you --

17      A.          The agreement that the New Penn people had with

18              the Teamsters negotiating committee, the freight

19              industry negotiating committee and the APA operation.

20      Q.          What else did you discuss during this

21              conversation?

22      A.          The fact that I hadn t been called.

23      Q.          And what did Mr. Carnes tell you?

24      A.          He told me to send a grievance in.
```

JANEY ASSOCIATES

41

```
1     Q.          And did you send a grievance into Mr. Carnes?

2     A.          I did.

3                       MS. PENNINI: Would you mark this as an

4          Exhibit, please?

5                              (The document above-referred

6                              to was marked Deposition

7                              Exhibit No. 2 for Identification)

8               BY MS. PENNINI:

9     Q.          If you could please look at deposition Exhibit

10         No. 2?

11    A.          Um-hum.

12    Q.          Have you seen this document before?

13    A.          Yes.

14    Q.          Were you the author of this document?

15    A.          Yes.

16    Q.          Could you please tell me what this document is?

17    A.          It s a grievance.

18    Q.          A grievance concerning what?

19    A.          It s a grievance concerning my seniority rights.

20    Q.          I m sorry, what do you mean by  a grievance

21         concerning your seniority rights ?

22    A.          Just as it states.  Would you like me to read

23         it?

24    Q.          Sure.
```

JANEY ASSOCIATES

42

1    A.          Okay.   In accordance with the National Master

2              Freight Agreement, Article V, and all of Article V

3              subsections, along with the New England Supplemental

4              Freight Agreement, Article No. XLIII, Seniority,

5              including all of Article XLIII subsections, I am

6              filing a grievance against New Penn Motor Express to

7              include all time lost, back pay, seniority and

8              contractual benefits under the contract agreement from

9              March 1st, 2002 up to and continuing past March 1st,

10             2003 based on the agreement between TNFINC and New

11             Penn Motor Express as a result of the closure of APA

12             operations.

13   Q.          And had you been medically cleared to work

14             between March 1st, 2002 and March 1st, 2003?

15   A.          No.

16                    MS. PENNINI: If I could just have one

17             second.  Would you please mark that as an Exhibit,

18             please?

19                         (The document above-referred

20                         to was marked Deposition

21                         Exhibit No. 3 for Identification)

22             BY MS. PENNINI:

23   Q.          Did you have any additional contact with

24             Mr. Carnes following your March 31st telephone

                    JANEY ASSOCIATES

43

1          conversation with him?

2    A.          I filed a grievance with him.

3    Q.          When was this grievance filed?

4    A.          November 7th.

5                MR. LATHROP: November?

6                THE WITNESS: I mean, April 7th.

7                BY MS. PENNINI:

8    Q.          And did you have any contact with Mr. Carnes

9          following your sending of the April 7th, 2003

10         grievance?

11   A.          No.

12   Q.          Did you attempt to contact Mr. Carnes at anytime

13         after the time you sent the April 7th, 2003 grievance?

14   A.          No, I did not.

15   Q.          Following the sending of the April 7th, 2003

16         grievance, what was the next time you had any contact

17         with anyone at Local 25?

18   A.          I spoke to Mark Harrington.

19   Q.          And when did you speak with Mark Harrington?

20   A.          Sometime after May 2nd, 2003.

21   Q.          Why did you speak with Mark Harrington after May

22         2nd, 2003?

23   A.          Bill Carnes had left office.

24   Q.          How did you know to contact Mr. Harrington?

                      JANEY ASSOCIATES

44

```
 1    A.          Mr. Harrington was the business agent that was

 2          put in charge of the New Penn people.

 3    Q.          How did you know that Mr. Harrington had been

 4          put in charge of the New Penn employees?

 5    A.          I don t recall.

 6    Q.          Sorry, just to back up a little bit.  Before you

 7          sent Mr. Carnes your April 7th, 2003 letter, did you

 8          inform Mr. Carnes that you were on an APA seniority

 9          list?

10    A.          Yes.

11    Q.          And did you speak with Mr. Carnes during the

12          spring of 2003, on March 31st I believe you said it

13          was, 2003?

14    A.          Yes.

15    Q.          Did you speak with him at all about your

16          October, 2001 grievance decision?

17    A.          No.

18    Q.          So Mr. Carnes was not aware of whether you had

19          been medically cleared to work or had served the

20          10-day suspension as of March 31st, 2003?

21    A.          I don t know what Mr. Carnes knew, what he was

22          aware of.  I have no idea.

23    Q.          You said you spoke with Mr. Harrington sometime

24          after May 2nd, 2003?
```

45

```
1    A.        Yes.

2    Q.        What sort of contact did you have with

3              Mr. Harrington?

4    A.        It was a follow up conversation with regards to

5              the grievance I filed.

6    Q.        A telephone call?

7    A.        Yes.

8    Q.        And do you recall when this telephone call

9              occurred?

10   A.        Sometime after Bill Carnes had left office.

11   Q.        Do you recall when after May 2nd, 2003 such

12             contact occurred?

13   A.        No, not exactly.

14   Q.        Do you recall what you said during this -- was

15             it a telephone conversation?

16   A.        It was a telephone conversation, yes.

17   Q.        And do you recall what you said during this

18             telephone conversation?

19   A.        Regarding my grievance,  What was the status of

20             my grievance? .

21   Q.        Did you specifically ask Mr. Harrington what was

22             the status of your grievance?

23   A.        Yes.

24   Q.        And what did Mr. Harrington say?
```

JANEY ASSOCIATES

46

```
 1     A.          He said he didn t -- wasn t aware of a

 2          grievance.

 3     Q.          Do you recall whether this conversation took

 4          place during the summer of 2003?

 5     A.          It was in May.  As I said, after Mr. Carnes left

 6          office I was calling to follow up on the status of the

 7          grievance.

 8     Q.          At this time did Mr. Harrington ask you if you

 9          had been medically cleared to return to work?

10     A.          No.

11     Q.          Did you tell Mr. Harrington whether you had been

12          medically cleared to work?

13     A.          No.

14     Q.          Did you tell Mr. Harrington whether you had

15          served the 10-day suspension?

16     A.          No.

17     Q.          Did he ask you about the 10-day suspension that

18          was listed in the decision of October 16th, 2001?

19     A.          I think he -- he may have mentioned it, yes.

20     Q.          Do you recall what he said concerning that

21          suspension?

22     A.          He said that I had a 10-day suspension to serve.

23     Q.          During this May conversation Mr. Harrington told

24          you you had to serve a 10-day suspension?
```

47

```
 1    A.          Yes.

 2    Q.          Did he tell you -- I m sorry, strike that.  Did
 3                you have any subsequent contact with Mr. Harrington
 4                following the May, 2003 telephone conversation?
 5    A.          Yes, I forwarded him copies of the grievance.
 6    Q.          And when did you do that?

 7    A.          Initially, probably right in May.  And then
 8                there was follow up conversation in July, a telephone
 9                conversation.
10    Q.          Do you recall when in July you had this follow

11                up conversation?
12    A.          Maybe a week before I wrote the letter.
13    Q.          Do you recall whether it was a week before you
14                wrote the letter?

15    A.          Yeah, it was probably a week before I wrote the
16                letter.
17    Q.          And what did you speak about during this
18                conversation?
19    A.          The grievance.

20    Q.          Did Mr. Harrington tell you that there might be
21                an issue with the grievance because you had not been
22                medically cleared to return to work?
23    A.          No.

24    Q.          I m sorry, Mr. Harrington did not mention that?
```

JANEY ASSOCIATES

48

```
 1    A.          Nope.

 2    Q.          Did Mr. Harrington say anything concerning the

 3                10-day suspension that you had spoken about during the

 4                May, 2003 telephone call?

 5    A.          No, I don t think so.

 6    Q.          So what did Mr. Harrington speak about during

 7                this telephone conversation?

 8    A.          We were trying to find out what became of the

 9                grievance that was filed.

10    Q.          And was there any resolution concerning what had

11                happened to the grievance you had sent in April of

12                2003?

13    A.          I had sent him copies of it.

14    Q.          But was there any resolution?

15    A.          It was to my understanding that he was

16                negotiating with the company over the grievance.

17    Q.          And by  the company  do you mean New Penn Motor

18                Express?

19    A.          Yes.

20    Q.          If you could please look at deposition Exhibit

21                No. 3?  If you could look at the second paragraph, it

22                starts with  Let s not lose sight of the real issue

23                here ?

24    A.          Um-hum.
```

49

1    Q.        And in this paragraph you speak about the issue

2              being seniority rights not whether you were capable of

3              returning to work, or capable of working, is that

4              correct?

5    A.        That s what it says.

6    Q.        Do you recall why you wrote this paragraph?

7    A.        I don t recall exactly what my thought process

8              was at the time, no.

9    Q.        Had you ever had a conversation with

10             Mr. Harrington in which he discussed that there would

11             be an issue concerning whether or not you were capable

12             of returning to work?

13   A.        No.

14   Q.        Did you think there was an issue concerning

15             whether you were medically capable of returning to

16             work?

17   A.        No.

18                      MS. PENNINI: Please mark this as an

19             Exhibit?

20                          (The document above-referred

21                           to was marked Deposition

22                           Exhibit No. 4 for Identification)

23             BY MS. PENNINI:

24   Q.        Did you have any additional contact with

                       JANEY ASSOCIATES

50

1          Mr. Harrington during the summer of 2003 besides the

2          July telephone conversation you spoke about and the

3          letter of July 25th, 2003?

4     A.        Yes, I believe there was another phone call.

5     Q.        And when was this phone call?

6     A.        Oh, I can t be sure.

7     Q.        Can you give me an approximate date, was it

8          still during the summer of 2003?

9     A.        August, maybe.

10    Q.        Did you call Mr. Harrington or did

11         Mr. Harrington call you?

12    A.        I believe I probably called Mr. Harrington.

13    Q.        Did you call Mr. Harrington for any particular

14         reason in August of 2003?

15    A.        Yes.

16    Q.        And why was that?

17    A.        To find out what the status of my grievance was.

18    Q.        And what did Mr. Harrington tell you regarding

19         the status of your grievance?

20    A.        I don t recall exactly what the conversation was

21         about.  They were, to my understanding, again

22         discussing things with the company with regards to the

23         grievance.

24    Q.        Did Mr. Harrington ever send you any

                    JANEY ASSOCIATES

51

1           correspondence during the summer of 2003?

2    A.         No.

3    Q.         Did you speak with Mr. Harrington at all during

4           the fall of 2003?

5    A.         I believe I did.

6    Q.         When did you have contact with Mr. Harrington

7           during the fall of 2003?

8    A.         As I said, it was August.  Sometime in August.

9    Q.         What about during the fall of 2003?

10   A.         September.  Maybe August or September.

11   Q.         Was there an additional phone call in August

12          besides the phone call you already mentioned?

13   A.         No.

14   Q.         Was there an additional phone call in September

15          besides the August phone call you have already

16          mentioned?

17   A.         I don t recall.

18   Q.         Do you recall if you spoke with Mr. Harrington

19          in October of 2003?

20   A.         Yes, I might ve.

21   Q.         Do you recall whether you did?

22   A.         As I said, I might have.

23   Q.         Do you recall whether you spoke with

24          Mr. Harrington in November of 2003?

                        JANEY ASSOCIATES

52

| | | |
|---|---|---|
| 1 | A. | I believe I did. |
| 2 | Q. | Do you know whether you spoke with him in |
| 3 | | November of 2003? |
| 4 | A. | I m sure I did. |
| 5 | Q. | And do you recall what you spoke about during |
| 6 | | November of 2003? |
| 7 | A. | The status of my grievance. |
| 8 | Q. | And what did Mr. Harrington tell you? |
| 9 | A. | That he was going to file a grievance. |
| 10 | Q. | Did he say why he was filing a grievance? |
| 11 | A. | That was his duty. |
| 12 | Q. | So did he tell you in November of 2003 that he |
| 13 | | was filing a grievance in November of 2003? |
| 14 | A. | He was going to file the grievance with the |
| 15 | | appropriate committee. |
| 16 | Q. | Do you recall when in November this telephone |
| 17 | | conversation took place? |
| 18 | A. | No. |
| 19 | Q. | During this November, 2003 telephone |
| 20 | | conversation, did Mr. Harrington ask you whether you |
| 21 | | had been medically cleared to return to work? |
| 22 | A. | No. |
| 23 | Q. | Did you tell Mr. Harrington whether you had been |
| 24 | | medically cleared to return to work? |

JANEY ASSOCIATES

53

1    A.          Nope.

2    Q.          Prior to November of 2003, you had said that

3                Mr. Harrington had been in negotiations with the

4                company concerning your grievance?

5    A.          That s my understanding.

6    Q.          And did your understanding change in November of

7                2003?

8    A.          No.

9    Q.          Did Mr. Harrington, in November of 2003, tell

10               you that he no longer wanted to negotiate with the

11               company concerning this grievance?

12   A.          No.

13   Q.          Did Mr. Harrington just tell you that he was

14               going to file a grievance at this time?

15   A.          I filed the grievance.  It was Mr. Harrington s

16               job --

17   Q.          I m sorry, file the grievance with the --

18                    MR. LATHROP: I think Mr. Goulet was

19               attempting to answer your question, so if you would

20               allow him please.

21                    MS. PENNINI: Okay.

22                    THE WITNESS: I filed the grievance with

23               the local union.  It was their job to docket the case

24               before the committee to have it heard.

                        JANEY ASSOCIATES

54

```
1                    BY MS. PENNINI:

2         Q.         Had you ever filed other grievances with the

3                    local union prior to 2003?

4         A.         Yes.

5         Q.         And when did you file prior grievances?

6         A.         1987.

7         Q.         And what was this grievance concerning?

8         A.         Working conditions.

9         Q.         When you filed this grievance, did you

10                   immediately file it with the local?

11        A.         Yes.

12        Q.         To whom did you give your grievance?

13        A.         I m going to say George Cashman.

14        Q.         In 1987, do you recall whether there was a

15                   steward at the APA facility in Canton?

16        A.         Yes.  Yes, there was.

17        Q.         Do you recall who this was?

18        A.         His last name was Yettman.  I m not sure what

19                   his first name was.  Bobby.

20        Q.         Did you file a grievance with Mr. Yettman in

21                   1987?

22        A.         I believe I filed it with George Cashman.

23        Q.         And why did you file it with George Cashman?

24        A.         I had been discharged, Mr. Yettman was at home.
```

                              JANEY ASSOCIATES

55

1    Q.          I m sorry, I thought you said working

2             conditions?

3    A.          It was working conditions.  I think there was a

4             discharge that may have been involved with it.

5    Q.          Did you file more than one grievance in 1987?

6    A.          No, I don t think so.

7    Q.          So it was the grievance you were discussing

8             concerning the February 25th termination?

9    A.          No.

10                MR. LATHROP: Did you say February 25th?

11                MS. PENNINI: The 1987 termination.

12                MR. LATHROP: Objection.

13                THE WITNESS: Nope.

14           BY MS. PENNINI:

15    Q.          Did you file a grievance concerning the February

16           25th, 1987 termination?

17                MR. LATHROP: Objection.

18                THE WITNESS: The union filed the response

19           to the discharge.

20           BY MS. PENNINI:

21    Q.          Okay.  You said you filed a grievance in 1987

22           concerning working conditions, just to clarify, and

23           that you filed this with George Cashman because

24           Mr. Yettman was unavailable?

                    JANEY ASSOCIATES

56

| | | |
|---|---|---|
| 1 | A. | Right. |
| 2 | Q. | Do you know why Mr. Yettman was unavailable? |
| 3 | A. | Mr. Yettman worked on the day shift and I worked |
| 4 | | on the night shift. |
| 5 | Q. | Was there a steward on the night shift, as well? |
| 6 | A. | No. |
| 7 | Q. | Do you recall when in 1987 this grievance was |
| 8 | | filed? |
| 9 | A. | November -- no, that s not right.  Maybe it was |
| 10 | | January. |
| 11 | Q. | If you could please look at deposition Exhibit |
| 12 | | No. 4?  Did you write this letter? |
| 13 | A. | Yes. |
| 14 | Q. | Did you send this letter to Mr. Harrington? |
| 15 | A. | Yes. |
| 16 | Q. | And was this letter written before or after your |
| 17 | | telephone conversation with him in November of 2003? |
| 18 | A. | Afterwards. |
| 19 | Q. | Do you recall why you wrote this letter? |
| 20 | A. | Yes. |
| 21 | Q. | And why is that? |
| 22 | A. | Again, to follow up on the grievance that I had |
| 23 | | filed. |
| 24 | Q. | Following your termination on March 12, 1987 you |

JANEY ASSOCIATES

57

```
 1                 said you were on Worker s Compensation leave, correct?

 2      A.         Say that again.

 3      Q.         Following the March 12th, 1987 termination from

 4                 APA, you said you were on industrial accident leave or

 5                 Worker s Compensation leave?

 6      A.         Yes.

 7      Q.         During your time on Worker s Compensation leave,

 8                 were you able to drive?

 9      A.         Yes.

10      Q.         Did you have any issues concerning your ability

11                 to drive?

12      A.         No.

13      Q.         Did you have any problem concerning your ability

14                 to lift any objects?

15      A.         Yes.

16      Q.         And what was that inability?

17      A.         I had certain restrictions on lifting heavy

18                 objects as a result of the herniated disc in my back

19                 and my neck.

20      Q.         And you had mentioned that there was a 35 pound

21                 restriction as a result of that?

22      A.         Yes.

23      Q.         Have you been able to remember any additional

24                 restrictions?
```

JANEY ASSOCIATES

58

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Do you recall whether that was the only |
| 3 | | restriction now -- do you still not recall whether |
| 4 | | there were any additional specific restrictions? |
| 5 | A. | No, offhand I don t. |
| 6 | Q. | Were you incapacitated for anytime following the |
| 7 | | March, 1987 termination? |
| 8 | | MR. LATHROP: Objection. |
| 9 | | THE WITNESS: Could you say that again? |
| 10 | | BY MS. PENNINI: |
| 11 | Q. | Following the March 12th, 1987 termination, were |
| 12 | | you able to walk and get around? |
| 13 | A. | I did, yes. |
| 14 | Q. | Following this termination did you ever seek any |
| 15 | | additional education? |
| 16 | A. | No. |
| 17 | Q. | Did you graduate from high school? |
| 18 | A. | Yes, I did. |
| 19 | Q. | When did you graduate from high school? |
| 20 | A. | 1978. |
| 21 | Q. | Where did you graduate from high school? |
| 22 | A. | Hudson High School. |
| 23 | Q. | Did you attend any college or other institution |
| 24 | | following your graduation from high school? |

JANEY ASSOCIATES

59

| 1 | A. | No. |
|---|----|-----|
| 2 | Q. | In what year were you born? |
| 3 | A. | 1960. |
| 4 | Q. | And what is the date of your birth? |
| 5 | A. | 6/11/1960. |
| 6 | Q. | Would that be June 11th, 1960? |
| 7 | A. | Yes, it would be. |
| 8 | Q. | And you said you currently live in Hudson, |
| 9 |    | Massachusetts? |
| 10 | A. | Yes, I do. |
| 11 | Q. | And you said Cox Street, Hudson, Massachusetts? |
| 12 | A. | C-O-X, yeah. |
| 13 | Q. | Have you lived in any other places besides Cox |
| 14 |    | Street in Hudson, Massachusetts between 1978 and the |
| 15 |    | present? |
| 16 | A. | Yes. |
| 17 | Q. | Where else did you live? |
| 18 | A. | I lived in Marlboro for a time. |
| 19 | Q. | And what was your address? |
| 20 | A. | 750 Farm Road. |
| 21 | Q. | When did you live on Farm Road in Marlboro? |
| 22 | A. | 1982  til 1986. |
| 23 | Q. | Did you live on Cox Street between 1978 and |
| 24 |    | 1986? |

JANEY ASSOCIATES

60

| | | |
|---|---|---|
| 1 | A. | Yes.  Not until 1986.  Did you say 1986? |
| 2 | Q. | I m sorry, where did you live between 1978 and |
| 3 | | 1982? |
| 4 | A. | I lived on Cox Street. |
| 5 | Q. | Where did you live between 1960 and 1978? |
| 6 | A. | At Cox Street. |
| 7 | Q. | The same place on Cox Street? |
| 8 | A. | Yes. |
| 9 | Q. | Where did you live after 1986?  You said you |
| 10 | | lived in Marlboro from 1982 to 1986, where did you |
| 11 | | live after Farm Road in Marlboro? |
| 12 | A. | Back to Hudson, Cox Street. |
| 13 | Q. | Have you lived anyplace else besides Cox Street |
| 14 | | in Hudson, Massachusetts between 1986 and the present? |
| 15 | A. | No. |
| 16 | Q. | Do you own the house on Cox Street? |
| 17 | A. | Yes. |
| 18 | Q. | I m sorry, do you live in a house on Cox Street? |
| 19 | A. | Yes. |
| 20 | Q. | How long have you owned this house? |
| 21 | A. | How long have I owned the house? |
| 22 | Q. | Yes. |
| 23 | A. | Since I ve lived there. |
| 24 | Q. | I m sorry, I thought you said you lived there |

JANEY ASSOCIATES

61

```
1              since 1960?

2      A.        Since I moved back there in 1987 --  86.

3      Q.        Do you have any particular hobbies that you

4              engage in?

5      A.        I go to my daughter s field hockey games, I like

6              to go to the races.

7      Q.        What races do you --

8      A.        Stock cars.

9      Q.        I m sorry, stock cars?

10     A.        Race cars, yes.

11     Q.        So do you watch stock car races?

12     A.        Yes.

13     Q.        Do you participate in stock car races?

14     A.        I own a stock car.

15     Q.        How long have you owned a stock car?

16     A.        The family s had stock cars since the 50's.

17     Q.        I m sorry, what do you mean by your family has

18             had stock cars?  Could you explain to me what you mean

19             by that?

20     A.        Yeah, my family owned a junk yard and they had

21             stock cars, and we were involved with stock cars as

22             kids.  And me and my brothers had cars all our lives.

23     Q.        So you said you own -- do you own one stock car?

24     A.        Yes.
```

                                                                    62

1        Q.          Have you ever owned another car besides the one

2                    you currently own?

3        A.          No.

4        Q.          I m sorry, was that  no ?

5        A.          No.

6        Q.          How long have you owned the stock car that you

7                    currently own?

8        A.          Since 1996.

9        Q.          Not to be ignorant here, what kind of stock car

10                   is it?  Could you explain to me what a stock car is?

11       A.          It s a race car.

12       Q.          Is it a particular kind of race car?  Could you

13                   explain to me a little more.

14       A.          It goes around in circles.

15       Q.          What is it that makes a stock car different than

16                   a typical sedan?

17       A.          It s one that they use to race in circles.  It s

18                   not a dragster.

19       Q.          Okay.  Does that mean there is a different size

20                   engine in a stock car than in a typical sedan?

21       A.          Oh, I don t know.

22       Q.          I know you said you owned a stock car and you

23                   watched stock car racing.  Do you also drive a stock

24                   car?

                          JANEY ASSOCIATES

63

1    A.         No.

2    Q.         Did you ever participate in stock car racing as

3               a driver?

4    A.         No.

5    Q.         Is there someone that does race your stock car?

6    A.         Yes.

7    Q.         And who is that?

8    A.         His name is Jeff.

9    Q.         Does Jeff have a last name?

10   A.         Yeah, Crowley.

11   Q.         How often does Jeff Crowley race in your stock

12              car?

13   A.         He hasn t raced at all this year.  It s been --

14              not since last year.

15   Q.         But you still own this car?

16   A.         Yes.

17   Q.         Can you win money owning a stock car?

18                   MR. LATHROP: I m sorry, what did you say?

19                   MS. PENNINI: Can you, as a stock car

20              owner, win money based on how Mr. Crowley does in a

21              stock car race?

22                   THE WITNESS: I think -- yes, there s a

23              payoff for the finish.

24                   BY MS. PENNINI:

                          JANEY ASSOCIATES

64

1    Q.        Has Mr. Crowley ever placed well in a stock car

2              race?

3    A.        Yes.

4    Q.        And what is the most that Mr. Crowley has ever

5              won for his stock car racing?

6    A.        Oh, I don t know.

7    Q.        Or as the stock car owner are you entitled to a

8              portion of whatever is earned by Mr. Crowley s

9              finishes?

10   A.        Mr. Crowley got the checks.

11   Q.        As the owner of the car are you entitled a

12             portion of that money?

13   A.        Mr. Crowley got the checks.  I didn t get

14             anything.

15   Q.        Are you entitled, as a stock car owner, to part

16             of that money?

17   A.        I suppose I could be.

18                  MS. PENNINI: I have no further questions

19             at this time.

20                  MR. GLUEK: Can we take a break for five

21             minutes?

22                  MS. PENNINI: Yes, please.

23                  (A brief recess was taken)

24                  MR. GLUEK: Back on the record.

                    JANEY ASSOCIATES

65

1       EXAMINATION

2                   BY MR. GLUEK:

3       Q.          The ground rules are the same.  I don t

4                   anticipate this taking too long, but if you don t

5                   understand one of my questions, please tell me.  If

6                   you cannot hear one of my questions, please tell me.

7                   If you answer one of my questions, I am going to

8                   assume that you both heard and understood the

9                   question, is that fair?

10      A.          Yes.

11      Q.          This is not supposed to be an endurance contest.

12                  If you need to take a break, just tell me, we ll take

13                  a break, okay?

14      A.          Okay.

15      Q.          If you need to talk to your lawyer, as long as

16                  there is a question not pending, just say you need to

17                  take a break, okay?

18      A.          Yeah.

19      Q.          Have you ever been convicted of any crimes?

20      A.          Have I ever been convicted of any crimes?  I m

21                  not sure I understand the question.

22      Q.          Do you know what a crime is?

23      A.          Yes.

24      Q.          Do you know what a conviction is?

JANEY ASSOCIATES

66

| | | |
|---|---|---|
| 1 | A. | I think so. |
| 2 | Q. | Okay.  Have you been convicted of any crimes? |
| 3 | A. | I don t think so. |
| 4 | Q. | Do you have anything that would refresh your |
| 5 | | recollection? |
| 6 | A. | No. |
| 7 | Q. | Are you married? |
| 8 | A. | Yes. |
| 9 | Q. | To whom? |
| 10 | A. | Ann M. Goulet. |
| 11 | Q. | How long have you been married? |
| 12 | A. | 15 years. |
| 13 | Q. | Any prior marriages? |
| 14 | A. | No. |
| 15 | Q. | Does she work? |
| 16 | A. | Yes. |
| 17 | Q. | Where does she work? |
| 18 | A. | She works for herself. |
| 19 | Q. | What does she do? |
| 20 | A. | She drives a coffee truck. |
| 21 | Q. | Does she have a d/b/a, doing business as? |
| 22 | A. | Yes. |
| 23 | Q. | And what is that? |
| 24 | A. | Ann s Quality Catering. |

JANEY ASSOCIATES

67

| | | |
|---|---|---|
| 1 | Q. | Does she employ anyone? |
| 2 | A. | No. |
| 3 | Q. | Do you help her out on the truck? |
| 4 | A. | No. |
| 5 | Q. | How long has she been operating Ann s Quality |
| 6 | | Catering? |
| 7 | A. | Five years. |
| 8 | Q. | Before that was she employed? |
| 9 | A. | Yes. |
| 10 | Q. | By whom? |
| 11 | A. | She was in the restaurant business, she was a |
| 12 | | waitress/bartender. |
| 13 | Q. | And for how long did she do that? |
| 14 | A. | Ten or twelve years. |
| 15 | Q. | One particular restaurant/bar or several during |
| 16 | | that period? |
| 17 | A. | Several. |
| 18 | Q. | Can you name them, please? |
| 19 | A. | The 401 Club. |
| 20 | Q. | Where is that? |
| 21 | A. | Marlboro, Mass. |
| 22 | Q. | Okay. |
| 23 | A. | Scaletti s Restaurant. |
| 24 | Q. | Can you spell that? |

JANEY ASSOCIATES

68

| 1  | A. | I can t. |
|----|----|----|
| 2  | Q. | Can you say it slowly then? |
| 3  | A. | Scaletti s. |
| 4  | Q. | And where is that located? |
| 5  | A. | Hudson. |
| 6  | Q. | Any others? |
| 7  | A. | Nope. |
| 8  | Q. | No others or no others that you remember? |
| 9  | A. | No others. |
| 10 | Q. | Do you have children? |
| 11 | A. | Yes. |
| 12 | Q. | How many? |
| 13 | A. | Two. |
| 14 | Q. | Names? |
| 15 | A. | Craig, Jr. |
| 16 | Q. | How old? |
| 17 | A. | 23. |
| 18 | Q. | Is he dependant upon you? |
| 19 | A. | No. |
| 20 | Q. | And your other child? |
| 21 | A. | Nicole. |
| 22 | Q. | Nicole is how old? |
| 23 | A. | 17. |
| 24 | Q. | Is she dependant upon you? |

JANEY ASSOCIATES

69

```
 1       A.          Yes.

 2       Q.          Other than this lawsuit, have you filed any
 3                   other lawsuits?
 4       A.          No.
 5       Q.          Have you been a defendant in any lawsuit?
 6       A.          No.

 7       Q.          I believe I understood your testimony that since
 8                   your accident at APA until March 1st, 2002 you had not
 9                   worked, is that correct?
10       A.          Yes.

11       Q.          Since March 1st, 2002 to the present, have you
12                   been employed?
13       A.          No.
14       Q.          Since March 1st, 2002 until the present, have

15                   you been offered employment by any employer?
16       A.          No.
17       Q.          Since March 1st, 2002 until the present, have
18                   you had any interviews for employment?
19       A.          No.

20       Q.          Since March 1st, 2002 until the present, have
21                   you filed any applications for employment?
22       A.          No.
23       Q.          Since March 1st, 2002 until the present, have

24                   you sent out any resumes?
```

JANEY ASSOCIATES

70

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Since March 1st, 2002 until the present, have |
| 3 | | you contacted any employment counselors? |
| 4 | A. | Nope. |
| 5 | Q. | Since March 1st, 2002 until the present, have |
| 6 | | you gone to the library or purchased any books in |
| 7 | | terms of how one goes about finding employment? |
| 8 | A. | No. |
| 9 | Q. | Since March 1st, 2002 until the present, have |
| 10 | | you gotten on the computer to look for employment? |
| 11 | A. | No. |
| 12 | Q. | Since March 1st, 2002 until the present, have |
| 13 | | you made any efforts to find employment? |
| 14 | A. | No. |
| 15 | Q. | Why not? |
| 16 | A. | I ve got some outstanding issues with regard to |
| 17 | | my industrial accident. |
| 18 | Q. | What are those outstanding issues you have |
| 19 | | regarding your industrial accident? |
| 20 | A. | I ve got a knee that needs to be reconstructed. |
| 21 | Q. | Is that from the blown out tendon? |
| 22 | A. | Yes. |
| 23 | Q. | Do you have any plans to get that knee |
| 24 | | reconstructed? |

JANEY ASSOCIATES

71

```
 1      A.          Yes.

 2      Q.          When?

 3      A.          As soon as they resolve all the issues with the

 4                  insurance company with the old employer.

 5      Q.          Any other outstanding issues you have regarding

 6                  your industrial accident?

 7      A.          No.

 8      Q.          Just your knee?

 9      A.          Yes.

10      Q.          From March 1st, 2002 until the present, do you

11                  have any restrictions regarding your ability to work?

12      A.          Could you repeat the question?

13                      MR. GLUEK: Can you repeat it, please?

14                      (Question read back)

15                      THE WITNESS: I m not under any doctor s

16                  care at this time.

17                      BY MR. GLUEK:

18      Q.          The question still remains, since March 1st,

19                  2002 until the present, do you have any restrictions

20                  that effects your ability to work?

21      A.          Yes.

22      Q.          What are those restrictions?

23      A.          I have a herniated disc in my lower back.

24      Q.          Still?
```

JANEY ASSOCIATES

72

1       A.          Still.

2       Q.          Any other restrictions?

3       A.          A herniated disc in my neck.

4       Q.          Still?

5       A.          Still.

6       Q.          Any other restrictions?

7       A.          And the ligament in my knee.

8       Q.          Now your herniated disc in your lower back, does

9                   that effect your ability to sit?

10      A.          On occasion, yes.

11      Q.          Does that effect your ability to stand?

12      A.          Yes.

13      Q.          Does that effect your ability to lift?

14      A.          Yes.

15      Q.          Does it effect your ability to turn?

16      A.          Yes.

17      Q.          Does it effect your ability to bend?

18      A.          Yes.

19      Q.          All in negative ways?

20      A.          Yes.

21      Q.          With respect to your herniated disc in your

22                  neck, does that effect your ability to bend?

23      A.          No.

24      Q.          What limitations does the herniated disc in your

                    JANEY ASSOCIATES

73

```
1              neck have on you?

2       A.         It depends on the level of pain I m having on

3              any particular day.

4       Q.         So it s painful?

5       A.         Very painful.

6       Q.         Do you take medication for your herniated disc

7              in the neck?

8       A.         Yes, I do.

9       Q.         And what kind of medication?

10      A.         Naprosin, Soma.

11      Q.         And what are those?

12      A.         Anti-inflammatory pain medication.

13      Q.         And with respect to your herniated disc to your

14             lower back, is that also painful?

15      A.         Yes.

16      Q.         Do you take medication for that?

17      A.         The same medications.

18      Q.         Only the two medications?

19      A.         Yes.

20      Q.         Do you have a commercial driver s license?

21      A.         Yes, I do.

22      Q.         Is it still current?

23      A.         Yes.

24      Q.         Are you required to take a physical periodically
```

JANEY ASSOCIATES

74

1            to keep that current?

2    A.        No.

3    Q.        With respect to your knee, what limitations does

4            that cause on you?

5    A.        Well it s tough to get around some days.

6    Q.        With your limitations, could you currently do

7            dock work?

8    A.        I could try.

9    Q.        That is not the question.  Do you know if you

10            could currently do dock work with your limitations?

11   A.        I do not know.

12   Q.        With your limitations, do you know if you could

13            currently do driving work?

14   A.        I do not know.

15   Q.        You testified that you appealed your award of

16            partial disability, is that correct?

17   A.        Yes.

18   Q.        Why did you appeal it?

19   A.        Why did I appeal it?

20   Q.        Is it because you thought you should have gotten

21            total disability?

22   A.        Yes.

23   Q.        Do you still believe you should have gotten

24            total disability?

JANEY ASSOCIATES

75

```
1        A.        Yes.

2        Q.        Do you believe that you are currently totally

3                  disabled?

4        A.        Yes.

5        Q.        You testified that in 1995 you received Social

6                  Security benefits, correct?

7        A.        Yes.

8        Q.        Are you currently receiving Social Security

9                  benefits?

10       A.        Yes, I am.

11       Q.        Now when you received the Social Security

12                 benefits in 1995, did it go retroactive?

13       A.        Yes.

14       Q.        To what period?

15       A.        March 11th, 1987.

16       Q.        What is your monthly benefit on your Social

17                 Security currently?

18       A.        $2,160.00.

19       Q.        And has that remained the same or has that gone

20                 up?

21       A.        It goes up every year.

22       Q.        Do you remember what the lowest amount was?

23       A.        Not offhand.

24       Q.        And I am assuming your children were also
```

JANEY ASSOCIATES

76

1          receiving Social Security benefits when they were

2          minors?

3     A.        That s included.

4     Q.        The 2,160 includes their benefit?

5     A.        Yes.

6     Q.        Does your non-minor child still get Social

7          Security benefits?

8     A.        Yes.

9     Q.        Do you have to periodically reapply for Social

10         Security benefits?

11    A.        No.

12    Q.        Do you have to update Social Security with

13         respect to your status?

14    A.        No.

15    Q.        Where did you apply for these Social Security

16         benefits?

17    A.        Framingham.

18    Q.        Were you or are you currently assigned a case

19         worker for Social Security?

20    A.        No.

21    Q.        And you were never assigned a case worker?

22    A.        No.

23    Q.        Do you know who your contact person was at

24         Social Security when you applied?

                    JANEY ASSOCIATES

77

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Do you have any documents regarding Social |
| 3 | | Security and your application for Social Security? |
| 4 | A. | Do I have any documents? |
| 5 | Q. | Correct. |
| 6 | A. | What kind of documents? |
| 7 | Q. | Any piece of paper. |
| 8 | A. | Saying what? |
| 9 | Q. | That relates to your Social Security benefits |
| 10 | | and/or your application for Social Security. |
| 11 | A. | I have documents that pertain to my Social |
| 12 | | Security, yes. |
| 13 | Q. | Do you have a lawyer that represented you when |
| 14 | | you applied for Social Security? |
| 15 | A. | Yes. |
| 16 | Q. | And what is his name? |
| 17 | A. | The law firm was Ellis & Ellis out of Worcester. |
| 18 | Q. | And which lawyer at Ellis & Ellis did you deal |
| 19 | | with? |
| 20 | A. | I believe it was Bob Marque. |
| 21 | Q. | When was the last time you talked to Mr. Marque? |
| 22 | A. | I don t recall. |
| 23 | Q. | Since 1995? |
| 24 | A. | Yeah, probably. |

JANEY ASSOCIATES

78

```
 1    Q.        Since last year?

 2    A.        Nope, not last year.

 3    Q.        The last five years?

 4    A.        Nope.

 5    Q.        The last ten years?

 6    A.        1995.

 7    Q.        Okay.  Have you talked to anybody at New Penn

 8              since March 1st, 2002?

 9    A.        No.

10    Q.        Have you called up New Penn and asked if you are

11              going to be called?

12    A.        No.

13    Q.        Have you ever filled out an application at New

14              Penn?

15    A.        Nope.

16    Q.        Do you know Mr. Carnes?

17    A.        Yes.

18    Q.        Do you believe that he had any ill will towards

19              you?

20    A.        I don t know that.

21    Q.        You don t have an opinion one way or the other?

22    A.        Nope.

23    Q.        Do you have any facts that would suggest that he

24              had any ill will towards you?
```

JANEY ASSOCIATES

79

```
 1      A.          No.

 2      Q.          Do you have any facts that Mr. Carnes was

 3                  prejudiced against you in someway?

 4      A.          No.

 5      Q.          Do you have any facts that Mr. Carnes disliked

 6                  you in any respect?

 7      A.          Nope.

 8      Q.          You know Mr. Harrington, correct?

 9      A.          Yes.

10      Q.          Do you have any facts to believe that

11                  Mr. Harrington has any ill will towards you?

12      A.          Nope.

13      Q.          Do you have any facts to believe that

14                  Mr. Harrington had any prejudice towards you in any

15                  respect?

16      A.          Nope.

17      Q.          Do you have any facts that Mr. Harrington

18                  somehow wanted to see you damaged?

19      A.          Nope.

20      Q.          Do you have any facts that anyone connected with

21                  the union had any ill will towards you?

22      A.          No.

23      Q.          Do you have any facts that anybody connected

24                  with the union had any prejudices towards you?
```

JANEY ASSOCIATES

80

```
 1     A.          No.

 2     Q.          Do you have any facts that anyone connected with

 3                 the union had any hatred towards you?

 4     A.          Nope.

 5     Q.          Between March 1, 2002 and March 30, 2003, do you

 6                 know if you could have worked 30 days at New Penn?

 7     A.          Nope.

 8     Q.          Let me rephrase the question.  Between March 1,

 9                 2002 and March 30, 2003, do you know if you could have

10                 worked 30 days in a two month period at New Penn?

11     A.          No.

12     Q.          I think I understood your testimony, sir, that

13                 after you filed a grievance on April 7th, 2003 you had

14                 no discussions with Mr. Carnes?

15                     MR. LATHROP: I m sorry, could I have that

16                 date again?

17                     MR. GLUEK: After April 7th, 2003, which is

18                 the date your grievance is dated.

19                     THE WITNESS: Um-hum.

20                 BY MR. GLUEK:

21     Q.          You had no conversations with Mr. Carnes, is

22                 that correct?

23     A.          I don t believe I did.

24     Q.          Do you have anything that would refresh your
```

JANEY ASSOCIATES

81

1           recollection?

2    A.          Nope.

3    Q.          Do you have any documents memorializing any

4           conversations that you had with Mr. Carnes?

5    A.          Nope.

6    Q.          Did Mr. Carnes ever tell you to wait until after

7           the agreement with New Penn and the union expired

8           before you filed a grievance?

9    A.          No.

10   Q.          Did anybody have any discussion with you from

11          the union with respect to the timing of when the

12          grievance should be filed by you?

13   A.          No.

14   Q.          It is your testimony, isn t it sir, that for the

15          period between March 1, 2002 and March 30, 2003 you

16          had several discussions with Mr. Carnes?

17   A.          Yes.

18   Q.          And those were follow up discussions about you

19          not being called by New Penn, correct?

20   A.          Yes.

21   Q.          So during that time period you were aware that

22          there was at least an issue, correct?

23   A.          No.

24   Q.          Then why did you make these calls?

                        JANEY ASSOCIATES

82

```
 1        A.          To find out what the status of things were.

 2        Q.          And what did Mr. Carnes tell you the status was?

 3        A.          At first he said he wasn t sure and he would

 4                    look into it.

 5        Q.          That was in the springtime?

 6        A.          Yes.

 7        Q.          Did he say anything else in the springtime?

 8        A.          Nope.

 9        Q.          And I believe your testimony was two

10                    conversations you had in the spring, correct?

11        A.          Was it two in the spring?  It may have been.

12                    Initial phone call -- there was an initial phone call

13                    with Mark Harrington, who told me that he no longer

14                    represented the men at APA, I need to speak with Bill

15                    Carnes.

16        Q.          Right.  And then you had, in the spring of 2002,

17                    how many conversations with Mr. Carnes did you have?

18        A.          I had a follow up phone call from the Mark

19                    Harrington call with Mr. Carnes, and then one more

20                    after that.

21        Q.          In the spring?

22        A.          Early summer, spring.  Late spring, early

23                    summer.

24        Q.          And I apologize.  We have already been over
```

83

```
 1              this, but now I am confused.  Mr. Harrington called

 2              you up in the spring of 2002 to say he was no long --

 3      A.      No, I called Mr. Harrington.

 4      Q.      And he said he is no long responsible for APA,

 5              correct?

 6      A.      Right.

 7      Q.      Then you called Mr. Carnes, correct?

 8      A.      Yes.

 9      Q.      And Mr. Carnes said that he didn t know and he

10              would follow up?

11      A.      Right.

12      Q.      Did he say anything else?

13      A.      No.

14      Q.      And that took place in the spring of 2002,

15              correct?

16      A.      Yes.

17      Q.      And it is your testimony that he said -- that

18              you can recall that he said nothing other than he

19              didn t know?

20      A.      General conversation about what was going on,

21              the whole issue.

22      Q.      What else do you remember that he said?

23      A.      He said that he was going to look into it.

24      Q.      Do you remember anything else?
```

JANEY ASSOCIATES

84

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | When was the next time you talked to Mr. Carnes? |
| 3 | A. | I can t be sure. |
| 4 | Q. | But there was a subsequent time? |
| 5 | A. | Yes. |
| 6 | Q. | And was this by telephone? |
| 7 | A. | Yes. |
| 8 | Q. | Did you call him? |
| 9 | A. | Yes. |
| 10 | Q. | Did you take any notes of that conversation? |
| 11 | A. | I didn t take any written notes. |
| 12 | Q. | What was the substance of that conversation? |
| 13 | A. | The fact that he had spoke with New Penn with |
| 14 | | regards to my situation.  He had conversations with |
| 15 | | the New Penn people.  I m not sure if it was with the |
| 16 | | terminal manager or Dan Schmidt and possibly Charlie |
| 17 | | Zaccaria, but that was six months in advance from |
| 18 | | getting the grievance. |
| 19 | Q. | So he said he talked to New Penn? |
| 20 | A. | Yeah. |
| 21 | Q. | Did he say to whom he talked to? |
| 22 | A. | No. |
| 23 | Q. | Did he say what he said to New Penn? |
| 24 | A. | He -- yes. |

JANEY ASSOCIATES

85

```
1    Q.        What did he say he said?

2    A.        That he had an APA employee that was looking to
3              be put to work.

4    Q.        Did he say anything else to you?

5    A.        He talked about, I guess they told him that my
6              name wasn t on the list, on the seniority list and he

7              said it was on the seniority list.  He said,  I ll
8              show you the decision from the New England Joint
9              Committee that puts him on the list.

10   Q.        Did he say anything else?

11   A.        Nope, just that he would get back to me.

12   Q.        That is all that you remember of the
13             conversation?

14   A.        Yes.

15   Q.        Nothing else?

16   A.        No.

17   Q.        When was the next conversation you had with
18             Mr. Carnes?

19   A.        March.

20   Q.        Of 2003?

21   A.        Yes.

22   Q.        Who initiated that conversation?

23   A.        I believe I did.

24   Q.        And what do you recall of that conversation?
                    JANEY ASSOCIATES
```

86

```
 1    A.         I called and asked him what my status was as far

 2               as being called.  The agreement, in effect, ended and

 3               I hadn t received a phone call.

 4    Q.         What else of that conversation do you recall?

 5    A.         He said to me, pardon my french,  They fucked

 6               yah.  Send the grievance in.

 7    Q.         Did you say anything else?

 8    A.         Nope, I wrote the grievance.

 9    Q.         Did he say anything else?

10    A.         Nope.

11    Q.         That was it of the conversation?

12    A.         Um-hum.

13    Q.         Do you have any notes of that conversation?

14    A.         Nope.

15    Q.         Could you look at, please, what has been marked

16               as Goulet Exhibit 2?  Is that your grievance?

17    A.         Yes.

18    Q.         Is that your handwriting?

19    A.         Yes, it is.

20    Q.         Did anybody assist you in preparing this

21               grievance?

22    A.         Nobody.

23    Q.         Between the conversation that you had with

24               Mr. Carnes where he said,  They fucked you.  Send in
```

JANEY ASSOCIATES

87

```
1                the grievance.  and the time that you sent in the

2                grievance, did you have any other conversations with

3                Mr. Carnes?

4       A.       Don t believe I did.

5       Q.       You do not believe you did?

6       A.       I don t think so.

7       Q.       Okay.  After you sent in the grievance, your

8                next contact was with Mr. Harrington, is that correct?

9       A.       Yes.

10      Q.       Did you initiate that?

11      A.       Yes.

12      Q.       Do you recall when that occurred?

13      A.       Sometime after Bill Carnes left office.

14      Q.       But it was in May?

15      A.       I believe so.

16      Q.       May, 2003?

17      A.       Yes.

18      Q.       And do you have any notes of that conversation?

19      A.       Nope.

20      Q.       What was said during that conversation?

21      A.       Basically, I was following up on the status of

22               the grievance.  Like I said, I filed a grievance with

23               the union --

24      Q.       And I think your prior testimony was
```

JANEY ASSOCIATES

88

```
 1              Mr. Harrington said he didn t know anything about it,

 2         correct?

 3    A.        He said he didn t have any copies of the

 4         grievance.

 5    Q.        Do you know if he knew about the grievance

 6         before your phone call?

 7    A.        Yes, I m sure he did.

 8    Q.        Do you know that for a fact?

 9    A.        No.

10    Q.        As best you can recall, what were

11         Mr. Harrington s exact words to you during that

12         conversation?

13    A.        That he didn t have a copy of the grievance.

14         That Bill Carnes didn t file it with the committee,

15         that s why it didn t get filed.  Pretty basic.

16    Q.        Do you recall anything else he said?

17    A.        Nope.

18    Q.        When was your next conversation with

19         Mr. Harrington?

20    A.        Maybe sometime in June.

21    Q.        And did you initiate that conversation?

22    A.        I m sure I did, yes.

23    Q.        Do you have any notes of that conversation?

24    A.        No.
```

JANEY ASSOCIATES

89

1    Q.        What was the substance of that conversation?

2    A.        Again, to follow up on what happened to my

3              grievance.

4    Q.        And what did Mr. Harrington say?

5    A.        I don t recall.

6    Q.        You don t recall anything he said?

7    A.        No.

8    Q.        Do you recall anything that you said?

9    A.        Just trying to find out what happened to the

10             grievance.

11   Q.        And that s all that you recall from that

12             conversation?

13   A.        Yeah.

14   Q.        When was your next conversation with

15             Mr. Harrington?

16   A.        I think I followed that up with the letter I

17             wrote.

18   Q.        So that is the July 25th letter?

19   A.        Yeah.

20   Q.        Could you look at Exhibit 3, please?

21   A.        Um-hum.

22   Q.        Is it still your sworn testimony that you do not

23             recall why you wrote  Let s not lose sight of the real

24             issue here.  The grievance is about seniority rights

                        JANEY ASSOCIATES

90

| | | |
|---|---|---|
| 1 | | under the agreement not whether one was capable of |
| 2 | | working or not. |
| 3 | | MR. LATHROP: Objection. |
| 4 | | THE WITNESS: Is it my sworn testimony what |
| 5 | | now? |
| 6 | | BY MR. GLUEK: |
| 7 | Q. | Is it still your sworn testimony that you have |
| 8 | | no recollection as to why you wrote that? |
| 9 | | MR. LATHROP: Objection. |
| 10 | | THE WITNESS: Again, you know, I m not sure |
| 11 | | what my thought process was at the time.  Like I said, |
| 12 | | I was trying to follow up on the grievance that I had |
| 13 | | submitted and maybe there was some conversation about |
| 14 | | I was on comp or something, and I think I told them I |
| 15 | | wasn t on comp.  I wasn t collecting a Workman s |
| 16 | | Compensation check. |
| 17 | | BY MR. GLUEK: |
| 18 | Q. | So isn t it a fact that Mr. Harrington had |
| 19 | | conversations with you prior to you writing Exhibit 3 |
| 20 | | where he indicated to you that you may not be able for |
| 21 | | recall because you were not able to work? |
| 22 | A. | No. |
| 23 | Q. | Do you know whether or not the union ever |
| 24 | | supplied New Penn with your name on the seniority |

JANEY ASSOCIATES

91

| | | |
|---|---|---|
| 1 | | list? |
| 2 | A. | Yes, they did. |
| 3 | Q. | How do you know that? |
| 4 | A. | I have a copy of that, and I have a copy of the |
| 5 | | letter from the freight director that was sent out to |
| 6 | | the locals with my name on it. |
| 7 | Q. | Do you know if that was given to New Penn? |
| 8 | A. | Yes, it was. |
| 9 | Q. | And how do you know that? |
| 10 | A. | It was forwarded to New Penn from APA.  From |
| 11 | | their corporate offices to New Penn s corporate |
| 12 | | offices. |
| 13 | Q. | Okay.  So APA forwarded it to New Penn? |
| 14 | A. | Yes. |
| 15 | Q. | Listen to my question.  My question, sir, was |
| 16 | | whether the union -- do you know if the union ever |
| 17 | | forwarded your name on a seniority list to New Penn? |
| 18 | A. | I don t know that. |
| 19 | Q. | Okay.  After your conversation with |
| 20 | | Mr. Harrington in June of 2003, when was the next time |
| 21 | | you talked to him? |
| 22 | A. | As I said, I wrote the letter and I didn t hear |
| 23 | | anything.  So I probably called him sometime in early |
| 24 | | November, I m going to say, before I wrote the second |

JANEY ASSOCIATES

92

1              letter.

2    Q.        And do you have any notes of that conversation?

3    A.        No.

4    Q.        What was discussed during that conversation?

5    A.        Same thing, what happened to my grievance.

6    Q.        And what was his response?

7    A.        That they were going to file it.  They were

8              going to file it with the committee and get it heard.

9    Q.        Anything else that you recall?

10   A.        Nope.

11   Q.        Nothing else?

12   A.        No.

13   Q.        Did you have an understanding as to why the

14             grievance had not been previously filed?

15   A.        No.

16   Q.        Were you ever told why the grievance was not

17             previously filed?

18   A.        I was told that Bill Carnes didn t file the

19             grievance, that s why it wasn t filed.

20   Q.        Were you ever told why the grievance was not

21             filed after Mr. Carnes left office?

22   A.        No.

23   Q.        Doug, I can t remember his last name, Francie?

24   A.        Yes.

                        JANEY ASSOCIATES

93

| 1 | Q. | How do you pronounce it? |
|---|----|--------------------------|
| 2 | A. | Francie. |
| 3 | Q. | Francie? |
| 4 | A. | Francie. |
| 5 | Q. | When was the last time you talked to him? |
| 6 | A. | February of 2002. |

7      Q.      So that was during the phone call that he asked
8              you what?

9      A.      What my preference was.

10     Q.      And my preference was Billerica?

11     A.      Yes.

12     Q.      Do you know if Doug is currently employed?

13     A.      I don t know.

14     Q.      After your conversation with Mr. Harrington

15             sometime in the November time period, do you have any

16             subsequent conversation with him?

17                    MR. LATHROP: I m sorry, with

18             Mr. Harrington?

19                    MR. GLUEK: Yes.

20                    THE WITNESS: Nope.  I sent that letter to

21             him and then I think we spoke again in the fall and

22             spring.  Had met several times with regards to the

23             case being presented to the committee.

24                    BY MR. GLUEK:

                              JANEY ASSOCIATES

94

| | | |
|---|---|---|
| 1 | Q. | So you personally met Mr. Harrington? |
| 2 | A. | Yes. |
| 3 | Q. | And did you take any notes of those |
| 4 | | conversations? |
| 5 | A. | No. |
| 6 | Q. | Or meetings? |
| 7 | A. | Nope. |
| 8 | Q. | Did Mr. Harrington ever imply to you as to the |
| 9 | | merits in your case? |
| 10 | A. | No. |
| 11 | Q. | Did Mr. Harrington ever indicate that he thought |
| 12 | | your case was a strong case or a weak case? |
| 13 | A. | I think that he said we had a good case. |
| 14 | Q. | The question is, did he ever tell you you had a |
| 15 | | good case or a bad case? |
| 16 | A. | Yes. |
| 17 | Q. | In what context did he say that? |
| 18 | A. | How do you mean?  What do you mean  context , in |
| 19 | | what context? |
| 20 | Q. | Was this in a phone conversation or -- |
| 21 | A. | No, this was in person. |
| 22 | Q. | When you were preparing for the case? |
| 23 | A. | Yes. |
| 24 | Q. | Did he indicate to you why he thought it was a |

JANEY ASSOCIATES

95

1           strong case?

2    A.         Just based on the merits of the case.

3    Q.         Do you recall anything else?

4    A.         No.

5    Q.         Do you think the union just made a simple

6           mistake by not filing your grievance timely?

7               MR. LATHROP: Objection.

8               THE WITNESS: I don t know.

9           BY MR. GLUEK:

10   Q.         Do you have any facts that would suggest that

11          the union did anything more than just make a simple

12          mistake not filing your grievance timely?

13              MR. LATHROP: Objection.

14              THE WITNESS: I don t know what they did.

15          BY MR. GLUEK:

16   Q.         Do you have an understanding that with respect

17          to your decision the decision of the committee is

18          final and binding?

19   A.         That s what the decision says.

20   Q.         Is that your understanding going into it?

21   A.         Yes.

22   Q.         Now when you were being questioned by the

23          union s lawyer you said that you had an understanding

24          that Mr. Harrington was negotiating with the company?

                    JANEY ASSOCIATES

96

```
1      A.          Yes.

2      Q.          Why did you have that understanding?

3      A.          Through the phone conversations that we had that

4                  there was dialogue between Mr. Carnes and

5                  Mr. Harrington with New Penn.

6      Q.          Did he indicate to you what the dialogue was?

7      A.          No.

8      Q.          Did he indicate to with whom he would speak at

9                  New Penn?

10     A.          Nope.

11     Q.          Other than the two medications that you

12                 previously testified about, have you taken any other

13                 medication since March 1, 2002?

14     A.          No.

15     Q.          And they are just anti-inflammatories is your

16                 testimony?

17     A.          Yes, muscle relaxers.

18                      MR. GLUEK: I have nothing further.

19     RE-EXAMINATION

20                      BY MS. PENNINI:

21     Q.          Following your November, 2003 conversation with

22                 Mr. Harrington in which you discussed the filing of

23                 the grievance, did he ever speak to you regarding any

24                 issues as to the proper joint area committee where
```

JANEY ASSOCIATES

97

```
 1                this grievance could be brought or could be heard?

 2     A.          No.

 3     Q.          He never mentioned anything to you about the

 4                difference between Southern New England Joint Area

 5                Committee and the Eastern Region Committee?

 6     A.          No.  I think the case had been scheduled to be

 7                heard in April, and I got a phone call saying that it

 8                was rescheduled to be heard at the Eastern Region.

 9     Q.          Prior to the November, 2003 conversation and

10                letter to Mr. Harrington, did he ever have any

11                discussions with you concerning whether a grievance

12                could be brought concerning the failure to be called

13                off of a call list pursuant to the TNFINC/New Penn

14                agreement?

15     A.          No.

16     Q.          And I believe you previously indicated that you

17                are awaiting surgery on your knee?

18     A.          Yes.

19     Q.          Is it the left or the right knee?

20     A.          Right knee.

21     Q.          And you said that you continued with the

22                insurance benefits for a year following your injury,

23                is that correct?

24     A.          My pension was paid for a year, I m not sure
```

JANEY ASSOCIATES

98

1          about my insurance.  It was 1987, quite some time so I

2          don t recall.

3     Q.        You do not recall whether you had any health

4          insurance benefits?

5     A.        I did for a period of six months, I know.

6     Q.        So you are sure you had it for six months but --

7     A.        Yes.

8     Q.        -- you may have had it for a longer period?

9     A.        Yes.

10    Q.        During the period under which you were positive

11         that you had insurance coverage did you have any

12         surgeries to your knee?

13    A.        No.

14    Q.        Did you have any surgeries to your back?

15    A.        No.

16    Q.        Did you have any surgeries on the herniated disc

17         in your neck?

18    A.        No.

19    Q.        At that time had any of the doctors recommended

20         surgeries on the herniated disc in your neck?

21    A.        I don t believe so, nope.

22    Q.        What about the herniated disc in your back?

23    A.        No.

24    Q.        And any recommendation of surgery on the torn,

                    JANEY ASSOCIATES

99

```
1              I m sorry, is it a ligament or a torn tendon in your

2         knee?

3    A.        Ligament.

4    Q.        Did the doctors recommend any surgery concerning

5         the torn ligament in your knee?

6    A.        Not at that time.

7    Q.        When did you first become aware that you would

8         need surgery on the ligament in your knee?

9    A.        Oh, I can t be sure, positively sure.

10   Q.        Can you give me an approximate time?  Was it

11        during the 1980's?

12   A.        I honestly don t remember.  I don t know.

13   Q.        Was it during the first half of the 1990's?

14   A.        Yes.

15   Q.        Do you recall if it was in 1990?

16   A.        No.

17   Q.        Do you recall whether it was in 1991?

18   A.        Nope.

19   Q.        Is there any document that would help refresh

20        your memory concerning this fact?

21   A.        I m not sure.

22   Q.        Do you recall the name of the doctor who told

23        you you would need surgery on your knee?

24   A.        Yes.
```

JANEY ASSOCIATES

100

1     Q.          And what doctor was that?

2     A.          Dr. Solomon.

3     Q.          Do you have a first name for Dr. Solomon?

4     A.          Alan.

5     Q.          Where does Dr. Solomon practice?

6     A.          Out of Leonard Morse in Natick.

7     Q.          Is Leonard Morse a hospital?

8     A.          Yes.

9     Q.          Does he currently practice out of Leonard Morse

10          in Natick?

11    A.          I m not sure of that.

12    Q.          When was it that you would see Dr. Solomon?

13    A.          Dr. Solomon operated on my shoulder.

14    Q.          Well when would you see Dr. Solomon concerning

15          your knee?

16    A.          Periodically, when I was treating with him.

17    Q.          And during what time period was that?

18    A.          Right after my industrial accident.

19    Q.          And what time did you stop seeing Dr. Solomon?

20    A.          Oh, again, I can t be sure.

21    Q.          Is there anything that would help you as to when

22          you stopped seeing Dr. Solomon?

23    A.          Probably when the insurance company stopped

24          paying.

                    JANEY ASSOCIATES

101

1    Q.        And you also had a rotator cuff injury, is that

2              correct?

3    A.        Yes.

4    Q.        And you had surgery concerning this injury?

5    A.        Yes.

6    Q.        When did you have that surgery?

7    A.         89, 1990 maybe.

8    Q.        I m sorry, in 1989, is that what you said?

9    A.         89 or  90, somewhere thereabouts.

10   Q.        And was this surgery performed by Dr. Solomon?

11   A.        Yes.

12   Q.        And where was it performed?

13   A.        On my left shoulder.

14   Q.        I m sorry, the location of the hospital?

15   A.        Natick.

16   Q.        Is it at the Leonard Morse Hospital in Natick?

17   A.        Yes.

18   Q.        Did you also see Dr. Solomon concerning your

19             knee?

20   A.        Yes.

21   Q.        When did you stop seeing Dr. Solomon concerning

22             your knee?

23   A.        I don t recall.

24   Q.        Did you continue to see Dr. Solomon concerning

                        JANEY ASSOCIATES

102

```
 1              your knee after you stopped seeing him concerning your

 2              rotator cuff injury?

 3      A.          Like I said, the insurance company did not pay

 4              the bills so therefore he wouldn t see me.

 5      Q.          Do you know when the insurance company stopped

 6              paying the bills to Dr. Solomon?

 7      A.          They still haven t paid him.

 8      Q.          But do you recall when they stopped paying the

 9              bills?

10      A.          They never paid him.

11      Q.          When did you begin seeing Dr. Solomon?

12      A.          Sometime shortly after the accident.

13      Q.          So you began to see Dr. Solomon in about 1987,

14              is that correct?

15      A.          1988.

16      Q.          Do you recall what month you had your rotator

17              cuff surgery?

18      A.          No.

19      Q.          Is there anything that would help you remember

20              when you had this surgery?

21      A.          Not offhand.

22      Q.          How soon after you had your surgery did you stop

23              seeing Dr. Solomon?

24      A.          Six months maybe.
```

JANEY ASSOCIATES

103

1     Q.          Do you recall if your surgery was in the summer?

2     A.          No.

3     Q.          Winter?

4     A.          I don t remember.

5     Q.          Do you currently have any limitations concerning

6                 your rotator cuff injury, physical limitation?

7     A.          Yes, it still bothers me.

8     Q.          You said it still bother you, do you take any

9                 medication concerning the pain of your rotator cuff?

10    A.          Yes.

11    Q.          And what medications are those?

12    A.          Motrin, Advil.

13    Q.          Have you seen any doctor for this injury since

14                you stopped seeing Dr. Solomon?

15    A.          No.

16                     MS. PENNINI: That s all I have.

17                     MR. LATHROP: Well I am going to take a

18                break to decide whether or not I am going to have any

19                questions.

20                     (A brief recess was taken)

21    EXAMINATION

22                     BY MR. LATHROP:

23    Q.          Mr. Goulet, what date is today?

24    A.          October 4th, 2005.

                        JANEY ASSOCIATES

104

1    Q.        Is discovery over in this case?

2    A.        No.

3    Q.        Is discovery with regard to the union over in

4              this case?

5    A.        No.

6    Q.        As of the time that the APA decision was issued

7              were you receiving Worker s Compensation benefits?

8    A.        No.

9    Q.        You were off Worker s Compensation by the time

10             of the APA decision?

11   A.        Yes.

12   Q.        As of the time of the APA decision were you

13             under the active care of any physicians for your

14             Worker s Compensation injuries?

15   A.        Nope.

16   Q.        At anytime after March 1st, 2002 did you receive

17             a call from New Penn to go to work?

18   A.        No.

19   Q.        If you had received a call from New Penn at

20             anytime after March 1st, 2002 to go to work, what

21             would you have done?

22             MR. GLUEK: Objection.

23             THE WITNESS: I would ve made every effort

24             to go to work and get clearance from the doctors, had

JANEY ASSOCIATES

105

1          they called.

2                    MR. LATHROP: Thank you.  I have nothing

3          else.

4                    (Whereupon, the deposition in the above-

5          entitled matter was concluded at 12:45 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JANEY ASSOCIATES

106

COMMONWEALTH OF MASSACHUSETTS


Suffolk, ss.

      I, Michael C. Janey, a Massachusetts Verbatim Court Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 4th day of October, 2005, at 10:05 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined under his oath and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

      I further testify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 15th day of October, 2005. My Commission expires on October 28, 2005.


          Michael C. Janey, CR, Notary Public


         JANEY ASSOCIATES

107

I have read the foregoing transcript
of the testimony and the same
contains a true and accurate
recording of my answers given to the
questions therein set forth.

Signed under the pains and penalties
of perjury.

Date

JANEY ASSOCIATES

DEPONENT'S NAME   CRAIG S. GOULET SR.

DATE OF DEPOSITION

PAGE 11 LINE 6 READS,   YES

SHOULD READ,   YES BUT THE DATE
OF THE LETTER WAS FEBRUARY 6th 1987

PAGE 12 LINE 16 READS,   YES.

SHOULD READ,   YES BUT THE DATE
WAS FEBRUARY 6th 1987.



PLEASE SAY I DO NOT KNOW

THOULD READ, YES HE DID.

PAGE 29 LINE 14 READS, NO I DON'T RECALL

HOULD READ, YES HE DID SAY I WAS BACK ON THE SENIORITY LIST.

PAGE 66 LINE 12 READS, 15 YEARS.

HOULD READ, 17 YEARS.

P. 70 LINE 16 READS, I'VE GOT SOME OUTSTANDING ISSUES WITH REGARD TO MY INDUSTRIAL ACCIDENT.

OULD READ. I'VE GOT SOME OUTSTANDING ISSUES WITH REGARDS TO MY INDUSTRIAL ACCIDENT. IF I WAS UNABLE TO RESOLVE THOSE ISSUES, NEW PENN WAS OBLIGATED UNDER THE CONTRACT AND THE A.D.A. TO PROVIDE LIGHT DUTY WORK OR A REASONABLE ACCOMMODATION TO QUALIFIED INDIVIDUALS.

Should Read, I KNOW UNDER SOCIAL SECURITY ADMINISTRATION GUIDE LINES I COULD HAVE TRIED TO RETURN TO WORK HAD I BEEN GIVEN THE OPPORTUNITY.

PAGE 74 LINE 14 READS. I DONT KNOW.

Should READ, I KNOW IF NEW PENN CALLED AND OFFERED ME A DRIVING JOB, SOCIAL SECURITY WOULD HAVE ALLOWED ME TO TRY AND RETURN TO WORK.

PAGE 76 LINE 14 READS, NO
Should READ, yes

PAGE 80 LINE 7 READS, NOPE
Should READ, I KNOW BETWEEN MARCH 1ST 2002 AND MARCH 30, 2003, IF NEW PENN CALLED I WOULD HAVE TRIED TO WORK 30 DAYS.

PAGE 80 LINE 11 READS, NO
Should READ. WHAT I KNOW IS NEW PENN DID NOT CALL BETWEEN MARCH 1ST 2002 AND MARCH 30, 2003, AND IF THEY HAD CALLED I WOULD HAVE TRIED TO WORK 30 DAYS IN A TWO MONTH PERIOD.

PAGE 86 LINE 16 READS, NO.

SHOULD READ, YES. I RECALL MR. CARNES TELLING ME DURING THIS CONVERSATION WHEN HE TOLD NEW PENN THAT I WAS INFACT ON THE A.P.A. SENIORITY LIST, NEW PENN TOLD MR CARNES YES HE'S ON THE SENIORITY LIST BUT HE IS COLLECTING WORKMANS COMPENSATION. AND MR CARNES TOLD NEW PENN THAT I WAS NOT COLLECTING WORKMANS COMPENSATION AT THAT TIME. THEN MR. CARNES ASKED ME, CRAIG WHAT WILL YOU DO IF NEW PENN CALLS YOU? AND I TOLD M.. CARNES AT THAT TIME TELL NEW PENN TO CALL ME THEN WE WILL ALL KNOW WHAT I WILL DO.

PAGE 88 LINE 17 READS, NO DE

SHOULD READ, YES, SEND ME A COPY OF THE GRIEVANCE.

PAGE 91 LINE 18 READS, I DON'T KNOW THAT.

SHOULD READ, I KNOW MR CARNES SHOWED NEW PENN THE SENIORITY LIST WITH MY NAME ON IT

PAGE 92 LINE 10 READS, NO DE

SHOULD READ, YES, I RECALL ACTUALLY MEETING WITH MR. HARRINGTON IN PERSON AT THE UNION HALL TO DISCUSS THE PREPARATION OF THE CASE WITH THE GRIEVANCE COMMITTEE, AND AT THAT TIME I REMEMBER MR. HARRINGTON SUGGESTING THAT MAYBE I SHOULD WAIT UNTIL AFTER I HAD MY KNEE DONE BEFORE PURSUING THE GRIEVANCE AGAINST NEW PENN. HE ACTUALLY OFFERED TO FIND ME ANOTHER JOB ALSO

SHOULD READ, YES I RECALL MR. HARRINGTON TELLING ME YOU KNOW IF YOU PUSH THIS GRIEVANCE AGAINST NEW PENN YOU WILL PROBABLY NEVER WORK IN THE FREIGHT INDUSTRIE AGAIN. AND I SAID TO MR HARRINGTON YOU KNOW IF NEW PENN WOULD PUT ME ON THE SENIORITY LIST IN MY RIGHTFUL SPOT THEN WE WOULDN'T HAVE TO TAKE THE CASE TO THE COMMITTEE, AND MR HARRINGTON TOLD ME NEW PENN IS NOT GOING TO DO THAT.

PAGE 95 LINE 8 READS, I DON'T KNOW.
SHOULD READ. NO I DON'T THINK THAT THE UNION JUST MADE A SIMPLE MISTAKE.

PAGE 95 LINE 14 READS, I DON'T KNOW WHAT THEY DID.
SHOULD READ, YES, THE FACT THAT I CALLED MR. CARNES AND MR. HARRINGTON WHEN THE AGREEMENT TOOK EFFECT MARCH IST 2002, THE FACT THAT THE UNION PUT NEW PENN ON NOTICE WHILE THE AGREEMENT WAS IN EFFECT, WELL BEFORE THE GRIEVANCE WAS FILED WITH LOCAL 25 THESE FACTS ALONE SUGGEST THAT THIS WAS NO SIMPLE MISTAKE, NEVER MIND THE FACT THAT BOTH NEW PENN AND THE UNION SAID TIMELYNESS WAS NEVER AN ISSUE IN THE PAST.

I have read the foregoing transcript
of the testimony and the same
contains a true and accurate
recording of my answers given to the
questions therein set forth.


Signed under the pains and penalties
of perjury.


12/21/2005
Date

00001

```
                          Volume I
                          Pages 1 to 47
                          Exhibits 1 to 7
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - -x
                                 :
CRAIG GOULET,                    :
          Plaintiff,             :
                                 :
     vs.                         :  Civil Action
                                 :  No. 04-12577 JLT
NEW PENN MOTOR EXPRESS, INC.;    :
and TEAMSTERS LOCAL 25,          :
INTERNATIONAL BROTHERHOOD OF     :
TEAMSTERS,                       :
          Defendants.            :
                                 :
- - - - - - - - - - - - - - - - -x
```

        DEPOSITION OF PAUL DUBIEL, a witness called
on behalf of the Plaintiff, taken pursuant to the
Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Scott A. Lathrop & Associates,
122 Old Ayer Road, Groton, Massachusetts, on
Tuesday, November 15, 2005, commencing at 1:18 p.m.
PRESENT:
     Scott A. Lathrop & Associates
          (by Scott A. Lathrop, Esq.)
          122 Old Ayer Road, Groton, MA 01450,
          for the Plaintiff.
     Frantz Ward LLP
          (by Carl H. Gluek, Esq.)
          2500 Key Center, 127 Public Square,
          Cleveland, OH 44114-1230, for the Defendant
          New Penn Motor Express, Inc.
(Continued on Next Page)

00002

```
       PRESENT:  (Continued)
           Dwyer, Duddy and Facklam, P.C.
                (by Kathleen A. Pennini, Esq.)
                Two Center Plaza, Suite 430, Boston, MA
                02108-1804, for the Defendant Teamsters
                Local 25, International Brotherhood of
                Teamsters.
       ALSO PRESENT:  Craig Goulet
                      * * * * *
```

00003

```
                    I N D E X
WITNESS              DIRECT  CROSS   REDIRECT  RECROSS
PAUL DUBIEL
  BY MR. LATHROP        4                45
  BY PENNINI                  43
                    * * * *
              E X H I B I T S
NO.                 DESCRIPTION                 PAGE
  1      Dracut seniority list                   16
  2      Canton seniority list                   18
  3      Four-page document, Bates Nos.          21
         D024-D027
  4      Multipage document, with fax cover      22
         sheet dated 2/22/02
  5      List of names and addresses             23
  6      Call list of casual workers             23
  7      Letter to Charles Zaccaria from         33
         George Cashman dated 4/18/03, with
         attachments
                    * * * *
```

00004

```
 1                P R O C E E D I N G S
 2                     PAUL DUBIEL
 3    a witness called for examination by counsel for the
 4    Plaintiff, having been satisfactorily identified by
 5    the production of his driver's license and being
 6    first duly sworn by the Notary Public, was examined
 7    and testified as follows:
 8            MR. LATHROP:  What stipulations would you
 9    like, Mr. Gluek, in this circumstance?  How about 45
10    days for him to review the deposition?  If he
11    doesn't sign by then, it's deemed waived.  Save
12    objections, but for form?
13            MR. GLUEK:  Agreed.
14            MR. LATHROP:  And motions to strike?
15            MR. GLUEK:  Yes.
16            MR. LATHROP:  Anything else?
17            MR. GLUEK:  No.
18                  DIRECT EXAMINATION
19    BY MR. LATHROP:
20    Q.    Afternoon.
21    A.    Afternoon.
22    Q.    Could you please state your full name and
23    address for the record.
24    A.    Paul Dubiel, 8 Comanche Circle, Billerica,
```

00005

```
 1   Massachusetts.
 2        Q.   Is that a home or work address?
 3        A.   Home.
 4        Q.   Are you currently employed?
 5        A.   Yes.
 6        Q.   By whom are you employed?
 7        A.   New Penn Motor Express.
 8        Q.   What is your current job title?
 9        A.   Terminal manager.
10        Q.   How long have you held that title?
11        A.   February of 2002 -- no -- March of 2002,
12   actually.
13        Q.   Are you a terminal manager for a specific
14   terminal?
15        A.   Billerica, Massachusetts.
16        Q.   Have you been the terminal manager for
17   Billerica, Massachusetts since March of 2002?
18        A.   Yes.
19        Q.   What are your responsibilities generally as
20   terminal manager?
21        A.   Just overseeing the day-to-day operation of
22   the terminal.
23        Q.   Are any of the terminals at that terminal
24   unionized?
```

00006

```
 1      A.   Yes.
 2      Q.   More than one union?
 3      A.   No.
 4      Q.   What is the union that represents --
 5      A.   Local 25.
 6      Q.   Of the Teamsters?
 7      A.   Yes.
 8      Q.   Has that been true throughout your duration
 9  at New Penn Motor Express?
10      A.   Yes.
11      Q.   Is there a business agent for Local 25 that
12  has responsibility for the Billerica terminal?
13      A.   Yes.
14      Q.   Who is that?
15      A.   Mark Harrington.
16      Q.   Has that been true since March of 2002?
17      A.   No.
18      Q.   When did Mr. Harrington, according to your
19  recollection, begin as the business agent
20  responsible for the Billerica terminal?
21      A.   I would have to say sometime during 2003,
22  late 2003.
23      Q.   Who was the business agent, if anyone,
24  prior to Mr. Harrington?
```

00007
```
 1        A.    William Carnes.
 2        Q.    Was he the business agent covering the
 3    Billerica New Penn terminal since March 2002 through
 4    late 2003?
 5        A.    Yes.
 6        Q.    Did you know Mr. Harrington prior to late
 7    2003?
 8        A.    Yes.
 9        Q.    Did you know Mr. Carnes prior to March
10    2002?
11        A.    No.
12        Q.    Where did you work, if at all, prior to
13    becoming terminal manager at New Penn in March of
14    2002?
15        A.    APA Transport.
16        Q.    What was your date of hire?
17        A.    June of '76.
18        Q.    What was your original position?
19        A.    I started off as a driver.
20        Q.    How long did you remain a driver?
21        A.    12 years.
22        Q.    So sometime in approximately '88?
23        A.    Yes.
24        Q.    What position did you assume then with APA
```

00008
```
 1    Transport?
 2         A.    Supervisor.
 3         Q.    Where were you a supervisor?
 4         A.    New Jersey.
 5         Q.    How long did you remain a supervisor in New
 6    Jersey?
 7         A.    Two years.
 8         Q.    Then what happened?
 9         A.    I became a terminal manager in Buffalo, New
10    York.
11         Q.    How long did you remain a terminal manager
12    in Buffalo, New York?
13         A.    I believe it was 12 years -- no.  It was
14    about 10 years.
15         Q.    Okay, let's say approximately ten years.
16         A.    Right.
17         Q.    What was your next position after terminal
18    manager in Buffalo, New York?
19         A.    I was a terminal manager in Dracut,
20    Massachusetts.
21         Q.    From when to when were you the terminal
22    manager in Dracut, Massachusetts, as best you can
23    recall?
24         A.    About a year and a half.  The dates I'm off
```

00009

```
 1    on a little bit.  I want to say it was around 2000,
 2    until the later part of 2000 -- '99 to 2001 maybe,
 3    latter part of 2001.
 4         Q.   Was that the last position you held with
 5    APA Transport?
 6         A.   No.
 7         Q.   Let me ask you this way.  When did you stop
 8    being the terminal manager in Dracut?
 9         A.   November of 2001.
10         Q.   What position did you then hold?
11         A.   Terminal manager in Canton, Massachusetts.
12         Q.   I take it you began that in 11/01?
13         A.   Yes.
14         Q.   That ended when?
15         A.   February of 2002.
16         Q.   Did you go straight from being the terminal
17    manager in Canton for APA Transport to being the
18    terminal manager in Billerica for New Penn Motor
19    Express?
20         A.   Yes.
21         Q.   When you were the terminal manager in
22    Canton, Massachusetts, were any of your employees
23    unionized?
24         A.   Yes.
```

00010

```
 1        Q.    Which union?
 2        A.    Local 25 Teamsters.
 3        Q.    Was there a business agent assigned to the
 4   Canton terminal?
 5        A.    Yes.
 6        Q.    Who was that?
 7        A.    Mark Harrington.
 8        Q.    When you were the terminal manager in
 9   Dracut, Massachusetts, was Local 25 representing
10   employees there?
11        A.    Yes.
12        Q.    Was there a business agent?
13        A.    Yes.
14        Q.    Who was that?
15        A.    Mark Harrington.
16        Q.    Did you know Mr. Harrington prior to
17   becoming the terminal manager in Dracut
18   Massachusetts?
19        A.    No.
20        Q.    Was the terminal in Buffalo, New York
21   unionized?
22        A.    Yes.
23        Q.    What was the --
24        A.    Local 375 Teamsters.
```

00011

```
 1        Q.    When you were the terminal manager for
 2   Dracut, did you have seniority lists for your
 3   drivers?
 4        A.    Yes.
 5        Q.    Let me restate that.  Did you have
 6   seniority lists that covered also dock workers?
 7        A.    There was one seniority list.
 8        Q.    One seniority list?
 9        A.    Right.
10        Q.    Let me back up.  Local 25 represented
11   drivers and dock workers in Dracut?
12        A.    They do, yes.
13        Q.    Local 25 represented drivers and dock
14   workers in Canton?
15        A.    Yes.
16        Q.    And in Billerica?
17        A.    Yes.
18        Q.    Going back, in Dracut, there was one
19   seniority list for all unionized employees?
20        A.    That's correct.
21        Q.    Whether you be a driver or a dock worker,
22   correct?
23        A.    Correct.
24        Q.    During your tenure in Dracut, which persons
```

00012
```
 1    or entities had the responsibility for compiling a
 2    seniority list?
 3         A.    Corporate office.
 4         Q.    Of APA Transport?
 5         A.    Yes.
 6         Q.    Where was the corporate office when you
 7    were in Dracut?
 8         A.    North Bergen, New Jersey.
 9         Q.    I take it you received from the corporate
10    office then these seniority lists?
11         A.    Yes.
12         Q.    How were they delivered to you?
13         A.    By truck mail.
14         Q.    Did you in any way distribute or post these
15    seniority lists?
16         A.    Yes.  One had to be posted in the drivers'
17    room.
18         Q.    Did you send a copy of these seniority
19    lists to any representative of the union as a matter
20    of practice?
21         A.    Not from the local terminal, no.
22         Q.    Did you have some understanding from some
23    other source these seniority lists were sent to the
24    union?
```

00013

```
 1          A.    Per the contact, they are to be sent.  The
 2     union is to have a copy of the seniority list.
 3          Q.    But at the terminal office, you did not do
 4     that?
 5          A.    No.
 6          Q.    Do you have some understanding that it was
 7     done from the corporate office?
 8          A.    I would have to believe it was, but I am
 9     not sure.
10          Q.    You are not sure?
11          A.    No.
12          Q.    Do you have any understanding of how
13     frequently these seniority lists were updated, the
14     ones that were posted?
15          A.    Every six months.
16          Q.    Was that pursuant to labor contract, if you
17     know?
18          A.    I don't know that.
19          Q.    But that was the practice that was
20     observed?
21          A.    Yes.
22          Q.    Did you observe that practice also in
23     Buffalo?
24          A.    Yes.
```

00014
```
 1       Q.   The practice of getting from corporate the
 2   seniority list, that was true when you were in
 3   Canton, also?
 4       A.   Yes.  Well, I was only in Canton four
 5   months.  I've never seen a seniority list come via
 6   truck mail while I was there.
 7       Q.   But there was one there, correct?
 8       A.   There was one hanging in the drivers' room,
 9   yes.
10       Q.   That seniority list was already in
11   existence, if you will, before you reported to work
12   there?
13       A.   Correct.
14       Q.   What about your experience at New Penn at
15   Billerica, is there a seniority list for the union
16   employees at Billerica?
17       A.   Yes.
18       Q.   Let me backtrack.  When you were at Canton,
19   the seniority list was limited to the union
20   employees at Canton?
21       A.   That's correct.
22       Q.   When you were in Dracut, the seniority list
23   was limited to the union employees at Dracut?
24       A.   That's correct.
```

00015

```
 1          Q.   At Billerica, you have a unionized
 2   seniority list, correct?
 3          A.   Yes.
 4               MR. GLUEK:  Objection.  He as in New Penn?
 5               MR. LATHROP:  Yes.
 6          A.   Yes.
 7          Q.   You've only been at the Billerica terminal
 8   as a New Penn terminal manager; is that correct?
 9          A.   Yes.
10          Q.   In that capacity, you have seniority lists,
11   correct?
12          A.   Yes.
13          Q.   These seniority lists cover Local 25
14   employees who are based at the Billerica terminal,
15   correct?
16          A.   Yes.
17          Q.   Similarly, are these seniority lists
18   prepared at the corporate office?
19          A.   Yes.
20          Q.   Where's the corporate office for New Penn?
21          A.   Lebanon, Pennsylvania.
22          Q.   How frequently during your tenure at
23   Billerica have these seniority lists been updated?
24          A.   About every three or four months.
```

00016

```
 1        Q.   Are they similarly posted someplace in the
 2   terminal?
 3        A.   Similar to?
 4        Q.   You described, if I had understood it
 5   correctly, when you were at APA Transport, that the
 6   seniority lists were posted in the drivers' room, I
 7   think you mentioned.
 8        A.   Yes.  There is one posted in the drivers'
 9   room for New Penn in Billerica, also.
10        Q.   At New Penn, do you have any responsibility
11   for distributing to union representatives a copy of
12   the seniority lists?
13        A.   No.
14        Q.   Is it your understanding that the corporate
15   office has responsibility for sending copies of the
16   seniority lists to union representatives?
17             MS. PENNINI:  Objection.
18        A.   That's my understanding.
19        Q.   If you know.
20        A.   I'm assuming they do the same as I stated
21   to you before.
22                  (Document marked as Dubiel
23                   Exhibit 1 for identification)
24        Q.   Mr. Dubiel, I'm showing you a document
```

00017

```
 1    marked for purposes of this deposition as Exhibit
 2    No. 1.  This purports to be a one-page Dracut
 3    seniority list.
 4              The first question is have you seen this
 5    precise document before?
 6         A.   No, I have not.
 7         Q.   Have you seen a document similar in format?
 8              MR. GLUEK:  I have told him not to disclose
 9    anything attorneys have told him, but for the
10    preparation of this deposition, he certainly saw the
11    document.
12              MR. LATHROP:  I'm certainly not inquiring
13    into any communications or the substance of any
14    communications he had with any attorney as far as
15    that goes.
16         Q.   Mr. Dubiel, I'm really looking for your
17    understanding and recollection concerning
18    identification of documents, if you will, pre this
19    litigation.
20         A.   Okay.
21         Q.   So prior to this litigation, have you seen
22    any document in this format with regard to seniority
23    lists?
24         A.   No.
```

00018

```
 1          Q.   So this format does not look like something
 2     that was prepared, for example, by APA corporate?
 3               MR. GLUEK:  Objection.
 4               MS. PENNINI:  Objection.
 5               MR. GLUEK:  You can answer if you can.
 6          A.   I don't know.
 7          Q.   You have testified that you received while
 8     at Dracut seniority lists for the Dracut terminal as
 9     prepared by corporate, correct?
10          A.   Yes.
11          Q.   I'm asking you, were they in this format?
12          A.   No.
13          Q.   It's a different format than Exhibit 1?
14          A.   Yes.
15          Q.   Bear with me.  In what way does the
16     seniority list you recall seeing at Dracut as
17     prepared by APA corporate a different format than
18     Exhibit 1?
19          A.   All it would show is the employee's name
20     and seniority date.
21          Q.   Nothing else?
22          A.   Nothing else.
23                    (Document marked as Dubiel
24                    Exhibit 2 for identification)
```

00019

```
 1        Q.   Mr. Dubiel, I'm now showing you what was
 2   marked as Exhibit 2 for identification.  This
 3   purports to be a Canton seniority list with the
 4   heading "Local Union 25 November 2001."
 5        Do you recognize this document?
 6        A.   (Examines document)  No.
 7        Q.   Do you recognize this format?
 8        A.   Yes.
 9        Q.   What about the format do you recognize?
10        A.   That it has the employee's name and
11   seniority date on it.
12        Q.   When APA Transport prepared for its Dracut
13   or Canton terminals a seniority list, was this the
14   format that was used?
15        A.   I don't know.  I was not involved in
16   preparing the...
17        Q.   But you saw the list both in Canton and in
18   Dracut, correct?
19        A.   Yes, I have.
20        Q.   Was it organized in this fashion?
21        A.   Yes.
22        Q.   It would have a name such as "Canton" or
23   "Dracut Seniority List" on the top?
24        A.   Yes.
```

00020

```
 1        Q.   It would say, "Local Union 25," also with
 2   the date?
 3        A.   Yes.
 4        Q.   It would list 1 through whatever by
 5   seniority the unionized employees?
 6        A.   Yes.
 7        Q.   With their seniority dates?
 8        A.   Yes.
 9        Q.   So the format in Exhibit 2 is similar to
10   what you observed when you were the terminal manager
11   for APA Transport in Dracut or Canton; is that
12   correct?
13        A.   Yes.
14        Q.   But you don't recall whether or not you
15   have seen exactly this document before?
16        A.   Yes.
17        Q.   "This document" being Exhibit 2, correct?
18        A.   Yes.
19        Q.   When you were at APA Transport, did you
20   ever see any seniority lists prepared by someone
21   other than APA corporate?
22        A.   No.
23        Q.   I take it, therefore, that you never saw a
24   seniority list prepared by Local 25, for example?
```

00021

```
 1              MR. GLUEK:  Objection.
 2      A.   No.
 3      Q.   While you've been at New Penn Motor
 4  Express, have you seen any seniority lists that were
 5  prepared by anyone other than New Penn corporate?
 6      A.   No.
 7      Q.   Let me back up.  I'm sorry for jumping
 8  around so much.
 9              Now I'm focusing again on APA Transport.
10  You testified you never saw any other seniority
11  lists other than those prepared by APA corporate,
12  but do you have any understanding or any information
13  as to whether or not any other entity like Local 25
14  prepared their own seniority lists?
15      A.   No.
16              (Document marked as Dubiel
17               Exhibit 3 for identification)
18      Q.   Mr. Dubiel, I'm showing you a document
19  that's been marked as Exhibit 3, which is a
20  four-page document that's been Bates stamped D024
21  through D027.
22              I'm going to ask you after you have had the
23  chance to look at it as to whether or not you have
24  ever seen that document before?
```

00022
```
 1        A.   (Examines document)  No, I have not.
 2        Q.   Have you ever seen a document in this
 3   format?
 4        A.   No.
 5                  (Document marked as Dubiel
 6                   Exhibit 4 for identification)
 7        Q.   Mr. Dubiel, I'm showing you a multiple
 8   paged document marked as Exhibit 4 for purposes of
 9   this deposition.  This is actually a multiple paged
10   document, and the cover sheet is a fax cover sheet
11   dated 2/12/02.
12             MS. PENNINI:  It's 22.
13        Q.   Sorry.  It's 2/22/02.  I'm going to ask you
14   about some of the documents that are part of this.
15             I think you have already been shown the
16   second page of this document.  I believe you already
17   testified you don't recognize that document or the
18   format; is that correct?
19        A.   (Examines document)  Yes.
20        Q.   Would you now look at the third and fourth
21   pages, which is also marked on the bottom D19 and
22   D20.  My first question is have you seen that
23   specific document before?
24        A.   (Examines documents)  No.
```

00023

```
 1        Q.   Are you familiar at all with that format?
 2        A.   No.
 3        Q.   For this document, the last two pages,
 4   which they are stamped D021 and D022, have you seen
 5   that document before?
 6        A.   (Examines document)  No.
 7        Q.   Are you familiar at all with that format?
 8        A.   No.
 9                  (Document marked as Dubiel
10                  Exhibit 5 for identification)
11        Q.   Mr. Dubiel, I'm showing you what was marked
12   as Exhibit 5 to your deposition, which is a one-page
13   document.  It appears to be a listing of names,
14   addresses and so forth.
15             Similarly, I'm going to ask you, have you
16   seen this document before?
17        A.   (Examines document)  No.
18        Q.   Are you familiar with this format?
19        A.   No.
20        Q.   More specifically, you have not seen this
21   format when you were at the Canton location?
22        A.   No.
23                  (Document marked as Dubiel
24                  Exhibit 6 for identification)
```

00024

```
 1        Q.   Mr. Dubiel, I'm now showing you what was
 2   marked as Exhibit 6, which is also a document
 3   listing apparently dates and names.
 4        I would ask you if you have seen this
 5   document before?
 6        A.   (Examines document)  Yes.
 7        Q.   What is this document?
 8        A.   A call list for casual workers at New Penn
 9   Motor Express.
10        Q.   Do you have any recollection as to when you
11   first saw it?
12        A.   The first day I walked into the terminal,
13   which was in March of 2002.
14        Q.   That being the Billerica terminal?
15        A.   Billerica.
16        Q.   That's when you became the terminal
17   manager?
18        A.   Correct.
19        Q.   This document was already in existence?
20        A.   Yes.
21        Q.   Do you have any understanding as to who
22   prepared this document?
23        A.   No.
24        Q.   Do you have any understanding as to the
```

00025

```
 1      reason why this document was created?
 2              MS. PENNINI:  Objection.
 3          Q.    I'll state it differently.  How, if at all,
 4      was this document used by your office?
 5          A.    If we needed extra help, we would start
 6      from the top man and call down for work.
 7          Q.    Do you have any understanding as to what
 8      the first column listed?
 9          A.    I have no idea what that was.
10          Q.    The second column clearly is names?
11          A.    That's correct.
12          Q.    Names of APA casuals?
13          A.    (No response)
14          Q.    I'll restate the question.  Those are names
15      of former APA employees who could be called as
16      casuals?
17          A.    They were names of New Penn casuals.
18          Q.    It's certainly your testimony, not mine,
19      but I will point to the bottom line that says, "To
20      all supervisors, here is the list of APA's casuals.
21      To avoid a runaround on anyone not available, have a
22      Teamster sign off as a witness."  Do you see that
23      line?
24          A.    (Examines document)  Yes.
```

00026

```
 1          Q.   Just so we are talking about the same
 2    thing, is this a list of the employees who formerly
 3    were employed by APA Transport?
 4          A.   Yes.
 5          Q.   Who were on a list, a casual list for New
 6    Penn?
 7          A.   Yes.
 8          Q.   Do you have any understanding as to how
 9    these people got on this list?
10          A.   None.
11          Q.   The third column where it lists Canton and
12    sometimes in parenthesis Dracut, do you have any
13    understanding as to what that signifies?
14          A.   The terminal that they were formerly
15    employed at.
16          Q.   The Canton APA terminal, for example?
17          A.   Right.
18          Q.   In the next column is their telephone
19    number?
20          A.   Right.
21          Q.   The last column, I presume, is their Social
22    Security number?
23          A.   Yes.
24          Q.   When you first saw this document, were
```

00027
```
 1   these signatures on the left-hand side already
 2   there?
 3        A.   No.
 4        Q.   Do you know how those signatures came to be
 5   there?
 6        A.   When we would call the employees for work,
 7   the casuals for work, we would have a Teamster on
 8   the phone with us to verify either acceptance or
 9   pass.
10        Q.   Do you know whose initials MB is, if that's
11   what it is?
12        A.   I'm not sure at all.
13        Q.   Were you present when any of these calls
14   were made?
15        A.   Yes, on some days I was present.
16        Q.   When these calls were made, who was the
17   union representative present?
18        A.   Any dock worker that was available.
19        Q.   Not limited to, for example,
20   Mr. Harrington?
21        A.   No.
22        Q.   How long did you maintain this list?
23        A.   I want to say over a year.
24        Q.   Do you know how far down the list calls
```

00028

```
 1    were made?
 2         A.   No.
 3         Q.   Were calls made past Mr. Sullivan?
 4              MR. GLUEK:  Objection.  If you know.
 5         Q.   If you know.
 6         A.   Yes, they were.
 7         Q.   Were calls made past Mr. Powell?
 8         A.   On some days they were, yes.
 9              MS. PENNINI:  Can we take a two-minute
10    break.
11              (Recess)
12         BY MR. LATHROP:
13         Q.   Mr. Dubiel, we were looking at Exhibit 6.
14    To your knowledge, are there any names on this list
15    that New Penn never got to in terms of calling as
16    casual labor?
17         A.   No.
18         Q.   New Penn got down to even Mr. Levine?
19         A.   Yes.
20         Q.   To at least call him and ask him if he was
21    interested?
22         A.   Yes.
23         Q.   When you were at the Canton terminal, to
24    whom did you report?
```

00029

```
 1        A.   Bob Ritenberg.
 2        Q.   When you first moved to the Billerica
 3   terminal, to whom did you report?
 4        A.   Bob Ritenberg.
 5        Q.   At New Penn, when you first moved over
 6   there, what was Bob's title?
 7        A.   He didn't work for New Penn.
 8        Q.   I must have misstated it.  When you became
 9   the terminal manager at Billerica --
10        A.   For New Penn?
11        Q.   For New Penn.
12        A.   Go ahead.
13        Q.   -- to whom did you report?
14        A.   John Luciani.
15        Q.   What was his title?
16        A.   Division vice president.
17        Q.   Do you continue to report to the division
18   vice president?
19        A.   Yes.
20        Q.   Does John continue to be the division vice
21   president?
22        A.   No.
23        Q.   He's been replaced by someone?
24        A.   Yes.
```

00030

```
 1        Q.    Who was he at least first replaced by?
 2        A.    Charles Zaccaria.
 3        Q.    When did that take place, that Charles took
 4   over for John?
 5        A.    November 2002.
 6        Q.    As of November of 2002, where was Charles
 7   based?
 8        A.    Billerica.
 9        Q.    Do you continue to report to Charles?
10        A.    Yes.
11        Q.    Is he still based in Billerica?
12        A.    Yes.
13        Q.    Are you familiar with the plaintiff in this
14   case, Craig Goulet?
15        A.    No.
16        Q.    When is the first time, if ever, prior to
17   this litigation that you heard his name?
18        A.    Probably July or so of 2003.
19        Q.    What were the circumstances in which you
20   heard his name in July 2003?
21        A.    I received a grievance from Mark
22   Harrington.
23        Q.    It was a grievance that involved
24   Mr. Goulet?
```

00031

```
 1        A.   Correct.
 2        Q.   Are you familiar with a person by the name
 3   of "Doug Francey"?
 4        A.   Yes.
 5        Q.   He worked at the Canton facility, did he
 6   not?
 7        A.   Yes.
 8        Q.   He was a member of Local 25?
 9        A.   Yes.
10        Q.   He was also a steward for Local 25?
11        A.   Yes.
12        Q.   Did you ever have any conversations with
13   Mr. Francey about Mr. Goulet?
14        A.   No.
15        Q.   Did you ever have any communications
16   Mr. Francey concerning Mr. Goulet?
17        A.   No.
18        Q.   Do you recall having any communications
19   with Mr. Carnes concerning Mr. Goulet?
20        A.   No.
21        Q.   Do you recall having any telephone
22   conversations with Mr. Carnes concerning Mr. Goulet?
23             MR. GLUEK:  Objection, asked and answered.
24   Regarding communications, he already said, "No."
```

00032

```
 1              MR. LATHROP:  I'm just being a little more
 2     specific to see if it refreshes his memory.
 3         A.   No.
 4         Q.   Do you remember having any communications
 5     with Mr. Carnes concerning an APA employee who was
 6     not called by New Penn Motor Express?
 7         A.   No.
 8         Q.   Other than the grievance that you received
 9     from Mr. Harrington, did you ever have any
10     communications with any Local 25 representatives
11     concerning an APA Transport employee complaining of
12     not being called by New Penn Motor Express?
13         A.   No.
14         Q.   Do you know a person by the name of "Dan
15     Schmidt"?
16         A.   Yes.
17         Q.   Who is Mr. Schmidt?
18         A.   Vice president of labor for New Penn Motor
19     Express.
20         Q.   Has he been in that title since March 2002?
21         A.   Yes.
22         Q.   Where's he based?
23         A.   Lebanon, Pennsylvania.
24         Q.   Is it fair to say that prior to the receipt
```

00033

```
 1    in July of 2003 of the grievance from
 2    Mr. Harrington, New Penn Motor Express did not call
 3    Mr. Goulet for casual work?
 4            MS. PENNINI:  Objection.
 5        A.   I would have not called him, no.
 6        Q.   In fact, New Penn Motor Express never
 7    called Mr. Goulet for...
 8        A.   Correct.
 9            (Document marked as Dubiel
10             Exhibit 7 for identification)
11        Q.   Mr. Dubiel, I'm now showing you what was
12    marked as Exhibit 7, which purports to be a letter
13    from George Cashman to Mr. Charles Zaccaria dated
14    April 18, 2003, along with attachments.
15        A.   (Examines document)  Okay.
16        Q.   Do you see that document?
17        A.   Yes.
18        Q.   Have you seen any parts of that exhibit
19    prior to this litigation?
20        A.   No.
21        Q.   Did you ever have any communications
22    between yourself and Mr. Zaccaria concerning
23    Mr. Goulet?
24        A.   No.
```

00034

```
 1        Q.   Did you ever have any communications
 2   between yourself and Mr. Schmidt with regard to
 3   Mr. Craig Goulet?
 4        A.   No.
 5        Q.   I believe you testified that your first
 6   introduction to Mr. Goulet, if you will, occurred
 7   via a grievance from Mr. Harrington in July of 2003?
 8        A.   Yes.
 9        Q.   Is that a different grievance than what is
10   the third page of Exhibit 7, or a different
11   document?
12        A.   It looked different, yes.
13        Q.   How did you come to receive this grievance
14   from Mr. Harrington?
15        A.   U.S. Mail.
16        Q.   What, if anything, did you do with this
17   grievance that you received by U.S. Mail from
18   Mr. Harrington?
19        A.   Sent it to Dan Schmidt.
20        Q.   Did you merely forward it on, or did you
21   add some sort of communication to that?
22        A.   I just sent it in the truck mail to Dan.
23        Q.   Did you have any further communications or
24   meetings with Mr. Harrington with regard to this
```

00035

```
 1    grievance?
 2        A.    No.
 3        Q.    Did you have any further communications
 4    with Mr. Schmidt with regard to this grievance?
 5        A.    No.
 6        Q.    Did you have any further dealings with this
 7    grievance?
 8        A.    No.
 9        Q.    I'm going to pull out Exhibit 2.  If I
10    recall correctly, you testified that that format was
11    the format used by APA Transport for its terminal
12    seniority list, correct?
13        A.    Yes.
14        Q.    And that that was the format that then was
15    posted in the drivers' room?
16        A.    Yes.
17        Q.    Did APA Transport post any health and
18    welfare remittance reports?
19        A.    Yes.
20        Q.    Where were those posted?
21        A.    Drivers' room.
22        Q.    Where were those documents created, as far
23    as you know?
24        A.    At the corporate office, North Bergen, New
```

00036

```
 1    Jersey.
 2         Q.    Did those remittance reports also identify
 3    the Local members at the particular terminal?
 4         A.    Yes.
 5         Q.    Do you recall if those remittance reports
 6    listed seniority?
 7         A.    I believe they were in seniority order, so
 8    yes.
 9         Q.    As best you can recall, there were columns
10    on the remittance reports?
11         A.    Yes.
12         Q.    I take it there were names?
13         A.    Yes.
14         Q.    I'm talking about the health and welfare
15    form.
16         A.    Right.
17         Q.    There were names?
18         A.    Right.
19         Q.    Can you think of any other columns that
20    appeared on this report?
21         A.    There were other columns on there that
22    showed, you know, how much -- whether they were
23    current or not on their health and welfare and
24    pension that the company provided to the union.
```

00037

```
 1        Q.   Did APA Transport also post pension
 2   remittance reports?
 3        A.   I don't know that.  That I don't remember
 4   seeing.
 5             MR. LATHROP:  Let me take my five minutes.
 6             (Recess)
 7        BY MR. LATHROP:
 8        Q.   You testified that John Luciani was the
 9   division vice president when you joined New Penn?
10        A.   Yes.
11        Q.   What were his duties as division vice
12   president?
13        A.   I'm not sure what his duties were.
14        Q.   Did he interact at all to your knowledge
15   with Local 25?
16        A.   Yes.
17        Q.   Was that part of his duties, to interact
18   with Local 25?
19        A.   Yes.
20        Q.   What was the nature of his interactions
21   with Local 25?
22             MS. PENNINI:  Objection.
23        A.   Usually just a grievance.  You know, he
24   would handle a grievance.
```

00038

```
 1        Q.   Do you have any understanding as to whether
 2   or not Mr. Luciani had any communications with
 3   Mr. Carnes concerning Mr. Goulet?
 4        A.   I do not know that.
 5        Q.   Did Mr. Luciani perform any of the
 6   functions of terminal manager?
 7             MR. GLUEK:  Objection.  Over what time
 8   period?
 9             MR. LATHROP:  While he was the division
10   vice president in Billerica.
11        A.   No, not while I was there.
12        Q.   Is Mr. Luciani still employed to your
13   knowledge by New Penn?
14        A.   No, he's not.
15        Q.   Do you have any understanding as to when
16   his employment with New Penn ended?
17        A.   I believe I stated it was in November of
18   2002.
19        Q.   You certainly stated that that's when he
20   was no longer division vice president.  You're
21   saying now his employment ended at that time?
22        A.   Yes.
23        Q.   Do you have any understanding as to where
24   he works, if anyplace, now?
```

00039

```
 1        A.    No.
 2        Q.    Do you have any understanding as to where
 3   his last place of residence is?
 4        A.    Rhode Island.  That's all I know.
 5        Q.    You testified that you received by U.S.
 6   Mail in July of 2003 the grievance from
 7   Mr. Harrington, correct?
 8        A.    Correct.
 9        Q.    If need be we can mark this document, but
10   let me show you what is the Defendant's Response to
11   Plaintiff's First Set of Interrogatories to
12   Defendant New Penn Motor Express.
13            More specifically, I'm going to show you
14   Interrogatory No. 10, which inquires about a
15   grievance filed by Mr. Goulet.  I will read to you
16   the answer.  I will put the document in front of
17   you, but I'm going to read to you the answer that
18   was signed by --
19            MR. GLUEK:  I believe the verification was
20   by Andy.
21            MR. LATHROP:  I don't have the verification
22   in front of me.
23        Q.    "The grievance was received by U.S. Mail on
24   or after April 18, 2003 at the Billerica terminal by
```

00040

```
 1    Paul Dubiel.  Mr. Dubiel discussed the matter with
 2    Daniel Schmidt, and it was determined to be
 3    untimely."
 4         I just read the answer to Interrogatory
 5    No. 10.  Please feel free to read the full
 6    interrogatory and the answer if you like.  Once you
 7    have done that, let me just ask you some things
 8    about it.
 9    A.    (Examines document)  Okay.
10    Q.    Does that refresh your memory as to when
11    you received the grievance, or do you still recall
12    receiving it in July of 2003?
13    A.    I couldn't say if it was April or July.  It
14    was definitely in 2003.  It was warm out.  I assumed
15    it was July.  It could have been April.
16    Q.    Does that refresh your memory at all
17    concerning any communications between yourself and
18    Mr. Schmidt?
19    A.    No.
20    Q.    Similarly, Interrogatory No. 4 asks about
21    communications with regard to Mr. Goulet, and as
22    part of the answer -- well, I will read to you the
23    following sentence, and then you can review it.
24    Then I will ask you some questions about it.
```

00041

```
 1          It says, "In addition, in approximately May
 2  2003, Paul Dubiel asked William Carnes why the
 3  grievance was filed against the defendant."
 4          Again, the question was Interrogatory
 5  No. 4, and this is the answer by New Penn Motor
 6  Express to that interrogatory, which included the
 7  part that I just quoted to you.
 8      A.   Okay.
 9      Q.   Does that refresh your memory regarding
10  communications with Mr. Carnes concerning
11  Mr. Goulet?
12      A.   No, it does not.
13      Q.   When you became the terminal manager in
14  Billerica, New Penn Motor Express did call for
15  casual labor some former APA employees, correct?
16      A.   Yes.
17      Q.   What was the basis for the Billerica
18  terminal to make a call to a particular former APA
19  employee?
20      A.   Freight level.
21      Q.   That was the need for more labor?
22      A.   Right.
23      Q.   But on the side of it, what standard or
24  process did New Penn Motor Express at the Billerica
```

00042
```
 1    terminal use to decide which former APA employees it
 2    would call for this work opportunity?
 3         A.   The list that we had.  I don't know where
 4    it is at this time, but we saw the call list.
 5         Q.   I want to be precise about this.  This is
 6    one of the documents that we had put in front of
 7    you, correct?
 8         A.   That's correct.
 9         Q.   Is it fair to say that you as the terminal
10    manager in Billerica for New Penn Motor Express
11    relied upon Exhibit 6 to determine whom you would
12    call among the former APA employees for casual work
13    opportunities?
14         A.   Correct.
15         Q.   If somebody's name did not appear on this
16    document, you did not call them?
17         A.   Right.
18         Q.   Is it fair to say that Mr. Goulet's name
19    does not appear on Exhibit 6?
20         A.   Correct.
21         Q.   Even though he might have been a former APA
22    employee, because his name was not on Exhibit 6, you
23    did not call him?
24         A.   Correct.
```

00043

```
 1                MR. LATHROP:  Let's take a short break.
 2           (Recess)
 3                MR. LATHROP:  I have nothing further.
 4                     CROSS EXAMINATION
 5      BY MS. PENNINI:
 6      Q.   I have a couple of quick questions.
 7           You said you became terminal manager of APA
 8  in Canton in approximately November of 2001; is that
 9  correct?
10      A.   Correct.
11      Q.   Do you recall when in November you became
12  terminal manager?
13      A.   Towards the end.
14      Q.   Do you know who was terminal manager in
15  Canton prior to when you began?
16      A.   John Conti.
17      Q.   You mentioned there were certain lists that
18  would be hanging up in the drivers' room at the APA
19  facility in Canton.  Do you know what other lists
20  were hanging up in the drivers' room?
21      A.   No.
22      Q.   But were there other lists that were hung
23  up in the drivers' room besides the seniority lists?
24      A.   Yes.
```

00044

```
 1        Q.   If you could look again at Deposition
 2   Exhibit No. 6, the call list.  Once a person was
 3   called off the call list, would they continue to
 4   work for New Penn every day, or would they have to
 5   be called?
 6        A.   They would have to be called from day to
 7   day.
 8        Q.   When would someone go from being on the
 9   call list to being on the New Penn seniority list?
10        A.   After they would have triggered seniority
11   per the contract.
12        Q.   Do you know whether any of the people
13   listed on here became eventually permanent employees
14   of New Penn?
15        A.   Yes.
16        Q.   Do you recall how many?
17        A.   (Examines document)  Nine.
18        Q.   Nine in total?
19        A.   Yes.
20             MS. PENNINI:  Just give me a second.  I'm
21   not sure if I have any additional questions.
22             (Pause)
23             MS. PENNINI:  No further questions.
24             MR. GLUEK:  No questions.
```

00045

```
 1              REDIRECT EXAMINATION
 2      BY MR. LATHROP:
 3      Q.   In response to a question asked by Attorney
 4  Pennini, you counted nine persons that appear on
 5  Exhibit No. 6 that became New Penn employees; is
 6  that correct?
 7      A.   Correct.
 8      Q.   Could you point out the person who is on
 9  this list, the person furthest down that became a
10  New Penn employee.
11      A.   The last man on the list (indicating).
12      Q.   Mr. Levine?
13      A.   Yes.
14          MR. LATHROP:  Thank you.  I have no further
15  questions.
16               (Whereupon the deposition
17               was concluded at 2:34 p.m.)
18
19
20
21
22
23
24
```

00046
```
 1                C E R T I F I C A T E
 2       I, PAUL DUBIEL, do hereby certify that I have
 3  read the foregoing transcript of my testimony, and
 4  further certify under the pains and penalties of
 5  perjury that said transcript (with/without)
 6  suggested corrections is a true and accurate record
 7  of said testimony.
 8       Dated at _____, this _____ day of _____,
 9  2005.
10
11                       _____
12
13
14
15
16
17
18
19
20
21
22
23
24
```

00047

```
 1    COMMONWEALTH OF MASSACHUSETTS)
 2    SUFFOLK, SS.                )
 3         I, Ken A. DiFraia, Registered Professional
 4    Reporter and Notary Public in and for the
 5    Commonwealth of Massachusetts, do hereby certify
 6    that there came before me on the 15th day of Nov.,
 7    2005, at 1:18 p.m., the person hereinbefore named,
 8    who was by me duly sworn to testify to the truth and
 9    nothing but the truth of his knowledge touching and
10    concerning the matters in controversy in this cause;
11    that he was thereupon examined upon his oath, and
12    his examination reduced to typewriting under my
13    direction; and that the deposition is a true record
14    of the testimony given by the witness.
15         I further certify that I am neither attorney or
16    counsel for, nor related to or employed by, any
17    attorney or counsel employed by the parties hereto
18    or financially interested in the action.
19         In witness whereof, I have hereunto set my hand
20    and affixed my notarial seal this _____ day of Nov.,
21    2005.
22                   _____
23                        Notary Public
24                My commission expires 4/3/09
```

# NEW ENGLAND JOINT AREA GRIEVANCE COMMITTEE
## DECISION FORM

Established in accordance with the terms and conditions of the National Master Freight Agreement and the New England Supplemental Freight Agreement, entered into by and between the Local Unions and Carriers engaged in City Pickup and Delivery and/or Over-the-Road Freight Operations.

---

Teamster Local(s) No./Agent: 25 / M Harrington

Grievant: Craig Goulet

CASE NO.: 87-404

Employer: APA Transport Corp.

---

We, the undersigned parties to the National Master Freight Agreement and the New England Supplemental Freight Agreement hereby agree to submit the dispute to arbitration under the Rules of Procedure prescribed by the NE Joint Area Grievance Committee, by virtue of its authority, as set forth in Articles 7 and 8 of the National Master Freight Agreement and Articles 45 and 46 of the New England Supplemental Freight Agreement, the following:

Alleged violation of Article 47. Union seeks man to be returned to work will all lost wages, H, W and Pension. 3/01- Union request this case be placed back on the SNE JAC docket for hearing.

The undersigned further agree that a majority decision of the NE Joint Area Committee in the above dispute will be final, conclusive and binding with no appeal and, further, that neither party will attempt through any overt acts, to void the decision rendered. Failure to comply may result in economic action within the confines of Article 8 of the National Master Freight Agreement and Article 45 and 46 of the New England Supplemental Freight Agreement.

Employer: APA Transport Corp.

Signed: B Trebour

Local Union(s): 15

Signed: M Harrington

This is the Official Award and Decision of the New England Joint Area Grievance Committee. Decision must be promptly complied with and all Monetary Awards must be paid in pay period for the week following receipt of Decision.

## - DECISION -

The Panel in Executive Session, motion made, seconded and carried the Company's Point of Order was not upheld. The Panel after hearing the case, motion made, seconded and carried that upon submitting acceptable documentation to the Company of his ability to return to unrestricted duties, the grievant shall serve a ten (10) day suspension. Upon completion of the suspension he shall be reinstated to the seniority list in his original position.

DECISION DATE: 10/16/2001

EMPLOYER PANEL:

Scalzo

UNION PANEL:

Mundy

00001

```
                              Volume I
                              Pages 1 to 57
                              Exhibits 1 to 8
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - -x
:
CRAIG GOULET,               :
          Plaintiff,        :
:
      vs.                   : Civil Action
:                             No. 04-12577 JLT
NEW PENN MOTOR EXPRESS, INC:;
and TEAMSTERS LOCAL 25,     :
INTERNATIONAL BROTHERHOOD O:
TEAMSTERS,                  :
          Defendants.       :
:
- - - - - - - - - - - - - - -x
```

          DEPOSITION OF WILLIAM H. CARNES, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Scott A. Lathrop & Associates,
122 Old Ayer Road, Groton, Massachusetts, on
Thursday, September 8, 2005, commencing at
10:04 a.m.

PRESENT:
    Scott A. Lathrop & Associates
        (by Scott A. Lathrop, Esq.)
        122 Old Ayer Road, Groton, MA 01450,
        for the Plaintiff.
    Frantz Ward LLP
        (by Carl H. Gluek, Esq.)
        2500 Key Center, 127 Public Square,
        Cleveland, OH 44114-1230, for the Defendant
        New Penn Motor Express, Inc.

(Continued on Next Page)

```
00002
      PRESENT:  (Continued)
            Dwyer, Duddy and Facklam, P.C.
                  (by Kathleen A. Pennini, Esq.)
                  Two Center Plaza, Suite 430, Boston, MA
                  02108-1804, for the Defendant Teamsters
                  Local 25, International Brotherhood of
                  Teamsters.
      ALSO PRESENT:  Craig Goulet
       *  *  *  *  *
```

```
00003
      I N D E X
      WITNESS          DIRECT   CROSS    REDIRECT   RECROSS
      WILLIAM H. CARNES
       BY MR. LATHROP    5
       BY MR. GLUEK              49
       BY MS. PENNINI           54
      * * * *
      E X H I B I T S
      NO.            DESCRIPTION                   PAGE
        Agreement between Teamsters National        12
      Freight Industry Negotiating
      Committee and New Penn Motor
      Express, Inc., dated 2/13/02
        Document to Local 25, among other           16
      locals, from Teamsters National
      Freight Industry Negotiating
      Committee dated 2/14/02
        Canton seniority list dated 11/01           18
        Summary of tentative agreement              19
      between TNFINC and NPME
        Letter to Dan Schmidt from George           20
      Cashman dated 2/28/02
        Canton seniority list                       20
        Three-page document, including              27
      grievance report
        Letter to Great Members of Teamsters        44
      Local 25 from William Carnes dated
      4/03
```

00004
```
 1              P R O C E E D I N G S

 2    MR. LATHROP:  Stipulations?

 3    MS. PENNINI:  The usual.

 4    MR. LATHROP:  Reserve all objections,

 5    except as to form, and motions to strike until the

 6    time of trial.  I assume that's the usual.

 7    MS. PENNINI:  Yes.

 8    MR. LATHROP:  Are you representing

 9    Mr. Carnes, by the way, for the purpose of this

10    deposition?

11    MS. PENNINI:  No.

12    MR. LATHROP:  Mr. Carnes, after the

13    deposition is over, a transcript will be prepared by

14    this gentleman.  You have the right to read it and

15    make any corrections that you deem necessary and

16    then sign it in some form under oath.

17    Do you wish to exercise that right to read

18    and sign it?

19    As an aside, most people do read and sign

20    it.  It's your right.  The question is always put as

21    to whether or not people want to waive their right

22    to read and sign.  Since you are here without

23    counsel, I have to put the question to you as to

24    whether or not you want to read and sign the
```

```
00005
 1  deposition.
 2  THE WITNESS:  Yes, I do.
 3  MR. LATHROP:  For your information, you
 4  have 30 days after the deposition is presented to
 5  you to read it, sign it, and make any corrections.
 6  We will talk about the logistics of how to
 7  get it to Mr. Carnes in a bit.
 8  Also, I assume we can waive the requirement
 9  it's signed in front of a notary, that it's signed
10  under the pains and penalties of perjury?
11  MS. PENNINI:  That's fine.
12  MR. GLUEK:  Sure.
13  MR. LATHROP:  Would you like any other
14  stipulations?
15  MS. PENNINI:  No.
16  WILLIAM H. CARNES
17  a witness called for examination by counsel for the
18  Plaintiff, having been satisfactorily identified by
19  the production of his driver's license and being
20  first duly sworn by the Notary Public, was examined
21  and testified as follows:
22  DIRECT EXAMINATION
23      BY MR. LATHROP:
24  Q.   Good morning, sir.
```

00006

```
 1  A.   Morning.
 2  Q.   Could you please state your full name and
 3  address for the record.
 4  A.   William Harold Carnes, 45 Greenwood Street,
 5  Melrose, Massachusetts 02176.
 6  Q.   What is your date of birth, sir?
 7  A.   June 2, 1943.
 8  Q.   Would you briefly describe your educational
 9  background, please.
10  A.   High school, graduated in 1961.
11  Q.   Where did you go to high school?
12  A.   St. Mary's in Cambridge.
13  Q.   What was your first full-time employment
14  after you graduated from high school?
15  A.   United Shoe Machinery Corporation.
16  Q.   At some point in time, did you work in the
17  trucking industry?
18  A.   I did.
19  Q.   When did you first start in the trucking
20  industry?
21  A.   1969, 1967 or 1969.
22  Q.   What position did you hold in the trucking
23  industry as of that point in time?
24  A.   I was a dock worker and driver.
```

00007
```
 1   Q.   At some point in time, did you become

 2   associated with the Teamsters?

 3   A.   Yes, in 1969.

 4   Q.   What happened in 1969?

 5   A.   I joined the Teamsters.  I was working in a

 6   Teamster job.  I became a member.

 7   Q.   At some point in time, did you become an

 8   officer or steward for any Teamster locals?

 9   A.   I became a business agent in January of

10   1982.

11   Q.   As a business agent, you were a business

12   agent for what local in the Teamsters?

13   A.   Local 25.

14   Q.   How long did you remain a business agent

15   for Local 25?

16   A.   Almost 21 years.

17   Q.   As a business agent for Local 25, were you

18   assigned responsibilities for certain employers?

19   A.   Yes.

20   Q.   How was it based, geography?

21   A.   No.  It was at the direction of the

22   president.

23   Q.   As to which particular employees you had

24   responsibilities for?
```

00008

1   A.   That's correct.

2   Q.   As the business agent for Local 25, what

3   generally were your job duties?

4   A.   Well, I had assignments for various

5   companies and various industries.  I negotiated

6   their contracts.  I handled their grievances and

7   arbitrations, and the everyday business of dealing

8   with these companies and with the members.

9   Q.   As a business agent, what were your

10  responsibilities vis-a-vis the handling of

11  grievances?

12  A.   To follow the guidelines of the contract

13  and to take grievances forward to a hearing and to

14  adjudicate them.

15  In some cases, you know, depending on the

16  relationship with the companies, you know, there

17  would be where time periods and time frames could be

18  extended by mutual agreement, and pretty often those

19  things did happen.

20  Q.   Are you familiar with a company called

21  "APA"?

22  A.   Yes.

23  Q.   Did you ever have any responsibility as a

24  Teamsters business agent for APA?

00009
```
 1   A.   No.

 2   Q.   Are you familiar with a company called "New

 3   Penn Motor Express"?

 4   A.   Yes.

 5   Q.   Did you ever have responsibility for New

 6   Penn Motor Express?

 7   A.   Yes.

 8   Q.   Over what period of time did you have

 9   responsibility for New Penn Motor Express?

10   A.   From 1982 until 2003.

11   Q.   At any point in time, did you hold any

12   other positions with the Teamsters, other than as a

13   business agent for Local 25?

14   A.   Yes.  I was elected vice president in 1991,

15   and business agent.  I held both positions.

16   Q.   Vice president of Local 25?

17   A.   That's right.

18   Q.   How long did you remain vice president of

19   Local 25?

20   A.   Until 2003.

21   Q.   Did you hold any other positions with the

22   Teamsters, whether it be Local 25 or any other

23   Teamster-related entity?

24   A.   I'm not sure I understand the question.
```

00010

1   Q.    For example, are you familiar with an

2   entity called the "Southern New England Joint Area

3   Committee"?

4   A.    I am.

5   Q.    Could you describe for the record what that

6   is.

7   A.    It's a combined panel of employers and

8   Teamsters that gather together and hear grievances

9   as a committee, and yes, I was cosecretary on that

10  committee for four or five years.

11  Q.    Over what period of time was this four to

12  five years that you were secretary for this

13  committee?

14  A.    Going backwards to 2003, I was cosecretary

15  up until 2003, and I really don't recall when I took

16  over that position, but it was for four or five

17  years, and it may have been longer.

18  Q.    Did you sit on any other, if I can call it

19  that, grievance committees other than the Southern

20  New England Joint Area Committee?

21  A.    Yes.  I sat as a member of the panel on the

22  Eastern Region Joint Area Committee.

23  Q.    Did you hold any title other than member of

24  the panel?

00011
1   A.   No.

2   Q.   Over what period of time did you serve as a

3   member of that committee?

4   A.   From around 1992 until around 2000 I guess.

5   Q.   Was that an elected position or an

6   appointed position?

7   A.   No.  It was appointed by the general

8   president.

9   Q.   When you were secretary to the Southern New

10  England Committee, was that an elected or appointed

11  position?

12  A.   Appointed.

13  Q.   By whom?

14  A.   By the joint counsel.

15  Q.   Did you hold any other positions during

16  your long tenure with the Teamsters?

17  A.   I was a member of the Southern New England

18  Supplemental Negotiating Committee.

19  MR. GLUEK:  I'm sorry, I didn't hear that.

20  THE WITNESS:  I said I was a member of the

21  Supplemental Negotiating Committee.

22  Q.   Over what period of time did you serve on

23  that committee?

24  A.   From 1992 or 1993 until 2003.

00012
1    Q.    Are there any other committees you can

2    recall that you sat on or any other positions you

3    held during your tenure with the Teamsters?

4    A.    I was the chairman for the Advisory Council

5    on Workmen's Compensation for the State of

6    Massachusetts.

7    Q.    Any others?

8    A.    If there are, I don't remember.

9    Q.    The last one, when you were chairman of

10   this advisory council, from when to when?

11   A.    I would speculate it was from like 2005

12   until -- sorry -- 1995 until 2003.    There were times

13   I was the co-chairman.    It was something that I went

14   from management to union back and forth over various

15   periods of time.    It was an appointed position by

16   the Governor.

17   Q.    I'm going to have some documents marked

18   now.    Then we can talk about them.

19        (Document marked as Carnes

20        Exhibit 1 for identification)

21   Q.    Mr. Carnes, I'm showing you what was marked

22   for your deposition as Exhibit 1.    This purports to

23   be an agreement between the Teamsters National

24   Freight Industry Negotiating Committee and New Penn

00013
1    Motor Express, Inc., dated February 13, 2002 and

2    Bates stamped D1 through D4.

3    Have you ever seen this document before?

4    A.    Yes, I probably have seen it.  As chairman,

5    I'm sure I got a copy of it.

6    Q.    Did you participate in the negotiations

7    that led to Exhibit 1?

8    A.    No.

9    Q.    Did anyone to your knowledge or

10   understanding from Local 25 participate in those

11   negotiations that led to Exhibit 1?

12   A.    No.

13   Q.    Do you have any understanding as to who

14   from the Teamsters, outside of those listed on the

15   signature page, participated in these negotiations?

16   A.    No.

17   Q.    Did you see this document on or about

18   February 13, 2002?

19   A.    Was that when it was negotiated?

20   Q.    Sir, I'm just, quite frankly, looking at

21   the date on the very first page.

22   A.    No.  I didn't see this until after it was

23   signed, sealed and delivered.

24   Q.    When was this agreement signed, sealed and

00014
1    delivered, as you recall it?

2    A.    I really don't recall.  What I do recall

3    was being notified by telephone by somebody that was

4    involved in these negotiations that APA was closing

5    down their operations and that there was an

6    agreement made and that we would be getting notified

7    about the agreement.

8    Q.    Do you recall who it was that notified you

9    by telephone about that?

10   A.    It was Carlos, and I think the last name is

11   Rodriguez.

12   THE WITNESS:  Do you know Carlos from

13   Pennsylvania?

14   Q.    Unfortunately, sir, this is your

15   deposition.  You have to answer the questions.

16   MR. GLUEK:  Ramos?

17   THE WITNESS:  Ramos.

18   A.    There you go, Ramos.

19   Q.    Carlos Ramos?

20   A.    Carlos Ramos.

21   Q.    For the record, could you identify who

22   Carlos Ramos is.

23   A.    To my knowledge, he was a business agent

24   with Local 776 in Harrisburg.  He was working for

00015
1   the -- I think his title was director of the Eastern

2   Region, Dan Virtue.  He was just being the messenger

3   for Mr. Virtue, according to his conversation with

4   me.

5   Q.   Is it your understanding Mr. Virtue was

6   involved in the negotiations between the Teamsters

7   and New Penn Motor Express as it pertained to APA's

8   closing?

9   A.   No, I don't know that he was.

10  Q.   Nonetheless, Mr. Ramos was conveying

11  information?

12  A.   He was conveying information that was given

13  to him by Mr. Virtue.

14  Q.   Was that your first understanding that

15  indeed New Penn was in some fashion going to be

16  looking towards APA employees for possible

17  employment?

18  A.   No.  That was my first knowledge of the

19  fact that APA was closing down and that they were

20  negotiating something with APA, with New Penn and

21  APA, for New Penn to take over some of the business.

22  Q.   In terms of the development of that

23  incident, what is the next thing that came to your

24  knowledge then?

00016
1    A.    The next thing that I recall was that there

2    was an agreement between New Penn and the National

3    Freight Committee in regards to APA and the way it

4    was going to be handled, the employees and so on.

5    Q.    Is that Exhibit 1?

6    A.    To my knowledge, it is, yes.

7    Q.    Is it your testimony you saw this, a

8    version of this with actual signatures on it?

9    A.    You know, I don't recall if I did or not.

10   Q.    Do you recall how the agreement between the

11   Teamsters and New Penn Motor Express came to your

12   attention?

13   A.    I was notified by the people in Washington

14   that they made an agreement, between the company and

15   between the National Freight Committee.

16   MR. LATHROP:  Let's mark this as the next

17   exhibit in line.

18        (Document marked as Carnes

19        Exhibit 2 for identification)

20   Q.    Mr. Carnes, I'm showing you a document now

21   marked as Exhibit 2 for purposes of identification

22   in your deposition.  This purports to be a two-page

23   document dated February 14, 2002 from the Teamsters

24   National Freight Industry Negotiating Committee to,

00017

1    among other locals, Local No. 25, regarding TNFINC's

2    tentative agreement with New Penn Motor Express.

3    Have you seen this document before?

4    A.    (Examines document)  I believe so.

5    Q.    Is this the method whereby you were

6    provided a copy of the tentative agreement with New

7    Penn Motor Express?

8    A.    I believe that's it.

9    Q.    Do you have any recollection as to how you

10   received this particular document inasmuch as it's

11   addressed not to you personally but to Local 25 and

12   others?

13   A.    No, I don't, but I have seen it.  It may

14   have been left in my box, because anything that

15   would come in like that would go to the president's

16   office.

17   Q.    Who was the president at that time?

18   A.    George Cashman.

19   Q.    Mr. Carnes, in this document, it talks

20   about in the middle of the first paragraph that

21   there should be a ratification vote by the APA

22   transport members.  Do you see that reference?

23   A.    (Examines document)  Yes, I do.

24   Q.    To your knowledge, was there a ratification

00018
1    vote by the APA transport members?

2    A.    To my knowledge, there was, but I was not

3    involved in it.

4    Q.    Who was the business agent at the time

5    responsible for APA transport members, the Local 25

6    business agent?

7    A.    Mark Harrington.

8    Q.    At some point in time, did you see APA

9    seniority lists?

10    A.    I believe I did.  They were forwarded to me

11    for the committee.

12    Q.    Who forwarded to you APA seniority lists?

13    A.    I really don't recall.

14    Q.    Do you recall when it was forwarded to you?

15    A.    No, I don't.

16        (Document marked as Carnes

17        Exhibit 3 for identification)

18    Q.    Mr. Carnes, you've just been handed what's

19    been marked for identification in this deposition as

20    Exhibit 3.  This purports to be a Canton Seniority

21    List, Local Union 25, November 2001.  Have you ever

22    seen this document before?

23    A.    I have seen seniority lists for years.  I

24    can't say that I have seen this particular one, but

00019
 1   I probably have.

 2   Q.   I take it, therefore, you could not specify

 3   any particular time when you saw this document?

 4   MR. GLUEK:  Objection.

 5   A.   Not really.

 6   Q.   Can you tell me when you saw this document?

 7   MR. GLUEK:  Objection.

 8   A.   During that time frame after this whole

 9   thing took place.  I don't know particularly when,

10   but it was during that time.

11       (Document marked as Carnes

12       Exhibit 4 for identification)

13   Q.   Mr. Carnes, you've now been handed what was

14   marked as Exhibit 4, which purports to be a summary

15   of the tentative agreement between TNFINC and NPME

16   as a result of the closure of APA operations.

17   Have you seen this document before?

18   A.   Yes, I believe I have.

19   Q.   If you go back, sir, and look at Exhibit 2,

20   the second sentence there talks about a two-page

21   summary of the terms of New Penn Motor Express'

22   purchase proposal as it affects the Teamster

23   bargaining units.

24   To your knowledge, is Exhibit 4 the

00020

1   two-page summary referenced in Exhibit No. 2?

2   A.   I would say probably, yes.

3   Q.   Do you recall if you saw this summary in

4   February of 2002?

5   A.   I don't know if it was February, but I did

6   see it.  I don't recall exactly when.

7        (Documents marked as Carnes

8        Exhibits 5 for identification)

9   Q.   Mr. Carnes I'm handing you two exhibits.

10  One is Exhibit 5, which purports to be a

11  February 28, 2002 letter from George W. Cashman to

12  Dan Schmidt, Vice President of Labor Relations.

13  Exhibit 6 appears to be a seniority list of

14  the Canton facility, Bates stamped D24 through D27.

15  Let me first ask you, sir, if you have seen

16  Exhibit 5, the February 28, 2002 letter?

17  A.   I don't recall seeing it, no.

18  Q.   Looking at Exhibit 6, do you recall seeing

19  that before?

20  A.   I believe I have seen it.  It's a combined

21  list; is that right?

22  Q.   Sorry, did you say you have or have not

23  seen it before?

24  A.   Sorry?

00021

1   Q.   I didn't hear you clearly.

2   A.   Yes, I believe I have seen it.

3   Q.   Do you have any understanding as to who

4   prepared Exhibit 6?

5   A.   No.

6   Q.   I take it you did not prepare Exhibit 6?

7   A.   No, I didn't.

8   Q.   Are you familiar with the plaintiff in this

9   case, Craig Goulet?

10   A.   Yes, I know him.

11   Q.   When did you first meet or come to know

12   Mr. Goulet?

13   A.   That's a tough one.  I really don't recall

14   when we first met, but I have known him for a number

15   of years.

16   Q.   How many years, approximately?

17   A.   Well, I would say at least probably 12, 13

18   years.

19   Q.   Do you recall whether or not Mr. Goulet

20   ever worked for an employer for which you had

21   responsibility as a business agent of Local 25?

22   A.   I really don't.

23   Q.   At some point in time, did you come to

24   understand that Mr. Goulet wished to be employed or

00022
1    be on a call list for New Penn Motor Express?

2    A.    Via a telephone call at some point.

3    Q.    Let's talk about the telephone call.  Was

4    this a telephone call with Mr. Goulet?

5    A.    Yes.

6    Q.    I assume Mr. Goulet initiated the call?

7    A.    That's right.

8    Q.    Do you recall approximately when this phone

9    call took place?

10    A.    I really don't.  You know, I have to admit

11    I'm terrible with time frames.  I really am.

12    Q.    You need not apologize.  We're just

13    inquiring as to what you do recall.  That's all I'm

14    asking of you.

15    A.    And you will get those answers.

16    Q.    Do you recall where you took this phone

17    call?

18    A.    I was in my office.

19    Q.    For Local 25?

20    A.    Right.

21    Q.    For the record, where at least were the

22    offices of Local 25 at the time you took this phone

23    call?

24    A.    You mean where they were?

00023

1    Q.    Yes.

2    A.    544 Main Street in Charlestown.

3    Q.    What do you recall about this telephone

4    conversation between yourself and Mr. Goulet?

5    A.    He was concerned about being called to be

6    put back to work at New Penn.  I believe he had been

7    out injured or something of that nature.  He was

8    trying to get the case heard, you know, to get

9    himself put back on or -- I take that back a step.

10   I represented New Penn.  He wanted to know

11   what I could do about it.  I believe I called New

12   Penn.

13   Q.    Well, let's stop and limit the conversation

14   for the time being to the telephone call between

15   yourself and Mr. Goulet.

16   A.    Okay.  He was concerned about being put

17   back to work.

18   Q.    Had he previously worked in New Penn?

19   A.    I don't know.

20   Q.    But he was looking to be put to work at New

21   Penn, correct?

22   A.    Yes.

23   Q.    Do you know if it was pursuant to this

24   agreement between the Teamsters and New Penn and

00024
```
 1    former APA employees?

 2    A.    I believe it was after the agreement.

 3    Q.    Okay, after the agreement.  Do you have any

 4    understanding as to whether or not Mr. Goulet was a

 5    former APA employee?

 6    A.    To my knowledge, he was.

 7    Q.    So this telephone call took place sometime

 8    after the agreement between the Teamsters and New

 9    Penn?

10    A.    That's right.

11    Q.    But you are not certain exactly how long

12    after?

13    A.    That's right.

14    Q.    Do you recall anything else about this

15    telephone call you had between Mr. Goulet and

16    yourself?

17    A.    Just the fact that he was concerned about

18    getting back to work.  He wanted to exercise his

19    rights.

20    Q.    Your understanding of those rights are

21    what?

22    A.    The only understanding I had was what they

23    had negotiated between the National Freight Industry

24    Negotiating Committee and New Penn.
```

00025

1   Q.   As represented by Exhibit 1?

2   A.   Yes, right.

3   Q.   Do you recall anything else about this

4   telephone conversation you had with Mr. Goulet?

5   A.   No.

6   Q.   As a result of receiving this call from

7   Mr. Goulet, what, if anything, did you do?

8   A.   I spoke to New Penn on his behalf.

9   Q.   Let's stop.  Did you speak in person or by

10  telephone?

11  A.   Telephone.

12  Q.   Whom did you call?

13  A.   Honest to God, I don't know.  It was

14  whoever the manager was at the time.  They changed

15  managers back then a couple of times.  I forget the

16  guy's name, but I think it was John.

17  Q.   When you say "manager," do you mean manager

18  of a particular terminal?

19  A.   Yes, the terminal manager in Billerica.

20  Q.   You telephoned the manager at the Billerica

21  terminal, and what did you say?

22  A.   I believe I just told him, "I have an APA

23  employee who's looking to go back to work" blah,

24  blah, blah, "Here's the story.  Tell me what you are

00026
 1   going to do about it."

 2   Q.   Did you identify Mr. Goulet by name?

 3   A.   Yes.

 4   Q.   What, if anything, did the manager say in

 5   response?

 6   A.   Well, you know, I recall this guy was kind

 7   of a fresh bastard.  He probably told me to go fuck

 8   myself.  That's all I recall.

 9   Q.   I take it you interpreted that to mean --

10   A.   "No."

11   Q.   No?

12   A.   Pretty much.

13   Q.   As a result of receiving this "no" from the

14   terminal manager, what, if anything, did you do next

15   with regard to Mr. Goulet?

16   A.   I spoke to Mark Harrington.

17   Q.   Did you speak to Mr. Harrington in person?

18   A.   Yes.

19   Q.   Where did this conversation take place?

20   A.   In the union hall.

21   Q.   Could you recount for us everything that

22   was said or done in this conversation between

23   yourself and Mr. Harrington.

24   A.   Not really, but I know the gist of it would

00027

1  have been, because Mark was the representative for

2  APA, that "I got a call from one of your members,

3  and you need to deal with this," pretty much.

4  Q.   Do you recall what response or reaction

5  Mr. Harrington had, if any?

6  A.   Probably that he would take care of it.

7  Q.   Do you recall anything else with regard to

8  Mr. Goulet and his desire to be employed or called

9  by New Penn Motor Express?

10  A.   No, not really.

11  Q.   Do you recall whether or not a grievance

12  was ever filed by Mr. Goulet?

13  A.   Yes, I believe there was.

14  Q.   What is your recollection of that?

15  A.   I think he may have sent or brought the

16  grievance into me, and I forwarded it to New Penn.

17       (Document marked as Carnes

18       Exhibit 7 for identification)

19  Q.   I'm showing you, Mr. Carnes, what was

20  marked for identification as Exhibit No. 7, which is

21  a three-page document.  The first page purports to

22  be a letter from George W. Cashman to Mr. Charles

23  Zaccaria dated April 18, 2003.

24  The second page purports to be an envelope

00028
1    from Mr. Craig Goulet to Teamsters Union Local 25.
2    The third page purports to be a handwritten
3    Teamsters Union Local 25 grievance report.
4    Do you recognize any of these pages?
5    A.    I recognize this as a grievance.  I don't
6    recall seeing this specifically, but I probably did.
7    It is addressed to me at the Local.  I forwarded it.
8    It would have went out under George Cashman's cover.
9    Q.    Let's just talk about the general procedure
10   in existence in approximately April of 2003.  If a
11   member of Local 25 wanted to file a grievance
12   against a company that you dealt with, what was the
13   procedure, as you understood it, for the employee to
14   do that?
15   A.    He would go see a shop steward and initiate
16   a grievance.  The shop steward would then meet with
17   the company and try to settle the grievance.  If
18   that didn't happen, they would notify the business
19   agent.
20   Q.    Which would be you?
21   A.    Which would be me, right.  Then I would get
22   involved in the grievance and ask for a hearing to
23   try and settle it.  If we were not able to settle
24   it, we would then file it for hearing at the

00029

1    committee.

2    Q.    Correct me if I'm wrong, but I think you

3    said you would get involved in it if it was not

4    settled by the union steward?

5    A.    That's correct.

6    Q.    Typically what was the nature of your

7    getting involved if it couldn't be settled by the

8    union steward?

9    A.    The first thing I would do is to call the

10    company and attempt to straighten it out over the

11    telephone if possible.  If not, then we would go

12    forward and schedule a meeting to sit down with the

13    grievant, the steward and the manager and attempt to

14    settle it at that point.  If that was not possible,

15    we would go forward and either file it for a hearing

16    at the committee or not, depending on the issue.

17    Q.    At what point in the process, if any, was

18    the grievance reduced to writing?

19    A.    Well, let's start over.  The grievant would

20    go to the steward to try to settle something.  The

21    steward could talk to the manager.  If the manager

22    told him to piss off, then he would reduce it to

23    writing.

24    Q.    It would usually be in writing by the time

00030

1    it got to your stage; is that fair to say?

2    A.    It would be in writing before it got to me

3    as a rule.  That's why we have stewards.

4    Q.    I believe you talked about contacting the

5    company representative and trying to resolve it.

6    Did you also forward the written grievance to the

7    company representative?

8    A.    Sometimes, depending on where it came from

9    and how it was initiated.

10    Q.    Looking at Exhibit 7, this purports to be a

11    letter from George Cashman to Charles Zaccaria.  Did

12    you know who Mr. Zaccaria was as of April 2003?

13    A.    Where he was?

14    Q.    Do you know who he was?

15    A.    I still know who he is.  Yes, I know who he

16    was.

17    Q.    Who was he?

18    A.    I worked with him for over 20 years.  He's

19    the manager at New Penn.  He's also the vice

20    president.

21    Q.    Was he the person that you normally sent

22    grievances to?

23    A.    At that time, he was.

24    Q.    "At that time" being around April 2003?

00031
1    A.    Right.

2    Q.    Do you recall having any conversations with

3    Mr. Zaccaria or communications with Mr. Zaccaria

4    relative to the grievance that's the third page on

5    Exhibit 7?

6    A.    I don't recall it, no.

7    Q.    Do you recall having any communications

8    with representatives from New Penn Motor Express

9    relative to Mr. Goulet's grievance as represented by

10   the third page on Exhibit 7?

11   A.    I don't recall it.  I did have conversation

12   with somebody up there about it because they

13   declined to move on it.

14   Q.    Did you have a meeting with anybody at New

15   Penn Motor Express relative to this grievance?

16   A.    I don't believe I did.  I don't recall.

17   Q.    But you believe you had some form of

18   communication with a representative of New Penn

19   Motor Express?

20   A.    I spoke with somebody at New Penn.  It

21   might have been Charley.  I don't recall.

22   Q.    But your recollection is that this

23   representative of New Penn Motor Express denied the

24   grievance?

00032

```
 1   A.   They were looking into it.  You know, the

 2   natural fallout was, "Oh, we'll look into it,"

 3   "Okay."  So they were looking into it.  That's

 4   probably where it left off, with me anyway.

 5   Q.   I believe earlier you stated that -- and

 6   correct me if I'm wrong -- if you could not resolve

 7   the grievance with the company representative, it

 8   would then be filed with the committee?

 9   A.   Uh-huh.

10   Q.   Is that yes?

11   A.   Yes.

12   Q.   What was the committee in the normal

13   process that the grievance would be filed with if it

14   couldn't be resolved between yourself and the

15   company representative?

16   A.   You know, at this point I honestly could

17   not answer that only because your presentation of

18   Exhibit 1 locks it in TNFINC.  Now, whether the

19   local area committee would have jurisdiction over

20   something like this, I'm not sure.

21   Q.   Let's just talk about a general grievance,

22   not talking about something that may arise out of

23   Exhibit 1.

24   With regard to a general grievance, what
```

00033
 1    was the committee with which you would file a
 2    grievance if it couldn't be resolved between
 3    yourself and the company representative?
 4    A.    It would depend on the articles involved in
 5    the contract.  Jurisdiction over articles is
 6    determined by which article you file the grievance
 7    out of.
 8    Q.    The Southern New England Joint Area
 9    Committee, I think you described that as at least
10    one committee that heard grievances?
11    A.    That's right.
12    Q.    Do you recall what types of grievances it
13    had jurisdiction to hear?
14    A.    It had jurisdiction under the supplemental
15    agreement, Articles 43 forward.
16    Q.    Is it your testimony that you are uncertain
17    as to what committee would have jurisdiction over
18    grievances relative to Exhibit 1?
19    A.    (Witness reviews document)  Well, you know,
20    all I know is Exhibit 1 was negotiated by the
21    National Freight Committee.  Beyond that, you took
22    it to -- boy, my mind slowed down -- the grievance,
23    the grievance itself.
24    Q.    Exhibit 7?

00034
 1   A.    The grievance itself specifies Article 5

 2   and all of Article 5 subsections, along with the

 3   Northern supplemental freight agreement.

 4   I'm not exactly sure which committee would

 5   hold jurisdiction, whether it would have to go

 6   through the Southern New England supplement or

 7   whether it would have to go to Eastern region based

 8   on Article 5 for a hearing before it could be heard

 9   by the New England committee.  I'm not sure which

10   way that would go.

11   Q.    Do you have an understanding as to whether

12   or not there was a time limitation within which

13   grievances had to be filed with whatever the

14   appropriate committee was?

15   A.    Yes.

16   Q.    What was that time limitation?

17   A.    Depends on when the grievance was -- when

18   you were notified that the grievance was denied.

19   Q.    But following notification that the

20   grievance was denied, what is the time limit, as you

21   recall?

22   A.    It depends on the case.

23   Q.    Wasn't the time limitation in the contract

24   30 days?

00035
1    A.    I believe 30 days, yes.

2    Q.    Do you have any understanding as to whether

3    or not Mr. Goulet's grievance was filed with any

4    committee?

5    A.    No, I don't.

6    Q.    I think you told me the month, but do you

7    recall what your last day -- the last date was in

8    your role as a business agent for Local 25?

9    A.    May 2, 2003.

10   Q.    Did someone take over your role, shall we

11   say, on May 3rd of 2003, to your knowledge and

12   understanding?

13   A.    Take over my role?

14   Q.    Yes.

15   A.    Which role?  Would you be specific.

16   Q.    As business agent for Local 25.

17   A.    As a business agent?

18   Q.    Yes.

19   A.    I can't say exactly who took over my

20   positions at that time, but there were people that

21   were named as business agents following May 2nd.

22   Q.    Who took over for New Penn?

23   A.    I'm not sure.  I don't know who has New

24   Penn now.

00036

1  Q.   Prior to leaving office on May 2, 2003, did

2  you have certain grievance files that you were

3  responsible for?

4  A.   Grievance files?

5  Q.   Yes.

6  A.   I suppose I had grievance files in my

7  drawer.

8  Q.   Did you do anything to transfer

9  responsibility of those grievance files to anyone

10  else in Local 25?

11  A.   No.

12  Q.   Did anyone from Local 25 come to you in the

13  days and weeks before May 2, 2003 and ask for any of

14  your grievance files?

15  A.   No.

16  Q.   Did anyone from Local 25 and the days and

17  weeks before May 2, 2003 ask to be updated as to any

18  information pertaining to any outstanding

19  grievances?

20  A.   No.

21  Q.   Did you have a physical office at the

22  headquarters of Local 25 immediately prior to May 2,

23  2003?

24  A.   Yes.

00037
1   Q.   Did you have a desk?

2   A.   Yes.

3   Q.   Did you maintain at that desk copies of

4   active grievances?

5   A.   No.

6   Q.   Did you maintain anyplace copies of active

7   grievances?

8   A.   I had a secretary.  She maintained the

9   files.

10  Q.   What was the name of that secretary as of

11  May 2, 2003?

12  A.   Who was doing it back then...  We changed

13  around pretty often.  The only records they had were

14  those that were in the computer for filing cases and

15  so on.  If there was an active case, there would be

16  a filing maintained in the front office there.

17  Somebody out there would have it.

18  Q.   Let me make sure I understand what you are

19  telling me.

20  Local 25 headquarters had a computer system

21  or computer program that tracked active grievances;

22  is that what you are telling me?

23  A.    No, I'm not telling you that at all.  I'm

24  telling you that the secretary would file the case

00038
 1   with the committee.  She would have a physical copy
 2   of the filing.  She would have a hard copy of the
 3   filing that she would keep with her records.
 4   Let me explain something to you.
 5   Q.    Please.
 6   A.    As far as files for grievances or for
 7   cases, it depends on the individual agent.  There's
 8   no written method for doing this, okay?  There's no
 9   actual way to describe how each and every agent does
10   it.  They do it on their own.
11   We put our own cases together.  We don't
12   hire lawyers to put our cases on for us.  We do it
13   ourselves.  When and how you do it is up to you.
14   Some agents have more cases than others.  I didn't
15   have too many cases, in the end.
16   Q.    In April of 2003, what was your methodology
17   in terms of handling the actual files relating to
18   active grievances?
19   A.    If I had an active grievance, I would leave
20   it with my secretary.  If I had to go meet with the
21   company, I would get the copies and I would go.
22   When the case was done and I was finished, that was
23   it.
24   Q.    When you say your secretary, was this a

00039
1    personal secretary to you?

2    A.    No, no.  We had a pool of secretaries.  It

3    could have been any one of them out in the front

4    office.

5    Q.    How many secretaries do you recall were out

6    in the front office?

7    A.    Five or six.

8    Q.    Is it your testimony that it was the

9    responsibility of one of the secretaries to file a

10   grievance with the committee in a timely manner if

11   it was not resolved with the company?

12   A.    It was the agent's responsibility.  He

13   would give it to the secretary.  She would file it

14   on his behalf.

15   Q.    With regards to Mr. Goulet's grievance, the

16   one that's the third page attached to Exhibit 7, did

17   you give it to any secretary to file with the

18   committee?

19   A.    No.  I forwarded the grievance to New Penn

20   Motors Express.

21   Q.    By forwarding it, are you referencing any

22   action other than the cover sheet that is the first

23   page of Exhibit No. 7?

24   A.    No.  I forwarded the grievance to New Penn

00040
1    Motor Express.

2    Q.    Did you do anything else with regard to

3    that grievance?

4    A.    Not at that time.

5    Q.    At any time did you do anything further?

6    A.    No.

7    Q.    Did you ever get a response?

8    A.    Not that I recall.

9    Q.    Is it fair to say that as of the last date

10   that you served as a Local 25 business agent, May 2,

11   2003, you were still waiting for a response from New

12   Penn Motor Express to Mr. Goulet's grievance?

13   MR. GLUEK:  Objection.

14   A.    Yes.

15   Q.    Other than the communications you have

16   already testified to, do you recall any other

17   communications or discussions with anyone else

18   pertaining to Mr. Goulet's situation and grievance?

19   A.    Not really.  I spoke to Mark Harrington, as

20   I stated earlier.  I spoke to Craig Goulet I think

21   more than one time.  There may have been another

22   occasion for a call.  I spoke probably to George

23   Cashman.  I forwarded the grievance.  It went out

24   under George's cover.

00041

1    Q.    Do you know a person by the name of "John

2    Murphy?"

3    A.    Yes.

4    Q.    Could you identify for the record who John

5    Murphy is.

6    A.    Business agent of Local 25.

7    Q.    Did you ever speak to Mr. Murphy about

8    Mr. Goulet's grievance?

9    A.    I don't recall if I did.

10    Q.    Do you know an RL Schaffer?

11    A.    Yes.

12    Q.    Who is Mr. Schaffer?

13    A.    The company cosecretary to the committee.

14    Q.    Do you ever recall speaking with

15    Mr. Schaffer about Mr. Goulet's grievance?

16    A.    I believe I did, but I don't recall what

17    the conversation was.

18    Q.    Do you recall if that was a face-to-face

19    conversation or a telephone conversation, or some

20    other form of communication?

21    A.    It was probably face to face at a hearing.

22    Q.    Do you recall having a hearing on

23    Mr. Goulet's grievance?

24    A.    There was a hearing -- not on this

00042
1   grievance, no.

2   Q.   Let me ask the question again.   In terms of

3   Mr. Schaffer, do you recall having communications

4   then with him concerning this particular grievance?

5   A.   I'm not sure if I did.   I may have.

6   Q.   Do you know a Dan Schmidt?

7   A.   Yes.

8   Q.   Who is Mr. Schmidt?

9   A.   He's a vice president of New Penn.

10  Q.   Do you recall whether or not you had any

11  communications with Mr. Schmidt pertaining to this

12  grievance by Mr. Goulet?

13  A.   I may have.

14  Q.   Do you have any particular recollection?

15  A.   I really don't.

16  Q.   Under the applicable labor agreement, is

17  there a time limit for an employee filing a

18  grievance?

19  A.   Yes, there is.

20  Q.   If you believed a grievance had been filed

21  by the employee or raised by the employee that was

22  untimely, would you forward it to the company?

23  A.   It would depend on the circumstances.

24  Q.   What circumstances would affect your

00043
1  decision?

2  A.   Well, the company may have been aware of

3  what was going on with this grievance beforehand and

4  wouldn't exercise anything about it, and at some

5  point we would write up a grievance and say, "Hey,

6  come on, acknowledge it."

7  It depends on the relationship with the

8  agent of the company.  Let's put it that way.

9  Q.   What was your relationship like with the

10  agent of New Penn Motor Express?

11  A.   I lasted there over 20 years, so it was not

12  too bad.  We got along.  We worked things out.  We

13  had a pretty good relationship.  We had an

14  understanding with each other.

15  I was a busy guy.  The managers at New Penn

16  were busy guys.  You know, they had to run a

17  business.  There were times they couldn't just stop

18  with what business they were doing to sit down to

19  have a hearing.  We would extend those time periods.

20  We mutually agreed to do that, too.

21  There were times things dragged on for

22  several months.  Then we would sit down and finally

23  put it to bed, you know, whether we did it on their

24  time, my time, at the end of day or whatever, and

00044

1    keeping the manager there late, keeping the

2    employees over, we would do that.

3    That's the way the relationship went.  It

4    was a pretty good relationship for a number of

5    years.  I think I probably have met most of the

6    people in that company.

7    Q.   When you forwarded this particular

8    grievance by Mr. Goulet, did you consider it to be

9    untimely?

10   A.   No, I didn't.  I was not aware of all the

11   facts in the case really.  I believe there had been

12   a hearing prior, and I didn't know what the

13   situation was.  All I knew is Mr. Goulet was

14   attempting to get back to work at New Penn Motor

15   Express based on the agreement.

16         (Document marked as Carnes

17         Exhibit 8 for identification)

18   Q.   Mr. Carnes, I'm showing you Exhibit 8,

19   which purports to be a letter to the Great Members

20   of Teamsters Local 25 dated April of 2003,

21   purporting to be over your signature and

22   Mr. Cashman's.

23   I'm simply going to ask you, is that your

24   signature on the bottom right?

00045
1    A.    Uh-huh.

2    Q.    Is that yes?

3    A.    No, it's not my signature, but I agreed to

4    have somebody sign it.

5    Q.    What was your understanding of the status

6    of Mr. Goulet's grievance then as of the time -- as

7    of May 2, 2003?

8    A.    I hadn't heard back.

9    MR. LATHROP:  Let me take a few minutes to

10   see where we're at.

11   (Recess)

12        BY MR. LATHROP:

13   Q.    With regard to Mr. Goulet's grievance that

14   was attached to Exhibit 7, do you have any

15   recollection that the company and the union agreed

16   to any extension of the timelines within which

17   actions had to be taken?

18   A.    No, I don't.

19   Q.    Is it your recollection that the time limit

20   under the collective bargaining agreement for filing

21   with the appropriate grievance committee is based

22   upon when the company receives -- sorry -- when the

23   union receives a response from the company?

24   A.    That's always been my understanding.

00046

1  Q.   We can mark this as an exhibit if need be,

2  but I would like to show you -- and I will certainly

3  show counsel at the table -- a section of the

4  National Master Freight Agreement and New England

5  Supplemental Agreement for the period of April 1,

6  1998 through March 31, 2003, Article 7, Section 2,

7  Paragraph 9.

8  On this copy it's actually highlighted.

9  I'll read it to you and ask you some questions about

10  it, Mr. Carnes.

11  "Unless mutually agreed by the local union

12  and the company, the local union shall file all

13  approved grievances with the appropriate grievance

14  committee or association for a decision no later

15  than 30 days after the date the local union receives

16  the grievance."

17  First, did I read that correctly?

18  A.   Yes, you did.

19  Q.   Was that your understanding, that the

20  obligation to file the grievance with the

21  appropriate committee was based on 30 days after the

22  local union received the grievance?

23  A.   That's to file the case with the national

24  committee.  Article 7 holds jurisdiction under the

00047
1    National Freight agreement.

2    This grievance was filed under Article 5,

3    which is the National Freight agreement, and also

4    Article 43, which is seniority.  The Article 43

5    would probably supersede the National because it's

6    under the supplement and we were waiting to hear

7    back from the company before we took action.

8    Q.    Can you show me where in this document

9    different time limits other than what I read would

10   be arguably applicable?

11   A.    No, I can't.

12   Q.    Why is that?

13   A.    Because I don't think there are any.  It's

14   by mutual agreement between the company and the

15   agent.

16   Q.    Again, I'm not nearly as familiar with this

17   agreement as you may be, sir.  Are you aware of in

18   terms of the processing of a grievance any other

19   section other than Article 7, Section 2 that

20   specifies the time limits within which grievances

21   such as Mr. Goulet's must be processed?

22   A.    I can't think of any in the contract, but I

23   have not dealt with it for a few years either.

24   Q.    I understand.  Is there any source other

00048
1  than the contract that specifies the time limits for

2  filing grievances such as Mr. Goulet's?

3  A.   The only other place I can think about

4  would be the rules of procedures under the

5  committees.

6  Q.   Did the Southern New England Joint Area

7  Committee have its own rules of procedure?

8  A.   Yes.

9  Q.   Do you have any specific recollection of

10  those rules specifying time limits for filing

11  grievances with such a committee?

12  A.   There were rules.  I don't recall exactly

13  what they were.

14  Q.   Do you have a recollection as to when you

15  received Mr. Goulet's grievance, again, that being

16  Page 3 of Exhibit 7?

17  A.   Do I recall when I received it?

18  Q.   Correct.

19  A.   No.

20  Q.   Is it fair to say you received it sometime

21  between April 7th and April 18, 2003?

22  A.   I would say I received it before

23  April 18th because it was sent on.

24  Q.   Do you have any understanding as to whether

00049

1    or not this grievance was docketed with any

2    committee by May 18, 2003?

3    A.    No, I don't.

4    Q.    Again, your tenure ended May 2, 2003?

5    A.    That's right.

6    MR. LATHROP:  I have no further questions.

7    CROSS EXAMINATION

8        BY MR. GLUEK:

9    Q.    Sir, my name is Carl Gluek.  I represent

10   the employer, New Penn.

11   Do you have any personal animosity against

12   Mr. Goulet?

13   A.    No, I don't.

14   Q.    Do you have any ill will towards him?

15   A.    No, I don't.

16   Q.    Do you have any prejudice towards him?

17   A.    No, I don't.

18   Q.    Do you have any desire to see him harmed in

19   any way?

20   A.    No, sir.

21   Q.    Are you aware of anybody at Local 25 that

22   has any animosity towards Mr. Goulet?

23   A.    No, sir.

24   Q.    Are you aware of anybody at Local 25 that

00050

1    has any prejudices against Mr. Goulet?

2    A.    No, sir.

3    Q.    Do you know of anybody at Local 25 that

4    would like to see ill will suffered upon

5    Mr. Goulet?

6    A.    No, sir.

7    Q.    With respect to the agreement, which has

8    been identified as Exhibit 1, is it your

9    understanding that the employees of APA had an

10   obligation to advise the union that they wanted to

11   be on this call list?

12   MR. LATHROP:  Objection.

13   A.    (No response)

14   Q.    Do you know one way or the other?

15   A.    I really don't.

16   Q.    Do you know under the agreement, Exhibit 1,

17   that the union had an obligation to forward the

18   names of APA employees that wanted to be on a call

19   list?

20   A.    Correct.

21   Q.    Were you aware that under Exhibit 1, there

22   was a time period within which the union was to

23   forward those names?

24   MR. LATHROP:  Objection.

00051

1   A.    I believe so.

2   Q.    Do you know if Mr. Goulet's name was ever

3   forwarded to New Penn under the timeline set forth

4   in Exhibit 1?

5   A.    I don't know.

6   Q.    Are you aware of a grievance that

7   Mr. Goulet had with his prior employer, APA?

8   A.    I'm aware of it, yes, I am.

9   Q.    Are you aware that it went to hearing?

10  A.    Yes, I am.

11  Q.    Were you a part of that hearing?

12  A.    I was not a part of the hearing, but I was

13  there.

14  Q.    You were physically there?

15  A.    Yes.

16  Q.    At the hearing, is the decision announced

17  then and there?

18  A.    No.

19  Q.    Were you ever aware of what the decision

20  was?

21  A.    Yes.

22  Q.    Am I correct in saying that the decision

23  was that "Upon submitting acceptable documentation

24  to APA of his ability to return to unrestricted

00052
1    duties, plaintiff shall serve a ten-day suspension"?

2    MR. LATHROP:  Objection.

3    A.    Yes, sir.

4    Q.    Are you aware that that was the decision?

5    MR. LATHROP:  Objection.

6    A.    Yes, sir.

7    Q.    And that the decision went on to say, "Upon

8    completion of the suspension, he shall be reinstated

9    to the seniority listed in his original position"?

10   MR. LATHROP:  Objection.

11   A.    Yes.

12   Q.    Do you know if Mr. Goulet ever submitted

13   the acceptable documentation to APA of his ability

14   to return to unrestricted duties?

15   A.    No, I don't.

16   Q.    Do you know if Mr. Goulet ever served a

17   ten-day suspension?

18   A.    No, I don't.

19   Q.    Do you know if Mr. Goulet was ever returned

20   to the seniority list at APA?

21   A.    No, I don't.

22   Q.    You testified that you had a conversation

23   with John, last name unknown, who was a terminal

24   manager at New Penn?

00053
```
 1   A.   I believe it was John at the time, but I'm

 2   not sure.

 3   Q.   Do you recall approximately when that was?

 4   Was that around when the grievance was filed?

 5   A.   I don't remember.

 6   Q.   You don't remember one way or the other?

 7   A.   No.

 8   Q.   Do you know why John said, excuse me for

 9   the expression, "Fuck you"?

10   MR. LATHROP:  Objection.

11   A.   That was his makeup.

12   Q.   Do you know why he didn't agree with your

13   position?

14   MR. LATHROP:  Objection.

15   A.   No, I don't.

16   Q.   Did he give any rationale?

17   A.   No, he didn't.

18   Q.   What did you discuss with John?

19   A.   If it was John -- let's qualify that -- I

20   approached him with the idea that Mr. Goulet wanted

21   to be put on the seniority list in his rightful

22   spot, so and so forth.  That was from the

23   conversation with Mr. Goulet.

24   All I did was follow up with that
```

00054
1    conversation and attempt to solve the mystery that

2    was going on.

3    I'm pretty sure it was John.  That would be

4    his answer, yes.

5    Q.   Was this after the time period that the

6    union was supposed to have forwarded the seniority

7    list to New Penn?

8    A.   I don't know.

9    Q.   You don't know one way or the other?

10   A.   No.

11   Q.   Do you have anything that would refresh

12   your recollection on that?

13   A.   Not really.

14   MR. GLUEK:  I have nothing further.

15   CROSS EXAMINATION

16      BY MS. PENNINI:

17   Q.   Mr. Carnes, when you said that you were

18   unsure of Mr. Goulet's grievance because you were

19   uncertain of issues relating to a prior arbitration,

20   were you referring to the arbitration that

21   Mr. Gluek just questioned you about?

22   A.   Uh-huh.

23   Q.   What were you unsure of as related to that

24   prior arbitration?

00055
1   A.   Well, I don't know what happened after the

2   arbitration, you know, whether the decision was

3   complied with or not.  I don't know.  I didn't know.

4   Q.   If the decision had not been complied with,

5   do you believe that Mr. Goulet had a valid grievance

6   with New Penn?

7   MR. LATHROP:  Objection.

8   A.   If he didn't comply with the decision,

9   based on the rules of the committee, he would not

10  have a valid grievance.

11  Q.   At the time you filed the grievance, were

12  you aware of whether he had complied with the terms

13  of the October 2001 decision?

14  A.   I really wasn't, no.

15  MS. PENNINI:  That's all I have.

16              (Whereupon the deposition

17              was concluded at 11:25 a.m.)

18

19

20

21

22

23

24

```
00056
  1   C E R T I F I C A T E
  2        I, WILLIAM H. CARNES, do hereby certify that I
  3   have read the foregoing transcript of my testimony,
  4   and further certify under the pains and penalties of
  5   perjury that said transcript (with/without)
  6   suggested corrections is a true and accurate record
  7   of said testimony.
  8        Dated at _____, this _____ day of _____,
  9   2005.
 10
 11                        _____
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
```

```
00057
 1   COMMONWEALTH OF MASSACHUSETTS)
 2   SUFFOLK, SS.              )
 3      I, Ken A. DiFraia, Registered Professional
 4   Reporter and Notary Public in and for the
 5   Commonwealth of Massachusetts, do hereby certify
 6   that there came before me on the 8th day of Sept.,
 7   2005, at 10:04 a.m., the person hereinbefore named,
 8   who was by me duly sworn to testify to the truth and
 9   nothing but the truth of his knowledge touching and
10   concerning the matters in controversy in this cause;
11   that he was thereupon examined upon his oath, and
12   his examination reduced to typewriting under my
13   direction; and that the deposition is a true record
14   of the testimony given by the witness.
15      I further certify that I am neither attorney or
16   counsel for, nor related to or employed by, any
17   attorney or counsel employed by the parties hereto
18   or financially interested in the action.
19      In witness whereof, I have hereunto set my hand
20   and affixed my notarial seal this _____ day of
21   September, 2005.
22             _____
23                  Notary Public
24           My commission expires 4/3/09
```

00001

```
                              Volume I
                              Pages 1 to 76
                              Exhibits 1 to 12
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - -x
:
CRAIG GOULET,                 :
          Plaintiff,          :
:
      vs.                     :  Civil Action
:                                No. 04-12577 JLT
NEW PENN MOTOR EXPRESS, INC:;
and TEAMSTERS LOCAL 25,       :
INTERNATIONAL BROTHERHOOD O:
TEAMSTERS,                    :
          Defendants.         :
:
- - - - - - - - - - - - - - - -x
```

        DEPOSITION OF MARK A. HARRINGTON, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Scott A. Lathrop & Associates,
122 Old Ayer Road, Groton, Massachusetts, on
Wednesday, October 12, 2005, commencing at
10:15 a.m.

PRESENT:
    Scott A. Lathrop & Associates
        (by Scott A. Lathrop, Esq.)
        122 Old Ayer Road, Groton, MA 01450,
        for the Plaintiff.
    Frantz Ward LLP
        (by Carl H. Gluek, Esq.)
        2500 Key Center, 127 Public Square,
        Cleveland, OH 44114-1230, for the Defendant
        New Penn Motor Express, Inc.

(Continued on Next Page)

```
00002
     PRESENT:  (Continued)
          Dwyer, Duddy and Facklam
               (by Kathleen A. Pennini, Esq.)
               Two Center Plaza, Suite 430, Boston, MA
               02108-1804, for the Defendant Teamsters
               Local 25, International Brotherhood of
               Teamsters.
     ALSO PRESENT:  Craig Goulet
       *  *  *  *  *
```

```
00003
    I N D E X
    WITNESS          DIRECT   CROSS    REDIRECT   RECROSS
    MARK A. HARRINGTON
     BY MR. LATHROP   5                 61
     73
    74
     BY MR. GLUEK              52                  69
     BY MS. PENNINI            58                  72
    73
    * * * *
    E X H I B I T S
    NO.         DESCRIPTION                PAGE
     1Memo to Local 25 and others dated     11
    2/14/05
     2Agreement between TNFINC and New      13
    Penn Motor Express, Inc., dated
    2/13/02
     3Summary of agreement between TNFINC   14
    and New Penn Motor Express, Inc.
     4Employee list for Canton terminal     20
     5Letter to Irene from George Cashman   22
    dated 2/22/02, with attached list
     6Letter to Dan Schmidt from George     24
    Cashman dated 2/28/02, with
    enclosure
     7Handwritten grievance dated 4/7/03    28
     8Handwritten letter to Mark dated      31
    7/25/03
```

```
00004
      E X H I B I T S, Continued
      NO.         DESCRIPTION              PAGE
       9Southern New England Joint Area       33
      Committee prehearing information
       1Letter to Mark Harrington from Craig   35
      Goulet dated 11/24/03
       1Eastern Region Joint Area Committee    36
      grievance form dated 4/20/04
       1Letter to Gentlemen from Mark          38
      Harrington dated 7/22/04, with
      attachments
       *  *  *  *
```

00005
 1  P R O C E E D I N G S

 2  MR. LATHROP:  Same stipulations as with

 3  Mr. Francey's deposition?

 4  MS. PENNINI:  Yes, read and sign, 45 days.

 5  Save objections, except as to form, and motions to

 6  strike.

 7  MARK A. HARRINGTON

 8  a witness called for examination by counsel for the

 9  Plaintiff, having been satisfactorily identified by

10  the production of his driver's license and being

11  first duly sworn by the Notary Public, was examined

12  and testified as follows:

13  DIRECT EXAMINATION

14      BY MR. LATHROP:

15  Q.   Good morning, sir.

16  A.   Morning.

17  Q.   Could you please state your full name and

18  address for the record.

19  A.   Mark Arthur Harrington.

20  Q.   Your address, sir?

21  A.   It's 86 Briarwood Drive, Hanover,

22  Massachusetts.

23  Q.   What is your date of birth?

24  A.   4/28/54.

00006

1  Q.   Are you a member of Local 25 for the

2  Teamsters?

3  A.   Yes.

4  Q.   When did you first become a member?

5  A.   1977.

6  Q.   Under what circumstances did you become a

7  member?

8  A.   I was employed by St. Johnsburry Trucking

9  Company in Cambridge, Massachusetts.

10  Q.   How long were you employed by

11  St. Johnsburry in Cambridge?

12  A.   Until 1991.

13  Q.   What happened at that time?

14  A.   I was elected into office, Teamsters

15  Local 25.

16  Q.   What office were you elected into?

17  A.   Trustee.  I was appointed to be a field

18  representative and organizer.

19  Q.   How long did you remain a trustee?

20  A.   I remained a trustee until 2002.  I was

21  also elected business agent in 1994.  I served as a

22  trustee and as a business agent from 1994 until

23  2002.

24  Q.   As of 1994, when you became a business

00007
 1    agent, did you cease being a field representative

 2    and organizer?

 3    A.    Yes, but the functions of the field

 4    representative and the business agent are pretty

 5    much the same.  In 1991, I represented -- basically

 6    I functioned as a business agent.  It was just that

 7    it was not an elected position.  The trustee was an

 8    elected position.

 9    Q.    I lost you.  When you became a business

10    agent, was that an elected position?

11    A.    I was elected to two positions, trustee,

12    then business agent.

13    Q.    You remained a business agent through some

14    point in 2002?

15    A.    Uh-huh.

16    Q.    That's yes?

17    A.    Yes.

18    Q.    Did you have any positions with Teamsters

19    Local 25 thereafter?

20    A.    I became the secretary treasurer.

21    Q.    When did you become the secretary

22    treasurer?

23    A.    2002.

24    Q.    Is that your current position?

00008
1   A.   It is.

2   Q.   What were your duties as a business agent

3   for Local 25?

4   A.   I negotiated contracts, handled grievances,

5   arbitrations, et cetera.

6   Q.   Were you assigned a certain geographical

7   area or certain employers?

8   A.   Certain employers, certain crafts.

9   Q.   Throughout your tenure as a business agent,

10  were you assigned to the same crafts, or did it

11  change?

12  A.   It changes from term to term, depending on

13  people, you know, retiring within the organization,

14  reassignments by the principal officer.

15  Q.   What crafts did you represent originally?

16  A.   I represented the laundry division, I

17  represented healthcare, car rental, car haul,

18  building materials, tank haul, freight, public

19  sector, maintenance, oil, heating oil division,

20  office clerical, and whatever else I was assigned

21  to.

22  That's probably pretty much the gamut of

23  what we had.

24  Q.   Are you familiar with a company called "APA

00009
1    Transport"?

2    A.    Yes.

3    Q.    Did you have any responsibility with regard

4    to APA Transport?

5    A.    I took over for them as business agent I

6    think around 1994 because the fellow that handled

7    that retired.  He was an APA employee, and then when

8    he came on to the job, he was assigned to APA.  His

9    name is Ed Sheehan.  When he retired as a field

10   representative, George Cashman assigned me over to

11   APA.

12   Q.    How long did you continue to represent or

13   deal with APA?

14   A.    Right up until the closure.

15   Q.    Are you familiar with a company called "New

16   Penn Motor Express"?

17   A.    Yes.

18   Q.    Did you ever have any responsibilities with

19   regard to New Penn Motor Express?

20   A.    Starting in 2002, May.

21   THE WITNESS:  I guess Billy left in 2002,

22   right?

23   A.    I'm just trying to get my years right.

24   Q.    Are you referring to a time when

00010
 1   Mr. Cashman left?

 2   A.   Yes.

 3   Q.   You said George?

 4   A.   Uh-huh.

 5   Q.   Is that yes?

 6   A.   Yes.

 7   Q.   You are saying at the time Mr. Cashman left

 8   is when you assumed responsibilities for New Penn

 9   Motor Express?

10   A.   Well, when Mr. Carnes left.

11   Q.   Mr. Cashman and Mr. Carnes left at the same

12   time, did they not?

13   A.   That's correct.

14   Q.   Had Mr. Carnes previously been responsible

15   for New Penn Motor Express?

16   A.   Yes.

17   Q.   Are you familiar with the plaintiff in this

18   case, Craig Goulet?

19   A.   Yes.

20   Q.   When did you first meet Mr. Goulet?

21   A.   Mr. Goulet came across to me when he

22   reached out and told me he had settled his workers'

23   comp case or he was no longer on workers' comp and

24   he wanted to have his discharge case heard.

00011
1    Q.    This was with regard to a discharge from

2    APA Transport?

3    A.    Yes.

4    Q.    Did you handle that case?

5    A.    Yes.

6    Q.    Do you recall the result of that case?

7    A.    He was reinstated pending certain

8    stipulations.

9    Q.    At some point in time, APA Transport

10   closed, did it not?

11   A.    Yes.

12   Q.    How did you come to learn that APA

13   Transport was going to close?

14   A.    Well, Bill Carnes had been notified by

15   representatives of Eastern Region vis-a-vis TNFINC,

16   and then Mr. Carnes then contacted me.  That's how I

17   was notified.

18   Q.    Mr. Carnes was what?

19   A.    Billy was the chairman of the Southern New

20   England Joint Area Committee.  He was notified

21   because he handled -- I believe he was notified

22   because he handled the locals under that umbrella.

23        (Document marked as Harrington

24        Exhibit 1 for identification)

00012
 1    Q.   I'm showing you what was marked as Exhibit
 2    No. 1 in your deposition.  This purports to be a
 3    memo to Local Union 25 and others dated February 14,
 4    2002.  Have you seen this document before this
 5    litigation?
 6    A.   (Examines document)  I may have.  I don't
 7    recall specifically.  It was part of the packet I
 8    guess that was given to us regarding the settlement
 9    with APA.
10    Q.   Do you have any specific recollection of
11    seeing this around February 14, 2002?
12    A.   No.
13    Q.   This document references that each local
14    union with APA Transport members is requested to
15    conduct a secret ballot ratification vote.  Do you
16    see that reference in the middle of the first
17    paragraph?
18    A.   (Examines document)  Uh-huh.
19    Q.   Do you recall whether or not there was, in
20    fact, a ratification vote by Local 25?
21    A.   I recall we had a meeting with the members.
22    I don't recall specifically if we had a ratification
23    vote.
24    Q.   This document references that there should

00013

1    be a ratification vote on February 16, 2002.  Is

2    that when the meeting you recall occurred?

3    A.    Yes.

4    Q.    Where did that meeting take place?

5    A.    At the Local 25.

6    Q.    Do you recall what terminals of APA

7    Transport were covered by Local 25?

8    A.    Canton, Massachusetts; Dracut,

9    Massachusetts.

10    Q.    Before we talk about that particular

11    meeting, let's look at a couple of more documents.

12           (Document marked as Harrington

13           Exhibit 2 for identification)

14    Q.    Mr. Harrington, I'm showing you what was

15    marked as Exhibit 2 to your deposition, which

16    purports to be a February 13, 2002 agreement between

17    the Teamsters National Freight Industry Negotiating

18    Committee and New Penn Motor Express, Inc.

19    Have you seen this document before?

20    A.    (Examines document)  Yes.

21    Q.    Did you see it on or about February 13,

22    2002?

23    A.    Yes.

24    Q.    Did you see it prior to the union meeting

00014
1   that you said took place on February 16, 2002?

2   A.    Probably.

3        (Document marked as Harrington

4        Exhibit 3 for identification)

5   Q.    I'm showing you what was the marked as

6   Exhibit 3, which purports to be a summary of the

7   tentative agreement between TNFINC and NPME as a

8   result of the closure of APA operations.  Are you

9   familiar with this document?

10  A.    (Examines document)  Yes.

11  Q.    Did you see this also around the same time

12  of February 13th through February 16 of 2002?

13  A.    More than likely.

14  Q.    Was this document handed out at the meeting

15  on February 16, 2002?

16  A.    Yes.

17  Q.    Going back, looking at Exhibit 1, the

18  February 14, 2002 memo, if you look at the second

19  page, it refers to an "enclosure of a current

20  seniority roster for your APA terminal."  Do you

21  remember seeing at or prior to the February 16, 2002

22  meeting a seniority list covering Dracut and/or

23  Canton?

24  A.    No.

00015

1    Q.    As a result of being advised by Mr. Carnes

2    that APA was going to be closed, what, if anything,

3    did you do?

4    A.    At that particular moment?  I don't quite

5    understand the question.

6    Q.    You testified that Mr. Carnes notified you

7    that APA was going to be closed, correct?

8    A.    Yes.

9    Q.    As a result of receiving that information,

10   did you do anything?

11   A.    Well, we got notified, you know, within --

12   well, this is dated February 14th.  We were notified

13   the 15th, or thereabouts.  We were told to have a

14   meeting on the 16th.  We had like one day's notice.

15   We notified the stewards.  We really didn't

16   have time to send out a letter.  I don't recall if I

17   went to the terminals or not.  We got the word out

18   we were having a meeting that Saturday.  That was

19   that.

20   We received the documents.  We went through

21   them the best we could.  It was very, very short

22   notice.  Obviously we were under pressure to get

23   this done, as you can see by the timeline we were

24   on.  We just did the best we could to get everybody

00016
```
 1   at the meeting.

 2   Q.    Did you attend this meeting?

 3   A.    Yes.

 4   Q.    Do you recall who among the Local 25

 5   officials was present besides yourself, if anyone?

 6   A.    Bill Carnes, George Cashman, probably as

 7   many people that were able to attend.  Obviously it

 8   was a big group.

 9   We also I believe had some people in from

10   unemployment to help facilitate people receiving

11   unemployment benefits.

12   Q.    What do you recall being said and done at

13   this meeting?

14   A.    The packets were handed out.

15   Q.    What were the packets that were handed out?

16   A.    What you just provided me.

17   Q.    I provided you with several documents.

18   A.    They were all handed out.

19   Q.    Exhibits 1, 2 and 3 were handed out?

20   A.    Probably not Exhibit 1, but Exhibits 2 and

21   3 were because it was the agreement with APA

22   regarding the closure.  Then it was the agreement

23   with New Penn regarding work opportunity.

24   Q.    What else was said during this meeting, and
```

00017

1   done?

2   A.   Just went over this information, and,

3   again, we had I believe the people from unemployment

4   give a presentation.

5   We went over the documents regarding

6   closure and any work opportunity that may come as a

7   result of the New Penn settlement.

8   Q.   Do you remember if any vote actually took

9   place?

10   A.   I don't recall.

11   Q.   Under the agreement with New Penn, APA

12   drivers could choose a terminal to work out of,

13   correct?

14   A.   Yep.

15   Q.   That's a yes?

16   A.   Yes.

17   Q.   Was that discussed at this meeting?

18   A.   Yes.  That was part of the agreement.

19   Q.   Do you recall if there was any discussion

20   about individual APA employees and their preferences

21   as to which New Penn terminal, if any, they wanted

22   to work out of?

23   MR. GLUEK:  Objection.

24   A.   We just outlined the agreement and went by

00018
1    what the agreement said.

2    Q.    Did anyone solicit from the Local 25

3    members their New Penn preferences at this meeting,

4    if you recall?

5    A.    Well, we did over the course of some time.

6    It might have been some done at that meeting, but,

7    you know, over the few days -- as it being a

8    Saturday, we didn't have the clerical staff in

9    there, so we had a couple of days, because not

10    everyone was present at the meeting.

11    It was short notice.  I mean, I believe the

12    stewards over the course of a few days after the

13    meeting tried to compile a list.

14    Q.    Were you involved at all in the effort of

15    compiling a list as to APA drivers and employees and

16    their preferences?

17    A.    No.

18    Q.    It's your understanding it was the

19    stewards' responsibility to ascertain that

20    information?

21    A.    Yes.

22    Q.    Who were the stewards for the different APA

23    terminals?

24    A.    I believe at the time Doug Francey in

00019
1    Canton.  I think it was Rich Johnson for Dracut.

2    Q.   At some point in time, did Mr. Francey

3    indicate what the preferences were for the APA

4    employees at the Canton terminal?

5    A.   I believe he did.

6    Q.   Did he let you know what those preferences

7    were?

8    A.   No.

9    Q.   What is your understanding as to what

10   Mr. Francey did with regard to the information as to

11   the APA Canton employees and their terminal

12   preferences?

13   A.   I believe he polled the people and

14   forwarded that information to our office, to our

15   clerical staff, compiling the list and trying to get

16   it together and get it to the region.

17   Q.   Did you ever see a list compiled by

18   Mr. Francey?

19   A.   I don't recall.

20   Q.   At the union meeting, do you recall if

21   Mr. Goulet was discussed?

22   A.   I don't believe he was, no.

23   Q.   Do you recall any discussion about

24   Mr. Goulet's placement on the seniority list?

00020
1    A.    At that meeting?

2    Q.    Yes.

3    A.    No.  There was no discussion.

4    Q.    Do you recall at any time around the APA

5    closure there being any discussion concerning

6    Mr. Goulet being on the APA seniority list?

7    A.    I don't recall.

8          (Document marked as Harrington

9          Exhibit 4 for identification)

10   Q.    Mr. Harrington, I'm going to show you what

11   was marked as Exhibit 4 in your deposition, and I

12   would ask you whether or not you recognize that

13   document?

14   A.    (Examines document)  Well, I do recognize

15   the names on the document.

16   Q.    What do you recognize those names as?

17   A.    It's pretty blurry, but they look to be

18   employees of APA.  I can't tell if -- it's going to

19   take me a moment to look through it.  It looks like

20   a list for Canton.

21   Q.    Have you ever seen this document before?

22   A.    I might have.

23   Q.    You are not certain?

24   A.    Right.  I mean, this process was being done

00021

1    by the stewards.  There were a lot of documents

2    going through the office at the time.  I may or may

3    not have looked at it.

4    I acknowledge it is a list of employees at

5    the Canton terminal, though.

6    Q.    Do you have any recollection of Mr. Francey

7    giving this document to you?

8    A.    No.

9    Q.    Around the time of the APA closure, do you

10   recall seeing any documents that listed the APA

11   employees' preference with regard to New Penn

12   terminals?

13   A.    No.

14   Q.    What is your understanding as to what

15   happened with the steward's list of APA employees'

16   preferences?

17   A.    They were provided to our office clerical.

18   Then they, in turn, were forwarded to the Eastern

19   Region because the Eastern Region had to coordinate

20   it and turn it over to New Penn to start the calling

21   process.

22   Q.    What is the basis for your understanding

23   that that's the way the lists were handled?

24   A.    It's my personal knowledge.

00022

1    Q.    How did you come to have that personal

2    knowledge?

3    A.    Discussions within the office.  I mean, the

4    office manager, you know, coordinating the sending

5    of the list:  "Mark, I'm sending the list to Dan

6    Virtue."  "Okay."

7    Q.    Who was the office manager that so told you

8    that?

9    A.    Probably Sheila McLaughlin.

10    Q.    Is Ms. McLaughlin still an employee of

11    Local 25?

12    A.    Yes.

13    Q.    In what capacity is she employed?

14    A.    Office manager.

15    Q.    She was the office manager in February

16    2002?

17    A.    I'm not sure if she was at that time, but

18    for the sake of the term, probably the head

19    secretary.

20          (Document marked as Harrington

21          Exhibit 5 for identification)

22    Q.    I'm now showing you Exhibit 5,

23    Mr. Harrington, which purports to be a fax cover

24    sheet with five pages of an attachment, the cover

00023

1    sheet being dated February 22, 2002, to Irene from

2    George W. Cashman, I believe.

3    Are you familiar with any of these

4    documents?

5    A.    (Examines document)  No.

6    Q.    Do you know who Irene is?

7    A.    No.

8    Q.    Looking at the second page of the Dracut

9    seniority list, have you ever seen that document

10   before?

11   A.    (Witness reviews document)  No.

12   MR. GLUEK:  You are on a different page

13   than he is.

14   Q.    It's the second page.

15   A.    (Witness reviews document)  No.

16   Q.    Have you ever seen that form before, one

17   with numbers, name, seniority date, Preference 1 and

18   Preference 2?

19   A.    No.

20   Q.    Do you recognize any of the handwriting?

21   A.    Handwriting?

22   Q.    Yes.

23   A.    No.

24   Q.    Looking at Page No. 3, which has

00024
1    handwriting on the side, "APA Dracut,

2    Massachusetts," have you ever seen that document

3    before?

4    A.    Not to the best of my recollection.

5    Q.    Have you ever seen that form before?

6    A.    No.

7    Q.    Looking at the next to last page, I think

8    it's cut off, but I believe it's "APA Canton,

9    Massachusetts" on the side that's written.

10    A.    (Examines document)  Okay.

11    Q.    Have you ever seen that document before?

12    A.    No.

13    Q.    Have you seen that form, that kind of form

14    before?

15    A.    No.

16          (Document marked as Harrington

17          Exhibit 6 for identification)

18    Q.    I'm now showing you, Mr. Harrington, what

19    was marked as Exhibit 6, purporting to be a

20    February 28, 2002 letter to Dan Schmidt from

21    George W. Cashman, with a two-page enclosure.

22    Have you ever seen any of these documents

23    before?

24    A.    (Examines documents)  No.

00025
1    Q.    Do you know who Dan Schmidt is?

2    A.    Yes.

3    Q.    Was he as of February 2002 the vice

4    president of labor relations for New Penn Motor

5    Express?

6    A.    That's what it says.

7    Q.    Have you ever dealt with Dan Schmidt?

8    A.    Yes.

9    Q.    When you dealt with him, was he indeed an

10   employee of New Penn Motor Express?

11   A.    Not all the time.

12   Q.    Sorry?

13   A.    Not all the time.

14   Q.    During what period of time was he an

15   employee of New Penn Motor Express?

16   A.    I don't know when he was hired, but I've

17   dealt with him since I've taken over the assignment,

18   since May of 2002.

19   Q.    Looking at the second and third pages of

20   this exhibit, have you ever seen those documents

21   before?

22   A.    I may have.  I don't recall specifically

23   when I saw them, or if I saw them.

24   Q.    Do you have any understanding as to who

00026
1    prepared this document?

2    A.    No.

3    Q.    Around this period of time, did you have

4    any communications with Craig Goulet?

5    A.    No.

6    Q.    Did you speak to him after or shortly after

7    the employee meeting on February 16, 2002?

8    A.    I don't recall.

9    Q.    You handled his APA discharge grievance,

10   correct?

11   A.    Right.

12   Q.    That case had been decided prior to the APA

13   closure, correct?

14   A.    Yes.

15   Q.    Prior to the APA closure, had you seen

16   Mr. Goulet's name on any seniority list?

17   A.    No.

18   Q.    Are you certain about that?

19   A.    Yes.

20   Q.    Did you speak to Mr. Goulet about his

21   terminal preference?

22   A.    No.

23   Q.    What's the first communication that you

24   recall having with Mr. Goulet following the APA

00027
1   closure?

2   A.   His inquiry of what the status of his

3   grievance was that he had filed with Mr. Carnes.  It

4   would be in May of 2002, or sometime after May of

5   2002.

6   Q.   What do you recall about that inquiry?

7   A.   He wanted to know the status of his

8   grievance.

9   Q.   Was this a telephone conversation?

10  A.   Actually, was that 2002?  Yes, it was a

11  telephone conversation.

12  I guess it was 2003.  2003 is when I heard

13  from Mr. Goulet.  That's when Billy and George left,

14  2003.

15  Q.   Could you recount for us as best you can

16  recall what was said during this telephone

17  conversation.

18  A.   He wanted to know what the status of his

19  grievance was.  I said, "I never saw your grievance.

20  I will have to investigate it and find out what's

21  going on with it."

22  Q.   Do you recall anything else about this

23  telephone conversation?

24  A.   Maybe some chit-chat about Billy and

00028
1   George, but other than that, no.

2   Craig would call and ask me how George was

3   doing or how Billy was doing and other officers of

4   the local that he knew.  Other than that, I have no

5   other recollection of the conversation.

6   Q.   What, if anything, did you do next with

7   regard to Mr. Goulet's inquiry about his grievance?

8   A.   Actually, I think I asked him to forward me

9   a copy of the grievance in the mail.  I couldn't

10  find it.  He did that I believe.

11       (Document marked as Harrington

12       Exhibit 7 for identification)

13  Q.   Mr. Harrington, I'm showing you what was

14  marked as Exhibit 7, which purports to be a

15  handwritten Teamsters Union Local 25 grievance

16  report dated April 7, 2003.

17  Is this the grievance that Mr. Goulet

18  forwarded to you?

19  A.   (Examines document)  Yes.

20  Q.   Was this the first time you had seen this

21  grievance?

22  A.   Yes.

23  Q.   This was sometime after May 2003?

24  A.   Yes.

00029
1    Q.    Upon receipt of this grievance, what, if

2    anything, did you do?

3    A.    Well, I looked at it.  I didn't think it

4    really had any merit since Mr. Goulet had never

5    completed his original decision -- complied with his

6    decision.

7    I was not quite certain if I wanted to file

8    or not because, as I said, I didn't think it had any

9    merit.  Mr. Goulet continued to contact me, pressed

10   the issue.  Then -- well, that's it.  You can ask

11   your questions.

12   Q.    Over what period of time did Mr. Goulet

13   continue to contact you?

14   A.    Throughout the -- a couple of times over

15   the summer of that year.

16   Q.    What happened next?

17   A.    Through pretty much his persistence and

18   insistence, to appease him, I filed the case for the

19   Southern Joint Area Committee in September.

20   Q.    Did you ever communicate to Mr. Goulet in

21   writing about your opinion about the merits of the

22   grievance?

23   A.    No.

24   Q.    Did you ever make any internal notes about

00030
1  your opinion concerning the merits of the grievance?

2  A.   No.

3  Q.   Do you have anything that would support

4  your contention that you did not believe the

5  grievance was meritorious?

6  A.   Anything to support it?

7  Q.   Yes.

8  A.   Yes, the fact that he didn't fulfill his

9  original award.

10  Q.   Anything that you had that opinion at the

11  time?

12  A.   Excuse me?

13  Q.   Do you have any evidence that indeed that

14  was the opinion you had at the time, in the summer

15  of 2003?

16  A.   Just personal belief.

17  Q.   You made no record of that personal belief,

18  though?

19  A.   Well, we had a conversation over the phone.

20  There was a document introduced at Mr. Goulet's

21  deposition.  Certainly the body of the letter they

22  wrote certainly indicates we had some disagreement

23  about the merits of his grievance.

24  Q.   What document are you referencing?

00031

 1   A.   It was put in as an exhibit at Craig's

 2   deposition at the offices of Dwyer, Duddy and

 3   Facklam.

 4   MR. LATHROP:  Let's mark this as our next

 5   exhibit in line.

 6        (Document marked as Harrington

 7        Exhibit 8 for identification)

 8   Q.   I'm showing what was marked as Exhibit 8 in

 9   this deposition, purporting to be a handwritten

10   letter dated July 25, 2003 from Mark.  Is this the

11   document you are referencing?

12   A.   You said, "from Mark."

13   Q.   Sorry.  I meant to Mark.

14   A.   Yes.

15   Q.   This is the document you contend indicates

16   a disagreement over the merits of the case?

17   A.   Yes.

18   Q.   What particularly are you looking at to

19   indicate there's a disagreement over the merits of

20   the case?

21   A.   "Not whether one was capable of working or

22   not."

23   Q.   Anything else within this letter?

24   A.   "Let's not lose sight of the real issue

00032
 1  here."  Obviously we were having some disagreement
 2  about the issue.
 3  Q.    Anything else within the body of this
 4  letter that you contend shows that you had a
 5  disagreement about the merits of the case?
 6  A.    Well, in the last paragraph, "Over the
 7  years, I've asked APA to put me back to work light
 8  duty or otherwise."  I mean, I used to tell Craig
 9  all the time that he was not entitled to light duty,
10  but he used to press me on the issue.
11  Under the light duty clause in the National
12  Master Freight, it's a preparation for people that
13  are preparing for returning to work within a short
14  period of time.
15  At no time did Mr. Goulet ever say he was
16  going to return to work.
17  It was for a transitional period for people
18  that were going off the job on an injury and were in
19  the process of returning to work.  I kept telling
20  him he was not entitled to that benefit under the
21  contract.
22  Q.    You had those discussions before his
23  arbitration case was decided?
24  A.    Yes.

00033

1    Q.    Is there anything else within the body of

2    this letter from which you deduce that there was a

3    difference of opinion about Mr. Goulet's current

4    grievance?

5    A.    No.

6    Q.    Do you recall any discussions that you had

7    with Mr. Goulet about his grievance other than what

8    you have already testified to?

9    A.    No.

10          (Document marked as Harrington

11          Exhibit 9 for identification)

12    Q.    Mr. Harrington, I'm showing you what was

13    marked as Exhibit 9, which purports to be a Southern

14    New England Joint Area Committee prehearing

15    information document.

16    Is that your signature on there?

17    A.    (Examines document)  No.

18    Q.    Is that someone who signed it with your

19    permission?

20    A.    Yes.

21    Q.    Who was it that signed this with your

22    permission?

23    A.    Probably Maureen Henry, the office

24    secretary.  She handles the filing of the cases.

00034

```
 1   Q.   Is this the filing of the case?

 2   A.   Yes.

 3   Q.   You see the language under the Position of

 4   Filing Party?

 5   A.   (Examines document)  Uh-huh.

 6   Q.   Who drafted that language, if you know?

 7   A.   Myself.

 8   Q.   Is it your testimony you really didn't

 9   believe what you wrote there?

10   A.   Yes.

11   Q.   But you filed the grievance anyway?

12   A.   Yes.

13   Q.   Does this constitute a docketing of the

14   grievance?

15   A.   Yes.

16   Q.   Had this grievance been docketed prior to

17   September 3, 2003?

18   A.   No.

19   Q.   Do you know if there was a time limit in

20   the collective bargaining agreement with regard to

21   the docketing of grievances?

22   A.   Yes.

23   Q.   What is the time limit?

24   A.   30 days from the time of the filing of the
```

00035
```
 1  grievance.
 2          (Document marked as Harrington
 3          Exhibit 10 for identification)
 4  Q.   Mr. Harrington, I'm showing you what was
 5  marked as Exhibit 10, purporting to be a letter to
 6  you from Craig Goulet dated November 24, 2003.
 7  Do you recognize this document?
 8  A.   Yes, only because you introduced it at the
 9  last deposition that I attended.  Other than that, I
10  have no recollection of it.
11  Q.   I introduced it?
12  A.   Or that Kathleen introduced.  I'm sorry.
13  Q.   You don't have an independent memory of
14  receiving this document?
15  A.   No.
16  Q.   Was Mr. Goulet's grievance heard at the
17  Southern New England Joint Area Committee level?
18  A.   No.
19  Q.   Do you know why not?
20  A.   Yes.
21  Q.   What is the reason why not?
22  A.   Because it was a multi-local agreement.
23  Because we really didn't have a home for it, so to
24  speak, under the contract because it was outside the
```

00036
1    contract agreement as far as this affects

2    bargaining, so to speak, of the agreement between

3    APA, New Penn and TNFINC.

4    We filed it originally at the Southern New

5    England under the guise of seniority, but because it

6    was a multi-local issue as far as the whole

7    settlement, they referred it over to the Eastern

8    Region.

9    Q.    And who is "they"?

10   A.    The clearing house that, you know -- the

11   local cochair, John Murphy, who was the cochair from

12   the union side; Bob Schafer, who was the cochair for

13   the employer's side; and I believe they had

14   conversation with Dan Virtue; maybe Pete Hassler

15   from the employer's side, exactly where this

16   grievance should be heard.

17   Q.    Did you then file a document with the

18   Eastern Region Joint Area Committee?

19   A.    I don't recall if we filed one or it was

20   just referred to.  Anyway, it was moved to that

21   committee.

22        (Document marked as Harrington

23        Exhibit 11 for identification)

24   Q.    Mr. Harrington, I'm showing you what was

00037
1    marked as Exhibit 11, purporting to be a form used
2    in the filing of all grievances with the Eastern
3    Region Joint Area Committee.
4    A.    (Examines document)  Right.
5    Q.    This purports to be signed by yourself on
6    April 20, 2004.  Do you recognize this document?
7    A.    Yes.
8    Q.    Is that, in fact, your signature?
9    A.    No.
10    Q.    Did someone sign your name with your
11    approval?
12    A.    Yes.
13    Q.    Do you know who signed this one with your
14    approval?
15    A.    Looks like Maureen Henry.
16    Q.    Under Union Position, could you read that,
17    please.
18    A.    "Per the APA New Penn agreement, Craig
19    should have been called for work at New Penn Motor
20    Express.  Union seeks that Brother Goulet be
21    returned to his seniority."
22    It's actually hard to read.
23    Q.    Do you know who composed that language?
24    A.    Yes.

00038
1   Q.   Who?

2   A.   Myself.

3   Q.   At some point in time, was this grievance

4   heard?

5   A.   Yes.

6   Q.   Do you recall where it was heard?

7   A.   Myrtle Beach, South Carolina.

8   Q.   Do you recall when it was heard?

9   A.   I think it was July of 2004.

10  Q.   In advance of it being heard, did you

11  submit any sort of argument in favor of the

12  grievance?

13  A.   In advance?

14  Q.   Yes.

15  A.   No.

16  Q.   At the hearing, did you submit any writings

17  in favor of the grievance?

18  A.   Yes.

19       (Document marked as Harrington

20       Exhibit 12 for identification)

21  Q.   I'm showing you what was marked as Exhibit

22  No. 12, purporting to be a multiple page document

23  dated July 22, 2004, addressed to Gentlemen,

24  purportedly over your signature, in the matter of

00039
1   Teamsters Local 25 versus New Penn Motor Express

2   involving Craig Goulet.

3   A.   (Examines document)  Right.

4   Q.   Looking at the second page, is that your

5   signature?

6   A.   (Examines document)  No.

7   Q.   Is that someone who has signed your name

8   with your permission?

9   A.   Yes.

10  Q.   Did you compose Exhibit No. 12?

11  A.   Yes.

12  Q.   Would you please look at what is attached

13  as Exhibit 2 to this document.  Do you see that

14  document?

15  A.   (Examines document)  Uh-huh.

16  Q.   That's a Canton seniority list, is it not?

17  A.   Right.

18  Q.   For Local Union 25?

19  A.   Yes.

20  Q.   Dated November of 2001?

21  A.   Yes.

22  Q.   Mr. Goulet's name appears on that, does it

23  not?

24  A.   Yes.

00040
1    Q.    Where did you get this document?

2    A.    I didn't.  You just gave it to me.

3    Q.    It was attached as Exhibit 2, was it not?

4    A.    Oh, yes.  Well, periodically companies

5    remit seniority lists to the local union,

6    submit/remit.

7    Q.    Is it your testimony that in the normal

8    course of events, you had received this Canton

9    seniority list from APA Transport?

10   A.    The office did, yes.

11   Q.    So on or about November of 2001, the

12   Local 25 office received this Canton seniority list

13   with Mr. Goulet's name on it?

14   A.    I don't know when they received it.  It's

15   dated November 2001.

16   Q.    Do you have any reason to believe that it

17   was not received in the normal course in

18   approximately November of 2001?

19   A.    No.

20   Q.    It's your testimony that this seniority

21   list was in the office and that's from where you

22   retrieved it?

23   A.    Yes.

24   Q.    Do you remember specifically where within

00041
1    the office you retrieved it?

2    A.    Probably from the files, from the secretary

3    that keeps the files on seniority lists.

4    Q.    Was there a secretary within the Local 25

5    office who had the responsibility for maintaining

6    seniority lists?

7    A.    No.   The union doesn't maintain seniority

8    lists.

9    Q.    Then I'm confused by the answer.

10   A.    The union receives seniority lists from the

11   company.

12   Q.    Help clarify your prior answer, please.

13   Where did you get this document from?

14   A.    From the office.

15   Q.    Where?

16   A.    Local 25 office.

17   Q.    But where within the office, sir, did you

18   get this document?

19   A.    Probably it would be from Irene, who keeps

20   the 250 companies that we have.  She keeps records

21   of seniority lists that are sent in to the local.

22   Q.    Does Irene have a last name?

23   A.    Hanlon.

24   Q.    Does she still work for Local 25?

00042
```
 1   A.    Yes.

 2   Q.    Is she still a secretary?

 3   A.    Yes.

 4   Q.    Just to make sure I'm clear, in the normal

 5   course of events in the year 2001, Iran Hanlon kept

 6   files on employer seniority lists?

 7   A.    Yes.

 8   Q.    For how long has Irene Hanlon been doing

 9   that?

10   A.    As long as she's been employed there.

11   Q.    To your knowledge, how long has Irene

12   Hanlon been employed there?

13   A.    Around four or five years.

14   Q.    Since approximately the year 2000?

15   A.    Possibly.  I don't recall her exact hire

16   date.  I didn't hire her at the time.

17   I was not in the capacity to even recall

18   when she was hired.  It had nothing to do with me.

19   I just know she came over from the AFLCIO somewhere

20   around that time period.

21   Currently she does it.  She may not have

22   done it at the time.  She currently does it, but at

23   that time, I don't recall if it was Kathleen, you or

24   him, just that I need the information.
```

00043

1    Whoever was responsible for it at the

2    period of time gave it to me.

3    Q.   To whom does Irene report now?

4    A.   Sheila.

5    Q.   Sheila?

6    A.   Yes, McLaughlin.

7    Q.   As of November 2001, did Irene report to

8    Sheila McLaughlin at that point?

9    A.   Probably.

10   Q.   Sheila is the office manager?

11   A.   Yes.

12   Q.   Speaking at least currently, does anyone

13   other than Irene Hanlon keep the files of the

14   company seniority lists?

15   A.   No.

16   Q.   As of November 2001, did anyone other than

17   Irene Hanlon keep the files of the company seniority

18   lists?

19   A.   I don't know.

20   Q.   Would you look at Exhibit 3 that's attached

21   to your document.

22   A.   (Examines document)  Okay.

23   Q.   Where did you get that document from?

24   A.   The office.

00044
1   Q.   Do you know who had prepared this document?

2   A.   No.

3   Q.   Did you also get this from Irene Hanlon, or

4   whoever else was holding the employer seniority

5   lists?

6   A.   Probably not.

7   Q.   Do you recall from whom within the office

8   you got this document then?

9   A.   Sheila.

10  Q.   Why do you say that?

11  A.   Because she coordinates communication

12  between the region, any pending litigation that we

13  have.

14       Also, we are also pursuing WARN Act

15  violations against the APA, so she would keep that

16  type of information in her possession.

17  Q.   Do you have any understanding as to who

18  prepared what you attached as Exhibit 3 to this

19  document?

20  MS. PENNINI:  Objection.

21  A.   No.

22  Q.   Do you know if it was prepared by someone

23  at Local 25?

24  A.   More than likely.

00045
```
 1   Q.   Does Mr. Goulet's name appear on Exhibit 3?

 2   A.   No.

 3   Q.   Do you know why it doesn't appear on

 4   Exhibit 3?

 5   A.   No idea.

 6   Q.   Even though this is a document more than

 7   likely prepared by Local 25?

 8   A.   Right.

 9   Q.   Do you have any understanding as to how one

10   could learn who prepared Exhibit 3?

11   A.   No.

12   Q.   What persons in February 2002 do you

13   understand were involved in preparing the terminal

14   preference lists?

15   A.   The stewards, and then the office staff

16   would compile it and send it over to the Eastern

17   Region.

18   Q.   Would you look at the second page where it

19   says, "Mr. Goulet has sufficient seniority to be

20   called for work," correct?

21   A.   Uh-huh.

22   Q.   Do you recall what was the basis for your

23   saying that?

24   A.   People that had been called with less than
```

00046
1    seniority than him.

2    Q.    People from the Canton APA terminal who had

3    less seniority than Mr. Goulet had been called by

4    New Penn?

5    A.    Both terminals, Dracut and Canton.

6    Q.    Do you know of any people with less

7    seniority than Mr. Goulet who made the call list

8    from New Penn?

9    A.    I don't understand "call list."

10    MS. PENNINI:  Objection.

11    Q.    Do you know of any persons who were lower

12    on the APA seniority list than Mr. Goulet who made

13    the New Penn seniority list?

14    A.    People that were physically qualified and

15    available?

16    Q.    Yes.

17    A.    Yes.

18    Q.    Do you have a medical degree?

19    MR. GLUEK:  Objection.

20    MS. PENNINI:  Objection.

21    A.    Not recently.  It's a term under the

22    contract.

23    Q.    What, a medical degree is?

24    MR. GLUEK:  Objection.

00047
1    A.    No, "physically available."

2    Q.    Following the APA closure, did you have any

3    discussions with Mr. Goulet concerning his ability,

4    physical ability to return to work?

5    A.    Yes.

6    Q.    When did those discussions take place?

7    A.    Well, via phone calls, met with him in

8    preparation for his case at Picadilli Pub in

9    Westboro, Mass., and continued to stress to him that

10   I had concerns about his case and his ability to

11   even return to work, and I pressed him on it.

12   He was vague that he wanted to go back to

13   work, vague that he could even qualify to go back to

14   work.

15   I told him I would take his case on.  He

16   felt as though he had gotten neglected by the

17   situation, and, you know, I told him I would take

18   his case in.  He felt as though he had been, you

19   know, denied.

20   I continued to tell him -- and we had

21   several disagreements about it when we met -- that

22   he could even qualify or that he would have a desire

23   to actually go back to work.

24   Q.    You said he was vague.  Could you tell me

00048
```
 1   specifically what, in fact, Mr. Goulet said that you
 2   characterize as being "vague."
 3   A.   Well, sometimes he said he wanted to go
 4   back.  Other times he said he couldn't go back
 5   because of his limitations with his knee, the
 6   various injuries.  He said had to get his knee done.
 7   I said, "I don't know if you can do the
 8   work if you have to get your knee done.  I don't
 9   know if you can pass or get qualified.  I mean, you
10   still have to get examined and get a return to duty
11   evaluation from a company doctor."
12   Given the fact that he had concerns over
13   his injuries and the fact that over a year's time he
14   didn't attempt to get cleared, I questioned whether
15   or not he was able to go back to work.
16   Q.   You questioned it, and sometimes he told
17   you he could?
18   A.   In the same breath he would say, "I have to
19   get my knee done," "I have to get this," that.  I
20   would say, "Can you go back?"  "I don't know.  I
21   don't want to drive.  I might be able to do dock
22   work."
23   I said, "Craig, you have still not
24   fulfilled your award.  You still haven't been
```

00049

1     medically cleared to go back to work" or "You

2     haven't fulfilled your ten-day suspension."

3     Q.    What did he say in response to that?

4     A.    He would continue to say, you know, that he

5     wants his day in court.  He wants to be heard.

6     Q.    Did you know whether or not Mr. Goulet was

7     still on workers' compensation?

8     A.    Yes.

9     Q.    Was he still on workers' compensation?

10    A.    According to him, no, because his case

11    couldn't have got heard --

12    Q.    Do you have any reason to dispute that?

13    MR. GLUEK:  Objection.  He was still

14    answering.

15    A.    He couldn't have had his case heard at the

16    Southern New England if he was still collecting.

17    That question was asked of him at that hearing if he

18    was still collecting workers' compensation.

19    Q.    Do you recall his answer?

20    A.    It was no.

21    Q.    Do you have any reason to dispute his

22    answer?

23    A.    No.

24    Q.    Do you know if he was on Social Security?

00050
```
 1   A.   No.

 2   Q.   No, he was not, or --

 3   A.   I have no knowledge of that, is what I'm

 4   saying.

 5   Q.   That topic didn't come up?

 6   A.   I don't believe so.

 7   Q.   Did Mr. Goulet say, "Let them call me, and

 8   let's see if I can do the work"?

 9   A.   He may have.

10   Q.   But you understood that New Penn had not,

11   in fact, called him to work?

12   A.   Yes.

13   Q.   Do you have any understanding whether or

14   not Mr. Carnes ever docketed Mr. Goulet's grievance?

15   A.   No.

16   Q.   Do you have any understanding as to why it

17   was not docketed?

18   A.   No.

19   Q.   As of April 7, 2003, whose responsibility

20   within Local 25, if anyone, was it to docket

21   Mr. Goulet's grievance?

22   A.   Whoever the business agent was that's

23   assigned to the company.

24   Q.   Who was the business agent as of April 7,
```

00051
 1   2003 who was assigned to New Penn?

 2   A.   Bill Carnes.

 3   Q.   Did you ever have any conversation with

 4   Mr. Carnes concerning Mr. Goulet's grievance?

 5   A.   No.

 6   Q.   Did you ever ask him about the docketing of

 7   the grievance?

 8   A.   No.

 9   Q.   You took over for Mr. Carnes in May of

10   2003?

11   A.   Uh-huh.

12   Q.   That's a yes?

13   A.   Yes.

14   Q.   Was that on May 3, 2003?

15   A.   I don't recall the specific date.

16   Q.   Was Mr. Carnes also responsible for the

17   Dracut terminal?

18   A.   No.  Well, for what time period?  I don't

19   know what time period.

20   Q.   Sorry.  Prior to the Dracut terminal

21   closing, was Mr. Carnes responsible for that?

22   MR. GLUEK:  Objection.

23   A.   No.

24   Q.   I'm sorry.  You were responsible for the

00052
1    Dracut terminal?

2    A.    APA Dracut terminal?

3    Q.    Yes.

4    A.    Yes.

5    Q.    Do you know if Mr. Goulet's name was left

6    off the seniority list because he had been out on

7    workers' compensation?

8    A.    I have no idea.

9    Q.    Was there anyone responsible in the Local

10   25 office for supervising the secretaries as they

11   put together the APA preference list?

12   A.    I have no idea.

13   MR. LATHROP:  Let's take a few minutes.

14   (Recess)

15   MR. LATHROP:  I have no further questions.

16   CROSS EXAMINATION

17       BY MR. GLUEK:

18   Q.    Morning.  I'm Carl Gluek.  I represent New

19   Penn Motor Express.

20   Since you've been a BA, I think you

21   testified since 1994 --

22   A.    Yes.

23   Q.    -- approximately how many grievances have

24   you pursued to either the regional committee or at

00053
 1   the local committee level?

 2   A.   Handful.

 3   Q.   A handful?

 4   A.   Yes.

 5   Q.   When you drafted what's been previously

 6   marked as --

 7   A.   Excuse me, did you say docketed or put on?

 8   Q.   Put on.

 9   A.   Handful.

10   Q.   When you drafted what's been previously

11   marked as Harrington Exhibit 12, to whom were you

12   writing this to?

13   A.   Members of the committee of the Eastern

14   Region, employees in the union.

15   Q.   Were you writing this in your role as an

16   advocate?

17   A.   Yes.

18   Q.   Did you believe it was your responsibility

19   to draft Exhibit 12 and tell the committee the

20   weaknesses of your case?

21   MR. LATHROP:   Objection.

22   A.   No.

23   Q.   Were you ever instructed that when you

24   wrote a letter to the committee, you were supposed

00054

1    to be balanced in your writing?

2    A.    No.

3    Q.    If you would take a look at what was marked

4    as Exhibit 2 to Exhibit 12, the Canton seniority

5    list.  I notice there's only 40 names.

6    A.    (Examines document)  Right.

7    Q.    Could you compare that to what was marked

8    as Harrington Exhibit 4.

9    A.    (Examines document)  Okay.

10   Q.    There's approximately 75 names?

11   A.    (Examines document)  Okay.

12   Q.    Do you know what explains the difference?

13   A.    It's probably just the first page here of

14   the seniority list in Exhibit 12, No. 2.

15   Q.    So it was not your intent to give the

16   entire seniority list with respect to Exhibit 12?

17   A.    Right.

18   Q.    In your role as a BA or as a secretary

19   treasurer, do you have discretion as to what

20   grievances you pursue to the committees?

21   A.    Yes.

22   Q.    Is there anything that requires you to

23   pursue each and every grievance at a committee

24   level?

00055
1    A.    No.

2    Q.    What are some of the factors you use to

3    determine whether or not a grievance is going to be

4    pursued to the committee level?

5    A.    If it's not a violation of the contract;

6    settlement, offer of settlement by the company prior

7    to going into arbitration; criminal, somebody

8    convicted of a crime regarding termination or

9    something to that effect, we probably would not

10   pursue it since it's already been adjudicated.

11   It's things of that nature.

12   Q.    So you look at a multitude of factors?

13   A.    Yes.

14   Q.    When you were pursuing Mr. Goulet's

15   grievance with respect to New Penn, did you have any

16   animosity towards him?

17   A.    No.

18   Q.    Any ill will towards him?

19   A.    No.

20   Q.    Any prejudices towards him?

21   A.    No.

22   Q.    Could you look at what's been marked as

23   Harrington Exhibit 5, please.  Can you look at the

24   top.  Do you see the fax numbers?  The first one is

00056
1    a 717 number?

2    A.   (Examines document)  Right.

3    Q.   Do you know whose fax that is?

4    A.   Well, it goes on to say here, "Teamsters

5    776."

6    Q.   Do you see down below where there appears

7    to be a fax number, 202?

8    A.   (Examines document)  Right.

9    Q.   Do you know whose fax number that is?

10   A.   It's a Washington number.  It says, "IBT

11   National Freight."  It's probably going over at the

12   IBT headquarters.

13   Q.   To the best you can tell from the fax

14   numbers, it's coming from Teamsters 776 to the

15   International?

16   MR. LATHROP:  Objection.

17   Q.   I'm sorry.  To the National Freight

18   Division?

19   A.   Yes.

20   Q.   On the first page, do you see where it

21   says, "To Irene"?

22   A.   (Examines document)  Yes.

23   Q.   To your knowledge, is that a different

24   Irene than the secretary in your office?

00057
1    A.    Yes.

2    Q.    To your knowledge, was New Penn ever

3    provided between March 1, 2002 and March 31, 2003

4    with Mr. Goulet's name and/or preference?

5    A.    I have no knowledge.

6    Q.    Could you look again at what's been marked

7    as Exhibit 12.  Take a look at Exhibit 1 to that

8    document.

9    A.    (Examines document)  Okay.

10   Q.    Just read the decision to yourself.

11   A.    (Examines document)  Okay.

12   Q.    I think you already testified that to your

13   knowledge, Mr. Goulet never provided the company

14   with documentation that he could return to work

15   without restrictions; is that correct?

16   A.    That's correct.

17   Q.    To your knowledge, Mr. Goulet never served

18   a suspension?

19   A.    That's correct.

20   Q.    Therefore, under the decision, is it your

21   understanding that Mr. Goulet would not be on the

22   seniority?

23   A.    Correct.

24   MR. GLUEK:  Nothing further.

00058
1    CROSS EXAMINATION

2        BY MS. PENNINI:

3    Q.    Mr. Harrington, why did you docket

4    Mr. Goulet's grievance to the Southern New England

5    Joint Area Committee in September of 2003?

6    A.    Because that's usually the first step of

7    the grievance procedure -- arbitration procedure,

8    under the contract.

9    Q.    Why did you decide to file this grievance?

10   A.    Well, Mr. Goulet's insistence that it be

11   filed.  As I understand it, he had reached out to

12   some people within the International union and

13   thought he was getting a raw deal or whatever.

14   I docketed the case just to appease him

15   really.  I can't say anything else.  I mean, as I

16   say, he never really completed or fulfilled the

17   original case.

18   Q.    If not for Mr. Goulet's insistence, would

19   this have been a case you would have otherwise ever

20   docketed as a grievance?

21   MR. LATHROP:  Objection.

22   A.    Probably not.

23   Q.    If you could look at Exhibit 2 of

24   Deposition Exhibit No. 12.  You said that you

00059
1    received this list from Irene.  Was that Irene

2    Hanlon in the Local 25 office?

3    A.   I received it from a secretary in the Local

4    25 office, so if Irene was employed at the time and

5    handling it.  As in her capacity currently, it would

6    have been through her.

7    Q.   Do you recall when the first time you saw

8    the list was?

9    A.   Probably in preparation for the case.

10   Q.   Do you recall whether you ever saw this

11   list prior to the filing -- prior to filing and

12   docketing the grievance with the Joint Area

13   Committee?

14   A.   I don't recall.

15   Q.   Do you recall whether you saw this list in

16   November of 2001?

17   A.   I don't recall.

18   Q.   Prior to the arbitration before the Joint

19   Area Committee in October of 2001, did you speak to

20   Mr. Goulet about his ability to return to work?

21   A.   I don't recall if I did or not.

22   Q.   Do you recall what you said to Mr. Goulet

23   after the decision was rendered in October of 2001?

24   A.   I told him that he was reinstated back to

00060
1    work conditional upon the requirements.

2    Q.    Did you tell him what the requirements

3    were?

4    A.    Yes.

5    Q.    What were those requirements?

6    MR. LATHROP:  Objection.

7    A.    He needed to demonstrate an ability to

8    return unrestricted and to serve a ten-day

9    suspension.

10    Q.    Do you know whether he ever submitted any

11    documentation about his ability to return to work?

12    A.    I have no idea.

13    Q.    I believe you said his case could not have

14    been heard before the Joint Area Committee if he was

15    still receiving workers' compensation; is that

16    correct?

17    A.    That's correct.

18    Q.    Would this case have been able to go

19    forward if the committee was aware that he receiving

20    Social Security benefits?

21    A.    I'm not sure.

22    Q.    Following the October arbitration award,

23    did Mr. Goulet say whether he would be returning to

24    work?

00061

1   A.   No.

2   Q.   Did he give any indication as to whether he

3   was trying get clearance to return to work?

4   A.   No.

5   Q.   You said that you spoke with Mr. Goulet

6   during the summer of 2003 concerning his failure to

7   be called from the New Penn call list, correct?

8   A.   Yes.

9   Q.   When he spoke with you, did he ever ask for

10  any assistance regarding looking for other

11  employment?

12  A.   No.

13  MS. PENNINI:   That's all the questions I

14  have.  Thanks.

15  REDIRECT EXAMINATION

16      BY MR. LATHROP:

17  Q.   Do you have an understanding whether or not

18  someone on Social Security benefits has up to a year

19  to try to go back to work without putting their

20  benefits at risk?

21  A.   No.

22  Q.   You don't know that one way or the other?

23  A.   (Witness shakes head)

24  Q.   You never had that discussion with

00062
1    Mr. Goulet?

2    A.    No.

3    Q.    I would also ask you to look at Exhibit 12,

4    which is your brief dated July 22, 2004.  I believe

5    Attorney Pennini had you look at some of the

6    exhibits.

7    Exhibit 1 to that brief is the decision

8    with regard to Mr. Goulet's termination from APA,

9    correct?

10    A.    (Examines document)  Right.

11    Q.    The date of that is October 16, 2001?

12    A.    Okay.

13    Q.    Correct?

14    A.    Yes.

15    *Q.    It's your understanding that based upon

16    this decision, APA Transport could insist that

17    Mr. Goulet submit acceptable documentation of his

18    ability to return to unrestricted duties.

19    MR. GLUEK:  Objection.

20    MS. PENNINI:  Objection.

21    Q.    Please answer the question.

22    MR. GLUEK:  What is the question?

23    MR. LATHROP:  Please read back the

24    question.

00063
1    *(Question read)

2    MR. GLUEK:  Objection.  There's still no

3    question.

4    Q.   That was your understanding, correct?

5    MR. GLUEK:  Objection.

6    Q.   You still have to answer the question.

7    A.   My understanding is the award.

8    Q.   Right.  Let me read the second sentence.

9    It says, "The panel after hearing the case, motion

10   made, second carried, that upon submitting

11   acceptable documentation to the company of his

12   ability to return to unrestricted duties, the

13   grievant shall serve a ten-day suspension."  Do you

14   understand that sentence?

15   A.   Yes.

16   Q.   What's that mean to you?

17   A.   It means upon his unrestricted clearance to

18   go back to work, he would then serve a ten-day

19   suspension and then would be placed on the seniority

20   list.

21   Q.   Did you understand that the company could

22   put him on a seniority list without insisting on the

23   conditions?

24   MR. GLUEK:  Objection.  There's no

00064
```
 1   question.
 2   MR. LATHROP:  If you listen to it, you will
 3   hear the question.
 4   MR. GLUEK:  No, there is no question.
 5   Q.   Did you understand that APA could waive
 6   those requirements?
 7   MR. GLUEK:  Objection.
 8   A.   No.
 9   Q.   In fact, isn't that exactly what APA did?
10   APA put him on the seniority list in November of
11   2001 without him serving the suspension, correct?
12   A.   I don't know.  But they did, yes.
13   Q.   They did, didn't they?
14   MR. GLUEK:  Objection.
15   A.   (No response)
16   Q.   APA Transport put him on the seniority list
17   in November of 2001 without ever asking for or
18   seeing medical documentation, correct?
19   MR. GLUEK:  Objection.
20   MS. PENNINI:  Objection.
21   A.   I guess.
22   Q.   So Exhibit 2, the Canton seniority list for
23   November 2001, was prepared by APA Transport; is
24   that correct?
```

00065
1    A.    Correct.

2    Q.    Are you saying Local 25 has the right to

3    take someone off the APA Transport seniority list?

4    A.    No.

5    Q.    So if APA Transport doesn't insist on a

6    ten-day suspension, would Local 25 insist that

7    Mr. Goulet serve a ten-day suspension?

8    A.    No.

9    Q.    If APA Transport doesn't insist on medical

10   documentation, is Local 25 going to insist?

11   A.    No.  Local 25 doesn't call him to go to

12   work.

13   Q.    As of November 2001, based upon your

14   Exhibit 2 to your brief, Mr. Goulet was on the

15   seniority list in Canton for APA Transport, correct?

16   A.    I think that was the union's position in

17   the brief.

18   Q.    So the answer to the question is indeed he

19   was on the seniority list already as of November of

20   2001?

21   A.    His name was placed on a piece of paper.

22   Q.    Called the "seniority list"?

23   A.    Yes.

24   Q.    Are you telling me that Local 25 wanted to

00066
```
 1    take Mr. Goulet off the seniority list?

 2    A.    No.

 3    Q.    Did Local 25 have any authority to take

 4    Mr. Goulet off the seniority list?

 5    A.    No.  We didn't take him off the seniority

 6    list.

 7    Q.    Did Local 25 submit Mr. Goulet's name to

 8    New Penn?

 9    A.    I have no idea.

10    Q.    It didn't, did it?

11    MR. GLUEK:  Objection.

12    MS. PENNINI:  Objection.

13    A.    (No response)

14    Q.    Do you have any evidence that it did?

15    A.    I don't know.

16    Q.    Was it Local 25's job to submit APA

17    employee preferences to New Penn?

18    A.    Yes.

19    Q.    Was it Local 25's job to submit the APA

20    preferences to New Penn for all employees appearing

21    on the APA seniority list?

22    MR. GLUEK:  Objection.

23    MS. PENNINI:  Objection.

24    A.    I don't know.
```

00067
1    Q.    Who would?

2    A.    I don't know.

3    Q.    Do you know if Mr. Carnes left Mr. Goulet's

4    name off the APA preference list?

5    A.    Do I know?

6    Q.    Yes.

7    MS. PENNINI:   Objection.

8    A.    No, I don't know.

9    Q.    When you were preparing the brief that's

10   been marked as Exhibit 12, did you attempt to

11   determine how Mr. Goulet's name was omitted from the

12   call list?

13   A.    No.

14   Q.    Is there any particular reason why you

15   didn't investigate how Mr. Goulet's name was omitted

16   from the call list?

17   A.    No.

18   Q.    Do you think it was incumbent upon you as

19   his advocate to find out how Mr. Goulet's name was

20   omitted from the call list?

21   A.    No.   That was our case.

22   Q.    The case was that Mr. Goulet's name should

23   not have been omitted from the call list; that was

24   your case, right?

00068

1   A.   That's right.

2   Q.   But somebody did omit his name.

3   MR. GLUEK:  Objection.

4   MS. PENNINI:  Objection.

5   MR. GLUEK:  Is there a question?

6   Q.   Somebody did omit his name, correct?

7   A.   I don't know.

8   Q.   Well, you argued that somebody left off his

9   name.

10  MR. GLUEK:  Objection.

11  A.   I argued a lot of things in this case.

12  Q.   Let's go back then.  Do you have any

13  evidence that Local 25 ever forwarded Mr. Goulet's

14  name or preference to New Penn?

15  A.   No.

16  Q.   Do you have any understanding as to why

17  Local 25 did not forward Mr. Goulet's name to New

18  Penn?

19  A.   No.

20  Q.   Was it because Local 25 --

21  A.   I just answered your question.

22  Q.   Was it because Local 25 felt that that he

23  should serve a suspension first?

24  MR. GLUEK:  Objection.

00069

1    MS. PENNINI:  Objection.

2    A.    No.

3    Q.    Was it because Local 25 felt that he needed

4    to submit medical documentation first?

5    MS. PENNINI:  Objection.

6    A.    No.

7    MR. LATHROP:  I have nothing further.

8    RECROSS EXAMINATION

9        BY MR. GLUEK:

10   Q.    Under the collective bargaining agreement,

11   an employer is supposed to give the union seniority

12   lists, correct?

13   A.    Yes.

14   Q.    It's the union's responsibility, or one of

15   the union's responsibilities is to make sure that

16   those seniority lists are correct?

17   A.    No.

18   Q.    For what purpose do you get the seniority

19   lists?  Why?

20   MR. LATHROP:  Objection.

21   MR. GLUEK:  What basis, please, so I can

22   correct it?

23   MR. LATHROP:  As to his knowledge as to why

24   the employer submits a seniority list.

00070
 1    MR. GLUEK:  What's objectionable about

 2    that?

 3    MR. LATHROP:  You are talking about the

 4    mental rationale.

 5    Q.    Why in the collective bargaining agreement

 6    does the union get a seniority list?

 7    MR. LATHROP:  I think the appropriate

 8    question would be does the collective bargaining

 9    agreement state --

10    MR. GLUEK:  He already testified it did.

11    MR. LATHROP:  It didn't state why.

12    A.    First of all, for continuity purposes, I

13    mean, the seniority list is posted at the terminal.

14    Therefore, we get a copy of it, because it's posted.

15    Q.    If someone has a problem with where they

16    are placed on the seniority list, they have the

17    ability to file a grievance; is that correct?

18    A.    Correct.

19    Q.    Through the grievance procedure, that

20    seniority list can be corrected; is that correct?

21    A.    Yes.

22    Q.    Therefore, the union does have a mechanism

23    to ensure that the seniority lists are correct; is

24    that correct?

00071

```
 1   A.   Yes.

 2   Q.   Now, let's take a look at what was marked

 3   as Exhibit 2 to Harrington Exhibit No. 12.  Let's

 4   assume Exhibit 2 is a correct seniority list.

 5   A.   Okay.

 6   Q.   Would it be fair for Mr. Power to have been

 7   called by New Penn prior to Mr. Hoyt, No. 10?

 8   A.   Yes.

 9   Q.   Even though Mr. Power had less seniority

10   than Mr. Hoyt, it would be fair for him to be called

11   first?

12   A.   He could be, yes.

13   Q.   On what basis?

14   A.   Qualifications.

15   Q.   Let's assume the qualifications are the

16   same.  Would it be fair for Mr. Power to be called

17   before Mr. Hoyt?

18   A.   No.

19   Q.   Would it be fair for an individual with no

20   seniority to be called before somebody who's listed

21   on Exhibit 2?

22   A.   No.

23   Q.   So if Mr. Goulet had no seniority, it

24   wouldn't be fair for him to be called before
```

00072
1  somebody listed on Exhibit 2?

2  A.   That's correct.

3  MR. GLUEK:  Nothing further.

4  RECROSS EXAMINATION

5     BY MS. PENNINI:

6  Q.   Was it your understanding that APA waived

7  the requirement, that APA ever waived the

8  requirement that Mr. Goulet submit acceptable

9  documentation about his ability to return to

10  unrestricted duties?

11  MR. LATHROP:  Objection.

12  A.   No.

13  Q.   Is it your understanding that APA ever

14  waived the requirement that Mr. Goulet serve a

15  ten-day suspension?

16  MR. LATHROP:  Objection.

17  A.   No.

18  Q.   Were you ever informed by APA Transport

19  that they had waived the requirement that Mr. Goulet

20  present acceptable documentation to the company

21  regarding his ability to return to unrestricted

22  duties?

23  A.   No.

24  Q.   Did APA ever inform you that Mr. Goulet was

00073
1    not required to serve a ten-day suspension prior to

2    being placed on the seniority list?

3    A.    No.

4    MS. PENNINI:  That's all I have.

5    REDIRECT EXAMINATION

6        BY MR. LATHROP:

7    Q.    Mr. Harrington, did you personally ever

8    challenge the fact that Mr. Goulet's name appears on

9    the APA Canton seniority list for November 2001?

10   MS. PENNINI:  Objection.

11   A.    No.

12   Q.    Do you have any understanding as to whether

13   or not anyone within Local 25 objected to the fact

14   that APA Transport put Mr. Goulet on its November

15   2001 Canton seniority list?

16   A.    No.

17   MR. LATHROP:  Nothing further.

18   FURTHER RECROSS EXAMINATION

19       BY MS. PENNINI:

20   Q.    Mr. Harrington, are you aware of whether

21   this seniority list was ever posted in this form at

22   the APA Transport facility in Canton, Massachusetts?

23   A.    No.

24

00074
```
 1   FURTHER REDIRECT EXAMINATION

 2       BY MR. LATHROP:

 3   Q.   Exhibit 2 to your brief to the committee,

 4   that is the form of a seniority list that APA

 5   normally sent directly to Local 25?

 6   A.   Yes.

 7   MR. LATHROP:  Thank you.  I have nothing

 8   further.

 9                    (Whereupon the deposition

10                    was concluded at 12:06 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

00075
```
 1   C E R T I F I C A T E
 2       I, MARK A. HARRINGTON, do hereby certify that I
 3   have read the foregoing transcript of my testimony,
 4   and further certify under the pains and penalties of
 5   perjury that said transcript (with/without)
 6   suggested corrections is a true and accurate record
 7   of said testimony.
 8       Dated at _____, this _____ day of _____,
 9   2005.
10
11                      _____
12
13
14
15
16
17
18
19
20
21
22
23
24
```

00076
```
 1   COMMONWEALTH OF MASSACHUSETTS)

 2   SUFFOLK, SS.                 )

 3        I, Ken A. DiFraia, Registered Professional

 4   Reporter and Notary Public in and for the

 5   Commonwealth of Massachusetts, do hereby certify

 6   that there came before me on the 12th day of Oct.,

 7   2005, at 10:15 a.m., the person hereinbefore named,

 8   who was by me duly sworn to testify to the truth and

 9   nothing but the truth of his knowledge touching and

10   concerning the matters in controversy in this cause;

11   that he was thereupon examined upon his oath, and

12   his examination reduced to typewriting under my

13   direction; and that the deposition is a true record

14   of the testimony given by the witness.

15        I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19        In witness whereof, I have hereunto set my hand

20   and affixed my notarial seal this _____ day of

21   October, 2005.

22               _____

23                    Notary Public

24        My commission expires 4/3/09
```

## CANTON SENIORITY LIST

### LOCAL UNION 25     NOVEMBER 2001

| | | |
|---|---|---|
| 1 | Prout, R. | 11/12/68 |
| 2 | Burrill, P. | 06/30/70 |
| 3 | McCaffrey, M. | 10/07/70 |
| 4 | Mastropietro, R. | 06/14/73 |
| 5 | Setterland, D. | 11/05/73 |
| 6 | Loud, D. | 01/11/74 |
| 7 | Petit, A. | 03/11/74 |
| 8 | Petit, R. | 09/15/75 |
| 9 | Durette, M. | 09/30/75 |
| 10 | Hoyt, H. | 08/17/76 |
| 11 | Pitts, R. | 08/27/76 |
| 12 | D'Eramo, M. | 02/22/77 |
| 13 | Sullivan, T. | 10/24/77 |
| 14 | Rabideau, R. | 01/04/78 |
| 15 | Kelley, Jr., W. | 03/22/78 |
| 16 | Monahan, H. | 11/14/78 |
| 17 | Petit, Jr., E. | 04/23/79 |
| 18 | Pickering, G. | 08/03/81 |
| 19 | Tisbert, B. | 05/17/83 |
| 20 | Damiano, J. | 07/20/83 |
| 21 | Gwynn, N. | 05/14/84 |
| 22 | Goulet, C. | 06/28/84 |
| 23 | Cardoza, P. | 09/24/84 |
| 24 | Bouffard, R. | 09/30/85 |
| 25 | Couil, D. | 04/06/73 |
| 26 | McGee, R. | 05/20/82 |
| 27 | Francey, G. | 10/25/82 |
| 28 | Cruise, M. | 04/30/84 |
| 29 | Power, K. | 11/15/84 |
| 30 | Fennelly, E. | 02/25/85 |
| 31 | McGrath, H. | 08/26/85 |
| 32 | Bain, S. | 03/09/87 |
| 33 | Holderried, J. | 05/08/89 |
| 34 | Howe, T. | 05/15/89 |
| 35 | Howe, S. | 05/31/90 |
| 36 | Berry, S. | 05/31/90 |
| 37 | Sullivan, C. | 12/09/91 |
| 38 | MacDonald, J. | 12/09/91 |
| 39 | Hulbert, M | 12/09/91 |
| 40 | O'Meara, W. | 03/01/93 |

2/8/05   CG   60

00001

```
                              Volume I
                              Pages 1 to 35
                              Exhibits 1 to 3
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - -x
:
CRAIG GOULET,                   :
          Plaintiff,      :
:
      vs.                 :  Civil Action
:                           No. 04-12577 JLT
NEW PENN MOTOR EXPRESS, INC:;
and TEAMSTERS LOCAL 25,    :
INTERNATIONAL BROTHERHOOD O:
TEAMSTERS,                 :
          Defendants.    :
:
- - - - - - - - - - - - - - - -x
```

          DEPOSITION OF GEORGE D. FRANCEY, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Scott A. Lathrop & Associates,
122 Old Ayer Road, Groton, Massachusetts, on
Wednesday, October 12, 2005, commencing at 9:10 a.m.
PRESENT:
     Scott A. Lathrop & Associates
          (by Scott A. Lathrop, Esq.)
          122 Old Ayer Road, Groton, MA 01450,
          for the Plaintiff.
     Frantz Ward LLP
          (by Carl H. Gluek, Esq.)
          2500 Key Center, 127 Public Square,
          Cleveland, OH 44114-1230, for the Defendant
          New Penn Motor Express Inc.
(Continued on Next Page)

```
00002
      PRESENT:   (Continued)
            Dwyer, Duddy and Facklam
                  (by Kathleen A. Pennini, Esq.)
                  Two Center Plaza, Suite 430, Boston, MA
                  02108-1804, for the Defendant Teamsters
                  Local 25, International Brotherhood of
                  Teamsters.
      ALSO PRESENT:  Craig Goulet
        *  *  *  *  *
```

```
00003
     I N D E X
     WITNESS        DIRECT  CROSS   REDIRECT  RECROSS
     GEORGE D. FRANCEY
      BY MR. LATHROP    5
      BY MR. GLUEK            29
     * * * *
     E X H I B I T S
     NO.          DESCRIPTION              PAGE
      1Seniority list                      18
      2Statement by George Francey         22
      3Seniority list for Canton, dated    22
     11/01
      * * * *
```

00004
```
 1   P R O C E E D I N G S
 2              MR. LATHROP:  Any stipulations?
 3   MS. PENNINI:  Yes.
 4   MR. GLUEK:  What are they?
 5   MS. PENNINI:  Objections, except as to
 6   form, reserved for trial.
 7   MR. LATHROP:  And shall we reserve motions
 8   to strike?
 9   MS. PENNINI:  Yes.
10   MR. LATHROP:  How about reading and
11   signing?
12   MS. PENNINI:  45 days.  We can waive the
13   notary.
14   MR. LATHROP:  If it's not signed within 45
15   days of receipt, the reading and signing are deemed
16   waived?
17   MS. PENNINI:  Okay.
18   GEORGE D. FRANCEY
19   a witness called for examination by counsel for the
20   Plaintiff, having been satisfactorily identified by
21   the production of his driver's license and being
22   first duly sworn by the Notary Public, was examined
23   and testified as follows:
24
```

00005
1    DIRECT EXAMINATION
2        BY MR. LATHROP:
3    Q.    Morning, sir.
4    A.    Morning.
5    Q.    Could you please state your full name and
6    address for the record.
7    A.    George Douglas Francey, 324 Flagg Street,
8    Bridgewater, Mass.
9    Q.    What is your date of birth, sir?
10   A.    3/17/55.
11   Q.    Are you or have you ever been a member of
12   Local 25 of the Teamsters?
13   A.    Yep.
14   Q.    That's a yes?
15   A.    Oh, yes.
16   Q.    Are you currently a member?
17   A.    Yes.
18   Q.    When were you first a member of Local 25?
19   A.    I want to say it was November '78.  And I
20   was in Local 170 for four years, so from '82 to '86.
21   Q.    How did you happen to join Local 25?
22   A.    Working for Beacon Fast Freight.  It was a
23   union barn.  I had to join.
24   Q.    Where were you based when you worked for

00006
1    Beacon Fast Freight?

2    A.    Avon, Mass.

3    Q.    How long did you work for Beacon Fast

4    Freight?

5    A.    Until '82.

6    Q.    What happened in '82?

7    A.    Work was falling off, so I started sparing

8    over at Sanborn's.  Then I made the list over there,

9    so I transferred the locals and went over to

10   Sanborn's.

11   Q.    What's the full name of Sanborn's?

12   A.    Sanborn's Motor Express.

13   Q.    Where were you based?

14   A.    I worked out of the Wrentham terminal, but

15   their headquarters was in Portland, Maine.

16   Q.    Wrentham, Mass.?

17   A.    Yes.

18   Q.    When did you make the list?

19   A.    Let's see, I think it was in October of

20   1982.

21   Q.    How long did you continue to work for

22   Sanborn's?

23   A.    Until APA Transport bought Sanborn's Motor

24   Express in I believe October or thereabouts of '86.

00007
1    Q.    Where were you first based when you worked

2    for APA Transport?

3    A.    Canton, Mass.

4    Q.    How long did you work in Canton, Mass.?

5    A.    I worked in Canton until APA closed their

6    doors in 2002, February.

7    Q.    Where did you work after that?

8    A.    I currently work at Atlantic Plant

9    Maintenance in Watertown.

10   MR. GLUEK:  Could you repeat that.

11   THE WITNESS:  Atlantic Plant Maintenance in

12   Watertown, Mass.

13   Q.    Is that a union?

14   A.    Yes, Local 25.

15   Q.    When did you start with Atlantic Plant

16   Maintenance?

17   A.    Let's see, APA went out in February.  I

18   spared around for a while, like working where I

19   could get work.  I was not on anybody's list, and I

20   started there in May of 2002.

21   Q.    What do you do for them?

22   A.    Rigor, truck driver.

23   Q.    You currently work for them?

24   A.    Yes.

00008
```
 1   Q.   Have you held any positions in Local 25?
 2   A.   I was the steward at the APA facility from
 3   February 2001 until we went out of business in
 4   February of 2002.  It was just about a year.
 5   Q.   Did you hold any other positions with
 6   Local 25?
 7   A.   No.
 8   Q.   Was that an elected position?
 9   A.   Yep.
10   Q.   Is that yes?
11   A.   Yes.
12   Q.   Are you familiar with the plaintiff in this
13   case, Craig Goulet?
14   A.   Yes.
15   Q.   When did you first become familiar with
16   Craig Goulet?
17   A.   When did I first meet him?
18   Q.   Yes.
19   A.   At Sanborn's in Wrentham probably.  Was
20   that 1982?  Yes.
21   Q.   Was he working at the time?
22   A.   Yes.  That's how I met him.
23   Q.   Let's talk about APA Transport and its
24   closure.
```

00009
```
 1   A.    Sure.

 2   Q.    How did you first come to learn that APA

 3   Transport would be closing?

 4   A.    I came in off the street one night, and

 5   they said, "We're out of business."

 6   Q.    Who is that?

 7   A.    It was Valentine's Day.  The terminal

 8   manager told us.

 9   Q.    Who was the terminal manager?

10   A.    What is the name...  I know it.  Give me a

11   minute here.  He was not terminal manager that long,

12   only maybe a year before that, if that.  What was

13   the name...  It will come to me eventually.

14   Q.    Did you have some communications with the

15   Local 25 leadership with regard to --

16   A.    Oh, yes.  Mark Harrington was the business

17   agent for us at the time.

18   Paul Dubiel was the terminal manager's

19   name.

20   Q.    You said Mark Harrington was the business

21   agent?

22   A.    Right.

23   Q.    He was the business agent covering APA

24   Transport?
```

00010
```
 1   A.    Yes.
 2   Q.    How long had he been the business agent for
 3   APA Transport, as you recall?
 4   A.    I want to say he was always our business
 5   agent since he was a business agent.  I can't
 6   remember exactly.
 7   We were there for, what 16, 17 years, as
 8   far I remember.  I think maybe T. Eddie Sheehan
 9   might have been a business agent before him.  When I
10   was the steward, Harrington was the business agent,
11   and for the steward before me, Harrington was the
12   business agent.
13   Q.    Did you know a William Carnes?
14   A.    Not personally.  I know he was the vice
15   president of Local 25.
16   Q.    After you heard from the terminal manager
17   that APA Transport was closing, did you have any
18   communications with Mr. Harrington?
19   A.    Oh, yes.
20   Q.    What communications do you recall having
21   with Mr. Harrington relative to the closing?
22   A.    Just in general.  I mean, I can't remember
23   exactly.  Obviously, you know, he said, "Hey, we're
24   out of business."
```

00011
1    He, you know, communicated to me that New

2    Penn Motor Transport was offering work to APA

3    employees on a seniority basis.  There were two

4    terminals that you had your choice of.  There was

5    Billerica or Cranston, I think it was called.  The

6    Providence terminal I believe was in Cranston.  One

7    of my duties as the steward was to take the

8    seniority list and ask everybody where they wanted

9    to go, which I did.

10   Q.   When you communicated with Mr. Harrington

11   concerning the idea that New Penn Motor Express was

12   offering work at two different terminals, was

13   Mr. Harrington telling you this in person, by

14   telephone, by letter, or some other means?

15   A.   Could have been in person, could have been

16   by telephone.  I mean, he was there.  He came down

17   to the barn a few times.

18   They told us on Valentine's Day they were

19   closing the doors the following Tuesday.  I don't

20   remember whether Valentine's Day was a Wednesday or

21   Thursday.  The following Tuesday, the doors were

22   closing.

23   Of course, we had to get rid of freight in

24   the system.  Guys started getting laid off.  That

00012
 1    goes by seniority.
 2    Being the steward, the steward has super
 3    seniority for layoff purposes.  He wanted me to be
 4    the last guy out of there because he wanted to be
 5    sure APA -- they had a reputation for not doing
 6    things on the up and up.  I mean, what are you going
 7    to do, we're going out of business.  That's what he
 8    wanted me to do.  I mean, it was work for me.  I
 9    stayed.
10    I think I was the last one to work there
11    that Friday after Valentine's-- not the Friday
12    after.  It was a Wednesday or Thursday.  The
13    following week I think was my last day on a Friday,
14    whatever that was.  I would have to look at a
15    calendar.
16    Q.    You had a seniority list?
17    A.    Yes.
18    Q.    Where did the list come from?
19    A.    APA.
20    Q.    At some point in time, was there some sort
21    of vote?
22    A.    A vote?  About what?
23    Q.    Any sort of ratification vote?
24    A.    Of what?

00013
```
 1   Q.   With regard to New Penn.

 2   A.   What do you mean?  I'm not following you.

 3   What's a ratification vote?

 4   Q.   Did you have a meeting with --

 5   A.   Me, no.  With New Penn, no.

 6   Q.   Did you attend a meeting of APA drivers?

 7   A.   Oh, yes.  We went to the union hall, yes.

 8   Q.   Let's talk about that.  Do you recall when

 9   this meeting at the union hall took place?

10   A.   Not the exact day, no.

11   Q.   Was it before your last day at APA?

12   A.   Good question.  I don't remember.

13   Q.   But do you recall that there was --

14   A.   I mean, I could not swear to when it was.

15   You know what I'm saying?

16   Q.   You do recall a meeting at the union hall?

17   A.   Yes.

18   Q.   For the record, where is the union hall?

19   A.   Charlestown.  I think it's at 544 Main

20   Street.

21   Q.   Who was present at this meeting?

22   A.   Mark Harrington.  This is to the best of my

23   recollection.  I believe Shawn O'Brien was there.

24   I'm pretty sure George Cashman was there.
```

00014
1    Q.    Do you know if Mr. Carnes was there?

2    A.    Good possibility.  I don't remember talking

3    to him, but he was probably there.

4    Q.    Could you identify for the record who

5    George Cashman was at the time.

6    A.    President of Local 25.

7    Q.    And who was Shawn O'Brien?

8    A.    Business agent.

9    Q.    Do you know for what --

10    A.    Oh, he didn't have anything to do with us.

11    I mean, these guys were there simply because they

12    are the Local 25 leadership.

13    APA going out of business was a pretty big

14    hit for Local 25 because we had two terminals, one

15    in Dracut and then the Canton facility.  You are

16    talking, what, 72 guys in Canton, and I don't know

17    how many up in Dracut.  There was probably over 30

18    anyway.

19    Q.    Was this meeting at the union hall

20    therefore for the Dracut and Canton APA drivers?

21    A.    I believe we were all together, I believe.

22    Q.    When you say "all together," you mean both

23    the Dracut and the Canton employees?

24    A.    I believe so.

00015

 1   Q.   Do you recall what was said or done during

 2   this meeting?

 3   A.   We talked about getting work, because, I

 4   mean, everybody was out of a job.  I believe that

 5   was probably one of the times that they mentioned

 6   New Penn offering work on a seniority basis to APA

 7   employees.

 8   Q.   Do you know if a seniority list was shown

 9   or used at this meeting?

10   A.   At this meeting, I don't recall.  I don't

11   recall.

12   Q.   At this meeting, did any of the Local 25

13   members express their preferences for New Penn

14   terminals?

15   A.   No.  The way I did it, in Canton, I had a

16   copy of the seniority list, and I went to everybody,

17   asked them what terminal they wanted to go to.  I

18   wrote it down next to their name.  When I was done

19   with that, I handed it into Mark Harrington.  That's

20   the last I had anything to do with it.

21   Q.   Did you do that before or after --

22   A.   No.  While I was working, not at this

23   meeting.

24   Q.   Let me ask the full question.

00016
```
 1   A.    Go ahead.

 2   Q.    Did you do it before or after this meeting?

 3   A.    Probably before and after.  You know what

 4   I'm saying?  It was like as I could get ahold of

 5   people.  Like the guys were still coming into work

 6   until everything dried up.  I would get ahold of

 7   them and ask them.  Some of them I may have called

 8   on the phone.

 9   This went on continually until probably the

10   last day I was there, getting everybody's pick.

11   Q.    At this union meeting, do you recall

12   whether or not Craig Goulet was discussed?

13   A.    I can't remember, to tell you the truth.  I

14   had not seen him in years, and I know I communicated

15   with him because -- I don't remember whether I

16   called him or he called me, but he gave me a pick.

17   I wrote it down.

18   Because his name was not carried on the

19   seniority list.  They took it off long before I was

20   the steward.  I really never understood what his

21   position was, whether he was on comp, whether he was

22   off.  I didn't think he was off the list.  I knew he

23   had a case against APA.

24   You know, I mean, officially his name was
```

00017
1    not on the list.  I wrote his name in on the bottom
2    where he wanted to go and his phone number.  I drew
3    an arrow up the side.  I inserted it into where his
4    name should be on the seniority list.
5    Q.   Do you recall when it was you contacted
6    or --
7    MR. GLUEK:  Objection.
8    Q.   Let me restate it.  Do you recall when you
9    were in contact with Mr. Goulet?
10   A.   No.
11   Q.   Do you recall if it was before or after
12   this meeting?
13   A.   I don't recall, to tell you the truth,
14   honestly.
15   Q.   Correct me if I'm wrong, but I believe you
16   said the contact was by telephone?
17   A.   It would have been, I believe.  I mean, I
18   had not seen him.  I don't recall seeing him at the
19   meeting.  Maybe he was there.  I really don't
20   recall.
21   Q.   Correct me if I'm wrong, but you said in
22   this conversation you had with Mr. Goulet, his
23   preference for terminals with New Penn was
24   expressed?

00018
1    A.    Yes.

2    Q.    Do you recall the terminal that he

3    selected?

4    A.    Yes.  I have a copy.  I have the original

5    right here.  It's Billerica.

6    Q.    May I see that.

7    A.    Yes.  That's the original handwritten one

8    that I used.

9    MR. LATHROP:  I'm going to make copies of

10   this.

11   (Pause)

12   Q.    Mr. Francey, let me return the original to

13   you and have this copy marked.

14        (Document marked as Francey

15         Exhibit 1 for identification)

16   Q.    Mr. Francey, I'm showing you a photocopy of

17   what you had just handed me.  We marked it for

18   purposes of identification as Exhibit No. 1.  This

19   is a photocopy of the document you just handed me,

20   correct?

21   A.    (Examines document)  Correct.

22   Q.    Let's now talk a little bit about this

23   document.  In terms of what I will call the

24   typewritten portion, where did that come from?

00019
1    A.    APA.

2    Q.    Do you remember when you got it?

3    A.    Well, they always have to have the

4    seniority list posted on the bulletin board.  I may

5    have just photocopied that.  I might have got one

6    out of the office.

7    I mean, I would have had one as the steward

8    anyway.  I don't know whether I had been carrying

9    this one all along or what.

10   Q.    The handwriting that appears on this

11   document, is that all yours?

12   A.    That's all mine.

13   Q.    How did you get Mr. Goulet's telephone

14   number?

15   A.    I don't remember whether he called me or I

16   called him.  I know I spoke to him.

17   Q.    By B-i-l --

18   A.    That stands for Billerica.  If you look at

19   the top, you will see Providence.  B-i-l is for

20   Billerica.

21   Q.    When you say between 28, is that 28 and

22   29 --

23   A.    That's where his name used to be on the

24   seniority list.

00020
```
 1   Q.   I take it you attempted to go through
 2   approximately 75 persons to get their preferences?
 3   A.   Yep.
 4   Q.   That's a yes?
 5   A.   Yes.
 6   Q.   After you got everyone's preference, you
 7   gave this document to Mr. Harrington?
 8   A.   Yes.  I gave him a copy.
 9   Q.   You kept the original?
10   A.   That's the original that you just
11   photocopied.
12   Q.   Did you have any later dealings with
13   Mr. Goulet after you got his preference?
14   A.   I don't recall any.
15   Q.   After you gave this list to Mr. Harrington,
16   did you do anything further in terms of working on
17   employees' selection of New Penn preferences?
18   A.   No, because I was nobody after -- APA went
19   out of business.  I was not steward anymore.  I was
20   trying to get myself a job.
21   Q.   You did not go to New Penn?
22   A.   No.  They called me, but I was working at
23   the time.
24   Billerica is just too long of a haul for
```

00021
1    me.  I didn't want to change locals.  Cranston would

2    have been just as far.  By then I was working in the

3    rigging business, and I kind of liked it.

4    Q.    Help me out here.  I assume your name is on

5    this list?

6    A.    Yes.

7    Q.    What number are you?

8    A.    Good question.  I don't have my glasses.

9    Let's see here, where am I...  Right here.  I'm

10   number -- what's that?  I can't read it.

11   Q.    27?

12   A.    I believe so, yes.

13   Q.    You had at least listed Providence for

14   yourself?

15   A.    I did, but I had no intention of going

16   there.

17   Q.    You did get a call?

18   A.    They did call me.  I believe it was the

19   following, I want to say, June maybe.  It was warm

20   weather by the time they got around to calling me.

21   Like I said, I was already employed in the

22   rigging business, so I was not interested.

23   Q.    At some point in time, did you sign a

24   statement?

00022

1    A.    I would have to look at it, because she

2    said that to me (indicating).  I don't recall

3    signing it.

4    Q.    She being Attorney Pennini?

5    A.    Yes.

6          (Document marked as Francey

7          Exhibit 2 for identification)

8    Q.    Mr. Francey, I'm showing you what was

9    marked as Exhibit 2 in this deposition.  This

10   purports to be something signed by you on July 22,

11   2004.

12   A.    (Examines document)  Definitely.

13   Q.    Is that your signature?

14   A.    It is my signature.

15   Q.    That's an accurate statement, that you

16   spoke with Craig Goulet regarding the closure of

17   APA?

18   A.    Sure, that's an accurate statement.

19   Q.    It says, "When I spoke with Mr. Goulet, he

20   indicated to me his choice was the Billerica MA

21   terminal"?

22   A.    Yes.

23         (Document marked as Francey

24         Exhibit 3 for identification)

00023

1    Q.   Mr. Francey, I'm showing you what was

2    marked as Exhibit 3, which is another purported

3    seniority list for Canton, Local 25, November 2001.

4    Have you ever seen this document before?

5    A.   (Examines document)  Probably in the past,

6    yes.  That appears to be an older seniority list.

7    Q.   When you say "older," what do you mean by

8    older?

9    A.   Well, there doesn't appear to be as many

10   names on it as on this one, just looking at it

11   (indicating).  Yes, it's from November 2001.

12   Q.   The list that you used, is it dated?

13   A.   No.

14   Q.   Do you see Mr. Goulet's name on Exhibit 3?

15   A.   Oh, yes.

16   Q.   Do you have any understanding as to who put

17   together Exhibit 3?

18   A.   I would not know.

19   Q.   Did you have any communication with anyone

20   other than Mark Harrington concerning APA employees'

21   preference with regard to the New Penn terminal?

22   A.   No.  I mean, I had no power.  All I was

23   doing was making out a list for him basically.

24   Q.   Just to be clear, you spoke to no other

00024
1  officer of Local 25 with regard to the preferences
2  of the Canton employees?
3  A.   I don't recall speaking with anybody.   I
4  don't know why I would have spoke with anybody else.
5  Maybe in passing, maybe in conversation, but
6  officially?   I don't recall.
7  Q.   Did you ever have any dealings with New
8  Penn representatives?
9  A.   No.
10  Q.   Did you ever have any dealings with APA
11  representatives with regard to APA employees and
12  their New Penn selections?
13  A.   No.
14  Q.   Other than giving Exhibit 1 to
15  Mr. Harrington, did you do anything else with regard
16  to employee selection?
17  A.   No.
18  Q.   Did Mr. Harrington ever ask you any
19  questions about Exhibit 1?
20  A.   I don't recall any.
21  Q.   Did he discuss Craig Goulet with you?
22  A.   I don't recall discussing Craig Goulet at
23  all.  He may have just in passing, but I don't
24  recall it.

00025

1   Q.   Do you know who the steward was in the

2   Dracut terminal?

3   A.   Oh, I can see his face...  I can't recall

4   his name.  I didn't know him that well.

5   MR. LATHROP:  Let me just take a few

6   minutes.

7   (Recess)

8      BY MR. LATHROP:

9   Q.   Looking at Exhibit 1, Mr. Francey, you

10  talked about inserting Craig Goulet's name there.

11  Do you recall whether or not there was any

12  discussion among APA employees about --

13  A.   Where his name was on the seniority list?

14  I would have had to have asked someone, because I

15  didn't know.

16  I mean, I knew he was a Sanborn employee,

17  but I was not sure exactly where his name was

18  because his name had not been on there for many

19  years.  I don't know why APA took his name off of

20  the seniority list, but it was not carried.  A lot

21  of years went by.

22  I don't recall.  I either put it there

23  because that's what Craig told me where he was or

24  whether the former steward told me where he was or

00026
```
 1   whether the guys in general just said that that's
 2   where he should be.  I don't recall.
 3   And I may have injected his name on the
 4   wrong spot, but that was an accident if I did.  At
 5   least I got the name on there.
 6   Q.   Do you recall whether or not there was any
 7   discussion about the propriety of Craig's name being
 8   on the list?
 9   A.   The way it was explained to me is that -- I
10   knew he was out on a comp case, and he was hurt in I
11   believe '87.  I don't know, but that's my
12   recollection.  I knew he had a case going against
13   APA.
14   Before Dubiel was the terminal manager,
15   John Conti was.  I remember him calling me into the
16   office and asking me who Craig Goulet was because
17   his name wasn't on the seniority list.  I guess he
18   had just found out that Craig must have won his case
19   against APA, was supposed to be coming back to work,
20   because this was -- well, I don't know how many
21   years that was, 14, 15 years.  John Conti, you know,
22   was not terminal manager when Craig Goulet worked
23   there.
24   I remember Harrington telling me the same
```

00027

1    thing in a telephone conversation, that Craig Goulet

2    won his case and that he was going to be coming back

3    to work.  Everybody was kind of surprised, seeing he

4    had been gone for so many years.

5    That's what I recall about hearing that.

6    That was not very long before we went out of

7    business.  It was a matter of months, but I can't

8    remember exactly, you know, whether it was six

9    months, three months.  I think it could have been

10   six months, but I don't know.

11   Q.   At the time you heard about the APA

12   closure, do you remember whether there was any

13   discussion among the APA men about Craig's name

14   being on the seniority list?

15   A.   A lot of them, the older guys, like knew he

16   existed; the younger guys never saw his name

17   probably.

18   Q.   Do you recall whether there were any

19   complaints about him being on the list?

20   A.   No.  Before I was the steward, that was not

21   something that I concerned myself with.  His name

22   had not been carried on there for a long time.  I

23   don't recall when they took it off.

24   Now, I'm talking about the seniority list

00028
1    that they post on the bulletin board.  I mean,

2    that's the only seniority list I ever saw.

3    What APA had in their office, what Local 25

4    had in their office, I have no clue.  I only go by

5    what they post and I just assume that that's the

6    official seniority list, as far as I know.

7    Q.    Just to be clear, Exhibit 3, do you

8    recognize that?

9    A.    (Examines document)  I have never seen

10   this, but I see there's a mistake here where his

11   name should be, if this is accurate, because I have

12   him a few slots below that.  I mean, that would have

13   been a mistake, an innocent mistake.  I mean, I was

14   trying to do the right thing here.

15   Q.    At the union hall meeting, were there

16   seniority lists that were presented at that time?

17   A.    I don't recall, to be honest.  I don't

18   recall much of that meeting.  Everybody was kind of

19   bummed out, you know what I mean, after losing your

20   job after 18 years.  Everybody is worried about

21   where they are going to go.

22   I really don't recall much about that

23   meeting.

24   MR. LATHROP:  I have nothing further.

00029
1    CROSS EXAMINATION

2        BY MR. GLUEK:

3    Q.   Good morning.  My name is Carl Gluek.  I

4    represent New Penn.

5    A.   Morning.

6    Q.   If you could look at Exhibit 1 and

7    Exhibit 3.  They are the two different seniority

8    lists.  I notice that Exhibit 3 is different in form

9    in terms of the information that's provided from

10   Exhibit 1; is that correct?

11   A.   Wait a minute.  Is this 3?

12   Q.   Correct.

13   A.   And this is 1?

14   Q.   Correct.

15   A.   Yes, I see that, too.

16   Q.   You previously testified about their being

17   a seniority list that is posted.  In your mind,

18   that's the official one, correct?

19   A.   That is the only one I ever saw.

20   Q.   The one that's marked Exhibit 3, is that in

21   the format that would be posted, or is Exhibit 1 in

22   the format that would be posted?

23   A.   This is the one that would be posted, but

24   APA would have probably cut the phone numbers off

00030
1   (indicating).

2   Q.   Just so the record is clear, you were

3   pointing at Exhibit 1?

4   A.   This one, yes, Exhibit 1.

5   Q.   If you could look at Exhibit 1, No. 36.

6   What's that handwriting say?

7   A.   I don't have my glasses on.  Good question.

8   I can't see.

9   Q.   Maybe you can go over by the light.

10  A.   Well, I need something.  36?

11  Q.   Correct.

12  A.   Let's see, 36... "Steve Hurley," oh, "Not

13  going" is what I wrote.  He didn't make a pick.

14  Q.   He decided he didn't want to go to either

15  terminal?  He had no preference?

16  A.   Right.

17  Q.   Could you look at No. 48 and tell me what

18  that says.

19  A.   "Dennis Carvalho, No. 48, Not going."

20  Q.   He, too, decided he didn't want --

21  A.   He didn't want any part of it.  He must

22  have got another job.

23  Q.   No. 66, I notice that person is crossed

24  out?

00031
1   A.   Oh, yes.  I don't know whether he was fired

2   or whether he quit.  We couldn't get ahold of him.

3   This was even before this situation developed with

4   New Penn, too.  He was not returning calls.  I don't

5   know if he voluntarily quit or whatever.  We

6   couldn't get ahold of him.

7   He had problems.  He had issues with APA.

8   I could not get ahold of him even before this

9   because we wanted to know if he was coming back to

10  work.

11  Q.   75, the handwriting, is that supposed to be

12  B-i-l?

13  A.   No. 75?

14  Q.   Yes.

15  A.   Yes, Billerica, B-i-l.

16  Q.   Then there were several people that

17  retired.  Is that Ret --

18  A.   Yes, R-e-t is retirees.  They decided to

19  take a pension.

20  Q.   They had no preference then?

21  A.   No, no.  They didn't pick anything.

22  There's one with an arrow stick, Mark

23  Hurley.  He was in the Gulf.  He was on active duty.

24  I couldn't get ahold of him.  I never heard from him

00032

1   again.

2   Q.   You can sit down now.  I'm done with the

3   list.

4   A.   Thank you.

5   Q.   With respect to Mr. Goulet, did you

6   unilaterally decide to contact him or put him on the

7   list, or did somebody tell you to put him on the

8   list?

9   A.   You know, I don't recall the exact events

10  that led up to that.  I may have discussed it with

11  the former steward.  He may have said, "Technically

12  he's still on the list.  We don't know."

13  I don't recall exactly.  I knew, though,

14  that if he had won his case, I knew that from, you

15  know, previously, that he was coming back to APA.

16  Why he hadn't come back, I never knew.  I

17  mean, you know, it was just, you know, scuttlebutt,

18  or whatever you want to call it, that he was not

19  medically cleared to come back or whatever, and then

20  in the interim, we go out of business.

21  I must have thought it was the right thing

22  to do, though.

23  Q.   Just to make sure I understood the

24  testimony, you had no discussions with any

00033
1    representative of New Penn with respect to anybody's

2    preference?

3    A.    No.  That would not have been my job.

4    MR. GLUEK:  Nothing further.

5    MS. PENNINI:  May I have a couple of

6    minutes.

7    MR. LATHROP:  Sure.

8    (Pause)

9    MS. PENNINI:  I have no questions.

10         (Whereupon, the deposition

11               was concluded at 9:56 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

00034
```
 1    C E R T I F I C A T E

 2        I, GEORGE D. FRANCEY, do hereby certify that I

 3    have read the foregoing transcript of my testimony,

 4    and further certify under the pains and penalties of

 5    perjury that said transcript (with/without)

 6    suggested corrections is a true and accurate record

 7    of said testimony.

 8        Dated at _____, this _____ day of _____,

 9    2005.

10

11                         _____

12

13

14

15

16

17

18

19

20

21

22

23

24
```

00035
```
 1   COMMONWEALTH OF MASSACHUSETTS)

 2   SUFFOLK, SS.                 )

 3       I, Ken A. DiFraia, Registered Professional

 4   Reporter and Notary Public in and for the

 5   Commonwealth of Massachusetts, do hereby certify

 6   that there came before me on the 12th day of Oct.,

 7   2005, at 9:10 a.m., the person hereinbefore named,

 8   who was by me duly sworn to testify to the truth and

 9   nothing but the truth of his knowledge touching and

10   concerning the matters in controversy in this cause;

11   that he was thereupon examined upon his oath, and

12   his examination reduced to typewriting under my

13   direction; and that the deposition is a true record

14   of the testimony given by the witness.

15       I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19       In witness whereof, I have hereunto set my hand

20   and affixed my notarial seal this _____ day of

21   October, 2005.

22               _____

23                    Notary Public

24             My commission expires 4/3/09
```

FEBRUARY 13, 2002

### AGREEMENT BETWEEN
### THE TEAMSTERS NATIONAL FREIGHT
### INDUSTRY NEGOTIATING COMMITTEE
### AND NEW PENN MOTOR EXPRESS, INC.

1.     APA has notified TNFINC that the company intends to cease operations immediately. Absent the efforts contemplated by this Agreement, APA's existing customers will be divided among many competitors, most of them non-union regional carriers. This will result in the loss of many NMFA-covered jobs in the industry.   New Penn Motor Express (NPME) had no involvement in APA's decision to terminate operations and has no independent obligation, contractual, statutory or otherwise, to APA, TNFINC or APA's employees in connection with this closure.

2.     After being advised of APA's decision to close, however, NPME began negotiations with APA to explore the possibility of acquiring certain customer information.   Obtaining this customer information would allow NPME to capture a portion of APA's LTL business and keep that business with a NMFA carrier.   Any arrangement between NPME and APA regarding customer information is contingent upon approval of this Agreement by TNFINC.

3.     Under the contingent agreement between NPME and APA, NPME is seeking customer information and access. NPME is not a purchaser and does not seek to purchase any of APA's equipment or terminals from APA. NPME is not seeking or  participating in any merger or acquisition of APA or any of its rights or authority or stock. NPME is not the legal successor employer of APA.

4.     NPME does not believe its contingent agreement with APA creates any obligation to TNFINC or to APA NMFA employees, either legally or under the NMFA. However, NPME will extend an opportunity to those APA NMFA employees who are employed in the local supplemental areas where NPME has an established terminal operation to become NPME employees under terms and conditions hereinafter described.  In return for extending such opportunities, TNFINC will agree that NPME has fulfilled all contractual or legal obligations, if any, to TNFINC and the APA NMFA employees.

5.     NPME's discussions with APA regarding its customer lists and NPME's offer to extend opportunities to APA NMFA employees is voluntary.  NPME is undertaking these efforts because it believes there is some benefit to APA NMFA employees as well as a benefit to NPME.  However, NPME has negotiated with APA contingent upon reaching agreement with TNFINC.  Absent such agreements and approvals, NPME will abandon any further discussions with APA and will not extend the opportunities outlined herein, and shall have no obligation to TNFINC or the APA NMFA employees

1

6.     Because of the serious and urgent nature of APA's current financial condition and the need to avoid the immediate erosion of APA's customer base, the timing of this agreement is of the essence.

7.     As of February 20, 2002 APA will cease to make any pick ups of LTL freight. APA will continue to make deliveries of that freight in their system. It is not the intent or the plan of NPME to deliver any APA freight but will make itself available to do so on a limited basis.

8.     Following the termination of APA's operations, NPME will provide opportunities to APA NMFA employees as described herein:

        a.     NPME and APA have terminals in different locations. NPME will provide to TNFINC and APA a list of its terminals and a general description of its pick up and delivery territory for each terminal as well as will advise which NPME terminals have road operations and which NPME terminals do not in an effort to assist APA NMFA employees.

        b.     Thereafter each APA NMFA employee, whether active or inactive, employed in the same local supplemental area where NPME has existing direct terminal operations, shall have the right to place his/her name on the call list of only ONE NPME terminal (or the classification seniority list, where applicable) within the same local supplement where they currently are employed.    APA NMFA over-the-road drivers, active or inactive on separate over-the-road seniority at the Buffalo, NY, Philadelphia, PA and North Bergen, NJ terminals, shall only have the right to place his/her name on the over-the-road terminal seniority call list at one of the following NPME terminals where such same separate seniority exists. Albany, NY, Cinnaminson, NJ (Philadelphia area), Newburgh, NY and Trenton, NJ. (Footnote: In the event NPME opens a Burlington VT terminal, APA NMFA employees on the Burlington VT terminal seniority list shall be provided an opportunity to place their names on the list for the NPME Burlington VT terminal and gain seniority in accordance with the terms of this Agreement). NPME does not have any operations in Central States, nor does NPME have any operations in the Maritime Provinces of Canada as does APA, and thus those APA NMFA employees are not covered by this Agreement.    It is clearly understood that during the period between the date of APA's termination of operations and the effective date of this Agreement, NPME shall be able to utilize APA NMFA employees as necessary without regard to seniority.

        c.     No APA NMFA employee shall be required to place his/her name on any NPME terminal call list. NPME shall have no obligation to any APA NMFA employee who chooses to not place his/her name on a NPME terminal call list by March 1, 2002. Additionally, NPME shall have no obligation to APA NMFA employees until TNFINC provides the APA NMFA terminal selection call lists in accordance with this Agreement.

        d.     When an APA NMFA employee places his/her name on a NPME terminal call list, it will appear below all NPME employees names on that terminal seniority list (end-tailed). APA NMFA employees shall be arranged (and called as casuals) according to their current APA NMFA seniority. If more than one employee has the same seniority date, their positioning on the list will be decided by "coin-tossing" conducted by union officials. NPME is not obligated to hire any APA employee not covered by the NMFA.

2

D002

e.      Employees who are on a NPME terminal call list, will be offered work in accordance with their seniority position and qualifications. NPME shall not be penalized for passing an employee for work opportunity if the employee cannot perform all of the duties required of the job being filled or until APA NMFA employees meet all government pre-employment requirements.

f.      APA NMFA employees shall have work opportunity ahead of NPME casual employees, but shall not have work opportunity ahead of any probationary or preferred casual employees, if applicable.

g.      APA NMFA employees added to the NPME terminal call lists as described above shall be treated and paid as casual employees in accordance with the local supplement and shall establish seniority at NPME in accordance with the following provision. Any APA NMFA employee who works thirty (30) days within any two (2) consecutive calendar month period shall be deemed to have obtained seniority and shall be placed on the NPME seniority list in accordance with that established seniority date, end-tailed after the NPME seniority employees on such seniority list.

h.      NPME shall only be obligated to offer work to APA NMFA employees as outlined above until March 31, 2003 at which time such obligation will no longer exist.

If during the term of the current 1998-2003 NMFA, but not later than March 31, 2003, the list of former APA NMFA employees at any terminal is exhausted, those APA NMFA employees on other terminal lists in that local supplement, who have not obtained seniority at NPME, will be offered a second opportunity to place their name on the call list of such terminal.

i.      APA NMFA employees on a NPME terminal call list shall be paid in accordance with the casual rate listed in the NMFA until such time as they obtain NPME seniority. Thereafter they shall be paid ninety (90%) of the current NMFA rate for the first six (6) months and thereafter, one-hundred percent (100%) of the current rate in effect.

j.      Any APA NMFA employee who achieves seniority status at NPME and qualifies for vacation will receive one (1) bonus week of vacation in addition to the vacation earned under the local supplement unless or until such APA NMFA employee qualifies for three (3) weeks vacation, in which case the bonus week shall no longer apply. Under no circumstances shall any APA NMFA employee receive more than one bonus week of vacation in any vacation year. The vacation year being contract or calendar in accordance with the Local Supplemental Agreement.

k.      NPME shall have no obligation to relocate any APA NMFA employee.

l.      NPME shall have no responsibility, obligation or liability for any claim or for anything of any kind or nature regarding or involving APA NMFA employees added to NPME seniority lists as described prior to the time they are added to such NPME seniority list. This includes but is not limited to, unemployment or workers compensation claims, short-paid or

3

D003

underpaid wages, short-paid or under paid health and welfare or pension contributions, any unfunded or withdrawal pension liability, or claims or any kind against APA or others.

     m.    NPME will make contributions for each APA NMFA employee into the respective Health and Welfare and Pension fund where such APA NMFA employee is currently enrolled. All payments of Health and Welfare and Pension contributions made by NPME on behalf of the APA NMFA employee shall be made in accordance with the requirements of the NMFA and applicable Local Supplements. NPME shall not be obligated for Health and Welfare and Pension contributions on behalf of any APA NMFA employee on disability or workers compensation.

     n.    APA NMFA employees added to the NPME seniority lists shall be eligible to participate in the Teamsters 401-K program as do other NPME employees.

8.    It is acknowledged that the benefits provided to the APA NMFA employees under this Agreement are greater than would otherwise be provided under the NMFA for these employees under these circumstances, and that NPME has fulfilled any legal or contractual obligation it had or may have to these APA NMFA employees.

9.    This Agreement will become effective February 25, 2002, but only if (i) there is an agreement finalized between NPME and APA regarding customer lists and (ii) there is approval by the affected APA NMFA employees.

TNFINC                    NEW PENN MOTOR EXPRESS, INC.

_____      _____
Phil Young - Co-Chairman      Stephen M. O'Kane - President

_____      _____
James McCall - IBT Counsel     John Ring - Counsel

4

BIL - Billerica, MA
RET - Retired

#36 CALIFORNIA

EXHIBIT
Harrington

| NO. | NAME | ADDRESS | CITY/STATE | ZIP | DAY |
|---|---|---|---|---|---|
| 1. | RET. TROUT ROBERT | 33 NORRIS ST | BRAINTREE, MA | 02184 | 11/28/66 |
| 2. | PROV. BURRILL PETER | 3 GREAT WOODS CIRCLE | NORTON, MA | 02766 | 6/3/70 | 508-285-9452 |
| 3. | BIL McCAFFREY MICHAEL | 20 B SHAW ST | BRAINTREE, MA | 02184 | 10/7/70 | 781-840-9223 |
| | *DEPOUR* | | | | |
| 4. | RET. MARLBOROUGH RICHARD | 215 FOREST TRAIL | HANSON, MA | 02341 | 6/14/71 | 781-447-9455 |
| 5. | BIL PETERLAND DAVID | 164 HALL ROAD | HANOVER, MA | 02339 | 11/8/71 | 781-871-3535 |
| 6. | RET. LOUD DONALD | 500 BIRDFORD STREET | ABINGTON, MA | 02351 | 1/11/71 | 781-671-0416 |
| 7. | RET. PETTI ALAN | 31 OREGON ROAD | WEYMOUTH, MA | 02188 | 3/11/72 | 781-331-8823 |
| 8. | BIL PETTI ROBERT | 145 HIGHLAND AVE | QUINCY, MA | 02169 | 9/15/73 | 781-471-0098 | AREA (617) CODE |
| 9. | PROV. DUCCI RAMUHAEL | 11 POND STREET | SWANSEA, MA | 02777 | 9/31/73 | 508-674-7688 |
| 10. | RET. BOYD BERGER | 21 GARFIELD STREET | FOXBORO, MA | 02035 | 6/17/76 | 508-543-2978 |
| 11. | RET. PITTS ROBERT | 1555 LIBERTY STREET | BRAINTREE, MA | 02184 | 8/27/76 | 781-843-1549 |
| 12. | BIL DELANO MARIO | 31 WASHINGTON DRIVE | SHERBURN, MA | 01770 | 2/22/77 | 508-653-6006 |
| 13. | PROV. SULLIVAN THOMAS | 10 HILLSIDE DRIVE | PLYMOUTH, MA | 02360 | 10/24/77 | 508-224-5584 |
| 14. | BIL RAINBEAU RAYMOND | P.O. BOX 285 | EASTON, MA | 02334 | 1/9/78 | 508-230-2436 |
| 15. | PROV. BRADY WILLIAM | 100 FIELD STREET | BROCKTON, MA | 02301 | 3/31/78 | 508-589-0081 |
| 16. | PROV. MONAHAN ROBERT | 4 KATHY LANE | HANSON, MA | 02341 | 10/14/78 | 781-826-2751 |
| 17. | BIL PETTI RICHARD | 633 KING STREET | HANOVER, MA | 02339 | 4/23/79 | 781-871-4748 |
| 18. | BIL PICKERING GARY | 53 ROSALIND STREET | N.WEYMOUTH, MA | 02189 | 8/3/81 | 781-337-6278 |
| 19. | RET. TIBBETTI BRIAN | 317 MARSH AVE | SAGLUM, MA | 02050 | 8/11/81 | 781-894-1103 |
| 20. | PROV. DAMIANO JOHN | 51 BUDDY DRIVE | E.BRIDGEWATER, MA | 02333 | 7/20/83 | 508-378-3792 |
| 21. | PROV. GWYNN NORMAN | 481 CENTRAL STREET | E.BRIDGEWATER, MA | 02339 | 8/31/84 | 508-378-0498 |
| 22. | PROV. CARDOZA PHILIP | 108 MAPLE STREET | MANSFIELD, MA | 02048 | 9/24/84 | 508-339-5134 |
| 23. | BIL BOUFFARD ROBERT | CHURCH HILLSON STREET | BROCKTON, MA | 02301 | 9/30/85 | 508-588-6880 |
| 24. | RET. OSULL DENNIS | 3130 STATE ROAD | PLYMOUTH, MA | 02360 | 4/6/71 | 508-888-6964 |
| 25. | RET. BURKE RONALD | 31 COMMONWEAL BLVD | W.WAREHAM, MA | 01778 | 5/18/92 | 508-993-8174 |
| 26. | PROV. FRANCHY GEORGE | 114 FLAGG STREET | BRIDGEWATER, MA | 02324 | 10/25/82 | 508-697-9620 |
| 27. | PROV. OLSEN RICHARD | 10 SOUTH HORIZON DR | LAKEVILLE, MA | 02345 | 3/30/87 | 508-948-9336 |
| 28. | BIL POWDER REID | 16 CARVER ROAD | WAREHAM, MA | 02472 | | 617-926-5324 |
| 29. | PROV. FENNELL EDWARD | 168 WASHINGTON ST | PLAINVILLE, MA | 02762 | 7/15/84 | 508-699-8075 |
| 30. | PROV. McGRATH HAROLD | 163 MAIN STREET | WALPOLE, MA | 02081 | 6/26/95 | 508-668-0244 |
| 31. | BIL MAINS ROBERT | 38 POULE STREET | HOLBROOK, MA | 02343 | 8/31/98 | 781-767-8239 |
| 32. | BIL HOLBERG ROBERT | 139 CHURCH STREET | WESTWOOD, MA | 02090 | 6/8/89 | 781-329-1587 |
| 33. | BIL HOWE TIMOTHY | 117 EVERETT STREET | STOUGHTON, MA | 02072 | 8/11/90 | 781-344-1904 |
| 34. | PROV. HOWES STEVEN | 51 BRADFORD STREET | STOUGHTON, MA | 02072 | 5/31/90 | 781-341-1199 | 844/85 |
| 35. | BIL HENRY STEPHEN | 447 POND STREET | SO.WEYMOUTH, MA | 02190 | | 781-335-6187 |
| 36. | BIL SULLIVAN COLIN | 1 HADLEY ROAD | NORTON, MA | 02766 | 12/9/91 | 508-285-4915 |
| 37. | PROV. MacDONALD JEFFREY | 1 PENDLE PATH | FAIRHAVEN, MA | 02719 | 12/8/91 | 508-779-5224 |
| 38. | BIL HULBERT MILTON | 4 FIRST STREET | MANSFIELD, MA | 02048 | 12/9/91 | 508-339-8615 |
| 39. | PROV. BARBARA WILLIAM | 45 SOUTH STREET | RANDOLPH, MA | 02368 | 1/21/93 | 781-986-8986 |
| 40. | PROV. PORTER MARK | 155 WASHINGTON STREET | WALPOLE, MA | 02081 | 9/1/93 | 508-668-6435 |
| 41. | PROV. MERRITT GEORGE | 24 MARTIN STREET | FAIRHAVEN, MA | 02719 | 9/9/93 | 508-993-6614 |
| 42. | PROV. PHILLIPS CRAIG | 5 FALL LANE | CANTON, MA | 02021 | 9/9/93 | 781-828-1354 |
| 43. | PROV. FOLEY DANIEL | 13 SOUTH STREET | BARNSTABLE, MA | 02632 | 9/15/93 | 781-828-0883 |
| 44. | PROV. BURKE GERALD | 160 CEDAR STREET | NEW BEDFORD, MA | 02740 | 9/14/93 | 508-995-8028 |
| 45. | PROV. DENNIS ROBERT | 107 THOMAS PARK | FALL RIVER, MA | 02721 | 3/16/93 | 508-674-7348 |
| 46. | PROV. STEPHEN JOHN | 49 JESSIE AVE | SO.ATTLEBORO, MA | 02703 | 9/17/93 | 508-761-6979 |
| 47. | PROV. CHARBONNEAU DENNIS | 351 WAREHAM STREET | MIDDLEBORO, MA | 02346 | 9/18/93 | 508-947-6718 |
| 48. | PROV. CAREY PATRICK | 16 GRIST MILL LANE | PEMBROKE, MA | 02359 | 10/27/93 | 781-829-8773 |
| 49. | PROV. CREIGHTON ROBERT | 43 BROOK STREET | WEYMOUTH, MA | 02190 | 9/1/93 | 781-335-8815 |
| 50. | PROV. BLAIR RICHARD | 59 YELLOWSTONE AVE | WARWICK, RI | 02886 | 5/10/94 | 401-463-8145 |
| 51. | PROV. KEARLEY MARK | 16 HARTFORD ROAD | NO.ATTLEBORO, MA | 02760 | 7/18/94 | 508-643-3335 |
| 52. | PROV. BOUCHARD BRIAN | 30 CAROL STREET | ACUSHNET, MA | 02743 | 1/4/95 | 508-763-4760 |
| 53. | PROV. DRIER DANIEL | 50 LORANGE STREET | SO.DARTMOUTH, MA | 02748 | 1/5/95 | 508-992-9680 |
| 54. | PROV. DOLAN ROBERT | 31 ARLINGTON STREET APT | NASHUA, NH | 03060 | 7/24/95 | 603-589-3082 |
| 55. | PROV. PENDLETON JAMES | 138 BROADWAY APT | W.ROXBURY, MA | 02132 | 7/25/95 | 617-323-2046 |
| 56. | PROV. MERRILL WILLIAM | 138 BROADWAY APT | FAIRHAVEN, MA | | 7/8/92 | 508-993-1339 |
| 57. | PROV. MARQUEZ DAVID | 183 HART STREET | BROCKTON, MA | 02301 | 5/12/96 | 508-588-1321 |
| 58. | PROV. BRAND JAMES | 33 WEST CHESTNUT STREET | BROCKTON, MA | 02760 | 9/14/95 | 508-324-2514 |

* BIL CRAIG Goulet   978-5625880

00001

                              Volume I
                           Pages 1 to 62
                          Exhibits 1 to 5
                   UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - -x
                                   :
CRAIG GOULET,                      :
             Plaintiff,            :
                                   :
         vs.                       :   Civil Action
                                   :   No. 04-12577 JLT
NEW PENN MOTOR EXPRESS, INC.;      :
and TEAMSTERS LOCAL 25,            :
INTERNATIONAL BROTHERHOOD OF       :
TEAMSTERS,                         :
             Defendants.           :
                                   :
- - - - - - - - - - - - - - - - - -x
          DEPOSITION OF TEAMSTERS LOCAL 25,
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, THROUGH ITS
DESIGNEES JANET McLAUGHLIN and MARK HARRINGTON,
witnesses called on behalf of the Plaintiff, taken
pursuant to Rule 30(b)(6) of the Federal Rules of
Civil Procedure, before Ken A. DiFraia, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Scott A. Lathrop & Associates, 122 Old Ayer Road,
Groton, Massachusetts, on Tuesday, November 15,
2005, commencing at 10:35 a.m.
PRESENT:
    Scott A. Lathrop & Associates
         (by Scott A. Lathrop, Esq.)
         122 Old Ayer Road, Groton, MA 01450,
         for the Plaintiff.
    Frantz Ward LLP
         (by Carl H. Gluek, Esq.)
         2500 Key Center, 127 Public Square,
         Cleveland, OH 44114-1230, for the Defendant
         New Penn Motor Express, Inc.

00002

```
          PRESENT:  (Continued)
               Dwyer, Duddy and Facklam, P.C.
                    (by Kathleen A. Pennini, Esq.)
                    Two Center Plaza, Suite 430,
                    Boston, MA 02108-1804, for the Defendant
                    Teamsters Local 25, International
                    Brotherhood of Teamsters.
          ALSO PRESENT:  Craig Goulet
                         * * * * *
```

00003

```
                    I N D E X
WITNESS              DIRECT  CROSS   REDIRECT  RECROSS
JANET McLAUGHLIN
  BY MR. LATHROP        6              42
  BY MS. PENNINI              40
MARK HARRINGTON
  BY MR. LATHROP       47
                     * * * *
                  E X H I B I T S
McLAUGHLIN
NO.              DESCRIPTION              PAGE
   1    Amended notice of taking deposition   5
   2    Canton seniority list                 7
   3    Group of documents, including Dracut  17
        seniority list
   4    Seniority list form                  32
HARRINGTON
NO.              DESCRIPTION              PAGE
   5    Dracut seniority list                48
                     * * * *
```

00004

```
 1                P R O C E E D I N G S
 2          MR. LATHROP:  Let's do stipulations, and
 3     then I just want to talk on the record with
 4     Ms. Pennini about procedure.
 5          What stipulations would you like?
 6          MS. PENNINI:  Objections, except as to
 7     form, reserved until trial.
 8          MR. LATHROP:  Also reserve motions to
 9     strike?
10          MS. PENNINI:  Also reserve motions to
11     strike.
12          MR. LATHROP:  What about reading and
13     signing?
14          MS. PENNINI:  45 days, or else they're
15     deemed waived if they are not signed by the
16     deponent.
17          MR. LATHROP:  Well, it different people.
18          MS. PENNINI:  Right.  This is on behalf of
19     the Local.
20          MR. LATHROP:  As the first exhibits, can I
21     put in front of you this document, which is the
22     amended notice of taking deposition, without
23     attachments, and can we stipulate that the
24     deposition that we are now taking is pursuant to
```

00005
```
 1   this notice of taking deposition?
 2          I admit the documents are not attached to
 3   the exhibit, but this is the notice that brought us
 4   here today for this deposition.
 5          MS. PENNINI:  Well, this in addition to I
 6   would say the order from Judge Tauro on November 1st
 7   where he granted that you would be allowed to take
 8   the Rule 30(b)(6) deposition, which part of the
 9   reason this was not done on October 28th as well as
10   the fact that, one, the parties wouldn't have able
11   to attend on the date of October 28th; two, the
12   defendant --
13          MR. LATHROP:  I have no problem with the
14   date, but in terms of this is the notice that ended
15   up resulting in the deposition, can you stipulate to
16   that so we can mark it as Exhibit 1?
17          MS. PENNINI:  Right, with the comments I
18   made, yes.
19          MR. LATHROP:  I have no problem with the
20   comments.
21                  (Document premarked as McLaughlin
22                  Exhibit 1 for identification)
23
24
```

00006

```
 1                    JANET McLAUGHLIN
 2   a witness called for examination by counsel for the
 3   Plaintiff, having been satisfactorily identified by
 4   the production of her driver's license and being
 5   first duly sworn by the Notary Public, was examined
 6   and testified as follows:
 7                    DIRECT EXAMINATION
 8        BY MR. LATHROP:
 9        Q.   I apologize, I didn't catch your name.
10        A.   Janet McLaughlin.
11        Q.   Could you please provide your address for
12   the record.
13        A.   9 Emerson Road, Plymouth.
14        Q.   Massachusetts?
15        A.   Uh-huh.
16        Q.   That's a yes?
17        A.   Yes.
18        Q.   By whom are you employed?
19        A.   Teamsters Local 25.
20        Q.   How long have you been employed by
21   Teamsters Local 25?
22        A.   34 years.
23        Q.   I take it you were on employee of Teamsters
24   Local 25 in the years 2001, 2002 and 2003?
```

00007

```
 1         A.    Yes.
 2         Q.    Focusing on those years, 2001 through 2003,
 3    what capacity were you employed in at that time?
 4         A.    Executive assistant to the president.
 5         Q.    Where were you based when you were
 6    executive assistant to the president?
 7         A.    544 Main Street, executive offices in
 8    Boston, Mass.
 9         Q.    To whom did you serve as executive
10    assistant to the president from the years 2001
11    through 2003?
12         A.    George Cashman.
13         Q.    Was 545 Main Street, Boston the
14    headquarters for Local 25 for that period of time?
15         A.    It's 544 Main Street.
16         Q.    Sorry, I put it down incorrectly.  544 Main
17    Street?
18         A.    Yes.
19                    (Document marked as McLaughlin
20                     Exhibit 2 for identification)
21         Q.    Ms. McLaughlin, I'm showing you what was
22    marked as Exhibit 2 in this deposition.  This was,
23    in fact, marked as Exhibit 2 to the amended notice
24    of taking of deposition.
```

00008

```
 1            Are you familiar with this document?
 2       A.   I saw it yesterday and last Thursday.
 3       Q.   Do you have any personal knowledge as to
 4  when it was prepared?
 5       A.   No.
 6            MR. LATHROP:  Ms. Pennini, am I in error,
 7  but this was a 30(b)(6) on the examination of the
 8  preparation of Exhibit 2, the Canton list?
 9            MS. PENNINI:  Yes.  I can ask her further
10  questions.  Local 25 contends that they did not
11  prepare this list.  This witness can tell you more
12  about Exhibit 3 as to what she has seen and done
13  regarding Exhibit 3, but Local 25 is not the party
14  that actually prepared this document.
15            MR. LATHROP:  Have you produced somebody
16  who has personal knowledge as to who did prepare it
17  then?
18            MS. PENNINI:  Ms. McLaughlin can give you
19  some background.  We have done some research, and we
20  can't determine who exactly did this, but we can
21  tell -- what Ms. McLaughlin is here to say is that
22  we have gone through everyone at Local 25 that would
23  have knowledge as to who prepared this, and this was
24  not prepared by anyone at Local 25.
```

00009

```
 1              Ms. McLaughlin was a party who asked
 2     everyone in particular who would have done this as
 3     to how it was prepared.  The additional party, or
 4     Mr. Cashman, may have additional information, but
 5     unfortunately Mr. Cashman is not available for a
 6     Rule 30(b)(6) deposition and cannot be made
 7     available for a Rule 30(b)(6) deposition.
 8              MR. LATHROP:  Is there some particular
 9     reason why you did not inform me in advance of this
10     time that you don't have someone that has personal
11     knowledge about the preparation of Exhibit 2?
12              MS. PENNINI:  What I'm saying is the only
13     one with any knowledge whatsoever regarding this
14     document is -- Ms. McLaughlin has personal knowledge
15     of who did not prepare it.  We have checked through
16     Local 25 to see whether or not it was prepared by
17     the Local.
18              MR. LATHROP:  Let me explore that further
19     with Ms. McLaughlin.
20         Q.    Ms. McLaughlin, you said you first saw this
21     document maybe Thursday?
22         A.    Uh-huh.
23         Q.    Is that yes?
24         A.    Yes.
```

00010

```
 1       Q.   You have to say yes or no, please.
 2       A.   Yes.  I'm sorry.
 3       Q.   Today's November 15, so approximately
 4  November 10th was the first time that you saw
 5  Exhibit 2?
 6       A.   Yes.
 7       Q.   I take it from the comments by
 8  Attorney Pennini, that you or someone else on behalf
 9  of Local 25 made an attempt to find out who did
10  prepare Exhibit 2, correct?
11       A.   Correct.
12       Q.   What efforts did you make to determine who
13  did prepare Exhibit 2?
14       A.   I asked every staff person who would have
15  had anything to do with compiling a list like this
16  in 2002, whether or not they recognized it as
17  something that they prepared, and none of the office
18  staff prepared this list.
19       Q.   Let me ask the question differently.  I'm
20  trying to understand the nature of your inquiry into
21  the office staff.
22       A.   Yes.
23       Q.   The office persons that you made inquiry
24  of, did any of them say definitively, "I did not
```

00011
```
 1    prepare it"?
 2         A.    Yes.
 3         Q.    Did any of them say, "I'm not certain
 4    whether I prepared it or not"?
 5         A.    No.
 6         Q.    Were there any other forms of responses
 7    that you received when you inquired of the office
 8    staff?
 9         A.    No.
10         Q.    How many people did you make inquiry of?
11         A.    Six.
12         Q.    Can you name them.
13         A.    Sheila McLaughlin.
14         Q.    Is Ms. McLaughlin related to you?
15         A.    Not really.
16         Q.    Who else?
17         A.    Fran Carrier, Kathy Pestana, Maureen Henry,
18    Patricia Disilva, and Eileen Hanlon.
19         Q.    What are these people's job titles, or
20    title?
21         A.    Sheila McLaughlin is I think office
22    manager, yes, office manager.  Fran Carrier is
23    office manager of dues room.  The rest are just
24    secretaries, no specific titles.
```

00012
```
 1        Q.   At least as of November 10th, were there
 2   any office employees on Local 25's payroll other
 3   than these six persons and yourself?
 4        A.   Yes.
 5        Q.   So there were some persons on the office
 6   payroll who you did not make this inquiry of?
 7        A.   Yes.
 8        Q.   Can you identify those persons by name and
 9   title.
10        A.   Kathleen Ferri.
11        Q.   Her title?
12        A.   Secretary.
13        Q.   And?
14        A.   Maureen Lydon.
15        Q.   What is her title?
16        A.   Switchboard operator.
17        Q.   Why did you not make inquiry of them?
18        A.   They would not have done anything in 2002
19   on any of these lists.
20        Q.   The reason for that is?
21        A.   Maureen Lydon, she was in the dues room, so
22   she would not have handled anything like that, and
23   Katy Ferri didn't handle anything like this at the
24   time.
```

00013

```
 1        Q.    Directing your attention to the time frame
 2   in the year 2002, were there any staff employees
 3   then employed by Local 25 that you did not now list?
 4        A.    I don't know.  There may have been some
 5   people that retired, so I don't know.
 6        Q.    Among the universe of people that could
 7   have potentially prepared or worked with Exhibit 2
 8   in the year 2002, there potentially are people who
 9   were then employed by Local 25 who are not now
10   employed by Local 25 of whom you did not make such
11   an inquiry?
12             MR. GLUEK:  Objection.
13        A.    (No response)
14        Q.    Do you understand the question?
15        A.    If there was somebody that retired or left,
16   I did not question them, no.
17        Q.    You questioned current employees only,
18   correct?
19        A.    Yes.
20        Q.    Just to be clear, do you know one way or
21   another whether or not there were office personnel
22   in the year 2002 who potentially could have handled
23   this document who no longer are employed by
24   Local 25?
```

00014

```
 1        A.   I don't know whether or not those people
 2   that might have left would have been able to prepare
 3   a list like this.
 4        Q.   Do you recall the names of any people,
 5   office people, who have left since the year 2002?
 6        A.   I'm not sure of the years they may have
 7   left.  I know we have had two -- well, there's one
 8   person that I can remember that may have been
 9   between the year 2002 and now.
10        Q.   You are doing this by memory?
11        A.   Yes.
12        Q.   You have not since last Thursday, or
13   thereabouts, and today gone through any payroll
14   records to check out which office persons have left
15   since 2002, for example?
16        A.   That's correct, I have not.
17        Q.   Based upon memory, you can recall at least
18   one person as we sit here today who was an office
19   person who left since 2002?
20             MR. GLUEK:  Objection.
21        A.   I don't know the date which they may have
22   left.
23        Q.   But they may have left in that time frame?
24        A.   Yes, and I can only think of one person
```

00015

```
 1    that may have.
 2         Q.    What is the name of that person?
 3         A.    Jane Hagen.
 4         Q.    What was her last title?
 5         A.    Switchboard operator.
 6         Q.    When you made inquiry of your current
 7    staff, if I can call it that -- and if I incorrectly
 8    describe your activities, please correct me -- did
 9    you ask them about the preparation of the physical
10    document?
11         A.    Yes.
12         Q.    I take it it's your understanding of the
13    responses you got that everyone denied being
14    involved with the physical preparation of Exhibit 2,
15    correct?
16         A.    Yes.
17         Q.    Did you ask any of the current employees
18    concerning whether or not they had seen this
19    document in approximately 2002, or thereabouts?
20         A.    Yes.
21         Q.    What was the response or the responses that
22    you received?
23         A.    That they had not.
24         Q.    They denied seeing it or did not have a
```

00016

```
 1    recollection of seeing it, or both?
 2        A.    Both.
 3        Q.    Were there any persons among the current
 4    office staff who said, "I don't recall seeing it" as
 5    opposed to saying, "I never saw that document"?
 6        A.    No.
 7        Q.    So all of them that you made inquiry of
 8    discretely denied having ever seen this document
 9    before, correct?
10        A.    Yes.
11        Q.    Other than what you have already told us
12    based upon your either personal knowledge or the
13    knowledge that you gathered through speaking to
14    staff persons, do you have any other information or
15    understanding pertaining to Exhibit 2?
16        A.    No.
17        Q.    Is it fair to say that based upon your
18    personal knowledge and the knowledge you gained in
19    preparation for this deposition, if you will, you
20    have no understanding as to who prepared Exhibit 2?
21        A.    Right, no understanding.
22        Q.    And you have no understanding as to why
23    Exhibit 2 was prepared?
24        A.    Correct.
```

00017

```
 1        Q.    I know it's largely a typed document, but
 2   there is some handwriting on the first page.  Is
 3   that also true, that you have no understanding
 4   concerning the handwritten portions of Exhibit 2?
 5        A.    Correct.
 6                    (Document marked as McLaughlin
 7                    Exhibit 3 for identification)
 8        Q.    Ms. McLaughlin, I'm now handing you what
 9   was marked as Exhibit 3 for this Rule 30(b)(6)
10   deposition.  After you have had the chance to review
11   it, I'm going to ask you whether or not you have any
12   understanding as to the preparation of this document
13   or portions thereof?
14        A.    (Examines document)  Yes.
15        Q.    What portions of Exhibit 3, if not the
16   entirety, do you have an understanding concerning
17   the creation or preparation of it?
18        A.    Page 1, the fax cover sheet; Pages 3, 4, 5
19   and 6.
20        Q.    So everything but Page 2?
21        A.    Correct.
22        Q.    Page 2 being the one that has the heading
23   "Dracut Seniority List" on it?
24        A.    Yes.
```

00018

```
 1          Q.   Bear with me, but in light of your answer,
 2    I will probably go through this page by page.
 3               Looking at Page 1, which is the fax cover
 4    sheet, what is the basis for having any
 5    understanding with regard to the preparation of that
 6    page?
 7          A.   I prepared it.
 8          Q.   Describe to me the circumstances under
 9    which you prepared the first page of Exhibit 3.
10          A.   Mr. Cashman brought it out to me and told
11    me it needed to be faxed to Irene at the
12    International Office in Washington and told me to
13    write "Per request of the Eastern Region Freight
14    Department, attached please find seniority list
15    (preference list) with the most up-to-date
16    information that we have at the present time.  Any
17    questions please call."
18          Q.   I take it that was on February 22nd in the
19    year 2002?
20          A.   Correct.
21          Q.   Could you identify by name and title who
22    Irene is, or was at least as of February 2002.
23          A.   Irene was the secretary for the freight
24    division at the International offices in Washington.
```

00019
```
 1        Q.   The International --
 2        A.   Brotherhood of Teamsters.
 3        Q.   Do you recall Irene's last name?
 4        A.   No, I don't.
 5        Q.   Did you know it at the time?
 6        A.   No.
 7        Q.   Had you had communications with Irene prior
 8   to Mr. Cashman asking you to send a fax to her?
 9        A.   Not on that day.
10        Q.   At any time prior to that, had you had
11   communications with Irene?
12        A.   Within the last 34 years, yes.
13        Q.   Do you have any understanding as to whether
14   or not Irene still is employed by the International
15   Office?
16        A.   No.  She's retired.
17        Q.   Do you have any understanding as to whether
18   she retired, I take it, subsequent to February 22,
19   2002?
20        A.   No.
21        Q.   Did you have any conversations or
22   communications with Irene with regard to your fax
23   other than the fax itself?
24        A.   No.  She did not call for any assistance.
```

00020

```
 1        Q.   No one from the International I take it
 2   called you back?
 3        A.   Correct.
 4        Q.   That is, with regard to this fax?
 5        A.   Correct.
 6        Q.   Other than directing you to send this fax
 7   and to leave the message as you wrote it on the
 8   cover sheet, did you have any other communications
 9   with Mr. Cashman with regard to the fax or the
10   documents you were faxing to the International
11   Office?
12        A.   Yes, on Pages 3 through 6.
13        Q.   Let's back up.  I take it you had no
14   communications with Mr. Cashman with regard to
15   Page No. 2, the Dracut seniority list?
16        A.   No, just other than it was to go with this
17   fax.
18        Q.   Other than faxing the Dracut seniority list
19   to Irene on February 22, 2002, did you have any
20   other dealings with the Dracut seniority list?
21        A.   No.
22        Q.   Had you seen it before?
23        A.   No.
24        Q.   I'm sorry, I may have already, in essence,
```

00021

```
 1    asked this, but after sending the Dracut seniority
 2    list to Irene, among other things, you had no
 3    conversations with anyone concerning the Dracut
 4    seniority list?
 5        A.   Correct.
 6        Q.   I would now like to direct your attention
 7    to Pages 3 and 4 of this document, which appear to
 8    have the heading, at least on Page 3, "APA Dracut
 9    Massachusetts."  Do you see those pages?
10        A.   (Examines document)  Yes.
11        Q.   Prior to sending this fax, had you seen
12    this document or any versions of it?
13        A.   No.
14        Q.   Prior to sending this document by fax, had
15    you had any communications with regard to this
16    document or any prior versions?
17        A.   No.
18        Q.   Subsequent to your sending this part of the
19    fax to Irene, did you have any communications with
20    anyone concerning this part of the document?
21        A.   No.
22        Q.   Subsequent to sending this fax to Irene on
23    February 22, 2002, did you have any further dealings
24    with this part of the document?
```

00022

```
 1        A.    No.
 2        Q.    Do you have any understanding as to whose
 3   handwriting appears where it says, "APA Dracut,
 4   Massachusetts"?
 5        A.    That's mine.
 6        Q.    How did that handwriting come to be added?
 7        A.    George told me to make it clear that this
 8   was APA Dracut and the next page was APA Dracut and
 9   the next page was APA Canton and the last page was
10   APA Canton, because there was no, as the first page
11   says, New Penn seniority list, Dracut seniority list
12   New Penn.  These did not have any APA New Penn
13   anything on them.
14        Q.    When did Mr. Cashman tell you to so
15   denominate these documents?
16        A.    It was when he handed me the documents to
17   fax.
18        Q.    As you sit here today, do you have any
19   understanding with regard to the preparation of
20   Pages 3 and 4, the APA Dracut Massachusetts list?
21        A.    No.
22        Q.    Did you attempt in preparation for this
23   30(b)(6) deposition to make an inquiry concerning
24   the preparation of this document?
```

00023

```
 1        A.   With all of the office staff, I did ask
 2   them after that.
 3        Q.   You testified earlier about your inquiries
 4   of the office staff vis-a-vis Exhibit 2.
 5        A.   Correct.
 6        Q.   Am I to understand that -- and at least for
 7   the time being, we're talking about Pages 3 and 4 of
 8   Exhibit 3 -- you did make similar inquiry of the
 9   current office staff?
10        A.   Yes.
11        Q.   Tell us what you learned after you made
12   inquiry of the same current office staff about
13   Pages 3 and 4.
14        A.   They answered the same way they did with
15   Exhibit 2, that they had not seen it and they did
16   not prepare it.
17        Q.   I take it you did not prepare it?
18        A.   No.  I only labeled them or put a title on
19   the APA Canton and APA Dracut lists, what I was told
20   to put on, the APA Dracut and Canton lists.
21        Q.   Do you have any understanding as to whether
22   or not Mr. Cashman prepared this document?
23        A.   No.
24             MR. GLUEK:  Sorry, no, you didn't?
```

00024
```
 1              THE WITNESS:  I don't have any knowledge.
 2        Q.    Let me ask you this.  As the executive
 3   assistant to the president, do you have any
 4   understanding as to whether or not Local 25 had a
 5   computerized spreadsheet program that could produce
 6   a document like this?
 7        A.    In 2002, I'm not sure.
 8        Q.    Do you know whether or not Mr. Cashman had
 9   access to a spreadsheet program in 2002 that would
10   have allowed him to prepare this document?
11        A.    I would say he did not.
12        Q.    So it's your understanding -- and correct
13   me if I'm wrong -- as we sit here today, it is
14   unlikely that Mr. Cashman prepared this document?
15        A.    Correct.
16              MR. LATHROP:  Ms. Pennini, I'm going to ask
17   you a question.  You stated earlier Mr. Cashman was
18   not subject to a 30(b)(6) deposition.
19              MS. PENNINI:  I said that he's unavailable.
20              MR. LATHROP:  Would you state for the
21   record, because I don't know where this is going to
22   go, as to the reasons why he's not available for
23   deposition.
24              MS. PENNINI:  Actually, Ms. McLaughlin
```

00025
```
 1    might have a little more of the background than I
 2    would, but Mr. Cashman is currently incarcerated.
 3    He cannot be contacted by the Local as part of -- he
 4    has a no contact -- I don't know exactly what
 5    stipulation it is as part of his plea bargain I
 6    believe where he's not supposed to have any contact
 7    with the Local or the Local with Mr. Cashman.
 8              MR. LATHROP:  Do you know if that also
 9    applies to you as a representative of Local 25?
10              MS. PENNINI:  I believe it does.
11              MR. GLUEK:  He's not even employed by the
12    union anymore.
13              MS. PENNINI:  No.
14              MR. GLUEK:  So to the extent it's a
15    30(b)(6), I don't see --
16              MR. LATHROP:  We can argue this, but
17    certain representations were made he's not available
18    to be subpoenaed.
19              MS. PENNINI:  From what I understand, he's
20    not allowed to have any contact not only with the
21    union, but with counsel for the union as well.
22              And we did not represent him for the
23    purposes of that plea bargain, so I don't feel
24    comfortable giving any more information about that.
```

00026

```
 1              MR. LATHROP:  I was just, quite frankly,
 2    seeking an expansion upon what you earlier put into
 3    the record.  I understand your caveat, and I
 4    understand Mr. Gluek's caveat, also.
 5         Q.   After you faxed Exhibit 3 to Irene, what
 6    did you do, if anything, with the fax?
 7         A.   Take it back to Mr. Cashman.
 8         Q.   Did you ever see the fax again until
 9    Thursday?
10         A.   No.
11         Q.   I'm now going to ask you to look at the
12    last two pages of Exhibit 3.  Do I understand that
13    to the extent it shows up, that that's supposed to
14    be handwriting on the side of "APA Canton,
15    Massachusetts"?
16         A.   Correct.
17         Q.   And that if we saw the full thing, we would
18    recognize it as your handwriting?
19         A.   Correct.
20         Q.   Do I understand it correctly that you added
21    this at the same time that you added the APA Dracut,
22    Massachusetts?
23         A.   Correct.
24         Q.   And that you added that at Mr. Cashman's
```

00027
```
 1    directive?
 2        A.    Correct.
 3        Q.    You did that on or about February 22, 2002?
 4        A.    Correct.
 5        Q.    Let's talk about this specific document
 6    then.  Had you seen this document or any prior
 7    versions of this document prior to February 22,
 8    2002?
 9        A.    No.
10        Q.    Did you have any communications with anyone
11    at Local 25 with regard to this document or the
12    substance of the document prior to you faxing it to
13    Irene?
14        A.    No.
15        Q.    Subsequent to faxing it to Irene, did you
16    have any communications with anyone concerning the
17    document or the substance within the document?
18        A.    No.
19        Q.    What did you do with the document after you
20    faxed it to Irene?
21        A.    Gave it back to Mr. Cashman.
22        Q.    You gave the entire fax back to
23    Mr. Cashman?
24        A.    Yes.
```

00028

```
 1        Q.   Did you also make inquiry of the current
 2   office staff with regard to the APA Canton,
 3   Massachusetts list?
 4        A.   Yes.
 5        Q.   What information was provided to you by the
 6   current office staff with regard to the Canton,
 7   Massachusetts APA document?
 8        A.   That they did not prepare it.
 9        Q.   Did any of them recognize it?
10        A.   No.
11        Q.   Correct me if I'm wrong, but is it your
12   understanding from the responses you got, that all
13   of them denied ever seeing this before?
14        A.   Correct.
15        Q.   Again, your inquiries were limited to
16   current office staff?
17        A.   Correct.
18        Q.   I'm placing in front of you Exhibit 1,
19   which is the amended notice of taking deposition and
20   which has resulted, at least in part, in the
21   deposition that we're here for today.
22             Do you have any other information or
23   understanding pertaining to the topics listed in
24   Items 1, 2 and 3 regarding this notice of deposition
```

00029

```
 1    that you have not already provided to us?
 2         A.   No.
 3         Q.   If I may, let me ask you this.  Looking at
 4    Exhibits 2 and 3 -- well, do you have Exhibits 2 and
 5    3 in front of you?
 6         A.   Yes.
 7         Q.   In the time frame of early 2002, did it
 8    fall within your job duties to prepare documents
 9    similar to Exhibit 2?
10         A.   No.
11         Q.   Do you have any recollection in early 2002
12    of preparing documents similar to Exhibit 2?
13         A.   No.
14         Q.   I'm going to ask you similar questions with
15    regard to APA Dracut, Massachusetts that's within
16    Exhibit 3.  Focusing on early 2002, did it fall
17    within your job description to prepare a document
18    similar in form to that which is --
19         A.   No.
20         Q.   Do you recall, nonetheless, in early 2002
21    preparing a document similar to this APA Dracut
22    list?
23         A.   No.
24         Q.   I'm also going to ask you about the APA
```

00030

```
 1    Canton list.  In early 2002, did it fall within your
 2    job description to prepare documents similar in
 3    nature to that document?
 4         A.   No.
 5         Q.   Do you have any recollection, nonetheless,
 6    of preparing documents similar to the Canton APA
 7    list?
 8         A.   No.
 9         Q.   Focusing on that time frame, February 2002
10    or thereabouts, give or take a month, early 2002,
11    did it fall within the job descriptions of anyone
12    within Local 25 to prepare documents similar in
13    format to either Exhibit 2 or the enclosures, if you
14    will, to Exhibit 3?
15         A.   Not to my knowledge.
16         Q.   So it's your understanding that, for
17    example, the secretaries at Local 25 in early 2002,
18    it was not within their job description to prepare
19    documents similar to at least starting with Exhibit
20    No. 2?
21         A.   No.
22         Q.   Or the APA Dracut, Massachusetts list
23    that's attached to Exhibit 3?
24         A.   No, they would not.
```

00031

```
 1        Q.   Or the Canton, Massachusetts APA list
 2   attached to Exhibit 3?
 3        A.   No, they would not.
 4        Q.   Do you have any understanding based upon
 5   your years of experience at Local 25 as to whether
 6   or not anyone employed by Local 25 prepared
 7   documents similar in nature to Exhibit 2 or the
 8   enclosures to Exhibit 3?
 9        A.   No.
10        Q.   Prior to February 22, 2002, had you ever
11   seen documents similar to the attachments to Exhibit
12   No. 3?
13        A.   Yes.
14        Q.   In what context had you seen such
15   documents?
16        A.   It looks like a seniority list.
17        Q.   So you had seen in the office of Local 25
18   seniority lists before?
19        A.   Yes.
20        Q.   And it was your understanding that these
21   seniority lists were prepared by someone other than
22   Local 25 persons?
23        A.   Correct.
24        Q.   Was it your understanding -- and correct me
```

00032

```
 1    if I'm wrong -- that these were documents prepared
 2    by the employer typically?
 3        A.   Yes.
 4        Q.   Regarding the format, the seniority lists
 5    which you had seen which you understood were
 6    prepared by employers, were they similar in format
 7    to the Canton, Massachusetts list that's attached to
 8    Exhibit 3?
 9        A.   Yes.
10        Q.   Were they similar in format to Exhibit 2?
11        A.   Yes.
12                    (Document marked as McLaughlin
13                     Exhibit 4 for identification)
14        Q.   Ms. McLaughlin, I'm showing you a document
15    that's now been marked as Exhibit 4 for this
16    deposition.
17             MR. GLUEK:  Objection.  This is supposed to
18    be a 30(b)(6).  I don't think this is one of the
19    items covered in your notice.
20             MR. LATHROP:  It's not.
21             MR. GLUEK:  And I object.
22             MR. LATHROP:  Your objection is duly noted
23    on the record.
24             MR. GLUEK:  If I were her counsel, I would
```

00033

```
 1   tell her not to answer.
 2          MR. LATHROP:  That will just be in front of
 3   Judge Tauro.
 4      Q.    Looking at this form, not the document, as
 5   you have testified you had seen seniority lists in
 6   the Local 25 office, correct?
 7      A.    Correct.
 8      Q.    I'm not asking you even about this
 9   particular document, but have you seen seniority
10   lists in this format in the Local 25 office?
11      A.    Yes.
12      Q.    Have you seen this document before,
13   Exhibit 6?
14          MS. PENNINI:  Objection.
15          THE WITNESS:  Am I supposed to answer the
16   question?
17          MS. PENNINI:  You can still answer.
18      A.    I may have yesterday.
19      Q.    But prior to yesterday, you don't recall
20   seeing this in Local 25's office?
21      A.    No.
22      Q.    In February 2002, whom did Mr. Cashman use,
23   if anyone, for secretarial services?
24          MS. PENNINI:  Objection.  You can answer.
```

00034

```
 1   You can still answer.
 2        A.   I'm his secretary.  What do you mean?
 3        Q.   I understood you to be the executive
 4   assistant to the president.
 5        A.   Define "secretarial."
 6        Q.   If Mr. Cashman wanted to have
 7   correspondence prepared for his signature in
 8   February of 2002, was it within your job
 9   responsibility to do it?
10        A.   Some, yes.
11        Q.   When you say "some," you mean some was not?
12        A.   Correct.
13        Q.   Some would go to other persons within the
14   office?
15        A.   Correct.
16        Q.   What other persons within the office would
17   it go to?
18        A.   The office manager.
19        Q.   Who was the office manager as of February
20   2002?
21        A.   Sheila McLaughlin.
22        Q.   What kind of correspondence would you
23   prepare for Mr. Cashman?
24             MS. PENNINI:  Objection.
```

00035

```
 1        A.   Letters.  Most letters coming out of his
 2   office came from me, but pertaining to companies or
 3   arbitrations or cases, that wouldn't come out of my
 4   office.
 5        Q.   What do you mean by that?
 6             MS. PENNINI:  Objection.  I think you are
 7   getting far beyond the Rule 30(b)(6) now with this
 8   one, because it related to the seniority list, but
 9   now I think you are asking Ms. McLaughlin in her
10   individual capacity what it is that she performed,
11   and it goes I think a little bit beyond what a
12   Rule 30(b)(6) deponent should be answering.
13             MR. LATHROP:  Let me explain.  You provided
14   someone that says they have no knowledge, and
15   therefore I need to explore exactly -- you know,
16   it's not as though you said, "Here's the person that
17   prepared it."  You presented someone who is
18   testifying as to her, if you will, research into the
19   issue, and I am exploring the level of research, and
20   I'm going towards potentials of people within the
21   office who might have prepared certain kinds of
22   documents.
23             I wouldn't have had to have gone there had
24   you been able to bring a person that had personal
```

00036

```
 1    knowledge about the preparation of the document.  I
 2    need to go there, and I'm going to go there.
 3            MS. PENNINI:  If I can say one thing.
 4    Rule 30(b)(6) allows a Rule 30(b)(6) deponent to say
 5    that they don't know as long as they have done
 6    research in order to back it up.  They can't say
 7    they don't remember not having done further
 8    research.  Ms. McLaughlin has gone into the further
 9    research.
10            If Local 25 as an organization doesn't know
11    who prepared it, they can't magically come up with
12    who prepared it if they were not the preparing
13    party.
14            MR. LATHROP:  You can do whatever you wish.
15    I wish to explore it further because I don't have,
16    for example, Sheila McLaughlin in front of me, and I
17    don't have Fran Carrier in front of me, and I need
18    to know in one sense the thoroughness of which you
19    are presenting a 30(b)(6) person in terms of
20    inquiry.
21            MR. GLUEK:  Asking this woman what types of
22    letters she types for Mr. Cashman does not get into
23    the level of inquiry she did yesterday or on the
24    10th.
```

00037
```
 1              MR. LATHROP:  I'm getting there.
 2              MR. GLUEK:  Well, let's move on.
 3              MR. LATHROP:  I would like to.  I'm
 4   responding to objections.
 5              MR. GLUEK:  Why don't you move on to
 6   something that's relevant.
 7              MR. LATHROP:  I'm getting to things having
 8   to do with the investigation.
 9         Q.    You have documents that you identified as
10   Exhibit 3 handed to you by Mr. Cashman.  You
11   represented that you made inquiry of current office
12   people as to whether or not they have created this.
13              I, quite frankly, am trying to learn as to
14   whether or not there's other people within the
15   office who did clerical kinds of work for
16   Mr. Cashman that may be, quite frankly, inconsistent
17   with the responses you got on Thursday.
18              MR. LATHROP:  Okay, are we happy?
19         Q.    What persons within the office as of
20   February 2002 -- let's back up a bit.  Including
21   yourself, what persons did clerical kinds of work
22   for Mr. Cashman?
23         A.    The office staff.
24         Q.    So anyone who was then on the office staff
```

00038

```
 1    could have been asked in the normal course of his or
 2    her duties to prepare documents for Mr. Cashman; is
 3    that fair?
 4        A.   Correct.
 5        Q.   I understand that people have denied, for
 6    example, the people you asked and listed denied
 7    making the Canton, Massachusetts document?
 8        A.   Correct.
 9        Q.   But as of February 2002, if Mr. Cashman had
10    wanted such a document to be prepared, it's your
11    testimony that he had the authority to ask anyone on
12    the office staff to prepare such a document?
13        A.   As?
14        Q.   We are now talking about the APA Canton
15    list which was attached to Exhibit 3.
16        A.   He could have asked any one of them to
17    prepare a document, but it would not have looked
18    like that.
19        Q.   Why do you say that?
20        A.   Because it looks like a seniority list.
21        Q.   In terms of the procedure that was in place
22    in February 2002, if Mr. Cashman wanted such a
23    document to be prepared, he didn't have a normal
24    person who was designated as his secretary as to
```

00039

```
 1    from whom he would uniquely look to provide
 2    secretarial --
 3         A.   There was not just one, no.
 4         Q.   He could look to anyone on the office staff
 5    as it existed on February 2002 to prepare such a
 6    document if he wanted that document prepared?
 7         A.   He could have asked anyone.
 8         Q.   I'm just asking about the procedure.  It's
 9    within the normal procedure in the office that he
10    could have asked you to prepare such a document, and
11    it would have been consistent with past projects?
12         A.   That's correct.
13         Q.   He could have asked the office manager to
14    prepare a document?
15         A.   That's normally who he would have asked,
16    was the manager.
17         Q.   But it was also within past practice for
18    him to ask any of the secretarial persons to prepare
19    a document if he felt a document needed to be
20    prepared?
21         A.   Mostly he would go to the office manager,
22    and if she wanted to, she could have had any of the
23    staff prepare that letter -- or document.
24              MR. LATHROP:  Why don't we take five
```

00040

```
 1    minutes so I can figure out where I'm at.  We may be
 2    done with this witness for this part of the
 3    deposition.
 4           (Recess)
 5           MR. LATHROP:  I have no further questions.
 6           MS. PENNINI:  I have a couple of questions.
 7                 CROSS EXAMINATION
 8    BY MS. PENNINI:
 9       Q.   Ms. McLaughlin, if you could look at
10    Exhibits 2 and 3.  I believe you said that any
11    documents that clerical staff of Local 25 would have
12    done would not have looked like this.  Would the
13    office staff of Local 25 ever make any tables that
14    would contain unit members' names?
15       A.   Yes.
16       Q.   How would such tables look that would be
17    different than the tables that we previously
18    discussed?
19       A.   More likely would be in alphabetical order
20    and probably would not have where on Exhibit 1 it
21    says, P-R-E.
22       Q.   Sorry, do you mean Exhibit 2?
23       A.   Yes, Exhibit 2, PRE on the top, unless we
24    were given that information.  That's not something
```

00041

```
 1    that looks familiar to me.
 2        Q.    How are these tables arranged that's
 3    different than how you would ordinarily arrange such
 4    tables of the union member names?
 5        A.    No. 1 looks like it's a seniority date.  It
 6    looks like this list may be in seniority order.
 7            MR. LATHROP:  Sorry, which exhibit number
 8    are you looking at?
 9            THE WITNESS:  The new 2.
10        Q.    If you could just look at Exhibit 3 in
11    general.  Do you recall prior to the time you faxed
12    this exhibit to Irene whether this -- strike that.
13            Do you recall prior to faxing this exhibit
14    to Irene whether George Cashman or someone in the
15    Local had ever received a similar list like this?
16        A.    Not in my capacity.
17        Q.    Had you ever received or do you know
18    whether Mr. Cashman had ever received from either
19    the IBT or another Teamsters local a list similar to
20    the list you faxed to Irene on February 22nd?
21        A.    I don't know.
22            MS. PENNINI:  I have no further questions.
23            MR. GLUEK:  No questions.
24
```

00042
```
 1                    REDIRECT EXAMINATION
 2        BY MR. LATHROP:
 3        Q.    Let's look first at the last four pages of
 4    Exhibit 3.  I understand that it's your testimony
 5    that prior to at least Thursday, November 10, you
 6    had not seen any -- strike that.
 7                 Prior to you faxing this document on
 8    February 22, 2002, you had not seen this document,
 9    right?
10        A.    Correct.
11        Q.    The last two columns there, I take it you
12    have no personal knowledge as to what PREF.1 stands
13    for?
14        A.    I can assume, because I wrote in
15    parenthesis on the front preference list, that PREF
16    might mean preference.
17        Q.    So you have a column for Preference 1 and
18    Preference 2?
19             MR. GLUEK:  Objection.
20        A.    I have what?
21        Q.    In the documents you faxed, the last four
22    pages of Exhibit 3, is that your understanding of
23    what those columns were for?
24             MS. PENNINI:  Objection.
```

00043
```
 1        A.   Right now, yes.
 2        Q.   But Mr. Cashman had told you preference
 3   list, to write that?
 4        A.   Correct.
 5        Q.   Do you know what a preference list was?
 6        A.   No.
 7        Q.   Had you ever seen a preference list before
 8   February 22, 2002?
 9        A.   No.
10        Q.   Did Mr. Cashman ever explain to you what a
11   preference list was?
12        A.   No.
13        Q.   Did you make any effort to determine at the
14   time what a preference list was?
15        A.   No.
16        Q.   I may have asked you this, and I'm sorry if
17   I did, but had you ever seen a preference list
18   before?
19             MR. GLUEK:  Objection.
20        A.   No.
21        Q.   Could you read into the record the complete
22   message that you wrote on the cover page of Exhibit
23   No. 3.
24        A.   Complete meaning date?
```

00044
```
 1        Q.    No, starting under "Message."
 2        A.    "Per request of Eastern Region Freight
 3    Dept, attached please find seniority list
 4    (preference list) with the most up-to-date
 5    information we have at the present time.  Any
 6    question, please call."
 7              MR. LATHROP:  I have nothing further.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

00045

```
 1              C E R T I F I C A T E
 2      I, JANET McLAUGHLIN, do hereby certify that I
 3  have read the foregoing transcript of my testimony,
 4  and further certify under the pains and penalties of
 5  perjury that said transcript (with/without)
 6  suggested corrections is a true and accurate record
 7  of said testimony.
 8        Dated at _____, this ____ day of _____,
 9  2005.
10
11                     _____
12
13
14
15
16
17
18
19
20
21
22
23
24
```

00046

```
 1    COMMONWEALTH OF MASSACHUSETTS)
 2    SUFFOLK, SS.              )
 3         I, Ken A. DiFraia, Registered Professional
 4    Reporter and Notary Public in and for the
 5    Commonwealth of Massachusetts, do hereby certify
 6    that there came before me on the 15th day of Nov.,
 7    2005, at 10:35 a.m., the person hereinbefore named,
 8    who was by me duly sworn to testify to the truth and
 9    nothing but the truth of her knowledge touching and
10    concerning the matters in controversy in this cause;
11    that she was thereupon examined upon her oath, and
12    her examination reduced to typewriting under my
13    direction; and that the deposition is a true record
14    of the testimony given by the witness.
15         I further certify that I am neither attorney or
16    counsel for, nor related to or employed by, any
17    attorney or counsel employed by the parties hereto
18    or financially interested in the action.
19         In witness whereof, I have hereunto set my hand
20    and affixed my notarial seal this _____ day of Nov.,
21    2005.
22                 _____
23                      Notary Public
24               My commission expires 4/3/09
```

00047

```
 1                    AFTERNOON SESSION  (12:00 p.m.)
 2                    MARK HARRINGTON
 3      a witness called for examination by counsel for the
 4      Plaintiff, having been satisfactorily identified by
 5      the production of his driver's license and being
 6      first duly sworn by the Notary Public, was examined
 7      and testified as follows:
 8                    DIRECT EXAMINATION
 9         BY MR. LATHROP:
10         Q.    Morning, Mr. Harrington.
11         A.    Morning.
12         Q.    You have testified earlier in a deposition
13      that I took of you personally, correct?
14         A.    Correct.
15         Q.    You are here today testifying at least in
16      response to a so-called Rule 30(b)(6) notice of
17      deposition on Teamsters Local 25, correct?
18         A.    That's correct.
19         Q.    Before I mark this, let me just make sure
20      of something.  Is this the document concerning which
21      you have some information or knowledge regarding the
22      preparation of it?
23         A.    I had made inquiry in regards to the
24      preparation of it.  I don't have any knowledge of...
```

00048

```
 1        Q.   But this is the document among all of those
 2   several attached to the notice of deposition about
 3   which you are prepared to testify today; is that
 4   correct?
 5        A.   Correct.
 6           MR. LATHROP:  Let's then mark this as the
 7   next exhibit in line.
 8                (Document marked as Harrington
 9                 Exhibit 5 for identification)
10        Q.   Mr. Harrington, I'm now putting in front of
11   you what was marked as Exhibit 5, which purports to
12   be a Dracut seniority list, New Penn terminal
13   preference document.  When is the first time you saw
14   that document?
15        A.   I think I testified the last time I saw the
16   document was the last time we met.
17        Q.   I take it from what you said I believe off
18   the record, that in response to the notice of taking
19   deposition, you made some inquiry concerning the
20   preparation of this document?
21        A.   Yes.
22        Q.   Could you describe for the record what
23   inquiry you made concerning the preparation of
24   Exhibit 5.
```

00049

```
 1        A.   I questioned office manager Sheila
 2   McLaughlin as to her recollection of the document,
 3   since it had a Local 25 fax number on top.
 4        Q.   Did you do anything else other than
 5   question Ms. McLaughlin?
 6        A.   I think I -- hold on.  Sheila McLaughlin?
 7        Q.   Yes.
 8        A.   Yes, and then after she gave me an
 9   explanation that she couldn't have possibly done the
10   document given the fact of the death of her father
11   around that time period, I then questioned Janet
12   McLaughlin as to her knowledge of who may have
13   prepared the document at the Local union since
14   Sheila was out.
15        Q.   You were present while Janet McLaughlin
16   testified earlier as part of this same 30(b)(6)
17   deposition?
18        A.   I was.
19        Q.   Did you learn from her anything different
20   than she testified to a few minutes ago?
21        A.   No.
22        Q.   Have you done anything else to gather
23   information with regard to the preparation of this
24   document?
```

00050
```
 1        A.    No.
 2        Q.    Do you have any understanding as to whose
 3   handwriting this is?
 4        A.    No.
 5        Q.    Do you have any understanding as to who
 6   prepared the typed portion of the document?
 7        A.    No.
 8        Q.    Did you personally ask any office personnel
 9   other than the two Ms. McLaughlin's with regard to
10   Exhibit 5?
11        A.    No.
12        Q.    Is there any particular reason why you did
13   not ask other office personnel with regard to
14   Exhibit 5?
15        A.    Yes.
16        Q.    What was that?
17        A.    Delegation.
18        Q.    What do you mean by that?
19        A.    Chain of command.  You ask the office
20   manager to find out from staff if they had anything
21   to do with it.  She was not present at the time of
22   this polling that was going on.
23              I then asked the executive secretary
24   because Mr. Cashman at the time was very involved
```

00051

```
 1    with the Freight Division, and so she would be the
 2    next logical person to go to.
 3             Then she, in turn, as she already
 4    testified, went through the staff and made inquiries
 5    as to their participation in this.
 6        Q.    I apologize, because you already talked
 7    about the date of this document.  Were you
 8    referencing the date 2/20/02 that appears on top as
 9    apparently a fax number?
10        A.    Yes.
11        Q.    I apologize, because I know you testified
12    to this, what capacity did you hold as of
13    February 20, 2002 with Teamsters Local 25?
14        A.    Trustee and business agent.
15        Q.    At that point in time, you had
16    responsibility for APA?
17        A.    Well, I was in the transition period
18    between APA and New Penn.  APA was out of business.
19        Q.    Immediately prior to this January 2002, you
20    had responsibility for APA, did you not?
21        A.    Yes.
22        Q.    The names on this list, they are APA
23    employees, are they not?
24        A.    Yes.
```

00052
```
 1        Q.   Did you therefore, for example, know
 2   Mr. McGonagle, the first name on this list?
 3             MS. PENNINI:  Objection.  You can answer
 4   the question.
 5        A.   I'm not sure if I know Mr. McGonagle, but I
 6   know people on the list.
 7        Q.   Did you know No. 14, Mr. Guerrette?
 8        A.   Uh-huh.
 9        Q.   That's yes, you knew him?
10        A.   I do know him.  I did or do.
11        Q.   Do you see where it says, "Compensation
12   Workmen's" written in behind his name?
13        A.   Yes.
14        Q.   Do you know if he ever went to work for New
15   Penn?
16        A.   He has not.
17        Q.   Do you know if he was ever offered the
18   opportunity to work for New Penn?
19             MS. PENNINI:  Objection.
20        A.   I do not.
21        Q.   Do you know anything about his workers'
22   compensation status?
23             MS. PENNINI:  Objection.
24        A.   All I do know is that his case is still
```

00053

```
 1    pending in front of the Joint Area Committee because
 2    he is on litigation hold because he's still on
 3    compensation, and because of the WARN Act claim
 4    against APA, his case is still pending for possible
 5    health and welfare and pension contributions if
 6    there is ever a settlement made.
 7        Q.    Did you have any communications with
 8    Mr. Guerrette concerning his possible preferences
 9    for New Penn terminals?
10        A.    No.
11        Q.    Do you know who would have?
12        A.    No.
13        Q.    Was any other Teamsters representative in
14    January and February of 2002 responsible for the
15    Dracut APA terminal other than yourself?
16        A.    No.
17        Q.    Do you know who the shop steward, or the
18    steward I should say, was for the Dracut terminal
19    at APA --
20            MS. PENNINI:  Objection.  Sorry I
21    interrupted.
22        Q.    -- as of February 2002?
23        A.    Yes.
24        Q.    Who was that?
```

00054
```
 1        A.   Richard Johnson.
 2        Q.   Is that No. 5 on this list?
 3        A.   Uh-huh.
 4        Q.   That's a yes?
 5        A.   Yes.
 6        Q.   Does Mr. Johnson, if you know, work for New
 7   Penn now?
 8        A.   I believe he does.
 9        Q.   In your search to find out who created this
10   list, did you speak to Mr. Johnson about it?
11        A.   I have not as of yet.  I have not been able
12   to get ahold of him.
13        Q.   You have attempted to?
14        A.   (Witness nods)
15        Q.   That's yes?
16        A.   Yes.
17        Q.   What methods have you used to attempt to
18   get ahold of him?
19        A.   Barn visits, you know, go to the terminal,
20   which I do from time to time.  I actually asked the
21   shop steward to have him give me a call.
22        Q.   The current shop steward?
23        A.   Down there, yes.
24        Q.   Who is the current shop steward?
```

00055

```
 1        A.    Tim Halloron.
 2        Q.    I take it Mr. Johnson is working at the New
 3   Penn Billerica terminal?
 4        A.    Yes.
 5        Q.    Do you have any reason to believe
 6   Mr. Johnson prepared at least part of this document?
 7              MS. PENNINI:  Objection.
 8        A.    I have no knowledge one way or the other on
 9   that.
10        Q.    But that's indeed the point of your
11   attempting to speak to him, is it not, to find out
12   whether or not he was involved with the creation of
13   this document?
14        A.    Yes.
15        Q.    You have not been able to reach him so far,
16   correct?
17        A.    So far.
18        Q.    When did you first attempt to reach
19   Mr. Johnson?
20        A.    Last week.  I spoke to the shop steward
21   first.  I have not heard back from Mr. Johnson as of
22   yet.
23        Q.    Did you attempt to call the number listed
24   next to Mr. Johnson's name?
```

00056
```
 1        A.    I did not.
 2        Q.    Any particular reason why not?
 3        A.    No.
 4              MR. LATHROP:  Let me take a five-minute
 5     break.
 6              (Recess)
 7              MR. LATHROP:  This is directed to you,
 8     Ms. Pennini.  I think that we're going to have to
 9     leave this deposition open for the following reason.
10              As you recall, you were here when
11     Mr. Francey testified about the creation of a
12     document in which he used the seniority list to get
13     from Canton APA employees their terminal
14     preferences.  Therefore, I think there's a
15     reasonable chance to believe that Mr. Johnson in a
16     similar capacity at Dracut was in some way involved
17     and had some knowledge of the creation of Exhibit 5.
18              I appreciate the fact Mr. Harrington has,
19     in fact, attempted to reach him, but he has been
20     successful.  To the extent you are saying that --
21     and I'm not disputing the legal position -- there's
22     nothing inappropriate for you to present a 30(b)(6)
23     witness who says, "I have done the research, and we
24     have no knowledge," in this case, the research is
```

00057

```
 1    not quite done.  We have not heard from Mr. Johnson.
 2            I'm not, quite frankly, sure how we are
 3    going to close the loop on this, but rather than say
 4    I'm done with all my questions, I think I have to
 5    reserve my right to be able to resume this 30(b)(6)
 6    deposition.  And we can talk about this in terms of
 7    the details of it, because I'm not trying to make
 8    life difficult for anyone.
 9            MS. PENNINI:  If you want to go off the
10    record, I have some suggestions of how we can do
11    this without having Mr. Gluek having to fly back for
12    a two-minute conversation.
13            MR. LATHROP:  But you understand that that
14    piece of information -- I just want to reserve my
15    right to be able to pursue that level of inquiry,
16    because there's a potential person who has not yet
17    been reached and who may have some not only
18    information, but may be partial author.  It is not
19    absurd to think he could be a partial author of the
20    document, especially the handwritten portions.
21            I want to reserve my rights.  We can go off
22    the record to discuss any logistics issues you want
23    to deal with regarding that.
24            You also seemed to imply during the break
```

00058

```
 1   between the two witnesses that there may be more
 2   information.
 3            MS. PENNINI:  No.  What I was referring to
 4   in regard to that is when Janet McLaughlin asked all
 5   of the office staff whether they had seen the
 6   exhibits, she testified as to she did the same thing
 7   regarding Exhibit 1.  If you need her to come in and
 8   say that again...
 9            MR. LATHROP:  I think we got that
10   indirectly.
11            MS. PENNINI:  That's the only point I
12   wanted to state.  She would say she spoke to the
13   same people that she testified she spoke to for
14   Exhibits 2 and 3, and by "Exhibits 2 and 3," I mean
15   of the amended deposition exhibit numbers.
16            MR. LATHROP:  That's fine.
17            MR. GLUEK:  My position would be that as it
18   relates to Exhibit 5, this is irrelevant and not
19   likely to lead to the discovery of admissible
20   evidence because the plaintiff was not even at this
21   location.
22            In fact, you have already taken the
23   deposition of Mr. Francey, which he's the one who
24   was responsible for the location where the plaintiff
```

00059

```
 1    was located, and you were able to ask questions of
 2    Mr. Harrington about anything he did with respect to
 3    any employee preferences at that location.
 4              MR. LATHROP:  I think we are engaging in
 5    argument.  I will argue to the contrary.
 6              I'm curious as to the fact that we seem to
 7    have circumstances of people who were on workers'
 8    compensation by appearances that don't get asked by
 9    the union as to their preferences or that they would
10    get left off the list.  That would be my connection.
11    We can argue that, if need be, in front of the
12    judge.
13              I still technically reserve my right, but I
14    have no further questions of Mr. Harrington at this
15    time.  We can go off the record.
16              MS. PENNINI:  For the record, I have a
17    similar objection as Attorney Gluek as to the Dracut
18    seniority list and how if it was, in fact, a steward
19    that did this, how one steward is relevant to how it
20    was done at the facility at which Mr. Goulet's name
21    if it should have appeared, would have appeared.
22              MR. LATHROP:  The only thing that's
23    interesting -- and now we are engaging in argument
24    that we may have in front of a judge -- of course,
```

00060

```
 1    there was a later list that I think it was
 2    Pages 3 and 4 of Exhibit 3 that specified a Dracut
 3    list in which certain names did or did not appear.
 4    It varies.  Therefore, I would like the opportunity,
 5    if need be, to make my argument about relevance.
 6    There not being a judge present, we don't need to go
 7    into that.
 8             We can go off the record and have a
 9    discussion as to the logistics suggestions you have
10    vis-a-vis trying to close this deposition.  Is that
11    fair to everyone?
12             MS. PENNINI:  Okay.
13             MR. GLUEK:  Yes.
14             (Discussion off the record)
15                  (Whereupon the deposition
16                   was adjourned at 12:22 p.m.)
17
18
19
20
21
22
23
24
```

00061

```
 1                  C E R T I F I C A T E
 2       I, MARK HARRINGTON, do hereby certify that I
 3  have read the foregoing transcript of my testimony,
 4  and further certify under the pains and penalties of
 5  perjury that said transcript (with/without)
 6  suggested corrections is a true and accurate record
 7  of said testimony.
 8       Dated at _____, this _____ day of _____,
 9  2005.
10
11                    _____
12
13
14
15
16
17
18
19
20
21
22
23
24
```

00062

```
 1    COMMONWEALTH OF MASSACHUSETTS)
 2    SUFFOLK, SS.                 )
 3         I, Ken A. DiFraia, Registered Professional
 4    Reporter and Notary Public in and for the
 5    Commonwealth of Massachusetts, do hereby certify
 6    that there came before me on the 15th day of Nov.,
 7    2005, at 12:00 p.m., the person hereinbefore named,
 8    who was by me duly sworn to testify to the truth and
 9    nothing but the truth of his knowledge touching and
10    concerning the matters in controversy in this cause;
11    that he was thereupon examined upon his oath, and
12    his examination reduced to typewriting under my
13    direction; and that the deposition is a true record
14    of the testimony given by the witness.
15         I further certify that I am neither attorney or
16    counsel for, nor related to or employed by, any
17    attorney or counsel employed by the parties hereto
18    or financially interested in the action.
19         In witness whereof, I have hereunto set my hand
20    and affixed my notarial seal this ____ day of Nov.,
21    2005.
22                    _____
23                         Notary Public
24              My commission expires 4/3/09
```

02/22/02  FRI 15:28 FAX 7172338023          TEAMSTERS 770                    ☒001
02/22/2002  15:18    2826248722              IBT NAT FRT DIV        PAGE  81



*Teamsters Local 25*

*International Brotherhood of Teamsters*

544 MAIN STREET * BOSTON, MASSACHUSETTS 02129-1113 - 617-241-8825 - Fax 617-242-4284
www.teamsterslocal25.com

GEORGE W. CASHMAN
President / Principal Officer

RITCHIE E. REARDON
Secretary-Treasurer

WILLIAM H. CARNES
Vice President / Business Agent

JOHN A. MURPHY
Recording Secretary/Business Agent

MARK A. HARRINGTON
Trustee/Business Agent

LOU DiGIAMPAOLO
Trustee/Director of Organizing/
Field Representative

ERNEST C. SHEEHAN JR.
Trustee/Business Agent

VINCENT L. PISACRETA
Business Agent

ARTHUR J. LAZAZZERO
Business Agent

# FAX COVER SHEET

DATE: 0-22-02        TIME: 2-10

TO: _____          FAX #: 203-624-8722

FROM: George W. Cash

NUMBER OF PAGES INCLUDING COVER SHEET: 6

IF THERE IS ANY PROBLEM WITH THIS FAX TRANSMITTAL PLEASE
CALL _____

MESSAGE:

*Per request of Eastern Region Frt. Dept.
Attached please final seniority list (preference
list) with the most up to date information
we have at the present time.
Any question please call.*

Note: The information contained in this transmittal is privileged and
confidential. If the reader of this transmittal is not the intended
recipient or the employee or agent responsible for delivering it to the
intended recipient, you are hereby notified that any dissemination,
distribution or copying of this communication is strictly prohibited. If
you have received this communication in error, please notify us
immediately by telephone, and return the original to us.

We will only accept deliveries from Union carriers! All other deliveries will be refused!





Ex 3        D017

02/20/02  WED 15:54 FAX 2424284                TEAMSTERS                                    ☒002

# Dracut Seniority List
New Perm Terminal Preferences

| | Number | Name | Seniority Date | Preference 1 | Preference 2 |
|---|---|---|---|---|---|
| 17-443-69 | 04 1 | McGonigle, W. | 05/28/1976 | Billerica | |
| 17-667-2122 | 2 | Adams, W. | 05/16/1977 | Billerica | |
| 781 9388639 | 3 | Sullivan, Jr. J. | 02/21/1979 | Billerica | |
| 508-975-41 | 33 4 | Mooney, A. | 05/01/1985 | Billerica | |
| 508-683-35 | 20 5 | Johnson, R. | 09/02/1993 | Billerica | |
| 08-988-01 | 60 6 | Murray, B. | 10/02/1993 | Billerica | |
| 508-922-40 | 487 | Martin, D. | 10/23/1993 | Billerica | Springfield |
| 508-975-04 | 17 8 | Partridge, G. | 10/24/1993 | Billerica | Springfield |
| 508-468-5 | 6259 | Lorizio, V. | 08/30/1994 | Billerica | Burlington VT |
| -679-84 | 97 10 | Thibeault, R. | 01/17/1996 | Billerica | |
| 03-382-06 | 20 11 | Sheperd, G. | 01/30/1996 | Billerica | |
| 03-437-51 | 28 12 | Roddy, J. | 02/12/1997 | Billerica | |
| 78-957-786 | 6 13 | Jusseaume, M. | 02/14/1997 | Billerica | |
| 03-881-74 | 31 14 | Guerratic, M. | 02/21/1997 | Compensation | Westporen |
| 03-898-135 | 1 15 | Johnson, C. | 10/01/1997 | Billerica | Springfield |
| 03-668-04 | 84 16 | Comire, H. | 10/07/1997 | Billerica | |
| 08-489-19 | 24 17 | Racoupeli, R. | 10/14/1997 | Billerica | Springfield |
| 78-663-67 | 94 18 | Walukdowicz, S. | 06/01/1998 | Billerica | |
| 03-432-43 | 27 19 | Hussey, R. | 10/22/1998 | Billerica | Springfield |
| 03-647-54 | 32 20 | Carney, III, R. | 10/23/1998 | Billerica | |
| 78-685-2181 | 21 | Michaud, J. | 10/26/1998 | Billerica | |
| 03-880-826 | 5 22 | Babin, M. | 10/30/1998 | Billerica | |
| 10-444-18 | 95 23 | Boynton, E. | 12/01/1998 | Billerica | Burlington VT |
| 03-772-57 | 04 24 | Small, Jr., C. | 09/08/1999 | Billerica | |
| 53-429-44 | 36 25 | Guimond, N. | 10/01/1999 | Billerica | |
| 78-632-31 | 05 26 | Vaughan, M. | 10/04/1999 | Billerica | Springfield |
| 03-626-78 | 55 27 | Chaillour, P. | 10/06/1999 | Billerica | |
| 78-486-30 | 13 28 | Tucker, J. | 10/18/1999 | Billerica | Springfield |
| 03-888-44 | 49 29 | Dion, R. | 10/28/1999 | Billerica | |
| 603-537-154 | 1 30 | Arseneault, Jr., R. | 08/18/2000 | Billerica | |
| 978-685-49 | 16 31 | Morasse, Jr., J. | 12/22/2000 | Billerica | |
| 03-635-235 | 32 | Levine, J. | 08/18/2001 | Billerica | |

02/22/02  FRI 15:27 FAX 7172338023     TEAMSTERS 770     @003
02/22/2002  15:18   2026246722     IBT NAT FRT DIV     PAGE  03

| | NAME | ADDRESS | CITY | ST | ZIP | TELEPHONE | SOCIAL | SEN. DATE | PREF. 1 | PREF. 2 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | McGonigle, III | 3 Marilyn Road | Billerica | MA | 01821 | 978-663-6290 | 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 | 1/20/1976 | Billerica | |
| 2 | Adams, W. | 11 Charles Anna Lane | Billerica | MA | 01821 | 978-667-2122 | 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 | 5/16/1977 | Billerica | |
| 3 | Sullivan, Jr.) | 29 Harold Avenue | Woburn | MA | 01801 | 781-938-4327 | 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 | 2/21/1979 | Billerica | |
| 4 | Mooney, A. | 2A Salem Street | Lawrence | MA | 01841 | 978-258-0112 | 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 | 5/21/1985 | Billerica | |
| 5 | Johnson, R. | 390 Anna Street | Lawrence | MA | 01841 | 508-687-1936 | 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 | 9/02/1993 | Billerica | |
| 6 | Murray, S. | 6 Cambridge Avenue | Wilmington | MA | 01887 | 978-918-0160 | 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 | 16/02/1993 | Billerica | |
| 7 | Marino, D. | 8 Riverview Street | Beverly | MA | 01905 | 508-744-0618 | 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 | 10/21/1993 | Billerica | |
| 8 | Partridge, G. | 35 Amherst Street | Lawrence | MA | 01841 | 508-688-6328 | 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 | 10/24/1993 | Springfield | |
| 9 | Loiacono, V. | 67 Lincoln Avenue | Hamilton | MA | 01982 | 508-468-5625 | 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 | 9/20/1994 | Billerica | Barl, VT |
| 10 | Thibeault, R. | 29 Lyford Lane | Brentwood | NH | 01833 | 603-679-2780 | 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 | 1/17/1996 | Billerica | |
| 11 | Shepard, G. | PO Box 239 | E. Hampstead | NH | 01836 | 603-329-1170 | 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 | 1/30/1996 | Billerica | |
| 12 | Ruddy, J. | PO Box 116 | Hampstead | NH | 01841 | 603-437-5128 | 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 | 2/7/1997 | Billerica | |
| 13 | Thurman, M. | 126 Wimbledon Xing | Dracut | MA | 01826 | 508-957-7866 | 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 | 2/14/1997 | Billerica | |
| 14 | Gervette, M. | 44 Riverside Avenue | Hudson | NH | 01051 | 603-930-8165 | 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 | 2/21/1997 | Comp. | Springfield |
| 15 | Johnson, C. | 22 Baldwin Street | Salem | NH | 01079 | 603-898-4311 | 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 | 10/11/1997 | Billerica | Springfield |
| 16 | Connie, H. | 344 Woodcrest Court | Manchester | NH | 01103 | 605-268-0484 | 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 | 10/8/1997 | Billerica | |
| 17 | Boooygni, R. | 90 Pelham Street | Methuen | MA | 01844 | 978-689-1924 | 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 | 10/24/1997 | Billerica | Springfield |
| 18 | Wabkowitz, S. | 6 Fairview Avenue | Billerica | MA | 01821 | 978-663-4794 | 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 | 6/01/1998 | Billerica | |
| 19 | Rassey, R. | 29 Linwood Drive | Aligo | NH | 01809 | 603-661-9169 | 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 | 10/22/1998 | Billerica | |
| 20 | Carney, III R. | 16 Woodridge Drive | Allenstown | NH | 01275 | 603-210-1412 | 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 | 10/23/1998 | Billerica | Springfield |
| 21 | Michaud, J. | 117 Pleasant Valley Street | Methuen | MA | 01844 | 978-685-2181 | 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 | 10/24/1998 | Billerica | |
| 22 | Dahib, M. | 1 Hillside Drive | Radroe | NH | 01051 | 603-880-8269 | 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 | 10/30/1998 | Billerica | |
| 23 | Boynton, E. | 19 Trail Lane | Littleton | NH | 03561 | 603-444-6895 | 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 | 12/61/1998 | Billerica | Burlington, VT |
| 24 | Small, Jr., C. | 6 Powder Mill Road | Exeter | NH | 03033 | 603-772-5704 | 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 | 9/08/1999 | Springfield | |
| 25 | Grimord, N. | 43 Cota Road | Merrimack | NH | 03054 | 603-429-4436 | 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 | 10/01/1969 | Billerica | |
| 26 | Vaughn, M. | 171 Otter River Road | Gardner | MA | 01440 | 978-632-3105 | 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 | 10/04/1969 | Billerica | Springfield |
| 27 | Chalifour, P. | 107 Lida Avenue | Manchester | NH | 01103 | 603-668-0484 | 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 | 10/05/1969 | Billerica | |

AAA

DRACUT MASSACHUSETTS.

D019

01/22/02 FRI 15:25 FAX 7172305023
02/22/2002 15:18  2026248722

TEAMSTERS 770
IBT NAT FRT DIV

☑ 004

PAGE 84

| 28 | Tocler, J. | 69 Taylor Street | Littleton | MA | 01460 | 978-486-3013 | 031-156-8017 | 10/31/1999 | Billerica | Springfield |
| 29 | Dion, R. | 6 Edwards Avenue | Nashua | NH | 03060 | 603-888-4669 | 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 | 10/28/1999 | Billerica | |
| 30 | Arenault, Jr. R | 63 Scobie Pond Road | Derry | NH | 03038 | 603-537-1541 | 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 | 8/18/2000 | Billerica | |
| 31 | Morrow, Jr., J | 29 Salem Street | Lawrence | MA | 01843 | 978-318-0112 | 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 | 12/22/2000 | Billerica | |
| 32 | Levine, J. | 20 Litchfield Circle | Pelham | NH | 03076 | 603-635-2357 | 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 | 9/1/2001 | Billerica | |

D020

'02/22/02  FRI 15:28  FAX 7172335023          TEAMSTERS 776
02/22/2002  15:18  2826248722               IBT NAT FRT DIV                    PAGE 06

| # | Name | Address | City | State | Zip | Phone | | | Status |
|---|------|---------|------|-------|-----|-------|---|---|--------|
| 1 | Paul, P. | 64 Spring Rd. | Berlinsa | MA | 02411 | (781) 447-8455 | 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 | 6/19/73 | Bill |
| 2 | Bund, P. | B Girl Waunds Cl. | | MA | 02315 | (781) 848-5208 | 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 | 1/20/28 | Bill |
| 3 | McCaffrey, M. | 288 Shaw St. | Braintree | MA | 02184 | (508) 285-9452 | 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 | 10/7/70 | Bill |
| 4 | Hanox | | Norton | MA | 02768 | (781) 648-5223 | 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 | | |
| 5 | Anderson, R. | 318 Forst Trail | Hanson | MA | 02311 | (781) 447-8455 | 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 | 6/19/73 | Bill |
| 6 | Sutherland, D. | 77 Paul Rd. | Hanwell | MA | 02339 | (781) 871-8525 | 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 | 11/9/73 | Ret. |
| 7 | Loud, D. | 640 Bedford St. | Abington | MA | 02351 | (781) 874-2415 | 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 | 3/14/74 | Ret. |
| 8 | Polti, A. | 41 Hisson Rd. | Weymouth | MA | 02188 | (781) 337-3357 | 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 | 3/13/74 | Ret. |
| 9 | Petti, R. | 116 Highland Ave. | Quincy | MA | 02169 | (781) 471-0596 | 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 | 9/16/75 | Bill |
| 10 | Durella, M. | 111 Pond St. | Swansea | MA | 02777 | (508) 674-7863 | 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 | 9/20/75 | Prov. |
| 11 | Hopi, J. | 23 Garfield St. | Foxboro | MA | 02035 | (509) 543-2878 | 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 | 8/14/76 | Ret. |
| 12 | Galli, R. | 1573 Birth St. | Braintree | MA | 02184 | (781) 843-1648 | 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 | 8/27/76 | Ret. |
| 13 | Deanna, M. | 31 Washington St. | Sheldon | MA | 01770 | (508) 652-6608 | 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 | 2/22/77 | Bill |
| 14 | Sullivan, T. | 17 Whale Dr. | Plymouth | MA | 02380 | (508) 724-5364 | 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 | 10/24/77 | Prov. |
| 15 | Rabideau, R. | P.O. Box 765 | Easton | MA | 02334 | (508) 730-2435 | 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 | 1/4/78 | Prov. |
| 16 | Kelley, Jr., W. | 308 Field St. | Brockton | MA | 02403 | (508) 583-0861 | 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 | 3/7/78 | Bill |
| 17 | Morrison, H. | 4 Kelly Ln. | Hanson | MA | 02341 | (781) 535-2761 | 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 | 4/19/78 | Prov. |
| 18 | Konilson, H. | 813 King St. | Hanover | MA | 02339 | (781) 871-7848 | 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 | 4/29/79 | Bill |
| 19 | Petti, Jr., E. | 53 Roselind St. | N. Weymouth | MA | 02188 | (781) 337-8278 | 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 | 8/3/81 | Bill |
| 20 | Pickering, C. | 17 Marsh Ave. | Hanover | MA | 02339 | (781) 871-7648 | 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 | 2/3/81 | Bill |
| 20 | Tisbert, B. | 22 Bixby Dr. | Salem | NH | 03079 | (603) 890-9183 | 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 | 5/17/85 | Bill |
| 21 | Davidson, J. | 287 Central St. | E. Bridgewater | MA | 02333 | (508) 378-3792 | 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 | 7/20/81 | Prov. |
| 22 | Gwynn, N. | 804 Maple St. | E. Bridgewater | MA | 02333 | (508) 378-0461 | 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 | 5/14/84 | Prov. |
| 23 | Carcioca, P. | 20 E. Nilsson St. | Brockton | MA | 02048 | (508) 339-0134 | 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 | 8/24/84 | Bill |
| 24 | Bouthard, R. | 420 State Rd. | Plymouth | MA | 02360 | (508) 586-6540 | 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 | 9/30/85 | Bill |
| 25 | Cook, B. | 437 Commonwealth Rd. | | | | (508) 888-6364 | 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 | 4/6/83 | Prov. |
| 26 | McShea, R. | 336 Flagg St. | Wayland | MA | 02374 | (608) 697-8620 | 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 | 11/25/87 | Prov. |
| 27 | Francey, C. | 103 So. Pickens St. | Bridgewater | MA | 02347 | (608) 948-0350 | 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 | 4/20/84 | Prov. |
| 28 | Crafse, M. | 18 Carver St. | Lakeville | MA | 02472 | (617) 825-5324 | 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 | 11/16/84 | Bill |
| 29 | Power, K. | 160 Washington St. | Watertown | MA | 02782 | (508) 586-3075 | 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 | 7/23/85 | Prov. |
| 30 | Femelly, E. | 1153 Main St. | Plainville | MA | 02081 | (605) 668-0224 | 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 | 8/26/85 | Prov. |
| 31 | McGrath, H. | 28 Prose Ct. | Walpole | MA | 02081 | (508) 668-5435 | 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 | 8/2/93 | Prov. |
| 32 | Belia, E. | 139 Church St. | Hanson | MA | 02343 | (781) 767-8728 | 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 | 3/8/87 | Bill |
| 33 | Holderbaid, J. | 127 Everett Ct. | Westwood | MA | 02090 | (781) 329-3587 | 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 | 5/8/86 | BM |
| 34 | Horn, T. | 53 Bratford St. | Stoughton | MA | 02072 | (781) 344-1904 | 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 | 9/15/85 | Prov. |
| 35 | Hone, B. | 807 Pond St. | Bo-Weymouth | MA | 02190 | (781) 344-3671 | 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 | 5/31/90 | Prov. |
| 36 | Berry, B. | 8 Ricky Rd. | Norton | MA | 02766 | (508) 285-4918 | 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 | 3/21/90 | Pass |
| 37 | Bullivan, C. | 1 Pebble Path | Forestdale | MA | 02644 | (508) 477-5724 | 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 | 12/0/91 | BA |
| 38 | Hulbert, M. | 4 First St. | Mansfield | MA | 02048 | (508) 339-3545 | 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 | 12/0/91 | BA |
| 39 | MacDonald, R. | 75 Chestnut W. | Randolph | MA | 02368 | (781) 968-6686 | 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 | 3/1/93 | Bill |
| 40 | O'Meara, W. | 755 Washington St. | Walpole | MA | 02081 | (508) 668-5435 | 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 | 8/2/93 | Prov. |
| 41 | Fowles, W. | 36 Brown St. | Fair Haven | MA | 02719 | (508) 994-5614 | 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 | 9/8/93 | Prov. |
| 42 | Pimental, J. | | | | 02021 | (781) 826-3354 | 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 | 8/6/93 | Prov. |
| 43 | Fabi, P. | 6 Fall Ln. | Denton | MA | 02021 | (781) 826-3354 | 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 | 8/6/93 | Prov. |
| 44 | Lehan, D. | 4 South St. | Canton | MA | 02021 | (781) 828-6595 | 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 | 9/10/93 | Prov. |

D02

| # | Name | Address | City | State | Zip | Phone | | Date | Status |
|---|------|---------|------|-------|-----|-------|---|------|--------|
| 45 | Houde, G. | 350 Cedar St. | New Bedford | MA | 02740 | (508) 998-6028 | 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 | 9/14/93 | Prov |
| 46 | Roche, J | 3 Buttercup Ln | Medway | MA | 02053 | (508) 533-7749 | 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 | 9/16/93 | Prov |
| 47 | Stephen, J | 25 Jessie Ave | S. Attleboro | MA | 02703 | (508) 761-6079 | 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 | 9/17/93 | Prov |
| 41 | Carvalho, D. | 483 Wareham St | Middleboro | MA | 02346 | (508) 947-9183 | 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 | 9/18/93 | Pass |
| 48 | Casey, P. | 16 Grist Mill Ln. | Pembroke | MA | 02359 | (781) 829-8773 | 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 | 10/27/93 | Prov. |
| 50 | Creighton, R. | 42 Brooks Ter. | Weymouth | MA | 02189 | (781) 335-8815 | 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 | 8/1/94 | (Prov.) |
| 51 | Perry, J. | 89 Yellowstone Ave | Warwick | RI | 02888 | (401) 463-8145 | 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 | 9/10/94 | Prov. |
| 52 | Blake, R | 17 Glenhill Rd | N. Attleboro | MA | 02760 | (508) 643-2239 | 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 | 1/13/95 | Prov |
| 53 | Kenthy, M | 36 Gandi St. | Ashland | MA | 02743 | (508) 763-4960 | 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 | 4/6/95 | Military |
| 54 | DeSouza, B | 80 McCabe St. | E. Dartmouth | MA | 02748 | (508) 763-9680 | 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 | 4/6/95 | Prov. |
| 55 | Oxner, J | 31 Arlington St. Apt. 3 | Nashua | NH | 03060 | (603) 598-2862 | 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 | 7/24/95 | BF |
| 56 | Dolan, J. | 18 Wilverton Ave. | W. Roxbury | MA | 02132 | (617) 323-2026 | 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 | 7/25/95 | BL |
| 57 | Pendleton, J | 1810 Broadway Lot 73 | Raynham | MA | 02767 | (508) 822-7740 | 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 | 7/8/96 | BL |
| 58 | Gilmore, M | 24 Keith Ave. | Brockton | MA | 02301 | (508) 586-1327 | 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 | 9/3/96 | Prov |
| 59 | Parquette, D | 103 Hart St. | Taunton | MA | 02780 | (508) 823-7150 | 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 | 9/24/98 | Prov. |
| 60 | Spuria, J | 53 W. Chestnut St. | Brockton | MA | 02301 | (508) 559-0183 | 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 | 10/1/96 | Prov. |
| 61 | Kelley, Jr., R | 574 Hancock St. | Abington | MA | 02351 | (781) 982-8328 | 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 | 3/25/97 | BL |
| 81 | Johnson, Jr, R | 186 Wareham St | Middleboro | MA | 02348 | (508) 946-1129 | 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 | 4/15/97 | Prov |
| 82 | Chmilere, Jr, R | 52 Prospect St | Attleboro | MA | 02703 | (508) 222-5576 | 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 | 12/10/98 | (Prov.) |
| 84 | Crawford, H | 4 W. Baldner Rd | Foxboro | MA | 02035 | (508) 543-8198 | 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 | 12/31/98 | Ref |
| 85 | Clark, D | 7 Gardner St. | Randolph | MA | 02368 | (781) 963-2737 | 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 | 1/3/99 | Rel |
| 86 | White, R | 86 Harvard St | Dedham | MA | 02026 | (781) 326-4327 | 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 | 8/28/99 | |
| 67 | Kelleher, L. | 239 Whitier St. | Brockton | MA | 02402 | (508) 659-5477 | 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 | 9/15/99 | Prov. |
| 88 | Minnisi, P. | 27 Degley Dell Ln. | Duxbury | MA | 02332 | (781) 834-8608 | 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 | 8/7/99 | Prov. |
| 69 | Gould, D. | 6 Roxberry Ln. | Rochester | MA | 02770 | (508) 763-9521 | 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 | 9/11/99 | Prov. |
| 75 | Morris, T | 24 Lake St. | Rehoboth | MA | 02769 | (508) 330-6919 | 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 | 10/28/99 | Prov |
| 71 | Hamilton, D. | 8 Urquhara Rd | W. Wareham | MA | 02576 | (508) 208-3976 | 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 | 1/18/99 | Prov |
| 72 | Kelley, G. | 104 Brentwood Cl. | Plymouth | MA | 02360 | (508) 224-7912 | 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 | 12/72/99 | BL |
| 73 | Wertz, E. | 131 Lawrence St | Brockton | MA | 02302 | (508) 588-4847 | 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 | 12/22/99 | Prov |
| 74 | Palm, W. | 80 Lester Rd. | Brockton | MA | 02301 | (508) 584-1644 | 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 | 11/29/00 | Prov. |
| 76 | Zobuck, Jr, B | 365 Crescon Pk. | Bridgewater | MA | 02324 | (508) 354-3796 | 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 | 1/24/00 | BR |



MAR 0 4 2002

# Teamsters Local 25
# International Brotherhood of Teamsters

544 MAIN STREET • BOSTON, MASSACHUSETTS 02129-1113 • 617-241-8825 • Fax 617-242-4284
www.teamsterslocal25.com

GEORGE W. CASHMAN
*President / Principal Officer*

RITCHIE E. REARDON
*Secretary-Treasurer*

WILLIAM H. CARNES
*Vice President / Business Agent*

JOHN A. MURPHY
*Recording Secretary / Business Agent*

MARK A. HARRINGTON
*Trustee / Business Agent*

LOU DiGIAMPAOLO
*Trustee / Director of Organizing /
Field Representative*

ERNEST C. SHEEHAN JR.
*Trustee / Business Agent*

VINCENT J. PISACRETA
*Business Agent*

ARTHUR J. LAZAZZERO
*Business Agent*

February 28, 2002

Dan Schmidt
Vice President of Labor Relations
New Penn Motor Express
625 So. 5th Ave. P.O. Box 630
Lebanon, PA 17042

Dear Mr. Schmidt:

Enclosed please find updated list of former employees of A.P.A. in Canton, Massachusetts. Please note that R. Petit's area code number has changed from (781) to (617) and T. Sullivan has changed his preference from Providence, Rhode Island to Billerica, Massachusetts.

Should you have any question, please contact Mark Harrington at 617-241-8825 extension #277.

Thank you for your attention to this matter.

Sincerely,

George W. Cashman
President/Principal Officer

GWC/jcm

*We will only accept deliveries from UNION carriers! All other deliveries will be refused.*

D023

| # | TOWN | NAME | ADDRESS | CITY/TOWN | STATE | ZIP | PHONE | SS# | DATE | PRE |
|---|------|------|---------|-----------|-------|-----|-------|-----|------|-----|
| 1 | CANTON | Proud, R. | 58 Spring St. | Braintree | MA | 02184 | (781) 848-5905 | 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 | 11/12/68 | Rel |
| 2 | CANTON | Burril, P. | 6 Grt. Woods Ct. | Norton | MA | 02766 | (508) 285-9452 | 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 | 6/30/70 | Prov |
| 3 | CANTON | McCaffrey, M | 298 Shaw St | Braintree | MA | 02184 | (781) 848-9223 | 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 | 10/7/70 | Bil |
| 4 | CANTON | Heroux | | | | | | | | Rel |
| 5 | CANTON | Mastropietro, R. | 215 Forest Trail | Hanson | MA | 02311 | (781) 447-9455 | 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 | 6/14/73 | Rel |
| 6 | CANTON | Setterland, D | 72 Paul Rd. | Hanover | MA | 02339 | (781) 871-3525 | 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 | 11/3/73 | Bil |
| 7 | CANTON | Loud, D | 560 Bedford St | Abington | MA | 0235 | (781) 871-0416 | 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 | 1/11/74 | Rel |
| 8 | CANTON | Petit, A | 11 Hinson Rd. | Weymouth | MA | 02188 | (781) 337-3597 | 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 | 3/11/74 | Rel |
| 9 | CANTON | Petit, R. | 115 Highland Ave. | Quincy | MA | 02169 | (617) 471-0098 | 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 | 9/15/75 | Bil |
| 10 | CANTON | Durette, M | 111 Pond St. | Swansea | MA | 02777 | (508) 674-7683 | 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 | 9/30/75 | Prov |
| 11 | CANTON | Hoyt, K. | 23 Garfield St. | Foxboro | MA | 02035 | (508) 543-2978 | 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 | 8/17/76 | Rel |
| 12 | CANTON | Ellis, R | 1573 Liberty St. | Braintree | MA | 02194 | (781) 843-1549 | 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 | 8/27/76 | Rel |
| 13 | CANTON | Deramo M | 31 Washington St. | Sherborn | MA | 01770 | (508) 552-6085 | 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 | 2/26/77 | Bil |
| 14 | CANTON | Sullivan, T | 17 Hillside Dr | Plymouth | MA | 02360 | (508) 224-5584 | 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 | 10/24/77 | Bil |
| 15 | CANTON | Rabideau, R | P.O. Box 265 | Easton | MA | 02334 | (508) 230-2436 | 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 | 1/4/78 | Prov |
| 16 | CANTON | Kelley, Jr., W | 306 Field St. | Brockton | MA | 02403 | (508) 583-0867 | 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 | 3/27/78 | Bil |
| 17 | CANTON | Monahan, H. | 4 Kathy Ln. | Hanson | MA | 02341 | (781) 816-2751 | 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 | 11/1/78 | Prov |
| 18 | CANTON | Petit, Jr., E. | 633 King St. | Hanover | MA | 02339 | (781) 871-7648 | 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 | 4/23/79 | Bil |
| 19 | CANTON | Pickering, G | 53 Rosalind St | N. Weymouth | MA | 02188 | (781) 337-6278 | 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 | 8/3/81 | Bil |
| 20 | CANTON | Isbert, B | 17 Marsh Ave. | Salem | NH | 03079 | (603) 890-6163 | 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 | 5/17/03 | Bil |
| 21 | CANTON | Damiano, J | 22 Bixby Dr | E Bridgewater | MA | 02333 | (508) 378-3792 | 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 | 7/20/83 | Prov |
| 22 | CANTON | Gwynn, N | 283 Central St. | E Bridgewater | MA | 02333 | (508) 378-0466 | 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 | 5/14/84 | Prov |
| 23 | CANTON | Cardoza, P. | 804 Maple St | Mansfield | MA | 02048 | (508) 339-5134 | 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 | 9/24/84 | Prov |
| 24 | CANTON | Bouffard, R | 20 E Nilsson St. | Brockton | MA | 02301 | (508) 588-6540 | 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 | 9/30/85 | Bil |

CHANGE



EXHIBIT

EXHIBIT

Ex
D02

| # | | Name | Address | City | State | Zip | Phone | ID | Date | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| 25 | CANTON | Coull, D | 230 State Rd. | Plymouth | MA | 02360 | (508) 888-6964 | 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 | 4/6/73 | Ret. |
| 26 | CANTON | McGee, R. | 437 Commonwealth Rd. | Wayland | MA | 01778 | (508) 653-8174 | 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 | 5/20/82 | Ret. |
| 27 | CANTON | Francey, G. | 324 Flagg St. | Bridgewater | MA | 02324 | (508) 697-9620 | 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 | 10/25/82 | Prov. |
| 28 | CANTON | Cruise, M | 103 So. Pickens St. | Lakeville | MA | 02347 | (508) 946-0330 | 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 | 4/30/84 | Bil. |
| 29 | CANTON | Power, K | 16 Carver St. | Watertown | MA | 02472 | (617) 926-5324 | 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 | 11/15/84 | Bil. |
| 30 | CANTON | Fennelly, E. | 160 Washington St., Unit #60 | Plainville | MA | 02762 | (508) 695-3075 | 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 | 2/25/85 | Prov. |
| 31 | CANTON | McGrain, H | 1165 Main St. | Walpole | MA | 02081 | (508) 668-0244 | 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 | 8/26/85 | Prov. |
| 32 | CANTON | Bain, S. | 28 Poole Cl. | Holbrook | MA | 02343 | (781) 767-6229 | 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 | 3/9/87 | Bil. |
| 33 | CANTON | Holderried, J | 139 Chirich St. | Westwood | MA | 02090 | (781) 329-3587 | 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 | 5/8/89 | Bil. |
| 34 | CANTON | Howe, T. | 127 Everett Cl | Stoughton | MA | 02072 | (781) 344-1904 | 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 | 5/16/89 | Prov. |
| 35 | CANTON | Howe, S. | 53 Bradford St | Stoughton | MA | 02072 | (781) 344-3871 | 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 | 5/31/90 | Prov. |
| 36 | CANTON | Barry, S | 367 Pond St | So. Weymouth | MA | 02190 | (781) 335-4217 | 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 | 5/31/90 | Pass |
| 37 | CANTON | Sullivan, C | 4 Hadley Rd | Norton | MA | 02766 | (508) 285-4918 | 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 | 12/9/91 | Bil. |
| 38 | CANTON | MacDonald, J | 1 Pebble Path | Forestdale | MA | 02644 | (508) 477-5324 | 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 | 12/29/91 | Prov. |
| 39 | CANTON | Hulbert, M | 4 First St. | Mansfield | MA | 02048 | (508) 339-8545 | 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 | 12/9/91 | Bil. |
| 40 | CANTON | O'Meara, W. | 75 Chestnut W. | Randolph | MA | 02368 | (781) 966-8686 | 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 | 3/1/93 | Prov. |
| 41 | CANTON | Fuxtes, M | 755 Washington St | Walpole | MA | 02081 | (508) 683-5435 | 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 | 9/3/93 | Prov. |
| 42 | CANTON | Pimental, J | 36 Brown St. | Fair Haven | MA | 02719 | (508) 994-5614 | 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 | 9/6/93 | Prov. |
| 43 | CANTON | Friel, P | 5 Fall Ln. | Canton | MA | 02021 | (781) 828-3354 | 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 | 9/9/93 | Prov. |
| 44 | CANTON | Lehan, D | 4 South St. | Canton | MA | 02021 | (781) 828-6595 | 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 | 9/10/93 | Prov. |
| 45 | CANTON | Houde, G. | 350 Cedar St. | New Bedford | MA | 02740 | (508) 996-6028 | 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 | 9/14/93 | Prov. |
| 46 | CANTON | Roche, J. | 3 Buttercup Ln. | Medway | MA | 02053 | (508) 533-7249 | 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 | 9/16/93 | Prov. |
| 47 | CANTON | Stephen, J. | 29 Jessie Ave. | S. Attleboro | MA | 02703 | (508) 761-6979 | 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 | 9/17/93 | Prov. |
| 48 | CANTON | Carvalho, D | 363 Wareham St. | Middleboro | MA | 02346 | (508) 947-2177 | 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 | 9/18/93 | Pass |

D02

| # | | Name | Address | City | State | Zip | Phone | SSN | Date | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| 49 | CANTON | Carey, P. | 19 Grist Mill Ln | Pembroke | MA | 02359 | (781) 829-8773 / 5163 | 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 | 10/27/93 | Prov. |
| 50 | CANTON | Creighton, R. | 42 Brooke Ter | Weymouth | MA | 02188 | (781) 335-8815 | 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 | 9/1/94 | (Prov. |
| 51 | CANTON | Perry, J. | 59 Yellowstone Ave | Warwick | RI | 02886 | (401) 463-8145 | 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 | 9/10/94 | Prov. |
| 52 | CANTON | Blake, R | 17 Glenfield Rd | N Attleboro | MA | 02760 | (508) 643-2239 | 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 | 1/13/95 | Prov. |
| 53 | CANTON | Kealey, M | 30 Carol St | Acushnet | MA | 02743 | (508) 763-4960 | 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 | 4/4/95 | Milita y |
| 54 | CANTON | DeSouza, B | 81 McCabe St | S. Dartmouth | MA | 02743 | (508) 763-9680 | 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 | 4/5/95 | Prov |
| 55 | CANTON | Oxsner, J | 31 Arlington St Apt 3 | Nashua | NH | 03060 | (603) 590-2902 | 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 | 7/24/95 | Bil |
| 56 | CANTON | Dolan, J. | 19 Willowdean Ave. | W. Roxbury | MA | 02132 | (617) 323-2026 | 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 | 7/25/95 | Dil. |
| 57 | CANTON | Pendleton, J | 1540 Broadway Lot 23 | Raynham | MA | 02301 | (508) 822-7740 | 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 | 7/8/96 | Bi. |
| 58 | CANTON | Gilmore, M. | 24 Keith Ave. | Brockton | MA | 02301 | (508) 580-1327 | 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 | 9/23/96 | Prov |
| 59 | CANTON | Parquette, D | 100 Hart St. | Taunton | MA | 02780 | (508) 823-7150 | 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 | 9/24/96 | Prov |
| 60 | CANTON | Spano, J | 53 W. Chestnut St. | Brockton | MA | 02301 | (508) 559-0189 | 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 | 10/1/95 | Prov |
| 61 | CANTON | Kelley, Jr. R | 674 Hancock St | Abington | MA | 02351 | (781) 982-9328 | 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 | 3/2/97 | Bil |
| 62 | CANTON | Johnson, Jr R | 185 Wareham St. | Middleboro | MA | 02346 | (508) 946-1129 | 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 | 4/15/97 | Prov |
| 63 | CANTON | Chouinard, Jr. R | 52 Prospect St. | Attleboro | MA | 02703 | (508) 222-5776 | 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 | 12/30/98 | Prov |
| 64 | CANTON | Crawford, H. | 4 W Belches Rd | Foxboro | MA | 02035 | (508) 543-2196 | 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 | 12/31/98 | Rel. |
| 65 | CANTON | Clark, D. | 7 Garden St. | Randolph | MA | 02368 | (781) 983-5737 | 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 | 1/3/99 | Rel |
| 66 | CANTON | White, A | 95 Harvard St. | Dedham | MA | 02026 | (781) 326-4327 | 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 | 8/26/99 | |
| 67 | CANTON | Kelleher, T. | 230 Winter St. | Brockton | MA | 02402 | (508) 559-5477 | 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 | 9/15/99 | Prov |
| 68 | CANTON | Winquist, P | 21 Dingley Dell Ln | Duxbury | MA | 02332 | (781) 834-5908 | 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 | 9/17/99 | Prov. |
| 69 | CANTON | Gould, D. | 9 Boxberry Ln | Rochester | MA | 02770 | (508) 763-9521 | 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 | 9/17/99 | Prov. |
| 70 | CANTON | Morris, T. | 24 Lake St. | Rehoboth | MA | 02769 | (508) 336-6919 | 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 | 10/28/99 | Prov. |
| 71 | CANTON | Hamilton, D. | 8 Uncatena Rd. | W. Wareham | MA | 02576 | (508) 295-3979 | | 1/9/99 | Prov. |

D0

| 72 | CANTON | Kelley. G | 104 Brentwood Cl. | Plymouth | MA | 02360 | (508) 224-7017 | 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 | 12/2/99 | Bil. |
| 73 | CANTON | Wertz, E. | 137 Lawrence St | Brockton | MA | 02302 | (508) 588-4847 | 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 | 12/23/99 | Prov. |
| 74 | CANTON | Palm, W | 89 Lester St. | Brockton | MA | 02301 | (508) 586-6682 | 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 | 11/28/00 | Prov. |
| 75 | CANTON | Zulauf, Jr. B. | 3166 Grance Pk. | Bridgewater | MA | 02324 | (508) 284-3796 | 032-54-667 | 12/4/00 | Bil. |

D0.

| 10/07/1970 | M. McCAFFREY | CANTON | 781-848-9223 | 028 32 0083 |
| 11/05/1973 | D. SETTERLAND | CANTON | 781-871-3525 | 034 38 9885 |
| 09/15/1975 | R. PETIT | CANTON | 617-471-0098 | 034 38 9800 |
| 05/18/1976 | J. McGONIGLE III | (DRACUT) | 978 663 6290 | |
| 02/22/1977 | M. D'ERAMO | CANTON | 508 653 6086 | 018 46 9114 |
| 05/16/1977 | W. ADAMS | (DRACUT) | 978 -667-2122 | |
| 03/22/1978 | W. KELLEY, JR | CANTON | 508-583-0861 | 015 40 7158 |
| 02/21/1979 | J. SULLIVAN JR | (DRACUT) | 781-938-8839 | |
| 04/23/1979 | E. PETIT, JR | CANTON | 781-871-7648 | 022 44 6082 |
| 08/03/1981 | G. PICKERING | CANTON | 781-337-6278 | 037 40 8998 |
| 05/17/1983 | B. TISBERT | CANTON | 603-890-8183 | 031 44 3942 |
| 05/01/1985 | A. MOONEY | (DRACUT) | 978 975 0595 | |
| 09/30/1985 | R. BOUFFARD | CANTON | 508 378 1543 | D15 54 3381 |
| 11/15/1984 | K. POWER | CANTON | 617-926-5324 | 020 39 9473 |
| 03/09/1987 | S. BAIN | CANTON | 781 767 6229 | 031 54 1053 |
| 05/08/1989 | J. HOLDERRIED | CANTON | 781 329 2587 | 022 30 5547 |
| 12/09/1991 | C. SULLIVAN | CANTON | 508-285-4918 | 010 56 8107 |
| 12/09/1991 | M. HULBERT | CANTON | 508-339-8545 | 010 58 1605 |
| 09/02/1993 | R. JOHNSON | (DRACUT) | 978 682 5247 | |
| 10/02/1993 | S. MURRAY | (DRACUT) | 508-988-0160 | |
| 10/23/1993 | D. MARTIN | (DRACUT) | 978 884 5789 | |
| 10/24/1993 | G. PARTRIDGE | (DRACUT) | 978 975 0417 | |
| 09/30/1994 | V. LORIZIO | (DRACUT) | 508-468-5625 | |
| 07/24/1995 | J. OSMER | CANTON | 603-598-2982 | 029 64 4926 |
| 07/25/1995 | J. DOLAN | CANTON | 617-323-2026 | 029 58 5578 |
| 01/17/1996 | R. TRIBEAULT | (DRACUT) | 603 679 2780 | |
| 02/26/1996 | G. SHEPARD | (DRACUT) | 603 382 1013 | |

PAGE1

TO: ALL SUPERVISORS
HERE IS THE LISTS OF APA'S CASUALS
TO AVOID A RUN AROUND ON ANYONE NOT AVAILABLE
HAVE A TEAMSTER SIGN OFF AS A WITNESS



EXHIBIT
#6
11-15-05
Dubiel

| | | | | |
|---|---|---|---|---|
| 02/12/1997 | J. RODDY | (DRACUT) | 603-437-5128 | |
| 02/14/1997 | M. JUSSAUME | (DRACUT) | 978-957-7866 | |
| 02/21/1997 | M. GUERRETTE | (DRACUT) | 603-881-7431 | maybe on compensatio |
| 03/25/1997 | R. KELLEY JR. | CANTON | 781-982-9328 | 033 56 3626 |
| 10/01/1997 | C. JOHNSON | (DRACUT) | 603-898-1351 | |
| 10/07/1997 | H. COMIRE | (DRACUT) | 603-668-0484 | |
| 10/14/1997 | R. RACIOPPI | (DRACUT) | 508-689-1924 | |
| 06/01/1998 | S. WALUKIEWICZ | (DRACUT) | 978-663-6794 | |
| 10/22/1998 | R. HUSSEY | (DRACUT) | 603 661 9159 | |
| 10/23/1998 | R. CARNEY III | (DRACUT) | 603 210 1432 | |
| 10/26/1998 | J. MICHAUD | (DRACUT) | 978-685-2181 | |
| 10/30/1998 | M. BABIN | (DRACUT) | 603-880-8269 | |
| 12/01/1998 | E. BOYNTON | (DRACUT) | 603-444-6895 | |
| 09/08/1999 | C. SMALL JR. | (DRACUT) | 603 772 5704 | |
| 10/01/1999 | N. GUIMOND | (DRACUT) | 603-429-4436 | |
| 10/04/1999 | M. VAUGHAN | (DRACUT) | 978-632-3105 | |
| 10/05/1999 | P. CHALIFOUR | (DRACUT) | 603-626-7805 | |
| 10/18/1999 | J. TUCKER | (DRACUT) | 978-486-3013 | |
| 10/26/1999 | R. DION | (DRACUT) | 603-888-4649 | |
| 12/22/1999 | G. KELLEY | CANTON | 508-224-7012 | 025 46 1306 |
| 08/18/2000 | R. ARSENAULT JR | (DRACUT) | 603-537-1541 | |
| 12/04/2000 | B. ZUTAUT, JR | CANTON | 508-284-3796 | |
| 12/22/2000 | J. MORASSE, JR. | (DRACUT) | 978 556 9698 | |
| 09/18/2001 | J. LEVINE | (DRACUT) | 603-635-2357 | |

PAGE 2

TO: ALL SUPERVISORS
HERE IS THE LISTS OF APA'S CASUALS
TO AVOID A RUN AROUND ON ANYONE NOT AVAILABLE
HAVE A TEAMSTER SIGN OFF A WITNESS.

02/25/2002 2:06 PM

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **CRAIG GOULET,** | ) | **CASE NO. 04-12577 JLT** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **DEFENDANT'S RESPONSE TO** |
| | ) | **PLAINTIFF'S FIRST SET OF** |
| **NEW PENN MOTOR EXPRESS, INC.,** | ) | **INTERROGATORIES TO DEFENDANT** |
| **et. al.,** | ) | **NEW PENN MOTOR EXPRESS** |
| | ) | |
| **Defendant.** | ) | |

1.      Please provide the occupation, job title and relations (if any) to you and identify

consistent with the above definition each person whom you expect to call as an expert witness at

trial and state as to each such person:

      a.      All background information by which you intend to qualify each such person as

an expert witness;

      b.      The subject matter on which each such expert is expected to testify;

      c.      The substance of the facts to which each such expert is expected to testify;

      d.      The substance of opinions to which each such expert is expected to testify; and

      e.      A summary of the grounds for each opinion to which each such expert is expected

to testify.

> **ANSWER:**      At this time, Defendant has not retained an expert witness. Defendant will
> supplement as required by the Federal Rules of Civil Procedure and any
> local court rule.

2.    Please state the name and address of every person who has any knowledge relating to the

matters referred to in the pending lawsuit including, but not limited to, any witness to or

participants in the incidents or with knowledge of the allegations at issue or participants in the

incidents at issue, and for each such person state:

  a. the substance of the knowledge the person has; and

  b. The source of the person's knowledge.

  **ANSWER**: See Defendant's initial disclosures. In addition, pursuant to Rule 33(d) of
      the Federal Rules of Civil Procedure, see the documents already produced
      by the Defendant.

3.    Please describe in detail the substance of any communications which Defendant's

employees and/or agents had with the Plaintiff or any other person relating in any way to the

incidents alleged in the Complaint, and for each such communication, kindly provide the

approximate date, time, place, form and substance of the communication and identify all persons

present or who have knowledge of the communication.

  **ANSWER**: Outside of the grievance proceeding, to Defendant's knowledge,
      Defendant's employees have not had any communications with the
      Plaintiff.

4.    Please describe in detail the substance of any communications which Defendant's

employees and/or agents had with defendant Teamsters Local 25's employees and/or agents or

any other person relating in any way to the incidents alleged in the Complaint, and for each such

communication, kindly provide the approximate date, time, place, form and substance of the

communication and identify all persons present or who have knowledge of the communication.

  **ANSWER**: Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, see the
      documents already produced by the Defendant. In addition, in
      approximately May 2003, Paul Dubiel asked William Carnes why the
      grievance was filed against the Defendant.

5.     Please describe all facts within your knowledge of the defenses described above or alleged in your Answer, and for each identify any witnesses and/or documents supporting said defenses, and provide a brief summary of facts of which each such witnesses has knowledge relative to each such defense, if not provided in response to a previous interrogatory(ies).

> **ANSWER**:     Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, see the documents already produced.

6.     Please describe in detail defendant New Penn Motor Express' procedure for possessing grievances received by it, for the years 2001 to date.

> **ANSWER**:     Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, see the collective bargaining agreements that have already been produced.

7.     Attached as Exhibit 1 is the A.P.A. Transport Corp. Canton Seniority List for November, 2001 (which document was produced by defendant Teamsters Local 25). With regard to this document, please state if defendant New Penn Motor Express ever received this document. If so, please:

       a.     Identify who received this Seniority List;

       b.     When this Seniority List was received; and

       c.     The method whereby it was received.

> **ANSWER**:     Objection. The document attached is marked as Exhibit 2. Assuming that Exhibit 2 is the document intended to be referred to in Interrogatory No. 7, Defendant states that it received the document at some point in time, although it does not recall precisely when, at its corporate office from A.P.A.

8.    Please describe in detail all actions taken by defendant Teamsters Local 25 to put Craig

Goulet on the defendant New Penn Motor Express call list for the Billerica, Massachusetts,

terminal.

      **ANSWER:**    Defendant is not aware of any action taken by Teamsters Local 25.


9.    Please describe in detail all communications between defendant Teamsters Local 25 and

defendant New Penn Motor Express with regard to Craig Goulet from March 1, 2002, to date.

      **ANSWER:**    See response to Interrogatory No. 4.

10.    Please state whether defendant New Penn Motor Express ever received a grievance filed

by Craig Goulet with regard to his not being put on the defendant New Penn Motor Express call

list for the Billerica, Massachusetts, terminal. If so, please state:

    a.    When this grievance was first received;

    b.    Who first received this grievance;

    c.    The method whereby it was received; and

    d.    all actions taken by defendant New Penn Motor Express to respond to this

grievance.

      **ANSWER:**    The grievance was received by U.S. mail on or after April 18, 2003 at the
                Billerica terminal by Paul Dubiel. Mr. Dubiel discussed the matter with
                Daniel Schmidt and it was determined to be untimely.

11.    Please identify the person at defendant New Penn Motor Express who was assigned to

handle the contractual affairs between defendant New Penn Motor Express and defendant

Teamsters Local 25 from April 1, 1998, to date.

      **ANSWER:**    Daniel Schmidt, V.P. Labor Relations
                Charles Zaccaria, Regional Manager
                Paul Dubiel, Terminal Manager

4

12.    Did defendant Teamsters Local 25 refer Craig Goulet to defendant New Penn Motor

Express for work opportunity. If so, please:

    a.    State the date on which this was done; and

    b.    Describe in detail all actions taken with regard to such referral.

    **ANSWER**:    No.

13.    Please state whether defendant New Penn Motor Express purchased the A.P.A. Transport

Corp. customer list. If so, please state the date when this purchase was completed.

    **ANSWER**:    The customer list was not purchased from A.P.A.

14.    Please describe in detail what action, if any, that defendant New Penn Motor Express

took upon receipt of the letter dated April 18, 2003, from defendant Teamsters Local 25 to Mr.

Charles Zaccaria, Vice President of New Penn Motor Express Inc., which letter was in regard to

Craig Goulet.

    **ANSWER**:    Objection. Without the letter being attached, Defendant cannot answer
            this interrogatory.

15.    Please state whether A.P.A. Transport Corp. ever provide defendant New Penn Motor

Express with any seniority list for any A.P.A. Transport Corp. terminals. If so, please:

    a.    State when the list(s) was (were) received;

    b.    Identify who received the list(s);

    c.    Describe in detail what, if anything, was done with the list(s);

    d.    Describe in detail what actions were taken, if any, with regard to the list(s); and

    e.    Identify the actual list(s) received.

    **ANSWER**:    See response to Interrogatory No. 7. Also, Defendant used the list to
            check seniority.

5

16.    When and how was defendant New Penn Motor Express first put on notice that Craig

Goulet wished to be placed on defendant New Penn Motor Express' Billerica, Massachusetts,

terminal call list.

>    **ANSWER:**    Defendant first learned that Plaintiff wished to be placed on the terminal
>    call list when it received a copy of the grievance on or about April 18,
>    2003.

17.    At any time prior to March 31, 2003, was the list of former A.P.A. Transport Corp.

employees on the defendant New Penn Motor Express Billerica, Massachusetts, terminal call list

exhausted? If so, please state when.

>    **ANSWER:**    Yes. Defendant does not recall at this time when it was exhausted.

18.    Were any A.P.A. Transport Corp. employees offered a second opportunity to place their

names on any call list with defendant New Penn Motor Express between March 1, 2002, and

March 31, 2003? If so, please:

>    a.    Identify each employee; and
>
>    b.    Stat the date when such second opportunity was offered.
>
>    **ANSWER:**    Not to Defendant's knowledge.

19.    Please state whether defendant New Penn Motor Express was ever provided with any list

or identification of A.P.A. Transport Corp. employees who were collecting worker's

compensation benefits or disability. If so, please:

>    a.    Identify who provided this list or identification;
>
>    b.    State when this list or identification was provided; and
>
>    c.    Identify who received this list or identification.
>
>    **ANSWER:**    No.

6

20.    Please state the number of times, if any, that defendant New Penn Motor Express

postponed the grievance hearing before the Southern New England Joint Area Committee

regarding grievance filed by Craig Goulet.

    **ANSWER**:    Once.

21.    Please state whether defendant New Penn Motor Express ever directly notified any

A.P.A. Transport Corp. employee regarding being placed on a call list. If so, please:

    a.    State when the notification was made;

    b.    Identify who made the notification;

    c.    Describe in detail what the notification indicated; and

    d.    Identify the actual notification.

    **ANSWER**:    No.

22.    Please state whether defendant New Penn Motor Express ever offered any A.P.A.

Transport Corp. employees work opportunities covered by article 14, section 2, and article 14,

section 3, of the 1998-2003 National Master Freight Agreement. If so, please:

    a.    Identify those employees;

    b.    State the date when such work opportunities were offered;

    c.    Identify the terminals for which such work opportunities were offered.

    **ANSWER**:    No.

**AS TO OBJECTIONS:**

Craig Goulet

By his attorney

Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450
(978) 448-8234
BBO No. 287820

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CRAIG GOULET,** ) | **CASE NO. 04-12577 JLT** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **DEFENDANT'S RESPONSE TO** |
| ) | **PLAINTIFF'S SECOND SET OF** |
| **NEW PENN MOTOR EXPRESS, INC.,** ) | **INTERROGATORIES TO DEFENDANT** |
| **et. al.,** ) | **NEW PENN MOTOR EXPRESS** |
| ) | |
| **Defendant.** ) | |

23.   In answering Interrogatory No. 7, defendant New Penn Motor Express stated that it

received the attached A.P.A. Transport Corp. Canton Seniority List for November, 2001, "at

some point in time, although it does not recall precisely when, at its corporate office from

A.P.A." Given that answer, please state:

a.   New Penn Motor Express' best recollection as to when it received this document;

**RESPONSE:** New Penn does not recall the date it received the document, but it
received the document as part of its due diligence in connection with A.P.A. and,
thus, it was prior to March 1, 2002.

b.   Whether New Penn Motor Express received this document before March 31,

2003;

**RESPONSE:** Yes.

c.   Whether New Penn Motor Express received this document before March 1, 2002;

**RESPONSE:** Yes.

d.   All actions, if any, taken by New Penn Motor took in response to the receipt of

that document;

**RESPONSE:** To the extent that New Penn Motor Express, Inc. understands this interrogatory, it used the document to conduct due diligence and to determine what the seniority was for A.P.A. employees.

e.    All actions, if any, taken by Penn Motor Express to put plaintiff Craig

Goulet on a call list; and

**RESPONSE:** None, because the Union did not supply Plaintiff's name and preference as required pursuant to the agreement between New Penn Motor Express and with the Teamsters National Freight Industry Negotiating Committee.

f.    If it did not take any action to put Craig Goulet on a call list, why not.

**RESPONSE:** See above.

24.    In answering Interrogatory No. 15, defendant New Penn Motor Express stated that it used

the attached A.P.A. Transport Corp. Canton Seniority List for November, 2001, "to check

seniority." Given that answer, please:

a.    State New Penn Motor Express' best recollection as to the period time over which

it used this document to check seniority;

**RESPONSE:** New Penn does not recall exactly, but the approximate period of time would have been February 13, 2002 through March 1, 2002.

b.    Identify those person(s) for whom it used this document to check seniority;

**RESPONSE:** Daniel Schmidt, Susan Miller and Penney Seyfert.

c.    State whether it used this list to put A.P.A. drivers on a call list, and if not, why

not; and

**RESPONSE:** No.  See response to interrogatory No. 24 e.

d.    Identify any and all documents it used in order to A.P.A. drivers on a call list.

**RESPONSE:** See Exhibits 2 and 3 attached to Plaintiff's Opposition to the Union's Motion for Protective Order.

2

Craig Goulet

By his attorney

_____

Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450
(978) 448-8234
BBO No. 287820


**AS TO OBJECTIONS:**


_____

Carl H. Gluek  (Ohio Bar #0029531)
**FRANTZ WARD LLP**
2500 Key Center
127 Public Square
Cleveland, OH  44114-1230
Telephone: (216) 515-1660
Facsimile: (216) 515-1650
cgluek@frantzward.com


Nicholas A. Klinefeldt (BBO # 647422)
**KELLY, LIBBY & HOOPES, P.C.**
175 Federal Street
Boston, Massachusetts 02110
Telephone: 617-338-9300
Facsimile: 617-338-9911
nklinefeldt@klhboston.com
*Attorneys for Defendant, New Penn Motor Express, Inc.*

3

STATE OF PENNSYLVANIA          )
                               )     SS:
COUNTY OF _LEBANON_            )

## **VERIFICATION**

Andrew J. Kerlik, VP Risk Management and Human Resources, for New Penn

Motor Express, Inc. being first duly sworn according to law, states that he has reviewed

Defendant's Responses to Plaintiff's Second Set of Interrogatories to Defendant New

Penn Motor Express in the case captioned *Craig Goulet v. New Penn Motor Express,*

*Inc., et al.,* Case No. 04-12577 JLT, in the United States District Court, District of

Massachusetts, and that the same are true to the best of his knowledge.

FURTHER AFFIANT SAYETH NAUGHT,

_____
Andrew J. Kerlik

SWORN TO before me and subscribed in my presence on this _28_ day of
October 2005.

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Elta M. Galbraith, Notary Public
City Of Lebanon, Lebanon County
My Commission Expires July 22, 2009
Member, Pennsylvania Association of Notaries

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Elta M. Galbraith, Notary Public
City Of Lebanon, Lebanon County
My Commission Expires July 22, 2009
Member, Pennsylvania Association of Notaries

TEAMSTERS UNION LOCAL 25
GRIEVANCE REPORT

COMPANY: NEW PENN MOTOR EXPRESS

NAME. CRAIG GOULET

ADDRESS   305 COX ST. HUDSON, MA. 01749

BUSINESS AGENTS NAME: William H. CARNES

DATE of COMPLAINT (APRIL 7th 2003)

NATURE of GRIEVANCE. SENIORITY RIGHTS.

IN ACCORDANCE with The NATIONAL MASTER FREIGHT
AGREEMENT ARTICLE #5 AND All of ARTICLE #5 SUBSECTIO
ALONG with the New ENGLAND SUPPLEMENTAL FREIGHT AGREEMT
ARTICLE # 43 - SENIORITY including All of ARTICLE 43'S
SUBSECTIONS, I AM FILING A GRIEVANCE AGAINST
NEW PENN MOTOR EXPRESS  TO INCLUDE ALL TIME LOST,
BACK PAY, SENIORITY AND CONTRACTUAL BENIFITS UNDER
THE CONTRACT AGREEMENT, (FROM MARCH 1ST 2002) UP TO
AND CONTINUING PAST MARCH 1ST 2003, BASED ON
AGREEMENT BETWEEN TNFINC AND NPME AS A
RESULT of The CLOSURE of A.P.A. OPERATIONS

Craig Goulet.

D03



# Teamsters Local 25
## International Brotherhood of Teamsters

544 MAIN STREET · BOSTON, MASSACHUSETTS 02129-1113 · 617-241-8825 · Fax 617-242-4284
www.teamsterslocal25.com

GEORGE W. CASHMAN
*President / Principal Officer*

RITCHIE E. REARDON
*Secretary-Treasurer*

WILLIAM H. CARNES
*Vice President / Business Agent*

JOHN A. MURPHY
*Recording Secretary / Business Agent*

MARK A. HARRINGTON
*Trustee / Business Agent*

LOU DIGIAMPAOLO
*Trustee / Director of Organizing / Field Representative*

COLLEEN BRADY
*Trustee / Special Projects Coordinator*

ARTHUR J. LAZAZZERO
*Business Agent*

SEAN M. O'BRIEN
*Business Agent*

JAMES F. WILSON
*Business Agent*

April 18, 2003

Mr. Charles Zaccaria, Vice President
New Penn Motor Express, Inc.
Sterling Road
Post Office Box 516
Billerica, MA  01821

Dear Mr. Zaccaria:

Enclosed for your processing, please find a copy of the grievance received by Vice President/Business Agent William H. Carnes from Craig Goulet, dated April 7, 2003.

If you have any questions, please do not hesitate to contact Mr. Carnes at the above number.

Very truly yours,

GEORGE W. CASHMAN
President

WHC/mh

Enclosure: 1

C: Craig Goulet





We will only accept deliveries from UNION carriers. All other deliveries

D03



CRAIG F.
GOULET.
3eSCox ST
Hudson, MA
01749

CERTIFIED MAIL

7002 3150 0001 9650 9246

TEAMSTER'S UNION LOCAL 25
544 MAIN STREET
BOSTON, MASSACHUSETTS
02129 - 1113

ATTENTION: WILLIAM H. CARNES

U.S. POSTAGE
HUDSON, MA
01749
APR 15 '03
AMOUNT
$4.42
00046423-02

D032

TEAMSTERS UNION LOCAL 25
GRIEVANCE REPORT

COMPANY: NEW PENN MOTOR EXPRESS

NAME: CRAIG GOULET
ADDRESS   305 COX ST. HUDSON, MA. 01749

BUSINESS AGENTS NAME: William H. CARNES
DATE of complaint  (APRIL 7th 2003)
NATURE of GRIEVANCE: SENIOR,ty RightS:

IN ACCORDANCE with The NATIONAL MASTER FREIGHT
AGREEMENT ARTICLE #5 AND All of ARTICLE #5 SUBSECTIONS
ALONG with the NEW ENGLAND SUPPLEMENTAL FREIGHT AGREEMENT
ARTICLE #43 - SENIORITY including All of ARTICLE 43's
SUBSECTIONS, I AM FILING A GRIEVANCE AGAINST
NEW PENN motor EXPRESS To include All TIME lost,
BACK PAY, SENIORITY AND CONTRACTUAL BENIFITS UNDER
The CONTRACT AGREEMENT, (FRom MARCH 1ST 2002) UP TO
AND CONTINUING PAST MARCH 1ST 2003, BASED ON
AGREEMENT BETWEEN TNFINC AND NPME AS A
RESULT of the CLOSURE of A.P.A. OPERATIONS

Craig Goulet.

July 25th 2003

Mark:

I have Enclosed For You copies of the Grievance I sent to Bill Carnes along with the Postal Receipt and letter which was sent to the Co.

Lets not lose sight of the real issue here. This Grievance is about Seniority Rights under the Agreement, not weather one was capable of working or not. It is my understanding that I infact was an Employee of A.PA. My name should have been on there list and therefore I should have been called period.

Summary Agreement states All Employees with Seniority. which I had. Therefore one would have to agree that my rights were disregarded for what ever reason when we and I meant 2005-CG-(-5)

EXHIBIT K #8-05-05 Farrington

understand.

I would also argue that
under the NMFA Article 14
section 3 that the Co did not
meet there obligation or at the
very least Recognize it, which
leaves yet Another issue to
address

over the years I had asked
APA to put me Back to work
light duty or otherwise and there
Defense was that I was no longer
An Employee I was Discharged 3/11/87
As you know the arbt court
committee put the case on hold
Because it was held up in Another
Venue (DIA) ??

## SOUTHERN NEW ENGLAND JOINT AREA COMMITTEE
SEP 0 4 2003

Employer Co-Secretary
**Robert Schaeffer**
Transport Employers Association
56 Main Street, 2nd Floor
Camillus, New York
Tel: (800)-552-0099
Fax: (315)-672-3640

Union Co-Secretary
**John A. Murphy**
Teamsters Local 25
544 Main Street
Boston, MA 02129
Tel: (617)-241-8825
Fax: (617)-242-4284

## PRE-HEARING INFORMATION

In order that the Committee Members may be familiar with the important facts in this case, please fill out the following form as completely as possible. The information submitted herein will be treated as a preliminary statement of your position.

Name and Address of Employer Involved: New Penn Motor Express, Inc., Sterling Road POB 516, Billerica, MA 01821

Local Union/Agent/Address involved Mark A. Harrington, Secretary Treasurer
544 Main Street, Boston, MA 02129

Name of Grievant Craig Goulet                    Classification:

Indicate Article of Contract which you claim was violated: Article:___ Section: _____ Article: _____
Section_____ ; Article_____ Section_____ Article_____ , Section _____

Amount being claimed, if any: _____

Date when company took action against employee or alleged violation took place: _____
Date when grievance was first taken up with management:_____

INCLUDE BRIEF RESUME OF PERTINENT FACTS:

POSITION OF FILING PARTY: Per the APA/New Penn Agreement Craig Goulet should have been called for work at New Penn Motor Express. The Union seeks that Brother Goulet be returned to the seniority list.

PREPARE FOUR (4) COPIES
1st copy - Employer Co-Secretary
2nd copy - Union Co-Secretary
3rd copy - Company involved
4th copy - Local Union

Submitted by: *Mark A. Harrington*

Mark A. Harrington, Secretary Treasurer

Date: September 3, 2003

FOR COMMITTEE USE ONLY
DATE RECEIVED_____ _____CASE NUMBER_____ DATE HEARD _____





# Teamsters Local 25
## International Brotherhood of Teamsters

544 MAIN STREET • BOSTON, MASSACHUSETTS 02129-1113 • 617-241-8825 • Fax 617-242-4284
www.teamsterslocal25.com

·· ··· ··· L. REARDON
*President / Principal Officer*

MARK A. HARRINGTON
*Secretary-Treasurer*

LOU DiGIAMPAOLO
*Vice President /*
*Field Representative*

JOHN A. MURPHY
*Recording Secretary / Business Agent*

COLLEEN BRADY
*Trustee / Special Projects Coordinator*

ARTHUR J. LAZAZZERO
*Trustee / Business Agent*

SEAN M. O'BRIEN
*Trustee / Business Agent*

JAMES E. WILSON
*Business Agent*

WALTER H. CAMPBELL
*Business Agent*

ROBERT B. McALLISTER
*Business Agent*



### TEAMSTERS LOCAL 25
### VS.
### NEW PENN MOTOR EXPRESS, INC.
### INVOLVING
### CRAIG GOULET – CASE No. SC-21-04
### ARTICLE 32, Sections 1 & 2

Gentlemen:

Brother Goulet has been a Teamster since 1979, and was employed by Sanborn's Transportation, earning his seniority in 1989. After the Sanborn acquisition, he went to work in the Canton, MA terminal in October, 1987.

On March 11, 1987, Mr. Goulet sustained a work place injury. As a result of that incident, he was seriously injured (torn rotor cuff, 2 herniated disks, and torn ligaments of the right knee). To add insult to injury, APA terminated Brother Goulet for gross negligence. His termination case was filed by the Local Union and placed on "committee hold" due to his worker's compensation status. Mr. Goulet notified the Local Union in the middle of 2001 that he had exhausted his worker's compensation and he would like his case to proceed to arbitration.

On October 16, 2001, Mr. Goulet's case was presented by myself before the Southern New England Joint Area Committee and a decision was rendered in favor of Mr. Goulet. The decision **[Exhibit 1]** reinstated him back to his former position at APA.

As we all know, APA ceased operations in mid February, 2002. Mr. Goulet had not yet returned to work, but was placed back on the APA seniority list as of November, 2001. **[Exhibit 2]**.

However, on the call list **[Exhibit 3]** Mr. Goulet name is omitted, indicating that he was never given the opportunity to bid on a location. He will also testify that he spoke with the steward.

It is the position of Teamsters Local 25 that New Penn bypassed Mr. Goulet and never gave him the opportunity to establish himself with New Penn. Mr. Goulet is entitled to compensation and seniority based on the following:

2/8/05   **CG**   56

*We will only accept deliveries from UNION carriers! All other deliveries will be refused!*

50

1) Mr. Goulet notified the steward Doug Francey of his desire to go to the Billerica, MA terminal.

2) Mr. Goulet had sufficient seniority to be called for work.

3) The agreement is silent with respect to New Penn's obligation to workers on disability, worker's compensation, etc. **[Exhibit 4]**

Since Mr. Goulet was never contacted by New Penn It is Local 25's position that the company failed to abide by the agreement.

Respectfully submitted,

*Mark A. Harrington*

MARK A. HARRINGTON
Secretary-Treasurer

MAH/mh

July 22, 2004

2/8/05   CG   57

## LIST OF EXHIBITS

Exhibit 1      Decision from New England Joint Area Grievance Committee – dated October 16, 2001.

Exhibit 2.     Seniority List – dated November, 2001 – with grievant's name on list No. 22.

Exhibit 3.     Seniority List – dated July 14, 2004 – with grievant's name omitted from list.

Exhibit 4.     Summary of the Tentative Agreement between TNFINC and NPME as a Result of the Closure of APA Operations

2/8/05   CG   58

# NEW ENGLAND JOINT AREA GRIEVANCE COMMITTEE
## DECISION FORM

Established in accordance with the terms and conditions of the National Master Freight Agreement and the New England Supplemental Freight Agreement, entered into by and between the Local Unions and Carriers engaged in City Pickup and Delivery and/or Over-the-Road Freight Operations.

\*¥¥¥¥↑¥¥↑↑↑↑↑◆◆¥¥¥¥¥¥¥¥↑¥↑↑↑↑↑◆¥↑¥↑↑◆↑↑↑¥↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑¥¥◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

Teamster Local(s) No./Agent: 25 / M. Harrington                    CASE NO.: 87-404

Grievant: Craig Goulet                                             Employer: APA Transport Corp.

\*◆◆◆◆◆◆◆◆¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥¥◆◆◆◆

We, the undersigned parties to the National Master Freight Agreement and the New England Supplemental Freight Agreement hereby agree to submit the dispute to arbitration under the Rules of Procedure prescribed by the NE Joint Area Grievance Committee, by virtue of its authority, as set forth in Articles 7 and 8 of the National Master Freight Agreement and Articles 45 and 46 of the New England Supplemental Freight Agreement, the following:

Alleged violation of Article 47. Union seeks man to be returned to work will all lost wages, H, W and Pension. 3/01- Union request this case be placed back on the SNE JAC docket for hearing.

The undersigned further agree that a majority decision of the NE Joint Area Committee in the above dispute will be final, conclusive and binding with no appeal and, further, that neither party will attempt through any overt acts, to void the decision rendered. Failure to comply may result in economic action within the confines of Article 8 of the National Master Freight Agreement and Article 45 and 46 of the New England Supplemental Freight Agreement.

Employer: APA Transport Corp.                    Local Union(s): 25

Signed:    B Trebour                              Signed: M. Harrington

This is the Official Award and Decision of the New England Joint Area Grievance Committee. Decision must be promptly complied with and all Monetary Awards must be paid in pay period for the week following receipt of Decision.

## - DECISION -

The Panel in Executive Session, motion made, seconded and carried the Company's Point of Order was not upheld. The Panel after hearing the case, motion made, seconded and carried that upon submitting acceptable documentation to the Company of his ability to return to unrestricted duties, the grievant shall serve a ten (10) day suspension. Upon completion of the suspension he shall be reinstated to the seniority list in his original position.

DECISION DATE: 10/16/2001

EMPLOYER PANEL:                                  UNION PANEL:

Scalzo                                           Mundy*

Picarello                                        Fenlason

2/8/05    CG    59

EXHIBIT 2

## CANTON SENIORITY LIST

### LOCAL UNION 25    NOVEMBER 2001

| | | |
|---|---|---|
| 1 | Prout, R. | 11/12/68 |
| 2 | Burrill, P. | 06/30/70 |
| 3 | McCaffrey, M. | 10/07/70 |
| 4 | Mastropietro, R. | 06/14/73 |
| 5 | Setterland, D. | 11/05/73 |
| 6 | Loud, D. | 01/11/74 |
| 7 | Petit, A. | 03/11/74 |
| 8 | Petit, R. | 09/15/75 |
| 9 | Durette, M. | 09/30/75 |
| 10 | Hoyt, H. | 08/17/76 |
| 11 | Pitts, R. | 08/27/76 |
| 12 | D'Eramo, M. | 02/22/77 |
| 13 | Sullivan, T. | 10/24/77 |
| 14 | Rabideau, R. | 01/04/78 |
| 15 | Kelley, Jr., W. | 03/22/78 |
| 16 | Monahan, B. | 11/14/78 |
| 17 | Petit, Jr., E. | 04/23/79 |
| 18 | Pickering, G. | 08/03/81 |
| 19 | Tisbert, B. | 05/17/83 |
| 20 | Damiano, J. | 07/20/83 |
| 21 | Gwynn, N. | 05/14/84 |
| 22 | Goulet, C. | 06/28/84 |
| 23 | Cardoza, P. | 09/24/84 |
| 24 | Bouffard, R. | 09/30/85 |
| 25 | Coull, D. | 04/06/73 |
| 26 | McGee, R. | 05/20/82 |
| 27 | Francey, G. | 10/25/82 |
| 28 | Cruise, M. | 04/30/84 |
| 29 | Power, K. | 11/15/84 |
| 30 | Fennelly, E. | 02/25/85 |
| 31 | McGrath, H. | 08/26/85 |
| 32 | Bain, S. | 03/09/87 |
| 33 | Holderried, J. | 05/08/89 |
| 34 | Howe, T. | 05/15/89 |
| 35 | Howe, S. | 05/31/90 |
| 36 | Berry, S. | 05/31/90 |
| 37 | Sullivan, C. | 12/09/91 |
| 38 | MacDonald, J. | 12/09/91 |
| 39 | Hulbert, M | '12/09/91 |
| 40 | O'Meara, W. | '03/01/93 |

2/8/05    CG    60

# DRACUT SENIORITY LIST

## LOCAL UNION 25   JANUARY 2002

| | | |
|---|---|---|
| 1 Tyler, Jr., G. | | 09/08/65 |
| 2 McGonigle, III, J. | (Road) | 05/28/76 |
| 3 Adams, W. | | 05/16/77 |
| 4 Sullivan, Jr., J. | | 02/21/79 |
| 5 Mooney, A. | | 05/01/85 |
| 6 Johnson, R. | | 09/02/93 |
| 7 Truscello, R. | (Road) | 10/01/93 |
| 8 Murray, S. | (Road) | 10/02/93 |
| 9 Martin, D. | | 10/23/93 |
| 10 Partridge, G. | | 10/24/93 |
| 11 Lorizio, V. | (Road) | 09/30/94 |
| 12 Thibeault, R. | | 01/17/96 |
| 13 Shepard, G. | | 01/30/96 |
| 14 Roddy, J. | | 02/12/97 |
| 15 Jussaume, M. | | 02/14/97 |
| 16 Guerrette, M. | | 02/21/97 |
| 17 Johnson, C. | | 10/01/97 |
| 18 Comire, H. | (Road) | 10/07/97 |
| 19 Racioppi, R. | | 10/14/97 |
| 20 Walukiewicz, S. | | 06/01/98 |
| 21 Hussey, R. | | 10/22/98 |
| 22 Carney, III, R. | | 10/23/98 |
| 23 Michaud, J. | | 10/26/98 |
| 24 Babin, M. | | 10/30/98 |
| 25 Boynton, E. | (Road) | 12/01/98 |
| 26 Small, Jr. C. | | 09/08/99 |
| 27 Guimond, N. | | 10/01/99 |
| 28 Vaughan, M. | | 10/04/99 |
| 29 Chalifour, P. | | 10/05/99 |
| 30 Tucker, J. | | 10/18/99 |
| 31 Dion, R. | | 10/28/99 |
| 32 Arsenault, R., Jr. | | 08/18/00 |
| 33 Morasse, J. Jr. | | 12/22/00 |
| 34 Levine, J. | | 09/18/01 |

*jm* 1/29/02

# DRACUT MECHANICS SENIORITY LIST

## LOCAL UNION 25    SEPTEMBER 2001

|   |   |
|---|---|
| 1 Oakes, D. | 02/28/71 |
| 2 Dawson, M. | 05/15/95 |

09/18/01
jm

2/8/05    CG    62

| # | NAME | ADDRESS | CITY | ST | ZIP | TELEPHONE | | | |
|---|------|---------|------|----|----|-----------|---|---|---|
| 1 | Proud, R. | 58 Spring St. | Braintree | MA | 02184 | (781) 848-5305 | 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 | 11/12/88 | Ret. |
| 2 | Burrill, P. | 6 Grt. Woods Ct | Braintree | MA | 02184 | (508)-285-9452 | 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 | 6/30/70 | Prov. |
| 3 | McCaffrey, M. | 29B Shaw St. | Braintree | MA | 02184 | (781) 848-8223 | 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 | 10/27/0 | Bill. |
| 4 | Heroux | | | | | | | | |
| 5 | Mastropietro, R. | 215 Forest Trail | Hanson | MA | 02311 | (781) 447-9465 | 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 | 6/14/73 | Ret. |
| 6 | Setterland, D. | 72 Paul Rd. | Hanover | MA | 02339 | (781) 871-3525 | 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 | 11/3/73 | Bill. |
| 7 | Loud, D. | 560 Bedford St. | Abington | MA | 02351 | (781) 871-0416 | 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 | 1/1/74 | Ret. |
| 8 | Petit, A. | 11 Hinson Rd. | Weymouth | MA | 02188 | (781) 337-3567 | 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 | 3/1/74 | Ret. |
| 9 | Petit, R. | 115 Highland Ave. | Quincy | MA | 02169 | (781) 471-0090 | 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 | 9/15/75 | Bill. |
| 10 | Durelle, M. | 111 Pond St. | Swansea | MA | 02777 | (508) 674-7683 | 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 | 9/30/75 | Prov. |
| 11 | Hoyt, H. | 23 Garfield St. | Foxboro | MA | 02035 | (508) 543-2978 | 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 | 8/1/76 | Ret. |
| 12 | Ellis, R. | 1573 Liberty St. | Braintree | MA | 02184 | (781) 843-1549 | 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 | 8/21/76 | Ret. |
| 13 | Deramo, M. | 31 Washington St. | Shelburn | MA | 02360 | (508) 652-6066 | 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 | 2/22/77 | Prov. |
| 14 | Sullivan, T. | 17 Hillside Dr. | Plymouth | MA | 02360 | (508) 224-5684 | 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 | 10/24/77 | Prov. |
| 15 | Rabideau, R. | P.O. Box 265 | Easton | MA | 02334 | (508) 230-2436 | 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 | 1/4/78 | Prov. |
| 16 | Kelley, Jr., W. | 306 Field St. | Brockton | MA | 02403 | (508) 583-0961 | 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 | 3/27/78 | Bill. |
| 17 | Monahan, H. | 4 Kathy Ln. | E. Bridgewater | MA | 02341 | (781) 826-2751 | 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 | 11/14/78 | Prov. |
| 18 | Petit, Jr., R. | 633 King St. | Hanover | MA | 02339 | (781) 871-7648 | 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 | 4/23/79 | Bill. |
| 19 | Pickering, G. | 53 Rosalind St. | N. Weymouth | MA | 02188 | (781) 337-6278 | 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 | 8/3/81 | Bill. |
| 20 | Trebert, B. | 17 Marsh Ave. | Salem | NH | 03079 | (603) 890-6163 | 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 | 3/27/81 | Prov. |
| 21 | Damiano, J. | 221 City Dr. | E. Bridgewater | MA | 02333 | (508) 378-3792 | 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 | 7/20/83 | Prov. |
| 22 | Gwynn, N. | 283 Central St. | E. Bridgewater | MA | 02333 | (508) 378-0466 | 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 | 11/1/84 | Prov. |
| 23 | Cardoza, P. | 804 Maple St. | Mansfield | MA | 02048 | (508) 339-6134 | 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 | 5/14/84 | Prov. |
| 24 | Bouillard, R. | 20 E Nilsson St. | Brockton | MA | 02301 | (508) 588-6640 | 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 | 9/24/84 | Prov. |
| 25 | Gould, D | 230 State Rd. | Plymouth | MA | 02360 | (508) 886-6964 | 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 | 9/30/85 | Bill. |
| 26 | McGee, R. | 437 Commonwealth Rd. | Wayland | MA | 01778 | (508) 655-6174 | 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 | 4/6/73 | Ret. |
| 27 | Francey, G. | 324 Flagg St. | Bridgewater | MA | 02324 | (508) 697-9620 | 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 | 5/20/82 | Prov. |
| 28 | Cruise, M. | 103 So. Pickens St. | Lakeville | MA | 02347 | (508) 946-0330 | 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 | 10/25/82 | Prov. |
| 29 | Power, K | 16 Carver St. | Watertown | MA | 02472 | (617) 926-5324 | 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 | 4/30/84 | Prov. |
| 30 | Fennelly, E. | 160 Washington St., Unit #68 | Plainville | MA | 02762 | (508) 695-3075 | 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 | 11/1/84 | Bil. |
| 31 | McGrath, H. | 1165 Main St. | Walpole | MA | 02081 | (508) 668-0244 | 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 | 2/25/85 | Prov. |
| 32 | Bain, S. | 28 Poole Ct. | Holbrook | MA | 02343 | (781) 767-6129 | 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 | 3/9/87 | Bill. |
| 33 | Holderied, J. | 139 Church St. | Westwood | MA | 02090 | (701) 329-3587 | 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 | 5/6/89 | Bill. |
| 34 | Howe, T. | 127 Everett Cr | Stoughton | MA | 02072 | (781) 344-1904 | 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 | 5/15/89 | Prov. |
| 35 | Howe, S. | 53 Bradford St. | Stoughton | MA | 02072 | (781) 344-3877 | 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 | 5/31/90 | Gil. |
| 36 | Berry, S | 367 Pond St. | So. Weymouth | MA | 02190 | (781) 335-4217 | 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 | 5/31/90 | Pass |
| 37 | Sullivan, C. | 4 Hadley Rd. | Norton | MA | 02766 | (508) 285-4918 | 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 | 12/9/91 | Bil. |
| 38 | MacDonald, J. | 1 Pebble Path | Foresdale | MA | 02644 | (508) 477-5324 | 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 | 12/9/91 | Prov. |
| 39 | Hulbert, M. | 4 First St. | Mansfield | MA | 02048 | (508) 339-8545 | 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 | 7/29/91 | Bill. |
| 40 | O'Meara, W. | 75 Chestnut W | Randolph | MA | 02366 | (781) 986-8686 | 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 | 3/1/93 | Prov. |
| 41 | Forbes, M. | 755 Washington St. | Walpole | MA | 02081 | (508) 660-5436 | 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 | 8/3/93 | Prov. |
| 42 | Pimental, J. | 36 Brown St. | Fair Haven | MA | 02719 | (508) 994-5614 | 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 | 9/8/93 | Prov. |
| 43 | Friel, P. | 5 Fall Ln. | Canton | MA | 02021 | (781) 828-3354 | 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 | 9/9/93 | Bill. |
| 44 | Leplan, D. | 4 South St. | Canton | MA | 02021 | (781) 828-6595 | | 9/10/93 | Prov. |

2/8/05    CG    63

**LONG ISLAND**
Teamster Local 707
14 Front Street
Hempstead, NY 11550
(516) 486-7100
Kevin McCaffrey

**MAYBROOK
(NEWBURGH)**
Teamster Local 445
P.O. Box 2097
Newburgh, NY 12250
(914) 564-5297
(914) 564-4120 (FAX)
Fred Smit, President

**MERIDEN**
Teamster Local 677
1871 Baldwin Street
Waterbury, CT 06706
(203) 755-3121
(203) 756-1058 (FAX)
Jay Gilmore
Cliff Socquet

**NORTH BERGEN**
Teamster Local 560
707 Summit Avenue
Union City, NJ 07087
(201) 864-0051
(201) 864-4177
Pete Brown, President
Tony Valdner, B.A.

**PHILADELPHIA**
Teamster Local 470
3565 Sepviva Street
Philadelphia, PA 19134
(215) 537-0600
(215) 537-0353 (FAX)
Dennis Crean (ext. 14)

**PITTSBURGH**
Teamster Local 585
One College Street
Washington, PA 15301
(724) 225-6465
(724) 225-6466 (FAX)
Roy Marshall

**PORTLAND/BANGOR**
Teamster Local 340
144 Thaddeus Street
S. Portland, ME 04106
(207) 767-2106
(207) 767-7315 (FAX)
Jim Gorman, B.A.

**ROCHESTER**
Teamster Local 118
1393 South Avenue
Rochester, NY 14620
(716) 256-1350
(716) 256-1429 (FAX)
Frank Posato/John Cantwell

**SCRANTON**
Teamster Local 229
3104 North Main Avenue
Scranton, PA 18508
(570) 344-7219
(570) 344-6432 (FAX)
Jack McGrail

**SPRINGFIELD**
Teamster Local 404
P.O. Box 1370
115 Progress Avenue
Springfield, MA 01101
(413) 781-6326
(413) 746-9094 (FAX)
Frank Gentile
Mike O'Connor

**SYRACUSE**
Teamster Local 317
566 Spencer Street
Syracuse, NY 13204
(315) 471-4164 ext.17
(315) 471-4328 (FAX)
John Ruffo, B.A.

**HALIFAX**
Teamster Local 927
Teamsters, Chauffeurs,
Warehousemen, Helpers &
Miscellaneous Workers
19 Alma Crescent
Halifax, NS B3N2Z4
(902) 445-5301
Harvey Edwards

## APA Terminals
### and
### Corresponding Teamsters Unions

**ALBANY**
Teamster Local 294
890 Third Street
Albany, New York 12206
(518) 489-5436
(518) 453-9251 (FAX)
Howard Bonnet, President
Kevin Hunter

**ALLENTOWN**
Teamster Local 773
1345 Hamilton Avenue
Allentown, PA 18101
(610) 434-4451
(610) 770-9581 (FAX)
Mr. Gail Brown "Brownie"

**BALTIMORE**
Teamster Local 557
600 Erdman Avenue
Baltimore, MD 21205
(410) 485-9200
(410) 485-8426 (FAX)
(800) 940-9910
Frank Imbragulio, President

**BUFFALO**
Teamster Local 375
656 Englewood Avenue
Buffalo, NY 14223-2432
(716) 836-4900
(716) 836-4985 (FAX)
Brian Masterson, Pres.

**BUFFALO (Road)**
Teamster Local 449
2175 William Street
Buffalo, NY 14806
(716) 874-2200
(716) 874-8322 (FAX)
Kenneth E. Nelligan
Vice President & Bus. Agent

**BURLINGTON and
WHITE RIVER JCT**
Teamster Local 597
Corey Hill Road, Box 424
Barre, VT 05641
(802) 476-4159
(802) 476-4150 (FAX)
Ronald Rabideau

**CANTON and DRACUT**
Teamster Local 25
544 Main Street
Charlestown, MA 02129
(617) 241-8825
(617) 242-4284 (FAX)
George Cashman, President
Mark Harrington

**CINCINNATI**
Teamster Local 100
2100 Oak Road
Cincinnati, OH 45241
(513) 769-5100
(513) 769-4420 (FAX)
William C. Wright, President
Freddie Kells
Dave Minix - BA

**CLEVELAND**
Teamster Local 24
727 Grant Street
Akron, OH 44311
(330) 434-8126/
(800) 483-2624
(330) 535-8508 (FAX)
Travis Bornstein, President

**COLUMBUS**
Teamster Local 413
555 East Rich Street
Columbus, OH 43215
(614) 228-6942
(614) 228-3933 (FAX)
Jimmy H. Duff, Pres.

**CLEARFIELD**
Teamster Local 110
P.O. Box 71
Ebensburg, PA 15931
(814) 472-6646
(814) 472-6444 (FAX)
Michael Suako, President

**LANCASTER**
Teamster Local 771
1025 N. Duke Street
Lancaster, PA 17602
(717) 397-8267
(800) 544-0606 x17
(717) 396-0491 (FAX)
Howard W. Rhinier, B.A.

2/8/05   CG   67

| # | Name | Address | City | State | Zip | Phone | | | |
|---|------|---------|------|-------|-----|-------|---|---|---|
| 45 | Rourke, G. | 360 Cedar St. | New Bedford | MA | 02740 | (508) 996-6928 | 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 | 9/14/93 | Prov. |
| 46 | Roche, J. | 3 Buttercup Ln. | Medway | MA | 02053 | (508) 533-7249 | 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 | 9/16/93 | Prov. |
| 47 | Stephen, J. | | S. Attleboro | MA | 02703 | (508) 761-8979 | 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 | 9/17/93 | Prov. |
| 48 | Carvalho, D. | 363 Wareham St. | Middleboro | MA | 02346 | (508) 947-8163 | 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 | 9/18/93 | Pass |
| 49 | Carey, P. | 19 Grist Mill Ln. | Pembroke | MA | 02359 | (781) 829-0773 | 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 | 10/27/93 | Prov. |
| 50 | Creighton, R. | 42 Brooke Ter. | Weymouth | MA | 02188 | (781) 335-8815 | 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 | 9/1/94 | Prov. |
| 51 | Perry, J. | 59 Yellowstone Ave. | Warwick | RI | 02886 | (401) 463-8145 | 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 | 5/10/94 | Prov. |
| 52 | Blake, R. | 77 Glenfield Rd. | N. Attleboro | MA | 02760 | (508) 643-2219 | 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 | 1/13/95 | Prov. |
| 53 | Keatley, M. | 30 Carol St. | Acushnet | MA | 02743 | (508) 763-4900 | 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 | 4/4/95 | Military |
| 54 | DeSouza, B. | 80 McCabe St. | S. Dartmouth | MA | 02748 | (508) 763-9680 | 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 | 4/6/95 | Prov. |
| 55 | Ostner, J. | 31 Arlington St. Apt. 3 | Nashua | NH | 03060 | (603) 598-2982 | 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 | 7/2/85 | Bill. |
| 56 | Doan, J. | 19 Willowdean Ave. | W. Roxbury | MA | 02132 | (617) 323-2026 | 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 | 7/25/95 | Bill. |
| 57 | Pendleton, J. | 1540 Broadway Lot 23 | Raynham | MA | 02767 | (508) 822-7740 | 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 | 7/18/96 | Bill. |
| 58 | Gilmore, M. | 24 Keith Ave. | Brockton | MA | 02301 | (508) 588-1327 | 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 | 9/7/96 | Prov. |
| 59 | Parquette, D. | 103 Hart St. | Taunton | MA | 02780 | (508) 823-7150 | 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 | 9/24/96 | Prov. |
| 60 | Spano, J. | 53 W. Chestnut St. | Brockton | MA | 02301 | (508) 559-0189 | 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 | 10/1/96 | Prov. |
| 61 | Kelley, Jr., R. | 674 Hancock St. | Abington | MA | 02351 | (781) 982-9328 | 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 | 3/25/97 | Bill. |
| 62 | Johnson, Jr., R. | 166 Wareham St. | Middleboro | MA | 02346 | (508) 946-1129 | 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 | 4/15/97 | (Prov. |
| 63 | Chioniere, Jr., R | 52 Prospect St. | Attleboro | MA | 02703 | (508) 222-5776 | 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 | 12/30/98 | Prov. |
| 64 | Crawford, H. | 4 W. Becker Rd. | Foxboro | MA | 02035 | (508) 543-2196 | 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 | 12/31/98 | Rel. |
| 65 | Clark, D. | 7 Garden St. | Randolph | MA | 02368 | (781) 983-5737 | 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 | 1/3/99 | Rel. |
| 66 | White, A. | 95 Harvard St. | Dedham | MA | 02026 | (781) 326-4927 | 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 | 8/26/99 | |
| 67 | Kelleher, T. | 239 Winter St. | Brockton | MA | 02301 | (781) 326-4327 | 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 | 9/3/99 | Prov. |
| 68 | Winquist, P. | 21 Dingley Dell Ln. | Duxbury | MA | 02332 | (781) 934-5008 | 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 | 9/11/99 | Prov. |
| 69 | Gould, D. | 9 Foxberry Ln. | Rochester | MA | 02770 | (508) 763-9621 | 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 | 9/17/99 | Prov. |
| 70 | Morris, T. | 24 Lake St. | Rehoboth | MA | 02769 | (508) 336-6919 | 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 | 10/28/99 | Prov. |
| 71 | Hamilton, D. | 8 Uncelena Rd. | W. Wareham | MA | 02676 | (508) 295-3979 | 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 | 11/9/99 | Prov. |
| 72 | Kelley, G. | 164 Brentwood Cl. | Plymouth | MA | 02360 | (508) 224-7012 | 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 | 12/22/99 | Prov. |
| 73 | Wertz, E. | 137 Lawrence St. | Brockton | MA | 02302 | (508) 588-4847 | 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 | 12/23/99 | Bill. |
| 74 | Palm, W. | 89 Lester St. | Brockton | MA | 02301 | (508) 586-6602 | 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 | 11/2/8800 | Prov. |
| 75 | Zinfault, Jr. B | 365 Grance Pk. | Bridgewater | MA | 02324 | (508) 284-3796 | 032-54-667 | 12/4/00 | Bil. |

2/8/05   CG   64

**EXHIBIT 4**

## SUMMARY OF THE TENTATIVE AGREEMENT
## BETWEEN TNFINC AND NPME AS A RESULT OF THE
## CLOSURE OF APA OPERATIONS

As a result of the closure of APA operations and the purchase of certain customer information by New Penn Motor Express (NPME), APA employees will be affected as follows:

1.    **Seniority Date.** By Friday, March 1, 2002, all employees with seniority at APA shall have the right to be put on the "call list" of ONE NPME terminal (or the classification seniority list, where applicable) within the NMFA supplemental area where they currently are employed. APA over-the-road drivers, active or inactive on separate over-the-road seniority at the Buffalo, NY, Philadelphia, PA and North Bergen, NJ terminals, shall only have the right to place his/her name on the over-the-road terminal seniority call list at one of the following NPME terminals where such same separate seniority exists: Albany, NY, Cinnaminson, NJ (Philadelphia area), Newburgh, NY and Trenton, NJ.

APA employees added to the NPME terminal call lists as described above shall be worked as casuals on the basis of their APA seniority and paid as casual employees in accordance with the Local Supplement. APA employees shall have work opportunity ahead of NPME casual employees, but shall not have work opportunity ahead of any NPME probationary or preferred casual employees, if applicable.

APA employees shall establish seniority at NPME in accordance with the following provision: Any APA NMFA employee who works thirty (30) days within any two (2) consecutive calendar month period shall be deemed to have obtained seniority and shall be placed on the NPME seniority list in accordance with established seniority date, end-tailed after the NPME seniority employees on such seniority list.

2.    **Wage Rates.** APA employees on the call list at a NPME terminal shall be paid the casual rate of pay. However, when the APA employee works thirty (30) days within any two (2) consecutive calendar month period and is placed on the NPME seniority list, such employee will

receive 90% of the applicable full NMFA rate in that supplemental area. After 6 months working at the 90% rate, the employee will progress to 100% of the full NMFA rate in the applicable supplemental area.

3. **Vacations.** During the first year of employment on the NPME seniority list (calendar year or contract year, depending on the applicable Local Supplement), a former APA employee on a NPME seniority list who qualifies for one week of vacation will receive, in addition to the earned vacation, a bonus of **one additional week of vacation**. Thereafter, each such former APA employee who qualifies for two weeks of vacation under the applicable Local Supplement will be granted one additional week for a total of three weeks. When any such employee qualifies for three (3) weeks or more of vacation under the applicable Local Supplement, no additional **"bonus"** weeks will be granted. Under no circumstances will any former APA employee receive more than one **bonus** week of vacation in any year. The vacation year being either contract or calendar year is determined by the applicable Local Supplement.

4. **Health & Welfare and Pension.** The former APA employees will be covered by the Teamster Health & Welfare and Pension Fund in which such former APA employee participated before the cessation of APA operations. All payments of health and welfare and pension by NPME on behalf of former APA employees shall be made in accordance with the NMFA and applicable Local Supplement.

5. **Teamsters' 401(k) Plan.** All former APA employees added to the NPME seniority list shall be eligible to participate in the Teamsters' 401(k) Plan as do other NPME employees.

2

**EASTERN REGION JOINT AREA COMMITTEE**
**Kingston Plantation**
**Myrtle Beach, SC**
**July 28, 2004**

**COMMITTEE B**

SC-21-04    <u>Local 25 v. New Penn Motor Express, Inc.</u>
On behalf of Craig Goulet, Union alleges violation of Article 32, Section 1, 2, September 2003, grievant should have been called for work at New Penn per APA/New Penn Agreement; requesting grievant be returned to proper seniority.

**UNION PANEL:**        Ernie Soehl, Chairman
Roger Fenlason
Theodore Uniatowski

**EMPLOYER PANEL:**     Robert Mergenhagen
Gary Quinn
Tony Nations

**<u>Ernie Soehl, Local 701, Chairman:</u>**  Company, you want to identify yourself and the parties with you?

**<u>Daniel Schmidt, New Penn Motor Express:</u>**  Yes, Danny Schmidt for the Company and I don't have anybody with me.

**<u>Soehl:</u>**  Union, identify yourself for the record.

**<u>Mark Harrington, Local 25, Business Agent:</u>**  Harrington, Murphy, and the grievant Goulet.

**<u>Schmidt:</u>**  The Company does have a point of order Mr. Chairman, that we passed out prior to getting into the case.

**<u>Soehl:</u>**  What's your point of order?

**<u>Schmidt:</u>**  Dan Schmidt for New Penn Motor Express.  The case was 03-914 filed at the New England JAC, now the case is SC-21-04 filed at the Eastern Region JAC.

Mr. Chairman and Members of the Committee, I would first like to say, in my opinion, this was not an Article 32 case.  The grievance makes reference to Article 5 and 43.  Its docketed on the agenda here as Article 32, I don't know what happened there, but its not

an Article 32 case in my understanding. The Company raises a point of order. The Company contends that the grievant, Mr. Goulet is attempting to claim a seniority violation. Yet, Mr. Goulet has never placed an application for employment with New Penn Motor Express, Inc. nor was he referred to New Penn for work opportunity.

**Harrington:** I object. The Point of Order, he is getting into his whole case. His Point of Order is what?

**Schmidt:** This is my Point of Order. And Mr. Goulet has never worked a day.

**Harrington:** Again, he is getting into the case. What's the Point of Order?

**Soehl:** The Point of Order is what, you made referenced to Article 32?

**Schmidt:** One, the case is filed under 32. My understanding is its not a 32 case, the grievant says, I will show you what he says before we get into it. The grievance was filed by him on, drop down to the last paragraph, dated April 7, 2003, received by the Company on April 18, 2003, okay, alleging a violation of March 1, 2002. In addition, the grievance was not docketed until September 2003, at the Southern New England Committee. Then, again docketed, never heard in Southern New England, then again docketed April 20, 2004, at the Eastern Region Committee. Exhibit 1, is a copy of the grievance which was forwarded to the Company by letter dated April 18, 2003, alleging a violation of March 1, 2002. If you go to exhibit 1.

**Soehl:** Hey Danny, wait a minute hang on, I have to ask you a question. What is your Point of Order?

**Schmidt:** I'm getting in to it, I'm telling you.

**Soehl:** All I heard you say so far, Article 32.

**Schmidt:** That's my first point of order. The case is filed improper before this Committee because its filed as a 32 and it isn't a 32 case, it's a 5, 43 case according to the grievance, that's one point.

**Soehl:** Ok, making it clearer. Is there another point?

**Schmidt:** Yes, oh yes, timeliness is a point. Let me clarify it for you.

**Soehl:** So its not only 32, its also timeliness.

**Schmidt:** Yes, and that's what I'm trying to get to Ernie.

**Soehl:** Hang on a minute, the Union brought up a question, which they had a right to do because all you told us about was 32, maybe if it was 32 and timeliness, they wouldn't have objected to you.

2

**Schmidt:** Well, I'm trying to get into the timeliness. You have to let me finish my brief. The grievance was filed by the grievant on April 7, 2003, received by the Company on April 18, 2003, alleging a violation on March 1, 2002. That's almost a year later, that's one point. Then the case wasn't even docketed until September 2003, that's two points untimely. Then, again, they took it off the New England Agenda, that they docketed late, and filed it down here on the April 20, 2004, agenda.

**Harrington:** Mr. Chairman, again I object. Their shooting a fish in a barrel. They should have a separate point of order for each issue he raised.

**Soehl:** On the 32 and on the timeliness. Mark, what are you saying on the point of order, you need to clarify?

**Harrington:** I'm saying, he should have a separate point of order for each issue he's raising. If you rule in favor of one, I'm just saying, this putting three or four different points of order on the table right now. You should put one point of order in per objections to our grievance.

**Soehl:** You want to respond to that?

**Schmidt:** My brief is written addressing the points of order that this grievance is improper before this Committee. I have a right to tell you why this grievance is improper before this Committee. If it's improper because of five reasons, I surely have that right and he has that right to rebut that. Let me read my brief and finish the point of order and he can rebut anything he wants.

**Soehl:** Danny, give us Executive Session.

**Schmidt:** No problem.

**Tape turned off during Executive Session.**

**Soehl:** Back on the record, please. Company continue with the point of orders that you raised.

**Schmidt:** Thank you. Exhibit 1 is a copy of the grievance which was forwarded to the Company by letter dated April 18, 2003, alleging violation of March 1, 2002, you have that in your packet. As you can see here it was send from George Cashman to Mr. Zaccaria, an employee of our Company.

> "Enclosed for processing, please find a grievance that was submitted to William Carnes by Mr. Goulet, dated April 7, 2003."

Okay, we got that, I'm going to guess on the 18th its dated, I will say that date I guess. Exhibit 2 is a copy of the pre-hearing information which shows that this grievance was first filed with the Southern New England Committee in September, in fact on September

3

30th. You have a copy of the grievance in your file, it shows that he is alleging a violation on March 1, 2002, as I said he filed it on April 7, 2003, you can look at the grievance and tell that. That's in your packet. The grievance was then docketed after we get it in April, it was docketed in September 3, 2003. April, May, June, July, August, September, about four or five, six months. Suppose to docket it within one month, under the contract, no big deal.

Exhibit 3 Gentlemen is a copy of the Grievance Machinery Language, Article 46 of the New England Agreement, which says that grievances must be docketed in thirty (30) days. This grievance, we received it on April 18th, by virtue of Mr. Cashman's letter. You have the docketing form that was send to the Committee by the Union, that wasn't even send until September 3, 2003. A copy of Article 7 is attached in your file which your all familiar with, that all grievances must be docketed for a decision no later than thirty (30) days, again that did not happened.

Exhibit 5 Gentlemen, is a copy of a pre-hearing form for the Eastern Region now, we never heard the case in New England, it just went from that agenda down here. It was docketed here in April 20, 2004, you have a copy of that pre-hearing form in your packet. Therefore, the Company contends the grievant, A) was never an employee, as I told you initially, the grievant also filed the grievance untimely, almost a year, from March 1, 2002, to April 2003, before he even filed a grievance. The case was then filed for whatever reason after Mr. Carnes left on September 3, 2003, untimely filed to the New England Committee and then ultimately filed again on April 20, 2004, untimely filed to this Committee. Therefore, based on those facts, the Company contends that this grievance is surely improper before this Committee.

**Soehl:** That's your Point of Order?

**Schmidt:** Yes.

**Soehl:** Union, you want to respond to the point of order?

**Harrington:** Surely, I want to give some background to this situation. First of all, I wasn't the agent for New Penn at the time when Mr. Goulet filed the case. As everybody is aware William Carnes was the Business Agent for New Penn. I was the Business Agent for APA at the time of the closure, Mr. Goulet was on the seniority list there. Again, the way I want to respond to his point of order is to give you my brief and present my case, so I can demonstrate to you, the circumstances around this.

**Schmidt:** Mr. Chairman, I don't want to interrupt anybody, he said that I was presenting the case.

**Soehl:** Danny, I'm Chairman alright, you made a statement regarding to his brief, I didn't say (inaudible). I told him to stay to the point of order and respond to your point of order, so far he has been doing that.

4

**Schmidt:** Ok, that's fine.

**Harrington:** Mr. Goulet is also going to testify and so is Mr. Murphy. Let me go right to his exhibits and respond to each one. Exhibit 1 copy of the grievance which was forwarded to the Company dated April 18, 2003, let me just read Mr. Goulet grievance into the record so that we can be clear on exactly what his grievance is.

> "Craig Goulet, Business Agent, William Carnes date of complaint is April 7, 2003, nature of grievance, seniority rights. In accordance with the National Master Freight Agreement Article 5, Subsection along with the New England Supplemental Freight Agreement, Article 43 Seniority including all of Article 43 Subsection. I am filing a grievance against New Penn Motor Express to include all lost time, back pay, seniority and contractual benefits under the agreement, from March 1, 2002, up to and continuing past March 31, 2003, based on the agreement between TNFINC and New Penn Motor Express as a result of the closure of APA Operations."

That's why Mr. Goulet's grievance was filed April 7th. Seven (7) days after the expiration of the agreement because he was never called. So that's what I guess Mr. Carnes instructed him to do, is file a grievance cause you weren't called within the year. He doesn't know, he is not working for the Company, he doesn't know anything, he was never contacted by New Penn. That's indisputable by the Company. Exhibit 2, copy of the pre-hearing information, shows the grievance as filed Southern New England, September and that should be the third, if you read the file its September 3rd, not September 30th.

**Soehl:** It's says the third.

**Harrington:** Right, he testified to the 30th, he states it on his brief. That grievance was filed on September 3rd, as I said I took the case over sometime in mid summer. Mr. Goulet expressed his frustration that his case has not moved forward, had no idea what happened what the case. I do know that the agreement really is silent on filing grievances. The APA and New Penn agreement. I also know since my experience with New Penn Motor Express, I have settled grievances with that Company, that are over a year old. I settled grievance from blizzards back in 2001 that were never docketed before the panel and the Company treated it as an active grievance, resolved the grievance. Charles Zaccaria, the Vice President of the Company, when you do business with New Penn you can't do anything unless Charlie Zaccaria gives you his blessing. And he's not around half time he's traveling to all these different terminals and whatever. So there's a precedent or practice there that grievances are held and held, and held until they are finally resolved or they can't come to an agreement or can't meet, and then they kick it (inaudible) the grievance procedures. I don't think that Mr. Schmidt will deny that. Exhibit 3, Article 46 of the Grievance Machinery. I take the case over in September, alright, so now its my ball game. I try to do the right thing, get this kid's grievance heard. I talk to John Murphy, that's why John is sitting here. John what should we do with this case, it's a closure case, there's really no language in the contract that deals with

this thing, so we are going to file under 43. File under 43 so that we can kick it off in the Southern New England Supplement. Postpone Company, Postpone Union, John talks to both Bob Schaeffer and Dan Virtue about this case. They tell us to kick it to the Eastern Region Joint Area because it is a Multi-Local closure agreement, it should be heard in front of you people today. We file the case, it gets send down, I don't know how misinformation, it was shown as being withdrawn, the case was never withdrawn so it went back on the agenda. So I can account for my handling of the case and the process of the steps along the way and everything we did until the time we took over was in conjunction with the contract and the advise and the consultation with both the labor side and the management side as to what to do with this case. So, you are dealing with the time frame obviously of when the grievance was filed and when it was originally docketed. My experience again with New Penn is they play loose with that all the time, (inaudible) its whatever suits them on that particular day. So we think that this guy, Mr. Schmidt testifies that he wasn't on the list, this guy was on the list, he won a case in arbitration, they reinstated him back to the (inaudible) that will be in my brief if I have an opportunity to present it, and show you the steps along the way as to where he was ignored and by-passed and did tell the Company where he wanted to go to work, we have that evidence. So John do you have anything to add to that?

**John Murphy, Local 25, Business Agent:** I think that what Mark said is true, I can tell you as the Co-Secretary of Southern New England, its my understanding was trying to be settled from the time that the grievance was filed in April 03, right up to when we put it on the agenda at the Southern New England area. We postponed it, I think there was still talks going on, there were some other reasons, we have some Unity Conference or something like that, whatever was going on. So we postponed it on both sides and consultation with the Eastern Region, Danny Virtue suggested that it should probably be heard down here at the Region. I talked to Bob Schaeffer, who's the Company Co-Secretary for Southern New England. We agreed to take the case out of New England and put it into the Eastern Region and that's where we are at.

**Harrington:** And to just follow up on that, they assigned 32 to it, the Committee, Dan and Schaeffer. Whatever they had a discussion about, whatever they did, they assigned 32, we didn't. So at this time we are going to let the grievant respond to why he didn't file the grievance. I don't want you to put your case on, I want you to limit it to why you filed the grievance a year or so after your understanding of the agreement.

**Soehl:** Addressing the point of order on the timeliness.

**Craig Goulet, Grievant:** Members of the Committee, the agreement that the New Penn people had with APA ran out March 31, 2002. I didn't get a phone call, I filed a grievance.

**Harrington:** 2003.

**Soehl:** 2003, right.

6

**Goulet:** Yes.

**Soehl:** Can I ask either side a question, cause unfortunately I don't have a copy of it. And I think that both sides would need a copy of the closure agreement so we know what's in it so that we can make a prudent decision.

**Harrington:** Its two separate documents there, one is the closure of APA and the other one is the responsibilities that New Penn had under the agreement.

**Goulet:** APA cease their operation March 1, 2002. They had an agreement, the men from that time to March 31, 2003. At the end of the agreement, I hadn't received a phone call, so I filed a grievance.

**Harrington:** That's our rebuttal to his point of order.

**Soehl:** Danny, you want to respond?

**Schmidt:** Yes, the Company is going to stand on their point of order. The grievant filed his grievance by his own testimony and his own handwriting on April 7, 2003. In his own grievance he says, "On March 1, 2003, 2002, he was violated that's what this says, so his grievance is untimely. You have to file within thirty (30) days, he didn't do that. This was no surprise to Local 25, we told them that the grievance was untimely from the beginning when we talked to Mr. Carnes. I handled this grievance cause they called me, our terminal. Now, why they didn't docket it until September, I don't know. It wasn't docketed as you can see until September 3, 2003, and was filed in April of 2003. And then all the docketing of Southern New England, there was never any discussion with the Company. But docketed down here, cause the Company found out it was on here as a 32 case. I said holy shit what's going on here, I thought we was hearing it in New England. But its down here under 32, by their own testimony it's not a 32 case.

**Soehl:** I think that their testimony said that they got advise from both of the Co-Secretaries.

**Schmidt:** While, I have their pre-hearing form and here it says Article 32. Co-Secretaries don't fill that out, they do.

**Soehl:** They said that the phone call that they had made on both sides, to Schaeffer and Virtue (inaudible) to bring it down here.

**Schmidt:** That's fine, whatever it is, that is. But you know what, there was never a conversation with Schmidt, let's make that understood. There was never a conversation with New Penn on timeliness. And yes, I will sit here and tell you that there are times we waived that issue, we both have that understanding. We never had that understanding in this case nor was I ever asked by 25 on this case to do that. And I want that understood cause if I was, I wouldn't be here raising timeliness. You got the case.

7

**Soehl:** Questions? Questions to the Union?

**Harrington:** I have a question to Mr. Schmidt. Doesn't our Co-Secretary usually advise you where the cases are going to go?

**Schmidt:** No.

**Harrington:** Is it my responsibility to tell you where the case is going to go?

**Schmidt:** Yeah, my understanding is this pre-hearing form has on here employer, union and company. And I should get a copy yeah.

**Harrington:** Did you get a copy?

**Schmidt:** And I didn't raise that, and I didn't get a copy, Mark. But you know what, I should get a copy its on here. It is your responsibility to tell me where the case is going. I'm not trying to be smart, but I never got a copy.

**Harrington:** Well, how did you get that copy?

**Schmidt:** I got it from TEA, I had to called them and have them fax it to me. But I didn't get into that.

**Soehl:** Just to clear me up a little bit, let me ask you a question? Unfortunate, nobody has this shut down agreement. Evidently, what it is, recall rights basically up to March 31, 2003, is that fair to say?

**Goulet:** Yes.

**Harrington:** Yes, sir.

**Soehl:** You never received a call from New Penn for recall so you filed a grievance on April 7, 2003.

**Schmidt:** That's not accurate. Are you asking them or me?

**Soehl:** I asked them.

**Schmidt:** You want to ask me, because that is not accurate.

**Soehl:** Well, I will ask you the same question.

**Schmidt:** That is not accurate. Under the agreements if they want to get into it.

**Soehl:** Well, we are going to get into it here. (inaudible).

8

**Schmidt:** Provided, we had the information he filed out an application and the Union gave us his name okay, then he would have been called. None of that happened.

**Harrington:** Mr. Chairman, I want to introduce rebuttal evidence to that then.

**Soehl:** You brought it up Danny, I think that he has a right to say it (inaudible)

**Gary Quinn, Yellow Transportation:** Executive Session,

**Soehl:** We're on a point of order and we're trying to find out what a shut down agreement cause we can't open a book to look at it.

**Quinn:** Executive Session.

**DECISION:** The Panel, in Executive Session, motion made, seconded and carried, the initial docketing of this case was not within thirty (30) days; therefore, the Company's point of order is upheld. Cost Union.

9

## EASTERN REGION JOINT AREA COMMITTEE

Established in accordance with the terms and conditions of the National Master Freight Agreement and the NE Supplemental Agreement, entered into by and between the Local Union and carriers engaged in City Pickup and Delivery and/or Over-the-Road Freight Operations.

DOCKET NO. SC-21-04

IN THE MATTER OF THE DISPUTE BETWEEN

TEAMSTERS LOCAL NO. 25
BOSTON, MA

SUBMISSION FORM

and

NEW PENN MOTOR EXPRESS, INC.

We, the undersigned, parties to the National Master Freight Agreement and the NE Supplemental Agreement, hereby agree to submit the dispute to arbitration under the Rules of Procedure prescribed by the Eastern Region Joint Area Committee, by virtue of its authority, as set forth in Article 45 and 46 of the NE Supplemental Agreement, the following:

On behalf of Craig Goulet, Union alleges violation of Article 32, Section 1,2, September, 2003, grievant should have been called for work at New Penn per APA/New Penn agreement; requesting grievant be returned to proper seniority.

The undersigned further agree that a majority decision of the Eastern Region Joint Area Committee in the above dispute will be final, conclusive and binding with no appeal and, further, that neither party will attempt through any overt acts, to void the decision rendered.

The undersigned also agree that failure to comply with the decision of a majority of the Committee within ten (10) days of the date of the decision will result in the loss of all contract rights, privileges and benefits due them under Article 45 of the NE Supplemental Agreement.

| Date | July 28, 2004 | | |
|------|---------------|---|---|
| Employer | NEW PENN MOTOR EXPRESS, INC. | Local Union | 25 |
| Signed by | D. W. Schmidt, V. P. | Signed by | Mark A. Harrington, Bus. Agent |

## DECISION

The Panel, in executive session, motion made, seconded and carried, the initial docketing of this case was not within thirty (30) days; therefore, the Company's point of order is upheld. Cast Union.

R. L. SCHAEFFER
Employer Co-Secretary

RONALD M. JENKINS
Union Co-Secretary

JULY 28, 2004
Date

JULY 28, 2004
Date

D028

# NATIONAL MASTER
# FREIGHT AGREEMENT AND
# NEW ENGLAND
# SUPPLEMENTAL AGREEMENT



## For the Period:
## April 1, 1998 through March 31, 2003



EXHIBIT

23



(e) In the event that an employee sustains an occupational illness or injury... Employer shall provide transportation by bus, train, plane, or automobile to his/her home terminal if and when directed by a doctor.

(f) The Employer agrees to provide any employee injured locally transportation at the time of injury, from the job to the medical facility and return to the job, or to his/her home if required.

(g) In the event of a fatality arising in the course of employment, while away from the home terminal, the Employer shall return the deceased to his/her home at the point of domicile.

(h) The Employer may publish reasonable safety rules and procedures and provide the Local Union with a copy. Failure to observe such reasonable rules and/or procedures shall subject the employee to disciplinary action in accordance with the disciplinary procedures in the applicable Supplemental Agreement. However, the time limitation relative to prior offenses shall be waived to permit consideration of the employee's entire record of failure to observe reasonable safety rules and/or procedures resulting in lost time personal injuries. This provision does not apply to vehicular accidents.

### Section 2. Modified Work

(a) The Employer may establish a modified work program designed to provide temporary opportunity to those employees who are unable to perform their normal work assignments due to a disabling on-the-job injury. Recognizing that a transitional return-to-work program offering both physical and mental therapeutic benefits will accelerate the rehabilitative process of an injured employee, modified work programs are intended to enhance worker's compensation benefits and are not to be utilized as a method to take advantage of an employee who has sustained an industrial injury, nor are they intended to be a permanent replacement for regular employment.

(b) Implementation of a modified work program shall be at the Employer's option and shall be in strict compliance with applicable federal and state worker's compensation statutes. Acceptance of modified work shall be on a voluntary basis at the option of the injured employee. However, refusal to accept modified work by an employee, otherwise entitled to worker's compensation benefits,

64

tion benefits as specifically provided... applicable federal and state worker's compensation statutes. Employees who accept modified work shall continue to be eligible to receive "temporary partial" worker's compensation benefits as well as all other entitlements as provided by applicable federal or state worker's compensation statutes.

(a) At facilities where the Employer has a modified work program in place, temporary modified assignments shall be offered in seniority order to those regular full time employees who are temporarily disabled due to a compensable worker's compensation injury and who have received a detailed medical release from the attending physician clearly setting forth the limitations under which the employee may perform such modified assignments. Once a modified work assignment is made and another person is injured, the second person must wait until a modified work opening occurs, regardless of seniority. All modified work assignments must be made in order compliance with the physical restrictions as outlined by the attending physician. All modified work program candidates must be released for eight (8) hours per day, five (5) days per week. The Employer, at its option, may make a modified work offer of less than eight (8) hours per day where such work is expected to accelerate the rehabilitative process and the attending physician recommends that the employee works back to regular status or up to eight (8) hours per day by progressively increasing daily hours. A copy of any release for modified work must be given to the employee before the modified work assignment begins.

It is understood and agreed that those employees who, consistent with professional medical evaluations and opinion, may not be expected to receive an unrestricted medical release, or whose injury has been medically determined to be permanent and stationary, shall not be eligible to participate in a modified work program.

In the event of a dispute related to conflicting medical opinion, such dispute shall be resolved pursuant to established worker's compensation law and/or the method of resolving such matters as outlined in the applicable Supplemental Agreement. In the absence of a provision in the Supplemental Agreement, the following shall apply:

65

When there is a dispute between two (2) physicians concerning the release of an employee for modified work, such two (2) physicians shall immediately select a third (3rd) neutral physician within seven (7) days, whose opinion shall be final and binding on the Employer, the Union and the employee. The expense of the third (3rd) physician shall be equally divided between the Employer and the Union. Disputes concerning the selection of the neutral physician or back wages shall be subject to the grievance procedure.

For locations where the Employer intends to implement a modified work program or has a modified work program in place, the Local Union shall be provided with a copy of the current form(s) being used for employee evaluation for release and general job descriptions. This information shall be general in nature, not employee specific.

When a modified work assignment is made, the employee shall be provided with the hours and days he/she is scheduled to work as well as the nature of the work to be performed in writing. A copy of this notice shall also be submitted to the Local Union.

An employee who is placed in a modified work position may be subject to medical evaluation(s) by a physician selected by the Employer to determine if the modified work being performed is accelerating the rehabilitative process as anticipated by Section 2 above. In the event such medical evaluation(s) determine that the rehabilitative process is not being accelerated, the employee shall have the right to seek a second opinion, from a physician of his choosing. Any disputes regarding conflicting medical claims shall be resolved in accordance with the provisions outlined above. The employee may be removed from the modified work program based upon final medical findings under this procedure. Employees so removed shall not have their workers' compensation benefits affected because of such removal. In the event the employee's temporary disability workers' compensation benefit is subject to reduction by virtue of an applicable Federal or State statute, the Employer shall pay the difference between the amount of the reduced temporary workers' compensation benefit to which the employee would be entitled.

(d) Modified work shall be restricted to the type of work that is not expected to result in a re-injury and which can be performed within the medical limitations set forth by the attending physician. In the event the employee, in his/her judgment, is physically unable

to perform the modified work within his/her physical capabilities or returned to full temporary total workers' compensation benefits. In the event a third (3rd) party insurance carrier refuses to reinstate such employee to full temporary total disability benefits, the Employer shall be required to pay the difference between the amount of the benefit paid by such third (3rd) party insurer and full total temporary disability benefits. Determination of physical capabilities shall be based on the attending physician's medical evaluation. Under no conditions will the injured employee be required to perform work at that location subject to the terms and conditions of the National Master Freight Agreement or its Area Supplemental Agreements. Prior to acceptance of modified work, the affected employee shall be furnished a written job description of the type of work to be performed.

(e) The modified workday and workweek shall be established by the Employer within the limitations set forth by the attending physician. However, the workday shall not exceed eight (8) hours, inclusive of coffee breaks where applicable and exclusive of a one-half (1/2) hour meal period and the workweek shall not exceed forty (40) hours, Monday through Friday, or Tuesday through Saturday, unless the nature of the modified work assignment requires a scheduled workweek to include Sunday. Whenever possible, the Employer will schedule modified work during daylight hours, Monday through Friday, or during the same general working hours and on the same workweek that the employee enjoyed before he/she became injured. In the case of an employee whose workdays and/or hours routinely varied, the Employer will schedule the employee based on the availability of the modified assignment being offered. Any alleged abuse of the assignment of workdays and work hours shall be subject to the grievance procedure.

(f) Modified work time shall be considered as time worked when necessary to satisfy vacation and sick leave eligibility requirements as set forth in the National Master Freight Agreement and/or its applicable Area Supplemental Agreements. In addition to earned vacation pay as set forth in the applicable Area Supplemental Agreements, employees accepting modified work shall receive prorated vacation pay for modified work performed based on the weekly average modified work pay. The only time modified work is used

66

67



the applicable Supplemental Agreement.

Holiday pay shall first be paid in accordance with the provisions of the applicable Supplemental Agreement as it relates to on-the-job injuries. Once such contractual provisions have been satisfied, holidays will be paid at the modified work rate which is the modified work wage plus the temporary partial disability benefit.

Sick leave and funeral leave taken while an employee is performing modified work will be paid at the modified work rate which is the modified work wage plus the temporary partial disability benefit. Unused sick leave will be paid at the applicable contract rate where the employee performed modified work and qualified for the sick leave during the contract year.

(g) The Employer shall continue to remit contributions to the appropriate health & welfare and pension trusts during the entire time period employees are performing modified work. The payment of health & welfare and pension contributions while the employee is on modified work is not included in the health & welfare and pension contributions required by the Supplement when an employee is off work on workers' compensation. Continuation of such contributions beyond the period of time specified in the Supplemental Agreement for on-the-job injury shall be required. Provisions of this Section shall not be utilized as a reason to disqualify or remove an employee from the modified work program.

(h) Employees accepting modified work shall receive temporary partial benefits as determined by each respective state workers' compensation law, plus a modified work wage when added to such temporary partial benefit, shall equal not less than eighty-five percent (85%) of forty (40) hours' pay he/she would otherwise be entitled to under the provisions of the applicable Area Supplemental Agreement for the first six (6) months from the date the modified work assignment commences. After this initial six (6) - month period, the percentage shall increase to ninety percent (90%) for the duration of each individual modified work assignment. The Employer shall not refuse to assign modified work to employees based solely on such employees reaching the ninety percent (90%) wage level. Such refusal shall be considered as abuse of the program and shall be subject to the grievance procedure. Modified work assignments

68

Where an employee participates in a wage reduction-job security plan as provided in Article 6, Section 2, the eighty-five percent (85%) and ninety percent (90%) as specified herein shall be based on the wage provisions of the applicable Supplemental Agreement and not the wage reduction-job security plan; provided, however, no such employee shall receive a modified work wage in excess of that provided in the applicable wage reduction-job security plan.

(i) Employees accepting modified work shall not be subject to disciplinary action provisions of the Supplemental Agreements unless such violation involves an offense for which an prior warning notice is required under the applicable Supplemental Agreement (Cardinal Sins). Additionally, the provisions of Article 45, Section 3(a), shall apply.

(j) Alleged abuses of the modified work program by the Employer and any factual grievance or request for interpretation concerning this Article shall be submitted directly to the Regional Joint Area Committee. Proven abuses may result in a determination by the National Grievance Committee that would withdraw the benefits of this Article from that Employer, in whole or in part, in which case affected employees shall immediately revert to full workers' compensation benefits.

### Section 3. Americans with Disabilities Act

The Union and the Employer recognize their obligations under the Americans with Disabilities Act. It is agreed that the Employer shall determine whether an employee is a qualified individual with a disability under the ADA and, if so, what reasonable accommodations, if any, should be provided. In the event that the Employer determines that a reasonable accommodation is necessary, the Employer shall notify the Local Union before providing the reasonable accommodation to a qualified bargaining unit employee to ensure that the reasonable accommodation selected by the Employer does not impact another employee's seniority or other contract rights.

Any dispute over whether the Employer complied with its duty to notify the Local Union before implementing a proposed reasonable accommodation or whether providing the reasonable accommoda-

69



Case 1:04-cv-12577-WGY    Document 45-24    Filed 02/10/2006    Page 3 of 5

tion violates any employee's rights under any other provision of the NMFA shall be subject to the grievance procedure. Disputes over whether the Employer has complied with its legal requirements under the ADA, including the ADA requirements to provide a reasonable accommodation, however, shall not be subject to the grievance procedure.

## ARTICLE 15.
## MILITARY CLAUSE

Employees in service in the uniformed services of the United States, as defined by the provisions of the Uniform Services Employment and Reemployment Rights Act (USERRA), Title 38, U.S. Code Chapter 43, shall be granted all rights and privileges provided by USERRA and/or other applicable state and federal laws. This shall include continuation of health coverage to the extent required by USERRA, and continuation of pension contributions for the employee's period of service as provided by USERRA. Employees shall be subject to all obligations contained in USERRA which must be satisfied for the employees to be covered by the statute.

In addition to any contribution required under USERRA, the Employer shall continue to pay health & welfare contributions for regular active employees involuntarily called to active duty status from the military reserves or the National Guard for military-related service, excluding civil domestic disturbances or emergencies. Such contributions shall only be paid for a maximum period of twelve (12) months.

## ARTICLE 16.
## EQUIPMENT, SAFETY AND HEALTH

### Preamble

It is agreed that all parties covered by this Agreement shall comply with all applicable federal, state and local regulations pertaining to worker safety and health and subjects covered by Article 16. Failure to do so shall be subject to the grievance procedure, in accordance with Articles 7 and 8 of the NMFA, and any other remedies

70

presently available and those conduct or obtained in this Agreement are exhausted.

### Section 1. Safe Equipment

The Employer shall not require employees to take out on the streets or highways any vehicle that is not in a safe operating condition, including, but not limited to, equipment which is acknowledged as overweight or not equipped with the safety appliances prescribed by law. It shall not be a violation of this Agreement or basis for discipline where employees refuse to operate such equipment unless such refusal is unjustified.

It shall also not be a violation of this Agreement or considered an unjustified refusal where employees refuse to operate a vehicle when such operation constitutes a violation of any federal rules, regulations, standards, or orders applicable to commercial motor vehicle safety or health, or because of the employee's reasonable apprehension of serious injury to himself/herself or the public due to the unsafe condition of such equipment. The unsafe conditions causing the employee's apprehension of injury must be of such nature that a reasonable person, under the circumstances then confronting the employee, would conclude that there is a bona fide danger of an accident, injury, or serious impairment of health, resulting from the unsafe condition. In order to qualify for protection under this provision, the employee must have sought from the Employer, and have been unable to obtain, correction of the unsafe condition.

All equipment which is refused because it is not mechanically sound or properly equipped shall be appropriately tagged so that it cannot be used by other employees until the maintenance department has adjusted the complaint. After such equipment is repaired, the Employer shall place on such equipment an "OK" in a conspicuous place so the employee can see the same.

### Section 2. Dangerous Conditions

Under no circumstances will an employee be required or assigned to engage in any activity involving dangerous conditions of work, or danger to person or property or in violation of any applicable statute or court order, or in violation of a government regulation relating to safety of person or equipment.

71

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CRAIG GOULET** )<br><br>   **Plaintiff,** )<br><br>**v.** )<br><br>**NEW PENN MOTOR EXPRESS** )<br>   **Defendant** )<br><br>**and** )<br><br>**TEAMSTERS LOCAL 25** )<br>**INTERNATIONAL BROTHERHOOD OF** )<br>**TEAMSTERS** )<br><br>   **Defendant,** ) | **CIVIL ACTION**<br>**NO. 04-12577-JLT** |

## AFFIDAVIT OF BURTON TREBOUR

1. In 2001-2002, I was the Vice President of Labor and Administration for A.P.A. Transport, Inc.

2. I am familiar with the grievance filed by Teamsters Local 25 on behalf of Craig Goulet in March 1987, and was heard by the Southern New England Joint Area Committee on October 21, 2001.

3. As the Vice President of Labor and Administration for A.P.A. in October 2001, I represented A.P.A. at the Southern New England Joint Area Committee hearing, and argued that Mr. Goulet's termination should not be reversed.

4. On October 16, 2001, the Southern New England Joint Area Committee made the following ruling concerning the grievance of Mr. Goulet:

5. A.P.A interpreted that decision to mean that it was not required to return Mr. Goulet to the active work roster until and unless he produced documentation concerning his medical clearance to return to unrestricted duties with A.P.A.

6. Two seniority lists were ordinarily generated for each A.P.A. facility: one generated by the corporate office, and the other generated at each individual terminal.

7. The corporate seniority list contained only the employee's name and date of seniority, and such lists were not necessarily available to employees at the terminal.

8. The seniority list produced by the terminal would list only the employees with active seniority, meaning that they were available to for day-to-day work, and would be posted for the employees perusal.

9. The corporate office returned Mr. Goulet's name to the corporate seniority list because it anticipated that Mr. Goulet would be returning to work, shortly following the decision of the Southern New England Joint Area Committee in October 2001.

10. The corporate office updated the corporate seniority list in November 2001 following the decision of the Southern New England Joint Area Committee's decision concerning the grievance of Mr. Goulet.

11. A.P.A.'s inclusion of Mr. Goulet's name on the November 2001 corporate seniority list was not due to any decision by A.P.A. to waive the requirements set forth by the Southern New England Joint Area Committee concerning Mr. Goulet's re-employment.

12. A.P.A. never waived the requirements that Mr. Goulet provide medical documentation of his ability to return to unrestricted duties and serve a ten (10) days suspension prior to being returned to the seniority list for the Canton, Massachusetts terminal.

13. If A.P.A. had been aware that Mr. Goulet was not intending to provide medical documentation of his ability to return to duties immediately following the decision of the Southern New England Joint Area Committee, it would not have reinserted his name in the November 2001 corporate seniority list for A.P.A.'s Canton, Massachusetts facility.

14. Mr. Goulet never presented any documentation to A.P.A. concerning his ability to return to unrestricted duties.

15. Mr. Goulet never served a ten (10) day suspension.

16. I do not recall whether the November 2001 corporate seniority list for A.P.A.'s Canton, Massachusetts facility was sent to the Union.

17. It is possible that the A.P.A. facility in Canton, Massachusetts did not receive the November 2001 seniority list prior to its closing in February 2002.

18. When New Penn Motor Express requested terminal seniority lists in order to create its call lists, it asked for seniority lists from the corporate office, and thus received the corporate seniority list.

Signed under the pains and penalties of perjury this ___ day of January 2006

.

_____

Burton Trebour

NOTE TO PROCESSING CENTER
FURTHER ACTION NECESSARY

**DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES**
Social Security Administration
**OFFICE OF HEARINGS AND APPEALS**

**DECISION**

**IN THE CASE OF**

**CLAIM FOR**

Period of Disability,
Disability Insurance Benefits, and
Supplemental Security Income

Craig S. Goulet
(Claimant)

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

(Wage Earner)

(Social Security Number)

The prior decision issued by the undersigned dated May 16, 1995
is being re-opened due to new and material evidence.

**PROCEDURAL HISTORY**

This case is before the Administrative Law Judge on a request for
hearing filed by the claimant, who is dissatisfied with the
previous determinations finding that he is not disabled.

The undersigned Administrative Law Judge has carefully reviewed
all the evidence of record and has concluded that the claimant
does in fact meet the Social Security definition of disability
and so is issuing a favorable decision on the record and without
a formal oral hearing having been held.

The claimant previously filed Title II and Title XVI applications
on April 6, 1992. These applications were initially denied on
June 2, 1992.  He filed the current applications on April 8,
1994.  These application were denied initially on May 5, 1994,
and again denied on reconsideration on July 19, 1994.  Claimant
disagreed with these determinations and requested a hearing on
October 25, 1994.

New and material evidence constitutes good cause for reopening
the claimant's prior applications pursuant to 20 CFR 416.1488-
416.1489 and 404.988-404.989.  Benefits will be payable based on
the claimant's Title II and Title XVI applications filed on April
6, 1992.


EXHIBIT
25

Craig S. Goulet
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

2

## ISSUES

The issues in this case are whether the claimant is under a
disability as defined by the Social Security Act and if so, when
his disability commenced, the duration of the disability, and
whether the insured status requirements of the Act are met for
the purpose of entitlement to a period of disability and
disability insurance benefits.

## EVALUATION OF THE EVIDENCE

After a thorough evaluation of the entire record, it is concluded
that the claimant has been disabled since March 11, 1987, and met
the insured status requirements of the Social Security Act on
that date and thereafter, through June 30, 1993. The claimant
was 26 years old on the date his disability began. The claimant
has a high school education. The claimant has not engaged in any
substantial gainful activity since the disability onset date.

The claimant has the following impairments which are considered
to be "severe" under the Social Security Act and Regulations:
dysthymia, personality disorder, low back pain, status post
rotator cuff tear, right knee pain, and alcohol dependence.

The medical evidence reveals that the claimant sustained a work
related injury in 1987 at which time he injured his left arm,
shoulder, right leg and knee. He has been treated by Dr.
Matzilevich, Dr. Courville and Dr. Garion but has continued to
experience pain. Claimant has also been diagnosed a shaving
dysthymia and a personality disorder.

The claimant's description of his limitations is consistent with
the record when considered in its entirety. The claimant cannot
perform his past relevant work and does not have transferable
skills to perform other work within his residual functional
capacity.

Given the claimant's residual functional capacity, and the
vocational factors of his age, education and past relevant work
experience, there are no jobs existing in significant numbers
that the claimant is capable of performing. The claimant is
under a disability as defined by the Social Security Act and
Regulations.

Craig S. Goulet
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

3

## FINDINGS

After consideration of the entire record, the Administrative Law
Judge makes the following findings:

1.    The claimant met the insured status requirements of the Act
      on March 11, 1987.  The claimant has not performed any
      substantial gainful activity since March 11, 1987.

2.    The claimant's impairments which are considered to be
      "severe" under the Social Security Act are dysthymia,
      personality disorder, low back pain, status post rotator
      cuff tear, right knee pain, and alcohol dependence.

3.    The claimant's impairments do not meet or equal in severity
      the appropriate medical findings contained in 20 CFR Part
      404, Appendix 1 to Subpart P (Listing of Impairments).

4.    The claimant's allegations are found to be credible.

5.    The claimant is unable to perform his past relevant work.

6.    The claimant was 26 years old on the date disability began,
      which is defined as a younger individual.  The claimant has
      a high school education.

7.    The claimant does not have transferable skills to perform
      other work within his physical and mental residual
      functional capacity.

8.    Based upon the claimant's residual functional capacity, and
      vocational factors, there are no jobs existing in
      significant numbers which he can perform.  This finding is
      based upon Section 201.00(h) of the Medical-Vocational
      Guidelines, 20 CFR Part 404, Appendix 2 to Subpart P.

9.    The claimant has been under a disability as defined by the
      Social Security Act and Regulations since March 11, 1987.

10. Alcoholism is not a contributing factor material to the
    finding of disability.

## DECISION

Based on the Title II application filed on April 6, 1992, the
claimant is entitled to a period of disability commencing March
11, 1987, and to disability insurance benefits under sections
216(i) and 223 of the Social Security Act, respectively, and the
claimant's disability has continued at least through the date of
this decision.

Craig S. Goulet
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

4

It is the further decision of the Administrative Law Judge that
based on the Title XVI application filed on April 6, 1992, the
claimant has been disabled since March 11, 1987, under section
1614(a)(3)(A) of the Social Security Act, and the claimant's
disability has continued through the date of this decision.

The Social Security Administration must also determine whether
the claimant meets the income and resources and other eligibility
requirements for supplemental security income payments, and if
the claimant is eligible, the amount and the month(s) for which
the claimant will receive payment.  The claimant will receive a
notice from another office of the Social Security Administration
when that office makes those determinations.

John T. Sweeney
Administrative Law Judge

AUG 2 1 1995

Date

Boston
BRANCH OFFICE LOCATION
Service Copy

MASSACHUSETTS REHABILITATION COMMISSION
DISABILITY DETERMINATION SERVICES

TRANSCRIPTION OF TELERECORDED MESSAGE

REPORTED BY:
STEPHAN SIMONIAN, M.D.
215 WEST STREET
2ND FLOOR
PO BOX 298
MILFORD MA  01752-2277

DATE: 05-18-03/08:32
RE  : GOULET, CRAIG
SSN : 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
D.E.:

CONSULTATIVE EXAMINATION REPORT

DATE/PLACE:  MAY 2, 2003 / MILFORD, MASSACHUSETTS

This 43-year-old man initially came for psychiatric evaluation
for Social Security and Disability Benefits.  The patient states
that he has suffered from an industrial accident in 1987 and was
fired from his job, and he had surgery on his shoulder for torn
ligaments and also his knee.  He was on Workers' Compensation
since then.  He says that he was fired from his job after the
accident.  He says that after the accident, he was accused of
being negligent instead of compensating him for his injuries.  He
says that he also has been on disability because of the accident
and because of the depression and alcohol abuse and dependence.
He states that depression came as a consequence of the accident,
and prior to the accident, he was working and doing fine.  He
describes that he has seen several doctors as well as a
neurologist, who was giving him his medications and caring for
his problem, but one year ago, the neurologist died.  Since then,
he has not been seeing any neurologist or psychiatrist, but the
last one year, he has seen a chiropractor _____.  Also, he
says that he has been seeing an orthopedist, which the
orthopedist retired about a year ago as well.  He also has seen,
a few times, a psychiatrist by the name of Dr. Romero, a few
years ago for depression.  He says that presently he is taking
anti-inflammatory medication and still occasionally drinks at
times but has never had any problem because of drinking, such as
a problem with the law or driving under the influence, etc.  He
says that he is on partial disability, but the patient is
somewhat angry and upset because he states that the office that
was dealing with his disability lost part of his file, and he has
written to the state senator, and the state senator was able to
move the case forward, but still there is no decision, and he
states that he is upset and depressed about it.  He also states

CONTINUED

EXHIBIT
26

STEPHAN SIMONIAN, M.D./GOULET, CRAIG/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/Page 2

that recently his father has been sick and has developed lymphoma
and that is also depressing for him.  The patient states that he
now spends most of the time at home, does some chores around
home, and helps his wife.  His wife is working, and he takes
care, at times, at home with his children.  He takes the children
to baseball games and sometimes watches them playing, but he says
that he is not active and has not been able to work.

FAMILY HISTORY:
The patient is married for 22 years and has two kids.  He has one
twin brother and two older brothers and one younger sister.  His
parents are alive.  The patient denies any psychiatric history in
the family.  His sister had a substance abuse problem and alcohol
problem.  The patient himself denies any abuse of substances,
except alcohol.

PAST HISTORY:
As described in History of Present Illness.

MENTAL STATUS EVALUATION:
Mental status evaluation reveals a alert and oriented times
three, 43-year-old man with no major disorder of speech, thought
process is coherent, affect is full range.  When the patient was
talking about his father, he was somewhat sad and on the verge of
crying and tears.  The patient denies any past psychiatric
hospitalization.  He presently lives in Hudson and drives his
car.  He drove himself to my office.  He states that he works
around home.  He makes his daughters ready for school.  He goes
to softball games and returns his daughter.  He does his
Activities of Daily Living.  He denies any hallucinations.  There
was no active hallucination.  There was no delusional thinking.
There was no suicidal ideation.  He was feeling angry towards the
judge who has not come to a decision and not done the job.  There
is no homicidal ideation.  He states that he is angry, but he
wrote to the senator and expressed his anger properly.
Intelligence and memory was judged average and within normal
limits.

DIAGNOSTIC IMPRESSION:

Axis    I:  A.   Adjustment disorder with mixed emotional
                 features.
             B.   Rule out dysthymic disorder.
             C.   Alcohol abuse, episodic.

CONTINUED

STEPHAN SIMONIAN, M.D./GOULET, CRAIG/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/Page 3

Axis    II:   Deferred.

Axis    III:  Status post left shoulder injury and operation and
              right knee arthritis.

Axis    IV:   Moderate.

Axis    V:    GAF:  55 to 60 percent.

DIAGNOSTIC IMPRESSION AND DISCUSSION:
This 43-year-old man has a past history of injury after which he
was treated medically and has not been able to work because of
the pain and medical reasons.  The patient states that, however,
this has made him angry and depressed and the fact that the
decision for his disability has been prolonged.  He presently is
not taking any psychiatric medication and has not been under
psychiatric follow up but has seen two times a psychiatrist in
the past for depressive symptoms.  He does not manifest any major
disorder of thought process or thought content but manifests some
degree of anger and sadness about his medical and work condition.
Therefore, considering the symptoms, diagnosis of adjustment
disorder with mixed emotional features seems appropriate for Axis
I diagnostic category, but also dysthymic disorder cannot be
ruled out in this patient.  Also, diagnosis of alcohol abuse,
episodic, is appropriate for Axis I diagnosis in this patient.
On Axis II, diagnosis was deferred.  On Axis III, the patient
gives history of left shoulder injury and status post operation
and right knee injury and arthritis; therefore, these two
diagnostic entities will be appropriate for Axis III diagnostic
category.  On Axis IV, stressors were judged moderate.  On Axis
V, considering the fact that the patient is able to do his
Activities of Daily Living and is helpful around the home with
his children, and he drives, and he drove himself to my office,
and his hygiene is good, and he is able to do some socialization,
his functional ability was judged to be 60 percent.  This patient
is able to take care of his financial affairs.


                        STEPHAN SIMONIAN, M.D.

SS/524
MedScripts/4672A/113

THIS TRANSCRIPTION WAS MADE FROM A RECORDING OF THE VOICE OF
   STEPHAN SIMONIAN, M.D. on 05-18-03.
A COPY OF THIS REPORT HAS BEEN FORWARDED TO THE AUTHOR
FOR REVIEW AND SIGNATURE ON 05-18-03.