# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CRAIG GOULET** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**NEW PENN MOTOR EXPRESS** )<br>**Defendant** )<br>)<br>**and** )<br>)<br>**TEAMSTERS LOCAL 25** )<br>**INTERNATIONAL BROTHERHOOD OF** )<br>**TEAMSTERS** )<br>)<br>**Defendant,** )<br>) | **CIVIL ACTION**<br>**NO. 04-12577-JLT** |

## DEFENDANT LOCAL 25'S REPLY MEMORANDUM TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO LOCAL 25' MOTION FOR SUMMARY JUDGMENT

Defendant, Teamsters Local 25 (hereinafter, "Local 25" or "the Union"), hereby submits the following Erply Brief in Support of Its Motion for Summary Judgment. The Plaintiff is unable to establish, as a matter of law, that Local 25 breached its duty of fair representation concerning the Plaintiff or that he has suffered any damages as a result of the alleged breach. Therefore, the Court should grant Local 25's Motion for Summary Judgment.

## ARGUMENT

In his Memorandum in Opposition to Local 25's Motion for Summary Judgment, counsel for the Plaintiff makes numerous assertions that arguments set forth by Local 25 in its Memorandum in Support of Its Motion for Summary Judgment are not supported by the factual record or are not presented in good faith. However, such arguments misrepresent the factual record and the inferences that must be drawn from the factual record, even viewed in the light most favorable to the Plaintiff as the non-moving party. Local 25 has presented a factual basis

for each of the statements which it has made in its Motion for Summary Judgment, its Concise

Statement of Material Facts, and its Memorandum in Support of Its Motion for Summary

Judgment.

A.    **The Factual Record Supports The Contention That The Preference List Was Reviewed By Local 25 Prior To Its Submission To New Penn Motor Express**

The Plaintiff implies that George Cashman prepared the preference list and that he

arbitrarily or maliciously left Mr. Goulet's name off of such list.  See Plaintiff's Memorandum in

Opposition to Local 25's Motion for Summary Judgment (hereinafter Plaintiff's Memorandum"),

pp. 13-14.  The record, however, does not support such a contention.  Rather, the evidence shows

that list of the employees' terminal preferences that was ultimately received by New Penn, was

prepared and submitted to New Penn by an entity other than Local 25.  At the Rule 30(b)(6)

deposition for Local 25, Ms. McLaughlin stated that the spreadsheet upon which the employees'

preferences were noted was not the sort of document that would be created by Local 25.  Rule

30(b)(6) deposition, p. 24.[1]  She also stated that at the time the spreadsheet list was created., that

she was not even sure whether Local 25 had the capability or the program needed to create the

type of spreadsheet that the preferences list is on and that Mr. Cashman did not have access to a

spreadsheet program that would allow him to create that type of document.  See Rule 30(b)(6)

deposition, p. 31.  In addition, in its Responses to the Plaintiff's First Set of Interrogatories, Local

25 informed the Plaintiff that it was not the party responsible for compiling the call list.  See

Defendant, Local 25's Responses to Plaintiff's First Set of Interrogatories, Interrogatory No. 19.[2]

Furthermore, despite the Plaintiff's contention that Mr. Cashman and/or Local 25 were

responsible for forwarding the preference list to New Penn, the Agreement required that

Teamsters National Freight Industry Negotiating Committee forwarded the lists to it, not each

---

[1]  A true copy of excerpts from the Rule 30(b)(6) deposition at attached hereto as Exhibit 1.

individual Teamsters local unions. See Agreement between the Teamsters National Freight Industry Negotiating Committee and New Penn Motor Express, Inc.[3] Also, the evidence shows that Mr. Cashman forwarded the preference list to the International Brotherhood of Teamsters so that it could be forwarded to New Penn for the creation of call lists. See February 22, 2002 fax from George Cashman to Irene;[4] See, Rule 30 (b)(6) deposition, p. 18.

However, there is evidence that the preference list was reviewed by Mr. Cashman after it was compiled, and that he made some minor changes to the list prior to its submission to New Penn Motor Express. Id. There is also evidence that Mr. Goulet was actively in touch with Mr. Cashman both before and after Mr. Goulet's October 2001 arbitration. Goulet Depo., pp. 21-23. Although the Plaintiff did not recall the topics of such conversations, thropugh such contact, Mr. Cashman would have been aware of Mr. Goulet's arbitration decision and his inability to return to work. Id. The record also shows that Mr. Cashman had received a WARN notice concerning the Canton facility that did not include Mr. Goulet's name as an employee that would be affected by APA's closure in February 2002, and that not all former APA employees opted to make a New Penn terminal preference. See Francey Depo., p. 30-33;[5] See February 14, 2002 letter from Burton Trebour to George Cashman.[6] Therefore, the only reasonable inferences that may drawn by the factual record are that Mr. Cashman was aware of Mr. Goulet's issues when he reviewed the preference list did not believe that Mr. Goulet's name should be added to the list because he was not eligible to be included on the list due to the absence of this name from the WARN list, his failure to obtain medical clearance to return to work, and the absence of his

---

[2] A true copy of Local 25's Responses to the Plaintiff's First Set of Interrogatories is attached hereto as Exhibit 2.
[3] A true copy of the Agreement between the Teamsters National Freight Industry Negotiating Committee and New Penn Motor Express, Inc., is attached hereto as Exhibit 3.
[4] A true copy of the February 22, 2002 fax was attached to Local 25's Memorandum in Support of Its Motion for Summary Judgment as Exhibit ___, and is attached hereto as Exhibit 4.
[5] A true copy of excerpts from Mr. Francey's deposition are attached hereto as Exhibit 5.
[6] A true copy of the WARN notice was attached to Local 25's Memorandum in Support of Its Motion for Summary Judgment as Exhibit ___, and is attached hereto as Exhibit 6.

name from the typewritten portion of Mr. Francey's seniority list or that Local 25 possibly made a "simple mistake" by failing to ensure that Mr. Goulet's name was included on the list. There is absolutely no evidence that the Mr. Goulet's name was intentionally left off the preference list due to any arbitrary or discriminatory conduct or ill will by the Union. In fact, Mr. Goulet himself testified that there was no one at Local 25 that he believed wished him any ill will. See Goulet Depo., pp. 78-80.

While it is possible that in hindsight, Local 25 could or should have taken additional steps to ensure that Mr. Goulet's name was included on the preference sheet in accordance with Mr. Goulet's wishes, its conduct does not constitute a breach of the duty of fair representation. Whether the Union made an error in judgment concerning its failure to ensure preference was noted on the preference list forwarded to Local 25 or a simple mistake while it was trying to get all APA employees' preferences forwarded in a timely manner to ensure that former APA employees were eligible for to be placed on New Penn call lists, there is simply no evidence that Local 25's conduct in reviewing the call list and failing to ensure that Mr. Goulet's name appeared on such call list, was arbitrary, discriminatory, in bad faith, or in reckless disregard of Mr. Goulet's rights. As such, the Plaintiff has not shown that the Union violated its duty of fair representation and the Union is entitled to judgment as a matter or law.

**B.      There Is No Evidence That A Formal Agreement Was Necessary For The Waiver Of Timelines Between The Union And New Penn Concerning Grievance Process**

The Plaintiff argues that Local 25 presents the new argument in its Memorandum in Support of Summary Judgment that it relied on the past practice of the waiver of the time period in which to file grievances to the appropriate grievance committee. See Memorandum, p. 16-. However, as seen by the testimony of William Carnes and Mark Harrington, business agents for Local 25 who have dealt with grievances with New Penn, and the transcript of Mr. Goulet's July

2004 arbitration, Local 25 has consistently argued that there was a past practice of waiving the time period for docketing grievances with the proper grievance committee.  See Hearing Transcript, pp. 5-7;[7]  Carnes Depo., pp. 43-44.[8]  The Plaintiff, on the other hand, in its Memorandum in Opposition to Local 25's motion for summary judgment, raises the novel issue that Local 25 cannot rely on this past practice because there was no "formal agreement" to waive timelines.  However, such argument ignores the past practice.  There is absolutely no evidence indicating that there was a past practice of having a formal agreement to waive timelines.  Rather, at the July 2004 arbitration, New Penn, rather than relying on past practice, sought to enforce the terms of the collective bargaining agreement, whereas Local 25 "acted in good faith and reasonable reliance on past practice" of the parties' waiving of deadlines established by the collective bargaining agreement.  In such a case, the failure to timely file a grievance will not be considered to be arbitrary.  See See Giordano v. Local Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., 634 F.Supp 953, 956 (S.D.N.Y. 1986).

## C.    The Union Has Continuously Argued That It Believed That The Plaintiff's Grievance Had Not Merit

The Plaintiff contends that Local 25, in its Memorandum in Support of Its Motion for Summary Judgment, argued in bad faith that the Union had determined that Mr. Goulet's grievance lacked merit.  (Memorandum, p. 17).  However, the factual record supports Local 25's argument, and it is an argument that the Union has consistently set forth during the course of the litigation.

Although William Carnes was aware of the Plaintiff's grievance, and forwarded it to New Penn for discussion and resolution, he testified that he would not have thought that grievance had any merit if he had been aware that Mr. Goulet had not yet met the requirements of the October

---

[7] The Hearing Transcript is attached to the Plaintiff's Appendix to his Oppositions to Defendants' Motions for Summary Judgment as Exhibit 21, and attached hereto as Exhibit 7.

[8] Excerpts from the Carnes Deposition are attached hereto as Exhibit 8.

2001 decision of the Southern New England Joint Area Committee. <u>See</u> Carnes Depo., p. 55. In addition, Mark Harrington has repeatedly stated that he believed that Mr. Gouelet's grievance lacked merit due to Mr. Goulet's failure to meet the requirements of the SNEJAC's October 2001 decision. <u>See</u> Harrington Depo., pp. 28-32, 48-49; <u>See</u> Local 25's Reponses to Plaintiff's First Set of Interrogatories, Response No. 4.

Mark Harrington stated that the only reason that he docketed the Plaintiff's grievance was due to Mr. Goulet's persistence that it be filed. <u>See</u> Harrington Depo., p. 29. The Plaintiff distorts the factual record by implying that he was simply forwarding Mr. Harrington the grievance and explaining the grievance in his July 2003 letter. In fact, the Plaintiff had already sent Mr. Harrington his April 7, 2003 by telephone conversations and forwarded a copy of the grievance to Mr. Harrington in or about May 2003. <u>See</u> Goulet Depo., p. 47. As such, the Plaintiff's new argument that the July letter was simply an explanation of a grievance of which Mr. Harrington was not aware, is not supported by the factual record.

Furthermore, the mere fact that Mr. Harrington composed a advocacy brief on behalf of Mr. Goulet does not therefore indicate that Mr. Harrington believed that the grievance had any merit. Mr. Harrington has repeatedly and consistently stated that the grievance did not have merit. In addition, in his role as a union advocate, it was Mr. Harrington's duty to present the grievance in the best light to the grievance committee and not to alert the grievance committee to lack of merit he saw in the grievance. Consequently, the Plaintiff is attempting to distort the record by implying that Local 25's argument that the grievance lacked merit is a new argument or one that was brought in bad faith. The record clearly shows that Local 25 consistently felt and informed the Plaintiff that the grievance lacked merit. Therefore, Local 25 is entitled to summary judgment as a matter of law.

**D.    Local 25 Is Entitled To Judgment As A Matter Of Law As The Plaintiff Is Unable To Show That He Was Able To Work During The Relevant Time Period**

In this case, whether the Plaintiff was capable of working is intricately related to his contention that the Union breached its duty of fair representation and is not limited solely to the damages that would be due the Plaintiff if he were to be successful in his suit. In order to defeat a motion for summary judgment, the Plaintiff must explain why his receipt of Social Security benefits are consistent with his claim that he was able to perform the functions of a dock worker at New Penn. See Sullivan v. Raytheon Company, 262 F.3d 41, 47 (1st Cir. 2001) (finding that a Plaintiff must reconcile contention that he is able to work with his receipt of Social Security disability benefits in an ADA claim).

In his Memorandum in Opposition to Local 25's Motion for Summary Judgment, the Plaintiff contends, for the first time, that Mr. Goulet was "receiving Social Security benefits due in large part to his depression, personality disorder, and alcohol dependence caused by his inability to work since he was fired from APA, major causes for his disability would have been cured if New Penn has offered him employment." (Memorandum, p. 19). However, these disabilities constitute only part of the ailments that constituted disabilities that rendered him able to collect Social Security benefits. Mr. Goulet's receipt of Social Security benefits, retroactive to March 11, 1987. Mr. Goulet, in 1995, was also found to have back pain, a rotator cuff tear, and right knee pain that were considered to be severe impairments.

While it is true that recipients of Social Security benefits may continue to receive benefits for a short time after they return to work, in order to recover any damages, the Plaintiff must show reconcile the inconsistency between his continuing receipt of social security benefits and contention that he was able to work.. The Plaintiff does not make any attempt to reconcile this inconsistency. Rather, the Plaintiff seeks damages based on his self-serving assertion that he

7

would have attempted to work if he had been called to do so.  Memorandum, pp. 18-19; Goulet's errata sheet.[9]  Such a statement is not sufficient to resolve the inherent inconsistency in the Plaintiff's contention and thus, cannot survive a motion for summary judgment.


For the Defendant,
**INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL UNION NO. 25,**
By its attorneys,


*Kathleen A. Pennini*
Matthew E. Dwyer (B.B.O. # 139840)
Kathleen A. Pennini (b.B.O. # 654573)
Dwyer, Duddy and Facklam, P.C.
Two Center Plaza, Suite 430
Boston, MA 02108-1804
Date:   February 24, 2006            (617) 723-9777


## CERTIFICATE OF SERVICE

I, Kathleen A. Pennini, do hereby certify I have electronically filed this motion on February 24, 2006, with delivery to :

Scott Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA  01450

Carl H. Gluek, Esq.
Frantz Ward, LLP
55 Public Square Building, 19th Floor
Cleveland, OH  44113-1999


*Kathleen A. Pennini*
Kathleen A. Pennini

f:\l25\goulet\pldg\reply.plaintiffs.opp.l25.mot.sj.doc:blg

---

[9] The Plaintiff submitted an errata sheet in which he appeared to argue that he would have tried to work if he had been called to work by New Penn.  However, the Plaintiff's errata sheet was procedurally defective, pursuant to Fed.R.Civ.P. 30(e) as the Plaintiff failed to provide any reasons for the substantive changes made to his deposition testimony by his errata sheet.  Furthermore, the Plaintiff's errrata sheet was not sent to the deposing party in the time agreed to by the parties.

1

Volume I
Pages 1 to 62
Exhibits 1 to 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                   :
CRAIG GOULET,                      :
          Plaintiff,               :
                                   :
     vs.                           :  Civil Action
                                   :  No. 04-12577 JLT
NEW PENN MOTOR EXPRESS, INC.;      :
and TEAMSTERS LOCAL 25,            :
INTERNATIONAL BROTHERHOOD OF       :
TEAMSTERS,                         :
          Defendants.              :
                                   :
- - - - - - - - - - - - - - - - - -x

          DEPOSITION OF TEAMSTERS LOCAL 25,
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, THROUGH ITS
DESIGNEES JANET McLAUGHLIN and MARK HARRINGTON,
witnesses called on behalf of the Plaintiff, taken
pursuant to Rule 30(b)(6) of the Federal Rules of
Civil Procedure, before Ken A. DiFraia, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Scott A. Lathrop & Associates, 122 Old Ayer Road,
Groton, Massachusetts, on Tuesday, November 15,
2005, commencing at 10:35 a.m.

PRESENT:

     Scott A. Lathrop & Associates
          (by Scott A. Lathrop, Esq.)
          122 Old Ayer Road, Groton, MA 01450,
          for the Plaintiff.

