**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **CRAIG GOULET**                              ) | |
|                                               ) | |
|     **Plaintiff,**         ) | |
|                                               ) | |
| **v.**                                        ) | |
|                                               ) | |
| **NEW PENN MOTOR EXPRESS**                    ) | |
|     **Defendant**         ) | |
|                                               ) | |
| **and**                                       ) | |
|                                               ) | |
| **TEAMSTERS LOCAL 25**                        ) | |
| **INTERNATIONAL BROTHERHOOD OF**              ) | |
| **TEAMSTERS**                                 ) | |
|                                               ) | **CIVIL ACTION** |
|     **Defendant,**        ) | **NO. 04-12577-WGY** |
|                                               ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT, TEAMSTERS LOCAL 25'S**
**MOTION IN LIMINE TO STRIKE PLAINTIFF'S ERRATA SHEET**

On October 4, 2005, the parties conducted the deposition of the Plaintiff, Craig Goulet. At this time, the Defendants' counsel, as well as the counsel for the Plaintiff, had the opportunity to examine and cross-examine the Plaintiff. On that date, the parties agreed that the time for reviewing the transcript would be extended to forty-five (45) days. On December 21, 2005, Plaintiff's counsel faxed opposing counsel eight (8) pages of changes to the deposition. The Defendant, Teamsters Local 25, files this motion to strike Plaintiff's errata sheet for failure to comply with the terms of F.R.Civ.P. 30(e).

**I.**     **Argument**

**A.**   **The Plaintiff's Errata Sheet To His Deposition Should Be Stricken By This Court As The Changes Made Do Not Comply With Rule 30(e)**

Fed.R.Civ.P. 30(e) states, "[T]he deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording

and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them." F.R.Civ.P. 30(e). This rule imposes three requirements on a deponent wishing to make changes to his or her deposition testimony. The deponent must (1) sign the statement making changes, (2) return the statement to the opposing parties within thirty (30) days, and (3) state his or her reasons for making the changes. Metayer v. PFL Life Insurance Co., 1999 WL 33117063, at *2 (D.Me. 1999) (Magistrate decision) (attached hereto as Exhibit 1); see F.R. Civ. P. 30(e). While the Rule does not require the court to examine the "sufficiency, reasonableness, or legitimacy of the reasons" given, it does require that the deponent give some reason for making the changes. See Id.; United States v. Piqua Engineering, Inc., 152 F.R.D. 565, 566-67 (S.D.Ohio 1993); Lutig v. Thomas, 89 F.R.D. 639, 641 (N.D.Ill. 1981).

On December 21, 2005, Plaintiff's counsel faxed an errata sheet to Defendants' counsel detailing eighteen (18) handwritten substantive changes that the Plaintiff had made to the transcript of his deposition. Nowhere on this errata sheet was any reason given for any of these changes. For each change, the errata sheet simply states what the transcript states followed by the Plaintiffs' "correction" to his deposition testimony. For example, the deposition transcript states:

Q:     You don't recall whether he said precisely, "You have been returned to the
       seniority list at APA Canton facility."?

A:     Precisely, I do not know

See Deposition transcript, p. 28, lines 16-19. A true copy of the Plaintiff's deposition is attached hereto as Exhibit 2. In his errata sheet, however, Plaintiff states that his answer should read:

A:     Yes, he did.

See Plaintiff's errata sheet. A true copy of the Plaintiff's errata sheet is attached hereto as Exhibit 3. In response to a similar query in the same line of questioning, the deposition transcript reads:

> Q:    Do you recall whether he said, you're back on the seniority list?
>
> A:    No, I don't recall.

See Exhibit 2, p. 29, line 12-14. In his errata sheet, the Plaintiff altered his testimony so as to read:

> A:    Yes, he did say that I was back on the seniority list.

See Exhibit 3, p. 3. Although the Plaintiff changed the substance of his deposition testimony, he failed to comply with Rule 30(e) by furnishing any reason why such a significant and material change was made.

The Plaintiff's dramatic alterations to his deposition testimony appear in every situation in which his actual deposition testimony would hinder his claim. In yet another instance, in which the deposing attorney sought learn whether the Plaintiff had any facts supporting his claim of the breach of the duty of fair representation, the original transcript, in pertinent read:

> Q:    Do you think the union just made a simple mistake by not filing your grievance timely?
>
> A:    I don't know.
>
> Q:    Do you have any facts that would suggest that the union did anything nmore than just make a simple mistake by not filing your grievance timely?
>
> A:    I don't know what they did.

See Exhibit 2, p.95, lines 5-6; 8; 10-12, 14.

However, in his errata sheet, Plaintiff states that his answers should respectively read:

> A:    No, I do not think that the Union just made a simple mistake

3

A:    Yes, the fact that I called Mr. Carnes an Mr. Harrington when the agreement took

effect March 1st 2002, the fact that the Union put New Penn on notice while the

agreement was in effect, well before the grievance with Local 25. These facts

alone suggest that this was no simple mistake, never mind the fact that both New

Penn and the Union said timelyness *(sic)* was never an issue in the past.

See Exhibit 3, p. 95

Again, the Plaintiff offers no rationale or explanation whatsoever as to why his "correction," which is in complete contradiction to his original testimony, is now offered. The Plaintiff, likewise, gives no reason for these or any of his other changes to the transcript, none of which involved simple misspellings or changes in syntax. By failing to provide any reason for the substantive changes made to his deposition testimony in his errata sheet, many of which seek to either retract significant, material admissions or offer markedly self-serving assertions, the Plaintiff has not complied with the procedural requirements of F.R. Civ. P. 30(e). Therefore, the substantive changes made in the errata sheet to the Plaintiff's deposition should be stricken from the record.

## II.    Conclusion

Because the Plaintiff's errata sheet fails to meet the requirements of F.R. Civ. P. 30(e), the Defendant, Teamsters Local 25, moves that the changes to the transcript listed therein be stricken from the record, and the Plaintiff's unadorned, original transcript be the basis for the parties use at trial.

Respectfully submitted,
Defendant,
**International Brotherhood of**
**Teamsters, Local 25**
By its attorneys,

*Kathleen A. Pennini*

Matthew E. Dwyer (BBO# 139840)
Kathleen A. Pennini (BBO# 654573)
Dwyer, Duddy and Facklam
Attorneys at Law, P.C.
Two Center Plaza, Suite 430
Boston, MA  02108
617-723-9777

Date: June 17, 2006

## CERTIFICATE OF SERVICE

I, Kathleen A. Pennini, hereby certify that I sent a copy of the foregoing document with attachments, via electronic filing:

Scott Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA  01450

Carl H. Gluek, Esq.
Frantz Ward, LLP
55 Public Square Building, 19th Floor
Cleveland, OH  44113-1999

*Kathleen A. Pennini*

Kathleen A. Pennini

Date: June ___, 2006
F:\L25\Goulet\pldg\memo.supp.def.mot.strike.plaint.errata.sheet.doc

5

*Ex. 1*

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1

Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Only the Westlaw citation is currently available.
United States District Court, D. Maine.
Arthur J. METAYER and Elizabeth A. Metayer,
Plaintiffs,
v.
PFL LIFE INSURANCE COMPANY, and
UNITED GROUP ASSOCIATION, INC.
Defendants
**No. CIV. 98-177-P-C.**

July 15, 1999.

*Recommended Decision on Defendants' Motion to
Strike, Plaintiffs' Motion to Strike, and Defendants'
Motion for Summary Judgment*
BEAULIEU, Magistrate J.
*1 Plaintiffs, Arthur and Elizabeth Metayer, bring
this action against Defendants, PFL Life Insurance (
"PFL") and United Group Life Insurance ("UGA")
and assert the following claims: estoppel (Count I);
breach of contract (Count II); fraud (Count III);
negligent misrepresentation (Count IV); innocent
misrepresentation (Count V); violation of the Maine
Deceptive Trade Practices Act (Count VI);
violation of the Maine Unfair Trade Practices Act
(Count VII); violation of the Maine Unfair Claims
Practices statute (Count VIII); negligence (Count
IX); intentional infliction of emotional distress
(Count X); negligent infliction of emotional distress
(Count XI); and punitive damages (Count XII).

Defendants and Plaintiffs have filed Motions to
Strike and Defendants a Motion for Summary
Judgment. For the reasons given below, the Court
recommends that Defendants' Motion to Strike be
GRANTED in part and DENIED in part and that
Plaintiffs' Motion to Strike be DENIED. Further,
the Court recommends that Defendants' Motion for
Summary Judgment be GRANTED in part and
DENIED in part.

Plaintiffs' Motion to Strike

Plaintiffs have filed a Motion to Strike the
following materials submitted by Defendants: the
Affidavit of Teresa Cloutier; the Affidavit of John
Lambert; the complaint and answer in the matter of
Arthur J. Metayer and Elizabeth Metayer v. Maine
Medical Center ("MMC"), Docket No. CV97-188,
Cumberland County; and the attachment to
Defendants' Motion to Strike entitled "Defendants'
Objections to the Statements in the Saucier Affidavit
".

*A. Affidavit of Teresa Cloutier*

Defendants submitted the Affidavit of Teresa
Cloutier in support of its Motion to Stay this
proceeding (Docket No. 30), not in support of its
motion for summary judgment. Accordingly, the
Court will not consider that affidavit in its
Recommended Decision on Defendants' Motion for
Summary Judgment.

*B. Affidavit of John Lambert*

Defendants submitted the Affidavit of John Lambert
to support Defendants' Objections to Plaintiffs'
Statement Facts (Docket No. 28). In the affidavit
Lambert states that he received the "errata sheet"
five business days before the end of discovery even
though Plaintiffs' counsel knew Defendants planned
to file a summary judgment motion in this matter.
Further, Lambert states that he had a conversation
with the attorney for MMC in which Lambert told
counsel that he "did not think the Metayers owed
Maine Medical Center for the outstanding bills
because the claims for payments of those bills had
to be preserved in a compulsory counterclaim...."
Affidavit of John Lambert ¶ 3.

I recommend that the Court DENY Plaintiffs'
Motion to Strike the affidavit. Nevertheless, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

Court agrees with Plaintiffs that the affidavit is of minimal relevance in the disposition of any issue in this action.

### C. Complaint and Answer filed in the State Action

Plaintiffs move to strike the complaint and answer from the Plaintiffs action against MMC in Cumberland County Superior Court. The Court takes judicial notice of those pleadings. *See E.I. DuPont de Nemours & Co. v. Cullen,* 791 F.2d 5, 7 (1st Cir.1986) (court took judicial notice of complaint filed in state court even though it was not certified). Having taken judicial notice of the pleadings, I recommend that the Court DENY Plaintiffs' motion to strike the complaint and answer in the state action.[FN1]

> FN1. As stated in this opinion, the fact that MMC has not filed a counterclaim up to this time has little bearing on the disposition of Defendants' summary judgment motion.

### D. Defendants' Objections to Statements in Saucier's Affidavit

**\*2** Plaintiffs move to strike an exhibit attached to Defendants' Motion to Strike entitled "Objections to Statements in Saucier's Affidavit" because Defendants are merely trying to avoid the seven-page limit to their Reply to the motion for summary judgment. The Court agrees with Defendant that the page limit on their Reply brief is irrelevant to the Motion to Strike. For that reason, I recommend that the Court DENY the motion to strike Defendants' objections.

### Defendants' Motion to Strike

Defendants have filed a Motion to Strike some of the materials cited by Plaintiffs in their Statement of Material Facts, namely, all or parts of the following: an errata sheet; Plaintiff Elizabeth Metayer's Answers to Interrogatories; Affidavit of David Saucier; and the Affidavit of Elizabeth Metayer.

The Court recommends that Defendants' motion be GRANTED in part and DENIED in part.

### A. The Errata Sheet

Plaintiff Elizabeth Metayer submitted to the Court an "errata sheet" dated January 20, 1999, that made twenty-three changes to her deposition. Defendants argue that the errata sheet should be stricken because it seeks to change Elizabeth Metayer's deposition testimony so significantly that it "offends Rule 30(e)" of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 30(e) reads:

(e) Review by Witness; Changes; Signing. If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. The officer shall indicate in the certificate prescribed by subdivision (f)(1) whether any review was requested and, if so, shall append any changes made by the deponent during the period allowed.

Defendants argue that the primary goal of discovery and, in particular of depositions, is to gain access to the facts of the case in an unfiltered fashion. *See Hall v. Clifton Precision,* 150 F.R.D. 525, 528 (E.D.Pa.1993) (one purpose of depositions is to freeze the deponent's testimony before it "has been altered by intervening events, other discovery, or the helpful suggestions of lawyers.") Defendants observe that a line of decisions striking errata sheets has recently emerged premised on the principle that "[a] deposition is not a take home exam." *Greenway v. International Paper Co.,* 144 F.R.D. 322, 324 (W.D.La.1992); *see also Rios v. Welch,* 856 F.Supp. 1499, 1502 (D.Kan.1994).

Although Defendants' position has some merit, the Court will not strike the errata sheet. The Court bases its decision on the plain language of Rule 30(e) which reads, "the deponent shall have 30 days. .. to review the transcript or recording and, if there are *changes in form or substance,* to sign a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

statement reciting such changes and the reasons given by the deponent for making them." Fed.R.Civ.P. 30(e) (italics added). Rule 30(e) clearly empowers a deponent to change the substance of her testimony if she: (i) does so in thirty days, (ii) signs a statement reciting the changes made, and (iii) states her reasons for each of the changes made. No dispute exists that Plaintiff Elizabeth Metayer's errata sheet fulfilled each of these three conditions. Other courts interpreting Rule 30(e) have similarly determined that the Rule permits substantive changes in deposition testimony after the deposition was concluded. *See Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 103 (2nd Cir.1997) (agreeing with the proposition in *Lutig* that Rule 30(e) places no limitation on the changes a deponent may make to her deposition); *United States v. Piqua Engineering, Inc.,* 152 F.R.D. 565, 566-67 (S.D.Ohio 1993) ("Thus, under the Rule, changed deposition answers of any sort are permissible, even those which are contradictory or unconvincing, as long as the procedural requirements set forth in the Rule are followed."); *Lutig v. Thomas,* 89 F.R.D. 639, 641 (N.D.Ill.1981) ("The language of [Rule 30(e) ] places no limitations on the types of changes that may be made by a witness before signing his deposition... nor does the Rule require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes.").

**\*3** Although the Court will not strike the errata sheet, the answers given at the deposition remain part of the record and may be admitted into evidence at trial. *Podell,* 112 F.3d at 103. This is the consequence a deponent faces when she makes substantive changes to her testimony after the fact:
The witness who changes his testimony on a material matter between the giving of his deposition and his appearance at trial may be impeached by his former answers, and the cross-examiner and the jury are likely to be keenly interested in the reasons he changed his testimony. There is no apparent reason why the witness who changes his mind between the giving of the deposition and its transcription should stand in any better case.

*Lutig,* 89 F.R.D. at 642 (quoting Charles A. Wright & Arthur Miller, Federal Practice and Procedure §

2118). In accordance with Rule 30(e), and for the reasons stated above, the Court recommends that Defendants' Motion to Strike the errata sheet be DENIED.

### *B. Interrogatory Answers of Elizabeth Metayer*

Defendants next seek to strike portions of Plaintiff Elizabeth Metayer's Answers to Interrogatories because the answers are not made on personal knowledge as required by Fed.R.Civ.P. 56(e). As Defendants note, the First Circuit has found that " [i]n summary judgment proceedings, answers to interrogatories are subject to exactly the same infirmities as affidavits." *Garside v. Osco Drug, Inc.* 895 F.3d 46, 49 (1st Cir.1990) (citing *H.B. Zachary Co. v. O'Brien,* 378 F.2d 423, 425 (10th Cir.1967)). Therefore, to have any probative force on a motion for summary judgment, the interrogatory answers must be based on Plaintiff Elizabeth Metayer's personal knowledge.

Defendants argue that the answers are inadequate to merit inclusion in the summary judgment record. Defendants point to the jurat at the end of the interrogatory answers where Plaintiff states that the answers are "to the best of her knowledge, information and belief." This District has previously indicated, when ruling on the sufficiency of affidavits, that the jurat cited above is insufficient for the purposes of Rule 56(e). *Clapp v. Northern Cumberland Mem. Hosp.,* 964 F.Supp. 503, 507 (D.Me.1997). However, in *Clapp,* this Court nonetheless relied on the deficient affidavit for factual statements that were clearly within the plaintiff's knowledge. *Id.* at 507 n. 5. Here, the Court will follow the same path.

Upon reviewing the specific answers, the Court is satisfied that many of the statements are insufficient because they contain averments that Plaintiff " believes" to be true. Therefore, for the purposes of this motion, the Court will not consider the statements in which Mrs. Metayer states only a " belief". I recommend that the Court STRIKE those statements as indicated below:

A2. My family had two health insurance policies

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)
(Cite as: Not Reported in F.Supp.2d)

from the State Farm Mutual Automobile Insurance Company since well prior to 1990. We made application with William Fox for health insurance through PFL and/or NASE in February of 1994 ~~and I believe that the PFL health insurance was effected in February or March of 1994.~~ In the early part of 1996, ~~i believe January of 1996,~~ we cancelled the PFL policy. We then obtained health insurance through John Alden Life Insurance Co., Group Number 924629-000 1 (Metayer Foundations, Inc.). Subsequently in January or February of 1998, the John Alden policy was canceled and we obtained health insurance from Tufts.

*4 I am not sure of the effective dates of each policy and annual premiums for each policy. However, I understand that we will make available the documents in my possession relative to all health insurance policies from 1990 to the present.

A3. There were two occasions when William Fox made a sales presentation at our home. ~~i believe the first such visit occurred in the fall or early winter of 1994.~~ It occurred when we were living on the Running Springs Road in Gorham. At that meeting William Fox and I were present.

It is impossible for me to recall verbatim everything that was said at that meeting several years ago. We discussed the current medical insurance that my family had through State Farm. Mr. Fox indicated that he understood my husband was a contractor and he stated that the PFL policy was a superior health insurance policy especially with respect to self-employed contractors because he felt that self-employed people in the construction industry seldom get sick but often have accidental injuries. He indicated that this was a particularly good policy because it covered one hundred percent of all expenses related to any accidental injury.

~~it is my belief that various rates may have been discussed with respect to different levels of coverage.~~ My lawyer advises me that notes taken at this meeting will be made available in response to Defendant's request for production. I also recall that Mr. Fox stated that the policy was guaranteed to cover pre-existing condition. ~~although I am not certain, I believe that he reviewed a copy of our~~

~~then current State Farm policy.~~ I know that I gave him some background information as to my husband's occupation and our family. I don't recall the specifics of the information that I gave to him. I do recall that he showed me some pamphlets or booklets that explained NASE and benefits attributable to being a member of NASE.

The second meeting was in early 1994. While I don't have a specific memory of the date, I note that I wrote a check to Mr. Fox on February 15, 1994. ~~i believe this check covered the NASE membership fee and an initial payment to PFL for the health insurance.~~ At this second meeting, myself, my husband and our four employees, Oren White, Todd Wing, Devereaux Barnes and Rick Jordan were present.

