UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12577 WGY

```
*****************************************
CRAIG GOULET,                          *
    Plaintiff                          *
                                       *
    v.                                 *
                                       *
NEW PENN MOTOR EXPRESS, INC., and      *
TEAMSTERS LOCAL 25,                    *
INTERNATIONAL BROTHERHOOD OF           *
TEAMSTERS,                             *
    Defendants                         *
*****************************************
```

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR A NEW TRIAL

Plaintiff Craig Goulet hereby submits his Memorandum in support of his Motion for a New Trial.

## I.    It Was Error To Direct A Verdict In Favor Of Defendant New Penn Motor Express, Inc.

The Court directed a verdict in favor of defendant New Penn Motor Express, Inc., ("New Penn") at the close of Plaintiff's case. In so doing, the Court reasoned that because New Penn had prevailed at the July, 2004, the Eastern Region Joint Area Committee grievance hearing, as a matter of law, the issue could not be relitigated and New Penn could not therefore be held liable for breach of a labor contract under 29 U.S.C. § 185. However, that is not the law under this statute. Rather, if the grievance resolution in favor of the employer is due to the labor union's violation of its duty of fair representation, then the employee is free in a suit brought under 29 U.S.C. § 185 to pursue the employer for breach of contract despite the grievance resolution.

1

The decision of a joint employer-employee committee or an arbitrator made under a collective labor contract is not final and binding where there was a breach of duty of fair representation by the exclusive bargaining agent.  Stated another way, an employer is not protected from relitigation by the express contractual provision declaring a decision to be final and binding if the union has breached its duty of fair representation.  <u>Hines v. Anchor Motor Freight, Inc.,</u> 424 U.S. 554, 567-568 (1976);  <u>Vaca v. Sipes</u>, 386 U.S. 171, 185-186 (1967).

The First Circuit has followed this precedent:

"To have a right to contest the merits of their discharge in court, the Earlys must first show that the union violated its duty of fair representation; otherwise the decision of the joint committee is "final and binding."" <u>Early v. Eastern Transfer</u>, 699 F.2d 552, 555 (1st Cir. 1983)

<u>See also</u> <u>Sear v. Cadillac Automotive Co. of Boston</u>, 654 F.2d 4, 7 (1st Cir. 1981)

Thus, because Goulet had alleged that defendant Teamsters Local 25 had violated its duty of fair representation in the handling of his grievance against New Penn, the employer was not protected from the "relitigation" of the merits of his grievance merely because a joint committee had found in New Penn's favor.

Therefore New Penn was improperly granted a directed verdict.


II.     <u>**The Jury Verdict Was Against The Weight Of The Evidence**</u>

The following evidence was presented at trial, all of which was uncontradicted.


Goulet has been a member of Teamsters Local 25 since 1987.  He worked for Sanborn Motor Express from 1984 up until it was bought out by APA Transport in October, 1986.  He then began working worked at APA ("APA") at its Canton, Massachusetts, terminal. The Local 25 business agent assigned to the APA Canton terminal was Mark Harrington.

2

On March 11, 1987, Goulet was involved in a industrial accident at APA. He was unloading a truck with a forklift, and the truck pulled away from the loading dock. Goulet and the forklift both went off the loading dock.

Due to this injury Goulet received partial disability worker's compensation benefits.

Because of this accident, APA terminated Goulet's employment on March 12, 1987. Within 30 days Local 25 filed a grievance over the termination.

Previous to his grievance being heard, in the early 1990's Goulet sought light duty work from APA. However, APA's response was that he was discharged.

Goulet applied for Social Security Disability benefits in 1992. He was denied benefits. In 1995 Goulet began to receive Social Security Disability benefits. The impairments which Goulet had that the Social Security Administration deemed to be severe were: dysthymia [depression], personality disorder, low back pain, status post rotator cuff tear, right knee pain, and alcohol dependence. (Ex. 13)

Goulet's depression, personality disorder and alcohol dependence are a function and result of Goulet having been fired and not been able to work since then.

