UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12577 WGY

```
**************************************
CRAIG GOULET,                        *
     Plaintiff                       *
                                     *
     v.                              *
                                     *
NEW PENN MOTOR EXPRESS, INC., and*
TEAMSTERS LOCAL 25,                  *
INTERNATIONAL BROTHERHOOD OF  *
TEAMSTERS,                           *
     Defendants                      *
**************************************
```

**PLAINTIFF'S REPLY MEMORANDUM TO DEFENDANTS' OPPOSITIONS TO
PLAINTIFF'S MOTION FOR A NEW TRIAL**

Plaintiff Craig Goulet hereby replies to the Oppositions filed by Defendant New Penn

Motor Express and by Defendant Teamsters Local 25 with regard to his Motion for a New Trial.

**I.      New Penn Implicitly Has Admitted That It Was Error To Direct A Verdict In Favor
Of Defendant New Penn**

As plaintiff stated in his original memorandum in support of his Motion for a New Trial,

the Court directed a verdict in favor of defendant New Penn Motor Express, Inc., ("New Penn")

at the close of Plaintiff's case on the premise that because New Penn had prevailed at the July,

2004, the Eastern Region Joint Area Committee grievance hearing, as a matter of law, the issue

could not be relitigated and New Penn could not therefore be held liable for breach of a labor

contract under 29 U.S.C. § 185. However, as pointed out, that is not the law under this statute.

Rather, if the grievance resolution in favor of the employer is due to the labor union's violation

1

of its duty of fair representation, then the employee is free in a suit brought under 29 U.S.C. §

185 to pursue the employer for breach of contract despite the grievance resolution.  Hines v.

Anchor Motor Freight, Inc., 424 U.S. 554, 567-568 (1976);  Vaca v. Sipes, 386 U.S. 171, 185-

186 (1967); Early v. Eastern Transfer, 699 F.2d 552, 555 (1st Cir. 1983); Sear v. Cadillac

Automotive Co. of Boston, 654 F.2d 4, 7 (1st Cir. 1981).

     In its Opposition, New Penn has not challenged the fact that the Court granted it a

directed verdict on the legal theory that because New Penn had prevailed at the Eastern Region

Joint Area Committee grievance hearing, as a matter of law, the issue could not be relitigated.

Neither has New Penn challenged the legal premise that it was not protected from the

"relitigation" of the merits of plaintiff's grievance merely because a joint committee had found

in New Penn's favor.

     Therefore New Penn has implicitly admitted that it was improperly granted a directed

verdict on that basis.


**II.**    **New Penn's New Rationale For Directed Verdict Miscites The Trial Evidence.**

     In order to salvage the directed verdict, New Penn now argues that "there is a total lack

of evidence in support of plaintiff's case." (New Penn Opposition, p. 2)   It apparently believes

that there was a total lack of evidence that it breached the collective bargaining agreement

between it and the Union.

     In making this new argument, New Penn miscites the trial evidence.  It especially errors

in its reading of the collective bargaining agreement negotiated between it and the Union on

February 13, 2002.   That agreement provides in relevant part:

"b.      Thereafter each APA NMFA employee, whether active or inactive, employed in the same local supplemental area where NPME has existing direct terminal operations, shall have the right to place his/her name on the call list of only ONE NPME terminal (or the classification seniority list, where applicable) within the same local supplement where they currently are employed. . . ."

"c.      No APA NMFA employee shall be required to place his/name on any NPME  terminal call list.   NPME shall have no obligation to any APA NMFA employee who chooses to not place his/her name on a NPME terminal call list by March 1, 2002. Additionally, NPME shall have no obligation to APA NMFA employees until TNFINC provides the APA NMFA terminal selection call lists in accordance with this Agreement." (Trial Ex. 2, ¶ 8)

First, New Penn states that: "Under the CBA, the Union was required to provide New

Penn with a terminal call list by March 1, 2002." (New Penn Opposition, p. 3)   But that is not

what the Agreement states.  Rather it states that the employee must make his or her selection by

March 1, 2002:

"NPME shall have no obligation to any APA NMFA employee who chooses to not place his/her name on a NPME terminal call list by March 1, 2002."

