# United States Court of Appeals
## For the First Circuit

No. 06-2487

CRAIG GOULET,

Plaintiff, Appellant,

v.

NEW PENN MOTOR EXPRESS, INC., and TEAMSTERS LOCAL 25,
AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS.

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young,   U.S. District Judge]

Before

Boudin, Chief Judge,
Campbell, Senior Circuit Judge,
and Howard, Circuit Judge.

Scott A. Lathrop with whom Scott A. Lathrop & Associates was
on brief for appellant.

Renee J. Bushey with whom Michael A. Feinberg and Feinberg,
Campbell & Zack were on brief for appellee Teamsters Local Union
25.

Carl H. Gluek with whom Jennifer L. Whitney, and Frantz Ward,
were on brief for appellee New Penn Motor Express, Inc.

January 8, 2008

**CAMPBELL**, **Senior Circuit Judge**.   Appellant-plaintiff

Craig Goulet appeals from the entry of a directed verdict in favor

of defendant New Penn Motor Express ("New Penn") and from a jury

verdict in favor of defendant Teamsters Local 25 ("Local 25" or

"the union") in the United States District Court for the District

of Massachusetts on his hybrid claim for breach of a labor

agreement by New Penn and breach of the duty of fair representation

by the union, in violation of 29 U.S.C. § 185.   We affirm the

judgments in favor of the defendants.

## Facts

APA Transport Company ("APA") was a trucking corporation

with several terminals, including two located in Canton and Dracut,

Massachusetts.   In 1986, APA hired Goulet at its Canton terminal.

On March 11, 1987, Goulet was seriously injured.   The truck he was

loading with a forklift moved away from the loading dock, pulling

Goulet and the forklift off the dock.   As a result of the accident,

Goulet suffered a torn rotator cuff, a herniated disc in his neck,

a herniated disc in his lower back, and a torn knee ligament.   Upon

investigation, APA determined that the accident was caused by

Goulet's own negligence.   APA then terminated Goulet's employment.

Local 25 represented the drivers and dockworkers at APA's

Canton terminal and at the time of his injury, Goulet was a member

of Local 25.   Pursuant to the collective bargaining agreement

between Local 25 and APA, Goulet filed a grievance relative to his

termination.    In accordance with the rules of the grievance committee, no action was taken on the grievance during the time that Goulet pursued and received workers' compensation benefits. From 1987-2000, Goulet collected the maximum of 600 weeks of partial disability workers' compensation benefits.   Goulet also applied for and was granted social security disability benefits starting in 1995 and retroactive to 1987.   Goulet receives a monthly social security disability benefit of $2,160.

After the exhaustion of his workers' compensation benefits, and more than thirteen years after his termination from APA, Goulet pursued his grievance against APA.  On October 16, 2001, the New England Joint Area Grievance Committee ("NEJAGC") issued, in relevant part, the following order:

> The panel after hearing the case, motion made, seconded and carried that upon submitting acceptable documentation to the Company of his ability to return to unrestricted duties, the grievant [Goulet] shall serve a ten (10) day suspension.  Upon completion of the suspension he shall be reinstated in the seniority list in his original position.

Goulet did not thereafter submit to APA documentation of his ability to return to unrestricted duties nor has he served any period of suspension.   His name, however, appeared on an APA seniority list dated November 2001. On the basis of that exhibit, Goulet argues that APA reinstated him as of that date and did so without requiring him to submit any documentation of ability to return or to serve a 10-day suspension.

-3-

New Penn is a trucking corporation with a terminal located in Billerica, Massachusetts. Local 25 represents the New Penn drivers and dockworkers at its Billerica terminal. In February 2002, APA ceased operations, and New Penn sought to acquire APA's customers. In order to serve them, New Penn believed it might need more drivers and dockworkers. New Penn, therefore, negotiated a collective bargaining agreement ("CBA") with the Teamsters National Freight Industry Negotiating Committee ("TNFINC") regarding the potential hiring of APA employees.

Under that agreement, in order for APA employees to receive work opportunities from New Penn, Local 25 was required to provide New Penn with a list identifying by name all of the APA employees who wanted to be placed on New Penn's call list, along with their terminal preferences. The CBA provided that New Penn was not obligated to place any APA employee on the terminal call list or to provide any APA employee with work unless he placed his name on the seniority call list by March 1, 2002. The CBA states, in pertinent part:

> No APA NMFA [National Master Freight Agreement] employee shall be required to place his/her name on any NPME [New Penn Motor Express] terminal call list. NPME shall have no obligation to any APA NMFA employee who chooses not to place his/her name on a NPME terminal call list by March 1, 2002. Additionally, NPME shall have no obligation to APA NMFA employees until TNFINC provides the APA NMFA terminal selection call lists in accordance with this agreement. (Emphasis supplied.)