     Frantz Ward LLP
          (by Carl H. Gluek, Esq.)
          2500 Key Center, 127 Public Square,
          Cleveland, OH 44114-1230, for the Defendant
          New Penn Motor Express, Inc.

2

PRESENT:   (Continued)

    Dwyer, Duddy and Facklam, P.C.
        (by Kathleen A. Pennini, Esq.)
        Two Center Plaza, Suite 430,
        Boston, MA 02108-1804, for the Defendant
        Teamsters Local 25, International
        Brotherhood of Teamsters.

ALSO PRESENT:  Craig Goulet

                * * * * *

1      Q.    Bear with me, but in light of your answer,

2    I will probably go through this page by page.

3          Looking at Page 1, which is the fax cover

4    sheet, what is the basis for having any

5    understanding with regard to the preparation of that

6    page?

7      A.    I prepared it.

8      Q.    Describe to me the circumstances under

9    which you prepared the first page of Exhibit 3.

10     A.    Mr. Cashman brought it out to me and told

11   me it needed to be faxed to Irene at the

12   International Office in Washington and told me to

13   write "Per request of the Eastern Region Freight

14   Department, attached please find seniority list

15   (preference list) with the most up-to-date

16   information that we have at the present time.  Any

17   questions please call."

18     Q.    I take it that was on February 22nd in the

19   year 2002?

20     A.    Correct.

21     Q.    Could you identify by name and title who

22   Irene is, or was at least as of February 2002.

23     A.    Irene was the secretary for the freight

24   division at the International offices in Washington.

19

1      Q.    The International --

2      A.    Brotherhood of Teamsters.

3      Q.    Do you recall Irene's last name?

4      A.    No, I don't.

5      Q.    Did you know it at the time?

6      A.    No.

7      Q.    Had you had communications with Irene prior

8   to Mr. Cashman asking you to send a fax to her?

9      A.    Not on that day.

10     Q.    At any time prior to that, had you had

11  communications with Irene?

12     A.    Within the last 34 years, yes.

13     Q.    Do you have any understanding as to whether

14  or not Irene still is employed by the International

15  Office?

16     A.    No.  She's retired.

17     Q.    Do you have any understanding as to whether

18  she retired, I take it, subsequent to February 22,

19  2002?

20     A.    No.

21     Q.    Did you have any conversations or

22  communications with Irene with regard to your fax

23  other than the fax itself?

24     A.    No.  She did not call for any assistance.

20

1     Q.    No one from the International I take it

2     called you back?

3     A.    Correct.

4     Q.    That is, with regard to this fax?

5     A.    Correct.

6     Q.    Other than directing you to send this fax

7     and to leave the message as you wrote it on the

8     cover sheet, did you have any other communications

9     with Mr. Cashman with regard to the fax or the

10    documents you were faxing to the International

11    Office?

12    A.    Yes, on Pages 3 through 6.

13    Q.    Let's back up.  I take it you had no

14    communications with Mr. Cashman with regard to

15    Page No. 2, the Dracut seniority list?

16    A.    No, just other than it was to go with this

17    fax.

18    Q.    Other than faxing the Dracut seniority list

19    to Irene on February 22, 2002, did you have any

20    other dealings with the Dracut seniority list?

21    A.    No.

22    Q.    Had you seen it before?

23    A.    No.

24    Q.    I'm sorry, I may have already, in essence,

21

1    asked this, but after sending the Dracut seniority

2    list to Irene, among other things, you had no

3    conversations with anyone concerning the Dracut

4    seniority list?

5        A.    Correct.

6        Q.    I would now like to direct your attention

7    to Pages 3 and 4 of this document, which appear to

8    have the heading, at least on Page 3, "APA Dracut

9    Massachusetts."  Do you see those pages?

10       A.    (Examines document)  Yes.

11       Q.    Prior to sending this fax, had you seen

12   this document or any versions of it?

13       A.    No.

14       Q.    Prior to sending this document by fax, had

15   you had any communications with regard to this

16   document or any prior versions?

17       A.    No.

18       Q.    Subsequent to your sending this part of the

19   fax to Irene, did you have any communications with

20   anyone concerning this part of the document?

21       A.    No.

22       Q.    Subsequent to sending this fax to Irene on

23   February 22, 2002, did you have any further dealings

24   with this part of the document?

22

1    A.    No.

2    Q.    Do you have any understanding as to whose

3    handwriting appears where it says, "APA Dracut,

4    Massachusetts"?

5    A.    That's mine.

6    Q.    How did that handwriting come to be added?

7    A.    George told me to make it clear that this

8    was APA Dracut and the next page was APA Dracut and

9    the next page was APA Canton and the last page was

10   APA Canton, because there was no, as the first page

11   says, New Penn seniority list, Dracut seniority list

12   New Penn.  These did not have any APA New Penn

13   anything on them.

14   Q.    When did Mr. Cashman tell you to so

15   denominate these documents?

16   A.    It was when he handed me the documents to

17   fax.

18   Q.    As you sit here today, do you have any

19   understanding with regard to the preparation of

20   Pages 3 and 4, the APA Dracut Massachusetts list?

21   A.    No.

22   Q.    Did you attempt in preparation for this

23   30(b)(6) deposition to make an inquiry concerning

24   the preparation of this document?

23

1      A.    With all of the office staff, I did ask
2   them after that.
3      Q.    You testified earlier about your inquiries
4   of the office staff vis-a-vis Exhibit 2.
5      A.    Correct.
6      Q.    Am I to understand that -- and at least for
7   the time being, we're talking about Pages 3 and 4 of
8   Exhibit 3 -- you did make similar inquiry of the
9   current office staff?
10     A.    Yes.
11     Q.    Tell us what you learned after you made
12  inquiry of the same current office staff about
13  Pages 3 and 4.
14     A.    They answered the same way they did with
15  Exhibit 2, that they had not seen it and they did
16  not prepare it.
17     Q.    I take it you did not prepare it?
18     A.    No.  I only labeled them or put a title on
19  the APA Canton and APA Dracut lists, what I was told
20  to put on, the APA Dracut and Canton lists.
21     Q.    Do you have any understanding as to whether
22  or not Mr. Cashman prepared this document?
23     A.    No.
24          MR. GLUEK:  Sorry, no, you didn't?

1          THE WITNESS:  I don't have any knowledge.

2      Q.    Let me ask you this.  As the executive

3  assistant to the president, do you have any

4  understanding as to whether or not Local 25 had a

5  computerized spreadsheet program that could produce

6  a document like this?

7      A.    In 2002, I'm not sure.

8      Q.    Do you know whether or not Mr. Cashman had

9  access to a spreadsheet program in 2002 that would

10  have allowed him to prepare this document?

11      A.    I would say he did not.

12      Q.    So it's your understanding -- and correct

13  me if I'm wrong -- as we sit here today, it is

14  unlikely that Mr. Cashman prepared this document?

15      A.    Correct.

16          MR. LATHROP:  Ms. Pennini, I'm going to ask

17  you a question.  You stated earlier Mr. Cashman was

18  not subject to a 30(b)(6) deposition.

19          MS. PENNINI:  I said that he's unavailable.

20          MR. LATHROP:  Would you state for the

21  record, because I don't know where this is going to

22  go, as to the reasons why he's not available for

23  deposition.

24          MS. PENNINI:  Actually, Ms. McLaughlin

25

1   might have a little more of the background than I

2   would, but Mr. Cashman is currently incarcerated.

3   He cannot be contacted by the Local as part of -- he

4   has a no contact -- I don't know exactly what

5   stipulation it is as part of his plea bargain I

6   believe where he's not supposed to have any contact

7   with the Local or the Local with Mr. Cashman.

8           MR. LATHROP:  Do you know if that also

9   applies to you as a representative of Local 25?

10          MS. PENNINI:  I believe it does.

11          MR. GLUEK:  He's not even employed by the

12  union anymore.

13          MS. PENNINI:  No.

14          MR. GLUEK:  So to the extent it's a

15  30(b)(6), I don't see --

16          MR. LATHROP:  We can argue this, but

17  certain representations were made he's not available

18  to be subpoenaed.

19          MS. PENNINI:  From what I understand, he's

20  not allowed to have any contact not only with the

21  union, but with counsel for the union as well.

22          And we did not represent him for the

23  purposes of that plea bargain, so I don't feel

24  comfortable giving any more information about that.

26

1          MR. LATHROP:  I was just, quite frankly,

2      seeking an expansion upon what you earlier put into

3      the record.  I understand your caveat, and I

4      understand Mr. Gluek's caveat, also.

5          Q.   After you faxed Exhibit 3 to Irene, what

6      did you do, if anything, with the fax?

7          A.   Take it back to Mr. Cashman.

8          Q.   Did you ever see the fax again until

9      Thursday?

10         A.   No.

11         Q.   I'm now going to ask you to look at the

12     last two pages of Exhibit 3.  Do I understand that

13     to the extent it shows up, that that's supposed to

14     be handwriting on the side of "APA Canton,

15     Massachusetts"?

16         A.   Correct.

17         Q.   And that if we saw the full thing, we would

18     recognize it as your handwriting?

19         A.   Correct.

20         Q.   Do I understand it correctly that you added

21     this at the same time that you added the APA Dracut,

22     Massachusetts?

23         A.   Correct.

24         Q.   And that you added that at Mr. Cashman's

27

1  directive?

2      A.    Correct.

3      Q.    You did that on or about February 22, 2002?

4      A.    Correct.

5      Q.    Let's talk about this specific document

6  then.  Had you seen this document or any prior

7  versions of this document prior to February 22,

8  2002?

9      A.    No.

10     Q.    Did you have any communications with anyone

11  at Local 25 with regard to this document or the

12  substance of the document prior to you faxing it to

13  Irene?

14     A.    No.

15     Q.    Subsequent to faxing it to Irene, did you

16  have any communications with anyone concerning the

17  document or the substance within the document?

18     A.    No.

19     Q.    What did you do with the document after you

20  faxed it to Irene?

21     A.    Gave it back to Mr. Cashman.

22     Q.    You gave the entire fax back to

23  Mr. Cashman?

24     A.    Yes.

28

1      Q.    Did you also make inquiry of the current

2   office staff with regard to the APA Canton,

3   Massachusetts list?

4      A.    Yes.

5      Q.    What information was provided to you by the

6   current office staff with regard to the Canton,

7   Massachusetts APA document?

8      A.    That they did not prepare it.

9      Q.    Did any of them recognize it?

10     A.    No.

11     Q.    Correct me if I'm wrong, but is it your

12   understanding from the responses you got, that all

13   of them denied ever seeing this before?

14     A.    Correct.

15     Q.    Again, your inquiries were limited to

16   current office staff?

17     A.    Correct.

18     Q.    I'm placing in front of you Exhibit 1,

19   which is the amended notice of taking deposition and

20   which has resulted, at least in part, in the

21   deposition that we're here for today.

22           Do you have any other information or

23   understanding pertaining to the topics listed in

24   Items 1, 2 and 3 regarding this notice of deposition

29

1  that you have not already provided to us?

2      A.   No.

3      Q.   If I may, let me ask you this.  Looking at

4  Exhibits 2 and 3 -- well, do you have Exhibits 2 and

5  3 in front of you?

6      A.   Yes.

7      Q.   In the time frame of early 2002, did it

8  fall within your job duties to prepare documents

9  similar to Exhibit 2?

10     A.   No.

11     Q.   Do you have any recollection in early 2002

12 of preparing documents similar to Exhibit 2?

13     A.   No.

14     Q.   I'm going to ask you similar questions with

15 regard to APA Dracut, Massachusetts that's within

16 Exhibit 3.  Focusing on early 2002, did it fall

17 within your job description to prepare a document

18 similar in form to that which is --

19     A.   No.

20     Q.   Do you recall, nonetheless, in early 2002

21 preparing a document similar to this APA Dracut

22 list?

23     A.   No.

24     Q.   I'm also going to ask you about the APA

30

1    Canton list.  In early 2002, did it fall within your

2    job description to prepare documents similar in

3    nature to that document?

4         A.    No.

5         Q.    Do you have any recollection, nonetheless,

6    of preparing documents similar to the Canton APA

7    list?

8         A.    No.

9         Q.    Focusing on that time frame, February 2002

10   or thereabouts, give or take a month, early 2002,

11   did it fall within the job descriptions of anyone

12   within Local 25 to prepare documents similar in

13   format to either Exhibit 2 or the enclosures, if you

14   will, to Exhibit 3?

15        A.    Not to my knowledge.

16        Q.    So it's your understanding that, for

17   example, the secretaries at Local 25 in early 2002,

18   it was not within their job description to prepare

19   documents similar to at least starting with Exhibit

20   No. 2?

21        A.    No.

22        Q.    Or the APA Dracut, Massachusetts list

23   that's attached to Exhibit 3?

24        A.    No, they would not.

31

1     Q.   Or the Canton, Massachusetts APA list
2  attached to Exhibit 3?
3     A.   No, they would not.
4     Q.   Do you have any understanding based upon
5  your years of experience at Local 25 as to whether
6  or not anyone employed by Local 25 prepared
7  documents similar in nature to Exhibit 2 or the
8  enclosures to Exhibit 3?
9     A.   No.
10    Q.   Prior to February 22, 2002, had you ever
11 seen documents similar to the attachments to Exhibit
12 No. 3?
13    A.   Yes.
14    Q.   In what context had you seen such
15 documents?
16    A.   It looks like a seniority list.
17    Q.   So you had seen in the office of Local 25
18 seniority lists before?
19    A.   Yes.
20    Q.   And it was your understanding that these
21 seniority lists were prepared by someone other than
22 Local 25 persons?
23    A.   Correct.
24    Q.   Was it your understanding -- and correct me

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CRAIG GOULET** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **NEW PENN MOTOR EXPRESS** ) | |
| **Defendant** ) | |
| ) | |
| **and** ) | |
| ) | |
| **TEAMSTERS LOCAL 25** ) | |
| **INTERNATIONAL BROTHERHOOD OF** ) | |
| **TEAMSTERS** ) | |
| ) | **CIVIL ACTION** |
| **Defendant,** ) | **NO. 04-12577-JLT** |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

### General Objections

Defendant objects to the Interrogatories to the extent that they are overly vague, unduly burdensome, do not identify with particularity the information sought, or are otherwise incomprehensible.

Defendant objects to the Interrogatories to the extent they seek to obtain information that is protected from disclosure by the attorney-client privilege or the attorney work product doctrine.

Defendant objects to the Interrogatories to the extent that they assume facts which are inaccurate.

Defendant objects to these Interrogatories because they are overly broad, unduly burdensome, or seek information that is neither relevant to the issues raised in this litigation nor reasonably calculated to lead to the discovery of admissible evidence. In providing response to these Interrogatories, the Defendant does not waive and expressly reserves all objections as to competency, relevancy, materiality, and admissibility of the responses.

Defendant objects to the Interrogatories to the extent that they seek information that is already in the possession of the Plaintiff.

Defendant objects to the Interrogatories to the extent that that are compound.

Defendant objects to these Interrogatories to the extent that they exceed the maximum number of Interrogatories that the Plaintiffs are permitted to propound upon the Defendant.

These general objections apply to and are incorporated into each individual response herein, whether or not expressly incorporated by reference in individual responses.

Defendant hereby reserves the right to supplement any response herein .

## INTERROGATORY NO. 1

Please provide the occupation, job title, and relationship (if any) to you and identify consistent with the definition above each person whom you expect to call as an expert witness at trial and state as to each person:

   a.   All background information by which you intend to qualify each person as an expert witness;

   b.   The subject matter on which each witness is expected to testify;

   c.   The substance of the facts as to which each such expert is expected to testify;

   d.   The substance of opinions as to which each such expert is expected to testify; and

   e.   A summary of the grounds for each opinion to which each such expert is expected to testify.