~~i believe at this meeting Mr. Fox asked a series of questions concerning my family, their ages, health, etc.~~ We filled out certain paperwork. ~~i believe that he filled out an application which I and my husband signed at that meeting.~~ At this meeting our State Farm health insurance policy was discussed as was the cost of the insurance. I was repeatedly assured by Mr. Fox that this coverage was much better than that which was provided by the State Farm policy, particularly with respect to accidental injuries (it covered 100% of all expenses related to an accidental injury) and because it was available through PFL at a better price.

I also recall a discussion at the second meeting about a prescription drug plan through NASE.

*5 I recall one or perhaps two of the employees, although I am not sure which ones, inquiring as to the accidental injury coverage. My recollection is that Mr. Fox indicated that he had suffered a serious knee or leg injury skiing, requiring substantial treatment and that the PFL policy covered all expenses related thereto.

A7. I am not sure on what date I received the PFL health insurance policy. ~~i believe it was received by regular mail, but I am not certain of this.~~ I am certain that I reviewed the policy within a reasonable amount of time after receipt. I cannot state that I read and understood each word

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

verbatim. Like all insurance policies that I have reviewed, I found the entire policy to be somewhat confusing and difficult to understand. I am not a lawyer. I relied on Mr. Fox's description of the policy and I do not recall making any further inquiries of PFL or Fox or NASE.

### C. David Saucier's Affidavit

Defendants next ask the Court to strike the affidavit of David Saucier, a former employee at PFL, because the statements in his affidavit are irrelevant, lack a proper foundation and contain hearsay. In the affidavit, Saucier states that he was under contract with UGA to act as a health insurance agent for PFL. Saucier then makes a series of statements based on his employment as a health insurance agent for PFL. The Court is satisfied that, for purposes of this motion, the affidavit indicates a sufficient foundation for Saucier to state what he saw and experienced while employed at PFL. The Court is also satisfied that the affidavit is relevant to the Plaintiffs' suit, especially with regard to Plaintiffs' claim that Defendants negligently hired and trained its agents. For the reasons stated, I recommend that the Court not strike Saucier's affidavit.

### D. Elizabeth Metayer's Affidavit

Defendants ask the Court to strike the exhibits attached to Elizabeth Metayer's affidavit. Defendants contend that the exhibits, Plaintiffs' hospital bills, must be sworn to or must be certified copies in order to be considered by the Court on a motion for summary judgment. F.R. Civ. P. 56(e) (" Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.") Because the attached exhibits do not fulfill the requirements of the Rule, I recommend that the exhibits be STRICKEN.

### Summary Judgment

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A material fact is one which has the 'potential to affect the outcome of the suit under applicable law.' ' *FDIC v. Anchor Properties,* 13 F.3d 27, 30 (1st Cir.1994) (quoting *Nereida-Gonzalez v. Tirado-Delgado,* 990 F.2d 701, 703 (1st Cir.1993)). The Court views the record on summary judgment in the light most favorable to the nonmovant. *Levy v. FDIC,* 7 F.3d 1054, 1056 (1st Cir.1993).

**\*6** However, summary judgment is appropriate " against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Once the moving party has presented evidence of the absence of a genuine issue, the nonmoving party must respond by "placing at least one material fact in dispute." *Anchor Properties,* 13 F.3d at 30 (citing *Darr v. Muratore,* 8 F.3d 854, 859 (1st Cir.1993)).

### Factual Background

With the law cited above in mind, the Court recites the following facts in a light most favorable to the nonmovants, i.e., Plaintiffs. In late 1993, Elizabeth Metayer responded by telephone to an advertisement for health insurance that appeared in a National Association of Self-Employed ("NASE") publication. Mrs. Metayer was interested in the advertisement because she believed her premiums with State Farm were "going sky high." E. Metayer Depo. at 20. She also wanted to determine what type of health insurance coverage her employees at Metayer Foundations, Inc., a construction company owned by Plaintiffs, could obtain. William Fox (" Fox"), a health insurance agent for PFL and UGA, returned Elizabeth Metayer's call and they met in the fall of 1993. [FN2]

FN2. Technically, William Fox had a contract with NASE Field Services Agency (NFSA). UGA does business under that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

name. Fox was under contract with NFSA to solicit insurance applications for UGA. PFL maintained an agreement with UGA in which UGA sold PFL policies. SMP ¶ 6.

At the first meeting between Elizabeth Metayer and Fox, Fox presented her with a NASE-endorsed PFL health insurance plan called the "Small Business Basic Plan"-the GHP 7 policy. Fox brought with him a notebook on the policy that described what the policy covered. During the meeting, Metayer and Fox compared the existing deductible and premium amounts in the GHP 7 policy with Metayer's State Farm policy. Elizabeth Metayer and Fox also discussed the policy's coverage of existing conditions and coverage of Plaintiffs' employees, (should the employees choose to apply for the policy), and generally compared the coverage under the GHP 7 policy with the coverage under the State Farm policy. During this meeting Fox told Mrs. Metayer that the GHP 7 policy covered 100 percent of the medical bills related to accidental injuries and that the GHP 7 policy was superior to Plaintiffs' existing policy.

The facts in the record present conflicting accounts as to whether Mrs. Metayer decided to purchase the GHP 7 policy prior to her second meeting with Fox on February 15, 1994. In any event a second meeting was held at which Mrs. Metayer was accompanied by Mr. Metayer and four of their employees. Fox presented the GHP 7 policy to the Metayers and the employees. At the meeting Fox again represented that the Plan covered 100 percent of the medical costs stemming from accidental injuries. Mrs. Metayer asserts she overheard Fox telling the employees that he had suffered a knee injury while skiing and that the policy had covered all the costs related to his injury.

The Metayers decided to purchase the policy and filled out an application. Mrs. Metayer did not read the application until after she signed it. In the top right hand corner of the page preceding Plaintiffs' signature, the figure of "$600" is written next to the line entitled "Accidental Benefit."

*7 At the second meeting, both Plaintiffs also

separately signed identical documents entitled " Confirmation of Presentation and Acknowledgment of Delivery." By signing this document Plaintiffs acknowledged that they reviewed the Outline of Coverage also known as the "Small Basic Business Plan". On page thirteen of the Outline of Coverage is an "Outpatient Accidental Expense Benefit Rider" which is circled with the notation "included". The last line of the Rider reads "Your choice of maximum benefit payable under this option is: ☐ ]]]]]]] $600 ☐$1200." Although Fox routinely checks off one of the boxes in the Rider, neither box was checked off.

By signing the "Confirmation of Presentation and Acknowledgment of Delivery" Plaintiffs also acknowledged that they would not receive coverage until their application was approved by Defendants. Furthermore, the Acknowledgment of Delivery gave Plaintiffs ten days to review the Plan and cancel their coverage. However, Mrs. Metayer did not review the policy until several weeks after she purchased it. Even after she reviewed the policy, she found the description of the policy confusing and continued to believe that the Plan covered 100 percent of medical costs related to accidental injuries.

In the fall of 1995, Mr. Metayer suffered a serious injury at work and as a result spent several months in the hospital. He incurred considerable medical bills from various medical providers including Maine Medical Center. PFL agreed to pay approximately $85,000 of the $465,000 of bills incurred. As a result of Defendants' refusal to pay the remaining portion of the bills, Mr. Metayer became distressed and spent approximately one week in Maine Medical Center's psychiatric unit.

*Facts relevant to Plaintiffs' claim of negligent hiring and training*

Defendants hired agents without regard to their educational background or training in the insurance industry. PFL trained its agents, in groups of three to four, by going over the Outline of Coverage page by page and by going over applications, pricing and other paperwork needed to process the application.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 7

Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

Training agents to understand the substance of the Outline of Coverage normally took half a day. Training in the other areas typically took three to five days. PFL did not train its agents on what was legal and illegal when selling health insurance. PFL encouraged its agents to relate their own experiences with injuries and health coverage. In accordance with that suggestion, Fox sometimes mentioned his knee injury and the coverage he received to prospective customers. Although Fox stated that 100 percent of his medical expenses from his knee injury were covered, some of those expenses in fact were not covered.

An agent trained by PFL avers that PFL agents were trained to represent that PFL's policy covered 100 percent of the medical costs attributed to accidental injury. The same affiant also states that agents were trained to spend little time discussing policy coverage and were told to focus on comparing the deductibles and premiums available of the PFL policy to the prospective customers existing policy.

Legal Analysis

*A. Justifiable Reliance*

**\*8** Defendants argue that it is entitled to summary judgment on all Counts because based on the facts in the record Plaintiffs could not have, as a matter of law, justifiably relied on Fox's statements. The misrepresentations alleged are:
(1) Fox said that the policy covered 100 percent of medical expenses that arose out of an accidental injury;
(2) Fox said that he had earlier been injured in a skiing accident and that the policy covered all his expenses when, in fact, not all of his injuries were covered under the policy;
(3) Fox generally compared the two policies, and stated that the PFL policy was superior to the State Farm policy.

Defendants argue that even assuming that Fox made these statements, Plaintiffs could not have reasonably relied on those statements because:(1) the Outline of Coverage indicated that the maximum benefit available under the Outpatient Accidental Expense Benefit is $600 or $1200;
(2) the application signed by Plaintiffs indicated the Accidental Benefit amount as $600.

Defendants maintain that because the written materials signed and reviewed by Plaintiffs clearly indicate a limitation on the accidental coverage, Plaintiffs could not, as a matter of law, have justifiably relied on Fox's misrepresentations.

In *Ferrel v. Cox,* 617 A.2d 1003, 1006 (Me.1992), the Law Court addressed whether a claim for fraud is precluded where alleged oral misrepresentations contradict a signed agreement.
Maine precedent is clear. A signed agreement that contradicts prior oral statements does not bar an action for fraud as a matter of law... A plaintiff's reliance on the fraudulent misrepresentations of a defendant *is unjustified only if the plaintiff knows the representation is false or its falsity is obvious to the plaintiff.*

*Id.* (citation omitted) (italics added).

Defendants do not contend that Plaintiffs knew that the misrepresentations were false. Instead, as stated above, Defendants assert that the falsity of Fox's statements was obvious to Plaintiffs. The Court is satisfied that questions of fact exist as to whether the falsity of Fox's statements was obvious to Plaintiffs. The Court arrives at this conclusion for the following reasons:
1. Fox repeatedly stated that the PFL policy covered 100 percent of medical costs related to accidental injuries;
2. Fox related a story that a ski injury he suffered was completely covered by the policy when, in fact, the policy did not cover all his medical costs related to the injury;
3. Although it appears that Fox went over the Accidental Coverage in the Outline of Coverage, it is not at all clear in what detail he did so. In fact, although Fox normally checks one of the boxes that indicates whether the applicant chose $600 or $1200 benefit, neither box was checked;
4. Although the upper left hand corner of the application indicates that Plaintiffs chose $600 of accidental coverage, this notation is not in Plaintiffs'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 8

Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

handwriting nor is it initialed by either of the Plaintiffs. Further, Plaintiffs do not recall discussing such a limitation, nor is the limitation set out in a manner as to make it obvious to the applicants that they were choosing that coverage.

**\*9** For the reasons stated above, I am satisfied that questions of fact remain as to whether Plaintiffs justifiably relied on Fox's statements regarding the coverage under the policy and therefore recommend that Defendants' motion be DENIED.

*B. Defendants' claim that Plaintiffs' Recovery pursuant to their Misrepresentation Claims is Limited Because Maine Medical Center Failed to File a Counterclaim Against Plaintiffs*

In addition to this action against PFL and UGA, Plaintiffs have brought a separate medical malpractice action against Maine Medical Center in the state superior court relating to its treatment of Mr. Metayer after his accident. *Metayer v. Maine Medical Center,* CV 97-188 (Cumb.Cty.). That action is scheduled for trial this fall.

Defendants argue that because Maine Medical Center ("MMC") has not asserted a counterclaim for unpaid bills against Plaintiffs in the state action, Plaintiffs cannot recover medical expenses owed to MMC from Defendants. Defendants first point out that intentional and negligent misrepresentation are claims in which the claimant is entitled only to pecuniary loss. The Court agrees. *See Jourdain v. Dineen,* 527 A.2d 1304, 1307 (Me.1987) (claims of intentional misrepresentation are limited to pecuniary loss); *Chapman v. Rideout,* 568 A.2d 829, 830 (Me.1990) (adopting Restatement which limits recovery for negligent misrepresentation to pecuniary loss.)

Defendants next argue that because the pecuniary damages alleged by Plaintiffs relate, in large part, to the medical bills owed by Plaintiffs to MMC, Plaintiffs cannot be awarded those damages because MMC waived any claim to the bills by failing to file a counterclaim in the state action pursuant to M.R. Civ. P. 13(a).[FN3] While Defendants may ultimately be correct, the Court cannot at this time conclude

that MMC waived its claim to those medical bills.

> FN3. Rule 13(a) provides:
> a pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim, and does not require for its adjudication the presence of third-parties of whom the court cannot acquire jurisdiction.

Although M.R. Civ. P. 13(a) requires a party to file a claim that arises out of the "same transaction or occurrence that is the subject matter of the claim" it is by no means clear that MMC has waived its opportunity to assert a counterclaim against Plaintiffs. Defendants have not pointed this Court to any time limitation within the Rule that would require the Court to conclude that MMC has waived its opportunity to assert a counterclaim. In fact, M.R. Civ. P. 15(a) states that leave to amend a pleading, "shall be freely given when justice so requires." This Court cannot conclude, as a matter of law, that the state court would prevent MMC from filing a counterclaim concerning Plaintiffs' unpaid medical bills. For the reasons explained above, I recommend that Defendants' Motion for Summary Judgment on this count be DENIED.[FN4]

> FN4. Defendants' Motion to Stay this matter is also before the Court. (Docket No. 28). This Court will act on the motion subsequent to the District Court's action on this Recommended Decision. Of course, if the District Court disagrees with this Court's recommendation and grants the Motion for Summary Judgment, the Motion to Stay becomes moot.

*C. Plaintiffs' Innocent Misrepresentation Claim*

Plaintiffs assert a claim against Defendants for innocent misrepresentation as set forth in the Restatement (Second) of Torts § 552C. Maine has never adopted innocent misrepresentation as a cause

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9

Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

of action and the Law Court has explicitly refused to consider whether such an action is recognized in Maine. *Emerson v. Ham,* 411 A.2d 687, 690 (Me.1980). Therefore, this Court must predict what the Law Court would do in this instance.

**\*10** A review of cases decided by the Law Court since *Emerson* leave this Court with almost no direction on whether the Law Court would adopt innocent misrepresentation as a right of action. Plaintiffs cite *Chapman v. Rideout,* 568 A.2d 829, 830 (Me.1990) for the proposition that the Law Court would allow a claim of innocent misrepresentation to proceed before a jury. In *Chapman,* the Law Court adopted the Restatement formulation of negligent misrepresentation. Restatement (Second) of Torts § 552(1) (1977). The Law Court stated, "[w]e adopt the Restatement formulation as it applies to this case. Although scienter is traditionally required, we are persuaded that the Restatement reflects a well-reasoned exception to that requirement." *Chapman,* 568 A.2d at 830. However, the fact that the Law Court allowed one exception to the scienter requirement does not mean it will allow another. If the Law Court were to adopt innocent misrepresentation as a legal remedy in Maine, it would be no small step. As the Court stated in *Emerson,* innocent misrepresentation "would ... impose strict liability on a seller for her alleged misrepresentation." *Emerson,* 411 A.2d at 690. In the absence of stronger signals from the Law Court, the Court cannot find that the Law Court would adopt the tort of innocent misrepresentation as set out in the Restatement. For this reason above, I recommend that Defendants' Motion for Summary Judgment be GRANTED as to Plaintiffs' innocent misrepresentation claim.

### D. Intentional Infliction of Emotional Distress

Defendants maintain that the facts alleged by Plaintiffs do not support their claim for emotional distress. To support a claim for intentional infliction of emotional distress, Plaintiffs must establish that:
(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result

from his conduct;
(2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community;
(3) the actions of the defendant caused the plaintiff's emotional distress; and
(4) the emotional distress suffered by the plaintiff was so severe that no reasonable man could be expected to endure it.

*Maine Mut. Fire Ins. Co. v. Gervais,* 715 A.2d 938, 940 (Me.1998) (citing *Vicnire v. Ford Motor Credit Co.,* 401 A.2d 148,154 (Me.1979)).

The Court is satisfied that the record contains no averments by Plaintiffs that Mrs. Metayer suffered emotional distress. For that reason, the Court recommends that Defendants' motion as to Mrs. Metayer be GRANTED.

Mr. Metayer, however, claims that his one week stay at the psychiatric unit at MMC was caused, at least in part, by Defendants' refusal to pay his medical bills. Defendants contend the Plaintiffs have failed to allege facts from which a reasonable jury could conclude that Fox, Defendants' agent, acted in an extreme and outrageous manner, exceeding the bounds of all possible decency, that no reasonable person could endure.[FN5] In Maine:

> FN5. The Court rejects Defendants' assertion that Mrs. Metayer was the only person to whom the alleged misrepresentations were made. It is undisputed that Mr. Metayer was present at the second meeting at which the misrepresentations were allegedly made.

**\*11** [i]t is for the Court to determine, in the first instance whether the Defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery, or whether it is necessarily so. Where reasonable [people] may differ, it is for the jury, subject to the control of the Court to determine whether, in a particular case the conduct has been sufficiently extreme and outrageous to result in liability.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10

Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

*Colford v. Chubb Life Insurance Co.,* 687 A.2d 609, 616 (Me.1996) (quoting *Rubin v. Matthews Int'l Corp.,* 503 A.2d 694,699 (Me.1986)).

Plaintiffs maintain that Fox's misrepresentations and Defendants' negligence in training its agents were sufficiently outrageous to require submission this claim to the jury. The Court agrees. The Court arrives at this conclusion based on the alleged conduct of the Defendants beyond any misrepresentations allegedly made by Fox. *See Massengale v. Ogu,* No. 91-489-LFO, 1992 WL 25894 at *1 (D.D.C. Jan. 28, 1992) ("fraud alone is not enough to state [such] a claim [of intentional infliction of emotional distress] ... Such a claim must include some outrageous act ...."). Plaintiffs have presented evidence that Defendants trained their agents to represent to customers that the policy covered 100 percent of the medical costs related to accidental injuries, even though that representation was false, and trained their agents to spend as little time as possible explaining the scope of coverage provided by the plan. If it is proved at trial that this training led to the alleged misrepresentations, the Court is satisfied that a reasonable jury could find that such training constituted extreme and outrageous conduct. For the reasons stated above, I recommend that Defendants' motion on this ground be DENIED as to Mr. Metayer and GRANTED as to Mrs. Metayer.

### E. Negligence

Plaintiffs claim that Defendants, through their agent, breached their duty to use due care in explaining the policy coverage and to provide insurance as represented by Fox. Defendants counter that Fox was solely a soliciting agent for them and as such, did not owe the duties Plaintiffs' claim they are owed. Maine law is clear that when an agency relationship does not exist between the agent and the insured, the agent does not have a duty to advise the insured as to the adequacy of the coverage. *Ghiz v. Richard S. Bradford,* Inc., 573 F.2d 379, 380-81 (Me.1990). An insurance agent only undertakes a duty to adequately explain the coverage in the plan when the agent procures insurance for another. *Roberts. v. Maine Bonding &*

*Cas. Co.,* 404 A.2d 238 (Me.1979).