In 2001 Goulet had exhausted all of his partial disability worker's compensation benefits. Therefore Goulet now wanted his termination grievance against APA to be heard and pushed Mark Harrington to process his grievance.

Goulet's grievance case could not be heard until October 16, 2001. This delay was due to the fact that up until that time Goulet was still on worker's compensation. The grievance committee's rules of procedure provide that the committee will not hear a case as long as it was pending in another venue, such as worker's compensation.

3

Goulet's termination grievance against APA was eventually heard by the Southern New England Joint Area Committee.

The October 16, 2001, decision in relevant part reads as follows:

"The Panel after hearing the case, motion made, seconded and carried that upon submitting acceptable documentation to the Company of his ability to return to unrestricted duties, the grievant shall serve a ten (10) day suspension. Upon completion of the suspension he shall be reinstated to the seniority list in his original position." (Ex. 14: APA Decision)

As a result of this grievance, APA reinstated Goulet's seniority in November, 2001, without requiring Goulet to submit any documentation as to his ability to return to unrestricted duties and without requiring him to serve a ten day suspension. (Ex. 10, Attachment 2)

Both business agents William Carnes and Mark Harrington told Goulet that he had been placed back on APA's seniority list. Harrington stated in deposition that Local 25's office received this Canton seniority list with Goulet's name it from APA in approximately November, 2001. According to Harrington, the APA seniority list, dated November, 2001, which had Goulet' name on it, was in the same format that APA normally sent directly to Local 25.

Goulet himself saw the APA seniority list, dated November, 2001, for the terminal in Canton, Massachusetts, with his name on it.

In any case, it is undisputed that it was the responsibility of APA (not the Union) for creating the seniority lists.

On Valentine's Day, 2002, Paul Dubiel, the APA terminal manager for the Canton terminal, told the APA employees that APA was going out of business.

On February 13, 2002, the Teamsters negotiated an Agreement with defendant New Penn Motor Express whereby each APA employee had the right to place his name on a call list for New Penn. (Ex. 2) This Agreement in section 8(b) states that:

"Thereafter each APA NMFA employee, whether active or inactive, employed in the same local supplemental area where NPME has existing direct terminal operations, shall have the right to place his/her name on the call list of only ONE NPME terminal (or the classification seniority list, where applicable) within the same local supplement where they currently are employed."

Doug Francey worked in Canton, Massachusetts, until APA closed in February, 2002. He was the steward at the APA facility from February, 2001, until February, 2002. When APA announced its closing, Harrington told Francey that New Penn was offering work to APA employees on a seniority basis. There were two New Penn terminals that the APA employees had choice of – Billerica, Massachusetts, or Providence, Rhode Island. One of Francey's duties as the steward was to ask all APA employees at Canton where they wanted to go, which he did.

Francey spoke directly with Goulet, who gave Francey his pick of New Penn terminals. Francey wrote Goulet's name on the bottom of this document and listed where Goulet wanted to go and his phone number. Goulet selected the Billerica terminal.

After Francey got everyone's preference, he gave a copy of this preference list – with Goulet's name and his preference for the Billerica terminal listed on it – directly to Harrington. (Ex. 19)

On February 22, 2002, Local 25 President Cashman brought several documents to his Executive Assistant Janet McLaughlin and told her to fax them to Irene at the Teamsters' International Office in Washington. Cashman told her to write on the cover sheet: "Per request of the Eastern Region Freight Department, attached please find seniority list (preference list) with the most up-to-date information that we have at the present time. Any questions please call." (Ex. 3)

These preference lists which McLaughlin faxed to the Teamster's International Office do not list Goulet.