It is undisputed that Goulet made his New Penn terminal selection by March 1, 2002.  In

fact, he chose to put his name on a NMPE terminal call list in February, 2002, which is when he

gave his New Penn terminal preference to his Union Steward Doug Francey.

Similarly, contrary to New Penn's argument, the Agreement does not specify when the

Union must supply the terminal call list to New Penn.  Rather the Agreement merely states that

New Penn's obligation does not arise until the Union does supply the terminal selection call list

to New Penn:

"Additionally, NPME shall have no obligation to APA NMFA employees until TNFINC provides the APA NMFA terminal selection call lists in accordance with this Agreement."

Thus, as long as the employee places his name on the NPME call list by March 1, 2002, he has

3

met his obligation, and New Penn's obligation to that employee arises when the Union thereafter supplies the terminal selection call list to New Penn.

With regard to William Carnes' testimony that he verbally notified New Penn of Goulet's terminal selection, New Penn now has two responses, both of which are erroneous. First, it states that "Plaintiff *admitted* at trial that his conversation with Mr. Carnes occurred after the March 1, 2002, deadline." (New Penn Opposition, p. 5) That assertion is itself erroneous in two regards. At trial plaintiff made no such admission. And even if he had, there was no such March 1, 2002, deadline, as demonstrated above. Goulet had already made his New Penn terminal selection in February, 2002.

Second, New Penn also claims that the "unambiguous terms of the CBA require that Local 25 provide New Penn with a *written* list of all employees interested in being called for work." (New Penn Opposition, p. 5, emphasis in original) This is another term incorrectly being read into the Agreement by New Penn that does not appear there. The Agreement requires the Union to provide New Penn with "terminal selection call lists"; it does not require the Union to provide New Penn with "written terminal selection call lists."

Lastly, New Penn argues that "New Penn was authorized to pass over any employee for work where, as here, the particular employee would have been unable to perform all of the requisite job duties." (New Penn Opposition, p. 5) Again, there are two problems with this argument. First, New Penn never produced any evidence that the reason it passed over Goulet was because he (arguably) could not have performed the requisite job duties.[1] In fact, it

---

[1] Even the Agreement did not allow New Penn to permanently pass over employees with physical ailments. The Agreement stated: "NPME shall not be penalized for passing an employee for work opportunity if the employee cannot perform all of the duties required of the job being filled <u>or</u>

presented no evidence whatsoever that it was aware at the time, one way or another, of Goulet's physical capabilities.  The only evidence in the record (which was unrebutted) was that upon being informed of Goulet's terminal preference by Carnes, the New Penn terminal manager for Billerica responded with an expletive to the effect that New Penn would not call Goulet.  Second, this argument also fails because there clearly was a factual dispute whether Goulet was physically able to perform all of the requisite job duties.

Hence, New Penn's new argument that it should have been granted a directed verdict on the new basis that there supposedly was a total lack of evidence that it breached the Agreement is unfounded.

New Penn was therefore improperly granted a directed verdict.


**III.    Teamsters Local 25 Repeatedly Miscites The Trial Evidence.**

In his Memorandum Goulet recited all the unrebutted evidence which would support his assertion that the jury verdict was against the weight of the evidence.   Defendant Teamsters Local 25 has responded to this argument by repeatedly misciting the trial evidence.  The following is a list of most of the miscited evidence in Teamsters Local 25's Opposition:

A.    Teamsters Local 25 claims that APA did not reinstate Goulet's seniority without requiring him to provide medical documentation or to serve a ten day suspension.  (Teamsters Local 25 Opposition, p. 3-4)   However, the following evidence was presented at trial:

---

until APA NMFA employees meet all government employment requirements." (Trial Exhibit 2, ¶ 8e, emphasis added)

5

1.      APA listed Goulet on its seniority list in November, 2001, without Goulet submitting any medical documentation and serving a ten day suspension. (Trial Ex. 10, Attachment 2)

2.      Even according to New Penn, APA – prior to New Penn negotiating to take over APA employees and operations – provided New Penn with the APA Canton seniority list with Goulet's name on it. (Trial Ex. 5; New Penn Opposition, p. 4)

3.      Harrington stated in deposition that Local 25's office received this Canton seniority list with Goulet's name it from APA in approximately November, 2001.   According to Harrington, the APA seniority list, dated November, 2001, which had Goulet' name on it, was in the same format that APA normally sent directly to Local 25.