When he found out that APA was closing, Goulet called Doug Francey, the steward for Local 25 in the APA Canton facility. Francey had been instructed to find out where each employee wanted to go if called to work for New Penn. The choices were Cranston, Rhode Island, or Billerica, Massachusetts. Goulet told Francey he would prefer to work for New Penn at the Billerica terminal. Goulet's name did not appear on the official APA seniority list given to Francey. Francey wrote Goulet's name in ink at the bottom of the call list he was preparing, despite Goulet's not having provided any documentation to APA concerning his ability to return to work. After filling out employees' preferences of terminal, Francey gave the list to Mark Harrington, the Local 25 Business Agent, who had represented Goulet in his October 16, 2001 grievance.

On February 22, 2002, Local 25 President George Cashman brought several documents to his assistant, Janet McLaughlin, and told her to fax them to the Teamsters' International Office in Washington. Cashman told her to write on the cover sheets, "Per request of the Eastern Region Freight Department, attached please find seniority list (preference list) with the most up-to-date information that we have at the present time. Any questions please call." The preference lists faxed to the Teamsters' International Office did not include Goulet's name or his preference for the New Penn terminal in Billerica. On February 28, 2002, Cashman wrote directly to Dan Schmidt, the Vice President of Labor Relations for

-5-

New Penn. He enclosed an "updated list of former employees of A.P.A. in Canton, Massachusetts," noting that the area code of one employee's phone number had changed and that another employee had shifted his terminal preference. Goulet's name and terminal preference were not on this list either.

In March, 2002, Goulet called William Carnes, the Local 25 Business Agent for New Penn, to ask about the call list. Carnes testified that he called the Billerica terminal on behalf of Goulet, and that the terminal manager responded with an expletive suggesting a negative reaction. Goulet testified that Carnes also told him that New Penn had indicated that Goulet was not on the call list the union had provided. The call lists provided to New Penn did not include Goulet's name.

Goulet was never called to work by New Penn. Goulet prepared a hand-written grievance on April 7, 2003, alleging that he should have been called to work. Carnes left the union office on May 2, 2003. Harrington was assigned to be the new Local 25 business agent for New Penn. Goulet called Harrington's office on approximately May 3, 2003 to inquire about the grievance. Harrington said he was not aware of the grievance and that Goulet should send him a copy. During this conversation, Harrington questioned Goulet about his medical fitness to return to work. Harrington knew Goulet had not complied with the decision of the

-6-

grievance panel and that employees had to be medically cleared to work in the freight industry.

Goulet sent Harrington a letter on July 25, 2003, enclosing a copy of the grievance he had sent to Carnes. Following up on their earlier conversation, Goulet wrote in the letter, "Let's not lose sight of the real issue here in this grievance. It's about seniority rights under the agreement, not weather [sic] one was capable of working or not." Goulet subsequently called Harrington's office again. Harrington stated that he had received a copy of the grievance and was looking into it. Goulet was aware that the grievance had not yet been docketed. The grievance was docketed with the Eastern Region Joint Area Committee ("Joint Area Committee") in September of 2003.

Harrington had meetings with Goulet in order to prepare for the arbitration of the call list grievance. During these meetings, Goulet expressed ambivalence about whether he wanted to go back to work, and was not sure if he was physically able to

work.[1]  Nonetheless, Harrington prepared a written brief and filed

_____

[1]Goulet testified at trial that he continues to struggle with physical injuries, including the herniated discs in his back and neck and torn ligaments in his knee.  He testified that his injuries have negatively affected his ability to sit, stand, lift, turn and bend.  Goulet further testified that his social security benefits were based on a finding by the Social Security Administration that he was disabled and unable to perform his past relevant work.  According to an exhibit introduced at trial and Goulet's own testimony, he represented to the Social Security Administration in December 2002 that "My condition has not improved since I first became disabled.  In fact my condition has become worse since I was first disabled in 1987."  Goulet admitted that between the time of his injury in 1987 and the March 1, 2002 decision to register terminal preferences with New Penn, he did not work for any employer.  In his reply brief, Goulet responds that the defendants' emphasis on his inability to work ignores the fact that the Social Security Administration allows trial periods during which disabled people may return to work without losing disability status.  Goulet requested that such reference be made in the jury instructions, and the trial court said the following to the jury:

   the Social Security Administration, not surprisingly, encourages people to go back to work and says the following:

      The trial work period is a period during which you may test your ability to work and still be considered disabled.  It begins and ends, as described in other regulations.  During this period you may perform services in as many as nine months but these months do not have to be consecutive.  We will not consider those services as showing that your disability has ended until you have performed these services in at least nine months.  However, after the trial period has ended, we will consider the work you did during the trial work period in determining whether your disability ended at any time after the trial work period.

   That's what the Social Security Administration has to say.

   Implicit in that regulation is some notification of the Social Security Administration, that the person is, you

-8-

it on behalf of Goulet in July, 2004.

The Joint Area Committee heard the grievance on July 26, 2004. A representative from New Penn brought a point of order before the Committee that the grievance was improper as Local 25 had not docketed the case within thirty days. The Joint Area Committee denied Goulet's grievance because the case had not been docketed within thirty days.

On or about December 9, 2004, Goulet filed this action under 29 U.S.C. § 185 against New Penn and Local 25 in the district court. In his complaint, inter alia, he alleged:

19. When New Penn failed to put Goulet on its call list, it breached the collective bargaining agreement then in effect between New Penn and Local 25.

20. Local 25's failure to timely file and pursue Goulet's grievance against New Penn was arbitrary, capricious, and in bad faith. As such, Local 25 breached its duty of fair representation with regard to Goulet and his grievance.

21. Due to said breach by Local 25, Goulet hereby also brings this action against New Penn directly for its breach of the collective bargaining agreement with regard to its failure to put him on the call list.

22. New Penn's failure to put Goulet on its call list has caused Goulet to suffer damages.

_____

know, going back for a trial period.

There was no evidence that Goulet notified the Social Security Administration that he was going to return to work for a trial period and no evidence that he would have been able to do so.

Goulet, among other things, demanded proper placement on New Penn's call list, all lost moneys and benefits, and compensatory and punitive damages. (He did not ask, specifically, for reinstatement.)

Following the completion of discovery, both defendants filed motions for summary judgment, which the district court denied. The case was reassigned to a different judge on June 12, 2006. A three-day trial was then held. At the close of Goulet's case, upon motion from both defendants, the court granted New Penn's motion for a directed verdict but denied the union's similar motion. In directing the verdict in favor of New Penn, the court reasoned that because New Penn had prevailed at the grievance hearing, as a matter of law, the issue of its alleged breach of a labor contract could not be relitigated, and New Penn could therefore not be held liable for a breach of a labor contract under 29 U.S.C. § 185.[2]

---

[2]The court's ruling was as follows:

The motion of New Penn Motor Express Incorporated is allowed on the following theory. It's allowed because the whole theory of labor disputes in these circumstances, the resolution of labor disputes, is to encourage, at least that's the congressional intent, that there be resolution by private ordering.

Here, I adopt one aspect of New Penn's argument, the aspect that the procedural ground on which the resolution was resolved, the dispute was resolved, was accurate under the contract, it wasn't docketed timely, and that was the ground that the arbitrators chose and that ground is correct. [New Penn counsel], as he's proper to argue

After New Penn was dismissed from the case, Local 25 rested. The court then conferred extensively regarding the nature and scope of the proposed jury instructions. During the course of those discussions, Goulet never voiced an objection to the court's intended charge. Goulet never requested the court provide the jury with a special verdict form. When the jury was brought in to hear its instructions and closing arguments, the court noted that the jury could see that counsel for New Penn "are no longer here" and that the case had been made simpler and more understandable for the jury. The court then instructed the jury that in the instant hybrid § 301 claim, Goulet had to prove both that 1) New Penn had breached the CBA in connection with its alleged failure to call Goulet for work; and 2) the Local 25 breached its duty of fair representation.[3]

_____

it, says, well, there was no violation anyway. I express no opinion on that one way or another, a jury's going to have to sort that out.

[3]Specifically, the court stated:

Mr. Goulet has to prove four things. Four things. And I'm going to go over them in detail. . . .

Now, it appears that it is not disputed in this case that at the time that's most important in this case, New Penn and Teamsters Local 25 had a labor agreement. I believe it's in evidence before you. All right? A labor agreement.