## RESPONSE NO. 1

The Defendant does not anticipate calling any expert witnesses, but reserves its right to supplement its answer to this Interrogatory if it later determines that it expects to call any expert witness

## INTERROGATORY NO. 2

Please state the name and address of every person who has any knowledge relating to the matters referred to in the pending lawsuit, including, but not limited to any witness to or participants in the incidents or with knowledge of the allegations at issues or participants in the incidents at issue, and for each such person state:

   a.   the substance of the knowledge the person has; and

   b.   the source of the person's knowledge.

## RESPONSE NO. 2

The Defendant objects to this Interrogatory to the extent that it is overly broad, unduly burdensome and calls for information protected from disclosure by attorney-client privilege. Subject to and without waiving said objections, the Defendant states that the following persons has knowledge related to the matters referred to the Plaintiff's lawsuit:

2

Mark Harrington, Secretary–Treasurer of Teamsters Local 25, 544 Main Street, Charlestown, MA 02129; Mr. Harrington, has knowledge of the following: as a former business agent for Local 25 with for A.P.A. Transport, has information relating to Mr. Goulet's 1987 grievance and October 16, 1987 arbitration award, including the terms of Mr. Goulet's reinstatement to A.P.A. Transport; as Business Agent for Local 25 with New Penn Motor Express, information concerning Mr. Goulet's complaint to Local 25 regarding the failure of New Penn Motor Express to call Mr. Goulet, the filing of Mr. Goulet's grievance with the Southern New England Joint Area Committee, and the July 24, 2004 decision of the Eastern Region Committee concerning Mr. Goulet's grievance that New Penn Motor Express improperly failed to call him off of the call list following the closure of the A.P.A.'s Canton, Massachusetts terminal.

William Carnes, former Vice President of Teamsters Local 25, 544 Main Street, Charlestown, MA 02129; Mr. Carnes, as the representative of Local 25 that dealt with New Penn Motor Express as of April 2003, received a handwritten complaint from the Plaintiff in April 2003 concerning his failure to be called by New Penn Motor Express from its call list.

George Cashman, former President of Teamsters Local 25, 544 Main Street, Charlestown, MA 02129; Mr. Cashman forwarded a copy of Mr. Goulet's complaint concerning his failure to be called from the New Penn Motor Express call list. to Charles Zaccaria, Vice President of New Penn Motor Express

Doug Francey, former steward for the APA Transport Corp.'s Canton, Massachusetts terminal, 544 Main Street, Charlestown, MA 02129; Mr. Francey was told by Mr. Goulet that he wanted to be placed on the New Penn Motor Express call list for its Billerica, Massachusetts terminal.

## INTERROGATORY NO. 3

Please describe in detail the substance of any communications which Defendant's employees and/or agents had with the Plaintiff or any other person relating in any way to the incidents alleged in the Complaint, and for each such communication, please provide the approximate date, time, place, form and substance of the communication and identify all persons present or who have knowledge of the communication.

## RESPONSE NO. 3

The Defendant objects to this Interrogatory to the extent that it is overly broad and unduly burdensome and seeks information that is protected from disclosure by privilege. Subject to and without waiving said objections, for the purpose of making a good faith reply, the Defendant states as follows:

Local 25 had the following communications concerning the incidents alleged in the Complaint: (1) Letter, dated April 21, 2004 from Ritchie Reardon to Craig Goulet; (2) Local 25's presentation brief concerning Case No. SC-21-04; (3) Letter, dated August 11, 2004 from Ritchie Reardon to Craig Goulet; (4) Letter, dated August 18, 2004, from Ritchie Reardon to Craig Goulet.

3

In addition, upon the request of Mr. Goulet, Local 25 sent Mr. Goulet the following form letter in either July or August 2003: (1) Letter dated February 21, 2002, from George Cashman to APA members regarding the closure of A.P.A. Transport Corp; (2) enclosures to the February 21, 2002 letter including: (a) document entitled "Collecting Unemployment Insurance in Massachusetts:2002; (b) document entitled "Career Centers in Massachusetts;" (c) two (2) page document entitled "How to File an Unemployment Insurance Claim;" (d) document entitled "Worksearch Activity Log;" (e) document entitled "Unemployment Insurance Benefit Claim Certification Form;" (f) two (2) page document entitled "Income Tax Withholding Request Form;" (g) document entitled "Health Insurance for Unemployment Insurance Claimants;" and (h) document entitled "Commonwealth Corporation's Workforce Response Center." This letter and its enclosures were not sent to Mr. Goulet on the dates listed in the correspondence as Mr. Goulet was not on the mailing list for APA employees with seniority since he had not fulfilled the terms required of the October 21, 2001 for his placement back on the A.P.A. seniority list as of the date of APA's closure.

The Defendant also states that there were telephone conversations between itself and Mr. Goulet on various dates. The Defendant reserves the right to supplement its answer to this Interrogatory.

## INTERROGATORY NO. 4

Please describe all facts within your knowledge to support the defense described above or alleged in your Answer, and for each identify any witnesses and/or documents supporting said defenses, and provide a brief summary of facts or which each such witness has knowledge relative to each such defense, of not provided in response to a previous interrogatory (ies).

## RESPONSE NO. 4

The Defendant objects to the Interrogatory to the extent that they are overly vague, unduly burdensome, do not identify with particularity the information sought, or are otherwise incomprehensible. Subject to and without waiving said objection, for the purpose of making a good faith reply, the Defendant states as follows:

The Plaintiff should have filed any grievance that he may have had by April 1, 2002 and thus his April 7, 2003 "grievance" was untimely; Plaintiff was not eligible to be placed on the New Penn Motor Express call list as he had not fulfilled the requirements dictated by the October 16, 2001 decision for him to be placed back on the A.P.A. seniority list; the Plaintiff has failed to mitigate damages as he has not worked or made himself available to work since the October 16, 2001 decision; that the Plaintiff did not follow the established grievance procedure, including the filing of a grievance with the Company at the local level by submitting a grievance to the steward, but rather, mailed a handwritten grievance to Local 25.

## INTERROGATORY NO. 5

Please describe in detail defendant Teamsters Local 25's procedure for processing grievances received by it, for the years 2001 to date.

**RESPONSE NO. 5**

The business agents for Local 25 do not usually receive grievances in the first instance at the first step of the grievance procedure. Rather, a grievant will complete a grievance form and give it to his shop steward. The steward and the grievant would file the grievance with the employer at the local level. Oftentimes, the grievance would be resolved at the local level or the parties would suspend the issue of timeliness in order to find a way to settle the grievance. If the grievance was not resolved at the local level, Local 25 would file, within thirty (30) days of the original grievance, at the appropriate grievance committee. Grievances arising from Articles 1 through 39 of the National Masters Freight Agreement (NMFA), are filed with the Eastern Region Joint Area Committee, and grievances arising under the Eastern Supplement of the NMFA (Articles 40 *et seq.*) are filed with the Southern New England Joint Area Association.

**INTERROGATORY NO. 6**

Please describe in detail how docket numbers are assigned grievances filed with the Southern New England Joint Area Committee, for the years 2001 to date.

**RESPONSE NO. 6**

The Defendant objects to this Interrogatory to the extent that it neither relevant to the issues in the litigation nor is it reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objection, for the purpose of making a good faith reply, the Defendant states as follows:

Grievances filed with the Southern New England Joint Area Committee are assigned docket numbers according to the year in which they were filed, and the number of the grievance would be in the chronological order it was filed.

**INTERROGATORY NO. 7**

Please describe in detail the procedure for processing grievances filed with the Southern New England Joint Area Committee for the years 2001 to date.

**RESPONSE NO. 7**

If the parties are unable to resolve a grievance at the local level with the employer, Local 25 would file the grievance with the Southern New England Joint Area Committee for grievances that concern Articles 1 through 39 of the National Master Freight Agreement (NMFA).

**INTERROGATORY NO. 8**

Please state the dates of which the Southern New England Joint Area Committee met between April 7, 2003 and July 26, 2004.

**RESPONSE NO. 8**

The Southern New England Joint Area Committee met on the following dates between April 7, 2003 and July 26, 2004: June 5, 2003, July 16, 2003, August 20, 2003, September 17, 2003, November 19, 2003, April 28, 2004, and July 21, 2004.

**INTERROGATORY NO. 9**

Attached as Exhibit 1 is the A.P.A. Transport Corp. Canton Seniority List for November 2001. With regard to this document, please:

    a.    Identify who created the seniority list;

    b.    State where this seniority list came from;

    c.    State whether this Seniority List was ever provided to defendant New Penn Motor Express, and if so, by whom it was provided, when it was provided, and how it was provided;

    d.    Identify all persons to whom this Seniority List was ever provided, indicating by whom it was provided, when it was provided, and how it was provided.

**RESPONSE NO. 9**

    a.    This seniority list was created by APA Transport Corp.

    b.    The Defendant is without knowledge as to precise origination of this seniority list beyond the fact except that it was received by Local 25 from APA Transport Corp.

    c.    The Defendant objects to this Interrogatory to the extent that it is overly broad and calls for facts that are outside the knowledge of the Defendant. Subject to and without waiving said objection, for the purpose of making a good faith reply, the Defendant states that it supplied New Penn Motor Express with a copy of this list as part of Mr. Goulet's arbitration case in July 2004. Defendant is without knowledge as to whether New Penn Motor Express had received this document by any other person or by any other means

    d.    The Defendant objects to this question as being overly broad and unduly burdensome and beyond the knowledge of the Defendant. Subject to and without waiving said objection, for the purpose of making a good faith reply, the Defendant states that it supplied New Penn Motor Express with a copy of this list during Mr. Goulet's arbitration hearing at the Eastern Region Joint Area Committee in July 2004, and that it sent Mr. Goulet a copy of the list as the list was part of Local 25's presentation at the Eastern Region Joint Area Committee concerning Mr. Goulet's grievance.

**INTERROGATORY NO. 10**

With regard to the agreement negotiated between defendant Teamsters Local 25 and defendant New Penn Motor Express (as referenced in paragraph 12 of the Complaint), please state:

    a.    Whether a ratification vote was ever held on this agreement;

    b.    If so,

        i.    Where this vote took place;

        ii.    When this vote took place; and

        iii.    How and when Local 25 members were notified of this ratification vote.

**RESPONSE NO. 10**

The Defendant objects to this Interrogatory to the extent that it assumes facts that are inaccurate. Subject to and without waiving said objection, for the purpose of making a good faith reply, the Defendant states that there was no agreement negotiated between Teamsters Local 25 and New Penn Motor Express.

**INTERROGATORY NO. 11**

Please describe in detail all actions taken by defendant Teamsters Local 25 to put Craig Goulet on the defendant New Penn Motor Express call list for the Billerica, Massachusetts terminal.

**RESPONSE NO. 11**

The Defendant objects to these Interrogatory to the extent that it is overly broad, unduly burdensome, or seek information that is neither relevant to the issues raised in this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objection, for the purpose of making a good faith reply, the Defendant states as follows:

At the time of the closure of A.P.A., Mr. Goulet had still not performed the prerequisites necessary to be placed back on the seniority list at A.P.A. and had not yet returned to work with A.P.A.. Following the closure of A.P.A., Mr. Goulet spoke with steward Doug Francey about his desire to be placed at New Penn.

**INTERROGATORY NO. 12**

Please describe in detail all communications between Teamsters Local 25 and defendant New Penn Motor Express with regards to Craig Goulet from March 1, 2002 to date.

7

**RESPONSE NO. 12**

The Defendant objects to this Interrogatory to the extent that it is overly broad and seeks information that is not relevant to the issues raised in the litigation. Subject to and without waiving said objections, for the purpose of making a good faith reply, the Defendant states that it had the following communications with New Penn Motor Express:

(1) By letter, dated April 18, 2003 George Cashman filed Mr. Goulet's complaint with Charles Zaccaria, Vice President of New Penn Motor Express is Billerica, Massachusetts; (2) Local 25 filed a form with the Southern New England Joint Area Committee concerning this matter; (3) Local 25 filed an Eastern Region Joint Area Committee Pre-Hearing Information form concerning this matter; and (4) Local 25 presented its brief and argument concerning Case No. SC-21-04. The Defendant reserves the right to supplement its response to this Interrogatory.

**INTERROGATORY NO. 13**

Please state whether Craig Goulet ever filed a grievance with defendant Teamsters Local 25 with regard to his not being put on the defendant New Penn Motor Express call list for the Billerica, Massachusetts terminal. If so, please state:

    a.     When this grievance was filed with the defendant;

    b.     With whom Craig Goulet filed it;

    c.     All actions taken by defendant Teamsters Local 25 to process this grievance;

    d.     The dates on which defendant Teamsters Local 25 filed Goulet's grievance with any grievance committee or association and the identity of such grievance committee or association.

**RESPONSE NO. 13**

The Defendant objects to this Interrogatory to the extent that it assumes facts that are inaccurate. Subject to and without waiving said objections, for the purpose of making a good faith reply, the Defendant states as follows:

    a.     Mr. Goulet sent a letter dated April 7, 2003, which he entitled "Grievance" to Local 25 on or after April 7, 2003

    b.     Mr. Goulet's complaint was received by William Carnes

    c.     By letter dated April 18, 2003, George Cashman sent for processing to Charles Zaccaria, Vice President of New Penn Motor Express in Billerica, Massachusetts an enclosure of Mr. Goulet's complaint concerning his failure to be called from the New Penn Motor Express call list for the Billerica, Massachusetts terminal.

    d.      On September 3, 2003, Mark Harrington filed grievance with Southern New England Joint Area Committee. On April 20, 2004, he sent a pre-hearing form concerning this matter to the Eastern Region Joint Area Committee.

## INTERROGATORY NO. 14

Please state whether Craig Goulet's grievance against New Penn Motor Express was ever filed with the Southern New England Joint Area Committee. If so, please:

    a.      State the date on which it was filed;

    b.      Identify the person and/or entity that filed it.

## RESPONSE NO. 14

Mr. Goulet's grievance was filed with the Southern New England Joint Area Committee on September 3, 2003 by Mark Harrington.

## INTERROGATORY NO. 15

Please state whether Craig Goulet's grievance against defendant New Penn Motor Express was ever referred to the Eastern Region Joint Area Committee. If so, please state:

    a.      The date it was referred;

    b.      Who discussed and approved such referral;

    c.      The docket number of the case referred to and filed with the Eastern Region Joint Area Committee;

    d.      The date(s) on which it was scheduled to be heard;

    e.      The reasons for any postponements of the hearing

## RESPONSE NO. 15

    a.      The grievance was referred to the Eastern Region Joint Area Committee in 2004.

    b.      The referral of this grievance from the Southern New England Joint Area Committee to the Eastern Region Joint Area Committee was discussed and approved by Robert Schaeffer and John Murphy.

    c.      SC-21-04

    d.      This grievance was scheduled to be heard, and was in fact heard by the Eastern Region Joint Area Committee on July 28, 2004.

    e.      This hearing was never postponed at the Eastern Region Joint Area Committee.

**INTERROGATORY NO. 16**

Please identify the person at defendant Teamsters Local 25 who was assigned to handle the contractual affairs between defendant New Penn Motor Express and defendant Teamsters Local 25 from April 1, 1998 to May 2, 2003.

**RESPONSE NO. 16**

The Defendant objects to this Interrogatory to the extent that it is overly broad, unduly burdensome, or seeks information that is neither relevant to the issues raised in this litigation nor reasonably calculated to lead to the discovery of admissible evidence, assumes facts that are inaccurate, and is in excess of the number of Interrogatories permitted by the Federal Rules of Civil Procedure. Subject to and without waiving said objections, for the purpose of making a good faith reply, the Defendant states as follows:

There was no one assigned at Teamsters Local 25 to handle contractual affairs between New Penn Motor Express and Local 25 as all "contractual affairs" between the parties were handled by Teamsters National Freight Industries Negotiating Committee (TNFINC). However, William Carnes was assigned to be the Local 25 "business agent" to handle issues arising between Local 25 and New Penn Motor Express from March 1, 2002 through May 2, 2003.