Here, Fox never undertook a duty to procure for Plaintiffs insurance that would cover 100 percent of accidental injury expenses. Fox presented himself as an agent for Defendants and offered to sell Plaintiffs one plan. He never agreed to act as Plaintiffs' agent and find a plan to meet their needs. For these reasons, Defendants cannot be liable under the legal theory advanced by Plaintiffs.

**\*12** In their Amended Complaint filed just before Defendants' Motion for Summary Judgment, Plaintiffs assert, within the negligence count, that Defendants negligently hired and trained their agents, including Fox. Defendants suggest that Plaintiffs have not asserted facts indicating that such negligence caused harm to Plaintiffs. While Defendants ultimately may be correct, the Court is satisfied that based on the facts in the record a trier of fact could conclude that: (1) Fox made misrepresentations concerning the policy's scope of coverage; and (2) those misrepresentations were caused by Defendants' failure to properly train Fox. *See infra* pp. 12-13. I recommend that Defendants' motion on this count be GRANTED to the extent Plaintiffs' claim is based on the alleged misrepresentations and DENIED to the extent Plaintiffs' claim is based on the negligent hiring and training of Fox.

### F. Negligent infliction of Emotional Distress

Plaintiffs next assert a claim of negligent infliction of emotional distress. To establish such a claim Plaintiffs must demonstrate that: (1) Defendants were negligent; (2) it was reasonably foreseeable that the negligent conduct would cause emotional distress; and (3) Plaintiffs in fact suffered severe emotional distress. *Krennerich v. Town of Bristol,* 943 F.Supp. 1345, 1357 (D.Me.1996) (citing *Bolton v. Caine,* 584 A.2d 615, 617-18 (Me.1990)).

As discussed above, Mrs. Metayer has failed to allege any facts that she suffered emotional distress. Therefore I recommend that Defendants' motion as to Mrs. Metayer be GRANTED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

Defendants argue that because Mr. Metayer's claims are similar to a breach of contract action, he cannot now recover for negligent infliction of emotional distress absent a showing of some physical injury arising from Defendants' tortuous conduct. *See McAfee v. Wright,* 651 A.2d 371 (Me.1994); *Marquis v. Farm Family Mutual Insurance Co.,* 628 A.2d 644, 651 (Me.1993). While it is true that Mr. Metayer does not allege a physical injury, he does, as stated above, allege an independent underlying negligence claim against Defendants. In Maine, "[a] contention [of] mental distress is insufficient in and of itself to establish the harm necessary to make negligence actionable, without either accompanying physical consequences, *or an independent underlying tort.*" *Rubin v. Matthews Intern. Corp.,* 503 A.2d 694 (Me.1986) (italics added). Having alleged an independent underlying tort, negligence, no physical injury need be alleged by Mr. Metayer. Accordingly, I recommend that Defendants' motion on this claim be DENIED as to Mr. Metayer and GRANTED as to Mrs. Metayer. [FN6]

> FN6. Because Defendants did not discuss whether the emotional distress suffered by Mr. Metayer was reasonably foreseeable from the negligence alleged, the Court does not address that issue in this decision.

### G. Contract claim

Plaintiffs next claim that Defendants, through their agent, breached a contract between them and Plaintiffs by failing to provide 100 percent coverage for accidental costs. The Court disagrees. Based on the facts in the record, it is clear that Fox, Defendants' agent, never contracted to provide 100 percent coverage to the Plaintiffs. As Defendants correctly note, the cases cited by Plaintiffs for the proposition that an insurance agent may be contractually bound to the oral declarations made to a customer are cases in which the broker explicitly agreed to procure a particular type of coverage requested by the customer. *Bramson v. Chester L. Jordan & Co.,* 379 A.2d 730,732 (Me.1977); *Miller v. Liberty Ins. Co.,* 213 A.2d 831 (Me.1965). Here, Fox only agreed to sell the one PFL policy offered

and never agreed to procure a particular type of coverage for the Plaintiffs.

*\*13 Furthermore, Fox only agreed to submit the insurance application to the company, which under the general principles of insurance law constitutes an offer by the prospective customer to the insurance company. *Couch on Insurance,* 3d § 11.1 ("A blank application is generally not regarded as an offer, but as a proposal from the insurer to make a contract of insurance. When the applicant completes the application and returns it to the insurer, it becomes an offer for an insurance contract.") The type of misrepresentations allegedly made by Fox are insufficient to constitute an offer triggering formation of a contract. Accordingly, I recommend that Defendants' motion on this count be GRANTED.

### H. Maine's Deceptive Trade Practices Act

In their Complaint, Plaintiffs assert a claim against Defendants under the Deceptive Trade Practices Act, Me.Rev.Stat. Ann. tit. 10, §§ 1211-1216. At an oral hearing on Defendants' Motion for Summary Judgment, Plaintiffs agreed to withdraw this claim.

### I. Unfair Trade Practices Act

Plaintiffs next argue that Defendants, through their agent, violated the Unfair Trade Practices Act ("UTPA"), Me.Rev.Stat. Ann. tit. 5, §§ 205-214. Plaintiffs allege that Defendants' conduct "constitutes unfair methods of competition and unfair and deceptive acts or practices in the conduct of trade or commerce." Plaintiffs' Complaint at ¶ 63. Defendants counter that the UTPA exempts from its scope those industries already regulated by Maine or the United States. Specifically, "[t]ransactions or actions otherwise permitted under laws as administered by any regulatory board or officer under statutory authority from the state or of the United States ..." are exempt from UTPA. 5 Me.Rev.Stat. Ann. tit. 5, § 208(1). In accordance with the plain language of the section, the Law Court refused to allow a defendant to file a counterclaim under UTPA because the plaintiffs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)
**(Cite as: Not Reported in F.Supp.2d)**

plaintiff. Punitive damages will also be available, however, where deliberate conduct by the defendant, although motivated by something other than ill will in any particular party, is so outrageous that malice toward a person injured as a result of that conduct can be implied. We emphasize that, for the purposes of assessing punitive damages, such " legal" or "implied" malice will *not* be established by the defendant's mere reckless disregard of the circumstances.

**\*15** *Tuttle v. Raymond,* 494 A.2d 1353, 1361 (Me.1985). (citations omitted).

The Court is satisfied that Plaintiffs have not asserted facts from which a trier of fact could find that actual malice existed. Therefore, the Court must determine whether Defendants' actions, through its agent and on their own part, were so outrageous that malice may be implied. Plaintiffs argue, and the Court agrees, that the following evidence would allow a trier of fact to impose punitive damages on Defendants: (1) PFL trained its agents to represent that the PFL policy covered 100 percent of medical expenses related to accidental injuries when in fact it did not; (2) PFL trained its agents to spend minimal time reviewing the coverage the policy provided; (3) Agent Fox, on more than one occasion, falsely represented to Plaintiffs that the PFL policy covered 100 percent of medical costs related to accidental injuries. The Court is satisfied that based on these facts, a trier of fact could find implied malice and impose punitive damages against Defendants. Accordingly, I recommend that Defendants' motion as to this count be DENIED.

*L. ERISA Preemption*

Defendants also argue that ERISA preempts Plaintiffs' claims. Recently, this Court held that a misrepresentation that occurs prior to the insurance policy's effective date is not covered by ERISA. *See Stetson v. PFL Insurance Co.,* 16 F.Supp.2d. 28 (D.Me.1998). Pursuant to the Court's reasoning in *Stetson,* Plaintiffs' claims are not preempted by ERISA.

### Conclusion

For the reasons delineated above, I recommend that Defendants' Motion to Strike be GRANTED in part and DENIED in part and that Plaintiffs' Motion to Strike be DENIED. Further, I recommend that Defendants' Motion for Summary Judgment be GRANTED as to Counts II, V, VI, VII, and VIII and DENIED as to Counts I, III, IV, XI, X and XII. Defendants' motion as to Counts IX, X and XI is GRANTED in part and DENIED in part.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) (1988) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.
Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

D.Me.,1999.
Metayer v. PFL Life Ins. Co.
Not Reported in F.Supp.2d, 1999 WL 33117063 (D.Me.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# In The Matter Of:

*Craig Goulet,    v.*
*New Penn Motor Express, et al.,*

---

*Craig Goulet*
*October 4, 2005*

---

*JANEY ASSOCIATES*
*Court Reporting Services*
*P.O. Box 365355*
*BOSTON, MA   02136-0003*
*(617) 364-5555     FAX: (617) 364-5550*

*Original File CGOU.ASC, 107 Pages*
*Min-U-Script® File ID: 1567331494*

# Word Index included with this Min-U-Script®

Craig Goulet, v.
Case 1:04-cv-12577-WGY   Document 77-3   Filed 06/17/2006   Page 3 of 43
New Penn Motor Express, et al.,

Craig Goulet
October 4, 2005

1-107
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRAIG GOULET,
  Plaintiff,
- vs. -     • C.A. # 04-12577-JLT
NEW PENN MOTOR EXPRESS,
and
TEAMSTERS LOCAL 25
INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
  Defendant.

DEPOSITION of CRAIG GOULET, a witness called by and on behalf of the defendants, pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Michael C. Janey, a Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Dwyer, Duddy and Facklam, P.C., Two Center Plaza, Suite 430, Boston, Massachusetts, 02108 on Tuesday, October 4, 2005, commencing at 10:05 a.m.

Page 2

APPEARANCES:
  Scott A. Lathrop, Esquire, law office of SCOTT A. LATHROP, 122 Old Ayer Road, Groton, Massachusetts, 01450,
  (978) 448-8234; on behalf of the Plaintiff.
  Kathleen A. Pennini, Esquire, law offices of DWYER, DUDDY AND FACKLAM, Two Center Plaza, Suite 430, Boston,
  Massachusetts, 02108, (617) 723-9777; on behalf of the Defendant, International Brotherhood of Teamsters, Local 25.
  Carl H. Gluek, Esquire, law office of FRANTZ WARD, LLP, 2500 Key Center, 127 Public Square, Cleveland, Ohio, 44114-1230, (216) 515-1660; on behalf of Defendant, New Penn Motor Express.
  Also Present: Mark Harrington
      JANEY ASSOCIATES

Page 3

INDEX
DEPOSITION OF:                          Page
CRAIG GOULET
Examination by Ms. Pennini          6
Examination by Mr. Gluek           65
Examination by Ms. Pennini         96
Examination by Mr. Lathrop        103
EXHIBITS:                            Page
#1   (Grievance Decision)           25
#2   (Grievance Report dated 4/7/03)  41
#3   (Letter to M. Harrington from C. Goulet,
      dated 7/25/03)                42
#4   (Letter to M. Harrington from C. Goulet,
      dated 11/24/03)               49
      JANEY ASSOCIATES

Page 4

[1] **STIPULATIONS**

[2] It is hereby stipulated and agreed by and [3] between counsel for the respective parties that the [4] reading and signing of the deposition by the witness [5] is not waived, but that the deposition may be signed [6] under the pains and penalties of perjury within [7] forty-five days of receipt of the transcript.

[8] It is further stipulated and agreed that [9] all objections, except as to the form of the [10] questions, and motions to strike shall be reserved [11] until the time of hearing or trial in this matter.

[12] CRAIG GOULET, having duly affirmed that [13] his testimony would be the truth, the whole truth, and [14] nothing but the truth, testified as follows in answer [15] to direct interrogatories:

[16] MS. PENNINI: Before we begin, do we [17] stipulate to the usual stipulations, objections except [18] as to form reserved until trial?

[19] MR. LATHROP: And motions to strike.

[20] MS. PENNINI: And motions to strike, I m [21] sorry. And regarding the signing of the deposition?

[22] MR. LATHROP: Mr. Goulet will read it and [23] sign it, and if we can waive the requirement that he [24] sign it in front of a notary and still simply sign it

Page 5

[1] under the pains and penalties of perjury, that would [2] be acceptable to me.

[3] MS. PENNINI: That s fine with me.

[4] MR. GLUEK: That s fine.

[5] MS. PENNINI: Will that be thirty days from [6] receipt of the deposition?

[7] MR. LATHROP: If we want to do it by [8] agreement, let s make it just forty-five.

[9] MS. PENNINI: Okay. Forty-five days is [10] fine.

[11] MR. GLUEK: We don t have a motion date [12] pending, correct?

[13] MS. PENNINI: I m sorry.

[14] MR. GLUEK: There is no motion date [15] pending.

[16] MR. LATHROP: I don t believe so. I [17] believe all we have is November 1st.

[18] MR. GLUEK: Right. That is our pretrial, [19] so conceivably this judge, he could schedule a very [20] short time line.

[21] MR. LATHROP: The flip side is he gave us [22] until the end of the month to complete discovery [23] anyway, so I don t think he could — I mean, I would [24] support you and say, this is too short a deadline, we

Page 6

[1] don t even have the transcript back yet if he tries to [2] do it.

[3] MR. GLUEK: Okay. That s fine.

[4] MR. LATHROP: I was under the impression [5] after the first scheduling conference that this is [6] more of a status conference to see whether discovery [7] has been completed before setting any additional [8] deadlines.

[9] MR. LATHROP: I m sure that is the case. [10] Unlike other pretrial conferences in Massachusetts [11] where you establish in advance all the motion [12] deadlines and so forth.

[13] MS. PENNINI: Right, because we only solely [14] discussed discovery at the first scheduling [15] conference.

[16] MR. LATHROP: If you are concerned about [17] that I will support you in the notion that an early [18] cut off time is unfair to you.

[19] MR. GLUEK: Okay [20] EXAMINATION [21] BY MS. PENNINI:

[22] Q: Could you please state your name?

[23] A: Craig Steven Goulet, Sr.

[24] Q: Could you spell your last name, please?

Page 7

[1] A: G-O-U-L-E-T.

[2] Q: And where do you currently live?

[3] A: 305 Cox Street, Hudson, Massachusetts.

[4] Q: Are you currently employed?

[5] A: No.

[6] Q: Are you currently a member of Teamsters Local [7] 25?

[8] A: Yes, I am.

[9] Q: How long have you been a member of Teamsters [10] Local 25?

[11] A: Since 1987.

[12] Q: Were you ever a member of any other Teamsters [13] local?

[14] A: Yes, I was.

[15] Q: And what local?

[16] A: Local 170.

[17] Q: When were you a member of Local 170?

[18] A: 1979.

[19] Q: Until what time?

[20] A: Until 1987.

[21] Q: What employers did you work for while a member [22] of Local 170?

[23] A: I worked for McLean Trucking.

[24] Q: And where is that located?

Page 8

[1] A: It was on Route 20 in Shrewsbury.

[2] Q: What did you do at McLean Trucking?

[3] A: I worked on the loading dock.

[4] Q: How long did you work there?

[5] A: Off and on until they went out of business [6] sometime in the early 80's.

[7] Q: So beginning in 79?

[8] A: Um-hum.

[9] Q: Anyplace else?

[10] A: Pilot Freight Carriers.

[11] Q: And when did you work there?

[12] A: From 1979 until they went out of business.

[13] Q: So you ended your employment there because they [14] went out of business?

[15] A: Yes.

[16] Q: Anyplace else?

[17] A: Roadway Express.

[18] Q: And when did you work there?

[19] A: From 1979 until approximately 1984.

[20] Q: Did you work for McLean, Pilot, and Roadway all [21] at the loading dock?

[22] **A:** Yes.

[23] **Q:** And why did you stop working for Roadway [24] Express?

---

Page 9

[1] **A:** I made the list with Sanborns Motor Express.

[2] **Q:** I m sorry, could you repeat that?

[3] **A:** Sanborns. I made the list, the sen-iority list [4] with Sanborns Motor Express.

[5] **Q:** And how is that related to Road-way?

[6] **A:** Separate company.

[7] **Q:** Did you work with these com-panies at the same [8] time or one after the other?

[9] **A:** No, I worked with them all at the same time.

[10] **Q:** And you said you made the sen-iority list with [11] Sanborn?

[12] **A:** Yes.

[13] **Q:** And how long did you work for Sanborn?

[14] **A:** I worked for Sanborns from 1984 up until the [15] time they were bought out by APA Transport.

[16] **Q:** And when was that?

[17] **A:** October, 1986.

[18] **Q:** What facility did you work for for Sanborn?

[19] **A:** Out of their Wrentham, Mass fac-ility.

[20] **Q:** Did you work at Sanborn on the loading dock, as [21] well?

[22] **A:** I was a — I worked the loading dock and I drove [23] for them.

[24] **Q:** Did you continue to work in Wrentham when you

---

Page 10

[1] began working for Sanborn Trucking — I mean, when [2] Sanborn was bought out by APA?

[3] **A:** No, I went to work at the APA Canton facility.

[4] **Q:** When did you begin work at APA in Canton?

[5] **A:** October of 1986.

[6] **Q:** How long did you work for APA?

[7] **A:** I worked for them from October, 1986 until March [8] 11th, 1987.

[9] **Q:** And what happened on March 11th, 1987?

[10] **A:** I was involved in a industrial accident.

[11] **Q:** Could you explain this industrial accident for [12] me, please?

[13] **A:** I was loading a — unloading a truck with a [14] forklift and the truck pulled away from the loading [15] dock.

---

[16] **Q:** How did that result in injury to you?

[17] **A:** Myself and the forklift both went off the [18] loading dock and I ended with a herniated disc in my [19] neck, lower back, torn rotator cuff in my shoulder,[20] torn ligament in my knee.

[21] **Q:** Did you go to the hospital on March 11th [22] following this injury?

[23] **A:** Yes, I did.

[24] **Q:** And what hospital?

---

Page 11

[1] **A:** Goddard Memorial Hospital.

[2] **Q:** Where is Goddard Memorial?

[3] **A:** Stoughton.

[4] **Q:** Had you previously been ter-minated from your [5] employment at APA by letter on February 25th, 1987?

[6] **A:** Yes.

[7] **Q:** And what precipitated that ter-mination?

[8] **A:** I think there was an argument between me and the [9] night boss, a disagreement.

[10] **Q:** Do you recall the date on which this argument [11] with the night boss happened?

[12] **A:** No, not offhand I don t.

[13] **Q:** Was it on February 25th?

[14] **A:** It could ve been.

[15] **Q:** Could it have been before Feb-ruary 25th?

[16] **A:** I don t recall.

[17] **Q:** Had you ever received any written warnings from [18] the terminal manager at APA prior to February 25th?

[19] **A:** Yes, I had.

[20] **Q:** And for what reason were you given a written [21] warning?

[22] **A:** Misloading freight, I think.

[23] **Q:** Do you recall if there were any other [24] disciplinary issues while you were working for APA?

---

Page 12

[1] **A:** Yeah, I think there was.

[2] **Q:** Could you tell me what those are?

[3] **A:** Not offhand, no.

[4] **Q:** Do you recall approximately when they occurred?

[5] **A:** Sometime between October of 86 and March 11th [6] of 87.

[7] **Q:** Do you recall how many disci-plinary issues you [8] had during that time?

[9] **A:** I do not.

[10] **Q:** Do you recall whether they were written warnings [11] or suspensions?

[12] **A:** There was a written warning. May have been [13] several written warnings

---

and a discharge.

[14] **Q:** And was the discharge you are speaking of the [15] one on February 25th?

[16] **A:** Yes.

[17] **Q:** Do you recall how your ter-mination of February [18] 25th was re-solved?

[19] **A:** Yes.

[20] **Q:** How was it resolved?

[21] **A:** It went to the Joint Area Com-mittee.