On February 28, 2002, Cashman wrote directly to Dan Schmidt, the Vice President of Labor Relations for New Penn. He enclosed an "updated list of former employees of A.P.A. in Canton, Massachusetts." He noted that the area code number had changed for one employee and that another employee had changed his preference of terminals. Once again, Cashman left Goulet's name off of this list. (Ex. 14)

In March, 2002, Goulet made a follow up phone call to Harrington about the call list and what was going on with the APA people and the New Penn agreement. Harrington told Goulet that he no longer handled the men at APA, and that Goulet would have to speak with business agent Carnes. William Carnes was another business agent for Local 25. Carnes had responsibility for New Penn Motor Express from 1982 until 2003.

Goulet then contacted Carnes in the spring of 2002 about being on the New Penn call list. Carnes said that he was going to look into it.

Carnes also testified that sometime shortly after the agreement was made with New Penn, Goulet called him saying that he wished to be on a call list for New Penn, that he wanted to be put back to work at New Penn and that he wanted Carnes to help him. As a result Carnes called New Penn. Carnes then telephoned the manager at the Billerica New Penn terminal and told him: "I have an APA employee who's looking to go back to work." Carnes identified Goulet by name. The New Penn terminal manager responded with an expletive, to the effect that New Penn would not call Goulet.

Paul Dubiel has been the terminal manager for New Penn at its Billerica, Massachusetts, terminal since March, 2002. Prior to that Dubiel had been the terminal manager for APA, first in Dracut, Massachusetts, as of November, 2001, then in Canton, Massachusetts, until APA went out

6

of business in February, 2002.

Carnes then spoke to Mark Harrington at the union hall about Goulet. Carnes told Harrington: "I got a call from one of your members, and you need to deal with this." Harrington told Carnes that he would take care of it.

Between March 1, 2002 and March 30, 2003, Goulet had multiple discussions with Carnes about Goulet not being called by New Penn. Carnes never told Goulet that New Penn from the very beginning told Carnes that it would not call Goulet.

Meanwhile New Penn had developed a call list of former APA employees for workers at the Billerica terminal. (Ex. 4) New Penn ended up using all the names on this call list. Nine people on this call list became permanent employees of New Penn, including the last man on the list. Goulet's name does not appear on this call list. And Goulet had enough seniority to be called to work.

In answer to Interrogatory Nos. 7 and 23, New Penn admitted that it had received the APA Canton Seniority List for November, 2001 (which list contained Goulet's name on it) prior to March 1, 2002, at its corporate office from APA. (Ex. 5)

Around March 31, 2003, Goulet called Carnes again when the agreement with New Penn expired. Goulet told Carnes that he still had not been called to work by New Penn. Carnes told him to send a grievance in. Goulet then sent a grievance to Carnes dated April 7, 2003. On April 18, 2003, Cashman also forwarded a copy of Goulet's grievance to Charles Zaccaria, New Penn's Vice President in Billerica, Massachusetts. (Exs. 6, 7)

Carnes knew that under the labor contract a grievance has to be docketed with the appropriate committee within 30 days after the grievance was received by the union. However,

Carnes never docketed Goulet's grievance with any grievance committee. (Ex. 12, p. 33) Furthermore, Carnes admitted in deposition that New Penn and Local 25 had <u>not</u> agreed to any extension of the time lines within which actions had to be taken with regard to Goulet's grievance. Previously, that had been done only by "mutual agreement."

On May 2, 2003, Carnes left office. According to Carnes, no one from Local 25 came to him in the days and weeks before May 2, 2003, to ask for any of his grievance files.

Sometime after Carnes left office, Goulet spoke to Harrington and asked about the status of his grievance. Harrington said he was not aware of a grievance. Harrington asked Goulet to send him a copy of the grievance.

Harrington knew that Goulet had sufficient seniority to be called for work by New Penn. Harrington knew that people who had less seniority than Goulet had been called to work by New Penn.

Harrington in deposition admitted that he knew that APA had put Goulet back on the seniority list without requiring him to serve a suspension or to supply medical documentation. Harrington further admitted that Local 25 does not have the right to take someone off the APA seniority list. And Harrington admitted that he knew that if APA did not insist on a suspension or medical documentation, Local 25 could not insist that Goulet serve a suspension or supply medical documentation. In fact, Harrington conceded that no one within Local 25 ever objected to the fact that APA had put Goulet back on its November, 2001, Canton seniority list.