4.      Harrington in deposition admitted that he knew that APA had put Goulet back on the seniority list without requiring him to serve a suspension or to supply medical documentation.  Harrington further admitted that Local 25 does not have the right to take someone off the APA seniority list.  And Harrington admitted that he knew that if APA did not insist on a suspension or medical documentation, Local 25 could not insist that Goulet serve a suspension or supply medical documentation.  In fact, Harrington conceded that no one within Local 25 ever objected to the fact that APA had put Goulet back on its November, 2001, Canton seniority list.

5.      At the grievance hearing, Harrington represented to the grievance

committee: "I was the Business Agent for APA at the time of the closure,

Mr. Goulet was on the seniority list there." (Trial Ex. 20, p. 4)

6.      Union Steward Doug Francey testified that although Goulet had not

returned to work as of the time of the APA closure, he knew that plaintiff

was on the seniority list; that is why Francy added Goulet's name, phone

number and preference to the document he gave to Harrington. (Trial Ex.

19)

7.      In fact, there is no evidence that APA did <u>not</u> put Goulet back on the

seniority list.


B.    Teamsters Local 25 claims that the Agreement negotiated with New Penn

"enabled <u>employees</u> of APA to submit a preference." (Teamsters Local 25

Opposition, p. 4, emphasis in original)

1.      In fact, under the Agreement "each APA NMFA employee, whether <u>active</u>

<u>or inactive</u>" could submit a preference.  (Trial Ex. 2, ¶ 8(b), emphasis

added)  Under any construct, this included Goulet.


C.    Teamsters Local 25 claims that although there was evidence presented that Local

25 made limited corrections to preference lists which were later sent to the

International Brotherhood of Teamsters and New Penn, "there was no evidence

presented as to how or by whom these list were created."  (Teamsters Local 25

Opposition, p. 5)

1.      This simply is not what was testified to at trial to the contrary. Francey

testified at trial that he created a call list as he was instructed to do by

Harrington, who was the business agent for APA, that he added Goulet's

name to that list and that he gave that list to at Harrington.

2.      Janet McGlaughlin testified that these two lists that were later sent to the

International and to New Penn were given to her by George Cashman,

President of Teamsters Local 25. This is verified by the fax cover sheet.

(Trial Ex. 3)

3.      Cashman mailed the second list directly to New Penn. (Trial Ex. 14)

D.      Teamsters Local 25 claims that the evidence failed to show that "Plaintiff was

eligible to have been placed on any New Penn Call list." (Teamsters Local 25

Opposition, p. 5, emphasis in original)

1.      Again, even if Goulet was not an active employee, under the Agreement

negotiated with New Penn, "each APA NMFA employee, whether active

or inactive" could submit a preference. (Trial Ex. 2, ¶ 8(b), emphasis

added)

2.      And, as noted above, APA had indisputably put Goulet back on its

seniority list and had shared that seniority list with both New Penn and

Teamsters Local 25.

8

E.    Teamsters Local 25 claims that there is no evidence that "the exclusion of the Plaintiff's name from the preference lists was anything more than a simple, good faith error by the Union." (Teamsters Local 25 Opposition, p. 5)

    1.    However, this ignores all the other undisputed evidence that:

        a.    Carnes hid from Goulet for over one year the fact that New Penn was not going to call Goulet to work;

        b.    Carnes did not timely docket Goulet's grievance;

        c.    Harrington did not timely docket Goulet's grievance; and

        d.    When Goulet met with Harrington to discuss the preparation of the case against New Penn with the grievance committee, Harrington told Goulet: "You know, if you push this grievance against New Penn, you will probably never work in the freight industry again."