So, the first thing that Mr. Goulet has to prove is that New Penn violated that labor agreement. And, what Mr. Goulet, through his attorney, is going to argue to you is that they did violate it because they did not, as they

At the conclusion of its instructions, the court gave counsel a chance to correct or expand upon the charge, stating:

Now, I may have been mistaken in something I said. I may not have said something I should have said, and the lawyers get a chance to explain that to me now.

Goulet's counsel specifically stated that he was satisfied with the court's instructions:

---

were required to, call him for duty from the seniority call list of drivers who wanted to work at a particular terminal which wanted to work for New Penn after APA, after their business ceased.

Now, as to that was there a breach of contract between New Penn and Teamsters Local 25, that's disputed. Because there's a question, a factual question whether New Penn ever got a seniority list with his name on it. And, one of the things he's complaining about is that the reason, if they didn't get one, Mr. Goulet says, well, the reason for that is that they, that the union didn't send it over. And they should have. But that's a factual dispute.

All right. So the first thing is did New Penn violate the, actually violate the labor agreement between it and the labor union.

Second, Mr. Goulet has to prove that the labor union, Teamsters Local 25, failed in its duty of fair representation of Mr. Goulet; that they failed in that duty of fair representation.

Now, here I'm not sure I explained this completely accurately when we went in, so let me be very careful.

It's not enough that Mr. Goulet prove that the union slipped a stitch or was negligent or careless. That's not enough. What Mr. Goulet has to prove--it's by the same fair preponderance of the evidence--is that the union acted arbitrarily, or acted in bad faith, or acted in reckless disregard of its duties under, its duties as a labor union under the labor union agreement.

The Court:  Satisfied, Mr. Lathrop?

Mr. Lathrop: I'm satisfied.

Counsel for Local 25, however, indicated dissatisfaction with the charge, insofar as the court had not instructed the jury on mitigation of damages. The court thereupon instructed the jury on mitigation. Goulet's counsel asked for a sidebar and sought a supplemental instruction on mitigation. After giving the requested supplemental instruction, the district court again asked counsel for approval:

> The Court:    Is  the  supplementary  instruction satisfactory, Mr. Lathrop?
>
> Mr. Lathrop: Yes, it is, your Honor.
>
> Mr. Dwyer: It is, your Honor.
>
> The Court: Thank you.

Counsel for Goulet never objected to the court's instruction on his hybrid § 301 claim and in fact affirmatively endorsed the jury charge when asked about it.

The jury received its instructions on July 21, 2006. That same afternoon, the jury asked the following question:

> Condition number one: Did NPMA [sic] violate the labor agreement between union and NPMA [sic]?
>
> Question: With NPMA [sic] no longer a defendant in this case should it matter if they did or didn't break the agreement?  This would not prove if the union acted in bad faith, it would only give an example of how NPMA [sic] acted.

The court responded:

-13-

To that question I make this answer. That's the formal way of doing it.

That's a very good question. But it has a direct answer. And the direct answer is this.

The duty of fair representation comes into play only when the employer has broken the contract. Let me give an example in the labor context and it has nothing to do with this case, but I think it's a good example.

I understand that in order to come out of bankruptcy the pilots in Delta had to give up some of their salary, whatever salary they were making. Those pilots--I'm making this up, but I think it to be true--those pilots had a union contract with Delta. All right. They renegotiate that contract in essence because the bankruptcy court tells them they have to, and so now they're getting a lesser salary than they got before.

Now, one can imagine that those pilots aren't very happy about that. But there's no duty of fair representation to go to bat for any particular pilot because that pilot is bellyaching about getting less pay. That's the contract. And the union is supposed to try and negotiate the best contract it can negotiate. So once the contract's negotiated the fact that this or that person doesn't like the way it works, thinks that their interests aren't adequately represented, there's no lawsuit. No lawsuit because that's worked out by the democracy within the union, the majority, how they elect the people who are going to negotiate the contracts.

So let's come to this case. The, the manner in which Mr. Goulet says that--you call it NMPA, and that threw me, it's New Penn Motor Express, but I assume we're talking about the employer in this case, and that's how I'm answering it.

The manner in which New Penn Motor Express is supposed to have violated the contract, says Mr. Goulet, is that they didn't call him from that call seniority list in the way they were supposed to under the contract. That's what he says is wrong.