**INTERROGATORY NO. 17**

Please identify the person at defendant Teamsters Local 25 who was assigned to handle the contractual affairs between defendant New Penn Motor Express and defendant Teamsters Local 25 from May 3, 2003, to date.

**RESPONSE NO. 17**

The Defendant objects to this Interrogatory to the extent that it is overly broad, unduly burdensome, or seek information that is neither relevant to the issues raised in this litigation nor reasonably calculated to lead to the discovery of admissible evidence, assumes facts that are inaccurate, and is in excess of the number of Interrogatories that are permitted by the Federal Rules of Civil Procedure. Subject to and without waiving said objections, for the purpose of making a good faith reply, the Defendant states as follows:

There is no one assigned at Teamsters Local 25 to handle contractual affairs between New Penn Motor Express and Local 25 as all "contractual affairs" between the parties were handled by Teamsters National Freight Industry Negotiating Committee (TINFINC). Mark Harrington has been assigned to handle issues arising between Local 25 and New Penn Motor Express from May 3, 2003 to the present.

**INTERROGATORY NO. 18**

Please identify the person at defendant Teamsters Local 25 who was assigned to handle the contractual affairs between A.P.A. Transport Corp. and defendant Teamsters Local 25 from April 1, 1998 to March 1, 2002.

10

**RESPONSE NO. 18**

The Defendant objects to these Interrogatory to the extent that it is overly broad, unduly burdensome, or seek information that is neither relevant to the issues raised in this litigation nor reasonably calculated to lead to the discovery of admissible evidence, assumes facts that are not accurate, and is in excess of the number of interrogatories permitted by the Federal Rules of Civil Procedure. Subject to and without waiving said objections, for the purpose of making a good faith reply, the Defendant states as follows:

There is no one assigned at Teamsters Local 25 to handle contractual affairs between New Penn Motor Express and Local 25 as all "contractual affairs" between the parties were handled by Teamsters National Freight Industry Negotiating Committee (TNFINC). Mark Harrington was assigned to handle issues arising between Local 25 and A.P.A. Transport Corp. from April 1, 1998 through March 1, 2002.

**INTERROGATORY NO. 19**

Please identify the person at defendant Teamsters Local 25 who was responsible for compiling the seniority lists for the A.P.A. Transport Corp. Canton, Massachusetts and Dracut, Massachusetts, terminals for the purpose of the agreement referenced in paragraph 12 of the Complaint.

**RESPONSE NO. 19**

The Defendant objects to these Interrogatory to the extent that it is overly broad, unduly burdensome, or seek information that is neither relevant to the issues raised in this litigation nor reasonably calculated to lead to the discovery of admissible evidence, assumes facts that are not accurate, and is in excess of the number of interrogatories permitted by the Federal Rules of Civil Procedure. Subject to and without waiving said objections, for the purpose of making a good faith reply, the Defendant states as follows:

Local 25 is not the party responsible for compiling seniority lists.

**INTERROGATORY NO. 20**

Did defendant Teamsters Local 25 ever refer Craig Goulet to defendant New Penn Motor Express for work opportunity. If so, please:

    a.    State the date on which this was done; and

    b.    Describe in detail all actions with regard to such referral.

**RESPONSE NO. 20**

The Defendant objects to these Interrogatory to the extent that it is overly broad, unduly burdensome, or seek information that is neither relevant to the issues raised in this litigation nor reasonably calculated to lead to the discovery of admissible evidence, assumes facts that are not accurate, is a compound interrogatory and is in excess of the number of interrogatories allowed

11

by the Federal Rules of Civil Procedure. Subject to and without waiving said objections, for the purpose of making a good faith reply, the Defendant states as follows

Local 25 has never referred the Plaintiff nor did the Plaintiff asked to be referred to New Penn Motor Express for any work opportunities.

## INTERROGATORY NO. 21

Please state whether a copy of the letter dated April 18, 2003, from defendant Teamsters Local 25 to Mr. Charles Zaccaria, Vice President of defendant New Penn Motor Express, ever forwarded to the Southern New England Joint Area Committee, or any other grievance committee or association. If so, please state:

    a.    The date on which such grievance was forwarded; and

    b.    To whom it was forwarded.

## RESPONSE NO. 21

The Defendant objects to this Interrogatory to the extent that it is a compound interrogatory and is in excess of the maximum number of interrogatories permitted by the Federal Rules of Civil Procedure. Subject to and without waiving said objections, the Defendant states as follows:

Local 25 is uncertain whether it ever forwarded this letter to the Southern New England Joint Area Committee.

## INTERROGATORY NO. 22

Please identify the secretaries to the New England Joint Area Committee from April 1, 1998 to July 26, 2004.

## RESPONSE NO. 22

The Defendant objects to this Interrogatory to the extent that it is in excess of the maximum number of interrogatories permitted by the Federal Rules of Civil Procedure. Subject to and without waiving said objections, the Defendant states as follows:

Robert Schaeffer has been a co-secretary of the Southern New England Joint Area Committee for the time period in question; William Carnes was a co-secretary of the Southern New England Joint Area Committee from April 1, 1998 through May 2003; and John Murphy has been serving as co-secretary of the Southern New England Joint Area Committee from May 2003 to the present date.

12

**INTERROGATORY NO. 23**

Please describe in detail the duties of the secretaries to the New England Joint Area Committee, including any duties regarding grievances filed with or received by the Committee, from April 1, 1998 to July 26, 2004.

**RESPONSE NO. 23**

The Defendant objects to this Interrogatory to the extent that it is in excess of the maximum number of interrogatories permitted by the Federal Rules of Civil Procedure. Subject to and without waiving said objections, the Defendant states as follows:

It is the duty of the Co-Secretaries of the Southern New England Joint Area Committee to prepare an agenda and docket of cases at least ten (10) days prior to each meeting of the Southern New England Joint Area Committee and mailing said docket at least seven (7) days prior to a Committee meeting, to select the members to serve on the panel for each case that is to be heard at a Committee meeting, to jointly prepare a written decision and any interpretation of each case heard by the Committee following each Committee meeting, and forward copies of these decisions to the Company and Local Union involved as well as to the Union and the Employer members of the Committee hearing that case. The co-secretaries are also responsible for setting the dates and locations of Committee meetings.

**INTERROGATORY NO. 24**

Please identify the secretaries to the Eastern Region Joint Area Committee from March 1, 2002 to date.

**RESPONSE NO. 24**

The Defendant objects to this Interrogatory to the extent that it is in excess of the maximum number of interrogatories permitted by the Federal Rules of Civil Procedure. Subject to and without waiving said objections, the Defendant states as follows:

Daniel Virtue and Robert Schaeffer served as the co-secretaries of the Eastern Region Joint Area Committee for the period in question.

**INTERROGATORY NO. 25**

Please describe in detail the duties of the secretaries to the Eastern Region Joint Area Committee, including any duties regarding grievances filed with or received by the Committee from March 1, 2002 to date.

**RESPONSE NO. 25**

The Defendant objects to this Interrogatory to the extent that it is in excess of the maximum number of interrogatories permitted by the Federal Rules of Civil Procedure. Subject to and without waiving said objections, the Defendant states as follows:

It is the duty of the Co-Secretaries of the Eastern Region Joint Area Committee to prepare an agenda and docket of cases for each meeting of the Eastern Region Joint Area Committee, to jointly prepare a written decision and any interpretation of each case heard by the Committee following each Committee meeting, and forward copies of these decisions to the Company and Local Union involved as well as to the Union and the Employer members of the Committee hearing that case.

Signed under the pains and penalties of perjury this 17th day for August 2005

Mark Harrington

As to the objections:

Kathleen A. Pennini

## CERTIFICATE OF SERVICE

I, Kathleen A. Pennini, hereby certify that I sent a copy of the foregoing document with attachments, via first–class mail, to:

Scott Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA  01450

Carl H. Glueck, Esq.
Frantz Ward, LLP
55 Public Square Building, 19th Floor
Cleveland, OH  44113-1999

Nicholas Klinefeldt, Esq.
Kelly Libby & Hoopes, P.C.
175 Federal Street
Boston, MA  02110

Kathleen A. Pennini

Dated: August 17, 2005
f:\l25\goulet\pldg\l25.resp.first.set.ints.doc:blg

14

FEBRUARY 13, 2002

## AGREEMENT BETWEEN
## THE TEAMSTERS NATIONAL FREIGHT
## INDUSTRY NEGOTIATING COMMITTEE
## AND NEW PENN MOTOR EXPRESS, INC.

1.    APA has notified TNFINC that the company intends to cease operations immediately. Absent the efforts contemplated by this Agreement, APA's existing customers will be divided among many competitors, most of them non-union regional carriers. This will result in the loss of many NMFA-covered jobs in the industry.    New Penn Motor Express (NPME) had no involvement in APA's decision to terminate operations and has no independent obligation, contractual, statutory or otherwise, to APA, TNFINC or APA's employees in connection with this closure.

2.    After being advised of APA's decision to close, however, NPME began negotiations with APA to explore the possibility of acquiring certain customer information.    Obtaining this customer information would allow NPME to capture a portion of APA's LTL business and keep that business with a NMFA carrier.    Any arrangement between NPME and APA regarding customer information is contingent upon approval of this Agreement by TNFINC.

3.    Under the contingent agreement between NPME and APA, NPME is seeking customer information and access. NPME is not a purchaser and does not seek to purchase any of APA's equipment or terminals from APA.    NPME is not seeking or participating in any merger or acquisition of APA or any of its rights or authority or stock.    NPME is not the legal successor employer of APA.

4.    NPME does not believe its contingent agreement with APA creates any obligation to TNFINC or to APA NMFA employees, either legally or under the NMFA.    However, NPME will extend an opportunity to those APA NMFA employees who are employed in the local supplemental areas where NPME has an established terminal operation to become NPME employees under terms and conditions hereinafter described.    In return for extending such opportunities, TNFINC will agree that NPME has fulfilled all contractual or legal obligations, if any, to TNFINC and the APA NMFA employees.

5.    NPME's discussions with APA regarding its customer lists and NPME's offer to extend opportunities to APA NMFA employees is voluntary.    NPME is undertaking these efforts because it believes there is some benefit to APA NMFA employees as well as a benefit to NPME.    However, NPME has negotiated with APA contingent upon reaching agreement with TNFINC.    Absent such agreements and approvals, NPME will abandon any further discussions with APA and will not extend the opportunities outlined herein, and shall have no obligation to TNFINC or the APA NMFA employees.

D001

6.    Because of the serious and urgent nature of APA's current financial condition and the need to avoid the immediate erosion of APA's customer base, the timing of this agreement is of the essence.

7.    As of February 20, 2002 APA will cease to make any pick ups of LTL freight. APA will continue to make deliveries of that freight in their system. It is not the intent or the plan of NPME to deliver any APA freight but will make itself available to do so on a limited basis.

8.    Following the termination of APA's operations, NPME will provide opportunities to APA NMFA employees as described herein:

    a.    NPME and APA have terminals in different locations. NPME will provide to TNFINC and APA a list of its terminals and a general description of its pick up and delivery territory for each terminal as well as will advise which NPME terminals have road operations and which NPME terminals do not in an effort to assist APA NMFA employees.

    b.    Thereafter each APA NMFA employee, whether active or inactive, employed in the same local supplemental area where NPME has existing direct terminal operations, shall have the right to place his/her name on the call list of only ONE NPME terminal (or the classification seniority list, where applicable) within the same local supplement where they currently are employed. APA NMFA over-the-road drivers, active or inactive on separate over-the-road seniority at the Buffalo, NY, Philadelphia, PA and North Bergen, NJ terminals, shall only have the right to place his/her name on the over-the-road terminal seniority call list at one of the following NPME terminals where such same separate seniority exists. Albany, NY, Cinnaminson, NJ (Philadelphia area), Newburgh, NY and Trenton, NJ. (Footnote: In the event NPME opens a Burlington VT terminal, APA NMFA employees on the Burlington VT terminal seniority list shall be provided an opportunity to place their names on the list for the NPME Burlington VT terminal and gain seniority in accordance with the terms of this Agreement). NPME does not have any operations in Central States, nor does NPME have any operations in the Maritime Provinces of Canada as does APA, and thus those APA NMFA employees are not covered by this Agreement. It is clearly understood that during the period between the date of APA's termination of operations and the effective date of this Agreement, NPME shall be able to utilize APA NMFA employees as necessary without regard to seniority.

    c.    No APA NMFA employee shall be required to place his/her name on any NPME terminal call list. NPME shall have no obligation to any APA NMFA employee who chooses to not place his/her name on a NPME terminal call list by March 1, 2002. Additionally, NPME shall have no obligation to APA NMFA employees until TNFINC provides the APA NMFA terminal selection call lists in accordance with this Agreement.

    d.    When an APA NMFA employee places his/her name on a NPME terminal call list, it will appear below all NPME employees names on that terminal seniority list (end-tailed). APA NMFA employees shall be arranged (and called as casuals) according to their current APA NMFA seniority. If more than one employee has the same seniority date, their positioning on the list will be decided by "coin-tossing" conducted by union officials. NPME is not obligated to hire any APA employee not covered by the NMFA.

D002

e.    Employees who are on a NPME terminal call list, will be offered work in accordance with their seniority position and qualifications. NPME shall not be penalized for passing an employee for work opportunity if the employee cannot perform all of the duties required of the job being filled or until APA NMFA employees meet all government pre-employment requirements.

f.    APA NMFA employees shall have work opportunity ahead of NPME casual employees, but shall not have work opportunity ahead of any probationary or preferred casual employees, if applicable.

g.    APA NMFA employees added to the NPME terminal call lists as described above shall be treated and paid as casual employees in accordance with the local supplement and shall establish seniority at NPME in accordance with the following provision. Any APA NMFA employee who works thirty (30) days within any two (2) consecutive calendar month period shall be deemed to have obtained seniority and shall be placed on the NPME seniority list in accordance with that established seniority date, end-tailed after the NPME seniority employees on such seniority list.

h.    NPME shall only be obligated to offer work to APA NMFA employees as outlined above until March 31, 2003 at which time such obligation will no longer exist.

If during the term of the current 1998-2003 NMFA, but not later than March 31, 2003, the list of former APA NMFA employees at any terminal is exhausted, those APA NMFA employees on other terminal lists in that local supplement, who have not obtained seniority at NPME, will be offered a second opportunity to place their name on the call list of such terminal.

i.    APA NMFA employees on a NPME terminal call list shall be paid in accordance with the casual rate listed in the NMFA until such time as they obtain NPME seniority. Thereafter they shall be paid ninety (90%) of the current NMFA rate for the first six (6) months and thereafter, one-hundred percent (100%) of the current rate in effect.

j.    Any APA NMFA employee who achieves seniority status at NPME and qualifies for vacation will receive one (1) bonus week of vacation in addition to the vacation earned under the local supplement unless or until such APA NMFA employee qualifies for three (3) weeks vacation, in which case the bonus week shall no longer apply. Under no circumstances shall any APA NMFA employee receive more than one bonus week of vacation in any vacation year. The vacation year being contract or calendar in accordance with the Local Supplemental Agreement.

k.    NPME shall have no obligation to relocate any APA NMFA employee.

l.    NPME shall have no responsibility, obligation or liability for any claim or for anything of any kind or nature regarding or involving APA NMFA employees added to NPME seniority lists as described prior to the time they are added to such NPME seniority list. This includes but is not limited to, unemployment or workers compensation claims, short-paid or

3

underpaid wages, short-paid or under paid health and welfare or pension contributions, any unfunded or withdrawal pension liability, or claims or any kind against APA or others.

     m.    NPME will make contributions for each APA NMFA employee into the respective Health and Welfare and Pension fund where such APA NMFA employee is currently enrolled. All payments of Health and Welfare and Pension contributions made by NPME on behalf of the APA NMFA employee shall be made in accordance with the requirements of the NMFA and applicable Local Supplements. NPME shall not be obligated for Health and Welfare and Pension contributions on behalf of any APA NMFA employee on disability or workers compensation.

     n.    APA NMFA employees added to the NPME seniority lists shall be eligible to participate in the Teamsters 401-K program as do other NPME employees.