[22] **Q:** And what was the result?

[23] **A:** I was put back to work.

[24] **Q:** When did you come back to work after the

---

Page 13

[1] February 25th termination?

[2] **A:** I m not sure offhand.

[3] **Q:** Do you recall whether it was in February or [4] March?

[5] **A:** I believe it was March.

[6] **Q:** Do you recall if it was more than a week prior [7] to March 11th?

[8] **A:** No, as I recall I think it was March 11th.

[9] **Q:** So you think you returned back to work on the [10] day you were injured?

[11] **A:** Yes.

[12] **Q:** What time of the day was the accident with the [13] forklift during the unloading of a truck?

[14] **A:** It was approximately 7:30 at night.

[15] **Q:** And you said after that you went to the Goddard [16] Memorial Hospital in Stoughton?

[17] **A:** Yes.

[18] **Q:** Were you kept at the hospital?

[19] **A:** No.

[20] **Q:** What sort of procedures did they do when you [21] were at the hospital during that night?

[22] **A:** They took an x-ray of my leg. I believe they [23] took an x-ray of my neck. Told me to follow up with [24] my doctor.

---

Page 14

[1] **Q:** Did you inform APA of what had occurred at the [2] hospital?

[3] **A:** Yes.

[4] **Q:** And what did they tell you? Did you return back [5] to work on March 12th?

[6] **A:** No.

[7] **Q:** And why didn t you return back to work on March [8] 12th?

[9] **A:** I went out on an industrial acci-dent, Workman s [10] Comp.

[11] **Q:** Had you informed APA that you were unable to [12] return to work on the

---

12th?

[13] **A:** Yes.

[14] **Q:** Were you soon thereafter terminated for the [15] events of March 11th, 1987?

[16] **A:** Yes.

[17] **Q:** And do you recall when you were terminated?

[18] **A:** March 12th.

[19] **Q:** Do you know what sort of Worker s Compensation [20] benefits you received?

[21] **A:** Partial disability.

[22] **Q:** And do you recall why you received partial [23] disability?

[24] **A:** I don t think I understand the question.

---

Page 15

[1] **Q:** Do you understand the difference between partial [2] disability benefits and full disability benefits?

[3] **A:** Yes.

[4] **Q:** And starting soon after March 12th you began to [5] receive partial disability benefits?

[6] **A:** Yes.

[7] **Q:** Do you know why you received partial disability [8] benefits as opposed to full disability benefits?

[9] **A:** That s what the judge ordered.

[10] **Q:** And what judge was this?

[11] **A:** Judge Scannell.

[12] **Q:** When was that ordered by Judge Scannell?

[13] **A:** In June, 1987.

[14] **Q:** Is Judge Scannell an administrative law judge [15] for the Department of Industrial Accident?

[16] **A:** She was at the time, yes.

[17] **Q:** Did you file a grievance as a result of your [18] termination on March 12th?

[19] **A:** The union hall filed a complaint. My business [20] agent at the time filed a complaint.

[21] **Q:** And who was the business agent?

[22] **A:** George Cashman.

[23] **Q:** Do you recall when this complaint was heard?

[24] **A:** Yes.

---

Page 16

[1] **Q:** When was that?

[2] **A:** October 16th, 2001.

[3] **Q:** Could you tell me why there was a lapse of 14 [4] years between the time the complaint was filed and the [5] date of the hearing in this matter?

[6] **A:** Because I was on Workman s Compensation, and the [7] rules of procedure with the grievance committee [8] stip-

---

ulated that they wouldn t hear the case as long as [9] it was pending in another venue.

[10] **Q:** Following the order of Judge Scannell in 1987, [11] did you appeal her granting of partial disability [12] benefits?

[13] **A:** Yes, I believe I did.

[14] **Q:** What was the result of that appeal?

[15] **A:** I m not quite sure.

[16] **Q:** Did you continue to receive partial disability [17] benefits?

[18] **A:** Yes, I did.

[19] **Q:** Do you recall whether there are any additional [20] appeals besides the initial appeal?

[21] **MR. LATHROP:** You are speaking about the [22] industrial accident?

[23] **MS. PENNINI:** I m sorry, I m speaking about the [24] the industrial accident appeal.

---

Page 17

[1] **THE WITNESS:** Yes, I believe there was.

[2] **BY MS. PENNINI:**

[3] **Q:** Do you recall how many appeals there were?

[4] **A:** No.

[5] **Q:** Were all the appeals filed by you or your [6] attorney?

[7] **A:** My attorney.

[8] **Q:** And when were these appeals finally resolved [9] with a final decision, do you recall?

[10] **A:** No.

[11] **Q:** Were there numerous appeals between 1987 and [12] 2001?

[13] **A:** I don t know how many appeals there were, maybe [14] one.

[15] **Q:** And that was heard before 2001?

[16] **A:** Yes.

[17] **Q:** While you were receiving partial Worker s [18] Compensation benefits, did you hold any other [19] employment?

[20] **A:** No.

[21] **Q:** Did you look for additional employment between [22] March 11th, 1987 and October of 2001?

[23] **A:** No.

[24] **Q:** Did you seek any light duty work of any sort?

---

Page 18

[1] **A:** Yes.

[2] **Q:** And where did you seek light duty work?

[3] **A:** With APA.

[4] **Q:** And what was their response, APA s response?

[5] **A:** APA s response was that I was discharged. I was [6] a discharged

---

employee.

[7] **Q:** When did you seek light duty work with APA?

[8] **A:** Sometime in early 1991 or 2 maybe.

[9] **Q:** Did you seek any light duty employment with any [10] other company?

[11] **A:** Nope.

[12] **Q:** In 1991-1992, had you received any documentation [13] from any doctor concerning your ability to return to [14] work?

[15] **A:** I don t recall.

[16] **Q:** Between 1987 and 1991, were there any [17] restrictions concerning your ability to work placed on [18] you by your doctor?

[19] **A:** Yes.

[20] **Q:** And what were those restrictions?

[21] **A:** That I was unable to work.

[22] **Q:** Can you be anymore specific?

[23] **A:** No, not offhand I can t.

[24] **Q:** Did you have any restrictions concerning the

---

Page 19

[1] amount that you could lift?

[2] **A:** Yes.

[3] **Q:** And what was that restriction?

[4] **A:** 35 pounds.

[5] **Q:** Do you recall any other restrictions?

[6] **A:** No, I don t.

[7] **Q:** Do you recall if there were more restrictions [8] than you could not lift more than 35 pounds?

[9] **A:** I don t recall offhand, no.

[10] **Q:** I m sorry, you don t recall what the other [11] restrictions were or you don t recall whether there [12] was more than that one restriction?

[13] **A:** I don t recall at all.

[14] **Q:** So you do not recall whether there was — I m [15] just trying to understand you. You do not recall if [16] there were any other restrictions?

[17] **A:** Yeah, I had a lot of doctor s reports.

[18] **Q:** Did you continue to receive health benefits [19] while you were on Worker s Compensation leave?

[20] **A:** I did up until a point, up until sometime.

[21] **Q:** And when was that time?

[22] **A:** It may have been a year after I got hurt.

[23] **Q:** Do you not recall the exact date?

[24] **A:** I can t be sure. The health and welfare was

---

---

Page 20

[1] paid on my behalf for a period of one year, so I was [2] covered for a year and then possibly six months after [3] that.

[4] **Q:** And after that time did you not have any health [5] benefits?

[6] **A:** I did not.

[7] **Q:** Did you receive any compensation in addition to [8] your partial disability benefits between the years of [9] 1987 and 2001?

[10] **A:** Yes.

[11] **Q:** What form of compensation did you receive?

[12] **A:** Social Security Disability.

[13] **Q:** And when did you receive that, what years?

[14] **A:** I think it was 1995.

[15] **Q:** You began to receive it in 95 or you only [16] received it in 1995?

[17] **A:** No, I began to receive it in 1995.

[18] **Q:** Did you receive any other compensation besides [19] Social Security?

[20] **A:** No.

[21] **Q:** So just to be clear, between 1987 and 2001 the [22] only compensation that you received was from Social [23] Security Disability benefits and Worker s Comp partial [24] disability benefits?

---

Page 21

[1] **A:** Yes.

[2] **Q:** Did you keep in contact with anyone at Teamsters [3] Local 25 while you were out on Worker s Compensation [4] leave?

[5] **A:** Yes.

[6] **Q:** With whom did you keep in contact?

[7] **A:** I spoke with George Cashman over the years.

[8] **Q:** Anybody else?

[9] **A:** Mark Harrington.

[10] **Q:** Do you recall what years you spoke with Mark [11] Harrington?

[12] **A:** Sometime in 2001.

[13] **Q:** So the first time you spoke with Mark Harrington [14] was about 2001?

[15] **A:** Yeah.

[16] **Q:** Do you recall approximately when you would speak [17] to George Cashman?

[18] **A:** No, I don t remember approximately when. Just [19] there was conversation over the years. We talked.

[20] **Q:** How often did you speak with Mr. Cashman?

[21] **A:** About every few months.

[22] **Q:** Would you stop by the union hall to speak with [23] Mr. Cashman?

[24] **A:** I did.

---

Page 22

[1] **Q:** Did you keep in contact with him through any [2] other means?

[3] **A:** No.

[4] **Q:** Would you ever telephone Mr. Cashman?

[5] **A:** Yes.

[6] **Q:** Besides George Cashman and Mark Harrington, did [7] you keep in contact with anyone else at Local 25?

[8] **A:** No.

[9] **Q:** How often would you go to the union hall during [10] that time?

[11] **MR. LATHROP:** I m sorry, what time frame [12] are we talking about here?

[13] **MS. PENNINI:** I m sorry, between 1987 and [14] 2001.

[15] **THE WITNESS:** I don t recall.

[16] **BY MS. PENNINI:**

[17] **Q:** But occasionally you would go to the union hall?

[18] **A:** Occasionally, yes. I used to stop by to pay my [19] dues, something like that.

[20] **Q:** Were you ever a steward for a Teamsters local?

[21] **A:** No.

[22] **Q:** What sorts of discussions would you have with [23] Mr. Cashman?

[24] **A:** I don t know offhand.

---

Page 23

[1] **Q:** You don t recall any general topics of [2] conversations?

[3] **A:** Nope.

[4] **Q:** Would you ever discuss whether you would be [5] returning back to work with Mr. Cashman?

[6] **A:** Nope.

[7] **Q:** Would you discuss what was going on with [8] different employers over at Local 25 with Mr. Cashman?

[9] **A:** Yeah, I think maybe I might ve attended some [10] meetings. You know, general union meetings.

[11] **Q:** Do you recall anything else concerning your [12] correspondence or interaction with Mr. Cashman between [13] 1987 and 2001?

[14] **A:** No.

[15] **Q:** And you said you began to speak or see [16] Mr. Harrington in 2001?

[17] **A:** Yes.

[18] **Q:** Do you recall why you began to speak with [19] Mr. Harrington?

[20] **A:** I had exhausted all my partial disability [21] benefits.

[22] **Q:** Okay. And how is that related to [23] Mr. Harrington?

[24] **A:** Well in order to have my discharge case heard at

---

Page 24

[1] the panel, I needed to discuss it with Mr. Harrington [2] who was the business agent at that time.

[3] **Q:** And you said you had exhausted your partial [4] disability benefits, could you explain to me what you [5] mean by that?

[6] **A:** My benefits came to an end.

[7] **Q:** Is that because you had received a certain [8] number of weeks of benefits?

[9] **A:** Yes.

[10] **Q:** And you said you contacted Mr. Harrington [11] because you wanted your grievance to be heard?

[12] **A:** Yes.

[13] **Q:** Was your grievance subsequently heard?

[14] **A:** Yes, it was.

[15] **Q:** And what s the date of that?

[16] **A:** October 16th, 2001.

[17] **Q:** Where was this grievance heard?

[18] **A:** At the union hall.

[19] **Q:** Do you recall who it was heard by?

[20] **A:** It was heard by the committee.

[21] **Q:** And what committee was this?

[22] **A:** It was the Southern New England Joint Area [23] Committee.

[24] **Q:** And you said it was held at the union hall,

---

Page 25

[1] which union hall are you referring to?

[2] **A:** At the Teamsters Local 25.

[3] **Q:** Do you recall what the result of this hearing [4] was?

[5] **A:** Yes.

[6] **Q:** And what was the result?

[7] **A:** My seniority was reinstated.

[8] **Q:** Do you recall anything else concerning the [9] result of the Joint Area Committee grievance decision?

[10] **A:** No.

[11] **MS. PENNINI:** Can I just have one second?

[12] (A brief recess was taken)

[13] **MS. PENNINI:** Could I have this marked as [14] an Exhibit, please?

[15] (The document above-referred [16] to was marked Deposition [17] Exhibit No. 1 for Identification)

[18] **BY MS. PENNINI:**

[19] **Q:** If you could please look at deposition Exhibit [20] 1, Mr. Goulet?

[21] **A:** Yeah.

[22] **Q:** Have you seen this document before?

[23] **A:** Yes, I have.

[24] **Q:** Could you tell me what this doc-

---

Craig Goulet
Case Y:04-cv-12577-WGY    Document 77-3    Filed 06/17/2006    Page 7 of 11
Craig Goulet
October 4, 2005
New Penn Motor Express, et al.,

ument is?

[1] **A**: It s the decision from the Southern New England [2] Committee.

[3] **Q**: When did you first see this decision?

[4] **A**: When it was mailed to me.

[5] **Q**: And do you recall approximately when you [6] received it?

[7] **A**: Yeah, maybe two weeks after the hearing.

[8] **Q**: Could you explain to me what the decision was?

[9] **MR. LATHROP**: Objection.

[10] **THE WITNESS**: The decision was, put me back [11] on the seniority list and it states that upon me [12] giving the company documentation of my ability to work [13] to unrestricted duties, I had to serve a 10-day [14] suspension.

[15] **BY MS. PENNINI**:

[16] **Q**: Did you ever submit any documentation to APA [17] regarding your ability to return to unrestricted [18] duties?

[19] **A**: No.

[20] **Q**: Did you ever serve a 10-day suspension at APA?

[21] **A**: No.

[22] **Q**: Did you understand this decision to immediately [23] reinstate you onto the seniority list for APA?

[24] **A**: Yes, I did.

[1] **Q**: Did you —

[2] **A**: I received a phone call by Bill Carnes —

[3] **Q**: I m sorry, I m asking you a question.

[4] **MR. LATHROP**: But nonetheless, if he needs [5] to expand upon his answer he has a right to do that.

[6] **MS. PENNINI**: Well I will allow you to do [7] that in one second. I m sorry, I was in the middle of [8] trying to get a question out.

[9] **BY MS. PENNINI**:

[10] **Q**: So you said that you believed your seniority was [11] immediately reinstated and you should have been placed [12] on the seniority list immediately upon the decision of [13] the New England Joint Area Grievance Committee?

[14] **A**: I was put back on the seniority list [15] immediately.

[16] **Q**: How do you know that you were immediately put [17] back on the seniority list?

[18] **A**: I received a phone call from Bill Carnes —

[19] **Q**: And what did Bill —

[20] **A**: — that afternoon, and also from Mr. Harrington.

[21] **Q**: I m sorry, what afternoon?

[22] **A**: The afternoon they heard the case on October [23] 16th, congratulating me and telling me that I won.

[24] **Q**: Did you receive one phone call or two separate

[1] phone calls?

[2] **A**: Two separate phone calls.

[3] **Q**: Do you recall what Mr. Carnes had said during [4] his phone call?

[5] **A**: Congratulations, you won your case.

[6] **Q**: Did he explain to you what the decision said?

[7] **A**: Yes.

[8] **Q**: And what did he say?

[9] **A**: He said, You have to serve a 10-day suspension [10] before you can go back to work.

[11] **Q**: Did Mr. Carnes tell you that you had been placed [12] back on the seniority list?

[13] **A**: Yes, that was my understanding.

[14] **Q**: Did he say that?

[15] **A**: I believe he did.

[16] **Q**: You don t recall whether he said precisely, You [17] have been returned to the seniority list at APA Canton [18] facility. ?

[19] **A**: Precisely, I do not know.

[20] **Q**: And you said you also received a call from [21] Mr. Harrington?

[22] **A**: Yes.

[23] **Q**: Could you tell me what Mr. Harrington said to [24] you on the phone that day?

[1] **A**: Basically, the same. You know, it had the same [2] context. It was, You won your case. [3] Congratulations, you won your case.

[4] **Q**: Did Mr. Harrington say anything else?

[5] **A**: Nope.

[6] **Q**: Did he tell you you would have to serve a 10-day [7] suspension?

[8] **A**: Yes, I believe he did.

[9] **Q**: Did he tell you you were back on the seniority [10] list at APA?

[11] **A**: Yes, I believe he did.

[12] **Q**: Do you recall whether he said, You re back on [13] the seniority list. ?

[14] **A**: No, I don t recall.

[15] **Q**: Did you ever work for APA after October 16th, [16] 2001?

[17] **A**: No.

[18] **Q**: Did you ever see a seniority list for the APA [19] terminal in Canton, Massachusetts with your name on [20] the seniority list?

[21] **A**: Yes.

[22] **Q**: Were you working at APA at the time that it [23] ceased operating?

[24] **A**: No.

[1] **Q**: Do you know when APA ceased its operations?

[2] **A**: Sometime in February of 2002.

[3] **Q**: And how did you learn that APA was closing its [4] operations?

[5] **A**: I had spoke with the steward.

[6] **Q**: Did the steward call you to inform you?

[7] **A**: Yes, he did.

[8] **Q**: And who was the steward?

[9] **A**: Doug Francie.

[10] **Q**: Do you recall when he called you?

[11] **A**: No. Approximately — there may have been [12] several phone calls. One initially is the word, Get [13] out, that the company was closing.

[14] **Q**: And Francie called you to let you know the [15] company was closing?

[16] **A**: I think probably I called him initially.

[17] **Q**: How did you get word that APA was closing?

[18] **A**: Someone called me.

[19] **Q**: Do you recall who called you?

[20] **A**: My sister-in-law.

[21] **Q**: And how did your sister-in-law know that APA was [22] closing?

[23] **A**: She worked for a company and had spoke with [24] another truck driver.

[1] **Q**: Your sister-in-law worked for APA, is that what [2] you said?

[3] **A**: No, she worked for another company.

[4] **Q**: What company did she work for?

[5] **A**: Vincent Metal Goods.

[6] **Q**: Vincent Metal Goods, is that what you said?

[7] **A**: Yeah, um-hum.

[8] **Q**: And she became aware that APA was closing?

[9] **A**: Yes.

[10] **Q**: And could I have your sister-in-law s name?

[11] **A**: Dawn.

[12] **Q**: And her last name?

[13] **A**: Goulet.

[14] **Q**: Is it D-A-W-N?

[15] **A**: Yes.

[16] Q: And Goulet as you previously spelled it?

[17] A: Um-hum.

[18] Q: Where is Vincent Metal Goods located?

[19] A: I believe they re in Fort Devins now at Devins. [20] They were in Marlboro at the time.

[21] Q: So after your sister-in-law informed you that [22] APA was closing you called Doug Francie?

[23] A: Yes.

[24] Q: How did you know to contact Doug Francie?

Page 32

[1] A: Doug Francie was the union steward.

[2] Q: And where was he the union steward for?

[3] A: For APA, at the Canton facility.