In any case, Goulet forwarded to Harrington copies of his grievance after Harrington said he was unaware of Goulet's grievance.

In July, 2003, Goulet had a follow up telephone conversation with Harrington and sent him

another letter about his grievance.  Harrington had not docketed Goulet's grievance with the appropriate committee.

Goulet called Harrington again in August, 2003, to find out the status of his grievance. Harrington <u>still</u> had not docketed the grievance with the appropriate committee.

Harrington did not file Goulet's grievance with the Southern Joint Area Committee until <u>September 3, 2003</u>.  Harrington waited many months to file Goulet's grievance even though he well knew that there was a time limit in the collective bargaining agreement requiring the docketing of grievances within 30 days from the filing of the grievance.  (Ex. 9)

It is uncontested that was Local 25's responsibility to timely docket the grievance before the committee to have it heard.

Goulet met with Harrington at the union hall to discuss the preparation of the case against New Penn with the grievance committee.  Harrington told Goulet: "You know, if you push this grievance against New Penn, you will probably never work in the freight industry again."

On July 22, 2004, Harrington submitted his written argument to grievance committee in support of Goulet's grievance.  In there he noted that:

A.      Goulet was placed back on the APA seniority list as of November, 2001;

B.      However, on the call list Goulet's name was omitted;

C.      Goulet notified the steward Doug Francey of his desire to go to the Billerica, MA terminal;

D.      Goulet had sufficient seniority to be called to work; and

E.      Since Goulet was never contacted by New Penn, it failed to abide by its agreement with the Teamsters. (Ex. 10)

At the grievance hearing held on July 28, 2004, Daniel Schmidt on behalf of New Penn argued that Goulet's April, 2003, grievance had not been docketed by Local 25 until September 3, 2003, while the labor agreement required that grievances must be docketed in thirty days. (Ex. 20)

On July 28, 2004, the Eastern Region Joint Area Committee denied Goulet's grievance against New Penn on the basis that: "The Panel, in executive session, motion made, seconded and carried, the initial docketing of the case was not within thirty (30) days; therefore, the Company's point of order is upheld." (Ex. 11)

As noted above, part of Goulet's continuing eligibility for Social Security disability benefits is the fact that he suffers from depression, personality disorder and alcohol dependence due to Goulet having been fired and not been able to obtain work since then.    Furthermore, under Social Security Administration guidelines, he could have tried to return to work had he been given the opportunity. If New Penn called and offered him a job, Social Security would have allowed him to try and return to work.

In the instant case, the jury's verdict was so clearly against the weight of the evidence so as to constitute a manifest miscarriage of justice. See Wagenmann v. Adams, 829 F.2d 196, 201 (1st Cir. 1987).

Under Federal labor law, a union has a statutory duty to fairly represent all it members, both in its collective bargaining with the employer and in its enforcement of the resulting collective bargaining agreement.   Federal labor law a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory manner.  A union's duty of fair representation to its members is a broad one; it has a duty to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

Thus a union may not, for example, arbitrarily ignore a meritorious grievance or process it in perfunctory fashion.

A labor organization will be liable for violation of its duty of fair representation if it significantly harms its members through actions that are arbitrary, reckless, or in bad faith. "Reckless disregard" of an employee's interests is actionable breach of duty of fair representation.

Union members are entitled to a bargaining agent in possession of all relevant facts and arguments; and to real, as opposed to perfunctory, efforts to protect their welfare.

A union violates its duty of fair representation, for example, if took virtually no action with respect to a grievance of a plaintiff.

A union violates is duty of fair representation, for example, if its fails to investigate and process a plaintiff's grievance

Also, a plaintiff can establish a breach of the duty of fair representation if it is shown that the handling of his grievances was materially deficient

Furthermore, the duty of fair representation mandates that a union conduct at least a minimal investigation into an employee's grievance.