    2.    All of this puts a full flavor on the Union's actions as being in reckless disregard of Goulet's rights.

F.    Teamsters Local 25 claims that Goulet's deposition testimony about his conversations with Carnes varied from his trial testimony. (Teamsters Local 25 Opposition, p. 5)

    1.    However, during Goulet's trial testimony his deposition was never read to the jury in any part whatsoever.  There was no variance therefore.

G.    Teamsters Local 25 claims that "Plaintiff admitted, at trial, that he was made

9

aware by Mr. Carnes by June 2002 that New Penn would not call him and this his name did not appear on the call list." (Teamsters Local 25 Opposition, p. 5-6)

1.    There simply was no such testimony.

H.    Teamsters Local 25 claims there was no evidence that "Plaintiff had a <u>meritorious</u> grievance." (Teamsters Local 25 Opposition, p. 6, emphasis in original)

1.    Teamsters Local 25 ignores the fact that when it finally docketed the case and filed a brief with the grievance committee, it argued that the grievance was meritorious.

2.    On July 22, 2004, Harrington submitted his written argument to grievance committee in support of Goulet's grievance.  In there Harrington noted that:

a.    Goulet was placed back on the APA seniority list as of November, 2001;

b.    However, on the call list Goulet's name was omitted;

c.    Goulet notified the steward Doug Francey of his desire to go to the Billerica, MA terminal;

d.    Goulet had sufficient seniority to be called to work; and

e.    Since Goulet was never contacted by New Penn, it failed to abide by its agreement with the Teamsters. (Trial Ex. 10)

3.    Teamsters Local 25 ignores the fact that Goulet testified that he would do everything to be able to go back to work.

10

4.      Teamsters Local 25 ignores the fact that as a matter of law, Goulet was allowed by Social Security to attempt to go back to work for up to nine months before putting his Social Security benefits at risk.

I.      Teamster Local 25 claims that there "was no competent evidence presented as to the cause of Plaintiff's depression and personality disorder." (Teamsters Local 25 Opposition, p. 7)

1.      However, it ignores that the only evidence on the topic was Goulet's testimony (supported by Social Security records) that he was not deemed disabled until 1995, by which time his impairments included depression and a personalty disorder after he had been out of work for eight years. (Trial Ex. 13)

2.      Teamsters Local 25 ignores the fact that it did not object to the above testimony by Goulet and that there was no other evidence on the topic. Belatedly it is calling this undisputed evidence not competent.

J.      Teamsters Local 25 claims that with regard to its admittedly late docketing of Goulet's grievance, "there was no evidence to suggest that such an extension required a formal 'mutual agreement' in each instance." (Teamsters Local 25 Opposition, p. 7)

1.      Here Teamsters Local 25 miscites the evidence in several ways.

a.      First, Carnes testified that he knew that under the labor contract a

11

grievance has to be docketed with the appropriate committee within 30 days after the grievance was received by the union. (Trial Ex. 12)

b.    Furthermore, Carnes admitted in deposition – which was read to the jury – that New Penn and Local 25 had <u>not</u> agreed to any extension of the time lines within which actions had to be taken with regard to Goulet's grievance.  Previously, that had been done only by "mutual agreement," which was the precise term used by Carnes in his deposition and read to the jury.

c.    There was no evidence of any "mutual agreement" – formal or informal – which would have excused Teamsters Local 25 from timely docketing Goulet's grievance.

d.    And it was because of this "reckless" conduct that Goulet's grievance was denied. (Trial Ex. 11)


K.    Finally, Teamsters Local 25 claims that Goulet "admitted on cross-examination that he already knew, in July 2003, that it [his grievance] had not yet been docketed." (Teamsters Local 25 Opposition, p. 8)

1.    This is a meaningless observation for the following reasons:

a.    It is undisputed that it was the Union's obligation to docket the grievance; and

b.    There is no evidence that Goulet knew at that time that the Union

12

had an obligation to docket his grievance within thirty days.  The

only evidence is that Goulet was present at the grievance hearing

in July, 2004, when the ruling was made that his grievance was

being denied because Teamsters Local 25 had not docketed the

grievance within 30 days of receiving it. (Trial Ex. 20)

Because virtually all of the evidence which Teamsters Local 25 cites in its Opposition is

miscited, the argument that the jury's verdict was against the clear weight of the evidence

becomes even stronger.