Now, there are factual issues about that. Factual issues about whether they ever had a list or should have had a list or where he was on the list. And I can't say

-14-

anything about that. But that's why that's the first issue: Did New Penn Motor Express break the contract? Until they've broken the contract, the union has no specific duty of fair representation with respect to Mr. Goulet. Once they have the union does, and I've explained all those matters.

That's my answer to the question. The jury may retire and continue their deliberations.

At this point, counsel for Goulet asked for a sidebar, at which he expressed concern that the jury might not understand the reason why New Penn had been let out of the case, and particularly that they were not let out of the case because they had been found not to have broken the contract. After discussion with the lawyers, the court said the following:

Once again, the lawyers have improved upon what I told you, in this respect.

They both agree that I ought to tell you this. The fact that New Penn Motor Express is not here this morning is not evidence in any way that they didn't break the contract, that they did break the contract, or anything about the contract.

Likewise, I should instruct you, you are not to speculate why they're not here, and I do so instruct you. That's my further answer to the question. You may retire and continue your deliberations.

After further deliberations, the jury returned that same afternoon with a unanimous verdict in favor of Local 25. Goulet did not then raise any objections to the verdict and did not ask the court to poll the jury. Judgment was entered that day.

On July 2, 2006, Goulet filed a motion for a new trial, which the court denied after a hearing. Among other issues, Goulet

-15-

strongly argued that it was error for the court to have directed a verdict for New Penn, in response to which the court stated that "it may be that I erred in letting the employer out when I did." Even so, the court concluded that any possible error was harmless as it "did not affect the substantial rights of Mr. Goulet."

## Discussion

i. Directed Verdict

Goulet contends the district court erred in directing a verdict for New Penn, thereby denying Goulet a "substantial right"- - his right to a jury trial against New Penn. See Chauffeurs, Teamsters and Helpers Local No. 391 v. Terry, 494 U.S. 558, 573 (1990) (providing for a jury trial in fair representation actions). The court stated that it allowed the motion because Goulet's grievance had been resolved against Goulet by the Joint Area Committee. However, as the court acknowledged, the panel ruled in favor of New Penn on the procedural ground that Local 25 had not docketed Goulet's grievance within the thirty days provided by the CBA. Goulet contends that in neglecting to file his grievance on time, the union violated its duty of fair representation, and that, given those grounds, the adverse ruling on the grievance could not be final and binding so as to prevent him proceeding against the employer in this hybrid action. See Early v. Eastern Transfer, 699 F.2d 552, 555 (1st Cir. 1981) (quoting Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567-568 (1976)).

Assuming that Goulet's above argument is correct and, arguendo, that the directed verdict cannot otherwise be sustained,[4] we hold nevertheless that any error in directing a verdict was harmless. While as a result, New Penn ceased to be a party, the jury trial went forward against Local 25, involving the same issues and evidence as would have been presented had New Penn not been let out. The jury returned a verdict for the union. Goulet does not argue that New Penn's dismissal after Goulet's case had been put in affected the evidence he was able or allowed to present to the jury. Under the circumstances, we do not believe that New Penn's absence prejudiced Goulet's substantial rights. A wrongly directed verdict in favor of one party is harmless where the jury's ultimate verdict necessarily defeats the claim against the dismissed party. See Mello v. K-Mart Corp., 792 F.2d 1228, 1231 (1st Cir. 1986) (finding error in directing verdict for manufacturer was harmless where jury necessarily had to conclude in reaching its verdict that there was no defect in manufacture).

In claiming prejudice, Goulet says the jury's question showed that it was bothered by the fact that, although New Penn had been dismissed from the case, the jury was still expected to decide

---

[4]New Penn responds that even if the court's asserted basis for directing a verdict was wrong, we should affirm its ruling on the alternative ground that the CBA provided that New Penn had no obligation to Goulet since the union had given New Penn a call list that did not contain Goulet's name, leaving New Penn with no duty under the CBA to hire Goulet.

-17-

whether New Penn had violated the contract. Goulet contends that the jury's swift arrival at a verdict following the court's answer to the question demonstrates that the jurors were "substantially swayed" by New Penn's absence from the case, but we see nothing from which to draw this conclusion.