8.    It is acknowledged that the benefits provided to the APA NMFA employees under this Agreement are greater than would otherwise be provided under the NMFA for these employees under these circumstances, and that NPME has fulfilled any legal or contractual obligation it had or may have to these APA NMFA employees.

9.    This Agreement will become effective February 25, 2002, but only if (i) there is an agreement finalized between NPME and APA regarding customer lists and (ii) there is approval by the affected APA NMFA employees.

TNFINC

NEW PENN MOTOR EXPRESS, INC.

_____
Phil Young - Co-Chairman

_____
Stephen M. O'Kane - President

_____
James McCall - IBT Counsel

_____
John Ring - Counsel

4

1

Volume I
Pages 1 to 35
Exhibits 1 to 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                   :

CRAIG GOULET,            :
          Plaintiff,    :
                       :
        vs.           :  Civil Action
                       :  No. 04-12577 JLT
NEW PENN MOTOR EXPRESS, INC.;  :
and TEAMSTERS LOCAL 25,     :
INTERNATIONAL BROTHERHOOD OF  :
TEAMSTERS,             :
          Defendants.   :
                       :
- - - - - - - - - - - - - - - - -x

DEPOSITION OF GEORGE D. FRANCEY, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Scott A. Lathrop & Associates,
122 Old Ayer Road, Groton, Massachusetts, on
Wednesday, October 12, 2005, commencing at 9:10 a.m.

PRESENT:

    Scott A. Lathrop & Associates
        (by Scott A. Lathrop, Esq.)
        122 Old Ayer Road, Groton, MA 01450,
        for the Plaintiff.

    Frantz Ward LLP
        (by Carl H. Gluek, Esq.)
        2500 Key Center, 127 Public Square,
        Cleveland, OH 44114-1230, for the Defendant
        New Penn Motor Express Inc.

(Continued on Next Page)

2

PRESENT:   (Continued)

    Dwyer, Duddy and Facklam
        (by Kathleen A. Pennini, Esq.)
        Two Center Plaza, Suite 430, Boston, MA
        02108-1804, for the Defendant Teamsters
        Local 25, International Brotherhood of
        Teamsters.

ALSO PRESENT:  Craig Goulet


                        * * * * *

3

# I N D E X

WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

GEORGE D. FRANCEY

  BY MR. LATHROP            5

  BY MR. GLUEK                      29


* * * *

# E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Seniority list | 18 |
| 2 | Statement by George Francey | 22 |
| 3 | Seniority list for Canton, dated 11/01 | 22 |

* * * *

4

1                 P R O C E E D I N G S

2            MR. LATHROP:  Any stipulations?

3            MS. PENNINI:  Yes.

4            MR. GLUEK:  What are they?

5            MS. PENNINI:  Objections, except as to

6    form, reserved for trial.

7            MR. LATHROP:  And shall we reserve motions

8    to strike?

9            MS. PENNINI:  Yes.

10           MR. LATHROP:  How about reading and

11   signing?

12           MS. PENNINI:  45 days.  We can waive the

13   notary.

14           MR. LATHROP:  If it's not signed within 45

15   days of receipt, the reading and signing are deemed

16   waived?

17           MS. PENNINI:  Okay.

18                      GEORGE D. FRANCEY

19   a witness called for examination by counsel for the

20   Plaintiff, having been satisfactorily identified by

21   the production of his driver's license and being

22   first duly sworn by the Notary Public, was examined

23   and testified as follows:

24

5

```
1                    DIRECT EXAMINATION
2        BY MR. LATHROP:
3        Q.   Morning, sir.
4        A.   Morning.
5        Q.   Could you please state your full name and
6    address for the record.
7        A.   George Douglas Francey, 324 Flagg Street,
8    Bridgewater, Mass.
9        Q.   What is your date of birth, sir?
10       A.   3/17/55.
11       Q.   Are you or have you ever been a member of
12   Local 25 of the Teamsters?
13       A.   Yep.
14       Q.   That's a yes?
15       A.   Oh, yes.
16       Q.   Are you currently a member?
17       A.   Yes.
18       Q.   When were you first a member of Local 25?
19       A.   I want to say it was November '78.  And I
20   was in Local 170 for four years, so from '82 to '86.
21       Q.   How did you happen to join Local 25?
22       A.   Working for Beacon Fast Freight.  It was a
23   union barn.  I had to join.
24       Q.   Where were you based when you worked for
```

6

1    Beacon Fast Freight?

2         A.    Avon, Mass.

3         Q.    How long did you work for Beacon Fast

4    Freight?

5         A.    Until '82.

6         Q.    What happened in '82?

7         A.    Work was falling off, so I started sparing

8    over at Sanborn's.  Then I made the list over there,

9    so I transferred the locals and went over to

10   Sanborn's.

11        Q.    What's the full name of Sanborn's?

12        A.    Sanborn's Motor Express.

13        Q.    Where were you based?

14        A.    I worked out of the Wrentham terminal, but

15   their headquarters was in Portland, Maine.

16        Q.    Wrentham, Mass.?

17        A.    Yes.

18        Q.    When did you make the list?

19        A.    Let's see, I think it was in October of

20   1982.

21        Q.    How long did you continue to work for

22   Sanborn's?

23        A.    Until APA Transport bought Sanborn's Motor

24   Express in I believe October or thereabouts of '86.

1      Q.    Where were you first based when you worked

2   for APA Transport?

3      A.    Canton, Mass.

4      Q.    How long did you work in Canton, Mass.?

5      A.    I worked in Canton until APA closed their

6   doors in 2002, February.

7      Q.    Where did you work after that?

8      A.    I currently work at Atlantic Plant

9   Maintenance in Watertown.

10         MR. GLUEK:  Could you repeat that.

11         THE WITNESS:  Atlantic Plant Maintenance in

12   Watertown, Mass.

13      Q.    Is that a union?

14      A.    Yes, Local 25.

15      Q.    When did you start with Atlantic Plant

16   Maintenance?

17      A.    Let's see, APA went out in February.  I

18   spared around for a while, like working where I

19   could get work.  I was not on anybody's list, and I

20   started there in May of 2002.

21      Q.    What do you do for them?

22      A.    Rigor, truck driver.

23      Q.    You currently work for them?

24      A.    Yes.

8

1     Q.   Have you held any positions in Local 25?

2     A.   I was the steward at the APA facility from

3  February 2001 until we went out of business in

4  February of 2002.  It was just about a year.

5     Q.   Did you hold any other positions with

6  Local 25?

7     A.   No.

8     Q.   Was that an elected position?

9     A.   Yep.

10    Q.   Is that yes?

11    A.   Yes.

12    Q.   Are you familiar with the plaintiff in this

13  case, Craig Goulet?

14    A.   Yes.

15    Q.   When did you first become familiar with

16  Craig Goulet?

17    A.   When did I first meet him?

18    Q.   Yes.

19    A.   At Sanborn's in Wrentham probably.  Was

20  that 1982?  Yes.

21    Q.   Was he working at the time?

22    A.   Yes.  That's how I met him.

23    Q.   Let's talk about APA Transport and its

24  closure.

9

1      A.    Sure.

2      Q.    How did you first come to learn that APA

3 Transport would be closing?

4      A.    I came in off the street one night, and

5 they said, "We're out of business."

6      Q.    Who is that?

7      A.    It was Valentine's Day.  The terminal

8 manager told us.

9      Q.    Who was the terminal manager?

10      A.    What is the name...  I know it.  Give me a

11 minute here.  He was not terminal manager that long,

12 only maybe a year before that, if that.  What was

13 the name...  It will come to me eventually.

14      Q.    Did you have some communications with the

15 Local 25 leadership with regard to --

16      A.    Oh, yes.  Mark Harrington was the business

17 agent for us at the time.

18          Paul Dubiel was the terminal manager's

19 name.

20      Q.    You said Mark Harrington was the business

21 agent?

22      A.    Right.

23      Q.    He was the business agent covering APA

24 Transport?

1    A.    Yes.

2    Q.    How long had he been the business agent for

3  APA Transport, as you recall?

4    A.    I want to say he was always our business

5  agent since he was a business agent.  I can't

6  remember exactly.

7         We were there for, what 16, 17 years, as

8  far I remember.  I think maybe T. Eddie Sheehan

9  might have been a business agent before him.  When I

10  was the steward, Harrington was the business agent,

11  and for the steward before me, Harrington was the

12  business agent.

13    Q.    Did you know a William Carnes?

14    A.    Not personally.  I know he was the vice

15  president of Local 25.

16    Q.    After you heard from the terminal manager

17  that APA Transport was closing, did you have any

18  communications with Mr. Harrington?

19    A.    Oh, yes.

20    Q.    What communications do you recall having

21  with Mr. Harrington relative to the closing?

22    A.    Just in general.  I mean, I can't remember

23  exactly.  Obviously, you know, he said, "Hey, we're

24  out of business."

1        He, you know, communicated to me that New
2   Penn Motor Transport was offering work to APA
3   employees on a seniority basis.  There were two
4   terminals that you had your choice of.  There was
5   Billerica or Cranston, I think it was called.  The
6   Providence terminal I believe was in Cranston.  One
7   of my duties as the steward was to take the
8   seniority list and ask everybody where they wanted
9   to go, which I did.
10      Q.   When you communicated with Mr. Harrington
11  concerning the idea that New Penn Motor Express was
12  offering work at two different terminals, was
13  Mr. Harrington telling you this in person, by
14  telephone, by letter, or some other means?
15      A.   Could have been in person, could have been
16  by telephone.  I mean, he was there.  He came down
17  to the barn a few times.
18          They told us on Valentine's Day they were
19  closing the doors the following Tuesday.  I don't
20  remember whether Valentine's Day was a Wednesday or
21  Thursday.  The following Tuesday, the doors were
22  closing.
23          Of course, we had to get rid of freight in
24  the system.  Guys started getting laid off.  That

12

1    goes by seniority.

2         Being the steward, the steward has super

3    seniority for layoff purposes.  He wanted me to be

4    the last guy out of there because he wanted to be

5    sure APA -- they had a reputation for not doing

6    things on the up and up.  I mean, what are you going

7    to do, we're going out of business.  That's what he

8    wanted me to do.  I mean, it was work for me.  I

9    stayed.

10         I think I was the last one to work there

11    that Friday after Valentine's-- not the Friday

12    after.  It was a Wednesday or Thursday.  The

13    following week I think was my last day on a Friday,

14    whatever that was.  I would have to look at a

15    calendar.

16         Q.   You had a seniority list?

17         A.   Yes.

18         Q.   Where did the list come from?

19         A.   APA.

20         Q.   At some point in time, was there some sort

21    of vote?

22         A.   A vote?  About what?

23         Q.   Any sort of ratification vote?

24         A.   Of what?

13

1      Q.    With regard to New Penn.

2      A.    What do you mean?  I'm not following you.

3   What's a ratification vote?

4      Q.    Did you have a meeting with --

5      A.    Me, no.  With New Penn, no.

6      Q.    Did you attend a meeting of APA drivers?

7      A.    Oh, yes.  We went to the union hall, yes.

8      Q.    Let's talk about that.  Do you recall when

9   this meeting at the union hall took place?

10     A.    Not the exact day, no.

11     Q.    Was it before your last day at APA?

12     A.    Good question.  I don't remember.

13     Q.    But do you recall that there was --

14     A.    I mean, I could not swear to when it was.

15   You know what I'm saying?

16     Q.    You do recall a meeting at the union hall?

17     A.    Yes.

18     Q.    For the record, where is the union hall?

19     A.    Charlestown.  I think it's at 544 Main

20   Street.

21     Q.    Who was present at this meeting?

22     A.    Mark Harrington.  This is to the best of my

23   recollection.  I believe Shawn O'Brien was there.

24   I'm pretty sure George Cashman was there.

14

1      Q.    Do you know if Mr. Carnes was there?

2      A.    Good possibility.  I don't remember talking

3   to him, but he was probably there.

4      Q.    Could you identify for the record who

5   George Cashman was at the time.

6      A.    President of Local 25.

7      Q.    And who was Shawn O'Brien?

8      A.    Business agent.

9      Q.    Do you know for what --

10     A.    Oh, he didn't have anything to do with us.

11  I mean, these guys were there simply because they

12  are the Local 25 leadership.

13         APA going out of business was a pretty big

14  hit for Local 25 because we had two terminals, one

15  in Dracut and then the Canton facility.  You are

16  talking, what, 72 guys in Canton, and I don't know

17  how many up in Dracut.  There was probably over 30

18  anyway.

19     Q.    Was this meeting at the union hall

20  therefore for the Dracut and Canton APA drivers?

21     A.    I believe we were all together, I believe.

22     Q.    When you say "all together," you mean both

23  the Dracut and the Canton employees?

24     A.    I believe so.

15

1    Q.   Do you recall what was said or done during

2   this meeting?

3    A.   We talked about getting work, because, I

4   mean, everybody was out of a job.  I believe that

5   was probably one of the times that they mentioned

6   New Penn offering work on a seniority basis to APA

7   employees.

8    Q.   Do you know if a seniority list was shown

9   or used at this meeting?

10    A.   At this meeting, I don't recall.  I don't

11   recall.

12    Q.   At this meeting, did any of the Local 25

13   members express their preferences for New Penn

14   terminals?

15    A.   No.  The way I did it, in Canton, I had a

16   copy of the seniority list, and I went to everybody,

17   asked them what terminal they wanted to go to.  I

18   wrote it down next to their name.  When I was done

19   with that, I handed it into Mark Harrington.  That's

20   the last I had anything to do with it.

21    Q.   Did you do that before or after --

22    A.   No.  While I was working, not at this

23   meeting.

24    Q.   Let me ask the full question.

1     A.    Go ahead.

2     Q.    Did you do it before or after this meeting?

3     A.    Probably before and after.  You know what

4  I'm saying?  It was like as I could get ahold of

5  people.  Like the guys were still coming into work

6  until everything dried up.  I would get ahold of

7  them and ask them.  Some of them I may have called

8  on the phone.

9          This went on continually until probably the

10  last day I was there, getting everybody's pick.

11     Q.    At this union meeting, do you recall

12  whether or not Craig Goulet was discussed?

13     A.    I can't remember, to tell you the truth.  I

14  had not seen him in years, and I know I communicated

15  with him because -- I don't remember whether I

16  called him or he called me, but he gave me a pick.

17  I wrote it down.

18          Because his name was not carried on the

19  seniority list.  They took it off long before I was

20  the steward.  I really never understood what his

21  position was, whether he was on comp, whether he was

22  off.  I didn't think he was off the list.  I knew he

23  had a case against APA.

24          You know, I mean, officially his name was

17

1   not on the list.  I wrote his name in on the bottom

2   where he wanted to go and his phone number.  I drew

3   an arrow up the side.  I inserted it into where his

4   name should be on the seniority list.

5       Q.   Do you recall when it was you contacted

6   or --

7           MR. GLUEK:  Objection.

8       Q.   Let me restate it.  Do you recall when you

9   were in contact with Mr. Goulet?