[4] Q: How did you know that he was the APA union [5] steward at the Canton facility?

[6] A: As I said, I had been to union meetings and kept [7] in contact with the — you know, other workers.

[8] Q: Other workers at APA?

[9] A: Yes.

[10] Q: What other workers did you keep in contact with?

[11] A: Jerry Hurley was a mechanic. I d spoke with [12] Kevin Power over the years.

[13] Q: Are Jerry Hurley and Kevin Power both APA [14] workers at the Canton facility?

[15] A: Yes.

[16] Q: I m sorry, go on, I didn t mean to interrupt [17] you.

[18] A: There was another fellow, Mike Cruz, drove a [19] truck in the Hudson area. I would see him from time [20] to time.

[21] Q: Was he at the APA Canton facility as well?

[22] A: Yes.

[23] Q: How did you get Doug Francie s telephone number?

[24] A: Oh, I had the phone number.

Page 33

[1] Q: Did you call him at home?

[2] A: Yes.

[3] Q: How did you have his home phone number?

[4] A: As I said, he was the union steward.

[5] Q: Had you known Doug Francie prior to February of [6] 2002?

[7] A: Yes.

[8] Q: And how did you know him?

[9] A: I worked with him at Sanborns Motor Express.

[10] Q: What did you speak with Mr. Francie about?

[11] A: Well it was general conversation about the [12] company was closing.

[13] Q: Did you tell Mr. Francie you had heard that the [14] company was closing?

[15] A: Yes.

[16] Q: Do you recall what else you said to him?

[17] A: We just discussed in general the fact that the [18] company was going out of business.

[19] Q: Did you ask Mr. Francie if you could be put on a [20] call list for New Penn Motor Express?

[21] A: Doug Francie called me — Doug Francie called [22] me, and I m going to say it was probably February 15th [23] or 16th, maybe the 17th.

[24] Q: And what did he say to you?

Page 34

[1] A: He relayed to me that there was a meeting with [2] the APA men and he wanted to know what my call list [3] preference was.

[4] Q: Did he tell you whether or not you were on his [5] list of people to determine what their preference for [6] a call list facilities were?

[7] A: Yes.

[8] Q: He said you were on the list?

[9] A: I believe that s why he called me.

[10] Q: So Mr. Francie said he thought you were on the [11] Canton facility call list and, therefore, called you [12] to find out your terminal preference, is that an [13] accurate statement?

[14] A: Not entirely.

[15] Q: Okay.

[16] A: I was on the Canton seniority list, the APA [17] Canton seniority list.

[18] Q: Okay.

[19] A: And he called me to ask me what my preference [20] would be as far as the New Penn call list went.

[21] Q: And your conversation with Mr. Francie, when you [22] called him, do you recall what date that occurred on?

[23] A: I don t offhand recall, no.

[24] Q: But you believe you spoke with him on February

Page 35

[1] 15th or possibly the 16th or the 17th?

[2] A: I m going to say it was the 17th of February.

[3] Q: That you spoke with Mr. Francie?

[4] A: Yes.

[5] MR. GLUEK: Could you say what year

it is?

[6] MS. PENNINI: I m sorry.

[7] BY MS. PENNINI:

[8] Q: Was it February 17th of 2002?

[9] A: Yes, 2002.

[10] Q: Do you know for sure that it was February 17th, [11] 2002?

[12] A: I m pretty sure it was February 17th, 2002, yes.

[13] Q: But it may have been the 16th or the 15th?

[14] A: No, it was after the 16th.

[15] Q: And how do you know it was after the 16th?

[16] A: Because they had a meeting at the union hall and [17] he called me after the meeting.

[18] Q: Do you know the date of the meeting at the union [19] hall?

[20] A: February 16th.

[21] Q: Did you receive any notification regarding the [22] closure of APA in the mail?

[23] A: Yes.

[24] Q: When did you receive this notification?

Page 36

[1] A: Sometime in February of 2002.

[2] Q: And by whom was this information sent?

[3] A: Local 25.

[4] Q: After you gave Mr. Francie your terminal [5] preference, did you ever check with Local 25 to make [6] sure that your name was on the call list for New Penn?

[7] A: I made a follow up phone call, I did, to the [8] union hall, yes.

[9] Q: Do you recall with whom you spoke?

[10] A: Mark Harrington.

[11] Q: And when was that?

[12] A: Sometime in March.

[13] Q: In March of what year?

[14] A: 2002.

[15] Q: Do you recall what you spoke about during this [16] telephone call?

[17] A: Yes.

[18] Q: And what was that?

[19] A: With regards to the call list and what was going [20] on with the APA people and New Penn agreement.

[21] Q: In February and March of 2002, had you been [22] medically cleared to return to work?

[23] A: No.

[24] Q: Besides your telephone conversation with Mark

Page 37

[1] Harrington in March of 2002, did you have any other [2] contact with Local 25?

[3] A: Yes.

[4] Q: What sort of contact did you have?

[5] A: When I spoke with Mr. Harrington he told me that [6] he no longer handled the men at APA, and I would have [7] to speak with Bill Carnes.

[8] Q: And when did this occur?

[9] A: Sometime right around March.

[10] Q: March of?

[11] A: 2002.

[12] Q: Was this during the same conversation that you [13] spoke about previously where you asked Mr. Harrington [14] about the call list?

[15] A: Yes.

[16] Q: Did you have any additional contact with anyone [17] at Local 25 after —

[18] A: Not that I recall.

[19] MR. LATHROP: Let her finish the question.

[20] BY MS. PENNINI:

[21] Q: After March of 2002?

[22] A: Yes.

[23] Q: What contact did you have?

[24] A: There were several phone calls to Bill Carnes.

Page 38

[1] Q: When did these phone calls occur?

[2] A: I can t be sure right offhand.

[3] Q: Can you tell me, did you have any [4] contact with Mr. Carnes during the spring of 2002?

[5] A: Yes.

[6] Q: What sort of contact did you have with him [7] during the spring of 2002?

[8] A: With regards to the agreement that they had with [9] the New Penn people.

[10] Q: What did he tell you concerning the agreement [11] with the New Penn people?

[12] A: He said that he was going to look into it.

[13] Q: Did you only have one conversation with [14] Mr. Carnes during the spring of 2002?

[15] A: No, I don t think so. There was probably two.

[16] Q: Two conversations?

[17] A: Yeah.

[18] Q: And what did you speak about during the second [19] conversation?

[20] A: Same issues.

[21] Q: Did you have any contact with him during the [22] summer of 2002?

[23] A: Yes.

[24] Q: What did you speak about during the summer of

Page 39

[1] 2002?

[2] A: More follow up, more of the same.

[3] Q: During the summer of 2002, had you been [4] medically cleared to return to work?

[5] A: No.

[6] Q: Did you alert Mr. Carnes that you had not been [7] medically cleared to return to work?

[8] A: No.

[9] Q: Did you tell Mr. Carnes whether you had ever [10] served your 10-day suspension with APA?

[11] A: No.

[12] Q: And approximately how often did you speak to him [13] during the summer of 2002?

[14] A: Several times. Two.

[15] Q: Several times or two times?

[16] A: Two times.

[17] Q: Did you speak to him during the fall of 2002?

[18] A: I don t recall.

[19] Q: The winter of 2002?

[20] A: I can t be sure.

[21] Q: You are not sure whether you had any contact [22] with Mr. Carnes during the winter of 2002?

[23] A: No, we had — like I said, we had conversations [24] throughout the year. There was initial phone call,

Page 40

[1] follow up phone call, subsequently I think there was a [2] third phone call in the spring of 2002, March.

[3] Q: Had you been medically cleared to return to work [4] during the winter of 2002?

[5] A: No.

[6] Q: Had you been medically cleared to return to work [7] prior to March 1st of 2003?

[8] A: No.

[9] Q: And you said you spoke with Mr. Carnes in March [10] of 2003?

[11] A: Yes.

[12] Q: What sort of contact did you have with [13] Mr. Carnes?

[14] A: I called him, it was probably March 31st, 2003 [15] when the agreement expired.

[16] Q: What agreement are you —

[17] A: The agreement that the New Penn people had with [18] the Teamsters negotiating committee, the freight [19] industry negotiating committee and the APA operation.

Page 41

[20] Q: What else did you discuss during this [21] conversation?

[22] A: The fact that I hadn t been called.

[23] Q: And what did Mr. Carnes tell you?

[24] A: He told me to send a grievance in.

Page 41

[1] Q: And did you send a grievance into Mr. Carnes?

[2] A: I did.

[3] MS. PENNINI: Would you mark this as an [4] Exhibit, please?

[5] (The document above-referred [6] to was marked Deposition [7] Exhibit No. 2 for Identification)

[8] BY MS. PENNINI:

[9] Q: If you could please look at deposition Exhibit [10] No. 2?

[11] A: Um-hum.

[12] Q: Have you seen this document before?

[13] A: Yes.

[14] Q: Were you the author of this document?

[15] A: Yes.

[16] Q: Could you please tell me what this document is?

[17] A: It s a grievance.

[18] Q: A grievance concerning what?

[19] A: It s a grievance concerning my seniority rights.

[20] Q: I m sorry, what do you mean by a grievance [21] concerning your seniority rights ?

[22] A: Just as it states. Would you like me to read [23] it?

[24] Q: Sure.

Page 42

[1] A: Okay. In accordance with the National Master [2] Freight Agreement, Article V, and all of Article V [3] subsections, along with the New England Supplemental [4] Freight Agreement, Article No. XLIII, Seniority, [5] including all of Article XLIII subsections, I am [6] filing a grievance against New Penn Motor Express to [7] include all time lost, back pay, seniority and [8] contractual benefits under the contract agreement [9] March 1st, 2002 up to and continuing past March 1st, [10] 2003 based on the agreement between TNFINC and New [11] Penn Motor Express as a result of the closure of APA [12] operations.

[13] Q: And had you been medically cleared to work [14] between March 1st, 2002 and March 1st, 2003?

[15] A: No.

[16] MS. PENNINI: If I could just have one [17] second. Would you please mark that as an Exhibit, [18] please?

[19] (The document above-referred [20] to

was marked Deposition [21] Exhibit No. 3 for Identification]

[22] BY MS. PENNINI:

[23] Q: Did you have any additional contact with [24] Mr. Carnes following your March 31st telephone

---

Page 43

[1] conversation with him?

[2] A: I filed a grievance with him.

[3] Q: When was this grievance filed?

[4] A: November 7th.

[5] MR. LATHROP: November?

[6] THE WITNESS: I mean, April 7th.

[7] BY MS. PENNINI:

[8] Q: And did you have any contact with Mr. Carnes [9] following your sending of the April 7th, 2003 [10] grievance?

[11] A: No.

[12] Q: Did you attempt to contact Mr. Carnes at anytime [13] after the time you sent the April 7th, 2003 grievance?

[14] A: No, I did not.

[15] Q: Following the sending of the April 7th, 2003 [16] grievance, what was the next time you had any contact [17] with anyone at Local 25?

[18] A: I spoke to Mark Harrington.

[19] Q: And when did you speak with Mark Harrington?

[20] A: Sometime after May 2nd, 2003.

[21] Q: Why did you speak with Mark Harrington after May [22] 2nd, 2003?

[23] A: Bill Carnes had left office.

[24] Q: How did you know to contact Mr. Harrington?

---

Page 44

[1] A: Mr. Harrington was the business agent that was [2] put in charge of the New Penn people.

[3] Q: How did you know that Mr. Harrington had been [4] put in charge of the New Penn employees?

[5] A: I don t recall.

[6] Q: Sorry, just to back up a little bit. Before you [7] sent Mr. Carnes your April 7th, 2003 letter, did you [8] inform Mr. Carnes that you were on an APA seniority [9] list?

[10] A: Yes.

[11] Q: And did you speak with Mr. Carnes during the [12] spring of 2003, on March 31st I believe you said it [13] was, 2003?

[14] A: Yes.

[15] Q: Did you speak with him at all about your [16] October, 2001 grievance decision?

[17] A: No.

[18] Q: So Mr. Carnes was not aware of whether you had [19] been medically

cleared to work or had served the [20] 10-day suspension as of March 31st, 2003?

[21] A: I don t know what Mr. Carnes knew, what he was [22] aware of. I have no idea.

[23] Q: You said you spoke with Mr. Harrington sometime [24] after May 2nd, 2003?

---

Page 45

[1] A: Yes.

[2] Q: What sort of contact did you have with [3] Mr. Harrington?

[4] A: It was a follow up conversation with regards to [5] the grievance I filed.

[6] Q: A telephone call?

[7] A: Yes.

[8] Q: And do you recall when this telephone call [9] occurred?

[10] A: Sometime after Bill Carnes had left office.

[11] Q: Do you recall when after May 2nd, 2003 such [12] contact occurred?

[13] A: No, not exactly.

[14] Q: Do you recall what you said during this — was [15] it a telephone conversation?

[16] A: It was a telephone conversation, yes.

[17] Q: And do you recall what you said during this [18] telephone conversation?

[19] A: Regarding my grievance, What was the status of [20] my grievance? .

[21] Q: Did you specifically ask Mr. Harrington what was [22] the status of your grievance?

[23] A: Yes.

[24] Q: And what did Mr. Harrington say?

---

Page 46

[1] A: He said he didn t — wasn t aware of a [2] grievance.

[3] Q: Do you recall whether this conversation took [4] place during the summer of 2003?

[5] A: It was in May. As I said, after Mr. Carnes left [6] office I was calling to follow up on the status of the [7] grievance.

[8] Q: At this time did Mr. Harrington ask you if you [9] had been medically cleared to return to work?

[10] A: No.

[11] Q: Did you tell Mr. Harrington whether you had been [12] medically cleared to work?

[13] A: No.

[14] Q: Did you tell Mr. Harrington whether you had [15] served the 10-day suspension?

[16] A: No.

[17] Q: Did he ask you about the 10-day

suspension that [18] was listed in the decision of October 16th, 2001?

[19] A: I think he — he may have mentioned it, yes.

[20] Q: Do you recall what he said concerning that [21] suspension?

[22] A: He said that I had a 10-day suspension to serve.

[23] Q: During this May conversation Mr. Harrington told [24] you you had to serve a 10-day suspension?

---

Page 47

[1] A: Yes.

[2] Q: Did he tell you — I m sorry, strike that. Did [3] you have any subsequent contact with Mr. Harrington [4] following the May, 2003 telephone conversation?

[5] A: Yes, I forwarded him copies of the grievance.

[6] Q: And when did you do that?

[7] A: Initially, probably right in May. And then [8] there was follow up conversation in July, a telephone [9] conversation.

[10] Q: Do you recall when in July you had this follow [11] up conversation?

[12] A: Maybe a week before I wrote the letter.

[13] Q: Do you recall whether it was a week before you [14] wrote the letter?

[15] A: Yeah, it was probably a week before I wrote the [16] letter.

[17] Q: And what did you speak about during this [18] conversation?

[19] A: The grievance.

[20] Q: Did Mr. Harrington tell you that there might be [21] an issue with the grievance because you had not been [22] medically cleared to return to work?

[23] A: No.

[24] Q: I m sorry, Mr. Harrington did not mention that?

---

Page 48

[1] A: Nope.

[2] Q: Did Mr. Harrington say anything concerning the [3] 10-day suspension that you had spoken about during the [4] May, 2003 telephone call?

[5] A: No, I don t think so.

[6] Q: So what did Mr. Harrington speak about during [7] this telephone conversation?

[8] A: We were trying to find out what became of the [9] grievance that was filed.

[10] Q: And was there any resolution concerning what had [11] happened to the grievance you had sent in April of [12] 2003?

[13] A: I had sent him copies of it.

---

[14] **Q:** But was there any resolution?

[15] **A:** It was to my understanding that he was [16] negotiating with the company over the grievance.

[17] **Q:** And by the company do you mean New Penn Motor [18] Express?

[19] **A:** Yes.

[20] **Q:** If you could please look at deposition Exhibit [21] No. 3? If you could look at the second paragraph, it [22] starts with Let s not lose sight of the real issue [23] here ?

[24] **A:** Um-hum.

### Page 49

[1] **Q:** And in this paragraph you speak about the issue [2] being seniority rights not whether you were capable of [3] returning to work, or capable of working, is that [4] correct?

[5] **A:** That s what it says.

[6] **Q:** Do you recall why you wrote this paragraph?

[7] **A:** I don t recall exactly what my thought process [8] was at the time, no.

[9] **Q:** Had you ever had a conversation with [10] Mr. Harrington in which he discussed that there would [11] be an issue concerning whether or not you were capable [12] of returning to work?

[13] **A:** No.

[14] **Q:** Did you think there was an issue concerning [15] whether you were medically capable of returning to [16] work?

[17] **A:** No.

[18] **MS. PENNINI:** Please mark this as an [19] Exhibit?

[20] (The document above-referred [21] to was marked Deposition [22] Exhibit No. 4 for Identification)

[23] **BY MS. PENNINI:**

[24] **Q:** Did you have any additional contact with

### Page 50

[1] Mr. Harrington during the summer of 2003 besides the [2] July telephone conversation you spoke about and the [3] letter of July 25th, 2003?

[4] **A:** Yes, I believe there was another phone call.

[5] **Q:** And when was this phone call?

[6] **A:** Oh, I can t be sure.

[7] **Q:** Can you give me an approximate date, was it [8] still during the summer of 2003?

[9] **A:** August, maybe.

[10] **Q:** Did you call Mr. Harrington or did [11] Mr. Harrington call you?

[12] **A:** I believe I probably called Mr. Harrington.

[13] **Q:** Did you call Mr. Harrington for any particular [14] reason in August of 2003?

[15] **A:** Yes.

[16] **Q:** And why was that?

[17] **A:** To find out what the status of my grievance was.

[18] **Q:** And what did Mr. Harrington tell you regarding [19] the status of your grievance?

[20] **A:** I don t recall exactly what the conversation was [21] about. They were, to my understanding, again [22] discussing things with the company with regards to the [23] grievance.

[24] **Q:** Did Mr. Harrington ever send you any

### Page 51

[1] correspondence during the summer of 2003?

[2] **A:** No.

[3] **Q:** Did you speak with Mr. Harrington at all during [4] the fall of 2003?

[5] **A:** I believe I did.

[6] **Q:** When did you have contact with Mr. Harrington [7] during the fall of 2003?

[8] **A:** As I said, it was August. Sometime in August.

[9] **Q:** What about during the fall of 2003?

[10] **A:** September. Maybe August or September.

[11] **Q:** Was there an additional phone call in August [12] besides the phone call you already mentioned?

[13] **A:** No.

[14] **Q:** Was there an additional phone call in September [15] besides the August phone call you have already [16] mentioned?

[17] **A:** I don t recall.

[18] **Q:** Do you recall if you spoke with Mr. Harrington [19] in October of 2003?

[20] **A:** Yes, I might ve.

[21] **Q:** Do you recall whether you did?

[22] **A:** As I said, I might have.

[23] **Q:** Do you recall whether you spoke with [24] Mr. Harrington in November of 2003?

### Page 52

[1] **A:** I believe I did.

[2] **Q:** Do you know whether you spoke with him in [3] November of 2003?

[4] **A:** I m sure I did.

[5] **Q:** And do you recall what you spoke about during [6] November of 2003?

[7] **A:** The status of my grievance.