Vaca v. Sipes, 386 U.S. 171, 177, 191 (1967);  Emmanual v. International Brotherhood of Teamsters, Local Union No. 25, 426 F.3d 416, 420 (1st Cir. 2005); Achilli v. John J. Nissen Baking Co., 989 F.2d 561, 563 (1st Cir. 1993);  Linnae v. GE, 948  F.2d 69, 74 (1st Cir. 1991);  Velez v. Puerto Rico Marine Management, Inc., 957 F.2d 933, 940 (1st Cir. 1992); Berrigan v. Greyhound Lines, Inc., 782 F.2d 295, 298 (1st Cir. 1986); Early v. Eastern Transfer, 699 F.2d 552, 556 (1st Cir. 1983); Soto Segarra v. Sea-Land Service, Inc., 581 F.2d 291 (1st Cir. 1978); De Arroyo v. Sindicato De Trabajadores Packinghouse, AFL-CIO, 425 F.2d 281 (1st Cir. 1970), cert. denied, 400 U.S. 877

(1970).

In the instant case the overwhelming evidence is that defendant Teamsters Local 25 violated its duty of fair representation to Goulet.  Twice it did not submit his name on the preference list to New Penn despite having been given by Francey his preference.  Carnes for over a year failed to inform Goulet that New Penn would not put him on its call list despite Carnes' verbal request.  And defendant Teamsters Local 25 lost Goulet's grievance at the committee level because it docketed his grievance too late – despite being fully aware of the contractual requirements to docket grievances within 30 days of receipt.

There is in fact no evidence to the contrary that defendant Teamsters Local 25 did not violate its duty of fair representation to Goulet.  Therefore the verdict was against the weight of the evidence, and the verdict should be overturned.


III.    **The Jury Charge Contained Plain Error**.

After New Penn was dismissed from the case, the parties rested, and the jury was charged.  The charge indicated that in order for the jury to return a verdict in favor of Goulet, it had to find four elements, the first of which was that New Penn violated the labor agreement that it had with the Teamsters.

In any standard case involving a claim of a violation of the duty fair representation, this is a totally correct charge for if the employer did not violate the labor agreement, the employee cannot have suffered any damages.

But in the instant case, because of the unique nature of the labor agreement involved, under a certain scenario Teamsters Local 25 could have violated its duty of fair representation and damaged

Goulet without New Penn having violated the labor agreement. Section 8.c. of the agreements provides, in relevant part:

> "Additionally, NPME shall have no obligation to APA NMFA employees until TNFINC provides the APA NMFA terminal selection call lists in accordance with this Agreement." (Ex. 2)

Because New Penn was dismissed from the case, we will never know what argument it would have made to the jury. But it is conceivable that New Penn could have argued that because Teamsters Local 25 never formally forwarded Goulet's name on a terminal selection call list, it had "no obligation" to Goulet. Under that theory, even if Teamsters Local 25 violated its duty of fair representation by not forwarding Goulet's name to New Penn, because of the foregoing language, New Penn would not have violated the labor agreement. Thus, under this scenario, with the peculiar language of this labor agreement, the jury charge was incorrect and plain error.

Admittedly, no objection was made to this charge, for indeed normally this charge would be correct. But based on a close review of the language of the labor agreement, the charge was not correct. This error seriously affected the fairness of the trial and should be the basis for a new trial. See Morris v. Travisono, 528 F.2d 856, 849 (1st Cir. 1976).

## IV.    Conclusion

For each of the foregoing reasons, plaintiff Craig Goulet should be granted a new trial.

13

Craig Goulet

By his attorney

_Scott A. Lathrop_
_____
Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450
(978) 448-8234
BBO No. 287820

Dated: July 3, 2006

Certificate of Service

I, Scott A. Lathrop, hereby certify that I have served the foregoing Memorandum on the defendants by electronic service and mail on their Attorneys of Record

_Scott A. Lathrop_
_____
Scott A. Lathrop

Dated: July 3, 2006

14