In the instant case the overwhelming evidence is that defendant Teamsters Local 25

violated its duty of fair representation to Goulet by its repeated "reckless disregard" of his

interests.   Twice it did not submit his name on the preference lists to New Penn despite having

been given by Francey his preference.  Carnes for over a year failed to inform Goulet that New

Penn would not put him on its call list despite Carnes' verbal request.  And  defendant Teamsters

Local 25 lost Goulet's grievance at the committee level because it docketed his grievance too

late – despite being fully aware of the contractual requirements to docket grievances within 30

days of receipt.

**IV.    The Jury Charge Contained Plain Error**.

In his Memorandum in Support of his Motion for a New Trial, Goulet argued that in the

instant case, because of the unique nature of the labor agreement involved, under a certain

scenario Teamsters Local 25 could have violated its duty of fair representation and damaged

13

Goulet without New Penn having violated the labor agreement.  Section 8.c. of the agreements

provides, in relevant part:

> "Additionally, NPME shall have no obligation to APA NMFA employees until TNFINC
> provides the APA  NMFA terminal selection call lists in accordance with this
> Agreement." (Trial Ex. 2, ¶ 8(c))

Now that New Penn has filed its Opposition, we can see that that is precisely one of New

Penn's arguments.  On page 4 of its Opposition, it states: "there is absolutely no evidence in the

record that New Penn breached the CBA.  It is undisputed that Plaintiff's name was not included

on the call list that Local 25 twice provided to New Penn by the March 1, 2002, deadline."

Thus, even New Penn is arguing that because Teamsters Local 25 never formally

forwarded Goulet's name on a terminal selection call list, it had "no obligation" to Goulet.

Under New Penn's stated theory, even if Teamsters Local 25 violated its duty of fair

representation by not forwarding Goulet's name to New Penn in reckless disregard of his rights,

because of the foregoing language, New Penn would not have violated the labor agreement.

Thus, under this scenario, with the peculiar language of this labor agreement, the jury charge was

incorrect and plain error.   Under New Penn's own argument, Teamsters Local 25 could have

violated its duty of fair representation to Goulet by not properly forwarding his terminal

preference to it, and because of that failure, New Penn would not have been in breach of the

Agreement.

That plain error was prejudicial to plaintiff.

Lastly, New Penn argues that under established labor law, both a breach of the collective

bargaining agreement and a breach of the duty of fair representation must be found or the cause

of action is doomed. (New Penn Opposition, p. 3)  But that is not so.  From the earliest U.S.

14

Supreme Court precedent it has been held that if a union – standing alone – fails to represent it members in the bargaining unit fairly, impartially, and in good faith, it violates the duty of fair representation even without there being any violation of the collective bargaining agreement. See, e.g., Steele v. Louisville & Nashville Railroad Co., et al ., 323 U.S. 192, 203 (1944).  That is true also here.   And indeed, that was one of the jury instructions given (to which Teamsters Local 25 did not object.)   The Court listed for the jury various actions that could be considered violations of the duty of fair representation.  One that it listed was the failure of the Teamsters Local 25 to put Goulet's name on the preference list.  As argued and pointed out (even by New Penn), that potential violation of the duty of fair representation – as listed to the jury – does not require a concurrent violation of the Agreement by New Penn.

Hence, a violation of the Agreement by New Penn was not essential in all instances, and the jury instruction to that effect was plain error.

## V.    Conclusion

For each of the foregoing reasons, plaintiff Craig Goulet should be granted a new trial.

Craig Goulet
By his attorney

*Scott A. Lathrop*
_____
Scott A. Lathrop, Esq.
Scott A. Lathrop & Associates
122 Old Ayer Road
Groton, MA 01450
(978) 448-8234
BBO No. 287820

Dated: July 26, 2006

Certificate of Service

I, Scott A. Lathrop, hereby certify that I have served the foregoing Memorandum on the defendants by electronic service and mail on their Attorneys of Record

*Scott A. Lathrop*
_____
Scott A. Lathrop

Dated: July 26, 2006

16