When the jury asked the court whether, with New Penn no longer a defendant, it still mattered whether it violated the CBA, the court told them unequivocally it did. The court emphasized that the first question was still whether New Penn had breached the CBA and advised the jury that the fact that "New Penn Motor Express is not here this morning is not evidence in any way that they didn't break the contract, that they did break the contract, or anything about the contract." By maintaining in its answer to the jury's question the first element of the inquiry earlier outlined in its jury charge--namely, whether New Penn had violated the CBA-- the court made clear that the jury was not to construe the absence of New Penn as evidence that New Penn had been found not to have violated the CBA. Rather, the court reiterated that the jury was to decide that issue for itself.[5]

We assume, therefore, that in arriving at its general verdict for Local 25, the jury considered and resolved the questions put to it. To be sure, given the general verdict, we

---

[5]The court added, "Likewise, I should instruct you, you are not to speculate why they're not here, and I do so instruct you."

-18-

cannot know whether the jury found that New Penn had violated the contract but the union had nonetheless properly represented Goulet, or rather found that New Penn had not violated the contract, making it irrelevant whether the union had properly represented Goulet. See Laurin v. The Providence Hosp., 150 F.3d 52, 61 (1st Cir. 1998) (failure to establish either prong is fatal to a hybrid claim); Mello, 792 F.2d at 1231. But either finding is fatal to Goulet's claim against New Penn--either because the jury found no breach of the CBA by New Penn, or because it found no breach of the union's duty of fair representation, which would render the joint committee's decision in favor of New Penn final. See Early, 699 F.2d at 555 ("To have a right to contest the merits of their discharge in court, the [plaintiffs] must first show that the union violated its duty of fair representation; otherwise the decision of the joint committee is 'final and binding.'"). We find no reason to believe that New Penn's "early release from the case" affected the jury's analysis or its ultimate result, rendering any error in the directed verdict harmless. Mello, 792 F.2d at 1231.[6]

ii.   The Jury Charge

Conceding that he did not make a timely objection to the instructions, Goulet argues on appeal that the jury charge

---

[6]Goulet argues that Mello is distinguishable on the grounds that in that case, the jury had a special verdict form, whereas there was only a general verdict form in this case. But the jury was amply instructed that if it failed to find liability on one prong of the hybrid claim, there was no liability for either party.

contained plain error.  The charge stated that in order for the
jury to return a verdict in favor of Goulet, it had to find four
elements, the first of which was that New Penn violated the CBA it
had with the union.  Goulet concedes that

> [i]n any standard case involving a claim of a violation
> of the duty fair representation [sic], this often is a
> correct charge for if the employer did not violate the
> labor agreement, the employee typically cannot have
> suffered any damages even if the union acted recklessly
> with regard to its member's grievance.

But he argues that his case is different "because of the unique
nature of the labor agreement," and that there was a potential
circumstance in which Local 25 could have violated its duty of fair
representation and damaged Goulet without New Penn's having
violated the labor agreement.

        The main problem with this contention is that, besides
failing to object to the instruction, Goulet appears affirmatively
to have waived any objection.  If so, he may not raise the point
now.   In response to a question from the district court about
whether he was satisfied with the charge the court gave, his
counsel affirmatively stated, "I'm satisfied."  The court later
asked  whether  its  supplementary  instruction  on  mitigation,
requested by Goulet, was satisfactory, and Goulet's counsel replied
once more that that instruction was.  Goulet said nothing about
wanting a further charge along the lines he now requests.   The
argument is therefore waived. See United States v. Wall, 349 F.3d
18, 24 (1st Cir. 2003) ("Having directly bypassed an offered

-20-

opportunity to challenge and perhaps modify the instructions,
appellant waived any right to object to them on appeal."); United
States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002)
(distinguishing waiver and forfeiture).

        iii. Weight of the Evidence for Jury Verdict

        Appealing from the district court's denial of his motion
for a new trial, Goulet argues that the jury's verdict in favor of
Local 25 was against the weight of the evidence. A district court
should grant a motion for a new trial only if "the outcome is
against the clear weight of the evidence such that upholding the
verdict will result in a miscarriage of justice." Ramos v. Davis
& Geck, Inc., 167 F.3d 727, 731 (1st Cir. 1999) (internal quotation
marks omitted). We review the district court's denial of a motion
for new trial for abuse of discretion only. Johnson v. Spencer
Press of Maine, Inc., 364 F.3d 368, 375 (1st Cir. 2004). We may
weigh the evidence but are mindful that "a jury's verdict on the
facts should only be overturned in the most compelling
circumstances." Velazquez v. Figueroa-Gomez, 996 F.2d 235, 237
(1st Cir. 1993) (citations omitted). "We will uphold the jury's
verdict unless the evidence points 'to one conclusion and one
conclusion only: that the losing party was entitled to win.'"
Sheek v. Asia Badger, Inc., 235 F.3d 687 (1st Cir. 2000) (citations
omitted).