10      A.   No.

11      Q.   Do you recall if it was before or after

12  this meeting?

13      A.   I don't recall, to tell you the truth,

14  honestly.

15      Q.   Correct me if I'm wrong, but I believe you

16  said the contact was by telephone?

17      A.   It would have been, I believe.  I mean, I

18  had not seen him.  I don't recall seeing him at the

19  meeting.  Maybe he was there.  I really don't

20  recall.

21      Q.   Correct me if I'm wrong, but you said in

22  this conversation you had with Mr. Goulet, his

23  preference for terminals with New Penn was

24  expressed?

18

1      A.    Yes.

2      Q.    Do you recall the terminal that he

3   selected?

4      A.    Yes.   I have a copy.   I have the original

5   right here.   It's Billerica.

6      Q.    May I see that.

7      A.    Yes.   That's the original handwritten one

8   that I used.

9          MR. LATHROP:   I'm going to make copies of

10  this.

11          (Pause)

12     Q.    Mr. Francey, let me return the original to

13  you and have this copy marked.

14               (Document marked as Francey

15               Exhibit 1 for identification)

16     Q.    Mr. Francey, I'm showing you a photocopy of

17  what you had just handed me.   We marked it for

18  purposes of identification as Exhibit No. 1.   This

19  is a photocopy of the document you just handed me,

20  correct?

21     A.    (Examines document)   Correct.

22     Q.    Let's now talk a little bit about this

23  document.   In terms of what I will call the

24  typewritten portion, where did that come from?

1      A.    APA.

2      Q.    Do you remember when you got it?

3      A.    Well, they always have to have the

4   seniority list posted on the bulletin board.  I may

5   have just photocopied that.  I might have got one

6   out of the office.

7           I mean, I would have had one as the steward

8   anyway.  I don't know whether I had been carrying

9   this one all along or what.

10     Q.    The handwriting that appears on this

11  document, is that all yours?

12     A.    That's all mine.

13     Q.    How did you get Mr. Goulet's telephone

14  number?

15     A.    I don't remember whether he called me or I

16  called him.  I know I spoke to him.

17     Q.    By B-i-l --

18     A.    That stands for Billerica.  If you look at

19  the top, you will see Providence.  B-i-l is for

20  Billerica.

21     Q.    When you say between 28, is that 28 and

22  29 --

23     A.    That's where his name used to be on the

24  seniority list.

1      Q.    I take it you attempted to go through

2   approximately 75 persons to get their preferences?

3      A.    Yep.

4      Q.    That's a yes?

5      A.    Yes.

6      Q.    After you got everyone's preference, you

7   gave this document to Mr. Harrington?

8      A.    Yes.  I gave him a copy.

9      Q.    You kept the original?

10      A.    That's the original that you just

11   photocopied.

12      Q.    Did you have any later dealings with

13   Mr. Goulet after you got his preference?

14      A.    I don't recall any.

15      Q.    After you gave this list to Mr. Harrington,

16   did you do anything further in terms of working on

17   employees' selection of New Penn preferences?

18      A.    No, because I was nobody after -- APA went

19   out of business.  I was not steward anymore.  I was

20   trying to get myself a job.

21      Q.    You did not go to New Penn?

22      A.    No.  They called me, but I was working at

23   the time.

24          Billerica is just too long of a haul for

1    me.  I didn't want to change locals.  Cranston would

2    have been just as far.  By then I was working in the

3    rigging business, and I kind of liked it.

4        Q.   Help me out here.  I assume your name is on

5    this list?

6        A.   Yes.

7        Q.   What number are you?

8        A.   Good question.  I don't have my glasses.

9    Let's see here, where am I...  Right here.  I'm

10   number -- what's that?  I can't read it.

11       Q.   27?

12       A.   I believe so, yes.

13       Q.   You had at least listed Providence for

14   yourself?

15       A.   I did, but I had no intention of going

16   there.

17       Q.   You did get a call?

18       A.   They did call me.  I believe it was the

19   following, I want to say, June maybe.  It was warm

20   weather by the time they got around to calling me.

21            Like I said, I was already employed in the

22   rigging business, so I was not interested.

23       Q.   At some point in time, did you sign a

24   statement?

1          A.    I would have to look at it, because she

2    said that to me (indicating).  I don't recall

3    signing it.

4          Q.    She being Attorney Pennini?

5          A.    Yes.

6                    (Document marked as Francey

7                    Exhibit 2 for identification)

8          Q.    Mr. Francey, I'm showing you what was

9    marked as Exhibit 2 in this deposition.  This

10   purports to be something signed by you on July 22,

11   2004.

12         A.    (Examines document)  Definitely.

13         Q.    Is that your signature?

14         A.    It is my signature.

15         Q.    That's an accurate statement, that you

16   spoke with Craig Goulet regarding the closure of

17   APA?

18         A.    Sure, that's an accurate statement.

19         Q.    It says, "When I spoke with Mr. Goulet, he

20   indicated to me his choice was the Billerica MA

21   terminal"?

22         A.    Yes.

23                    (Document marked as Francey

24                    Exhibit 3 for identification)

23

1      Q.    Mr. Francey, I'm showing you what was

2    marked as Exhibit 3, which is another purported

3    seniority list for Canton, Local 25, November 2001.

4    Have you ever seen this document before?

5      A.    (Examines document)  Probably in the past,

6    yes.  That appears to be an older seniority list.

7      Q.    When you say "older," what do you mean by

8    older?

9      A.    Well, there doesn't appear to be as many

10   names on it as on this one, just looking at it

11   (indicating).  Yes, it's from November 2001.

12     Q.    The list that you used, is it dated?

13     A.    No.

14     Q.    Do you see Mr. Goulet's name on Exhibit 3?

15     A.    Oh, yes.

16     Q.    Do you have any understanding as to who put

17   together Exhibit 3?

18     A.    I would not know.

19     Q.    Did you have any communication with anyone

20   other than Mark Harrington concerning APA employees'

21   preference with regard to the New Penn terminal?

22     A.    No.  I mean, I had no power.  All I was

23   doing was making out a list for him basically.

24     Q.    Just to be clear, you spoke to no other

1    officer of Local 25 with regard to the preferences

2    of the Canton employees?

3        A.    I don't recall speaking with anybody.  I

4    don't know why I would have spoke with anybody else.

5    Maybe in passing, maybe in conversation, but

6    officially?  I don't recall.

7        Q.    Did you ever have any dealings with New

8    Penn representatives?

9        A.    No.

10       Q.    Did you ever have any dealings with APA

11   representatives with regard to APA employees and

12   their New Penn selections?

13       A.    No.

14       Q.    Other than giving Exhibit 1 to

15   Mr. Harrington, did you do anything else with regard

16   to employee selection?

17       A.    No.

18       Q.    Did Mr. Harrington ever ask you any

19   questions about Exhibit 1?

20       A.    I don't recall any.

21       Q.    Did he discuss Craig Goulet with you?

22       A.    I don't recall discussing Craig Goulet at

23   all.  He may have just in passing, but I don't

24   recall it.

1     Q.   Do you know who the steward was in the

2    Dracut terminal?

3     A.   Oh, I can see his face...  I can't recall

4    his name.  I didn't know him that well.

5          MR. LATHROP:  Let me just take a few

6    minutes.

7          (Recess)

8     BY MR. LATHROP:

9     Q.   Looking at Exhibit 1, Mr. Francey, you

10   talked about inserting Craig Goulet's name there.

11   Do you recall whether or not there was any

12   discussion among APA employees about --

13    A.   Where his name was on the seniority list?

14   I would have had to have asked someone, because I

15   didn't know.

16          I mean, I knew he was a Sanborn employee,

17   but I was not sure exactly where his name was

18   because his name had not been on there for many

19   years.  I don't know why APA took his name off of

20   the seniority list, but it was not carried.  A lot

21   of years went by.

22          I don't recall.  I either put it there

23   because that's what Craig told me where he was or

24   whether the former steward told me where he was or

1    whether the guys in general just said that that's

2    where he should be.  I don't recall.

3          And I may have injected his name on the

4    wrong spot, but that was an accident if I did.  At

5    least I got the name on there.

6    Q.    Do you recall whether or not there was any

7    discussion about the propriety of Craig's name being

8    on the list?

9    A.    The way it was explained to me is that -- I

10   knew he was out on a comp case, and he was hurt in I

11   believe '87.  I don't know, but that's my

12   recollection.  I knew he had a case going against

13   APA.

14          Before Dubiel was the terminal manager,

15   John Conti was.  I remember him calling me into the

16   office and asking me who Craig Goulet was because

17   his name wasn't on the seniority list.  I guess he

18   had just found out that Craig must have won his case

19   against APA, was supposed to be coming back to work,

20   because this was -- well, I don't know how many

21   years that was, 14, 15 years.  John Conti, you know,

22   was not terminal manager when Craig Goulet worked

23   there.

24          I remember Harrington telling me the same

27

1    thing in a telephone conversation, that Craig Goulet

2    won his case and that he was going to be coming back

3    to work.  Everybody was kind of surprised, seeing he

4    had been gone for so many years.

5         That's what I recall about hearing that.

6    That was not very long before we went out of

7    business.  It was a matter of months, but I can't

8    remember exactly, you know, whether it was six

9    months, three months.  I think it could have been

10   six months, but I don't know.

11        Q.   At the time you heard about the APA

12   closure, do you remember whether there was any

13   discussion among the APA men about Craig's name

14   being on the seniority list?

15        A.   A lot of them, the older guys, like knew he

16   existed; the younger guys never saw his name

17   probably.

18        Q.   Do you recall whether there were any

19   complaints about him being on the list?

20        A.   No.  Before I was the steward, that was not

21   something that I concerned myself with.  His name

22   had not been carried on there for a long time.  I

23   don't recall when they took it off.

24        Now, I'm talking about the seniority list

1   that they post on the bulletin board.  I mean,

2   that's the only seniority list I ever saw.

3          What APA had in their office, what Local 25

4   had in their office, I have no clue.  I only go by

5   what they post and I just assume that that's the

6   official seniority list, as far as I know.

7      Q.   Just to be clear, Exhibit 3, do you

8   recognize that?

9      A.   (Examines document)  I have never seen

10  this, but I see there's a mistake here where his

11  name should be, if this is accurate, because I have

12  him a few slots below that.  I mean, that would have

13  been a mistake, an innocent mistake.  I mean, I was

14  trying to do the right thing here.

15     Q.   At the union hall meeting, were there

16  seniority lists that were presented at that time?

17     A.   I don't recall, to be honest.  I don't

18  recall much of that meeting.  Everybody was kind of

19  bummed out, you know what I mean, after losing your

20  job after 18 years.  Everybody is worried about

21  where they are going to go.

22          I really don't recall much about that

23  meeting.

24          MR. LATHROP:  I have nothing further.

29

1                    CROSS EXAMINATION

2        BY MR. GLUEK:

3        Q.    Good morning.  My name is Carl Gluek.  I

4    represent New Penn.

5        A.    Morning.

6        Q.    If you could look at Exhibit 1 and

7    Exhibit 3.  They are the two different seniority

8    lists.  I notice that Exhibit 3 is different in form

9    in terms of the information that's provided from

10   Exhibit 1; is that correct?

11       A.    Wait a minute.  Is this 3?

12       Q.    Correct.

13       A.    And this is 1?

14       Q.    Correct.

15       A.    Yes, I see that, too.

16       Q.    You previously testified about their being

17   a seniority list that is posted.  In your mind,

18   that's the official one, correct?

19       A.    That is the only one I ever saw.

20       Q.    The one that's marked Exhibit 3, is that in

21   the format that would be posted, or is Exhibit 1 in

22   the format that would be posted?

23       A.    This is the one that would be posted, but

24   APA would have probably cut the phone numbers off

1    (indicating).

2        Q.   Just so the record is clear, you were

3    pointing at Exhibit 1?

4        A.   This one, yes, Exhibit 1.

5        Q.   If you could look at Exhibit 1, No. 36.

6    What's that handwriting say?

7        A.   I don't have my glasses on.  Good question.

8    I can't see.

9        Q.   Maybe you can go over by the light.

10       A.   Well, I need something.  36?

11       Q.   Correct.

12       A.   Let's see, 36...  "Steve Hurley," oh, "Not

13   going" is what I wrote.  He didn't make a pick.

14       Q.   He decided he didn't want to go to either

15   terminal?  He had no preference?

16       A.   Right.

17       Q.   Could you look at No. 48 and tell me what

18   that says.

19       A.   "Dennis Carvalho, No. 48, Not going."

20       Q.   He, too, decided he didn't want --

21       A.   He didn't want any part of it.  He must

22   have got another job.

23       Q.   No. 66, I notice that person is crossed

24   out?

1      A.    Oh, yes.  I don't know whether he was fired

2   or whether he quit.  We couldn't get ahold of him.

3   This was even before this situation developed with

4   New Penn, too.  He was not returning calls.  I don't

5   know if he voluntarily quit or whatever.  We

6   couldn't get ahold of him.

7          He had problems.  He had issues with APA.

8   I could not get ahold of him even before this

9   because we wanted to know if he was coming back to

10  work.

11     Q.    75, the handwriting, is that supposed to be

12  B-i-l?

13     A.    No.  75?

14     Q.    Yes.

15     A.    Yes, Billerica, B-i-l.

16     Q.    Then there were several people that

17  retired.  Is that Ret --

18     A.    Yes, R-e-t is retirees.  They decided to

19  take a pension.

20     Q.    They had no preference then?

21     A.    No, no.  They didn't pick anything.

22          There's one with an arrow stick, Mark

23  Hurley.  He was in the Gulf.  He was on active duty.

24  I couldn't get ahold of him.  I never heard from him

32

1    again.

2        Q.    You can sit down now.  I'm done with the

3    list.

4        A.    Thank you.

5        Q.    With respect to Mr. Goulet, did you

6    unilaterally decide to contact him or put him on the

7    list, or did somebody tell you to put him on the

8    list?

9        A.    You know, I don't recall the exact events

10   that led up to that.  I may have discussed it with

11   the former steward.  He may have said, "Technically

12   he's still on the list.  We don't know."

13           I don't recall exactly.  I knew, though,

14   that if he had won his case, I knew that from, you

15   know, previously, that he was coming back to APA.

16           Why he hadn't come back, I never knew.  I

17   mean, you know, it was just, you know, scuttlebutt,

18   or whatever you want to call it, that he was not

19   medically cleared to come back or whatever, and then

20   in the interim, we go out of business.

21           I must have thought it was the right thing

22   to do, though.

23       Q.    Just to make sure I understood the

24   testimony, you had no discussions with any

33

1    representative of New Penn with respect to anybody's

2    preference?

3        A.    No.   That would not have been my job.

4            MR. GLUEK:   Nothing further.

5            MS. PENNINI:   May I have a couple of

6    minutes.

7            MR. LATHROP:   Sure.

8            (Pause)

9            MS. PENNINI:   I have no questions.

10               (Whereupon, the deposition

11               was concluded at 9:56 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

34

1                    C E R T I F I C A T E

2        I, GEORGE D. FRANCEY, do hereby certify that I

3   have read the foregoing transcript of my testimony,

4   and further certify under the pains and penalties of

5   perjury that said transcript (with/without)

6   suggested corrections is a true and accurate record

7   of said testimony.

8        Dated at _____, this ____ day of _____,

9   2005.