[8] **Q:** And what did Mr. Harrington tell you?

[9] **A:** That he was going to file a grievance.

[10] **Q:** Did he say why he was filing a grievance?

[11] **A:** That was his duty.

[12] **Q:** So did he tell you in November of 2003 that he [13] was filing a grievance in November of 2003?

[14] **A:** He was going to file the grievance with the [15] appropriate committee.

[16] **Q:** Do you recall when in November this telephone [17] conversation took place?

[18] **A:** No.

[19] **Q:** During this November, 2003 telephone [20] conversation, did Mr. Harrington ask you whether you [21] had been medically cleared to return to work?

[22] **A:** No.

[23] **Q:** Did you tell Mr. Harrington whether you had been [24] medically cleared to return to work?

### Page 53

[1] **A:** Nope.

[2] **Q:** Prior to November of 2003, you had said that [3] Mr. Harrington had been in negotiations with the [4] company concerning your grievance?

[5] **A:** That s my understanding.

[6] **Q:** And did your understanding change in November of [7] 2003?

[8] **A:** No.

[9] **Q:** Did Mr. Harrington, in November of 2003, tell [10] you that he no longer wanted to negotiate with the [11] company concerning this grievance?

[12] **A:** No.

[13] **Q:** Did Mr. Harrington just tell you that he was [14] going to file a grievance at this time?

[15] **A:** I filed the grievance. It was Mr. Harrington s [16] job —

[17] **Q:** I m sorry, file the grievance with the —

[18] **MR. LATHROP:** I think Mr. Goulet was [19] attempting to answer your question, so if you would [20] allow him please.

[21] **MS. PENNINI:** Okay.

[22] **THE WITNESS:** I filed the grievance with [23] the local union. It was their job to docket the case [24] before the committee to have it heard.

### Page 54

[1] **BY MS. PENNINI:**

[2] **Q:** Had you ever filed other grievances with the [3] local union prior to 2003?

[4] **A:** Yes.

[5] **Q:** And when did you file prior grievances?

[6] **A:** 1987.

[7] **Q:** And what was this grievance concerning?

[8] A: Working conditions.

[9] Q: When you filed this grievance, did you [10] immediately file it with the local?

[11] A: Yes.

[12] Q: To whom did you give your grievance?

[13] A: I m going to say George Cashman.

[14] Q: In 1987, do you recall whether there was a [15] steward at the APA facility in Canton?

[16] A: Yes. Yes, there was.

[17] Q: Do you recall who this was?

[18] A: His last name was Yettman. I m not sure what [19] his first name was. Bobby.

[20] Q: Did you file a grievance with Mr. Yettman in [21] 1987?

[22] A: I believe I filed it with George Cashman.

[23] Q: And why did you file it with George Cashman?

[24] A: I had been discharged, Mr. Yettman was at home.

Page 55

[1] Q: I m sorry, I thought you said working [2] conditions?

[3] A: It was working conditions. I think there was a [4] discharge that may have been involved with it.

[5] Q: Did you file more than one grievance in 1987?

[6] A: No, I don t think so.

[7] Q: So it was the grievance you were discussing [8] concerning the February 25th termination?

[9] A: No.

[10] MR. LATHROP: Did you say February 25th?

[11] MS. PENNINI: The 1987 termination.

[12] MR. LATHROP: Objection.

[13] THE WITNESS: Nope.

[14] BY MS. PENNINI:

[15] Q: Did you file a grievance concerning the February [16] 25th, 1987 termination?

[17] MR. LATHROP: Objection.

[18] THE WITNESS: The union filed the response [19] to the discharge.

[20] BY MS. PENNINI:

[21] Q: Okay. You said you filed a grievance in 1987 [22] concerning working conditions, just to clarify, and [23] that you filed this with George Cashman because [24] Mr. Yettman was unavailable?

Page 56

[1] A: Right.

[2] Q: Do you know why Mr. Yettman was unavailable?

[3] A: Mr. Yettman worked on the day shift and I worked [4] on the night shift.

[5] Q: Was there a steward on the night shift, [6] as well?

[6] A: No.

[7] Q: Do you recall when in 1987 this grievance was [8] filed?

[9] A: November — no, that s not right. Maybe it was [10] January.

[11] Q: If you could please look at deposition Exhibit [12] No. 4? Did you write this letter?

[13] A: Yes.

[14] Q: Did you send this letter to Mr. Harrington?

[15] A: Yes.

[16] Q: And was this letter written before or after your [17] telephone conversation with him in November of 2003?

[18] A: Afterwards.

[19] Q: Do you recall why you wrote this letter?

[20] A: Yes.

[21] Q: And why is that?

[22] A: Again, to follow up on the grievance that I had [23] filed.

[24] Q: Following your termination on March 12, 1987 you

Page 57

[1] said you were on Worker s Compensation leave, correct?

[2] A: Say that again.

[3] Q: Following the March 12th, 1987 termination from [4] APA, you said you were on industrial accident leave or [5] Worker s Compensation leave?

[6] A: Yes.

[7] Q: During your time on Worker s Compensation leave, [8] were you able to drive?

[9] A: Yes.

[10] Q: Did you have any issues concerning your ability [11] to drive?

[12] A: No.

[13] Q: Did you have any problem concerning your ability [14] to lift any objects?

[15] A: Yes.

[16] Q: And what was that inability?

[17] A: I had certain restrictions on lifting heavy [18] objects as a result of the herniated disc in my back [19] and my neck.

[20] Q: And you had mentioned that there was a 35 pound [21] restriction as a result of that?

[22] A: Yes.

[23] Q: Have you been able to remember any additional [24] restrictions?

Page 58

[1] A: No.

[2] Q: Do you recall whether that was the only [3] restriction now — do you still not recall whether [4] there were any additional specific restrictions?

[5] A: No, offhand I don t.

[6] Q: Were you incapacitated for any time following the [7] March, 1987 termination?

[8] MR. LATHROP: Objection.

[9] THE WITNESS: Could you say that again?

[10] BY MS. PENNINI:

[11] Q: Following the March 12th, 1987 termination, were [12] you able to walk and get around?

[13] A: I did, yes.

[14] Q: Following this termination did you ever seek any [15] additional education?

[16] A: No.

[17] Q: Did you graduate from high school?

[18] A: Yes, I did.

[19] Q: When did you graduate from high school?

[20] A: 1978.

[21] Q: Where did you graduate from high school?

[22] A: Hudson High School.

[23] Q: Did you attend any college or other institution [24] following your graduation from high school?

Page 59

[1] A: No.

[2] Q: In what year were you born?

[3] A: 1960.

[4] Q: And what is the date of your birth?

[5] A: 6/11/1960.

[6] Q: Would that be June 11th, 1960?

[7] A: Yes, it would be.

[8] Q: And you said you currently live in Hudson, [9] Massachusetts?

[10] A: Yes, I do.

[11] Q: And you said Cox Street, Hudson, Massachusetts?

[12] A: C-O-X, yeah.

[13] Q: Have you lived in any other places besides Cox [14] Street in Hudson, Massachusetts between 1978 and the [15] present?

[16] A: Yes.

[17] Q: Where else did you live?

[18] A: I lived in Marlboro for a time.

[19] Q: And what was your address?

[20] A: 750 Farm Road.

[21] Q: When did you live on Farm Road in Marlboro?

[22] A: 1982 til 1986.

[23] Q: Did you live on Cox Street between 1978 and [24] 1986?

**Page 60**

[1] A: Yes. Not until 1986. Did you say 1986?

[2] Q: I m sorry, where did you live between 1978 and [3] 1982?

[4] A: I lived on Cox Street.

[5] Q: Where did you live between 1960 and 1978?

[6] A: At Cox Street.

[7] Q: The same place on Cox Street?

[8] A: Yes.

[9] Q: Where did you live after 1986? You said you [10] lived in Marlboro from 1982 to 1986, where did you [11] live after Farm Road in Marlboro?

[12] A: Back to Hudson, Cox Street.

[13] Q: Have you lived anyplace else besides Cox Street [14] in Hudson, Massachusetts between 1986 and the present?

[15] A: No.

[16] Q: Do you own the house on Cox Street?

[17] A: Yes.

[18] Q: I m sorry, do you live in a house on Cox Street?

[19] A: Yes.

[20] Q: How long have you owned this house?

[21] A: How long have I owned the house?

[22] A: Yes.

[23] A: Since I ve lived there.

[24] Q: I m sorry, I thought you said you lived there

**Page 61**

[1] since 1960?

[2] A: Since I moved back there in 1987 — 86.

[3] Q: Do you have any particular hobbies that you [4] engage in?

[5] A: I go to my daughter s field hockey games, I like [6] to go to the races.

[7] Q: What races do you —

[8] A: Stock cars.

[9] Q: I m sorry, stock cars?

[10] A: Race cars, yes.

[11] Q: So do you watch stock car races?

[12] A: Yes.

[13] Q: Do you participate in stock car races?

[14] A: I own a stock car.

[15] Q: How long have you owned a stock car?

[16] A: The family s had stock cars since the 50's.

[17] Q: I m sorry, what do you mean by

your family has [18] had stock cars? Could you explain to me what you mean [19] by that?

[20] A: Yeah, my family owned a junk yard and they had [21] stock cars, and we were involved with stock cars as [22] kids. And me and my brothers had cars all our lives.

[23] Q: So you said you own — do you own one stock car?

[24] A: Yes.

**Page 62**

[1] Q: Have you ever owned another car besides the one [2] you currently own?

[3] A: No.

[4] Q: I m sorry, was that no ?

[5] A: No.

[6] Q: How long have you owned the stock car that you [7] currently own?

[8] A: Since 1996.

[9] Q: Not to be ignorant here, what kind of stock car [10] is it? Could you explain to me what a stock car is?

[11] A: It s a race car.

[12] Q: Is it a particular kind of race car? Could you [13] explain to me a little more.

[14] A: It goes around in circles.

[15] Q: What is it that makes a stock car different than [16] a typical sedan?

[17] A: It s one that they use to race in circles. It s [18] not a dragster.

[19] Q: Okay. Does that mean there is a different size [20] engine in a stock car than in a typical sedan?

[21] A: Oh, I don t know.

[22] Q: I know you said you owned a stock car and you [23] watched stock car racing. Do you also drive a stock [24] car?

**Page 63**

[1] A: No.

[2] Q: Did you ever participate in stock car racing as [3] a driver?

[4] A: No.

[5] Q: Is there someone that does race your stock car?

[6] A: Yes.

[7] Q: And who is that?

[8] A: His name is Jeff.

[9] Q: Does Jeff have a last name?

[10] A: Yeah, Crowley.

[11] Q: How often does Jeff Crowley race in your stock [12] car?

[13] A: He hasn t raced at all this year. It s been —[14] not since last year.

[15] Q: But you still own this car?

[16] A: Yes.

[17] Q: Can you win money owning a stock car?

[18] MR. LATHROP: I m sorry, what did

you say?

[19] MS. PENNINI: Can you, as a stock car [20] owner, win money based on how Mr. Crowley does in a [21] stock car race?

[22] THE WITNESS: I think — yes, there s a [23] payoff for the finish.

[24] BY MS. PENNINI:

**Page 64**

[1] Q: Has Mr. Crowley ever placed well in a stock car [2] race?

[3] A: Yes.

[4] Q: And what is the most that Mr. Crowley has ever [5] won for his stock car racing?

[6] A: Oh, I don t know.

[7] Q: Or as the stock car owner are you entitled to a [8] portion of whatever is earned by Mr. Crowley s [9] finishes?

[10] A: Mr. Crowley got the checks.

[11] Q: As the owner of the car are you entitled a [12] portion of that money?

[13] A: Mr. Crowley got the checks. I didn t get [14] anything.

[15] Q: Are you entitled, as a stock car owner, to part [16] of that money?

[17] A: I suppose I could have.

[18] MS. PENNINI: I have no further questions [19] at this time.

[20] MR. GLUEK: Can we take a break for five [21] minutes?

[22] MS. PENNINI: Yes, please.

[23] (A brief recess was taken)

[24] MR. GLUEK: Back on the record.

**Page 65**

[1] EXAMINATION

[2] BY MR. GLUEK:

[3] Q: The ground rules are the same. I don t [4] anticipate this taking too long, but if you don t [5] understand one of my questions, please tell me. If [6] you cannot hear one of my questions, please tell me. [7] If you answer one of my questions, I am going to [8] assume that you both heard and understood the [9] question, is that fair?

[10] A: Yes.

[11] Q: This is not supposed to be an endurance contest. [12] If you need to take a break, just tell me, we ll take [13] a break, okay?

[14] A: Okay.

[15] Q: If you need to talk to your lawyer, as long as [16] there is a question not pending, just say you need to [17] take a break, okay?

[18] A: Yeah.

[19] Q: Have you ever been convicted of any crimes?

[20] A: Have I ever been convicted of any crimes? I m [21] not sure I understand the

question.

[22] **Q:** Do you know what a crime is?

[23] **A:** Yes.

[24] **Q:** Do you know what a conviction is?

---

Page 66

[1] **A:** I think so.

[2] **Q:** Okay. Have you been convicted of any crimes?

[3] **A:** I don t think so.

[4] **Q:** Do you have anything that would refresh your [5] recollection?

[6] **A:** No.

[7] **Q:** Are you married?

[8] **A:** Yes.

[9] **Q:** To whom?

[10] **A:** Ann M. Goulet.

[11] **Q:** How long have you been married?

[12] **A:** 15 years.

[13] **Q:** Any prior marriages?

[14] **A:** No.

[15] **Q:** Does she work?

[16] **A:** Yes.

[17] **Q:** Where does she work?

[18] **A:** She works for herself.

[19] **Q:** What does she do?

[20] **A:** She drives a coffee truck.

[21] **Q:** Does she have a d/b/a, doing business as?

[22] **A:** Yes.

[23] **Q:** And what is that?

[24] **A:** Ann s Quality Catering.

---

Page 67

[1] **Q:** Does she employ anyone?

[2] **A:** No.

[3] **Q:** Do you help her out on the truck?

[4] **A:** No.

[5] **Q:** How long has she been operating Ann s Quality [6] Catering?

[7] **A:** Five years.

[8] **Q:** Before that was she employed?

[9] **A:** Yes.

[10] **Q:** By whom?

[11] **A:** She was in the restaurant business, she was a [12] waitress/bartender.

[13] **Q:** And for how long did she do that?

[14] **A:** Ten or twelve years.

[15] **Q:** One particular restaurant/bar or several during [16] that period?

[17] **A:** Several.

[18] **Q:** Can you name them, please?

[19] **A:** The 401 Club.

[20] **Q:** Where is that?

[21] **A:** Marlboro, Mass.

[22] **Q:** Okay.

[23] **A:** Scaletti s Restaurant.

[24] **Q:** Can you spell that?

---

Page 68

[1] **A:** I can t.

[2] **Q:** Can you say it slowly then?

[3] **A:** Scaletti s.

[4] **Q:** And where is that located?

[5] **A:** Hudson.

[6] **Q:** Any others?

[7] **A:** Nope.

[8] **Q:** No others or no others that you remember?

[9] **A:** No others.

[10] **Q:** Do you have children?

[11] **A:** Yes.

[12] **Q:** How many?

[13] **A:** Two.

[14] **Q:** Names?

[15] **A:** Craig, Jr.

[16] **Q:** How old?

[17] **A:** 23.

[18] **Q:** Is he dependant upon you?

[19] **A:** No.

[20] **Q:** And your other child?

[21] **A:** Nicole.

[22] **Q:** Nicole is how old?

[23] **A:** 17.

[24] **Q:** Is she dependant upon you?

---

Page 69

[1] **A:** Yes.

[2] **Q:** Other than this lawsuit, have you filed any [3] other lawsuits?

[4] **A:** No.

[5] **Q:** Have you been a defendant in any lawsuit?

[6] **A:** No.

[7] **Q:** I believe I understood your tes-timony that since [8] your accident at APA until March 1st, 2002 you had not [9] worked, is that correct?

[10] **A:** Yes.

[11] **Q:** Since March 1st, 2002 to the present, have you [12] been employed?

[13] **A:** No.

[14] **Q:** Since March 1st, 2002 until the present, have [15] you been offered employment by any employer?

[16] **A:** No.

[17] **Q:** Since March 1st, 2002 until the present, have [18] you had any interviews for employment?

[19] **A:** No.

[20] **Q:** Since March 1st, 2002 until the present, have [21] you filed any applications for employment?

[22] **A:** No.

---

Page 70

[23] **Q:** Since March 1st, 2002 until the present, have [24] you sent out any resumes?

[1] **A:** No.

[2] **Q:** Since March 1st, 2002 until the present, have [3] you contacted any employment counselors?

[4] **A:** Nope.

[5] **Q:** Since March 1st, 2002 until the present, have [6] you gone to the library or purchased any books in [7] terms of how one goes about finding employment?

[8] **A:** No.

[9] **Q:** Since March 1st, 2002 until the present, have [10] you gotten on the computer to look for employment?

[11] **A:** No.

[12] **Q:** Since March 1st, 2002 until the present, have [13] you made any efforts to find employment?

[14] **A:** No.

[15] **Q:** Why not?

[16] **A:** I ve got some outstanding issues with regard to [17] my industrial accident.

[18] **Q:** What are those outstanding issues you have [19] regarding your industrial accident?

[20] **A:** I ve got a knee that needs to be reconstructed.

[21] **Q:** Is that from the blown out tendon?

[22] **A:** Yes.

[23] **Q:** Do you have any plans to get that knee [24] reconstructed?

---

Page 71

[1] **A:** Yes.

[2] **Q:** When?

[3] **A:** As soon as they resolve all the issues with the [4] insurance company with the old employer.

[5] **Q:** Any other outstanding issues you have regarding [6] your industrial acci-dent?

[7] **A:** No.

[8] **Q:** Just your knee?

[9] **A:** Yes.

[10] **Q:** From March 1st, 2002 until the present, do you [11] have any restrictions regarding your ability to work?

[12] **A:** Could you repeat the question?

[13] **MR. GLUEK:** Can you repeat it, please?

[14] (Question read back)

[15] **THE WITNESS:** I m not under any doctor s [16] care at this time.

[17] **BY MR. GLUEK:**

[18] **Q:** The question still remains, since March 1st, [19] 2002 until the present, do

---

[20] you have any restrictions [20] that effects your ability to work?

[21] **A:** Yes.

[22] **Q:** What are those restrictions?

[23] **A:** I have a herniated disc in my lower back.

[24] **Q:** Still?

---
Page 72

[1] **A:** Still.

[2] **Q:** Any other restrictions?

[3] **A:** A herniated disc in my neck.

[4] **Q:** Still?

[5] **A:** Still.

[6] **Q:** Any other restrictions?

[7] **A:** And the ligament in my knee.

[8] **Q:** Now your herniated disc in your lower back, does [9] that effect your ability to sit?

[10] **A:** On occasion, yes.

[11] **Q:** Does that effect your ability to stand?

[12] **A:** Yes.

[13] **Q:** Does that effect your ability to lift?

[14] **A:** Yes.

[15] **Q:** Does it effect your ability to turn?

[16] **A:** Yes.

[17] **Q:** Does it effect your ability to bend?

[18] **A:** Yes.

[19] **Q:** All in negative ways?

[20] **A:** Yes.

[21] **Q:** With respect to your herniated disc in your [22] neck, does that effect your ability to bend?