Goulet argues that the evidence overwhelmingly supports a finding against Local 25. We disagree. Goulet focuses his assessment on the question of whether Local 25 violated its duty of fair representation, even though, as noted, in order to find Local 25 liable, the jury had to find <u>both</u> that New Penn had breached the CBA <u>and</u> that Local 25 had violated the duty of fair representation.[7] The evidence on both points was sufficient to support jury findings adverse to Goulet.

A union's duty of fair representation requires it not to "engage in arbitrary or bad faith conduct that evidences hostility, discrimination, or dishonesty toward an employee-union member." <u>Fant</u> v. <u>New England Power Service Co.</u>, 239 F.3d 8, 14 (1st Cir. 2001). "Reckless disregard" of an employee's interests is an actionable breach of duty of fair representation. <u>Achilli</u> v. <u>John J. Nissen Baking Co.</u>, 989 F.2d 561, 563 (1st Cir. 1993). A union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion. <u>Vaca</u> v. <u>Sipes</u>, 386 U.S. 171, 191 (1967). Goulet argues that Local 25's failure to submit his name and terminal preference list to New Penn[8] and failure to docket his

---

[7]As discussed <u>supra</u>, Goulet argues that this was a unique case in which he had only to prove the violation of the duty of fair representation in order for the jury to find Local 25 liable.

[8]Goulet's argument is somewhat unclear on this point; at other points in his briefs, he argues that New Penn was aware of his terminal preference, even though his name was not included on the call lists submitted to New Penn. Goulet's record citations on this point, however, do not demonstrate that at the relevant time,

-22-

grievance in a timely manner constituted a clear breach of its duty.[9] A rational jury, however, could believe otherwise.

First, there is no evidence that Goulet ever satisfied the conditions ordered by the NEJAGC on October 16, 2001 for him to achieve reinstatement on the APA seniority list. He never submitted documentation showing that he was fit to return to unrestricted duties and never served the required ten-day suspension. The only evidence of Goulet's alleged restored seniority was the November 2001 APA seniority list that contained his name. No evidence was ever submitted shedding light on whether this was simply a clerical mistake or whether, as Goulet argued, it reflected an intentional action taken by APA in order to restore Goulet to its employ; it seems doubtful that an employer would, on its own, reinstate a disabled employee that it had discharged after it found him negligent, without evidence that he was fit to perform productive work, especially given that it was required to restore him to the list only upon such a showing. Evidence counter to his having been reinstated existed in the subsequent official seniority list given to Francey, which did not contain Goulet's name. The jury was aware of the requirements for reinstatement set out by the

_____

New Penn was aware of his terminal preference or desire to be on the call list.

[9]Goulet's complaint did not allege that Local 25's breach of its duty stemmed from its failure to put him on the New Penn call list but rather only from its failure to docket the grievance in a timely manner.

NEJAGC's resolution of Goulet's grievance. Further, evidence at trial strongly suggested that Goulet remained severely disabled, and the jury was free to draw further inferences from this as to the likelihood of his having been reinstated. It would have been reasonable for the jury to conclude that Goulet had never satisfied the conditions of the award provisionally allowing his reinstatement, that he was not physically capable of work during the period the call list was in effect, and that the unexplained appearance of his name on the November 2001 list was an aberration rather than reflective of his actual reinstatement. The question of Goulet's ability to work affected whether his grievance was meritorious.

In any event, to find in favor of Goulet the jury would have had to find that New Penn had violated the CBA, and the evidence presented at trial does not require such a conclusion. New Penn did not receive a call list with Goulet's name on it.[10] Thus, the plain language of the CBA supports the conclusion that New Penn was not obligated to offer Goulet work after APA closed. Accordingly, we find little to persuade us that the weight of the evidence was other than as determined by the jury.

---

[10]Goulet's argument, raised for the first time in his reply brief, that the plain language of the CBA did not require that New Penn receive a physical list is both untimely and unpersuasive. See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000) ("We have held, with a regularity bordering on the monotonous, that issues advanced for the first time in an appellant's reply brief are deemed waived").

-24-

We **affirm** the judgment of the district court.