10

11                              _____

12

13

14

15

16

17

18

19

20

21

22

23

24

35

1  COMMONWEALTH OF MASSACHUSETTS)

2  SUFFOLK, SS.                    )

3      I, Ken A. DiFraia, Registered Professional

4  Reporter and Notary Public in and for the

5  Commonwealth of Massachusetts, do hereby certify

6  that there came before me on the 12th day of Oct.,

7  2005, at 9:10 a.m., the person hereinbefore named,

8  who was by me duly sworn to testify to the truth and

9  nothing but the truth of his knowledge touching and

10  concerning the matters in controversy in this cause;

11  that he was thereupon examined upon his oath, and

12  his examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this 27th day of

21  October, 2005.

22                  _Ken A. D. Fraia_

23                  Notary Public

24          My commission expires 4/3/09

COPY

# A-P-A TRANSPORT CORP.

2100 88th Street, North Bergen, New Jersey 07047 • 201-869-6600 212-564-3130
Fax 201-869-5472

February 14, 2002

**02 FEB 21  PM 1:00  RECEIVED**
**TEAMSTERS LOCAL 25**

<u>VIA FEDERAL EXPRESS</u>

George Cashman
President
Teamsters Local 25
544 Main Street
Charlestown, Massachusetts 02129

Re: <u>Canton Terminal Closing</u>

Dear Mr. Cashman:

In accord with the Worker Adjustment and Retraining Notification Act ("WARN"), you are being provided notice that, effective Wednesday, February 20, 2002, APA Transport Corp. ("APA") will be permanently closing down its terminal located at 30 Industrial Drive - B, Canton, Massachusetts. Almost all of the Teamsters employed at this terminal will be permanently laid off next week, although we may need a handful of your members for a few weeks to assist in the winding down of our operations. I will be contacting you shortly regarding same. Attached as Exhibit A is a list of the job titles of the Teamsters positions that will be eliminated at the above-referenced terminal, and the names of the employees currently in those positions.

The reason for the shortened WARN notice period is as follows: APA had been actively seeking financial assistance to alleviate its severe economic problems. If APA had provided an earlier shutdown notice, it would have precluded our ability to obtain the financing necessary to continue in business. APA has now been notified that its request for this critical financing has been rejected and, accordingly, it can no longer afford to operate.

As you may also be aware, certain APA employees may be employed by New Penn within the same multi-employer bargaining unit under the National Master Freight Agreement. We understand that employment will be based upon the extent to which New Penn is able to obtain former APA accounts, and in accord with terms and conditions that New Penn and the Teamsters may jointly determine, without regard to APA.

You may contact Jonathan Raymond, President, Commonwealth Corporation, Schraft Center, 529 Main Street, Suite 110, Boston, Massachusetts to obtain assistance for the Teamsters employed at the Canton terminal. Mr. Raymond's telephone number is 617-727-8158.

If you need any additional information, please contact me at 201-869-6600.

Sincerely,

Burton C. Trebour
Vice President, Labor and Administration

## EXHIBIT A

| POSITION | LAST NAME | FIRST NAME |
|---|---|---|
| CITY DRIVER | BAIN | SCOTT |
| CITY DRIVER | BLAKE | RICHARD |
| CITY DRIVER | CAREY | PATRICK |
| CITY DRIVER | CARVALHO | DENNIS |
| CITY DRIVER | CHOINIERE JR | ROGER |
| CITY DRIVER | COULL | DENNIS |
| CITY DRIVER | CREIGHTON | ROBERT |
| CITY DRIVER | CRUISE | MICHAEL |
| CITY DRIVER | D'ERAMO | MARIO |
| CITY DRIVER | DESOUZA | BRAD |
| CITY DRIVER | FENNELLY | EDWARD |
| CITY DRIVER | FONTES | MARK |
| CITY DRIVER | FRANCEY | GEORGE |
| CITY DRIVER | FRIEL | PADHRAIC |
| CITY DRIVER | GILMORE | MICHAEL |
| CITY DRIVER | HAMILTON | DAVID |
| CITY DRIVER | HOLDERRIED | JOSEPH |
| CITY DRIVER | HOUDE | GERALD |
| CITY DRIVER | HOWE | TIMOTHY |
| CITY DRIVER | JOHNSON JR. | RICHARD |
| CITY DRIVER | KEARLEY | MARK |
| CITY DRIVER | KELLEY | GEORGE |
| CITY DRIVER | KELLEY JR | RICHARD |
| CITY DRIVER | LEHAN | DANIEL |
| CITY DRIVER | MC GEE | RONALD |
| CITY DRIVER | MC GRATH | HAROLD |
| CITY DRIVER | MONAHAN | HUBERT |
| CITY DRIVER | O'MEARA | WILLIAM |
| CITY DRIVER | PALM | WAYNE |
| CITY DRIVER | PENDLETON | JAMES |
| CITY DRIVER | PETIT | ALAN |
| CITY DRIVER | PETIT | ROBERT |
| CITY DRIVER | PETIT JR | EDMUND |
| CITY DRIVER | PICKERING | GARY |
| CITY DRIVER | RABIDEAU | RAYMOND |
| CITY DRIVER | ROCHE | JAMES |

| | | |
|---|---|---|
| CITY DRIVER | SETTERLAND | DAVID |
| CITY DRIVER | SPANO JR | JAMES |
| CITY DRIVER | STEPHEN | JOHN |
| CITY DRIVER | SULLIVAN | THOMAS |
| CITY DRIVER | TISBERT | BRIAN |
| CITY DRIVER | WERTZ | ERIC |
| CITY DRIVER | ZUTAUT JR | BERNARD |
| ROAD DRIVER | BOSSE | FRANCIS |
| ROAD DRIVER | BOUFFARD | ROBERT |
| ROAD DRIVER | BURRILL | PETER |
| ROAD DRIVER | CLARK | DAVID |
| ROAD DRIVER | CRAWFORD | HENRY |
| ROAD DRIVER | GOULD | DAVID |
| ROAD DRIVER | HOYT | HERBERT |
| ROAD DRIVER | KELLEHER | TIMOTHY |
| ROAD DRIVER | MC CAFFREY | MICHAEL |
| ROAD DRIVER | MORRIS | TERRENCE |
| ROAD DRIVER | OSMER | JOHN |
| ROAD DRIVER | POWER | KEVIN |
| ROAD DRIVER | PROUT | ROBERT |
| ROAD DRIVER | WINQUIST | PETER |
| DOCKWORKER | BERRY | STEPHEN |
| DOCKWORKER | CARDOZA | PHILIP |
| DOCKWORKER | DAMIANO | JOHN |
| DOCKWORKER | DOLAN | JOSEPH |
| DOCKWORKER | DURETTE | MICHAEL |
| DOCKWORKER | GWYNN | NORMAN |
| DOCKWORKER | HOWE | STEPHEN |
| DOCKWORKER | HULBERT III | MILTON |
| DOCKWORKER | KELLEY JR | WILLIAM |
| DOCKWORKER | LOUD | DONALD |
| DOCKWORKER | MAC DONALD | JEFFREY |
| DOCKWORKER | MASTROPIETRO | RICHARD |
| DOCKWORKER | PARQUETTE | DAVID |
| DOCKWORKER | PERRY | JOHN |
| DOCKWORKER | PIMENTEL | JORGE |
| DOCKWORKER | PITTS | ROBERT |
| DOCKWORKER | SULLIVAN | COLIN |

8

1    A.    That's correct.

2    Q.    As the business agent for Local 25, what

3    generally were your job duties?

4    A.    Well, I had assignments for various

5    companies and various industries.  I negotiated

6    their contracts.  I handled their grievances and

7    arbitrations, and the everyday business of dealing

8    with these companies and with the members.

9    Q.    As a business agent, what were your

10    responsibilities vis-a-vis the handling of

11    grievances?

12    A.    To follow the guidelines of the contract

13    and to take grievances forward to a hearing and to

14    adjudicate them.

15         In some cases, you know, depending on the

16    relationship with the companies, you know, there

17    would be where time periods and time frames could be

18    extended by mutual agreement, and pretty often those

19    things did happen.

20    Q.    Are you familiar with a company called

21    "APA"?

22    A.    Yes.

23    Q.    Did you ever have any responsibility as a

24    Teamsters business agent for APA?

9

1      A.    No.

2      Q.    Are you familiar with a company called "New

3   Penn Motor Express"?

4      A.    Yes.

5      Q.    Did you ever have responsibility for New

6   Penn Motor Express?

7      A.    Yes.

8      Q.    Over what period of time did you have

9   responsibility for New Penn Motor Express?

10     A.    From 1982 until 2003.

11     Q.    At any point in time, did you hold any

12  other positions with the Teamsters, other than as a

13  business agent for Local 25?

14     A.    Yes.  I was elected vice president in 1991,

15  and business agent.  I held both positions.

16     Q.    Vice president of Local 25?

17     A.    That's right.

18     Q.    How long did you remain vice president of

19  Local 25?

20     A.    Until 2003.

21     Q.    Did you hold any other positions with the

22  Teamsters, whether it be Local 25 or any other

23  Teamster-related entity?

24     A.    I'm not sure I understand the question.

28

1    from Mr. Craig Goulet to Teamsters Union Local 25.

2            The third page purports to be a handwritten

3    Teamsters Union Local 25 grievance report.

4            Do you recognize any of these pages?

5        A.    I recognize this as a grievance.  I don't

6    recall seeing this specifically, but I probably did.

7    It is addressed to me at the Local.  I forwarded it.

8    It would have went out under George Cashman's cover.

9        Q.    Let's just talk about the general procedure

10   in existence in approximately April of 2003.  If a

11   member of Local 25 wanted to file a grievance

12   against a company that you dealt with, what was the

13   procedure, as you understood it, for the employee to

14   do that?

15       A.    He would go see a shop steward and initiate

16   a grievance.  The shop steward would then meet with

17   the company and try to settle the grievance.  If

18   that didn't happen, they would notify the business

19   agent.

20       Q.    Which would be you?

21       A.    Which would be me, right.  Then I would get

22   involved in the grievance and ask for a hearing to

23   try and settle it.  If we were not able to settle

24   it, we would then file it for hearing at the

29

1   committee.

2       Q.    Correct me if I'm wrong, but I think you

3   said you would get involved in it if it was not

4   settled by the union steward?

5       A.    That's correct.

6       Q.    Typically what was the nature of your

7   getting involved if it couldn't be settled by the

8   union steward?

9       A.    The first thing I would do is to call the

10  company and attempt to straighten it out over the

11  telephone if possible.  If not, then we would go

12  forward and schedule a meeting to sit down with the

13  grievant, the steward and the manager and attempt to

14  settle it at that point.  If that was not possible,

15  we would go forward and either file it for a hearing

16  at the committee or not, depending on the issue.

17      Q.    At what point in the process, if any, was

18  the grievance reduced to writing?

19      A.    Well, let's start over.  The grievant would

20  go to the steward to try to settle something.  The

21  steward could talk to the manager.  If the manager

22  told him to piss off, then he would reduce it to

23  writing.

24      Q.    It would usually be in writing by the time

35

1     A.   I believe 30 days, yes.

2     Q.   Do you have any understanding as to whether

3  or not Mr. Goulet's grievance was filed with any

4  committee?

5     A.   No, I don't.

6     Q.   I think you told me the month, but do you

7  recall what your last day -- the last date was in

8  your role as a business agent for Local 25?

9     A.   May 2, 2003.

10    Q.   Did someone take over your role, shall we

11  say, on May 3rd of 2003, to your knowledge and

12  understanding?

13    A.   Take over my role?

14    Q.   Yes.

15    A.   Which role?  Would you be specific.

16    Q.   As business agent for Local 25.

17    A.   As a business agent?

18    Q.   Yes.

19    A.   I can't say exactly who took over my

20  positions at that time, but there were people that

21  were named as business agents following May 2nd.

22    Q.   Who took over for New Penn?

23    A.   I'm not sure.  I don't know who has New

24  Penn now.

44

1    keeping the manager there late, keeping the

2    employees over, we would do that.

3            That's the way the relationship went.  It

4    was a pretty good relationship for a number of

5    years.  I think I probably have met most of the

6    people in that company.

7        Q.    When you forwarded this particular

8    grievance by Mr. Goulet, did you consider it to be

9    untimely?

10       A.    No, I didn't.  I was not aware of all the

11   facts in the case really.  I believe there had been

12   a hearing prior, and I didn't know what the

13   situation was.  All I knew is Mr. Goulet was

14   attempting to get back to work at New Penn Motor

15   Express based on the agreement.

16                    (Document marked as Carnes

17                    Exhibit 8 for identification)

18       Q.    Mr. Carnes, I'm showing you Exhibit 8,

19   which purports to be a letter to the Great Members

20   of Teamsters Local 25 dated April of 2003,

21   purporting to be over your signature and

22   Mr. Cashman's.

23            I'm simply going to ask you, is that your

24   signature on the bottom right?

45

1    A.    Uh-huh.

2    Q.    Is that yes?

3    A.    No, it's not my signature, but I agreed to

4  have somebody sign it.

5    Q.    What was your understanding of the status

6  of Mr. Goulet's grievance then as of the time -- as

7  of May 2, 2003?

8    A.    I hadn't heard back.

9         MR. LATHROP:  Let me take a few minutes to

10 see where we're at.

11        (Recess)

12    BY MR. LATHROP:

13    Q.    With regard to Mr. Goulet's grievance that

14 was attached to Exhibit 7, do you have any

15 recollection that the company and the union agreed

16 to any extension of the timelines within which

17 actions had to be taken?

18    A.    No, I don't.

19    Q.    Is it your recollection that the time limit

20 under the collective bargaining agreement for filing

21 with the appropriate grievance committee is based

22 upon when the company receives -- sorry -- when the

23 union receives a response from the company?

24    A.    That's always been my understanding.

52

1    duties, plaintiff shall serve a ten-day suspension"?

2         MR. LATHROP:  Objection.

3    A.   Yes, sir.

4    Q.   Are you aware that that was the decision?

5         MR. LATHROP:  Objection.

6    A.   Yes, sir.

7    Q.   And that the decision went on to say, "Upon

8    completion of the suspension, he shall be reinstated

9    to the seniority listed in his original position"?

10        MR. LATHROP:  Objection.

11   A.   Yes.

12   Q.   Do you know if Mr. Goulet ever submitted

13   the acceptable documentation to APA of his ability

14   to return to unrestricted duties?

15   A.   No, I don't.

16   Q.   Do you know if Mr. Goulet ever served a

17   ten-day suspension?

18   A.   No, I don't.

19   Q.   Do you know if Mr. Goulet was ever returned

20   to the seniority list at APA?

21   A.   No, I don't.

22   Q.   You testified that you had a conversation

23   with John, last name unknown, who was a terminal

24   manager at New Penn?

EASTERN REGION JOINT AREA COMMITTEE
Kingston Plantation
Myrtle Beach, SC
July 28, 2004

COMMITTEE B

SC-21-04      Local 25 v. New Penn Motor Express, Inc.
              On behalf of Craig Goulet, Union alleges violation of Article 32, Section
              1, 2, September 2003, grievant should have been called for work at New
              Penn per APA/New Penn Agreement; requesting grievant be returned to
              proper seniority.

UNION PANEL:              Ernie Soehl, Chairman
                          Roger Fenlason
                          Theodore Uniatowski

EMPLOYER PANEL:           Robert Mergenhagen
                          Gary Quinn
                          Tony Nations

**Ernie Soehl, Local 701, Chairman:**  Company, you want to identify yourself and the
parties with you?

**Daniel Schmidt, New Penn Motor Express:**  Yes, Danny Schmidt for the Company and
I don't have anybody with me.

**Soehl:**  Union, identify yourself for the record.

**Mark Harrington, Local 25, Business Agent:**  Harrington, Murphy, and the grievant
Goulet.

**Schmidt:**  The Company does have a point of order Mr. Chairman, that we passed out
prior to getting into the case.

**Soehl:**  What's your point of order?

**Schmidt:**  Dan Schmidt for New Penn Motor Express.  The case was 03-914 filed at the
New England JAC, now the case is SC-21-04 filed at the Eastern Region JAC.