[23] **A:** No.

[24] **Q:** What limitations does the herniated disc in your

---
Page 73

[1] neck have on you?

[2] **A:** It depends on the level of pain I m having on [3] any particular day.

[4] **Q:** So it s painful?

[5] **A:** Very painful.

[6] **Q:** Do you take medication for your herniated disc [7] in the neck?

[8] **A:** Yes, I do.

[9] **Q:** And what kind of medication?

[10] **A:** Naprosin, Soma.

[11] **Q:** And what are those?

[12] **A:** Anti-inflammatory pain medication.

[13] **Q:** And with respect to your herniated disc to your [14] lower back, is that also painful?

[15] **A:** Yes.

[16] **Q:** Do you take medication for that?

[17] **A:** The same medications.

[18] **Q:** Only the two medications?

[19] **A:** Yes.

[20] **Q:** Do you have a commercial drivers license?

[21] **A:** Yes, I do.

[22] **Q:** Is it still current?

[23] **A:** Yes.

[24] **Q:** Are you required to take a physical periodically

---
Page 74

[1] to keep that current?

[2] **A:** No.

[3] **Q:** With respect to your knee, what limitations does [4] that cause on you?

[5] **A:** Well it s tough to get around some days.

[6] **Q:** With your limitations, could you currently do [7] dock work?

[8] **A:** I could try.

[9] **Q:** That is not the question. Do you know if you [10] could currently do dock work with your limitations?

[11] **A:** I do not know.

[12] **Q:** With your limitations, do you know if you could [13] currently do driving work?

[14] **A:** I do not know.

[15] **Q:** You testified that you appealed your award of [16] partial disability, is that correct?

[17] **A:** Yes.

[18] **Q:** Why did you appeal it?

[19] **A:** Why did I appeal it?

[20] **Q:** Is it because you thought you should have gotten [21] total disability?

[22] **A:** Yes.

[23] **Q:** Do you still believe you should have gotten [24] total disability?

---
Page 75

[1] **A:** Yes.

[2] **Q:** Do you believe that you are currently totally [3] disabled?

[4] **A:** Yes.

[5] **Q:** You testified that in 1995 you received Social [6] Security benefits, correct?

[7] **A:** Yes.

[8] **Q:** Are you currently receiving Social Security [9] benefits?

[10] **A:** Yes, I am.

[11] **Q:** Now when you received the Social Security [12] benefits in 1995, did it go retroactive?

[13] **A:** Yes.

[14] **Q:** To what period?

[15] **A:** March 11th, 1987.

[16] **Q:** What is your monthly benefit on your Social [17] Security currently?

[18] **A:** $2,160.00.

[19] **Q:** And has that remained the same or has that gone [20] up?

[21] **A:** It goes up every year.

[22] **Q:** Do you remember what the lowest amount was?

[23] **A:** Not offhand.

[24] **Q:** And I am assuming your children were also

---
Page 76

[1] receiving Social Security benefits when they were [2] minors?

[3] **A:** That s included.

[4] **Q:** The 2,160 includes their benefit?

[5] **A:** Yes.

[6] **Q:** Does your non-minor child still get Social [7] Security benefits?

[8] **A:** Yes.

[9] **Q:** Do you have to periodically re-apply for Social [10] Security benefits?

[11] **A:** No.

[12] **Q:** Do you have to update Social Security with [13] respect to your status?

[14] **A:** No.

[15] **Q:** Where did you apply for these Social Security [16] benefits?

[17] **A:** Framingham.

[18] **Q:** Were you or are you currently assigned a case [19] worker for Social Security?

[20] **A:** No.

[21] **Q:** And you were never assigned a case worker?

[22] **A:** No.

[23] **Q:** Do you know who your contact person was at [24] Social Security when you applied?

---
Page 77

[1] **A:** No.

[2] **Q:** Do you have any documents regarding Social [3] Security and your application for Social Security?

[4] **A:** Do I have any documents?

[5] **Q:** Correct.

[6] **A:** What kind of documents?

[7] **Q:** Any piece of paper.

[8] **A:** Saying what?

[9] **Q:** That relates to your Social Security benefits [10] and/or your application for Social Security.

[11] **A:** I have documents that pertain to my Social [12] Security, yes.

[13] **Q:** Do you have a lawyer that represented you when [14] you applied for Social Security?

[15] **A:** Yes.

[16] **Q:** And what is his name?

[17] **A:** The law firm was Ellis & Ellis out of

Worcester.

[18] **Q:** And which lawyer at Ellis & Ellis did you deal [19] with?

[20] **A:** I believe it was Bob Marque.

[21] **Q:** When was the last time you talked to Mr. Marque?

[22] **A:** I don t recall.

[23] **Q:** Since 1995?

[24] **A:** Yeah, probably.

                                    Page 78

[1] **Q:** Since last year?

[2] **A:** Nope, not last year.

[3] **Q:** The last five years?

[4] **A:** Nope.

[5] **Q:** The last ten years?

[6] **A:** 1995.

[7] **Q:** Okay. Have you talked to anybody at New Penn [8] since March 1st, 2002?

[9] **A:** No.

[10] **Q:** Have you called up New Penn and asked if you are [11] going to be called?

[12] **A:** No.

[13] **Q:** Have you ever filled out an application at New [14] Penn?

[15] **A:** Nope.

[16] **Q:** Do you know Mr. Carnes?

[17] **A:** Yes.

[18] **Q:** Do you believe that he had any ill will towards [19] you?

[20] **A:** I don t know that.

[21] **Q:** You don t have an opinion one way or the other?

[22] **A:** Nope.

[23] **Q:** Do you have any facts that would suggest that he [24] had any ill will towards you?

                                    Page 79

[1] **A:** No.

[2] **Q:** Do you have any facts that Mr. Carnes was [3] prejudiced against you in someway?

[4] **A:** No.

[5] **Q:** Do you have any facts that Mr. Carnes disliked [6] you in any respect?

[7] **A:** Nope.

[8] **Q:** You know Mr. Harrington, correct?

[9] **A:** Yes.

[10] **Q:** Do you have any facts to believe that [11] Mr. Harrington has any ill will towards you?

[12] **A:** Nope.

[13] **Q:** Do you have any facts to believe that [14] Mr. Harrington had any prejudice towards you in any [15] respect?

[16] **A:** Nope.

[17] **Q:** Do you have any facts that Mr. Harrington [18] somehow wanted to see

you damaged?

[19] **A:** Nope.

[20] **Q:** Do you have any facts that anyone connected with [21] the union had any ill will towards you?

[22] **A:** No.

[23] **Q:** Do you have any facts that anybody connected [24] with the union had any prejudices towards you?

                                    Page 80

[1] **A:** No.

[2] **Q:** Do you have any facts that anyone connected with [3] the union had any hatred towards you?

[4] **A:** Nope.

[5] **Q:** Between March 1, 2002 and March 30, 2003, do you [6] know if you could have worked 30 days at New Penn?

[7] **A:** Nope.

[8] **Q:** Let me rephrase the question. Between March 1, [9] 2002 and March 30, 2003, do you know if you could have [10] worked 30 days in a two month period at New Penn?

[11] **A:** No.

[12] **Q:** I think I understood your testimony, sir, that [13] after you filed a grievance on April 7th, 2003 you had [14] no discussions with Mr. Carnes?

[15] **MR. LATHROP:** I m sorry, could I have that [16] date again?

[17] **MR. GLUEK:** After April 7th, 2003, which is [18] the date your grievance is dated.

[19] **THE WITNESS:** Um-hum.

[20] **BY MR. GLUEK:**

[21] **Q:** You had no conversations with Mr. Carnes, is [22] that correct?

[23] **A:** I don t believe I did.

[24] **Q:** Do you have anything that would refresh your

                                    Page 81

[1] recollection?

[2] **A:** Nope.

[3] **Q:** Do you have any documents memorializing any [4] conversations that you had with Mr. Carnes?

[5] **A:** Nope.

[6] **Q:** Did Mr. Carnes ever tell you to wait until after [7] the agreement with New Penn and the union expired [8] before you filed a grievance?

[9] **A:** No.

[10] **Q:** Did anybody have any discussion with you from [11] the union with respect to the timing of when the [12] grievance should be filed by you?

[13] **A:** No.

[14] **Q:** It is your testimony, isn t it sir, that for the [15] period between March 1,

2002 and March 30, 2003 you [16] had several discussions with Mr. Carnes?

[17] **A:** Yes.

[18] **Q:** And those were follow up discussions about you [19] not being called by New Penn, correct?

[20] **A:** Yes.

[21] **Q:** So during that time period you were aware that [22] there was at least an issue, correct?

[23] **A:** No.

[24] **Q:** Then why did you make these calls?

                                    Page 82

[1] **A:** To find out what the status of things were.

[2] **Q:** And what did Mr. Carnes tell you the status was?

[3] **A:** At first he said he wasn t sure and he would [4] look into it.

[5] **Q:** That was in the springtime?

[6] **A:** Yes.

[7] **Q:** Did he say anything else in the springtime?

[8] **A:** Nope.

[9] **Q:** And I believe your testimony was two [10] conversations you had in the spring, correct?

[11] **A:** Was it two in the spring? It may have been. [12] Initial phone call — there was an initial phone call [13] with Mark Harrington, who told me that he no longer [14] represented the men at APA, I need to speak with Bill [15] Carnes.

[16] **Q:** Right. And then you had, in the spring of 2002, [17] how many conversations with Mr. Carnes did you have?

[18] **A:** I had a follow up phone call from the Mark [19] Harrington call with Mr. Carnes, and then one more [20] after that.

[21] **Q:** In the spring?

[22] **A:** Early summer, spring. Late spring, early [23] summer.

[24] **Q:** And I apologize. We have already been over

                                    Page 83

[1] this, but now I am confused. Mr. Harrington called [2] you up in the spring of 2002 to say he was no long —

[3] **A:** No, I called Mr. Harrington.

[4] **Q:** And he said he is no long responsible for APA, [5] correct?

[6] **A:** Right.

[7] **Q:** Then you called Mr. Carnes, correct?

[8] **A:** Yes.

[9] **Q:** And Mr. Carnes said that he didn t know and he [10] would follow up?

[11] **A:** Right.

[12] Q: Did he say anything else?

[13] A: No.

[14] Q: And that took place in the spring of 2002, [15] correct?

[16] A: Yes.

[17] Q: And it is your testimony that he said — that [18] you can recall that he said nothing other than he [19] didn t know?

[20] A: General conversation about what was going on, [21] the whole issue.

[22] Q: What else do you remember that he said?

[23] A: He said that he was going to look into it.

[24] Q: Do you remember anything else?

Page 84

[1] A: No.

[2] Q: When was the next time you talked to Mr. Carnes?

[3] A: I can t be sure.

[4] Q: But there was a subsequent time?

[5] A: Yes.

[6] Q: And was this by telephone?

[7] A: Yes.

[8] Q: Did you call him?

[9] A: Yes.

[10] Q: Did you take any notes of that conversation?

[11] A: I didn t take any written notes.

[12] Q: What was the substance of that conversation?

[13] A: The fact that he had spoke with New Penn with [14] regards to my situation. He had conversations with [15] the New Penn people. I m not sure if it was with the [16] terminal manager or Dan Schmidt and possibly Charlie [17] Zaccaria, but that was six months in advance from [18] getting the grievance.

[19] Q: So he said he talked to New Penn?

[20] A: Yeah.

[21] Q: Did he say to whom he talked to?

[22] A: No.

[23] Q: Did he say what he said to New Penn?

[24] A: He — yes.

Page 85

[1] Q: What did he say he said?

[2] A: That he had an APA employee that was looking to [3] be put to work.

[4] Q: Did he say anything else to you?

[5] A: He talked about, I guess they told him that my [6] name wasn t on the list, on the seniority list and he [7] said it was on the seniority list. He said, I ll [8] show you the decision from the New England Joint [9] Committee that puts him on the list.

[10] Q: Did he say anything else?

[11] A: Nope, just that he would get back to me.

[12] Q: That is all that you remember of the [13] conversation?

[14] A: Yes.

[15] Q: Nothing else?

[16] A: No.

[17] Q: When was the next conversation you had with [18] Mr. Carnes?

[19] A: March.

[20] Q: Of 2003?

[21] A: Yes.

[22] Q: Who initiated that conversation?

[23] A: I believe I did.

[24] Q: And what do you recall of that conversation?

Page 86

[1] A: I called and asked him what my status was as far [2] as being called. The agreement, in effect, ended and [3] I hadn t received a phone call.

[4] Q: What else of that conversation do you recall?

[5] A: He said to me, pardon my french, They fucked [6] yah. Send the grievance in.

[7] Q: Did you say anything else?

[8] A: Nope, I wrote the grievance.

[9] Q: Did he say anything else?

[10] A: Nope.

[11] Q: That was it of the conversation?

[12] A: Um-hum.

[13] Q: Do you have any notes of that conversation?

[14] A: Nope.

[15] Q: Could you look at, please, what has been marked [16] as Goulet Exhibit 2? Is that your grievance?

[17] A: Yes.

[18] Q: Is that your handwriting?

[19] A: Yes, it is.

[20] Q: Did anybody assist you in pre-paring this [21] grievance?

[22] A: Nobody.

[23] Q: Between the conversation that you had with [24] Mr. Carnes where he said, They fucked you. Send in

Page 87

[1] the grievance. and the time that you sent in the [2] grievance, did you have any other conversations with [3] Mr. Carnes?

[4] A: Don t believe I did.

[5] Q: You do not believe you did?

[6] A: I don t think so.

[7] Q: Okay. After you sent in the griev-ance, your [8] next contact was with Mr. Harrington, is that correct?

[9] A: Yes.

[10] Q: Did you initiate that?

[11] A: Yes.

[12] Q: Do you recall when that oc-curred?

[13] A: Sometime after Bill Carnes left office.

[14] Q: But it was in May?

[15] A: I believe so.

[16] Q: May, 2003?

[17] A: Yes.

[18] Q: And do you have any notes of that conversation?

[19] A: Nope.

[20] Q: What was said during that con-versation?

[21] A: Basically, I was following up on the status of [22] the grievance. Like I said, I filed a grievance with [23] the union —

[24] Q: And I think your prior testimony was

Page 88

[1] Mr. Harrington said he didn t know anything about it, [2] correct?

[3] A: He said he didn t have any copies of the [4] grievance.

[5] Q: Do you know if he knew about the grievance [6] before your phone call?

[7] A: Yes, I m sure he did.

[8] Q: Do you know that for a fact?

[9] A: No.

[10] Q: As best you can recall, what were [11] Mr. Harrington s exact words to you during that [12] conversation?

[13] A: That he didn t have a copy of the grievance. [14] That Bill Carnes didn t file it with the committee, [15] that s why it didn t get filed. Pretty basic.

[16] Q: Do you recall anything else he said?

[17] A: Nope.

[18] Q: When was your next conversation with [19] Mr. Harrington?

[20] A: Maybe sometime in June.

[21] Q: And did you initiate that con-versation?

[22] A: I m sure I did, yes.

[23] Q: Do you have any notes of that conversation?

[24] A: No.

Page 89

[1] Q: What was the substance of that conversation?

[2] A: Again, to follow up on what hap-pened to my [3] grievance.

[4] Q: And what did Mr. Harrington say?

[5] A: I don t recall.

[6] Q: You don t recall anything he said?

[7] A: No.

Craig Goulet
October 4, 2005
Case 1:04-cv-12577-WGY    Document 77-4    Filed 06/17/2006    Page 35 of 43    Craig Goulet,    v.
New Penn Motor Express, et al.,

[8] **Q:** Do you recall anything that you said?

[9] **A:** Just trying to find out what happened to the [10] grievance.

[11] **Q:** And that s all that you recall from that [12] conversation?

[13] **A:** Yeah.

[14] **Q:** When was your next conversation with [15] Mr. Harrington?

[16] **A:** I think I followed that up with the letter I [17] wrote.

[18] **Q:** So that is the July 25th letter?

[19] **A:** Yeah.

[20] **Q:** Could you look at Exhibit 3, please?

[21] **A:** Um-hum.

[22] **Q:** Is it still your sworn testimony that you do not [23] recall why you wrote Let s not lose sight of the real [24] issue here. The grievance is about seniority rights

---
Page 90

[1] under the agreement not whether one was capable of [2] working or not.

[3] **MR. LATHROP:** Objection.

[4] **THE WITNESS:** Is it my sworn testimony what [5] now?

[6] **BY MR. GLUEK:**

[7] **Q:** Is it still your sworn testimony that you have [8] no recollection as to why you wrote that?

[9] **MR. LATHROP:** Objection.

[10] **THE WITNESS:** Again, you know, I m not sure [11] what my thought process was at the time. Like I said, [12] I was trying to follow up on the grievance that I had [13] submitted and maybe there was some conversation about [14] I was on comp or something, and I think I told them I [15] wasn t on comp. I wasn t collecting a Workman s [16] Compensation check.

[17] **BY MR. GLUEK:**

[18] **Q:** So isn t it a fact that Mr. Harrington had [19] conversations with you prior to you writing Exhibit 3 [20] where he indicated to you that you may not be able for [21] recall because you were not able to work?

[22] **A:** No.

[23] **Q:** Do you know whether or not the union ever [24] supplied New Penn with your name on the seniority

---
Page 91

[1] list?

[2] **A:** Yes, they did.

[3] **Q:** How do you know that?

[4] **A:** I have a copy of that, and I have a copy of the [5] letter from the freight director that was sent out to [6] the locals with my name on it.

[7] **Q:** Do you know if that was given to New Penn?

---
[8] **A:** Yes, it was.

[9] **Q:** And how do you know that?

[10] **A:** It was forwarded to New Penn from APA. From [11] their corporate offices to New Penn s corporate [12] offices.

[13] **Q:** Okay. So APA forwarded it to New Penn?

[14] **A:** Yes.

[15] **Q:** Listen to my question. My question, sir, was [16] whether the union — do you know if the union ever [17] forwarded your name on a seniority list to New Penn?

[18] **A:** I don t know that.

[19] **Q:** Okay. After your conversation with [20] Mr. Harrington in June of 2003, when was the next time [21] you talked to him?

[22] **A:** As I said, I wrote the letter and I didn t hear [23] anything. So I probably called him sometime in early [24] November, I m going to say, before I wrote the second

---
Page 92

[1] letter.

[2] **Q:** And do you have any notes of that conversation?

[3] **A:** No.

[4] **Q:** What was discussed during that conversation?

[5] **A:** Same thing, what happened to my grievance.

[6] **Q:** And what was his response?

[7] **A:** That they were going to file it. They were [8] going to file it with the committee and get it heard.

[9] **Q:** Anything else that you recall?

[10] **A:** Nope.

[11] **Q:** Nothing else?

[12] **A:** No.

[13] **Q:** Did you have an understanding as to why the [14] grievance had not been previously filed?

[15] **A:** No.

[16] **Q:** Were you ever told why the grievance was not [17] previously filed?

[18] **A:** I was told that Bill Carnes didn t file the [19] grievance, that s why it wasn t filed.

[20] **Q:** Were you ever told why the grievance was not [21] filed after Mr. Carnes left office?

[22] **A:** No.

[23] **Q:** Doug, I can t remember his last name, Francie?

[24] **A:** Yes.

---
Page 93

[1] **Q:** How do you pronounce it?