Mr. Chairman and Members of the Committee, I would first like to say, in my opinion,
this was not an Article 32 case.  The grievance makes reference to Article 5 and 43.  Its
docketed on the agenda here as Article 32, I don't know what happened there, but its not

an Article 32 case in my understanding. The Company raises a point of order. The Company contends that the grievant, Mr. Goulet is attempting to claim a seniority violation. Yet, Mr. Goulet has never placed an application for employment with New Penn Motor Express, Inc. nor was he referred to New Penn for work opportunity.

**Harrington:** I object. The Point of Order, he is getting into his whole case. His Point of Order is what?

**Schmidt:** This is my Point of Order. And Mr. Goulet has never worked a day.

**Harrington:** Again, he is getting into the case. What's the Point of Order?

**Soehl:** The Point of Order is what, you made referenced to Article 32?

**Schmidt:** One, the case is filed under 32. My understanding is its not a 32 case, the grievant says, I will show you what he says before we get into it. The grievance was filed by him on, drop down to the last paragraph, dated April 7, 2003, received by the Company on April 18, 2003, okay, alleging a violation of March 1, 2002. In addition, the grievance was not docketed until September 2003, at the Southern New England Committee. Then, again docketed, never heard in Southern New England, then again docketed April 20, 2004, at the Eastern Region Committee. Exhibit 1, is a copy of the grievance which was forwarded to the Company by letter dated April 18, 2003, alleging a violation of March 1, 2002. If you go to exhibit 1.

**Soehl:** Hey Danny, wait a minute hang on, I have to ask you a question. What is your Point of Order?

**Schmidt:** I'm getting in to it, I'm telling you.

**Soehl:** All I heard you say so far, Article 32.

**Schmidt:** That's my first point of order. The case is filed improper before this Committee because its filed as a 32 and it isn't a 32 case, it's a 5, 43 case according to the grievance, that's one point.

**Soehl:** Ok, making it clearer. Is there another point?

**Schmidt:** Yes, oh yes, timeliness is a point. Let me clarify it for you.

**Soehl:** So its not only 32, its also timeliness.

**Schmidt:** Yes, and that's what I'm trying to get to Ernie.

**Soehl:** Hang on a minute, the Union brought up a question, which they had a right to do because all you told us about was 32, maybe if it was 32 and timeliness, they wouldn't have objected to you.

2

**Schmidt:** Well, I'm trying to get into the timeliness. You have to let me finish my brief. The grievance was filed by the grievant on April 7, 2003, received by the Company on April 18, 2003, alleging a violation on March 1, 2002. That's almost a year later, that's one point. Then the case wasn't even docketed until September 2003, that's two points untimely. Then, again, they took it off the New England Agenda, that they docketed late, and filed it down here on the April 20, 2004, agenda.

**Harrington:** Mr. Chairman, again I object. Their shooting a fish in a barrel. They should have a separate point of order for each issue he raised.

**Soehl:** On the 32 and on the timeliness. Mark, what are you saying on the point of order, you need to clarify?

**Harrington:** I'm saying, he should have a separate point of order for each issue he's raising. If you rule in favor of one, I'm just saying, this putting three or four different points of order on the table right now. You should put one point of order in per objections to our grievance.

**Soehl:** You want to respond to that?

**Schmidt:** My brief is written addressing the points of order that this grievance is improper before this Committee. I have a right to tell you why this grievance is improper before this Committee. If it's improper because of five reasons, I surely have that right and he has that right to rebut that. Let me read my brief and finish the point of order and he can rebut anything he wants.

**Soehl:** Danny, give us Executive Session.

**Schmidt:** No problem.

**Tape turned off during Executive Session.**

**Soehl:** Back on the record, please. Company continue with the point of orders that you raised.

**Schmidt:** Thank you. Exhibit 1 is a copy of the grievance which was forwarded to the Company by letter dated April 18, 2003, alleging violation of March 1, 2002, you have that in your packet. As you can see here it was send from George Cashman to Mr. Zaccaria, an employee of our Company.

> "Enclosed for processing, please find a grievance that was submitted to William Carnes by Mr. Goulet, dated April 7, 2003."

Okay, we got that, I'm going to guess on the 18th its dated, I will say that date I guess. Exhibit 2 is a copy of the pre-hearing information which shows that this grievance was first filed with the Southern New England Committee in September, in fact on September

3

30th. You have a copy of the grievance in your file, it shows that he is alleging a violation on March 1, 2002, as I said he filed it on April 7, 2003, you can look at the grievance and tell that. That's in your packet. The grievance was then docketed after we get it in April, it was docketed in September 3, 2003. April, May, June, July, August, September, about four or five, six months. Suppose to docket it within one month, under the contract, no big deal.

Exhibit 3 Gentlemen is a copy of the Grievance Machinery Language, Article 46 of the New England Agreement, which says that grievances must be docketed in thirty (30) days. This grievance, we received it on April 18th, by virtue of Mr. Cashman's letter. You have the docketing form that was send to the Committee by the Union, that wasn't even send until September 3, 2003. A copy of Article 7 is attached in your file which your all familiar with, that all grievances must be docketed for a decision no later than thirty (30) days, again that did not happened.

Exhibit 5 Gentlemen, is a copy of a pre-hearing form for the Eastern Region now, we never heard the case in New England, it just went from that agenda down here. It was docketed here in April 20, 2004, you have a copy of that pre-hearing form in your packet. Therefore, the Company contends the grievant, A) was never an employee, as I told you initially, the grievant also filed the grievance untimely, almost a year, from March 1, 2002, to April 2003, before he even filed a grievance. The case was then filed for whatever reason after Mr. Carnes left on September 3, 2003, untimely filed to the New England Committee and then ultimately filed again on April 20, 2004, untimely filed to this Committee. Therefore, based on those facts, the Company contends that this grievance is surely improper before this Committee.

**Soehl:** That's your Point of Order?

**Schmidt:** Yes.

**Soehl:** Union, you want to respond to the point of order?

**Harrington:** Surely, I want to give some background to this situation. First of all, I wasn't the agent for New Penn at the time when Mr. Goulet filed the case. As everybody is aware William Carnes was the Business Agent for New Penn. I was the Business Agent for APA at the time of the closure, Mr. Goulet was on the seniority list there. Again, the way I want to respond to his point of order is to give you my brief and present my case, so I can demonstrate to you, the circumstances around this.

**Schmidt:** Mr. Chairman, I don't want to interrupt anybody, he said that I was presenting the case.

**Soehl:** Danny, I'm Chairman alright, you made a statement regarding to his brief, I didn't say (inaudible). I told him to stay to the point of order and respond to your point of order, so far he has been doing that.

4

**Schmidt:** Ok, that's fine.

**Harrington:** Mr. Goulet is also going to testify and so is Mr. Murphy. Let me go right to his exhibits and respond to each one. Exhibit 1 copy of the grievance which was forwarded to the Company dated April 18, 2003, let me just read Mr. Goulet grievance into the record so that we can be clear on exactly what his grievance is.

> "Craig Goulet, Business Agent, William Carnes date of complaint is April 7, 2003, nature of grievance, seniority rights. In accordance with the National Master Freight Agreement Article 5, Subsection along with the New England Supplemental Freight Agreement, Article 43 Seniority including all of Article 43 Subsection. I am filing a grievance against New Penn Motor Express to include all lost time, back pay, seniority and contractual benefits under the agreement, from March 1, 2002, up to and continuing past March 31, 2003, based on the agreement between TNFINC and New Penn Motor Express as a result of the closure of APA Operations."

That's why Mr. Goulet's grievance was filed April 7th. Seven (7) days after the expiration of the agreement because he was never called. So that's what I guess Mr. Carnes instructed him to do, is file a grievance cause you weren't called within the year. He doesn't know, he is not working for the Company, he doesn't know anything, he was never contacted by New Penn. That's indisputable by the Company. Exhibit 2, copy of the pre-hearing information, shows the grievance as filed Southern New England, September and that should be the third, if you read the file its September 3rd, not September 30th.

**Soehl:** It's says the third.

**Harrington:** Right, he testified to the 30th, he states it on his brief. That grievance was filed on September 3rd, as I said I took the case over sometime in mid summer. Mr. Goulet expressed his frustration that his case has not moved forward, had no idea what happened what the case. I do know that the agreement really is silent on filing grievances. The APA and New Penn agreement. I also know since my experience with New Penn Motor Express, I have settled grievances with that Company, that are over a year old. I settled grievance from blizzards back in 2001 that were never docketed before the panel and the Company treated it as an active grievance, resolved the grievance. Charles Zaccaria, the Vice President of the Company, when you do business with New Penn you can't do anything unless Charlie Zaccaria gives you his blessing. And he's not around half time he's traveling to all these different terminals and whatever. So there's a precedent or practice there that grievances are held and held, and held until they are finally resolved or they can't come to an agreement or can't meet, and then they kick it (inaudible) the grievance procedures. I don't think that Mr. Schmidt will deny that. Exhibit 3, Article 46 of the Grievance Machinery. I take the case over in September, alright, so now its my ball game. I try to do the right thing, get this kid's grievance heard. I talk to John Murphy, that's why John is sitting here. John what should we do with this case, it's a closure case, there's really no language in the contract that deals with

5

this thing, so we are going to file under 43. File under 43 so that we can kick it off in the Southern New England Supplement. Postpone Company, Postpone Union, John talks to both Bob Schaeffer and Dan Virtue about this case. They tell us to kick it to the Eastern Region Joint Area because it is a Multi-Local closure agreement, it should be heard in front of you people today. We file the case, it gets send down, I don't know how misinformation, it was shown as being withdrawn, the case was never withdrawn so it went back on the agenda. So I can account for my handling of the case and the process of the steps along the way and everything we did until the time we took over was in conjunction with the contract and the advise and the consultation with both the labor side and the management side as to what to do with this case. So, you are dealing with the time frame obviously of when the grievance was filed and when it was originally docketed. My experience again with New Penn is they play loose with that all the time, (inaudible) its whatever suits them on that particular day. So we think that this guy, Mr. Schmidt testifies that he wasn't on the list, this guy was on the list, he won a case in arbitration, they reinstated him back to the (inaudible) that will be in my brief if I have an opportunity to present it, and show you the steps along the way as to where he was ignored and by-passed and did tell the Company where he wanted to go to work, we have that evidence. So John do you have anything to add to that?

**John Murphy, Local 25, Business Agent:** I think that what Mark said is true, I can tell you as the Co-Secretary of Southern New England, its my understanding was trying to be settled from the time that the grievance was filed in April 03, right up to when we put it on the agenda at the Southern New England area. We postponed it, I think there was still talks going on, there were some other reasons, we have some Unity Conference or something like that, whatever was going on. So we postponed it on both sides and consultation with the Eastern Region, Danny Virtue suggested that it should probably be heard down here at the Region. I talked to Bob Schaeffer, who's the Company Co-Secretary for Southern New England. We agreed to take the case out of New England and put it into the Eastern Region and that's where we are at.

**Harrington:** And to just follow up on that, they assigned 32 to it, the Committee, Dan and Schaeffer. Whatever they had a discussion about, whatever they did, they assigned 32, we didn't. So at this time we are going to let the grievant respond to why he didn't file the grievance. I don't want you to put your case on, I want you to limit it to why you filed the grievance a year or so after your understanding of the agreement.

**Soehl:** Addressing the point of order on the timeliness.

**Craig Goulet, Grievant:** Members of the Committee, the agreement that the New Penn people had with APA ran out March 31, 2002. I didn't get a phone call, I filed a grievance.

**Harrington:** 2003.

**Soehl:** 2003, right.

6

**Goulet:** Yes.

**Soehl:** Can I ask either side a question, cause unfortunately I don't have a copy of it. And I think that both sides would need a copy of the closure agreement so we know what's in it so that we can make a prudent decision.

**Harrington:** Its two separate documents there, one is the closure of APA and the other one is the responsibilities that New Penn had under the agreement.

**Goulet:** APA cease their operation March 1, 2002. They had an agreement, the men from that time to March 31, 2003. At the end of the agreement, I hadn't received a phone call, so I filed a grievance.

**Harrington:** That's our rebuttal to his point of order.

**Soehl:** Danny, you want to respond?

**Schmidt:** Yes, the Company is going to stand on their point of order. The grievant filed his grievance by his own testimony and his own handwriting on April 7, 2003. In his own grievance he says, "On March 1, 2003, 2002, he was violated that's what his says, so his grievance is untimely. You have to file within thirty (30) days, he didn't do that. This was no surprise to Local 25, we told them that the grievance was untimely from the beginning when we talked to Mr. Carnes. I handled this grievance cause they called me, our terminal. Now, why they didn't docket it until September, I don't know. It wasn't docketed as you can see until September 3, 2003, and was filed in April of 2003. And then all the docketing of Southern New England, there was never any discussion with the Company. But docketed down here, cause the Company found out it was on here as a 32 case. I said holy shit what's going on here, I thought we was hearing it in New England. But its down here under 32, by their own testimony it's not a 32 case.

**Soehl:** I think that their testimony said that they got advise from both of the Co-Secretaries.

**Schmidt:** While, I have their pre-hearing form and here it says Article 32. Co-Secretaries don't fill that out, they do.

**Soehl:** They said that the phone call that they had made on both sides, to Schaeffer and Virtue (inaudible) to bring it down here.

**Schmidt:** That's fine, whatever it is, that is. But you know what, there was never a conversation with Schmidt, let's make that understood. There was never a conversation with New Penn on timeliness. And yes, I will sit here and tell you that there are times we waived that issue, we both have that understanding. We never had that understanding in this case nor was I ever asked by 25 on this case to do that. And I want that understood cause if I was, I wouldn't be here raising timeliness. You got the case.

7

**Soehl:** Questions? Questions to the Union?

**Harrington:** I have a question to Mr. Schmidt. Doesn't our Co-Secretary usually advise you where the cases are going to go?

**Schmidt:** No.

**Harrington:** Is it my responsibility to tell you where the case is going to go?

**Schmidt:** Yeah, my understanding is this pre-hearing form has on here employer, union and company. And I should get a copy yeah.

**Harrington:** Did you get a copy?

**Schmidt:** And I didn't raise that, and I didn't get a copy, Mark. But you know what, I should get a copy its on here. It is your responsibility to tell me where the case is going. I'm not trying to be smart, but I never got a copy.

**Harrington:** Well, how did you get that copy?

**Schmidt:** I got it from TEA, I had to called them and have them fax it to me. But I didn't get into that.

**Soehl:** Just to clear me up a little bit, let me ask you a question? Unfortunate, nobody has this shut down agreement. Evidently, what it is, recall rights basically up to March 31, 2003, is that fair to say?

**Goulet:** Yes.

**Harrington:** Yes, sir.

**Soehl:** You never received a call from New Penn for recall so you filed a grievance on April 7, 2003.

**Schmidt:** That's not accurate. Are you asking them or me?

**Soehl:** I asked them.

**Schmidt:** You want to ask me, because that is not accurate.

**Soehl:** Well, I will ask you the same question.

**Schmidt:** That is not accurate. Under the agreements if they want to get into it.

**Soehl:** Well, we are going to get into it here. (inaudible).

8

**Schmidt:** Provided, we had the information he filed out an application and the Union gave us his name okay, then he would have been called. None of that happened.

**Harrington:** Mr. Chairman, I want to introduce rebuttal evidence to that then.

**Soehl:** You brought it up Danny, I think that he has a right to say it (inaudible)

**Gary Quinn, Yellow Transportation:** Executive Session,

**Soehl:** We're on a point of order and we're trying to find out what a shut down agreement cause we can't open a book to look at it.

**Quinn:** Executive Session.

**DECISION:** The Panel, in Executive Session, motion made, seconded and carried, the initial docketing of this case was not within thirty (30) days; therefore, the Company's point of order is upheld. Cost Union.