[2] **A:** Francie.

---
[3] **Q:** Francie?

[4] **A:** Francie.

[5] **Q:** When was the last time you talked to him?

[6] **A:** February of 2002.

[7] **Q:** So that was during the phone call that he asked [8] you what?

[9] **A:** What my preference was.

[10] **Q:** And my preference was Billerica?

[11] **A:** Yes.

[12] **Q:** Do you know if Doug is currently employed?

[13] **A:** I don t know.

[14] **Q:** After your conversation with Mr. Harrington [15] sometime in the November time period, do you have any [16] subsequent conversation with him?

[17] **MR. LATHROP:** I m sorry, with [18] Mr. Harrington?

[19] **MR. GLUEK:** Yes.

[20] **THE WITNESS:** Nope. I sent that letter to [21] him and then I think we spoke again in the fall and [22] spring. Had met several times with regards to the [23] case being presented to the committee.

[24] **BY MR. GLUEK:**

---
Page 94

[1] **Q:** So you personally met Mr. Harrington?

[2] **A:** Yes.

[3] **Q:** And did you take any notes of those [4] conversations?

[5] **A:** No.

[6] **Q:** Or meetings?

[7] **A:** Nope.

[8] **Q:** Did Mr. Harrington ever imply to you as to the [9] merits in your case?

[10] **A:** No.

[11] **Q:** Did Mr. Harrington ever indicate that he thought [12] your case was a strong case or a weak case?

[13] **A:** I think that he said we had a good case.

[14] **Q:** The question is, did he ever tell you you had a [15] good case or a bad case?

[16] **A:** Yes.

[17] **Q:** In what context did he say that?

[18] **A:** How do you mean? What do you mean context , in [19] what context?

[20] **Q:** Was this in a phone conversation or —

[21] **A:** No, this was in person.

[22] **Q:** When you were preparing for the case?

[23] **A:** Yes.

[24] **Q:** Did he indicate to you why he thought it was a

---

Page 95

[1] strong case?

[2] **A:** Just based on the merits of the case.

[3] **Q:** Do you recall anything else?

[4] **A:** No.

[5] **Q:** Do you think the union just made a simple [6] mistake by not filing your grievance timely?

[7] **MR. LATHROP:** Objection.

[8] **THE WITNESS:** I don t know.

[9] **BY MR. GLUEK:**

[10] **Q:** Do you have any facts that would suggest that [11] the union did anything more than just a simple [12] mistake not filing your grievance timely?

[13] **MR. LATHROP:** Objection.

[14] **THE WITNESS:** I don t know what they did.

[15] **BY MR. GLUEK:**

[16] **Q:** Do you have an understanding that with respect [17] to your decision the decision of the committee is [18] final and binding?

[19] **A:** That s what the decision says.

[20] **Q:** Is that your understanding going into it?

[21] **A:** Yes.

[22] **Q:** Now when you were being questioned by the [23] union s lawyer you said that you had an understanding [24] that Mr. Harrington was negotiating with the company?

Page 96

[1] **A:** Yes.

[2] **Q:** Why did you have that understanding?

[3] **A:** Through the phone conversations that we had that [4] there was dialogue between Mr. Carnes and [5] Mr. Harrington with New Penn.

[6] **Q:** Did he indicate to you what the dialogue was?

[7] **A:** No.

[8] **Q:** Did he indicate to with whom he would speak at [9] New Penn?

[10] **A:** Nope.

[11] **Q:** Other than the two medications that you [12] previously testified about, have you taken any other [13] medication since March 1, 2002?

[14] **A:** No.

[15] **Q:** And they are just anti-inflammatories is your [16] testimony?

[17] **A:** Yes, muscle relaxers.

[18] **MR. GLUEK:** I have nothing further.

[19] **RE-EXAMINATION**

[20] **BY MS. PENNINI:**

[21] **Q:** Following your November, 2003 conversation with [22] Mr. Harrington in

which you discussed the filing of [23] the grievance, did he ever speak to you regarding any [24] issues as to the proper joint area committee where

Page 97

[1] this grievance could be brought or could be heard?

[2] **A:** No.

[3] **Q:** He never mentioned anything to you about the [4] difference between Southern New England Joint Area [5] Committee and the Eastern Region Committee?

[6] **A:** No. I think the case had been scheduled to be [7] heard in April, and I got a phone call saying that it [8] was rescheduled to be heard at the Eastern Region.

[9] **Q:** Prior to the November, 2003 conversation and [10] letter to Mr. Harrington, did he ever have any [11] discussions with you concerning whether a grievance [12] could be brought concerning the failure to be called [13] off of a call list pursuant to the TNFINC/New Penn [14] agreement?

[15] **A:** No.

[16] **Q:** And I believe you previously indicated that you [17] are awaiting surgery on your knee?

[18] **A:** Yes.

[19] **Q:** Is it the left or the right knee?

[20] **A:** Right knee.

[21] **Q:** And you said that you continued with the [22] insurance benefits for a year following your injury, [23] is that correct?

[24] **A:** My pension was paid for a year, I m not sure

Page 98

[1] about my insurance. It was 1987, quite some time so I [2] don t recall.

[3] **Q:** You do not recall whether you had any health [4] insurance benefits?

[5] **A:** I did for a period of six months, I know.

[6] **Q:** So you are sure you had it for six months but —

[7] **A:** Yes.

[8] **Q:** — you may have had it for a longer period?

[9] **A:** Yes.

[10] **Q:** During the period under which you were positive [11] that you had insurance coverage did you have any [12] surgeries to your knee?

[13] **A:** No.

[14] **Q:** Did you have any surgeries to your back?

[15] **A:** No.

[16] **Q:** Did you have any surgeries on the herniated disc [17] in your neck?

[18] **A:** No.

[19] **Q:** At that time had any of the doctors recommended [20] surgeries on the herniated disc in your neck?

[21] **A:** I don t believe so, nope.

[22] **Q:** What about the herniated disc in your back?

[23] **A:** No.

[24] **Q:** And any recommendation of surgery on the torn,

Page 99

[1] I m sorry, is it a ligament or a torn tendon in your [2] knee?

[3] **A:** Ligament.

[4] **Q:** Did the doctors recommend any surgery concerning [5] the torn ligament in your knee?

[6] **A:** Not at that time.

[7] **Q:** When did you first become aware that you would [8] need surgery on the ligament in your knee?

[9] **A:** Oh, I can t be sure, positively sure.

[10] **Q:** Can you give me an approximate time? Was it [11] during the 1980's?

[12] **A:** I honestly don t remember. I don t know.

[13] **Q:** Was it during the first half of the 1990's?

[14] **A:** Yes.

[15] **Q:** Do you recall if it was in 1990?

[16] **A:** No.

[17] **Q:** Do you recall whether it was in 1991?

[18] **A:** Nope.

[19] **Q:** Is there any document that would help refresh [20] your memory concerning this fact?

[21] **A:** I m not sure.

[22] **Q:** Do you recall the name of the doctor who told [23] you you would need surgery on your knee?

[24] **A:** Yes.

Page 100

[1] **Q:** And what doctor was that?

[2] **A:** Dr. Solomon.

[3] **Q:** Do you have a first name for Dr. Solomon?

[4] **A:** Alan.

[5] **Q:** Where does Dr. Solomon practice?

[6] **A:** Out of Leonard Morse in Natick.

[7] **Q:** Is Leonard Morse a hospital?

[8] **A:** Yes.

[9] **Q:** Does he currently practice out of Leonard Morse [10] in Natick?

[11] **A:** I m not sure of that.

[12] **Q:** When was it that you would see Dr. Solomon?

[13] **A:** Dr. Solomon operated on my

Craig Goulet
October 4, 2005   Case 1:04-cv-12577-WGY   Document 77-4   Filed 06/17/2006   Page 9 of 9  Craig Goulet, v.
New Penn Motor Express, et al.,

[14] **Q:** Well when would you see Dr. Solomon concerning [15] your knee?

[16] **A:** Periodically, when I was treating with him.

[17] **Q:** And during what time period was that?

[18] **A:** Right after my industrial accident.

[19] **Q:** And what time did you stop seeing Dr. Solomon?

[20] **A:** Oh, again, I can t be sure.

[21] **Q:** Is there anything that would help you as to when [22] you stopped seeing Dr. Solomon?

[23] **A:** Probably when the insurance company stopped [24] paying.

---

### Page 101

[1] **Q:** And you also had a rotator cuff injury, is that [2] correct?

[3] **A:** Yes.

[4] **Q:** And you had surgery concerning this injury?

[5] **A:** Yes.

[6] **Q:** When did you have that surgery?

[7] **A:** 89, 1990 maybe.

[8] **Q:** I m sorry, in 1989, is that what you said?

[9] **A:** 89 or 90, somewhere thereabouts.

[10] **Q:** And was this surgery performed by Dr. Solomon?

[11] **A:** Yes.

[12] **Q:** And where was it performed?

[13] **A:** On my left shoulder.

[14] **Q:** I m sorry, the location of the hospital?

[15] **A:** Natick.

[16] **Q:** Is it at the Leonard Morse Hospital in Natick?

[17] **A:** Yes.

[18] **Q:** Did you also see Dr. Solomon concerning your [19] knee?

[20] **A:** Yes.

[21] **Q:** When did you stop seeing Dr. Solomon concerning [22] your knee?

[23] **A:** I don t recall.

[24] **Q:** Did you continue to see Dr. Solomon concerning

---

### Page 102

[1] your knee after you stopped seeing him concerning your [2] rotator cuff injury?

[3] **A:** Like I said, the insurance company did not pay [4] the bills so therefore he wouldn t see me.

[5] **Q:** Do you know when the insurance company stopped [6] paying the bills to Dr. Solomon?

[7] **A:** They still haven t paid them.

[8] **Q:** But do you recall when they stopped paying the [9] bills?

[10] **A:** They never paid him.

[11] **Q:** When did you begin seeing Dr. Solomon?

[12] **A:** Sometime shortly after the accident.

[13] **Q:** So you began to see Dr. Solomon in about 1987, [14] is that correct?

[15] **A:** 1988.

[16] **Q:** Do you recall what month you had your rotator [17] cuff surgery?

[18] **A:** No.

[19] **Q:** Is there anything that would help you remember [20] when you had this surgery?

[21] **A:** Not offhand.

[22] **Q:** How soon after you had your surgery did you stop [23] seeing Dr. Solomon?

[24] **A:** Six months maybe.

---

### Page 103

[1] **Q:** Do you recall if your surgery was in the summer?

[2] **A:** No.

[3] **Q:** Winter?

[4] **A:** I don t remember.

[5] **Q:** Do you currently have any limitations concerning [6] your rotator cuff injury, physical limitation?

[7] **A:** Yes, it still bothers me.

[8] **Q:** You said it still bother you, do you take any [9] medication concerning the pain of your rotator cuff?

[10] **A:** Yes.

[11] **Q:** And what medications are those?

[12] **A:** Motrin, Advil.

[13] **Q:** Have you seen any doctor for this injury since [14] you stopped seeing Dr. Solomon?

[15] **A:** No.

[16] **MS. PENNINI:** That s all I have.

[17] **MR. LATHROP:** Well I am going to take a [18] break to decide whether or not I am going to have any [19] questions.

[20] (A brief recess was taken)

[21] **EXAMINATION**

[22] **BY MR. LATHROP:**

[23] **Q:** Mr. Goulet, what date is today?

[24] **A:** October 4th, 2005.

---

### Page 104

[1] **Q:** Is discovery over in this case?

[2] **A:** No.

[3] **Q:** Is discovery with regard to the union over in [4] this case?

[5] **A:** No.

[6] **Q:** As of the time that the APA decision was issued [7] were you receiving Worker

---

s Compensation benefits?

[8] **A:** No.

[9] **Q:** You were off Worker s Compensation by the time [10] of the APA decision?

[11] **A:** Yes.

[12] **Q:** As of the time of the APA decision were you [13] under the active care of any physicians for your [14] Worker s Compensation injuries?

[15] **A:** Nope.

[16] **Q:** At anytime after March 1st, 2002 did you receive [17] a call from New Penn to go to work?

[18] **A:** No.

[19] **Q:** If you had received a call from New Penn at [20] anytime after March 1st, 2002 to go to work, what [21] would you have done?

[22] **MR. GLUEK:** Objection.

[23] **THE WITNESS:** I would ve made every effort [24] to go to work and get clearance from the doctors, had

---

### Page 105

[1] they called.

[2] **MR. LATHROP:** Thank you. I have nothing [3] else.

[4] (Whereupon, the deposition in the above- [5] entitled matter was concluded at 12:45 p.m.)

---

### Page 106

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

I, Michael C. Janey, a Massachusetts Verbatim Court Reporter and Notary Public duly commissioned and qualified in

and for the Commonwealth of Massachusetts, do hereby certify

that there came before me on the 4th day of October, 2005, at 10:05 a.m., the person hereinbefore named, who was by me duly

sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined under his oath and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further testify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 15th day of October, 2005.

My Commission expires on October 28, 2005.

    Michael C. Janey, CR, Notary Public

---

### Page 107

I have read the foregoing transcript

of the testimony and the same

contains a true and accurate

recording of my answers given to the

questions therein set forth.

Signed under the pains and penalties

of perjury.

Date

    JANEY ASSOCIATES

*EXHIBIT 3*

107

I have read the foregoing transcript
of the testimony and the same
contains a true and accurate
recording of my answers given to the
questions therein set forth.

_Craig Hulet_

Signed under the pains and penalties
of perjury.

_12/21/2005_
Date

JANEY ASSOCIATES

ERRATA Sheet

DEPONENT'S NAME    CRAig S. GOULET SR.

DATe of DEPOsition

PAge 11 liNe 6 READS,      yes

SHoulD READ,    yes BUT the DATe
of the leTTER WAS FEBRUARY 6th 1987

PAge 12 liNe 16 READS, Yes.

SHOUID READ,    yes BUT the DATe
WAS FebRUARY 6th 1987.

Age 28 line 19 Reads, Precisely I do not know

should Read; YES HE DID.


age 29 line 14 READS, NO I DON'T RECALL

should READ, YES HE DID SAY I WAS BACK ON THE

SENIORITY LIST.


Ge 66 line 12 READS, 15 YEARS.

should READ, 17 YEARS.


Sa 70 line 16 READS, I'VE GOT SOME OUTSTANDING ISSUES

with REGARD TO MY INDUSTRIAL ACCIDENT.


SHOULD READ. I'VE GOT SOME OUTSTANDING ISSUES WITH

REGARDS TO MY INDUSTRIAL ACCIDENT. IF I WAS

UNABLE TO RESOLVE THOSE ISSUES, NEW PENN WAS

OBLIGATED UNDER THE CONTRACT AND THE A.D.A. TO

PROVIDE LIGHT DUTY WORK OR A REASONABLE ACCOMMODATION

TO QUALIFIED INDIVIDUALS.

PAGE 74 line 11 READS,    I DO NOT KNOW.

SHOULD READ,    I KNOW UNDER SOCIAL SECURITY ADMINISTRATION GUIDE LINES I COULD HAVE TRIED TO RETURN TO WORK HAD I BEEN GIVEN the OPPORTUNITY.

PAGE 74 line 14 READS.    I DONT KNOW.

SHOULD READ,    I KNOW IF NEW PENN CALLED AND OFFERED ME A DRIVING JOB, SOCIAL SECURITY WOULD HAVE ALLOWED me TO TRY AND RETURN TO WORK.

PAGE 74 line 14 READS,    NO

SHOULD READ,    yes

PAGE 80 line 7 READS,    NOPE

SHOULD READ,    I KNOW BETWEEN MARCH 1ST 2002 AND MARCH 30, 2003, IF NEW PENN CALLED I WOULD HAVE TRIED TO WORK 30 DAYS.

PAGE 80 line 11 READS,    NO

SHOULD READ.    WHAT I KNOW IS NEW PENN DID NOT CALL BETWEEN MARCH 1ST 2002 AND MARCH 30, 2003, AND IF THEY HAD CALLED I WOULD HAVE TRIED TO WORK 30 DAYS IN A TWO MONTH PERIOD.

PAGE 85  line 16 READS, NO.

SHOULD READ,  YES.  I RECALL MR. CARNES telling ME DURING this Conversation WHEN He TOLD NEW PENN THAT I WAS INFACT ON THE A.P.A. SENIORITY liST, New PENN TOLD MR CARNES yes he's on THE SENIORITY liST BUT He IS COllecting WORKMANS COMPENSATION. AND MR CARNES TOLD NEW PENN THAT I WAS NOT Collecting WORKMANS COMPENSATION AT THAT TIME. THEN MR. CARNES ASKED ME, CRAIG WHAT WILL YOU DO IF NEW PENN CAllS YOU? AND I TOLD MR. CARNES AT THAT TIME Tell NEW PENN TO CAll ME THEN WE WILL All KNOW WHAT I WILL DO.

PAGE 88 liNE 17 READS,  NOPE

SHOULD READ,  YES, SEND ME A COPY of THE GRIEVANCE.

PAGE 91 liNE 18 READS,  I DON'T KNOW THAT.

SHOULD READ,  I KNOW MR CARNES SHOWED NEW PENN THE SENIORITY LIST with MY NAME ON it

PAGE 92 liNE 10 READS,  NOPE

SHOULD READ,  YES, I RECALL ACTUALLY MEETING with MR. HARRINGTON IN PERSON AT the UNION HAll TO DISCUSS the PREPARATION of the CASE with THE GRIEVANCE committee, AND AT that TIME I Remember MR. HARRINGTON SUGGESTING THAT MAybe I ShoULD WAIT UNTIl AFTER I HAD MY KNEE DONE BEFORE PURSUING the GRIEVANCE AGAINST NEW PENN. He ACTUALLY offered TO FIND ME ANOTHER JOB  AlSO

'AGE 95 lINE 4 READS,   NO

<u>Should READ</u>,   YES I RECALL MR. HARRINGTON telling me you KNOW if you push This GRIEVANCE AGAINST New PENN you will Probably NEVER WORK IN the FREIGHT INDUSTRIE AGAIN.  AND I SAID TO MR HARRINGTON you KNOW if New PENN WOULD PUT ME ON THE SENIORITY LIST IN MY RIGHTFUL SPOT then WE WOULDNT HAVE TO TAKE the CASE TO the COMMITTEE, AND MR HARRINGTON TOLD ME NEW PENN IS NOT GOING TO DO THAT.

<u>PAGE 95 lINE 8 READS</u>,   I DONT KNOW.

<u>Should READ</u>.  NO I DONT THINK THAT the UNION JUST MADE A SIMPLE MISTAKE.

<u>PAGE 95 lINE 14 READS</u>,   I DONT KNOW what THEY DID.

<u>Should READ</u>,  YES, The FACT that I CALLED MR. CARNES AND MR. HARRINGTON WHEN THE AGREEMENT TOOK EFFECT MARCH 1ST 2002, the FACT that the UNION PUT NEW PENN ON NOTICE While THE AGREEMENT WAS IN EFFECT, Well BEFORE the GRIEVANCE WAS FILED with LOCAL 25 THESE FACTS ALONE SUGGEST that this WAS NO SIMPLE MISTAKE, NEVER MIND the FACT that BOTH New PENN AND the UNION SAID TIMELYNESS WAS NEVER AN ISSUE IN The PAST.